# EXHIBIT 13

# Dust-Free Bedrooms in the Treatment of Asthmatic Children with House Dust or House Dust Mite Allergy: A Controlled Trial

Andrew B. Murray, MB, FRCP (C), and
Alexander C. Ferguson, MD, FRCP (C)

From the Division of Allergy, Department of Pediatrics, University of British Columbia,
Vancouver, British Columbia, Canada

ABSTRACT. Twenty asthmatic children with prick tests positive for house dust or house dust mites were allocated to two groups that were matched for severity. One group was provided with zippered vinyl covers for pillows, mattresses, and box springs, and instructions for making the bedroom as easy to keep clean as a hospital ward; the other group was not. At the end of a 1-month study period, there was a marked and statistically significant difference in symptoms and signs of asthma between the two groups. Those with a dust-free bedroom had fewer days on which wheezing was observed, medication was given, or an abnormally low peak expiratory flow rate was recorded. Bronchial tolerance to aerosolized histamine significantly improved in the group whose bedrooms had been modified. A dust-free bedroom diminishes bronchial irritability and is a practical and effective method for decreasing asthma in children with house dust or house dust mite allergy. *Pediatrics* 1983;71:418–422; *asthma, dust, allergy, bronchial reactivity.*

Pediatric allergists have for many years advised that asthmatics with sensitivity to house dust have their bedroom modified in such a way as to reduce exposure to dust.[1] Following reports that both house dust and house dust mites are capable of inducing asthma in patients who are allergic to these substances,[2] and the finding by Sarsfield and colleagues[3] that dust avoidance measures in the bedroom resulted in reduced mite numbers and improvement of asthmatic symptoms in mite-sensitive children, the value of such measures became generally accepted. It seems a logical procedure as children spend approximately 12 of every 24 hours

Received for publication Feb 24, 1982; accepted June 24, 1982.
Reprint requests to (A.B.M.) Division of Allergy, Children's Hospital, 4480 Oak St, Vancouver, British Columbia, Canada V6H 3V4.
PEDIATRICS (ISSN 0031-4005). Copyright © 1983 by the American Academy of Pediatrics.

in the bedroom where house dust is plentiful and where mite numbers are greatest.[4,5] However, subsequent controlled studies by Burr and colleagues[6,7] showed little or no improvement either in asthma symptoms or in peak expiratory flow rates (PEFR) from dust avoidance measures. As the study by Sarsfield et al[3] had neither a control group nor objective indication of improvement, the value of attempting to free the bedroom of dust has been called into question.

It is important to know whether dust avoidance measures help children with house dust or mite-induced asthma as it is a common medical problem,[8] and hyposensitization therapy remains controversial.[9] We therefore undertook a controlled trial of the effect of modifying the bedroom to make it as easy to keep clean as a hospital ward, where little dust and no mites are found.[10,11]

## POPULATION AND METHOD

Patients were admitted to the study between October and January so that pollens, which might induce asthma, would not be airborne during the trial. All children aged 6 years or older who had been referred to the allergy clinic because of asthma were studied. None had ever received hyposensitization therapy. The accompanying parent was asked standardized questions, and skin prick tests were performed on the subject using the following extracts: 1% *Dermatophagoides farinae* (Bencard), concentrated house dust (Bencard), dander appropriate for animals in the patient's house (2% acetone precipitated extract, Hollister-Stier), 2% pollen, and 5% mold spores that are locally airborne (Greer). A resulting wheal that had a diameter 2 mm greater than that of the control was taken as positive.

Those with a test positive either to house dust or *D farinae* entered the study, if the parents were

DMC 000852

FM Validity Ex. 13

agreeable, and were placed either in the dust-free bedroom group or unchanged bedroom (control) group. In order to minimize a possible placebo effect, the parents were told that there are two equally regarded methods of treating asthmatics, to give optimal medications only, or to make certain changes in the house in addition to giving such medications.

A histamine bronchial challenge test was performed using the protocol of Cockroft and colleagues[15] with minor modifications.[16] After the base line forced expiratory volume in 1 second ($FEV_1$) had been recorded, the patient held a loosely fitting plastic mask to his face for two minutes, inhaling an aerosol generated by air flowing at 8 L/min through a Wright nebulizer. The volume of solution aerosolized was 0.2 mL/min. $FEV_1$ was recorded 30 and 90 seconds after each of these inhalation sessions. The patient first inhaled a control solution of phosphate buffer and, after that, increasing concentrations of histamine acid phosphate. Inhalations were stopped when the $FEV_1$ fell 20% below control value or when the top concentration of 8 mg/mL was reached.

The parents were contacted prior to the appointment to ensure that the patient had not recently had a respiratory infection and that no medication that would alter the sensitivity of the bronchi to aerosolized histamine would be given.

The 20 subjects in the study were asked to record, in a special diary, the number of hours of wheezing that had occurred and doses of bronchodilator medication that had been given each day. Ten of the dust-free bedroom group and nine of the control group were given freshly standardized Wright miniature peak flow meters[17] and were asked to record the best of three peak expiratory flow rate (PEFR) measurements every morning before breakfast and every evening after dinner. An abnormally low PEFR was defined as one that was lower than that recorded during the initial examination, when the child was free of symptoms, and was also less than 80% of predicted mean.[18] All were requested to keep animals out of the child's bedroom and, when there was a prick test that was positive to the animal in question, to keep the animal out of the house altogether. Salbutamol inhalations were prescribed for wheezing attacks, as required, and theophylline was given when continued medication was needed for days or weeks. The optimal dose of theophylline was determined by serum levels. Prednisone was reserved for severe attacks. The patient (control group) was maintained on the disodium cromoglycate regimen he had been receiving prior to the study.

Patients were allocated to dust-free bedroom and control groups alternately, as far as possible, to ensure that seasonal factors would be the same for both groups.[19] However, an attempt was also made to keep both groups comparable as regards reactivity of their bronchi to histamine and the size of their prick test reaction to house dust and mites, as the amount of allergen needed to induce an asthmatic attack appears to depend largely on these two variables (Table).[20, 21]

Those who were to have a dust-free bedroom received zippered vinyl covers to enclose all pillows, mattresses, and box springs, and were given the following instructions for preparing the bedroom: launder the curtains; wash blankets and mattress pads every 2 weeks; clean drawers and closets with a damp cloth, and use them only for storing laundered clothes; remove other clothes, toys, models, books, upholstered furniture, and carpets from the room; clean the floor with a damp or oiled mop every day; and seal any hot air duct, heating the room with an electric radiator if necessary. Implementation of these measures was delayed for 24 hours to that base line PEFRs could be obtained morning and evening.

A health nurse visited the home of each child in the study, after 2 weeks had elapsed, to ensure that directions were being followed. As the method we were using had been proved effective in reducing mite numbers[3] we did not collect dust samples for mite counts. We had previously found that some

TABLE.   Initial Comparability of Two Groups*

|  | Group with Dust-Free Bedroom | Control Group |
|---|---|---|
| Mean age (yr) | 8.6 | 9.7 |
| Sex (M/F) | 6/4 | 8/2 |
| Mean diameter of largest wheal from mite or house dust (mm) | 6.5 | 5.8 |
| No. with tests positive for molds | 2 | 3 |
| No. with tests positive for pollens | 8 | 7 |
| No. with tests positive for dog or cat | 3 | 4 |
| No. with dog or cat in house | 4 | 3 |
| Mean log histamine concentration resulting in 20% fall in $FEV_1$ (mg/mL) | −0.91 | −0.63 |
| Mean no. of days of wheezing in previous month | 5.6 | 3.5 |
| Mean no. of days on which medication was given in previous month | 4.9 | 2.6 |
| Mean PEFR predicted on first evening (L/min) | 105.9 | 108.1 |
| Mean PEFR predicted on first morning (L/min) | 102.5 | 108.9 |

* Abbreviations used are: $FEV_1$, forced expiratory volume in 1 second; PEFR, peak expiratory flow rate. No differences between groups were statistically significant.

DMC 000853

parents resent this procedure, as an implied slur on their cleanliness, and we wished to enlist a sample of dust- and mite-sensitive asthmatics as representative as possible.

Each subject returned in 6 weeks for repeat histamine bronchial challenge testing, except those who had a "cold" during the last 2 weeks of the study period; the repeat histamine test was delayed until they had been free of respiratory infection for 2 weeks. The laboratory technician who performed the test was unaware of the group to which the patient belonged. The data from the diary that were analyzed were those that had been recorded during the 4 weeks following the health nurse's visit to the house.

Differences between the dust-free bedroom group and control group were compared using the $\chi^2$ test or Student's $t$ test as appropriate.

## RESULTS

The two groups were comparable for all indicators of severity of asthma, severity of allergy to house dust and mites, and presence of allergy to other airborne allergens. However, the group that was to have the dust-free bedroom reported having had slightly more wheezing and medication in the



PC20 Histamine
  o Initial
  • End of trial

Fig 2. Concentration of aerosolized histamine required to reduce the 1-second forced expiratory volume (FEV₁) by 20% (PC₂₀ histamine) at start and end of trial period.



Fig 1. Percentage of days (± SE) on which wheezing was noticed, medication was given, and abnormally low peak expiratory flow rate (PEFR) was recorded during 4-week study period.

month prior to the study, and the mean PEFR on the first morning and evening were slightly lower in the dust-free bedroom group than in the control group (Table). None of the patients had wheezing or tightness of the chest at the initial examination. All of the subjects completed the trial. Six patients in the dust-free bedroom group and four in the control group reported having a "cold" during the 4-week trial period.

There was a marked difference between the two groups in subjective as well as in objective evidence of asthma frequency and severity during the trial. In those with a dust-free bedroom, the percentage of days on which wheezing had been recorded was 2% compared with 27% for those in the control group ($P = .003$), whereas medications had been given on 2% compared with 30% ($P = .032$), and PEFR was abnormally low on 1% compared with 28% of days ($P = .035$), respectively (Fig 1). Those with dust-free rooms reported a total of ten hours of wheezing and five doses of salbutamol whereas the control subjects reported a total of 339 hours of wheezing ($P = .011$) and 224 doses of medication, including salbutamol, theophylline, and prednisone ($P = .032$).

The tolerance of the bronchi to inhaled histamine aerosol also changed. On average, it increased four-

DMC 000854

fold in those whose bedroom had been made dust-free and decreased twofold in control subjects ($P = .007$), indicating diminished irritability of the airways in those with a dust-free bedroom during the trial period (Fig 2).

We were able to enlist a representative sample of asthmatic children who were sensitive to house dust or mites. Of the 23 consecutive potential subjects seen during the course of the study, 20 took part in, and completed the trial.

## DISCUSSION

House dust- and mite-sensitive asthmatics had improvement in their condition when their bedrooms were modified so that they were as easy to keep clean as acute-care hospital rooms. Although those patients who were to have a dust-free bedroom had been at least as severely affected as those in the control group during the month prior to the study, in the trial period itself those in the dust-free bedrooms had markedly fewer days of wheezing, fewer days on which medication was given, and fewer days on which the PEFR was abnormal.

Also, those whose bedrooms had been modified were able to tolerate more aerosolized histamine. Their average tolerance increased fourfold. As inhaling specific allergen increases[15, 22] and freedom from allergen decreases[23, 24] reactivity of the bronchi to histamine, the improved tolerance in the group with dust-free bedrooms is evidence of diminished exposure to allergen during the study period. Decreased irritability of the bronchi, in turn, is desirable as the readiness with which asthma occurs depends not only on allergen load and on allergic reactivity of the bronchi but also on the nonallergic reactivity of the bronchi.[21] In the control subjects, by contrast, there was a twofold decrease in average tolerance to histamine. It is likely that this decrease resulted from the increased exposure to house dust and mites that occurs when a child spends a greater proportion of the day indoors during the winter months.[17] The majority of subjects (75%) started the trial in October when the weather was still mild, and they had their second histamine bronchial challenge test after the onset of cold, wet weather in November.

It is unlikely that a placebo effect influenced objective measurements of asthma, although it is possible that reporting of wheezing and administration of medication were affected. A placebo effect is difficult or impossible to eliminate in a study such as this in which the cooperation of patient and parents is necessary for keeping the bedroom clean. Burr and colleagues' attempted to overcome the difficulty by setting an equal task for the control group: they were instructed to carefully vacuum-clean furniture and carpets in the living room. Their study was criticized by Sarsfield[25] who pointed out that mite infestation in upholstered furniture is considerable[14] and that exposure of the control group to mites had been diminished by the "placebo" maneuver. We attempted to minimize a possible placebo effect by telling the parents, before entering the trial, that the child would be given one of two treatments, both of which are used extensively by leading allergists and that the purpose of the study was to find which was more effective. It appears that we were successful in preventing bias in their reporting as shown by the approximately equal percentage of days on which subjective and objective evidence of asthma was recorded. Wheezing, asthma medication, and an abnormally low PEFR were each recorded on 1% to 2% of days by the group with the dust-free bedroom and on 27% to 30% of days by the control group. In addition, it is unlikely that suggestibility of parents or children could influence the response to histamine aerosol. The subjects were unaware of the concentration being inhaled and the technician who administered the test did not know either the previous threshold concentration of histamine or whether the subject was a study patient or control subject.

We suspect that inadequate reduction in house dust exposure was the reason for lack of improvement in asthmatic subjects studied by Burr and colleagues. Blankets were cleaned by hanging them on a clothes line and beating them,[1] and pillows,[1,9] mattresses,[1] and carpets,[1,9] were vacuum cleaned. There was little effect on numbers of house dust mites.[1] Arlian et al[14] also found that even repeated vacuum cleaning is ineffective for removing mites from carpets, where they are present in abundance. Sarsfield and colleagues,[3] by contrast, achieved highly significant reduction in mite density by recommending removal of carpets, enclosing the top and sides of the mattress with a vinyl cover, and washing blankets frequently. The bedroom environmental changes were the same in our study, with two additional measures to make the room comparable to a hospital ward, where no mites are found[12-14]: (1) our patients used zippered vinyl covers to encase completely the mattress and box spring so that dust would not puff out from the bottom surfaces, and (2) the pillows were also enclosed in vinyl covers.

The finding that appropriate environmental measures in the bedroom will decrease asthma in children who are sensitive to house dust and house dust mites has important implications for management. Whether or not hyposensitization therapy for house dust and mite-induced asthma is beneficial is still uncertain[11] and treatment with medications carries the risks of toxicity and undesirable side effects.

ARTICLES   421

DMC 000855

Ridding the bedroom of dust seems to be a preferable method as it is a simple procedure that disrupts the child's life little and is usually effective in decreasing asthma.

## ACKNOWLEDGMENTS

This study was supported by a grant from The British Columbia Lung Association.

We thank Felisa Tan for statistical help and Ronnie Sinto for computer programming.

## REFERENCES

1. Deamer WC: Allergy in childhood. Adv Pediatr 1952;11:147
2. Stenius B, Wide L: Reagenic antibody (IgE), skin and provocation tests to Dermatophagoides culinae and house dust in respiratory allergy. Lancet 1969;2:455
3. Sarsfield JK, Gowland G, Toy R, et al: Mite-sensitive asthma in childhood: Trial of avoidance measures. Arch Dis Child 1974;49:716
4. Sesay HR, Dobson RM: Studies on the mite fauna of house dust in Scotland with special reference to that of bedding. Acarologia 1972;14:384
5. Van Bronswijk JEMH: Dermatophagoides pteronyssinus in mattress and floor dust in a temperate climate. J Med Entomol 1973;10:63
6. Lang JD, Mulla MS: Spatial distribution and abundance of house dust mites, Dermatophagoides spp. in homes in Southern California. Environ Entomol 1978;7:121
7. Burr ML, St Leger AS, Neale E: Anti-mite measures in mite-sensitive adult asthma: A controlled trial. Lancet 1976;1:333
8. Burr ML, Dean BV, Merrett TG, et al: Effects of anti-mite measures on children with mite-sensitive asthma: A controlled trial. Thorax 1980;35:506
9. Burr ML, Neale E, Dean BV, et al: Effect of a change to mite-free bedding on children with mite-sensitive asthma: A controlled trial. Thorax 1980;35:513
10. Warner JO: Mites and asthma in children. Br J Dis Chest 1978;72:79
11. Hyposensitization to house dust mites, editorial. Br Med J 1980;1:589
12. Cunnington AM, Gregory PH: Mites in bedroom air. Nature 1968;217:1271
13. Turos M: Mites in house dust in the Stockholm area. Allergy 1979;34:11
14. Sarsfield JK: Role of house dust mites in childhood asthma. Arch Dis Child 1974;49:711
15. Cockcroft DW, Ruffin RE, Dolovich J, et al: Allergen-induced increase in non-allergic bronchial reactivity. Clin Allergy 1977;7:503
16. Murray AB, Ferguson AC, Morrison B: Airway responsiveness to histamine as a test for overall severity of asthma in children. J Allergy Clin Immunol 1981;68:119
17. Wright BM: A miniature Wright peak-flow meter. Br Med J 1978;2:1627
18. Murray AB, Cook CD: Measurement of peak expiratory flow rates in 220 normal children from 4.5 to 18.5 years of age. J Pediatr 1963;62:186
19. Murray AB, Ferguson AC, Morrison B: The seasonal variation of allergic respiratory symptoms induced by house dust mites. Ann Allergy 1980;45:347
20. Killian D, Cockcroft DW, Hargreave FE, et al: Factors in allergen-induced asthma: Relevance of the intensity of the airways allergic reaction and non-specific bronchial reactivity. Clin Allergy 1976;6:219
21. Cockcroft DW, Ruffin RE, Frith PA, et al: Determinants of allergen-induced asthma: Dose of allergen, circulating IgE antibody concentration, and bronchial responsiveness to inhaled histamine. Am Rev Respir Dis 1979;120:1053
22. Cartier A, Frith PA, Dolovich MB, et al: Allergen-induced increase in non-allergic airway responsiveness to histamine. J Allergy Clin Immunol 1980;65:207
23. Altounyan REC: Changes in histamine and atropine responsiveness as a guide to diagnosis and evaluation of therapy in obstructive airways disease, in Pepys J, Frankland AW (eds): Disodium Cromoglycate in Allergic Airways Disease. London, Butterworths, 1970, pp 47–53
24. Cartier A, Bandouvakis J, Ryan G, et al: Asthma and increased non-allergic bronchial responsiveness to methacholine during natural exposure to ragweed pollen. Am Rev Respir Dis 1980;121(suppl):83
25. Sarsfield JK: Mite avoidance and asthma. Lancet 1976;1:291
26. Arlian LG, Appleton CL, Bernstein IL, et al: Effect of home environmental factors on the abundance of house dust mites. J Allergy Clin Immunol 1981;5:211

DMC 000856

Copyright 1992 Information Access Company, a Thomson Corporation Company
ASAP
Copyright 1992 American Academy of Family Physicians
American Family Physician

May, 1992

SECTION: Vol. 45 ; No. 5 ; Pg. 2105; ISSN: 0002-838X

LENGTH: 3756 words

HEADLINE: Outpatient management of asthma in adults; includes patient information handout

BODY:
Rivo, Marc L. ; Malveaux, Floyd J.

MARC L. RIVO, M.D., M.EH., Bureau of Health Professions, Rockville, Maryland FLOYD J. MALVEAUX, M.D., PH.D., Howard University College of Medicine, Washington, D.C.

The diagnosis of asthma is made by demonstrating episodic and reversible airway obstruction. Office spirometry or peak flow meters should be used to objectively measure pulmonary status, since the history and physical examination do not correlate well with asthma severity. Reducing exposure to indoor and outdoor allergens may prevent exacerbations. Asthma medications are prescribed in a step-wise fashion. Inhaled beta.sub.2 agonists should be used by patients with mild asthma during brief and limited symptomatic episodes. Anti-inflammatory agents, such as inhaled corticosteroids or cromolyn, should be added for moderate degrees of asthma. If symptoms persist, a long-ating bronchodilator, such as an oral beta agonist or oral theophylline, may be added in the evening. A short course of oral steroids may also be prescribed as needed. Patients should be taught to correctly use metered-dose inhalers, to keep a daily record with home peak flow measurements that monitor their pulmonary status and to follow a prescribed medication plan for exacerbations.

Despite scientific and therapeutic advances, asthma morbidity and mortality are rising. From 1980 to 1987, the prevalence rate of asthma increased 29 percent, and asthma death rates increased 31 percent. 1 In 1989, the National Heart, Lung, and Blood Institute created the National Asthma Education Program (NAEP) to focus national attention on asthma morbidity, to translate scientific advances into practical clinical guidelines and to facilitate the dissemination of these guidelines to both generalist physicians and subspecialists. In February 1991, the NAEP Expert Panel released a report on the diagnosis and management of asthma. 2 This article summarizes the report's guidelines for the office management of asthma in adults.

Pathophysiology

Asthma is a lung disease characterized by airway obstruction, inflammation and hyperresponsiveness. Airway obstruction is responsible for the common clinical manifestations of asthma, such as wheezing, dyspnea and cough. Bronchial wall edema, mucus production, hypertrophy and smooth muscle contraction all contribute to pulmonary obstruction. Patients with asthma also demonstrate exaggerated bronchoconstrictor response to many different agents. The level of airway hyperresponsiveness usually correlates with the clinical severity of asthma and with medication requirements. 3

The critical role of airway inflammation in both the development of airway obstruction and the degree of hyperresponsiveness has only recently been appreciated. 4 The airways of patients with asthma are infiltrated by a variety of inflammatory cells that contribute to epithelial injury, mucosal edema, abnormalities in neural mechanisms, increases in airway smooth muscle responsiveness and airflow obstruction. Recognition of this important pathophysiologic mechanism has led to a new recommendation to use anti-inflammatory medication early in the course of therapy. 5

Diagnosis

People with asthma are a heterogeneous group, presenting at different ages with a wide variety of signs and symptoms and with varying degrees of respiratory compromise.

DMC 000857

Outpatient management of asthma in adults; includes patient information

### HISTORY

Patients who present with shortness of breath, cough, wheezing or some combination of these symptoms should be asked about the onset, duration and frequency of their symptoms, any precipitating or aggravating factors and their current management plan. Nocturnal cough may be the initial or even the sole presenting symptom of asthma. The patient should be asked to describe the course of a typical exacerbation. It is important to understand the patient's living situation, the impact of the illness on the patient and the family, and the amount of social support available.

A thorough history is necessary to identify allergic components. A checklist for identifying the possible role of allergens is given in Figure 1. Common outdoor triggers include ragweed, grass, mold and pollen (weed, grass, tree). Common indoor allergens include house dust and house dust mites, animal dander, mold and cockroaches. Cold air and tobacco smoke are also major irritants. Foods are not common asthma triggers.

### PHYSICAL EXAMINATION

The physical examination should focus on the upper respiratory tract, the chest and the skin. Patients should be examined for the presence of purulent nasal discharge, nasal polyps and other manifestations of rhinitis or sinusitis. Chest examination should focus on the quality of breath sounds. Although wheezing is the characteristic finding, it is not a reliable indicator of the severity of asthma. 6 Other pulmonary signs of asthma include use of accessory muscles, diminished breath sounds and prolonged expiratory phase. Flexural eczema is an associated finding in some asthma patients.

### OBJECTIVE MEASURES OF LUNG FUNCTION

Objective measures of lung function are essential for diagnosing asthma, for assessing its severity and for evaluating response to therapy. The use of objective measures is particularly important because a patient's history and physical examination often do not correlate well with the severity of airflow obstruction. Spirometry is useful in the initial assessment of patients with suspected asthma and for periodic evaluation. Spirometry allows measurement of small and large airway function and can distinguish between obstructive and restrictive pulmonary disease.

Peak expiratory flow rate (PEFR) measurement obtained with a peak flow meter is an inexpensive and simple means of demonstrating episodic airway obstruction PEFR measurements, when performed with maximal effort, correlate well with the forced expiratory volume in one second ( $FEV_1$ ) obtained with spirometry. 8 A full explanation of spirometry and PEFR measurements is found in the expert panel report. 2

The diagnosis of asthma is made by demonstrating episodic, reversible airway obstruction. Signs and symptoms of episodic shortness of breath, coughing and wheezing in adults are almost always due to asthma. Spirometric or PEFR evidence of airflow obstruction that is reversed through the use of bronchodilators helps confirm the diagnosis. An algorithm for diagnosing asthma is presented in Figure 2.

Before making the diagnosis of asthma, physicians should consider and exclude other causes of airflow obstruction, including airway foreign body, congestive heart failure, pulmonary embolism, pulmonary infection, laryngeal dysfunction, and cough secondary to drugs, such as beta blockers or angiotensin converting enzyme inhibitors. Because distinguishing asthma from bronchitis or pneumonia can be difficult, a trial of therapy to rule out asthma may be warranted.

### Treatment

The goals of therapy are to maintain normal pulmonary function rates and normal activity levels, prevent chronic and troublesome symptoms, minimize exacerbations and avoid adverse effects of asthma medications. Proper management of asthma involves continuous attention to four essential elements: (1) asthma status must be monitored using objective measures, such as PEFR; (2) appropriate pharmacologic therapy is necessary to relieve or prevent symptomatic airway narrowing in mild asthma and to reduce bronchial inflammation in moderate and severe asthma; (3) asthma exacerbations should be reduced by minimizing exposure to allergens and irritants, and (4) physicians must establish a therapeutic relationship with patients and their families that will encourage patients to gain the skill and confidence to take an active role in managing their asthma.

### PEAK FLOW MONITORING

Patients who learn to obtain and record PEFR measurements at home can improve the management of their asthma. Daily PEFR monitoring helps detect early deterioration in airway patency, assess daily fluctuations in airway function

DMC 000858

and provide an objective measure for monitoring therapy. It is important to establish each patient's best PEFR value to monitor pulmonary status. Best PEFR values are identified by taking measurements twice daily over a two-week period while receiving optimal therapy. If the value is less than 80 percent of the predicted norm, continued monitoring on more aggressive therapy, including a course of oral steroids, is recommended.

Physicians should instruct patients to keep a daily log (Figure 3 ). Measurements should be taken in the morning and in the evening. If medications are being taken, PEFR values should be recorded both before and after therapy. Color zones that function like traffic signs may help patients more effectively monitor their lung function and make decisions about therapy according to a written plan agreed on with their physician.

For example, PEFR values in the "green zone" (e.g., 80 to 100 percent of ones personal best) indicate that the patient's pulmonary status is stable and no therapeutic changes are necessary. PEFR values in the "yellow zone" (e. g., 50 to 80 percent of one's best) indicate a deterioration of pulmonary status that requires additional medication taken according to a recommended protocol, or a telephone call or visit to the physician for advice. PEFR values that decline into the "red zone" (e. g., less than 50 percent of one's best) are a medical emergency. Patients should be instructed to use a bronchodilator and immediately contact their physician for evaluation if PEFR values do not rapidly improve. These zones are guidelines only. Specific zones should be tailored to each patient's condition.

## PHARMACOLOGIC THERAPY

Asthma medications reverse airflow obstruction and correct underlying airway inflammation and hyperresponsiveness. Bronchodilators and anti-inflammatory agents are the major classes of asthma medications. Bronchodilators act principally to dilate the airways by relaxing bronchial smooth muscle. They include beta-adrenergic agonists, methylxanthines and anticholinergics.

An increased use of bronchodilators or a lack of expected therapeutic response to the medication is often an indication of diminished asthma control. Anti-inflammatory agents act prophylactically by interrupting the development of bronchial inflammation. They may also modulate or terminate ongoing airway inflammatory reactions. These agents include inhaled and systemic corticosteroids and cromolyn (Intal).

Medications are prescribed in a stepwise fashion for mild, moderate and severe asthma (Figure 4). Progression to the next step is indicated when the current step fails to achieve the goals of therapy despite correct use of medication. Once control is achieved and sustained for several weeks to months, a step down in therapy may be considered.

Patients with mild asthma have brief episodes of wheezing, coughing and dyspnea that occur no more than once or twice a week. Symptoms may arise following exposure to irritants, exercise or a respiratory tract infection. Except during the brief exacerbations, patients with mild asthma are asymptomatic.

Inhaled beta.sub.2 agonists are the treatment of choice for patients with mild asthma. These drugs are preferable to oral therapy because they have a faster onset of action and fewer adverse systemic side effects, and they achieve desired results at lower doses. 9 A usual dose is one to two puffs repeated every three to four hours as necessary during the asthma exacerbation. Use of an inhaler on a daily basis or more than three to four times a day indicates the need for additional treatment.

Moderate asthma is not adequately controlled by episodic administration of an inhaled beta.sub.2 agonist. In patients with moderate asthma, exacerbations occur more than twice a week, last a few days and affect sleep and activity levels. Occasionally, symptoms may be severe enough to require emergency care. Anti-inflammatory agents such as inhaled corticosteroids or cromolyn should be added to their regimen on a daily basis. Administered prophylactically via aerosol, cromolyn is thought to reduce inflammation by stabilizing mast cells. 10 The usual starting dose is two puffs taken four times daily. A four-week to six-week trial of therapy may be necessary to determine the effectiveness of the drug. Side effects from inhalation of the dry powder are minimal. The most common reported side effect is coughing.

An inhaled corticosteroid is also an excellent anti-inflammatory drug for moderate asthma. While smaller doses (i.e., 400 to 800 Micro g per day of beclomethasone Beclovent, Vanceril or its equivalent) are typically prescribed, studies indicate that higher doses (e.g., more than 800 Micro g per day) may be particularly effective and should be tried if necessary. 11,12

Concentrations of formulations vary among the three current corticosteroid inhalers: bedomethasone, 42 Micro g per puff, triamcinolone acetonide (Azmacort), 100 Micro g per puff, and flunisolide (AeroBid), 250 Micro g per puff.

DMC 000859

Outpatient management of asthma in adults; includes patient information

The relative effect of each steroid formulation has not been established. The usual recommendation is to start patients on a dosage of two to four puffs twice daily of beclomethasone or its equivalent. Patients should be told that maximal improvement may take two to four weeks. Side effects of inhaled steroids are generally mild and include oropharyngeal candidiasis, dysphonia and occasional coughing. These adverse effects can be minimized by administering inhaled steroids with a spacer device or by rinsing the mouth after each use.

If symptoms persist after adding cromolyn or an inhaled corticosteroid, additional options are available. The dosage of inhaled corticosteroid may be increased. A longer acting bronchodilator, such as an oral beta agonist or a sustained relief theophylline preparation, may be added in the evening to control nocturnal symptoms.

If theophylline is prescribed, the dosage must be carefully calculated, and levels must be closely monitored to avoid significant side effects. 13 Although the optimal effect is produced by serum theophylline levels in the range of 10 to 20 Micro g per mL, a more conservative level of 5 to 15 Micro g per mL is often effective. Serum levels should be checked when starting the medication, when an adverse effect is suspected, when patients fail to demonstrate bronchodilation at the prescribed dose and when higher dosage levels are desired. Levels should also be checked when the patient has a condition such as a febrile illness or congestive heart failure, or is taking a medication known to affect theophylline blood concentration. Serum concentrations under 15 Micro g per mL are not generally associated with toxicity. Nausea and vomiting are usually the earliest signs of toxicity. Toxicity may be manifested by tachycardia, arrhythmias, tachypnea, hyperglycemia, hypokalemia and seizures.

When asthma is not controlled by maximal dosages of bronchodilators and cromolyn or inhaled steroids, a short course of oral corticosteroids may be indicated. A usual course in adults is 40 to 60 mg prednisone per day (in single or divided doses) for one week, followed by a tapering dose over one to two weeks. The onset of action begins three hours after administration and peaks after six to 12 hours.

Patients whose asthma is poorly controlled despite maximal doses of bronchodilators and corticosteroids or cromolyn may require systemic corticosteroid therapy on a routine basis. However, longterm oral steroid therapy is limited by significant adverse effects, including hypertension, osteoporosis, Cushing's syndrome, cataracts and suppression of the hypothalamic-pituitary-adrenal axis. If oral steroid therapy is the only option, the lowest possible dose should be prescribed, to be taken every other morning. Repeated attempts should be made to replace the oral medication with maximal doses of inhaled steroids. Furthermore, patients should be continually evaluated for the development of adverse effects. Patients with severe asthma should be evaluated by an asthma specialist.

ENVIRONMENTAL CONTROL MEASURES

Reducing exposure to indoor and outdoor allergens is an important means of asthma control. Exposure to outdoor pollen and mold can be minimized by staying indoors in an air-conditioned environment with the windows closed during the midday and afternoon when pollen counts are highest. 14

Indoor allergens to be eliminated from the home include dust, mites, cockroaches and animal dander. 15 Unfortunately, warmblooded pets (especially cats and dogs) contribute greatly to the allergenic composition of house dust. If the pet cannot be removed from the house, it should be kept out of the patient's bedroom at all times, and the room's heating vents should be sealed off.

House dust mites depend on atmospheric moisture and human dander for survival. They are found in debris in mattresses, pillows, carpets, upholstered furniture, bed covers, clothes and soft toys. Dust mite control requires weekly hot-water washing of pillows and bedding. Mattresses should be encased in airtight covers, and carpets should be removed. 16

Mold is prominent in humid indoor environments. Frequent cleaning and ventilation of bathrooms, kitchens and basements is important. Indoor humidity should be reduced to less than 50 percent. Dehumidifiers may be necessary, especially in basements. Air conditioning is an effective method of climate control, because windows and doors stay closed and indoor humidity is reduced.

Referral for immunotherapy may be considered when it is not possible to avoid allergens and irritants, when medication fails to control allergic asthma and when specific immunotherapy of proven efficacy is available (e.g., house dust mite, cat dander, grass pollen).

PATIENT EDUCATION

DMC 000860

Outpatient management of asthma in adults; includes patient information

Helping patients and their families learn to manage their asthma is essential to prevent exacerbations, hospitalization or death. Physicians can help patients develop the skill and confidence necessary to control this chronic condition.  17 Patients using inhaled bronchodilators or steroids should be instructed in the correct use of metered–dose inhalers.

Patients with moderate to severe asthma should be taught to use home peak flow monitoring. Keeping a daily log can help patients recognize patterns and learn effective responses. Patients should have an individually tailored medication plan for managing their asthma on a chronic basis, as well as an action plan to help them manage exacerbations. These plans should be agreed on with the patient. Patients should be aware of medication side effects. Their fears and misconceptions about asthma should be addressed. Periodically, physicians and patients should reevaluate their goals and the individual management plan, identify any barriers to effective treatment and agree on necessary treatment changes.

A patient information handout on the use of metered–dose inhalers is provided on the following page.

## REFERENCES

1. Asthma—United States, 1980–1987. MMWR 1990;39:493–7.

2. National Asthma Education Program Expert Panel. Guidelines for the diagnosis and management of asthma. Bethesda, Md.: National Heart, Lung, and Blood Institute, 1991; DHHS publication no. 91–3042:

3. Cockcroft DW. Airway hyperresponsiveness: therapeutic implications. Ann Allergy 1987; 59:405–14.

4. Rachelefsky GS. The inflammatory response in asthma. Am Fam Physician 1992;45:15360.

5. Djukanovic R, Roche WR, Wilson JW, et al. Mucosal inflammation in asthma. Am Rev Respir Dis 1990;142:434–57.

6. Shim CS, Williams MH Jr. Relationship of wheezing to the severity of obstruction in asthma. Arch Intern Med 1983;143:890–2.

7. Burdon JG, Juniper EF, Killian KJ, Hargreave FE, Campbell EJ. The perception of breathlessness in asthma. Am Rev Respir Dis 1982; 126:825–8.

8. Kimmel SR. Use of the peak flow meter in office practice. Am Fam Physician 1986;34 (6):107–11.

9. Nelson HS. Adrenergic therapy of bronchial asthma. J Allergy Clin Immunol 1986;77: 771–85.

10. Bernstein IL. Cromolyn sodium. Chest 1985; 87(1 Suppl):68S–73S.

11. Salmeron S, Guerin JC, Godard P, et al. High doses of inhaled corticosteroids in unstable chronic asthma. A multicenter, double-blind, placebo-controlled study. Am Rev Respir Dis 1989; 140:167–71.

12. Toogood JH. High-dose inhaled steroid therapy for asthma. J Allergy Clin Immunol 1989; 83(2 Pt 2):528–36.

13. Tsiu SJ, Self TH, Burns R. Theophylline toxicity: update. Ann Allergy 1990;64(2 Pt 2): 241–57.

14. Solomon WR, Burge HA, Boise JR. Exclusion of particulate allergens by window air conditioners. J Allergy Clin Immunol 1980;65: 305–8.

15. Mansfield LE, Nelson HS. Allergens in commercial house dust. Ann Allergy–1982; 48: 205–9.

16. Murray AB, Ferguson AC. Dust-free bedrooms in the treatment of asthmatic children with house dust or house dust mite allergy: a controlled trial. Pediatrics 1983; 71:418–22.

17. Feldman CH, Clark NM, Evans D. The role of health education in medical management of asthma. Some program applications. Clin Rev Allergy 1987; 5:195–205.

The Authors

MARC L. RIVO, M.D., M.P.H. is director of the Division of Medicine in the Health Resources and Services Administration's Bureau of Health Professions, Rockville, Md. After graduating from the University of California, San Francisco, School of Medicine, he received a master's degree in health administration and policy from the University of California, Berkeley, School of Public Health, and completed a residency in family practice at the Duke–Watts program in Durham, N.C. Dr. Rivo represents the American Academy of Family Physicians on the National Asthma Education Program Coordinating Committee.

Outpatient management of asthma in adults; includes patient information

FLOYD J. MALVEAUX, M.D., PH.D. is aSSoCiate prOfeSSOr Of medicine and microbiology and chairman of microbiology at the Howard University College of Medicine, Washington, D.C., where he received his medical degree. He completed a doctorate in microbiology and immunology at Michigan State University, College of Human Medicine, East Lansing, a residency in internal medicine at Washington Hospital Center, Washington, D.C., and a fellowship in allergy and clinical immunology at Johns Hopkins University School of Medicine, Baltimore. Dr. Malveaux is a member of the National Asthma Education Program Expert Panel that drafted the clinical guidelines for treatment of asthma.

**GRAPHIC:** Table; Chart; Graph; Diagram

**LOAD-DATE:** August 24, 1995

DMC 000862

# EXHIBIT 14

# THE QUARTERLY JOURNAL OF MEDICINE

The official journal of the Association of Physicians
of Great Britain and Ireland

**Clarendon Press · Oxford**

FM Validity Ex. 14

*Quarterly Journal of Medicine, New Series 58, No. 226, pp. 199–215, February 1986*

# Allergen Avoidance in House Dust Mite Sensitive Adult Asthma

M. J. WALSHAW and C. C. EVANS

*From the Regional Adult Cardiothoracic Unit, Broadgreen Hospital, Thomas Drive, Liverpool 14*

Accepted 30 September 1985

---

## SUMMARY

Fifty adult asthmatic patients with strongly positive skinprick tests to the house dust mite were admitted into a prospective randomised controlled trial of house dust mite avoidance in the community. Twenty-two of the experimental group completed one year of dust avoidance and 19 of these tolerated the use of plastic mattress and pillow covers. Twenty of the control group (who did not alter their housecleaning habits) also completed one year of study. A fall in mite and dust levels was noted in the homes of the experimental but not the control group.

Fifteen of the experimental group who completed the study were strongly RAST positive (score 3 or more) to the house dust mite. These patients had a significant improvement in FEV1/FVC, PEFR, PC20, use of treatment, and symptom score at one year, whilst the seven experimental patients who were not strongly RAST positive (score 2 or less) did not, suggesting that the change noted in the former patients was not merely due to a placebo effect. Fifteen of the control group who completed the study were also strongly RAST positive for the house dust mite, and these patients showed no change in any of the parameters.

This study demonstrates that adult asthmatic patients can successfully carry out house dust eradication procedures in the community over a long period of time, and that those patients who are allergic to the house dust mite appear to have both subjective and objective improvement in their asthma.

## INTRODUCTION

The house dust mite (*Dermatophagoides pteronyssinus*) has been shown to be commonly associated with allergic asthma (1). Removal of house dust mite-sensitive asthmatic patients to an allergen-free environment appears to be associated with an improvement in their disease (2, 3). However, few studies have looked at house dust mite avoidance in the community and these have either failed to show an improvement (4–7) or have been incomplete (8–10). Furthermore, most of these studies have been uncontrolled, short term, and in childhood asthma. This study was therefore undertaken to assess in a controlled fashion the use of plastic mattress and pillow covers and other dust avoidance techniques in adult mite sensitive asthma over a long period of time.

© Oxford University Press 1986

DMC000885

200               *M. J. Walshaw and C. C. Evans*

## PATIENTS

Only adult asthmatic patients with a strongly positive skinprick test (wheal 5 mm diameter or more) to the house dust mite (*Dermatophagoides pteronyssinus*), a documented history of asthma, and the absence of any other chest disease were admitted to the study. These patients had all attended selected chest clinics in the Liverpool area within the previous year, but they were not all currently attending a clinic. However, all had symptoms at the start of the study and required regular drug treatment for their asthma.

## METHODS

Baseline data was collected from all patients at the start of the study. The patients were then randomly allocated into two groups, experimental and control. The experimental patients instituted rigorous house dust mite eradication procedures, whilst the control group did not alter their housecleaning habits. Control patients were told that the study was examining changes in house dust with the seasons. In those patients who were aware of house dust mite allergy, care was taken not to reinforce this. Both groups had the baseline data reassessed at four-monthly intervals for one year, making four visits in all.

*Baseline data*

A full history was taken from each patient. A history of sensitivity to other allergens was noted, but this was not regarded as a cause for exclusion from the study. The following parameters were measured.

*Dust and mite levels.* Dust samples were taken from the mattress, bedroom and lounge floors in the home of each patient using a modified hand-held vacuum cleaner. In the lounge and bedroom, 1 m² of floor was sampled for 2 min using a standardised sampling technique. For repeat sampling, a note was made of the location of floor area sampled and a similar area sampled at the next visit. The whole of the mattress surface was sampled, at a rate of 0.5 m²/min. Preliminary studies revealed this technique to have a coefficient of variation for dust sampling of about 10 per cent. For repeat sampling of beds in the experimental group, patients were asked not to clean the mattress for one week before sampling.

The dust samples were processed to separate the mites by a modification of the method of Spieksma *et al.* (11). Briefly, raw dust samples were sieved to separate the fine dust which contains the mites. Aliquots of this dust were dissolved in 90 per cent lactic acid with lignin pink dye and incubated at 57°C for at least two days. Mites were then counted from each sample using a stereomicroscope (×30), with incident and transillumination. Only intact mature mites and larger immature specimens were counted. Mite counting had a coefficient of variation of about 5 per cent.

*Respiratory function.* FEV1, FVC, and FEV1/FVC were measured using a dry spirometer (Vitalograph) which was calibrated regularly. The best of three attempts was recorded. PEFR was measured on the same Wright's Peak Flow Meter each time. Bronchial reactivity was measured with a histamine challenge test, modified from the method of Cockroft (12). Oral bronchodilators were withheld for two days and inhaled bronchodilators withheld 6 h before this test. All respiratory tests were performed at the same time of day for repeat testing.

*Immunological function.* Total serum immunoglobulins (IgA, IgG, IgM, and IgE) were

measured. A RAST test was performed to demonstrate specific allergy to the house dust mite. Those patients who had a high RAST score to *Dermatophagoides pteronyssinus* (score 3 or more) (13) were termed 'allergic', and the remainder as 'non-allergic'.

## DUST ERADICATION

Standard house dust avoidance procedures were advocated in the experimental group (4, 8). All patients had access to a vacuum cleaner.

*Bed.* Plastic mattress and pillow covers were provided free of charge. The mattress and surround was given a thorough vacuum cleaning at the start of the study and the plastic covers were then applied. Patients were asked not to remove the covers once they were *in situ,* but merely to damp dust them at least at weekly intervals. Feather duvets and quilts were changed for synthetic polyester types or were avoided completely. Woollen blankets were changed for cotton cellular or polyester equivalents. All bedding was to be washed at least weekly, or failing this shaken outside frequently to remove all dust.

TABLE 1. *Study completion*

| Group | Visit | | | |
|---|---|---|---|---|
| | 1 | 2 | 3 | 4 |
| *Experimental* | | | | |
| All patients | 25 | 24 | 23 | 22 |
| Allergic patients | 18 | 17 | 16 | 15 |
| *Control* | | | | |
| All patients | 25 | 23 | 21 | 20 |
| Allergic patients | 20 | 18 | 16 | 15 |

TABLE 2. *Patient matching*

| | Experimental group | | Control group | |
|---|---|---|---|---|
| | $\bar{X}$ | ±SEM | $\bar{X}$ | ±SEM |
| Age (years) | 33 | 2 | 34 | 2 |
| Sex | 9 male, | 16 female | 13 male, | 12 female |
| Social class | 3.16 | 0.24 | 2.96 | 0.30 |
| Duration of symptoms (years) | 13.5 | 2.3 | 15.5 | 2.7 |
| Inhaled cromoglycate (occasions per day) | 1.9 | 0.6 | 1.7 | 0.5 |
| Inhaled bronchodilators (occasions per day) | 4.6 | 1.5 | 3.7 | 0.7 |
| Inhaled steroids (occasions per day) | 2.9 | 0.6 | 2.8 | 0.6 |
| FEV1 (l) | 2.67 | 0.20 | 2.6 | 0.19 |
| FVC (l) | 3.71 | 0.22 | 3.73 | 0.23 |
| PEFR (l/min) | 377.6 | 23.7 | 358.4 | 23.3 |
| FEV1/FVC (%) | 70.9 | 2.6 | 68.8 | 2.6 |
| PC20 (log mg/ml) | −0.92 | 0.08 | −0.76 | 0.11 |

DMC000887

202                                M. J. Walshaw and C. C. Evans

*Bedroom.* The bedroom carpet was to be removed and replaced with linoleum, which was to be washed frequently. Failing this, the carpet was to be vacuum cleaned at regular intervals. All unnecessary soft furnishings were to be removed from the bedroom.

*Lounge.* The carpet was to be vacuum cleaned frequently.

*Dehumidification procedures.* All plants were to be removed from the bedroom. The bathroom door was to be kept closed during and immediately after bathing etc., and the internal kitchen

TABLE 3. *Mite levels at different sites*

| Site | $\bar{X}$† | ±SEM | $p^*$ |
|------|------|------|-------|
| Bed | 3.07 | 0.07 | |
| Bedroom | 2.73 | 0.10 | <0.02 |
| Lounge | 2.00 | 0.10 | <0.001 |

\* Compared with mattress mites.
† Geometric mean mites/m².



FIG. 1. Bimonthly mean bedroom relative humidity throughout the study period.

TABLE 4. *Mite avoidance in the bedroom*

| Furnishing change | Visit | | | |
|---|---|---|---|---|
| | 1 | 2 | 3 | 4 |
| Plastic bed covers installed | 0 | 21 (87) | 21 (91) | 19 (86) |
| Non-allergenic bedding installed | 0 | 16 (67) | 22 (96) | 22 (100) |
| Bedroom carpet removed | 0 | 3 (12) | 4 (17) | 7 (32) |

Percentages in parentheses.

DMC000888

*House Dust Mite Sensitive Adult Asthma*



FIG. 2. Mite levels on the mattress throughout the study.

DMC000889

M. J. Walshaw and C. C. Evans

door during and immediately after cooking. The bedroom was to be thoroughly ventilated on dry days only.

### Symptom scores

The symptoms of each patient were assessed at every visit for the preceding four-month period by means of a detailed history. From this it was possible to rank the symptoms for each visit in order of severity, allowing a guide to symptomatic change.

### Data analysis

None of the data were analysed until the end of the study, and experimental patients were not divided into non-allergic and allergic groups until this time. This ensured that there was no bias in assessment between the two experimental groups. All the data were analysed by paired Student's 't' tests, or by a Wilcoxon signed rank test where there was no reasonably normal distribution.

## RESULTS

Fifty patients were admitted to the study between November 1982 and April 1983. 25 experimental patients and 25 controls. Similar numbers of patients were admitted to each group each month. Mean sampling times for the four visits for both groups were January, May, September 1983, and January 1984.

At the start of the study, 18 experimental patients were found to be allergic to the house dust mite on RAST testing, as were 20 of the control group. Fifteen of these patients were still in the study at one year. Of the three experimental allergic patients who failed to complete the study, one had moved to Australia and was unavailable, one did not undertake any of the dust avoidance procedures (including the use of plastic covers) and was therefore excluded after the second visit, and the third died of acute severe asthma two weeks after entering the study but before the initiation of dust eradication procedures. Seven non-allergic experimental and five non-allergic control patients also completed one year of study (Table 1).

Initially, both groups of patients were matched for age, sex, social class, length of disease, dust and mite levels, parameters of respiratory function, and use of treatment (Table 2).

*Dermatophagoides pteronyssinus* was the most common mite found throughout the study, and it occurred in all homes. More mites were found on the mattress than on the bedroom floor ($p<0.02$), and more on the bedroom floor than on the lounge floor ($p<0.001$), as noted in previous studies (14) (Table 3). There was also a good correlation between relative humidity and mite levels at the initial visit ($r=0.61, p<0.001$). Bimonthly mean relative humidity levels in the bedrooms of the control group revealed a high level in the winter, followed by a fall in spring, and a slow rise throughout summer and autumn towards the following winter (Fig. 1).

Following initiation of the house dust avoidance procedures, the experimental group had a significant increase in the frequency of mattress cleaning, bedclothes changing, and bedroom floor cleaning, whilst there was no change in the frequency of lounge floor cleaning. Nineteen of the 22 experimental patients who completed one year of study tolerated the use of plastic covers for this time; of these 12 were allergic to the house dust mite as shown by RAST testing. All experimental patients who completed the study had changed to non-allergenic bedding. Seven patients also removed the bedroom carpet; five put down linoleum, one had bare boards, and another laid ceramic tiles (Table 4). The control patients did not alter any of the parameters of

DMC000890



FIG. 3. Mite levels on the bedroom floor throughout the study.

DMC000891

206                              *M. J. Walshaw and C. C. Evans*

housecleaning. One control patient had a linoleum covered bedroom floor throughout the study.

The experimental group had a significant and sustained fall in the level of mites found on the mattress surface after initiation of house dust eradication procedures (Fig. 2). A similar fall was noted for the level of dust and mite density in these beds. Those beds which had no covers *in situ* contained more mites. There was a significant and sustained fall also in mite levels on the bedroom floor for the experimental group (Fig. 3). There was also a significant and sustained fall in the weight of dust collected from the lounge floor for the experimental group as the study progressed, although mite density did not alter.

The control group had no change in dust or mite levels in the bed (Fig. 2) or on the bedroom floor (Fig. 3) throughout the study. The bedroom floor which had a linoleum covering *in situ* had persistently low levels of mites and dust. In the lounge, the control group had a significant increase ($p<0.02$) in mite numbers at the third visit, which coincided with a seasonal increase in relative humidity. This level had fallen to baseline values again by the final visit.

Values for relative humidity in the bedroom were the same for both groups of patients at the start of the study (Table 5). At the second visit, relative humidity in the bedroom had fallen for both groups, coinciding with the spring season. There was then a rise at the third visit for both groups, such that there was no difference from baseline values. However, there was a significant fall in relative humidity in the bedroom for the experimental group at the final visit. This change was not mirrored by the control group, whose levels were unchanged from baseline values.

TABLE 5. *Bedroom relative humidity throughout the study*

| Visit | Experimental | | | Control | | |
|---|---|---|---|---|---|---|
| | $\bar{X}$ | ±SEM | $p^*$ | $\bar{X}$ | ±SEM | $p^*$ |
| 1 | 65.3 | 1.6 | | 65.0 | 1.8 | |
| 2 | 60.6 | 1.5 | <0.05 | 58.9 | 1.4 | <0.05 |
| 3 | 63.3 | 1.5 | NS | 62.2 | 1.7 | NS |
| 4 | 60.1 | 2.1 | <0.05 | 61.0 | 1.7 | NS |

$\bar{X}$=mean % relative humidity. * Compared with first visit.

No patient group had a change in FEV1 or FVC as the study progressed. However, the allergic experimental patients showed a significant improvement in FEV1/FVC at the end of the study (Table 6). The control allergic group has a significant fall in this parameter at the second visit, which coincided with the onset of the pollen season. FEV1/FVC had returned to baseline levels in this group by the next visit, and did not change at the final visit.

PEFR showed a significant improvement in the allergic experimental group at the final visit, but showed no change at any visit for the other patient groups, experimental or control (Table 7).

Bronchial reactivity (as indexed by the PC20) showed a progressive improvement in the allergic experimental group as the study progressed, and this had become significant by the third visit (Fig. 4). There was no change in PC20 for either of the control groups throughout the study. There was a tendency for the non-allergic experimental group to show an improvement in PC20 as the study continued.

The experimental allergic patients showed a significant fall in the use of inhaled bronchodilators at the second visit, although usage had risen again by the third visit. There was a significant fall in the use of inhaled bronchodilators and steroids at the end of the study (Table 7). There

DMC000892

Case 1:04-cv-10162-DPW    Document 81-7    Filed 11/30/2005    Page 23 of 68

throughout the

es found on the
. similar fall was
no covers *in situ*
e levels on the
t and sustained
up as the study

n the bedroom
covering *in situ*
! a significant
nal increase in
it.
patients at the
n had fallen for
d visit for both
. there was a
: the final visit.
l from baseline

However, the
at the end of
meter at the
d returned to
t.
he final visit.
ntrol (Table

ement in the
ficant by the
roughout the
nprovement

ronchodila-
a significant
le 7). There

TABLE 6. *Simple pulmonary function throughout the study*

| Group | Respiratory function | Visit 1 x̄ | ±SEM | Visit 2 x̄ | ±SEM | p* | Visit 3 x̄ | ±SEM | p* | Visit 4 x̄ | ±SEM | p* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Experimental allergic | FEV1/FVC (%) | 69.5 | 2.9 | 68.8 | 2.3 | NS | 68.9 | 3.0 | NS | 77.8 | 1.9 | <0.02 |
| | PEFR (l/min) | 391 | 31 | 392 | 29 | NS | 405 | 35 | NS | 423 | 31 | <0.05 |
| Experimental non-allergic | FEV1/FVC (%) | 74.6 | 5.8 | 70.3 | 4.9 | NS | 75.1 | 3.3 | NS | 76.6 | 4.7 | NS |
| | PEFR (l/min) | 344 | 31 | 366 | 26 | NS | 354 | 24 | NS | 374 | 34 | NS |
| Control allergic | FEV1/FVC (%) | 68.8 | 2.8 | 64.9 | 3.7 | <0.01 | 66.6 | 3.9 | NS | 70.8 | 3.1 | NS |
| | PEFR (l/min) | 376 | 27 | 417 | 34 | NS | 384 | 39 | NS | 372 | 11 | NS |
| Control non-allergic | FEV1/FVC (%) | 68.8 | 7.4 | 71.0 | 7.1 | NS | 73.7 | 5.0 | NS | 86.2 | 3.6 | NS |
| | PEFR (l/min) | 286 | 31 | 297 | 28 | NS | 268 | 55 | NS | 361 | 41 | NS |

* Compared with first visit.

DMC000893

TABLE 7. Use of treatment throughout the study

| Group | Treatment | Visit | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 | | 2 | | | 3 | | | 4 | | |
| | | $\bar{X}$ | ±SEM | $\bar{X}$ | ±SEM | $p^*$ | $\bar{X}$ | ±SEM | $p^*$ | $\bar{X}$ | ±SEM | $p^*$ |
| Experimental allergic | Inhaled cromoglycate | 2.67 | 0.69 | 1.41 | 0.56 | NS | 0.86 | 0.41 | NS | 1.07 | 0.43 | NS |
| | Inhaled bronchodilators | 4.78 | 2.10 | 2.15 | 0.36 | <0.05 | 2.61 | 0.82 | NS | 1.60 | 0.42 | <0.05 |
| | Inhaled steroids | 1.83 | 0.55 | 1.94 | 0.64 | NS | 2.13 | 0.74 | NS | 1.00 | 0.47 | <0.05 |
| Experimental non-allergic | Inhaled cromoglycate | 0 | | 0 | | | 0 | | | 0 | | |
| | Inhaled bronchodilators | 4.14 | 0.88 | 2.95 | 0.92 | NS | 4.00 | 1.15 | NS | 3.43 | 0.81 | NS |
| | Inhaled steroids | 4.57 | 1.29 | 4.57 | 1.29 | NS | 5.71 | 1.11 | NS | 5.42 | 1.21 | NS |
| Control allergic | Inhaled cromoglycate | 2.00 | 0.58 | 1.72 | 0.54 | NS | 1.50 | 0.58 | NS | 1.60 | 0.62 | NS |
| | Inhaled bronchodilators | 3.56 | 0.78 | 2.87 | 0.73 | NS | 3.16 | 0.80 | NS | 3.24 | 0.85 | NS |
| | Inhaled steroids | 2.80 | 0.75 | 2.11 | 0.68 | NS | 2.12 | 0.11 | NS | 2.40 | 0.76 | NS |
| Control non-allergic | Inhaled cromoglycate | 0.40 | 0.40 | 0.40 | 0.40 | NS | 0.50 | 0.50 | NS | 0.50 | 0.50 | NS |
| | Inhaled bronchodilators | 4.42 | 1.45 | 3.62 | 1.46 | NS | 4.52 | 2.86 | NS | 4.52 | 2.04 | NS |
| | Inhaled steroids | 2.80 | 1.50 | 4.40 | 1.60 | NS | 5.00 | 1.91 | NS | 5.00 | 1.91 | NS |

* Compared with first visit. All values are inhalations per day.

DMC000894

Case 1:04-cv-10162-DPW     Document 81-7     Filed 11/30/2005     Page 25 of 68



FIG. 4. Bronchial reactivity for allergic patients.

* Compared with first visit. All values are inhalations per day.

DMC000895

210                                M. J. Walshaw and C. C. Evans

was a tendency for this group to use less sodium cromoglycate as the study progressed. None of the patients in the experimental non-allergic group nor of those in the control groups showed any significant change in the use of treatment throughout the study (Table 7).

Three control patients were taking oral steroids at the start of the study, and two continued their use throughout. The remaining (non-allergic) patient showed a marked improvement in symptoms. In the experimental group, one (non-allergic) patient was using oral steroids at the start of the study, but had ceased by the third visit. Three control patients were using slow release oral bronchodilators at the start of the study, and another patient added them as the study progressed. Two experimental patients (one non-allergic) also used this treatment at the start of the study. The allergic patient still required it at the end of the study.

Symptom ranking showed a progressive improvement for the allergic patients in the experimental group (Fig. 5), but there was no change in the experimental non-allergic group nor in any of the control groups as the study continued.

There was a significant fall in total IgE in the allergic experimental group at the end of the study, but no change in any other patient group (Table 8). Total IgA and total IgM did not change in any patient group throughout the study. However, there was a significant fall in total IgG levels in the experimental allergic groups at the second visit (Fig. 6). This level then rose significantly at the third visit, such that there was no difference from baseline values. Total IgG levels then fell once again at the final visit, and this value was significantly lower ($p = 0.05$) than



(MEAN ± S.E.M.)

FIG. 5. Mean symptom ranks for allergic patients

DMC000896

y progressed. None of
ontrol groups showed
ble 7).

y, and two continued
rked improvement in
ng oral steroids at the
ents were using slow
t added them as the
this treatment at the
udy.

atients in the experi-
allergic group nor in

up at the end of the
d total IgM did not
gnificant fall in total
This level then rose
e values. Total IgG
ower ($p = 0.05$) than

TABLE 8. *Total IgE levels throughout the study*

| Group | Visit 1 | | Visit 2 | | | Visit 3 | | | Visit 4 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | $\bar{X}$ | ±SEM | $\bar{X}$ | ±SEM | $p^*$ | $\bar{X}$ | ±SEM | $p^*$ | $\bar{X}$ | ±SEM | $p^*$ |
| Experimental allergic | 2.56 | 0.11 | 2.45 | 0.11 | NS | 2.54 | 0.11 | NS | 2.45 | 0.11 | <0.05 |
| Experimental non-allergic | 2.16 | 0.22 | 2.05 | 0.22 | NS | 2.06 | 0.19 | NS | 2.13 | 0.22 | NS |
| Control allergic | 2.59 | 0.10 | 2.56 | 0.12 | NS | 2.59 | 0.10 | NS | 2.59 | 0.12 | NS |
| Control non-allergic | 2.24 | 0.13 | 2.16 | 0.12 | NS | 2.04 | 0.17 | NS | 2.24 | 0.33 | NS |

* Compared with first visit. $\bar{X}$ = geometric mean.

DMC000897

212 — *M. J. Walshaw and C. C. Evans*



FIG. 6. Total IgG levels for allergic patients.

O = EXPERIMENTAL
● = CONTROL

$p < 0.01$ * $p < 0.005$ * $p < 0.005$ *+

*(compared to preceding visit)
+(p=0.05 compared to 1st visit)

DMC000898

baseline levels. There was no change in total IgG levels for any other patient group throughout the study.

## DISCUSSION

Studies in asthma which require active patient participation and are not double blind will inevitably suffer the criticism that a strong placebo effect might occur. In this study, the inclusion into the experimental group of patients who were not strongly allergic to the house dust mite (and yet were unaware of their limited allergic status) and who did not improve as the study progressed suggests that the changes noted in the allergic experimental group were not merely due to a placebo effect.

The aim of this study was to produce a practicable long-term technique for house dust mite avoidance. The bed has been shown to be the major site of house dust allergen (15), and eradication techniques were therefore concentrated here. Previous studies have demonstrated adequately that it is not possible to eradicate mites from the mattress (5, 7); in this study the mattress (and pillow) were encased in impermeable plastic covers to avoid this source of allergen. It is interesting to note that the two previous studies which have shown benefit from house dust avoidance procedures both used plastic covers (8, 9). These covers were well tolerated by this group of patients and 19 of 22 used them for one year. The efficiency of the mattress cover in protecting patients is shown by the very low levels of mites and dust which were recovered from this site: patients who could not tolerate the covers had higher levels of mites. It is unlikely that this reduction in mites and dust was due to an error in sampling technique since mite density was also decreased. This suggests that there was interference in mite growth and development by regular cleaning.

A possible criticism of this study is that mite levels were not measured in the bedding. However, all the experimental patients changed to non-allergenic bedding and any mites present would ultimately fall on to the mattress for sampling. Mite antigen was not measured since this has been shown to correlate well with mite levels (4, 15).

Previous studies have shown that there is a good relationship between mite levels and substrate relative humidity (16), since mites have poor water homeostatic mechanisms. Thus, a diminution in relative humidity would be a simple and effective way of decreasing mite levels. Basic dehumidification procedures were advocated in this study, and the fall in relative humidity noted in the experimental group which was not mirrored by the control group suggests that these may have had some effect.

The failure of the allergic experimental group to show an improvement in FEV1 or FVC as the study progressed can be explained by the fact that this group had an initial FEV1/FVC of more than 69 per cent i.e. their asthma was well controlled and there was therefore little room for improvement in simple respiratory function. Despite this, there was a significant improvement in PEFR and FEV1/FVC at one year, in the face of a significant fall in the use of treatment. Furthermore, a significant and progressive improvement in PC20 as the study continued with no change in FEV1 suggests that this was not merely due to an alteration in baseline airway calibre (17), but must reflect a true change in bronchial reactivity. This is in keeping with a diminution in allergen load.

This study did not show an objective improvement in asthma until eight months had passed. Previous workers have shown that the bronchial hyperreactivity associated with the redwood cedar can last for a considerable time after removal of the allergen (18) and the slow improvement noted in this group following house dust allergen removal is in keeping with this. The failure of some house dust avoidance studies to show benefit could well be related to the short-

+(p=0.05 compared to 1st visit)

FIG. 6. Total IgG levels for allergic patients.

214

*M. J. Walshaw and C. C. Evans*

term nature of most of these projects. Nevertheless, this study has demonstrated that adult patients are willing and able to carry out dust avoidance in the home over long periods of time.

Previous workers have demonstrated a fall in total IgE (2, 8) (as shown in the present study), and also mite specific IgE (3) following allergen avoidance, but significant falls in IgG have not been recorded. Subgroups of IgG are known to possess reaginic activity, in particular, IgG4 and IgG(STS) (19). These subgroups can show a rise in titre following hyposensitisation treatment, and a role as a blocking antibody has been suggested (20). It is therefore logical to assume that a fall in antigen level would be mirrored by a fall in IgG levels, as demonstrated in this study. It has also been suggested that IgG has the capacity to react more quickly to a given antigen load than can IgE (21). The significant changes noted in IgG but not in IgE in this study between the four-monthly sampling visits supports this. The rise in IgG noted in the allergic experimental group at the third visit could be related to the advent of seasonal allergens several months previously; about 40 per cent of this group gave a history suggestive of pollen sensitivity. This was further supported by the increase in the use of treatment in this group at the third visit.

This study has shown that house dust mite avoidance measures in the community are a practicable proposition for adult asthmatic patients, and that those individuals who are highly mite sensitive appear to have both a subjective and objective improvement in their disease, although this may take some time to develop.

It is therefore recommended that all adult asthmatic patients who are mite sensitive are given a prolonged trial of adequate house dust mite avoidance procedures, including the use of plastic mattress covers.

## ACKNOWLEDGEMENT

The authors thank the Samuel Crossley Barnes Research Fund, University of Liverpool, for supporting M.J.W. with a Fellowship Award throughout this study.

## REFERENCES

1. Voorhorst R, Spieksma FThM, Varekamp H, Leupen MJ, Lyllema AW. The house-dust mite (*Dermatophagoides pteronyssinus*) and the allergens it produces. Identity with the house dust allergen. J Allergy 1967; 39: 325–339.
2. Vervloet D. Penaud A, Razzouk H. *et al*. Altitude and house dust mites. J Allergy Clin Immunol 1982; 69: 290–296.
3. Platts-Mills TAE, Tovey ER, Mitchell EB, Moszoro H, Nock P, Wilkins SR. Reduction of bronchial hyperreactivity during prolonged allergen avoidance. Lancet 1982; 2: 675–678.
4. Burr ML, Dean BV, Merrett TG, Neale E, St Leger AS, Verrier-Jones ER. Effects of anti-mite measures on children with mite-sensitive asthma: a controlled trial. Thorax 1980; 35: 506–512.
5. Carswell F, Robinson DW, Oliver J, Clark J, Robinson P, Wadsworth J. House dust mites in Bristol. Clin Allergy 1982; 12: 533–545.
6. Burr ML, St Leger AS, Neale E. Anti-mite measures in mite-sensitive adult asthma. Lancet 1976; 1: 333–335.
7. Korsgaard J. Preventive measures in mite asthma. Allergy 1983; 38: 93–102.
8. Sarsfield JK, Gowland G, Toy R, Norman ALE. Mite-sensitive asthma of childhood. Trial of avoidance measures. Arch Dis Childh 1974; 49: 716–721.
9. Murray AB, Ferguson AC. Dust-free bedrooms in the treatment of asthmatic children with house dust or house dust mite allergy: a controlled trial. Pediatrics 1983; 71: 418–422.
10. Korsgaard J. Preventive measures in house-dust allergy. Am Rev Respir Dis 1982; 125: 80–84.
11. Spieksma FThM, Spieksma-Boezeman MIA. The mite fauna of house dust with particular reference to the house-dust mite *Dermatophagoides pteronyssinus* (Trouessart, 1897). (Psoroptidae: Sarcoptiformes). Acarologia 1967; 9: 226–241.

12. Cockcroft
   histamine
13. Korsgaard
   house-dust
14. Wharton C
15. Tovey ER,
   in the hous
16. Blythe ME
   70; 1–31.
17. Benson M
18. Chan-Yeu
   Western R
19. Stanworth
   subclass. C
20. Nakagawa
   patients w
   specific imi
21. Pepys J, P
   common all

12. Cockcroft DW, Killian DN, Mellon JJA, Hargreave FE. Bronchial reactivity to inhaled histamine: a method and clinical survey. Clin Allergy 1977; 7: 235–243.
13. Korsgaard J. Mite asthma and residency – a case-control study on the impact of exposure to house-dust mites in dwellings. Am Rev Respir Dis 1983; 128: 231–235.
14. Wharton GW. House dust mites – a review article. J Med Entomol 1976; 12: 577–621.
15. Tovey ER, Chapman MD, Wells CW, Platts-Mills TAE. The distribution of dust mite allergen in the houses of patients with asthma. Am Rev Respir Dis 1981; 124: 630–635.
16. Blythe ME. Some aspects of the ecological study of the house dust mites. Br J Dis Chest 1976; 70: 3–31.
17. Benson MK. Bronchial hyperreactivity. Br J Dis Chest 1975; 69: 227–239.
18. Chan-Yeung M, *et al*. Clinical features and natural history of occupational asthma due to Western Red Cedar (*Thuja plicata*). Am J Med 1982; 125: 281–285.
19. Stanworth DR, Smith AK. Inhibition of reagin-mediated PCA reactions in baboons by IgG4 subclass. Clin Allergy 1973; 3: 37–41.
20. Nakagawa T, Takaishi T, Sakamoto Y, Ito K, Miyamoto T, Skvaril F: IgG4 antibodies in patients with with house-dust-mite-sensitive bronchial asthma: relationship with antigen-specific immunotherapy. Int Arch Allergy Appl Immunol 1983; 71: 122–125.
21. Pepys J, Parish WE, Stenius B, Wide L. Long-term and short-term sensitising antibodies to common allergens in intrinsic and cryptogenic asthma. Clin Allergy 1975; 5: 237p.

DMC000901

# EXHIBIT 15

Page 1

Copyright 1992 Information Access Company, a Thomson Corporation Company
ASAP
Copyright 1992 American Academy of Family Physicians
American Family Physician

May, 1992

SECTION: Vol. 45 ; No. 5 ; Pg. 2105; ISSN: 0002-838X

LENGTH: 3756 words

HEADLINE: Outpatient management of asthma in adults; includes patient information handout

BODY:

Rivo, Marc L. ; Malveaux, Floyd J.

MARC L. RIVO, M.D., M.EH., Bureau of Health Professions, Rockville, Maryland FLOYD J. MALVEAUX, M.D., PH.D., Howard University College of Medicine, Washington, D.C.

The diagnosis of asthma is made by demonstrating episodic and reversible airway obstruction. Office spirometry or peak flow meters should be used to objectively measure pulmonary status, since the history and physical examination do not correlate well with asthma severity. Reducing exposure to indoor and outdoor allergens may prevent exacerbations. Asthma medications are prescribed in a step-wise fashion. Inhaled beta.sub.2 agonists should be used by patients with mild asthma during brief and limited symptomatic episodes. Anti-inflammatory agents, such as inhaled corticosteroids or cromolyn, should be added for moderate degrees of asthma. If symptoms persist, a long-ating bronchodilator, such as an oral beta agonist or oral theophylline, may be added in the evening. A short course of oral steroids may also be prescribed as needed. Patients should be taught to correctly use metered-dose inhalers, to keep a daily record with home peak flow measurements that monitor their pulmonary status and to follow a prescribed medication plan for exacerbations.

Despite scientific and therapeutic advances, asthma morbidity and mortality are rising. From 1980 to 1987, the prevalence rate of asthma increased 29 percent, and asthma death rates increased 31 percent. 1 In 1989, the National Heart, Lung, and Blood Institute created the National Asthma Education Program (NAEP) to focus national attention on asthma morbidity, to translate scientific advances into practical clinical guidelines and to facilitate the dissemination of these guidelines to both generalist physicians and subspecialists. In February 1991, the NAEP Expert Panel released a report on the diagnosis and management of asthma. 2 This article summarizes the report's guidelines for the office management of asthma in adults.

Pathophysiology

Asthma is a lung disease characterized by airway obstruction, inflammation and hyperresponsiveness. Airway obstruction is responsible for the common clinical manifestations of asthma, such as wheezing, dyspnea and cough. Bronchial wall edema, mucus production, hypertrophy and smooth muscle contraction all contribute to pulmonary obstruction. Patients with asthma also demonstrate exaggerated bronchoconstrictor response to many different agents. The level of airway hyperresponsiveness usually correlates with the clinical severity of asthma and with medication requirements. 3

The critical role of airway inflammation in both the development of airway obstruction and the degree of hyperresponsiveness has only recently been appreciated. 4 The airways of patients with asthma are infiltrated by a variety of inflammatory cells that contribute to epithelial injury, mucosal edema, abnormalities in neural mechanisms, increases in airway smooth muscle responsiveness and airflow obstruction. Recognition of this important pathophysiologic mechanism has led to a new recommendation to use anti-inflammatory medication early in the course of therapy. 5

Diagnosis

People with asthma are a heterogeneous group, presenting at different ages with a wide variety of signs and symptoms and with varying degrees of respiratory compromise.

FM Validity Ex. 15

DMC 000857

## HISTORY

Patients who present with shortness of breath, cough, wheezing or some combination of these symptoms should be asked about the onset, duration and frequency of their symptoms, any precipitating or aggravating factors and their current management plan. Nocturnal cough may be the initial or even the sole presenting symptom of asthma. The patient should be asked to describe the course of a typical exacerbation. It is important to understand the patient's living situation, the impact of the illness on the patient and the family, and the amount of social support available.

A thorough history is necessary to identify allergic components. A checklist for identifying the possible role of allergens is given in Figure 1. Common outdoor triggers include ragweed, grass, mold and pollen (weed, grass, tree). Common indoor allergens include house dust and house dust mites, animal dander, mold and cockroaches. Cold air and tobacco smoke are also major irritants. Foods are not common asthma triggers.

## PHYSICAL EXAMINATION

The physical examination should focus on the upper respiratory tract, the chest and the skin. Patients should be examined for the presence of purulent nasal discharge, nasal polyps and other manifestations of rhinitis or sinusitis. Chest examination should focus on the quality of breath sounds. Although wheezing is the characteristic finding, it is not a reliable indicator of the severity of asthma. 6 Other pulmonary signs of asthma include use of accessory muscles, diminished breath sounds and prolonged expiratory phase. Flexural eczema is an associated finding in some asthma patients.

## OBJECTIVE MEASURES OF LUNG FUNCTION

Objective measures of lung function are essential for diagnosing asthma, for assessing its severity and for evaluating response to therapy. The use of objective measures is particularly important because a patient's history and physical examination often do not correlate well with the severity of airflow obstruction. 7 Office spirometry is useful in the initial assessment of patients with suspected asthma and for periodic evaluation. Spirometry allows measurement of small and large airway function and can distinguish between obstructive and restrictive pulmonary disease.

Peak expiratory flow rate (PEFR) measurement obtained with a peak flow meter is an inexpensive and simple means of demonstrating episodic airway obstruction PEFR measurements, when performed with maximal effort, correlate well with the forced expiratory volume in one second ( FEV.sub.1 ) obtained with spirometry. 8 A full explanation of spirometry and PEFR measurements is found in the expert panel report. 2

The diagnosis of asthma is made by demonstrating episodic, reversible airway obstruction. Signs and symptoms of episodic shortness of breath, coughing and wheezing in adults are almost always due to asthma. Spirometric or PEFR evidence of airflow obstruction that is reversed through the use of bronchodilators helps confirm the diagnosis. An algorithm for diagnosing asthma is presented in Figure 2.

Before making the diagnosis of asthma, physicians should consider and exclude other causes of airflow obstruction, including airway foreign body, congestive heart failure, pulmonary embolism, pulmonary infection, laryngeal dysfunction, and cough secondary to drugs, such as beta blockers or angiotensin converting enzyme inhibitors. Because distinguishing asthma from bronchitis or pneumonia can be difficult, a trial of therapy to rule out asthma may be warranted.

### Treatment

The goals of therapy are to maintain normal pulmonary function rates and normal activity levels, prevent chronic and troublesome symptoms, minimize exacerbations and avoid adverse effects of asthma medications. Proper management of asthma involves continuous attention to four essential elements: (1) asthma status must be monitored using objective measures, such as PEFR; (2) appropriate pharmacologic therapy is necessary to relieve or prevent symptomatic airway narrowing in mild asthma and to reduce bronchial inflammation in moderate and severe asthma; (3) asthma exacerbations should be reduced by minimizing exposure to allergens and irritants, and (4) physicians must establish a therapeutic relationship with patients and their families that will encourage patients to gain the skill and confidence to take an active role in managing their asthma.

### PEAK FLOW MONITORING

Patients who learn to obtain and record PEFR measurements at home can improve the management of their asthma. Daily PEFR monitoring helps detect early deterioration in airway patency, assess daily fluctuations in airway function

DMC 000858

Outpatient management of asthma in adults; includes patient information

and provide an objective measure for monitoring therapy. It is important to establish each patient's best PEFR value to monitor pulmonary status. Best PEFR values are identified by taking measurements twice daily over a two-week period while receiving optimal therapy. If the value is less than 80 percent of the predicted norm, continued monitoring on more aggressive therapy, including a course of oral steroids, is recommended.

Physicians should instruct patients to keep a daily log (Figure 3 ). Measurements should be taken in the morning and in the evening. If medications are being taken, PEFR values should be recorded both before and after therapy. Color zones that function like traffic signs may help patients more effectively monitor their lung function and make decisions about therapy according to a written plan agreed on with their physician.

For example, PEFR values in the "green zone" (e.g., 80 to 100 percent of ones personal best) indicate that the patient's pulmonary status is stable and no therapeutic changes are necessary. PEFR values in the "yellow zone" (e. g., 50 to 80 percent of one's best) indicate a deterioration of pulmonary status that requires additional medication taken according to a recommended protocol, or a telephone call or visit to the physician for advice. PEFR values that decline into the "red zone" (e. g., less than 50 percent of one's best) are a medical emergency. Patients should be instructed to use a bronchodilator and immediately contact their physician for evaluation if PEFR values do not rapidly improve. These zones are guidelines only. Specific zones should be tailored to each patient's condition.

PHARMACOLOGIC THERAPY

Asthma medications reverse airflow obstruction and correct underlying airway inflammation and hyperresponsiveness. Bronchodilators and anti-inflammatory agents are the major classes of asthma medications. Bronchodilators act principally to dilate the airways by relaxing bronchial smooth muscle. They include beta-adrenergic agonists, methylxanthines and anticholinergics.

An increased use of bronchodilators or a lack of expected therapeutic response to the medication is often an indication of diminished asthma control. Anti-inflammatory agents act prophylactically by interrupting the development of bronchial inflammation. They may also modulate or terminate ongoing airway inflammatory reactions. These agents include inhaled and systemic corticosteroids and cromolyn (Intal).

Medications are prescribed in a stepwise fashion for mild, moderate and severe asthma (Figure 4). Progression to the next step is indicated when the current step fails to achieve the goals of therapy despite correct use of medication. Once control is achieved and sustained for several weeks to months, a step down in therapy may be considered.

Patients with mild asthma have brief episodes of wheezing, coughing and dyspnea that occur no more than once or twice a week. Symptoms may arise following exposure to irritants, exercise or a respiratory tract infection. Except during the brief exacerbations, patients with mild asthma are asymptomatic.

Inhaled beta.sub.2 agonists are the treatment of choice for patients with mild asthma. These drugs are preferable to oral therapy because they have a faster onset of action and fewer adverse systemic side effects, and they achieve desired results at lower doses. 9 A usual dose is one to two puffs repeated every three to four hours as necessary during the asthma exacerbation. Use of an inhaler on a daily basis or more than three to four times a day indicates the need for additional treatment.

Moderate asthma is not adequately controlled by episodic administration of an inhaled beta.sub.2 agonist. In patients with moderate asthma, exacerbations occur more than twice a week, last a few days and affect sleep and activity levels. Occasionally, symptoms may be severe enough to require emergency care. Anti-inflammatory agents such as inhaled corticosteroids or cromolyn should be added to their regimen on a daily basis. Administered prophylactically via aerosol, cromolyn is thought to reduce inflammation by stabilizing mast cells. 10 The usual starting dose is two puffs taken four times daily. A four-to six-week trial of therapy may be necessary to determine the effectiveness of the drug. Side effects from inhalation of the dry powder are minimal. The most common reported side effect is coughing.

An inhaled corticosteroid is also an excellent anti-inflammatory drug for moderate asthma. While smaller doses (i.e., 400 to 800 Micro g per day of beclomethasone Beclovent, Vanceril or its equivalent) are typically prescribed, studies indicate that higher doses (e.g., more than 800 Micro g per day) may be particularly effective and should be tried if necessary. 11,12

Concentrations of formulations vary among the three current corticosteroid inhalers: bedomethasone, 42 Micro g per puff, triamcinolone acetonide (Azmacort), 100 Micro g per puff, and flunisolide (AeroBid), 250 Micro g per puff.

DMC 000859

The relative effect of each steroid formulation has not been established. The usual recommendation is to start patients on a dosage of two to four puffs twice daily of beclomethasone or its equivalent. Patients should be told that maximal improvement may take two to four weeks. Side effects of inhaled steroids are generally mild and include oropharyngeal candidiasis, dysphonia and occasional coughing. These adverse effects can be minimized by administering inhaled steroids with a spacer device or by rinsing the mouth after each use.

If symptoms persist after adding cromolyn or an inhaled corticosteroid, additional options are available. The dosage of inhaled corticosteroid may be increased. A longer acting bronchodilator, such as an oral beta agonist or a sustained relief theophylline preparation, may be added in the evening to control nocturnal symptoms.

If theophylline is prescribed, the dosage must be carefully calculated, and levels must be closely monitored to avoid significant side effects. 13 Although the optimal effect is produced by serum theophylline levels in the range of 10 to 20 Micro g per mL, a more conservative level of 5 to 15 Micro g per mL is often effective. Serum levels should be checked when starting the medication, when an adverse effect is suspected, when patients fail to demonstrate bronchodilation at the prescribed dose and when higher dosage levels are desired. Levels should also be checked when the patient has a condition such as a febrile illness or congestive heart failure, or is taking a medication known to affect theophylline blood concentration. Serum concentrations under 15 Micro g per mL are not generally associated with toxicity. Nausea and vomiting are usually the earliest signs of toxicity. Toxicity may be manifested by tachycardia, arrhythmias, tachypnea, hyperglycemia, hypokalemia and seizures.

When asthma is not controlled by maximal dosages of bronchodilators and cromolyn or inhaled steroids, a short course of oral corticosteroids may be indicated. A usual course in adults is 40 to 60 mg prednisone per day (in single or divided doses) for one week, followed by a tapering dose over one to two weeks. The onset of action begins three hours after administration and peaks after six to 12 hours.

Patients whose asthma is poorly controlled despite maximal doses of bronchodilators and corticosteroids or cromolyn may require systemic corticosteroid therapy on a routine basis. However, longterm oral steroid therapy is limited by significant adverse effects, including hypertension, osteoporosis, Cushing's syndrome, cataracts and suppression of the hypothalamic–pituitary–adrenal axis. If oral steroid therapy is the only option, the lowest possible dose should be prescribed, to be taken every other morning. Repeated attempts should be made to replace the oral medication with maximal doses of inhaled steroids. Furthermore, patients should be continually evaluated for the development of adverse effects. Patients with severe asthma should be evaluated by an asthma specialist.

## ENVIRONMENTAL CONTROL MEASURES

Reducing exposure to indoor and outdoor allergens is an important means of asthma control. Exposure to outdoor pollen and mold can be minimized by staying indoors in an air–conditioned environment with the windows closed during the midday and afternoon when pollen counts are highest. 14

Indoor allergens to be eliminated from the home include dust, mites, cockroaches and animal dander. 15 Unfortunately, warmblooded pets (especially cats and dogs) contribute greatly to the allergenic composition of house dust. If the pet cannot be removed from the house, it should be kept out of the patient's bedroom at all times, and the room's heating vents should be sealed off.

House dust mites depend on atmospheric moisture and human dander for survival. They are found in debris in mattresses, pillows, carpets, upholstered furniture, bed covers, clothes and soft toys. Dust mite control requires weekly hot–water washing of pillows and bedding. Mattresses should be encased in airtight covers, and carpets should be removed. 16

Mold is prominent in humid indoor environments. Frequent cleaning and ventilation of bathrooms, kitchens and basements is important. Indoor humidity should be reduced to less than 50 percent. Dehumidifiers may be necessary, especially in basements. Air conditioning is an effective method of climate control, because windows and doors stay closed and indoor humidity is reduced.

Referral for immunotherapy may be considered when it is not possible to avoid allergens and irritants, when medication fails to control allergic asthma and when specific immunotherapy of proven efficacy is available (e.g., house dust mite, cat dander, grass pollen).

## PATIENT EDUCATION

DMC 000860

Outpatient management of asthma in adults; includes patient information

Helping patients and their families learn to manage their asthma is essential to prevent exacerbations, hospitalization or death. Physicians can help patients develop the skill and confidence necessary to control this chronic condition. 17 Patients using inhaled bronchodilators or steroids should be instructed in the correct use of metered-dose inhalers.

Patients with moderate to severe asthma should be taught to use home peak flow monitoring. Keeping a daily log can help patients recognize patterns and learn effective responses. Patients should have an individually tailored medication plan for managing their asthma on a chronic basis, as well as an action plan to help them manage exacerbations. These plans should be agreed on with the patient. Patients should be aware of medication side effects. Their fears and misconceptions about asthma should be addressed. Periodically, physicians and patients should reevaluate their goals and the individual management plan, identify any barriers to effective treatment and agree on necessary treatment changes.

A patient information handout on the use of metered-dose inhalers is provided on the following page.

REFERENCES

1. Asthma—United States, 1980–1987. MMWR 1990;39:493–7.

2. National Asthma Education Program Expert Panel. Guidelines for the diagnosis and management of asthma. Bethesda, Md.: National Heart, Lung, and Blood Institute, 1991; DHHS publication no. 91–3042:

3. Cockcroft DW. Airway hyperresponsiveness: therapeutic implications. Ann Allergy 1987; 59:405–14.

4. Rachelefsky GS. The inflammatory response in asthma. Am Fam Physician 1992;45:15360.

5. Djukanovic R, Roche WR, Wilson JW, et al. Mucosal inflammation in asthma. Am Rev Respir Dis 1990;142:434–57.

6. Shim CS, Williams MH Jr. Relationship of wheezing to the severity of obstruction in asthma. Arch Intern Med 1983;143:890–2.

7. Burdon JG, Juniper EF, Killian KJ, Hargreave FE, Campbell EJ. The perception of breathlessness in asthma. Am Rev Respir Dis 1982; 126:825–8.

8. Kimmel SR. Use of the peak flow meter in office practice. Am Fam Physician 1986;34 (6):107–11.

9. Nelson HS. Adrenergic therapy of bronchial asthma. J Allergy Clin Immunol 1986;77: 771–85.

10. Bernstein IL. Cromolyn sodium. Chest 1985; 87(1 Suppl):68S–73S.

11. Salmeron S, Guerin JC, Godard P, et al. High doses of inhaled corticosteroids in unstable chronic asthma. A multicenter, double-blind, placebo-controlled study. Am Rev Respir Dis 1989; 140:167–71.

12. Toogood JH. High-dose inhaled steroid therapy for asthma. J Allergy Clin Immunol 1989; 83(2 Pt 2):528–36.

13. Tsiu SJ, Self TH, Bums R. Theophylline toxicity: update. Ann Allergy 1990;64(2 Pt 2): 241–57.

14. Solomon WR, Burge HA, Boise JR. Exclusion of particulate allergens by window air conditioners. J Allergy Clin Immunol 1980;65: 305–8.

15. Mansfield LE, Nelson HS. Allergens in commercial house dust. Ann Allergy–1982; 48: 205–9.

16. Murray AB, Ferguson AC. Dust-free bedrooms in the treatment of asthmatic children with house dust or house dust mite allergy: a controlled trial. Pediatrics 1983; 71:418–22.

17. Feldman CH, Clark NM, Evans D. The role of health education in medical management of asthma. Some program applications. Clin Rev Allergy 1987; 5:195–205.

The Authors

MARC L. RIVO, M.D., M.P.H. is director of the Division of Medicine in the Health Resources and Services Administration's Bureau of Health Professions, Rockville, Md. After graduating from the University of California, San Francisco, School of Medicine, he received a master's degree in health administration and policy from the University of California, Berkeley, School of Public Health, and completed a residency in family practice at the Duke-Watts program in Durham, N.C. Dr. Rivo represents the American Academy of Family Physicians on the National Asthma Education Program Coordinating Committee.

Outpatient management of asthma in adults; includes patient information

FLOYD J. MALVEAUX, M.D., PH.D. is aSSoCiate prOfeSSOr Of medicine and microbiology and chairman of microbiology at the Howard University College of Medicine, Washington, D.C., where he received his medical degree. He completed a doctorate in microbiology and immunology at Michigan State University, College of Human Medicine, East Lansing, a residency in internal medicine at Washington Hospital Center, Washington, D.C., and a fellowship in allergy and clinical immunology at Johns Hopkins University School of Medicine, Baltimore. Dr. Malveaux is a member of the National Asthma Education Program Expert Panel that drafted the clinical guidelines for treatment of asthma.

**GRAPHIC:** Table; Chart; Graph; Diagram

**LOAD-DATE:** August 24, 1995

DMC 000862

# EXHIBIT 16

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FLEXI-MAT CORPORATION, an Illinois corporation,<br><br>        Plaintiff,<br><br>     v.<br><br>DALLAS MANUFACTURING COMPANY, a Texas corporation, BJ'S WHOLESALE CLUB, INC., a Delaware corporation, and DOSKOCIL MANUFACTURING COMPANY, INC., a Texas corporation,<br>        Defendants. | Civil Action No. 04 10162 DPW<br><br>SIMON HANDELSMAN'S<br>EXPERT REPORT ON VALIDITY |

DALLAS MANUFACTURING COMPANY, INC., a corporation,

        Counter-claimant,

     v.

FLEXI-MAT CORPORATION, a corporation,

        Counter-defendant.

BJ'S WHOLESALE CLUB, INC., a corporation,

        Counter-claimant,

     v.

FLEXI-MAT CORPORATION, a corporation,

        Counter-defendant.

DOSKOCIL MANUFACTURING COMPANY, INC., a corporation,

        Counter-claimant,

     v.

FLEXI-MAT CORPORATION, a corporation,

        Counter-defendant.

FM Validity Ex. 16

If called to testify in this case, I will express the following opinions at the trial, the basis and reasons for which are set forth below and detailed in the documentation identified below. I reserve the right to supplement these opinions in the event of new information.

**The Basis For My Opinion**

In preparation for this declaration and pursuant to my role as expert witness, I have reviewed the following documents and things which serve as the data and information upon which I base the opinions set forth herein:

1. U.S. Patent No. 5,765,502 ("the '502 patent");

2. The file history of the '502 patent;

3. Various pet beds, which I understand were manufactured by Doskocil and Dallas (as described in more detail below);

4. The patents and publications set forth on the face of the '502 patent as "References Cited";

5. Testimony from Neil Nivert, an employee of Dallas Manufacturing;

6. "Expert Report of Suzanne Fessler re:  Validity Issues for U.S. Patent No. 5,765,502" dated September 23, 2004 ("Fessler Validity Opinion" or simply "Op."); and

7. The patents and articles referenced in the Fessler Validity Opinion.

8. The dictionary definitions referenced in my Report.

I also have extensive knowledge and personal experience in the research and development of products for the pet industry, and I used this knowledge and experience in preparing this report.

2

**Statement of My Opinion**

The claims at issue (claims 1-3) read as follows:

1. A pet bed comprising:

> an outer covering;

> a removable cushion disposed within the outer covering to form a cushioned bottom portion; and

> a bolster removably disposed within the interior of the outer covering and substantially all of said bolster disposed exteriorly about at least a portion of the perimeter of the bottom portion without being secured to the removable cushion.

2. The pet bed of claim 1, wherein the outer covering further includes a reclosable access opening.

3. The pet bed of claim 2, wherein the reclosable access opening further includes a zipper.

> Figures 2 and 5 from the '502 patent are shown below.



### A.    Person of Ordinary Skill

In my opinion, a person of ordinary skill in the art relevant to the '502 patent has at least a high school diploma or trade technical/junior college courses in product design, fashion or the like; and some practical experience working with pet product development.    Also, a person of ordinary skill would have knowledge of pet behavior, especially sleeping behavior, and experience in designing pet beds.

**B.    The Prior Art Cited by Ms. Fessler Do Not Alone or In Combination Disclose or Make Obvious Claims 1-3 Of The '502 Patent**

**1.    U.S. Patent No. 5,421,044 (Steensen)**

I have reviewed U.S. Patent No. 5,421,044 (Steensen).  Steensen describes a human air bed, not a pet bed, and Figures 1, 2 and 3 are shown below.  It is not analogous art.



FIG. 1

FIG. 2

FIG. 3

<u>Not a Pet Bed</u>

The '502 patent describes only pet beds.  Pets, primarily dogs and cats, use pet beds differently than humans use human beds.  Human beds are usually raised above the floor and not placed on the floor, like pet beds.  Pets have both denning and guarding instincts, and prefer to have their heads facing out to keep an eye out for approaching danger.  When a pet sleeps, in general, it prefers to keep its back in a position where attack is limited or against a protective structure such as a wall.  Also, pets tend to be dirtier than humans.  Because pet beds become

5

dirty, the pet beds should be easy to clean. Pet beds do not have sheets that can be cleaned. In contrast, human beds typically have sheets that can be cleaned. Human beds are usually used with the human's head, not the human's back, next to a headboard or wall. Human beds are substantially different from pet beds. Steensen does not discuss pet beds, the needs of a pet or requirements for pet beds.

No Bolster

Contrary to Ms. Fessler's argument, Steensen does not disclose a bolster as described in the '502 patent. Ms. Fessler argues that each of the air tubes 31, 32, 33, 34, 35, and 36 is a bolster as recited in claim 1. Op. at 11. The '502 patent explains that the claimed bolster is a separate structure from the bottom cushion and is not part of the bottom cushion. The bolster of the '502 patent can be used as a pillow by the pet and it is described in the claims as separately removable from the bottom cushion.

The Steensen patent discloses a human bed without a bolster. The tubes 31, 32, 33, 34, 35, and 36 together with air tubes 42 and pads 58 and 59 make up a single bottom portion or resting surface (shown above). As described in the Steensen patent, the foam pads 58 and/or 59 and tubes 31, 32, 33, 34, 35, and 36 and 42 "provide a soft cushioned feel to the user, and are used to provide a level top surface." Col. 4, lines 26-27 (emphasis added). These air tubes do not provide a structure separate from the "level top surface" for the user of the air bed and are not the bolster described and claimed in the '502 patent.

Foam Pads

Ms. Fessler incorrectly describes the Steensen patent at page 12 of her report to suggest that the foam pads need not be used. Actually, the language of the Steensen patent from which

6

she quotes teaches that the assembled bed should include the foam pads so that the top surface is level.

### Non-removable interconnected air tubes

Ms. Fessler asserts that the air tubes of the Steensen air mattress (both those that she claims are the bottom cushion and those that she claims are the bolsters) are removable because the outer covering can be unzipped and each of the air tubes 31-36, 42 and 45 can be removed from the air mattress. She further claims that these air tubes are not connected. Op. at 11. She is wrong.

The term "removable cushion" is used in the '502 patent to describe a cushion that is designed to be removed from the outer cover and then replaced. "The pet bed should be . . . equipped with a one-piece cover and separately removable bolster and bottom cushion for ease of cleaning." Col. 1 lines 60-64. The '502 patent also discusses the construction of the pet bed in a manner that provides for the ease of removing and replacing the bolster and bottom cushion at Col. 3, lines 8-17:

> Access to the interior of the outer covering 2 is preferably provided by a zipper 7.
> Thus, the bolster 6 is easily removable by the simple expedient of unzipping the
> zipper 7 on the bottom of the pet bed 1, disengaging the straps 8, and
> withdrawing the bolster through the reclosable access opening 11 that is sealed by
> the zipper 7. The bottom cushion 4 can also be withdrawn in the same way. The
> outer covering 2 can then be cleaned, and the bolster 6 and cushion 4 can be
> washed and replaced within the outer covering 2.

A pet bed with a removable cushion as described in the '502 patent is one that is specifically designed in a manner such that the bolster and bottom cushion can be readily removed and replaced and excludes the removal by a means that would require such excessive effort as to discourage a pet bed owner from removing the bolster and bottom cushion or destroy the bed. Removability is a benefit to the pet bed owner, allowing convenient removal of both the bolster

and bottom cushion. "Removable" does not include disassembling a connection that is intended to be permanent, cutting seams, or tearing the fabric to access the bolster and bottom cushion.

None of Steensen's air tubes are removable. The lower air tubes 45 are in a magazine formed of two rectangular sheets, and held in place by restraining straps 52. The air tubes 31, 32, 33, 34, 35, and 36 and the air tubes 42 that make up the cushioned bottom portion of the Steensen bed are, like the air tubes 45, connected by hose assembly 77 through a hole 80 in the bottom panel 14 of the outer cover to an air pump via a manifold block, both of which are located outside the outer cover. Col. 7, lines 37-43. Figures 7 and 8 (below) show the

permanently installed air tubes interconnected with the air hoses, which supply air pressure. Contrary to Ms. Fessler's report, each of the air tubes are connected to the remaining air tubes through this system of air hoses. These interconnected air tubes mean that 1) the bolster asserted by Ms. Fessler is not "removable"; 2) the bolster asserted by Ms. Fessler is secured to the bottom cushion; and 3) the bottom cushion is not "removable."



FIG. 7



FIG. 8

While I agree that the pads 58 and 59 are removable, I do not agree that they alone or individually make up the bottom cushion claimed in the '502 patent. They are simply parts of

8

the bottom cushion.  Air tubes 31, 32, 33, 34, 35, and 36 together with air tubes 42 and pads 58

and 59 make up the "level top structure" of Steensen's air bed.

### 2.    U.S. Patent No. 5,136,981 (Barreto)

<u>No Bolster</u>

Ms. Fessler is wrong in asserting that the side wall of Barreto "comes within the scope of the 'bolster' in claim 1." A *bolster* is commonly understood to be a long, narrow pillow or cushion. Am. Herit. Dict. (2000). It is a pillow for use by the pet while it rests. The '502 patent confirms that this ordinary usage of the term *bolster* is intended. The '502 patent describes the bolster as a "long, slender pillow," col. 3, line 4, and "more cylindrical or banana-shaped than flat, and more like a pillow than a wall," col. 2, lines 56-57, so that it "tends to retain its shape even when used as a pillow by the pet, and does not easily collapse from the weight of the pet as in some prior art products." Col. 2, lines 58-60.

Representative illustrations of Barreto's walled pet bed in perspective and cross-section are shown below.



A bolster is not a wall. The '502 patent specifically distinguishes between pet beds that use a wall and those that use a bolster. In the section of the '502 patent entitled Background of the Invention, the patent describes previously-known walled pet beds and explains why they are unsatisfactory, *i.e.*, because the wall "does not provide support for heavier ... animals" to use as

10

a headrest and "tends to collapse … unless it is made of material so rigid that it is uncomfortable." Col. 1, lines 21-26. Examples of these pet beds that used walls were provided to the Patent and Trademark Office during the application process leading to the issuance of the '502 patent. See DMC000068, 70-73, 75.

In contrast to the walled beds, the Summary of the Invention section of the '502 patent explains that the invention, rather than using a wall and a bottom cushion, uses a bolster and a bottom cushion. Subsequently, in the Detailed Description of the Invention, the '502 patent explains that:

> Since the bolster 6 is more cylindrical or banana-shaped than flat, and **more like a pillow than a wall**, the bolster 6 tends to retain its shape even when used as a pillow by the pet, and does not easily collapse from the weight of the pet as in some prior art products.

Col. 2, lines 57-60 (emphasis added).

Barreto discloses the same wall as that disclosed in the prior art cited to the Patent and Trademark Office by the applicant of the '502 patent. Barreto explains that "[t]he <u>sidewall</u> serves as a wall against which the pet may lean," Col. 3, lines 57-58, and the sidewall has "a generally upright orientation with respect to [the] base", Col. 8, lines 3-4, and it "extends upwardly" from the base, Col. 8, lines 7-8. In contrast to a bolster, Barreto's wall creates an "enclosure" for the pet to provide security and does not act like a pillow. Barreto also teaches that the "foam–core material" used to construct the wall can vary in thickness of between 1/4" to 6" and is "dependent upon the size and weight of the pet." This teaching is clearly that a larger pet requires a more substantial wall to lean against, not that a thicker wall becomes a bolster. Barreto does not teach the use of a bolster.

Those persons experienced in the pet industry also distinguish between the terms *bolster* and *side wall* and recognize the difference between the two structures.  The term *bolster*, as used in the '502 patent, does not include a wall.

3.    **U.S. Patent No. 4,754,513 (Rinz)**

I have reviewed U.S. Patent No. 4,754,513 (Rinz).  As shown in Figures 1 and 5 below

from Rinz, it describes a pillowcase and insert, for use by humans in relieving neck pain.  It is

not analogous art.



Not A Pet Bed

Human pillows are not for pets and are not pet beds.  Pillows are for supporting the head

of the user, while a pet bed is supposed to support the entire animal.

Substantially All Of The Bolster Is Not Disposed Exteriorly

Rinz does not teach a bolster substantially all of which is disposed exteriorly about at

least a portion of the perimeter of the bottom portion.  Rinz describes a semi-cylindrical insert in

combination with a conventional pillow, both within a pillowcase that has a pocket formed inside

one panel for the insert.  The semi-cylindrical insert is shown on top of the pillow.

Ms. Fessler's reliance on Col. 1, lines 53-56 is misplaced.  These lines state:

> The position of the insert 16 can be adjusted by simply rotating the pillowcase 10
> having the pocket 15 and insert 16 received therein, about the conventional pillow
> 17 in accordance with the preferance [sic] of the user . . . .

From this statement, Ms. Fessler speculates that if a person rotated the pillowcase far enough, the

insert could be positioned beside the pillow.  But, the only disclosed location of the insert 16 is

atop the pillow 17. There certainly is no teaching or suggestion in the Rinz patent to make substantially all of the bolster disposed exteriorly about at least a portion of the perimeter of the bottom portion, as described in claim 1 of the '502 patent. Also, there is no teaching or suggestion in Rinz to rotate the pillow case to the extent or in the manner suggested by Ms. Fessler. The rotation actually suggested by the Rinz patent is to "prevent and provide relief from morning headache, stiff neck, pain in the back, shoulders, and arms, tension and generally provide for a comfortable, relaxed sleep." Col. 2, lines 57-60. To accomplish those purposes, the insert should remain atop the pillow.. If one were to rotate the pillow case as Ms. Fessler suggests, the insert would simply lie along side the pillow and, due to the constraints of the pillowcase, compress the pillow. In other words, the insert would cease functioning as a neck support and in effect become part of that pillow.

4.    **U.S. Patent No. 5,586,350 and German Patent No. 93 09 699.2 (Thönnessen)**

Not a Pet Bed

I have reviewed U.S. Patent No. 5,586,350 (Thönnessen). Thönnessen describes a low

flammability pillow, not a pet bed. It is not analogous art. As explained above, a human pillow

is not a pet bed.



Substantially All Of The Bolster Is Not Disposed Exteriorly

It is unclear whether Ms. Fessler is claiming that all of the limitations of Claim 1 of the

'502 patent are present in the pillow disclosed by Thönnessen. She concedes that the "bolster

pillow ... is disposed atop the bottom portion," Op. at 26, but then states:

> "[I]f Claim 1 of the '502 patent were read to cover a bed with the bolster atop the
> bottom cushion, then it would be anticipated by the '350 patent."

Op. at 26. Apparently, however, she concludes that Claim 1 of the '502 patent should not be so

interpreted. I agree that it should not.

Thönnessen does not teach or disclose a bolster substantially all of which is disposed

exteriorly about at least a portion of the perimeter of the bottom portion.

15

Ms. Fessler speculates "that if a person using the pillow disclosed in the [Thönnessen] patent were to lean against or push on the cylindrical roll, the cylindrical roll could lean over the side of the pillow or at least partly flop over the side of the pillow," Op. at 26, but this is not what is shown or taught by Thönnessen. Thönnessen shows only a roll atop the pillow and there is no suggestion that the roll would flop over the side. If the roll were pushed over the side of the pillow, it would no longer work as a neck roll. Further, before concluding that the roll could flop over as Ms. Fessler claims, one would need to see the actual construction of the product and know for example: What is the connection made of? How strong is the connection? How tight are the covers to the roll and pillow? What kinds of material are the covers made of?

Ms. Fessler also argues that the phrase "substantially all of the bolster" being disposed exteriorly about the perimeter of the bottom portion means that a "significant amount of the bolster cannot be atop the bottom cushion." Op. at 25. I disagree.

The modifying term *substantially* is used in its common and ordinary manner. The term "substantially" as used in claim 1 does not exclude a "significant" part of the bolster being atop the bottom cushion. *Substantially* means considerable in importance, value, degree, amount, or extent. Am. Herit. Dict. (2000). Merriam Webster's Online Dictionary defines "substantially" as "being largely <u>but not wholly</u> that which is specified." In specifying that only "substantially all of the bolster" rather than all or the entirety of the bolster be disposed outside the bottom portion, Claim 1 specifically allows that a portion of the bolster be located or disposed on top of the bottom portion. The claim does not require that the amount of the bolster on top of the bottom cushion be significant, as Ms. Fessler argues, or insignificant.

<u>No Bolster That Is Not Secured To The Removable Cushion</u>

I disagree with Ms. Fessler's interpretation of Figure 1 of Thönnessen. Ms. Fessler states in regard to Figure 1 that "[t]he bolster cushion is connected 'detachably' to the bottom cushion," and that "[w]hen the bolster cushion 3 is detached from the bottom cushion 2, the bolster cushion is not secured to the bottom cushion." Op. at 25-26. She then concludes that Thönnessen discloses that the bolster need not be secured to the removable bottom cushion (the nonwoven block 2). Op. at 26. Thönnessen does not teach a bottom cushion with an unsecured bolster.

Figure 1 of Thönnessen discloses only a neck roll that is secured to the pillow. See connection 4 in Figure 1, connection 14 in Figure 2, col. 2, lines 14-39 and lines 49-61 (describing nature of connection). And, when the neck roll is detachably secured to the pillow, as in Figure 2, detaching the neck roll and pillow results in two, separate parts that do not function together. These separate components are not the assembly taught by the patent, and Ms. Fessler's modification in effect destroys the Thönnessen invention. Thönnessen does not disclose a bolster that is not secured to the removable cushion and, in fact, teaches away from this limitation of claim 1 of the '502 patent.

Further, *secured* as used in the claims of the '502 patent means firmly fastened, as in *a secure lock*. Am. Herit. Dict. (2000). A secure lock can still be opened, and thus, *secured* does not require permanence, as Ms. Fessler suggests by alleging that a "detachable" connection between the bolster and bottom cushion falls within the scope of claim 1. Thus, *without being secured to the removable cushion* means that the bolster is not fastened to the cushion, whether permanently or detachably.

### 5.    U.S. Patent No. 4,872,228 (Bishop) and (a) Murray & Ferguson or (b) Walshaw and Evans or (c) Rivo and Malveaux

<u>Not A Pet Bed</u>

I have reviewed U.S. Patent

No. 4,872,228 (Bishop).    Bishop

describes a bed guard for human beds

(shown at right) and in particular, for

those who need to be restrained in

their bed, such as children, the infirm,

and those who otherwise fall out of

bed.    It is not analogous art.    As

explained above, human beds are not

pet beds.    A guard for a human bed is

certainly not a pet bed.



Again, it is unclear whether Ms. Fessler is claiming that all of the limitations of Claim 1

of the '502 patent are present in the bed guard disclosed by Bishop.    She concedes that the

bolster is disposed atop the mattress, Op. at 30, and then states:

> "[I]f claim 1 of the '502 patent were read to cover a bed with the bolster atop the
> bottom cushion, then it would be anticipated by the '228 patent."

Op. at 30.    Apparently, however, she concludes that Claim 1 of the '502 patent should not be so

interpreted.    I agree that it should not.

Ms. Fessler speculates "that if a person using the bed disclosed in the '228 patent were to

roll against or lean on one of the bolsters, the bolster could lean over the side of the bed or at

least partly flop over the side of the bed," Op. at 30, but this is not what is shown or taught by

18

Bishop. Bishop shows only a bolster atop the bed and there is no suggestion that the roll would flop over the side. In fact, the suggestion is clearly to the contrary. The Bishop bed was designed to "reduce the risk of people accidentally falling out of conventional beds.' If the bolsters "could lean over the side of the bed or at least partly flop over the side of the bed," they would not serve their intended purpose of keeping people in bed.

Further, before concluding that bolsters could act as Ms. Fessler claims, one would need to see the actual construction of the product and know, for example: How strongly and tightly are the bolsters anchored to the mattress? What kinds of material are the sheets used to anchor the bolsters made of?

Ms. Fessler concedes that Bishop does not teach or suggest the reclosable access opening of claim 2 or the zipper of claim 3. Thus, Bishop does not teach each and every element of claims 1-3.

### The Asthma Articles

I have also reviewed the three articles, (a) Murray & Ferguson and (b) Walshaw and Evans and (c) Rivo and Malveaux. These articles all relate to treatment of human asthma. Treating asthma and pet beds are at cross purposes because I believe asthmatics are not supposed to be exposed to pet dander. A person designing a pet bed would not look to the art pertaining to the treatment of human asthma to assist in that design effort. These articles are not analogous art.

I have found no suggestion in these articles or in Bishop that their teachings should be combined in any manner. Moreover, these articles do not disclose the limitations missing from Bishop. Even if combined, the asthma articles, alone or in combination with Bishop, do not teach or suggest every limitation of claims 1-3.

19

**6.    U.S. Patent No. 4,873,734 (Pollard) and (a) Murray & Ferguson or (b) Walshaw and Evans or (c) Rivo and Malveaux**

I have reviewed U.S. Patent No. 4,873,734 (Pollard). Figure 1 from Pollard is shown.

<u>Substantially All Of The Bolster Is Not Disposed Exteriorly</u>

It is unclear whether Ms. Fessler is claiming that all of the limitations of claim 1 of the '502 patent are present in the bumper sheet disclosed by Pollard and shown at right. After describing the inserts as disposed atop the mattress and conceding that they are not



disposed exteriorly as described in claim 1 of the '502 patent, she states:

> "[I]f claim 1 of the '502 patent were read to cover a bed with the bolster atop the bottom cushion, then this distinction [of the inserts being disposed atop the mattress] would be moot."

Op. at 35. Apparently, however, she concludes that Claim 1 of the '502 patent should not be so interpreted. I agree that it should not.

Ms. Fessler speculates "that if a person were to use the [Pollard] bumper sheet on a mattress outside a crib and were to roll against or lean on one of the inserts, the insert could lean over the side of the mattress or at least partly flop over the side of the mattress," Op. at 35, but this is not what is shown or taught by Pollard. As Ms. Fessler concedes, Pollard shows only bumper guards atop the mattress and there is no suggestion that the bumper guards would flop over the side. In fact, if a bumper guard did flop over, then it would not be a bumper guard because the user would then roll out of bed and the guard would not serve its intended purpose. See Col. 2, line 65-Col. 3, line 2 (noting that the bed guards can be used in a regular bed).

20

Further, before concluding that the bumpers could act as Ms. Fessler claims, one would need to see the actual construction of the product and know, for example: How strongly and tightly are the bed covers or sheets joined to the cylindrical inserts? What kinds of material are the covers made of?

Ms. Fessler concedes that Pollard does not teach or suggest the reclosable access opening of claim 2 or the zipper of claim 3.

Thus, Pollard does not teach each and every element of claims 1-3.

The Asthma Articles

I have also reviewed the three articles, (a) Murray & Ferguson and (b) Walshaw and Evans and (c) Rivo and Malveaux. As explained above, these articles all relate to treatment of asthma. Neither these articles nor Pollard provide a suggestion to combine these references. For the same reasons that they do not address the deficiencies of Bishop, as explained above, they also do not address the deficiencies of Pollard. Thus, even if combined, they, alone or in combination with Pollard, do not teach every element of claims 1-3.

21

7.  **U.S. Patent No. 5,010,843 (Henry)**

I have reviewed U.S. Patent No. 5,010,843 (Henry). Representative figures are shown.



Substantially All Of The Bolster Is Not Disposed Exteriorly

It is unclear whether Ms. Fessler is claiming that all of the limitations of claim 1 of the '502 patent are present in the pet bed disclosed by Henry. She concedes that:

> "The top cushions 14 and 16 of the '843 patent are disposed atop the bottom cushion. But if claim 1 of the '502 patent were read to cover a bed with the bolster atop the bottom cushion, then this distinction would be moot."

Op. at 40. Apparently, however, she concludes that Claim 1 of the '502 patent should not be so interpreted. I agree that it should not.

Ms. Fessler speculates "that if a pet were to use the '843 pet bed as shown in Figure 4 of the '843 patent, and were to roll against or lean on one of the top cushions, the top cushion could lean over the side of the bottom cushion or at least partly flop over the side of the bottom cushion," Op. at 40, but this is not what is shown or taught by Henry. Henry shows only cushions atop the bottom cushion and there is no suggestion that the top cushions



FIG. 4

would flop over the side. Henry teaches that "[t]he semi-circular edges 18, 20 of the top cushions are coincident with the circular top edge 22 of the base cushion 12. The circumferential edges 18, 20, 22 are joined together by any suitable means ...." Col 2, lines 19-23. In order for the semi- circular cushions to lean over the side of the bottom cushion, the joined edges would have to be at least partially separated or removed. Henry teaches joining the cushions in such a manner that the top cushions do not move from their position atop the bottom cushion. Ms. Fessler is suggesting something contrary to Henry.

Further, the Henry bed was designed to form pockets between the top and bottom cushions and a trough between the two top cushions. Col. 1, lines 44-50. As Henry states, "[d]ogs seem to have an instinct to withdraw into recesses and trough-like depressions. Col. 1, lines 19-20. If the top cushions "could lean over the side of the bottom cushion or at least partly flop over the side," Op. at 40, then the top cushions would not serve their intended purpose of providing a recess or trough-like depression. Further, even if the joined edges of the cushions of Henry were partially separated, before concluding that top cushions could act as Ms. Fessler claims, one would need to see the actual construction of the product and know, for example:

23

How strongly and tightly are the edges joined between the top and bottom cushions? What kinds of material are the cushion covers made of?

8.    **U.S. Patent Nos. 5,588,393 and 5,826,537 (Heilborn)**

I have reviewed U.S. Patent Nos. 5,588,393 and 5,826,537 (Heilborn).

<u>No Bolster</u>

As explained above with respect to the Barreto patent, walls are not bolsters. Heilborn discloses pet beds with walls, not bolsters. Heilborn does not disclose the bolsters claimed in the '502 patent.



**C.    The '502 Patent Describes The Claimed Invention And How To Keep The Bolster In Place**

I disagree with Ms. Fessler's opinion that:

> [A] person of ordinary skill would not understand from the patent specification that the inventor had possession of an invention in which the bolster is somehow disposed in the outer covering in a particular relationship with the bottom portion without the bolster being affixed or otherwise secured to the outer covering.

Op. at 47.

Claim 1 of the '502 patent does not include a limitation requiring that the bolster be affixed or otherwise secured to the outer covering. It does contain a limitation that the bolster be disposed in the outer covering in a particular relationship with the bottom portion. One of ordinary skill would understand that the inventor had possession of the invention actually described in claim 1.

The patent specification makes clear that the inventor did have possession of an invention in which the bolster is disposed in the outer covering in a particular relationship with the bottom portion, *i.e.*, such that substantially all of the bolster is disposed exteriorly about at least a portion of the perimeter of the bottom portion. The patent discloses the use of a "bolster pocket" and a "bottom pocket" to create such a relationship. Col. 2, lines 9-14.

Further, the specification teaches that one way of keeping the bolster in the bolster pocket so that it is disposed in a particular relationship with the bottom portion is to affix the bolster in the bolster pocket. Various ways of affixing the bolster through the use of straps, fasteners etc. are disclosed.

Another way to dispose the bolster, that would have been recognized by one of skill in the art upon reading the '502 patent, would be to simply separate the bolster pocket from the bottom pocket by stitching the bolster pocket closed and providing for an access to the bolster pocket separate from the access to the bottom pocket. While the patent makes clear that

26

substantially all of the bolster is to be disposed exteriorly about the perimeter of the bottom portion, nowhere does it make any particular method of so locating the bolster critical to the invention.

Based on the patent's disclosure of "pockets" for both the bolster and bottom cushion, one of ordinary skill would know to simply size the pockets closely to the shapes of the bolster and bottom cushion and thereby retain them in the claimed spatial relationship.

I also disagree with Ms. Fessler's opinion that:

[C]laim 1 requires the pet bed to perform the function of keeping the bolster "disposed exteriorly about at least a portion of the perimeter of the bottom portion," but fails disclose [sic] or explain how this is done or accomplished."

Op. at 48.

First, claim 1 does not state or require any "function" that the pet bed must perform. Claim 1 requires that the pet bed have a bolster (defined above), and then further requires that this bolster be located in a particular relationship to the bottom portion, *i.e.,* substantially all of the bolster disposed exteriorly. Secondly, even if claim 1 were rewritten to require the "function" asserted by Ms. Fessler, the patent does disclose "fasteners or straps" as a "means to keep the bolster in the required position," as conceded in Ms. Fessler's report at page 48.

My qualifications, compensation and expert testimony in other cases have not changed since the time of my Expert Report on Infringement and are set forth in that report.

Having been informed that willful false statements and the like so made are punishable by fine or

imprisonment, or both, under Section 1001 of Title 18 of the United States Code, I declare under

penalty of perjury that the foregoing is true and correct:

October 20, 2005                                        Simon Handelsman

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of SIMON HANDELSMAN'S EXPERT REPORT

ON VALIDITY was served, via e-mail and first class mail, postage pre-paid, on this 21st day of

October, 2005 upon:

Gary A. Clark / gclark@sheppardmullin.com
Darren M. Franklin / dfranklin@sheppardmullin.com
SHEPPARD MULLIN
333 South Hope Street, 48th Floor
Los Angeles, California 90071-1448
Facsimile: 213/620-1398

James J. Marcellino (BBO # 318840) / U.S. Mail Only
David M. Mello (BBO #634722) / U.S. Mail Only
MCDERMOTT, WILL & EMERY
28 State Street
Boston, Massachusetts 02109
Facsimile: 617/535-3800

Roy W. Hardin / rhardin@lockeliddell.com
M. Scott Fuller / sfuller@lockeliddell.com
Locke, Liddell & Sapp LLP
2200 Ross Avenue, Ste. 2200
Dallas, Texas 75201-6776
Facsimile: 214/740-8800

William Meunier / wmeunier@goodwinprocter.com
Richard Myrus / rmyrus@goodwinprocter.com
Goodwin Procter LLP
Exchange Place
Boston, MA 02109
Facsimile: 617/523-1231

*Lisa C. Childs*
_____
One of the Attorneys for Plaintiff