# EXHIBIT 17

**EXPERT REPORT OF SUZANNE FESSLER**
**RE: VALIDITY ISSUES FOR U.S. PATENT NO. 5,765,502**

### I.

### <u>INTRODUCTION</u>

I have been retained by the law firms of Sheppard, Mullin, Richter & Hampton LLP and Locke, Liddell & Sapp LLP to serve as an expert witness on behalf of Dallas Manufacturing Company, Inc., Doskocil Manufacturing Company, Inc., and BJ's Wholesale Club, Inc. I have been asked as an expert witness to analyze the disclosure of U.S. Patent No. 5,765,502 ("the '502 patent") and other patents and publications that I am informed are "prior art" to the '502 patent, and to address issues relating to the validity or invalidity of certain claims of the '502 patent. I am informed that the '502 patent is assigned to Flexi-Mat Corporation, as shown on the face of the patent. I also have been asked to address issues relating to infringement or non-infringement of the '502 patent by certain pet beds sold by Dallas Manufacturing, Doskocil, and BJ's Wholesale Club. I have no past or present affiliation with any of these entities or with anyone associated with them to the best of my knowledge.

This report discusses the '502 patent and the ways in which the inventions set forth in claims 1-3 of the '502 patent were disclosed or suggested by the prior art before April 18, 1996. This is the filing date shown on the face of the '502 patent, which I am informed is the relevant date for determining what is prior art. I understand that claims 1-3 are the only claims of the '502 patent that Flexi-Mat asserts are infringed by pet beds sold by Dallas Manufacturing, Doskocil, and BJ's Wholesale Club. In this report, I will refer to these claims and pet beds as the "asserted claims" and the "accused

**FM Validity Ex. 17**

pet beds," respectively. Issues relating to whether the accused pet beds infringe the asserted claims will be addressed in a later report.

## II.

## BACKGROUND OF U.S. PATENT NO. 5,765,502

In general, the '502 patent characterizes what is disclosed in the patent as follows:

> A pet bed comprising an outer covering, a removable cushion disposed within the outer covering to form a cushioned bottom portion, and a bolster removably affixed to the interior of the outer covering and disposed about at least a portion of the perimeter of the bottom portion. The outer covering further includes a reclosable access opening permitting both the bottom cushion and bolster to be removed as needed.

('502 patent, Abstract.)

The '502 patent further states, "This invention relates generally to a pet bed and in particular to a pet bed having a removable bolster." ('502 patent, col. 1, lines 4-5.)

Claims 1-3 of the '502 patent read as follows:

1. A pet bed comprising:

an outer covering;

a removable cushion disposed within the outer covering to form a cushioned bottom portion; and

a bolster removably disposed within the interior of the outer covering and substantially all of said bolster disposed exteriorly about at least a portion of the perimeter of the bottom portion without being secured to the removable cushion.

2.  The pet bed of claim 1, wherein the outer covering further includes a reclosable access opening.

3.  The pet bed of claim 2, wherein the reclosable access opening further includes a zipper.

('502 patent, col. 3, lines 37-46.)

## III.

## LEGAL STANDARDS

I am informed that the legal analysis of patent invalidity involves two steps; first, the claims at issue must be construed; and second, the claims as construed are compared to the prior art.  Claims are construed as a matter of law by assigning the ordinary and customary meaning of each term as would be understood by one of ordinary skill in the art.  The claims are construed in view of the written specification, the drawings, and the prosecution history.

### Level of Ordinary Skill

I am informed that, in patent law, the level of ordinary skill in the art is based on factors such as the educational level of the inventor, the educational level of those who work in the industry, and the sophistication of the technology involved, in addition to the type of problems encountered in the art, prior art solutions to those problems, and the rapidity with which innovations are made in the particular technology.

### Claim Interpretation

I am informed that the claims of a patent are the numbered paragraphs at the end of the patent, following the words "I claim" or the like.  Each claim of a patent is

a legal definition of the invention covered by the patent.  Interpretation of a claim is a question of law for the Court.

I am informed that a claim generally consists of three parts:  a preamble, a transition clause, and a body usually consisting of several "elements" or "limitations" that must be met in order to be considered a practice of the invention covered by the patent.

I am informed that, generally, the preamble of a claim is an introductory phrase that may summarize the invention, its relation to the prior art, or its intended use.  In this case, the preamble of claims 1-3 is the words "pet bed."  The preamble must be read in the context of the entire claim, and whether the preamble limits the claim can only be resolved upon a review of the entirety of the record to gain an understanding of what the inventors actually invented and intended to encompass by the claim.  However, when the preamble recites essential structures or steps that are necessary to give life, meaning, and vitality to the claim, the preamble is a limitation on the claim.

I am informed that the transition clause indicates whether the claim is considered "open ended" or "closed ended."  In claims 1-3, the transition clause is the word "comprising."  This indicates that claims 1-3 are open-ended claims, which means that these claims are satisfied by anything that has or includes at least every element or limitation in the body of the claim.  In other words, infringement of an open-ended claim is not avoided by an accused product that has more features than specified by the element or limitations in the body of the claim.  By the same token, an open-ended claim does not distinguish over the prior art just because the prior art may have more features than specified by the element or limitations in the body of the claim.

I am informed that claim construction analysis begins with the words of the claim. The claims are interpreted to have the ordinary and customary meaning that would be attributed to the claim terms by those of ordinary skill in the art at the time of the filing of the patent application. Properly viewed, the "ordinary meaning" of a claim term is its meaning to the ordinary artisan after reading the entire patent. Dictionary definitions may be useful in illustrating the ordinary meaning of the claim terms. However, in interpreting claim terms, the general meanings gleaned from such references must always be compared with the use of the terms in context of the claim and the "intrinsic record" (i.e., the patent and its file history) to ensure that the interpretation is consistent with the use of the words by the inventor.

I am informed that claims are not interpreted in a vacuum; rather, they must be interpreted in light of the specification of which they are a part. Where the specification expressly defines a claim term differently from the ordinary meaning, the specified definition supersedes the ordinary meaning. The meaning expressed in the specification is applied for interpreting the claim. Furthermore, claim terms are not limited by preferred embodiments described in the patent unless the claim language states otherwise.

I am informed that the prosecution history may be used to clarify ambiguity, but may not be used to vary or contradict the terms of the claims. Any statements made by the examiner or applicant can be used to demonstrate how the claims were understood at the time of prosecution. In addition, if the applicant distinguished the claimed invention from the references or prior art, the claims cannot later be interpreted to encompass the subject matter that was distinguished.

I am informed that if the claims remain ambiguous after considering the claim language, specification, and prosecution history, which constitute the intrinsic evidence, then extrinsic evidence may be considered. For example, encyclopedias, treatises, expert testimony, and inventor testimony are extrinsic evidence that may be considered when interpreting the claims. Extrinsic evidence is particularly useful for providing understanding of technology not fully explained in the specification. However, the extrinsic evidence may not be used to vary the meanings of the terms that are clear from the intrinsic evidence.

I am informed that, in interpreting claims, the claim term is attributed one interpretation applicable throughout the patent, including all the claims, unless the patent expressly states otherwise. The terminology or technology disclosed in a patent that is not related to the subject patent based on a priority claim, even if the patents share a common inventor, is generally not persuasive in interpreting the claims of the subject patent because each patent has its own context and directly or indirectly uses terms in different ways. Finally, any references including patents that postdate the subject patent are not persuasive in interpreting the claims, because claim interpretation is based on the ordinary meaning at the time of the filing of the patent application.

**Invalidity**

I am informed that the requirements for patentability include the requirement that the claimed subject matter be new (not anticipated) and not have been obvious to one of ordinary skill in the art at the time the invention was made. A claim is anticipated if, in a single prior art document or device, all of the elements of the claim are found expressly or inherently. If not all of the elements of the claim are found in a single

prior art reference, the subject matter still may not be patentable if it would have been obvious to one of ordinary skill in the art to which the claimed subject matter pertains. A patent claim will be invalid as obvious if the differences between the subject matter of the claim and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art.

I am informed that in determining whether the subject matter for a claim would have been obvious, one or more prior art references may be combined in order to encompass the claimed invention in such a way that the combination would have been obvious at the time the invention was made to a person of ordinary skill in the art. There must be a motivation or suggestion to combine the prior art references, coupled with a reasonable expectation of success.

I am informed that the following types of facts are considered in determining whether a patent claim recites obvious subject matter:

    a.    the scope and content of the prior art;

    b.    the level of ordinary skill in the relevant art at issue;

    c.    the differences between the prior art and the claims at issue;

    d.    indicia of non-obviousness (e.g., commercial success, unexpected results, copying, long felt but unsolved needs, failure of others), if any.

## IV.

## PERSON OF ORDINARY SKILL IN THE ART FOR THE '502 PATENT

I believe that a person of ordinary skill in 1996 in the art relevant to the '502 patent would generally have the following education and experience: at least a high

school diploma; trade technical/junior college courses in toy design, soft product design,

fashion, or the like; and some experience working with soft product development.

This opinion is based upon my personal knowledge and experience and

my consideration of the following factors:  (1) the levels of education and experience of

persons of skill working in the field; (2) the types of problems encountered in the art;

(3) the prior art patents and publications; (4) the activities of others; (5) prior art solutions

to the problems encountered by the inventor; (6) the sophistication of the technology; and

(7) the rapidity with which innovations are made.

I am informed that a person of ordinary skill in the art should not be

viewed as working in isolation from outside influences, such as manufacturers' concepts

and industry products in the pet bed field.  This person, designer or manufacturer would

research all of the art in the field.

I am informed that for purposes of assessing the validity of a patent, the

law presumes that a person of ordinary skill in the art has knowledge of all of the relevant

prior art, even though this generally is not true in the real world.

In this report, I use the terms "person of ordinary skill in the art," "person

of ordinary skill," "one of ordinary skill in the art," "one of ordinary skill," "those of

ordinary skill in the art," and "those of ordinary skill," and other like variants,

interchangeably.

## V.

## THE PRIOR ART DISCLOSES EACH ELEMENT OF THE ASSERTED CLAIMS

Based on my knowledge, experience, and review of the materials considered, in my opinion the prior art, individually and through combinations that one of ordinary skill in the art would have been motivated to make, discloses each requirement of at least claims 1, 2, and 3 of the '502 patent.

### A.    U.S. Patent No. 5,421,044 (Steensen)

U.S. Patent No. 5,421,044 ("the '044 patent") to Steen W. Steensen describes "an improved air bed which may be used in vehicles, in the home, or in other locations." ('044 patent, col. 1, lines 6-8.)  The abstract states:

> An air bed is disclosed comprising an enclosure formed from a flat rectangular bottom panel, a lower vertical panel standing perpendicularly up from the periphery of the bottom panel, an upper vertical panel disposed above the lower vertical panel, a gusset connecting the lower and upper vertical panels, a rectangular top panel removeably connected to the upper vertical panel, and a plurality of restraining straps, with one end of each restraining strap connected to the gusset along the left side of the enclosure and the other end of each restraining strap attached to the gusset along the right side of the enclosure.  The enclosure has upper level and lower levels separated by the restraining straps.  In each level inflatable air tubes are inserted.  Each level of tubes includes bolster tubes inserted parallel and adjacent to the sides and ends of the enclosure, and cushion tubes which are disposed laterally across the enclosure in the rectangular space surrounded by the bolster tubes.  Each tube has sheathing surrounding it to reduce noise when adjacent tubes rub against each other, and attachment means are used to prevent rotation of the tubes.

('044 patent, Abstract.)

The application for the '044 patent was filed on August 27, 1993, and the patent was ultimately issued on June 6, 1995. Both of these dates are before the presumptive date of invention of the subject matter of claims 1-3 as represented by the April 18, 1996 filing date of the application for the '502 patent.

### 1.    Claim 1 of the '502 patent

In my opinion, the '044 patent discloses each requirement of claim 1 of the '502 patent.

#### a.    An outer covering.

The '044 patent states, "Referring to FIGS. 1-3, this 'transport' embodiment 10 comprises an outer covering 12." ('044 patent, col. 3, lines 11-12.) The outer covering 12 "is formed of flexible material and has a bottom panel 14 formed of rip stop nylon, upper and lower vertical panels 16 and 18, respectively, and a top panel 20." ('044 patent, col. 3, lines 13-15.)

As a result, one of ordinary skill in the art in 1996 would have understood that the '044 patent discloses the requirements for the first element of claim 1 of the '502 patent.

#### b.    A removable cushion disposed within the outer covering to form a cushioned bottom portion.

The '044 patent states that "either or both of 'egg crate' polyurethane foam pad 58 and rectangular polyurethane foam pad 59 are . . . placed on top of . . . upper laterally disposed cushion air tubes 42 in the space bounded by upper side bolster air tubes 32, 33, 34 and 35 and upper end bolster air tubes 31 and 36." ('044 patent, col. 4, lines 21-26.) "Top panel 20 . . . is removably joined to the upper vertical panel through

the use of a zipper attachment means 22 which is disposed along the periphery of the top

panel and the upper edge of the upper vertical panel." ('044 patent, col. 3, lines 52-57.)

The foam pads 58 and 59 and the air tubes 42 are removable from the outer covering 12

when the zipper attachment means 22 is unzipped.  Foam pad 58, foam pad 59, and the

air tubes 42, alone or in combination, thus make up a removable cushion disposed within

the outer covering to form a cushioned bottom portion.

It is my further opinion that an air tube is a type of cushion within the

meaning of claim 1 of the '502 patent.

As a result, one of ordinary skill in the art in 1996 would have understood

that the '044 patent discloses the requirements for the second element of claim 1 of the

'502 patent.

**c.    A bolster removably disposed within the interior of the
outer covering and substantially all of said bolster
disposed exteriorly about at least a portion of the
perimeter of the bottom portion without being secured
to the removable cushion.**

The '044 patent explains that "referring to FIGS 4 and 5, side and end

bolster tubes are placed within a sheath 62." ('044 patent, col. 4, lines 40-41.)  The

bolster tubes are air tubes 31-36. ('044 patent, col. 4, line 11.)  Each air tube 31-36 is a

"bolster."  As stated in the '044 patent, "The air bed of claim 7 further [comprises] a foam

pad having a length and width substantially equal to the length and width of the

rectangular space surrounded by the left side bolster tubes, the foot end bolster tube, the

right side bolster tubes, and the head end bolster tube . . . ." ('044 patent, col. 11,

lines 44-50.)

Each air tube 31-36 is disposed within the interior of the outer covering 12 and exteriorly about at least a portion of the foam pads 58 and 59 and the air tubes 42, without being secured to the foam pads 58 and 59 or the air tubes 42. Each air tube 31-36 is removable from the outer covering 12 when the zipper 22 is unzipped. Thus, the air tubes 31-36, singly or in combination, make up a bolster, and are disposed exteriorly about at least a portion of the perimeter of the bottom portion formed by foam pad 58, foam pad 59, and/or the air tubes 42, and are not secured to the removable cushion formed by the foam pads and/or the air tubes.

Although the bed disclosed in the '044 patent is flat when foam pads 58 and 59 are within the outer covering, the foam pads need not be used. In that case, the top surface of the bed would

> have its outside edges extending substantially above the
> interior portions of the top surface due to the fact that the
> bolster air tubes . . . will typically be 8" diameter tubes, and
> the height of the two levels of bolster tubes will therefore
> be 2" greater than the height of the two levels of interior
> tubes.

('044 patent, col. 4, lines 28-37.)

As a result, one of ordinary skill in the art in 1996 would have understood that the '044 patent discloses the requirements for the third element of claim 1 of the '502 patent.

### 2.    Claim 2:  Reclosable access opening

In my opinion, the '044 patent discloses each requirement of claim 2 of the '502 patent.

The '044 patent discloses a reclosable access opening—the zipper 22

('044 patent, col. 3, line 55). The '044 patent states,

> Top panel 20, which in the transport embodiment is formed
> of conventional mattress covering, is removably joined to
> the upper vertical panel through the use of a zipper
> attachment means 22 which is disposed along the periphery
> of the top panel and the upper edge of the upper vertical
> panel.

('044 patent, col. 3, lines 52-57.)

As a result, one of ordinary skill in the art in 1996 would have understood

that the '044 patent discloses the requirements for claim 2 of the '502 patent.

### 3.    Claim 3: Zipper

In my opinion, the '044 patent discloses each requirement of claim 3 of the

'502 patent.

The '044 patent discloses a reclosable access opening—the zipper 22

('044 patent, col. 3, line 55). The '044 patent states,

> Top panel 20, which in the transport embodiment is
> formed of conventional mattress covering, is removably
> joined to the upper vertical panel through the use of a
> zipper attachment means 22 which is disposed along the
> periphery of the top panel and the upper edge of the upper
> vertical panel.

('044 patent, col. 3, lines 52-57.)

As a result, one of ordinary skill in the art in 1996 would have understood

that the '044 patent discloses the requirements for claim 3 of the '502 patent.

**B.**    **U.S. Patent No. 5,136,981 (Barreto)**

U.S. Patent No. 5,136,981 ("the '981 patent") to Aurelio F. Barreto, III

describes a pet bed that provides a soft padded bedding for pets, including cats and dogs.

('981 patent, col. 1, lines 16-18.)  The '981 patent explains:

> The invention comprises:  a flexible foam-core sidewall; a
> flexible foam-core base; and a cover having a sidewall
> enclosure, a separate base enclosure, and a floor, the
> sidewall enclosure capable of at least partially enclosing the
> sidewall, and the base enclosure capable of at least partially
> enclosing the base."

('981 patent, Abstract.)

The application for the '981 patent was filed on July 31, 1991, and the

patent was ultimately issued on August 11, 1992.  Both of these dates are before the

presumptive date of invention of the subject matter of claims 1-3 as represented by the

April 18, 1996 filing date of the application for the '502 patent.

**1.**    **Claim 1**

In my opinion, the '981 patent discloses each requirement of claim 1 of the

'502 patent.

**a.**    **An outer covering.**

The '981 patent states, "The cover generally covers and protects the

sidewall and the base." ('981 patent, col. 3, lines 62-63.)  "Cover 46 generally covers and

protects sidewall 42 and base 44 against becoming soiled." ('981 patent, col. 7, lines 14-

15.)  "It is important to note the structure and function of cover 46." ('981 patent, col. 7,

lines 24-25.)  It is my opinion that cover 46 is an "outer covering."

As a result, one of ordinary skill in the art in 1996 would have understood that the '981 patent discloses the requirements for the first element of claim 1 of the '502 patent.

        b.      **A removable cushion disposed within the outer covering to form a cushioned bottom portion.**

The '981 patent explains: "The base is separable and removable from the base enclosure of the cover and, similarly, is insertable therein. The base is also separable from the sidewall of the invention." ('981 patent, col. 4, lines 1-4.) The patent later identifies the base with the number 44.

Base 44 is a removable bottom cushion. Base 44 is disposed within the outer covering 46, as shown in Figures 2, 3, and 4. When so disposed, base 44 forms a cushioned bottom portion.

As a result, one of ordinary skill in the art in 1996 would have understood that the '981 patent discloses the requirements for the second element of claim 1 of the '502 patent.

        c.      **A bolster removably disposed within the interior of the outer covering and substantially all of said bolster disposed exteriorly about at least a portion of the perimeter of the bottom portion without being secured to the removable cushion.**

The '981 patent states, "The base is also separable from the sidewall of the invention." ('981 patent, col. 4, lines 3-4.) "The sidewall may be made of a single section or piece of foam which is generally continuous about at least a portion of periphery of the pet bed." ('981 patent, col. 3, lines 55-57.) The patent later identifies the sidewall with the number 42.

The sidewall 42 is disposed within the outer covering 46, as shown in Figure 2 and as described at column 7, lines 9-45. As disclosed by the '981 patent, the sidewall 42 is disposed exteriorly about (*i.e.,* outside) the perimeter (*i.e.,* outermost limits) of the bottom cushion 44. This is shown in Figures 1-4. The sidewall disclosed by the '981 patent is not secured to the bottom cushion, and can be removed from the cover 46 separately from the base 44. ('981 patent, col. 7, lines 9-59.)

The '981 patent does use the word "sidewall" instead of "bolster." But the '981 patent states that the sidewall can vary widely in shape, ranging from a slim wall a quarter-inch thin to a wide cushion a half-foot thick. ('981 patent, col. 6, line 55.) The patent further says that the thickness of the wall "is dependent upon the size and weight of the pet, and the particular configuration of embodiment selected." ('981 patent, col. 6, lines 56-58.) In short, the patent does not limit the shape of the wall, allowing for a thick wall that may be more pillow-like than flat and upright.

The sidewall described in the '981 patent thus comes within the scope of the "bolster" in claim 1 of the '502 patent. Claim 1 says nothing about the size, shape, or proportions of the bolster, allowing for a square or rectangular bolster encompassed by the disclosure of the '981 patent. Although the '502 patent says the bolster may be cylindrical or banana-shaped, ('502 patent, col. 2, lines 56-57), this limitation does not appear in claim 1. The '502 patent emphasizes that the invention is not limited "except as may be necessary in view of the appended claims," which lack any limitation on the shape of the bolster. ('502 patent, col. 3, line 36.)

It is thus my opinion that the sidewall 42 of the '981 patent is a type of bolster. A bolster may have a square or rectangular cross-section.

- 16 -

As a result, one of ordinary skill in the art in 1996 would have understood that the '981 patent discloses the requirements for the third element of claim 1 of the '502 patent.

### 2.    Claim 2:  Reclosable access opening

In my opinion, the '981 patent discloses the requirements of claim 2 of the '502 patent.

Claim 15 of the '981 patent reads, "The pet bed of claim 14, wherein said means for urging said opening toward *at least partial closure* comprises an elastic material attached to said floor and positioned around the opening of said floor." ('981 patent, col. 14, lines 46-49 (emphasis added).)  The patent specification explains, "Cover 46 may further comprise a length of elastic material 86 affixed to securing means 80 about an edge 88 of opening 84.  Elastic material 86 urges opening 84 toward *at least a partial closure*." ('981 patent, col. 7, lines 60-63 (emphasis added).)

The '981 patent has an access opening 84.  In my opinion, the above language shows that a reclosable access opening was contemplated.  The inventors of the '981 patent contemplated that the elastic material 86 might cause the opening 84 to close completely, although a partial closure would suffice.

Claim 2 of the '502 patent is also invalid if you look at the '981 patent together with U.S. Patent No. 5,588,393 ("the '393 patent") to Eric W. Heilborn.  The '393 patent discloses a pet bed with foam cores that form a bottom cushion and surrounding wall.  ('393 patent, Abstract.)  The bottom cushion and foam wall are enclosed in separate fabric enclosures.  (*Id.*)  The patent states that "the bottom cushion

- 17 -

core may be retained in its enclosure . . . by a continuous bottom panel which is releasably secured to the edges of the enclosure by a zipper, Vector™ (hook and loop) material, snaps, or other means." ('393 patent, col. 7, lines 53-58.)  In other words, the '393 patent discloses a bottom panel that can be used to close the access opening 134 into the bottom cushion enclosure.

        The bottom panel disclosed in the '393 patent could also be used to close the access opening 84 in the '981 pet bed.  Both the opening 134 in the '393 pet bed and the opening 84 in the '981 bed are oval- or circle-shaped holes through which a person can remove a bottom cushion.   As discussed above, the '981 patent contemplated that the opening 84 might be closed completely.  A person who wanted to do this (to keep the bottom cushion from getting dirty, for example) would be motivated to use the bottom panel disclosed in the '393 patent.  A person might also be motivated to use the '393 bottom panel because it would fix the cover around the cushions so that a pet could not bite or claw the cover off.  U.S. Patent No. 5,826,537 ("the '537 patent") to Eric W. Heilborn similarly discloses a zippered bottom panel that can be used to close the access opening 134 into the bottom cushion enclosure.

        As a result, one of ordinary skill in the art in 1996 would have understood that the '981 patent discloses the requirements for claim 2 of the '502 patent, or at least makes claim 2 obvious in light of the '393 patent and/or the '537 patent.

        **b.**    **Claim 3**

        The '981 patent makes claim 3 of the '502 patent obvious in light of either the '393 patent or the '537 patent, for the same reasons as discussed above.

C.      **U.S. Patent No. 4,754,513 (Rinz)**

U.S. Patent No. 4,754,513 ("the '513 patent") to Gustave R. Rinz

describes:

> A pillowcase and insert for converting a conventional
> pillow into a [sic] orthopedic pillow comprising a
> pillowcase having a pocket secured to the inside of the
> pillowcase receiving a soft, resilient, elastomeric insert. A
> conventional pillow is inserted in the pillowcase such that
> the pillowcase, insert and pillow support the neck and head
> of the user while lying on a side or in a supine position.

('513 patent, Abstract.)

The application for the '513 patent was filed on November 13, 1986, and

the patent was ultimately issued on July 5, 1988. Both of these dates are before the

presumptive date of invention of the subject matter of claims 1-3 as represented by the

April 18, 1996 filing date of the application for the '502 patent.

1.      **Claim 1**

In my opinion, the '513 patent discloses each requirement of claim 1 of the

'502 patent.

a.      **An outer covering.**

The '513 patent states, "A conventional pillow is inserted in the inventive

pillowcase . . . ." ('513 patent, col. 1, lines 54-55.) The patent adds, "The pillowcase 10

has a pocket 15 formed on the inside of one panel 9, as presently described, for receiving

and carrying an insert 16 to be used in combination with a conventional pillow 17."

('513 patent, col. 2, lines 15-18.)

The '513 patent thus discloses a pillowcase 10 that is an outer covering.  A pillowcase is an outer covering for a pillow.

As a result, one of ordinary skill in the art in 1996 would have understood that the '513 patent discloses the requirements for the first element of claim 1 of the '502 patent.

### b. A removable cushion disposed within the outer covering to form a cushioned bottom portion.

The '513 patent discloses a pillow 17 disposed within the pillowcase 10 that makes up the outer covering:  "A conventional pillow [17] is inserted in the inventive pillowcase . . . ."  ('513 patent, col. 1, lines 54-55.)

The pillow 17 is removable from the pillowcase 10 because the pillowcase 10 may be open at one side:  "The pillowcase 10 is thus substantially rectangular in shape, closed on three sides, specifically its opposite longer sides 13a, 13b and one of its short sides 14a.  The pillowcase 10 is open at the other of its short sides 14b." ('513 patent, col. 2, lines 29-32.)  "The open side of the pillowcase 10 can be left open . . . ."  ('513 patent, col. 2, line 39.)

A pillow is a type of cushion.  When the pillow 17 is disposed within the pillowcase 10, it forms a cushioned bottom portion.

As a result, one of ordinary skill in the art in 1996 would have understood that the '513 patent discloses the requirements for the second element of claim 1 of the '502 patent.

           **c.**      **A bolster removably disposed within the interior of the outer covering and substantially all of said bolster disposed exteriorly about at least a portion of the perimeter of the bottom portion without being secured to the removable cushion.**

The '513 patent explains:

> The pillowcase 10 has a pocket 15 formed on the inside of one panel 9, as presently described, for receiving and carrying an insert 16 to be used in combination with a conventional pillow 17. The insert 16 is preferably semi-cylindrical in cross section defining a curved surface 18 facing the panel 9 on which the pocket 15 is formed and a flat side 19. The insert may have a diameter in the range of about 4 inches to 5 inches, and preferably 5 inches, and may have a length in the range of about 17 inches to 19 inches, and preferably 17 inches. Alternatively the insert may be oval in cross section. The insert 16 is made of a soft, resilient, elastomeric material such as polyurethane foam or polyester foam.

('513 patent, col. 2, lines 15-28.) The patent also states, "Among the objectives of the

present invention are to provide a conventional and inexpensive, pillowcase and

removable insert . . . ." ('513 patent, col. 1, lines 47-49.)

       The '513 patent thus discloses a bolster (insert 16) that is removably

disposed within the interior of the pillowcase 10. A bolster may have a semi-cylindrical

or oval cross-section.

       The insert 16 is removable from the pillowcase 10 because the pillowcase

has a pocket 15 that may be open at one side: "The pocket 15 is formed by a flat

rectangular panel 22 and has opposed long sides 23 and short sides 24. The panel 22 is

secured, as by sewing, to the inside of the pillowcase 10 on its opposite longer sides 23

and on one short side 24a furthest from the open side 14b of the pillowcase, near and

parallel to one of the longer sides 13a, 13b of the panel 9." ('513 patent, col. 2, lines 42-48.) The insert 16 is not secured to the removable pillow 17.

Although the drawings of the '513 patent show the insert 16 atop the pillow 17, the patent states that "[t]he position of the insert 16 can be adjusted by simply rotating the pillowcase 10 having the pocket 15 and insert 16 received therein, about the conventional pillow 17 in accordance with the preferance [sic] of the user . . . ." (Col. 2, lines 53-56.) If a person rotated the pillowcase 10 far enough, the person could adjust the position of the insert 16 so that substantially all of the insert would be disposed beside the pillow 17, as opposed to atop the pillow 17. In this case, substantially all of the insert would be disposed exteriorly about (*i.e.*, outside) the perimeter (*i.e.*, outermost limits) of the pillow 17.

As a result, one of ordinary skill in the art in 1996 would have understood that the '513 patent discloses the requirements for the third element of claim 1 of the '502 patent.

### 2.    Claim 2: Reclosable access opening

The '513 patent states, "The open side of the pillowcase 10 can be left open but is preferably closed by fasteners that be opened such as a zipper 21." ('513 patent, col. 2, lines 39-41.) The '513 patent thus discloses a reclosable access opening.

As a result, one of ordinary skill in the art in 1996 would have understood that the '513 patent discloses the requirements for claim 2 of the '502 patent.

### 3.    Claim 3:  Zipper

The '513 patent states, "The open side of the pillowcase 10 can be left

open but is preferably closed by fasteners that be opened such as a zipper 21."

('513 patent, col. 2, lines 39-41.)  The '513 patent thus discloses a zipper.

As a result, one of ordinary skill in the art in 1996 would have understood

that the '513 patent discloses the requirements for claim 3 of the '502 patent.

### D.    U.S. Patent No. 5,586,350 (Thönnessen) and German Patent No. 93 09 699.2 (Hoechst AG)

U.S. Patent No. 5,586,350 ("the '350 patent") to Franz Thönnessen and

Hans H. Mühlhaus states:

> Described is a low flammability pillow comprising a
> cushioning core and a cover separable therefrom, wherein
> the cushioning core comprises a binder-consolidated
> nonwoven block from 5 to 15 cm in thickness and from 700
> to 3000 g/m$^2$ in basis weight comprising fibers or filaments
> having a linear density from 3 to 30 dtex and the cover is a
> pocket-shaped, closable casing comprising a textile sheet
> material comprising or consisting of woven or knitted
> fabric, the fibers and filaments of the cushioning core and
> of the casing comprising flame resistant polyester.

('350 patent, Abstract.)

The application for the '350 patent was filed on June 28, 1994, and the

patent was ultimately issued on December 24, 1996.  The filing date of the '350 patent is

before the presumptive date of invention of the subject matter of claims 1-3 as

represented by the April 18, 1996 filing date of the application for the '502 patent.

1.    **Claim 1**

In my opinion, the '350 patent discloses each requirement of claim 1 of the '502 patent.

a.    **An outer covering.**

The '350 patent discloses a "conjoint cover (5)." ('350 patent, col. 2, lines 53-54.) The patent also states, "The cover of the flame retardant pillow of the invention may comprise a fabric woven or knitted from continuous filament yarn or from staple fiber yarn." ('350, col. 3, lines 43-45.) The '350 patent thus discloses a conjoint cover 5 that is an outer covering.

As a result, one of ordinary skill in the art in 1996 would have understood that the '350 patent discloses the requirements for the first element of claim 1 of the '502 patent.

b.    **A removable cushion disposed within the outer covering to form a cushioned bottom portion.**

The '350 patent discloses:  "A low flammability pillow comprising a cushioning core and a cover separable therefrom . . . ." ('350 patent, col. 7, lines 1-2.) The patent further discloses a pillow 1 "comprising the nonwoven block (2) [*i.e.*, cushioned bottom portion], the nonwoven roll (3) [*i.e.*, bolster] . . . ." ('350 patent, col. 2, lines 50-51.)

The '350 patent thus discloses a "nonwoven block (2)" that is disposed within the cover 5 that makes up the outer covering. The nonwoven block 2 is removable from the cover 5. The nonwoven block 2 is also a type of cushion. When the nonwoven block 2 is disposed within the cover 5, it forms a cushioned bottom portion.

As a result, one of ordinary skill in the art in 1996 would have understood that the '350 patent discloses the requirements for the second element of claim 1 of the '502 patent.

> c. **A bolster removably disposed within the interior of the outer covering and substantially all of said bolster disposed exteriorly about at least a portion of the perimeter of the bottom portion without being secured to the removable cushion.**

Claim 1 of the '502 patent requires that "substantially all of said bolster [be] disposed exteriorly about at least a portion of the perimeter of the bottom portion." ('502 patent, col. 3, lines 43-45.) The word "about" means "[o]n all sides of; surrounding,"[1] and the word "exterior" means "outer" or "external."[2] This means that substantially all of the bolster must be disposed on the sides of or surrounding the perimeter of the bottom portion. A significant amount of the bolster cannot be atop the bottom cushion because then it would be within the perimeter of the cushion. This is consistent with the way the bolster 6 and cushion 4 are shown in the figures of the '502 patent. As shown in the figures, the bolster 4 is disposed entirely around the side of the cushion 4, and essentially none of the bolster is on top of the cushion.

The '350 patent discloses a bolstered pillow 1 having an outer covering 5, a removable cushion disposed within the outer covering to form a cushioned bottom portion 2, and a bolster cushion removably disposed within the interior of the outer covering 3. (*See* Fig. 1). The bolster cushion is connected "detachably" to the bottom

---

[1] THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2000), at http://www.yourdictionary.com/ahd/a/a0021300.html.

[2] THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2000), at http://www.yourdictionary.com/ahd/e/e0296200.html.

cushion. ('350 patent, col. 2, lines 49-54.) When the bolster cushion 3 is detached from the bottom cushion 2, the bolster cushion is not secured to the bottom cushion. The '350 patent thus discloses a bolster (the nonwoven roll 3) that is removably disposed within the interior of the cover 5 and need not be secured to the removable bottom cushion (the nonwoven block 2).

The bolster pillow (*i.e.*, the "cylindrical roll") of the '350 patent is disposed atop the bottom portion. But if claim 1 of the '502 patent were read to cover a bed with the bolster atop the bottom cushion, then it would be anticipated by the '350 patent. Also, it is my opinion that if a person using the pillow disclosed in the '350 patent were to lean against or push on the cylindrical roll, the cylindrical roll could lean over the side of the pillow or at least partly flop over the side of the pillow.

I am informed that German Patent No. 93 09 699.2 (the "DE '699 patent") to Hoechst AG is the German version of the '350 patent. As such, the DE '699 patent would anticipate claim 1 of the '502 patent for the same reasons as stated above.

### 2.    Claim 2: Reclosable access opening

The '350 patent states, "It is further particularly advantageous for the cover of the low flammability pillow to be constructed closable by means of a zip fastener (zipper) or a hook-and-loop fastener." ('350 patent, col. 4, lines 64-66.) Applying this sentence to Figure 1, the '350 patent discloses a reclosable single cover 5 with an access opening for both the base cushion 2 and the bolster cushion 3.

As a result, one of ordinary skill in the art in 1996 would have understood that the '350 patent discloses the requirements for claim 2 of the '502 patent, if claim 1 of

the '502 patent is read to cover a bed with the bolster atop the bottom cushion. As the German version of the '350 patent, the DE '699 patent likewise discloses the requirements for claim 2 of the '502 patent, if claim 1 of the '502 patent is read to cover a bed with the bolster atop the bottom cushion.

### 3.    Claim 3:  Zipper

The '350 patent states that "FIG. 4 is a diagrammatic elevational view illustrating a closure for cover (5) in the form of a zip or hook and loop fastener (24)." ('350 patent, col. 2, lines 65-67.)  The '350 patent also states, "It is further particularly advantageous for the cover of the low flammability pillow to be constructed closable by means of a zip fastener (zipper) or a hook-and-loop fastener."  ('350 patent, col. 4, lines 64-66.)  Applying these sentences to Figure 1, the '350 patent discloses a reclosable single cover 5 with a zippered access opening for both the base cushion 2 and the bolster cushion 3.

As a result, one of ordinary skill in the art in 1996 would have understood that the '350 patent discloses the requirements for claim 3 of the '502 patent, if claim 1 of the '502 patent is read to cover a bed with the bolster atop the bottom cushion. As the German version of the '350 patent, the DE '699 patent likewise discloses the requirements for claim 3 of the '502 patent, if claim 1 of the '502 patent is read to cover a bed with the bolster atop the bottom cushion.

### E.    U.S. Patent No. 4,872,228 (Bishop)

U.S. Patent No. 4,872,228 ("the '228 patent") to Carolyn B. Bishop describes the following:

> A bed guard for temporary use to reduce the risk of falling
> out of bed comprises at least one elongated bolster
> operatively assembled on top of a conventional mattress
> and releasably held in operative position along one side of
> the bed by a conventional bedsheet covering the mattress
> and the bolster and tucked under the mattress.

('228 patent, Abstract.)

The application for the '228 patent was filed on June 27, 1988, and the

patent was ultimately issued on October 10, 1989. Both of these dates are before the

presumptive date of invention of the subject matter of claims 1-3 as represented by the

April 18, 1996 filing date of the application for the '502 patent.

### 1.    Claim 1

In my opinion, the '228 patent discloses each requirement of claim 1 of the

'502 patent.

#### a.    An outer covering.

The '228 patent states that the patented bed guard includes

> at least one generally cylindrical[] bolster adapted to be
> positioned in use on one side of a conventional bed and
> retained in place by being covered with a conventional
> sheet which covers the mattress and the bolster(s) and is
> tucked under the mattress in the usual way.

('228 patent, col. 1, lines 51-56.) The '228 patent also states,

> It is a further object of the invention to provide a
> plurality of bolsters of the type described wherein each
> bolster is less than half the length of the bed and wherein
> one or more bolsters may be aligned along one or both
> sides of a conventional bed on top of a conventional
> mattress and covered with a conventional contour bottom
> sheet with pockets at its ends to fit around the ends of the
> mattress and hold the bolster (s) in operative position.

('228 patent, col. 2, lines 8-16.)

The patent identifies the conventional bottom sheets with the number 13. The sheet 13 is an outer covering for the mattress and bolsters.

As a result, one of ordinary skill in the art in 1996 would have understood that the '228 patent discloses the requirements for the first element of claim 1 of the '502 patent.

**b.    A removable cushion disposed within the outer covering to form a cushioned bottom portion.**

The '228 patent explains that the patented bed guard is set "on top of a conventional mattress and covered with a conventional contour bottom sheet with pockets at its ends to fit around the ends of the mattress and hold the bolster (s) in operative position." ('228 patent, col. 2, lines 12-16.) The mattress 12 forms a cushioned bottom and can be removed from the fitted bottom sheet 13. In use, the mattress 12 is disposed within the fitted bottom sheet 13. A mattress is a type of cushion.

As a result, one of ordinary skill in the art in 1996 would have understood that the '228 patent discloses the requirements for the second element of claim 1 of the '502 patent.

**c.    A bolster removably disposed within the interior of the outer covering and substantially all of said bolster disposed exteriorly about at least a portion of the perimeter of the bottom portion without being secured to the removable cushion.**

The '228 patent explains that "the invention provide[s] a temporary bed guard comprising a generally cylindrical bolster that can be installed in operative position on top of the mattress along one side of the bed while making up the bed, and retained in

operative position by a conventional bottom sheet covering the mattress and the bolster(s) and tucked under the mattress." ('228 patent, col. 1, line 65 to col. 2, line 3.)

The patent identifies the bolster with the number 10. The bolster 10 is removably disposed within the fitted bottom sheet 13. The bolster 10 is not secured to the mattress 12.

The bolster of the '228 patent is disposed atop the mattress. But if claim 1 of the '502 patent were read to cover a bed with the bolster atop the bottom cushion, then it would be anticipated by the '228 patent. Also, it is my opinion that if a person using the bed disclosed in the '228 patent were to roll against or lean on one of the bolsters, the bolster could lean over the side of the bed or at least partly flop over the side of the bed.

### 2.    Claim 2: Reclosable access opening

The '228 patent makes claim 2 of the '502 patent obvious in light of any or a combination of the following articles:

- AB Murray and AC Ferguson, *Dust-free bedrooms in the treatment of asthmatic children with house dust or house dust mite allergy: a controlled trial*, 71 PEDIATRICS 418-22 (March 1, 1983) (the "Murray-Ferguson article");

- M. J. Walshaw and C. C. Evans, *Allergen Avoidance in House Dust Mite Sensitive Adult Asthma*, QUARTERLY JOURNAL OF MEDICINE, New Series 58, No. 226, pp. 199-215 (February 1986) (the "Walshaw-Evans article"); and/or

- Marc L. Rivo and Floyd J. Malveaux, *Outpatient Management of Asthma in Adults*, 45 AMERICAN FAMILY PHYSICIAN 2105 (May 1992) (the "Rivo-Malveaux article").

The abstract for the Murray-Ferguson article states, "Twenty asthmatic children with prick tests positive for house dust or house dust mites were allocated to two groups that were matched for severity. One group was provided with *zippered vinyl covers for pillows, mattresses, and box springs . . . .*" (emphasis added). The article later adds that "our patients used *zippered vinyl covers to encase completely the mattress and box spring* so that dust would not puff out from the bottom surfaces . . . ." (Murray-Ferguson article at 421, emphasis added.)

The Walshaw-Evans article states: "Previous studies have demonstrated adequately that it is not possible to eradicate dust mites from the mattress . . .; in this study the mattress (and pillow) were encased in impermeable plastic covers to avoid this source of allergen." (Walshaw-Evans article at 213.) The Rivo-Malveaux article states: "Dust mite control requires weekly hot-water washing of pillows and bedding. Mattresses should be encased in airtight covers . . . ." (Rivo-Malveaux article, DMC 000860.)

A person of ordinary skill in the art who wanted to use the '228 patent with an asthmatic child would be motivated to use a bed sheet that could completely enclose the bed mattress and keep dust mites away from the child. The Murray-Ferguson article, the Walshaw-Evans article, and the Rivo-Malveaux article each disclose such a bed sheet.

### 3.    Claim 3:  Zipper

The '228 patent makes claim 3 of the '502 patent obvious in light of the Murray-Ferguson article.  The abstract for the Murray-Ferguson article states, "Twenty asthmatic children with prick tests positive for house dust or house dust mites were allocated to two groups that were matched for severity. One group was provided with *zippered vinyl covers for pillows, mattresses, and box springs* . . . ." (emphasis added). The article later adds that "our patients used *zippered vinyl covers to encase completely the mattress and box spring* so that dust would not puff out from the bottom surfaces . . . ."  (Murray-Ferguson article at 421, emphasis added.)

A person of ordinary skill in the art who wanted to use the '228 patent with an asthmatic child would be motivated to use a zippered bed sheet that could completely enclose the bed mattress and keep dust mites away from the child.  The Murray-Ferguson article discloses such a bed sheet.

### F.    U.S. Patent No. 4,873,734 (Pollard)

U.S. Patent No. 4,873,734 ("the '734 patent") to Dianne J. Pollard describes the following:  "A bumper sheet includes an array of pockets in which relatively soft yet form-retaining inserts (such as foam plastic cylinders or inflatable bladders) are removably fitted to define a bumper area enclosing a sleeping or rest area within the confines of a crib, bed rails or the like."  ('734 patent, Abstract.)

The application for the '734 patent was filed on July 1, 1988, and the patent was ultimately issued on October 17, 1989.  Both of these dates are before the presumptive date of invention of the subject matter of claims 1-3 as represented by the April 18, 1996 filing date of the application for the '502 patent.

### 1.    Claim 1

In my opinion, the '734 patent discloses each requirement of claim 1 of the

'502 patent.

#### a.    An outer covering.

The '734 patent states that the "present invention relates to bed-type

restraints and, in particular, to a removable bumper restraint which is incorporated into a

covering or sheet used in a crib or other bed-type restraint having surrounding rails or

slats or the like, for preventing children or the infirm (or even animals or inanimate

objects) from getting stuck or injured by the restraining slats or rails." ('734 patent,

col. 1, lines 13-19.)  The patent later claims, in part, a "bumper sheet for covering the top

surface of a base such as a mattress within a secure rest area defined by structural

members such as crib slats or bed rails . . . ." ('734 patent, col. 5, lines 1-3.)  The patent

adds:

> The illustrated embodiment includes a fitted sheet 12, but is
> quite obviously adapted to non-fitted sheets as well.  The
> fitted sheet 12 includes end panels 13 and side panels 14
> which are designed to closely fit the associated contours of
> the mattress 11.  Typically, the sheet 12 includes an elastic
> border or hem on the end and side panels (not shown)
> which retains the sheet on the mattress 11.

('734 patent, col. 2, lines 23-30.)  It is my opinion that the sheet 12 is an outer covering

for the mattress 11.

As a result, one of ordinary skill in the art in 1996 would have understood

that the '734 patent discloses the requirements for the first element of claim 1 of the

'502 patent.

**b.    A removable cushion disposed within the outer covering to form a cushioned bottom portion.**

The '734 patent explains that "FIG. 6 depicts my bumper sheet 10 in use on a mattress 41 in a crib 40 having spaced vertical slats 42 which are designed to prevent a person, typically a child, from falling out of or off the mattress." ('734 patent, col. 4, lines 5-8.) The patent also refers to a "mattress 11," shown in Figures 1, 2, and 5.

The mattress 11 or mattress 41 forms a cushioned bottom and can be removed from the fitted sheet 12. In use, the mattress 11 or mattress 41 is disposed within the fitted bottom sheet 12. A mattress is a type of cushion.

As a result, one of ordinary skill in the art in 1996 would have understood that the '734 patent discloses the requirements for the second element of claim 1 of the '502 patent.

**c.    A bolster removably disposed within the interior of the outer covering and substantially all of said bolster disposed exteriorly about at least a portion of the perimeter of the bottom portion without being secured to the removable cushion.**

The '734 patent explains that "the bumper pockets 16 and 19 preferably are attached by stitching or the like along the entire length of the sides and ends of the mattress . . . ." ('734 patent, col. 4, lines 9-11.) The patent adds,

> The cloth rectangles for the end pockets or sleeves and the overlapping side pockets are approximately the same size as the inserts to permit ready insertion and stability. All four cloth pockets preferably are attached to the sheet by sewing along the stitch lines with dimensions A and B being selected, as mentioned, to smoothly accommodate the inserts.

('734 patent, col. 4, lines 33-39.)

The patent identifies the inserts with the numbers 17 and 20. In my opinion, inserts 17 and 20 are bolsters. The inserts 17 and 20 are removable from the patented bumper sheet. The inserts 17 and 20 are not secured to mattress 11 or mattress 41.

The inserts of the '734 patent are disposed atop the mattress. But if claim 1 of the '502 patent were read to cover a bed with the bolster atop the bottom cushion, then this distinction would be moot. Also, it is my opinion that if a person were to use the '734 bumper sheet on a mattress outside a crib and were to roll against or lean on one of the inserts, the insert could lean over the side of the mattress or at least partly flop over the side of the mattress.

Also, the inserts 17 and 20 of the '734 patent are placed in different outer coverings than the mattress itself. I am informed that, during the application process for the '502 patent, Flexi-Mat gave up any coverage for pet bed designs that require covers for the bolster cushions which are separate from the cover for the base cushion. I am also informed that, during the application process for the '502 patent, Flexi-Mat limited its patent to pet bed designs that have a single cover that encompasses both cushions. But if claim 1 of the '502 patent were read to cover a bed having covers for the bolster cushions which are separate from the cover for the base cushion, then it is a moot point that the inserts 17 and 20 of the '734 patent are placed in different outer coverings than the mattress itself.

### 2.    Claim 2: Reclosable access opening

The '734 patent makes claim 2 of the '502 patent obvious in light of any or a combination of the following articles:

- the Murray-Ferguson article;

- the Walshaw-Evans article; and/or

- the Rivo-Malveaux article.

The abstract for the Murray-Ferguson article states, "Twenty asthmatic children with prick tests positive for house dust or house dust mites were allocated to two groups that were matched for severity. One group was provided with *zippered vinyl covers for pillows, mattresses, and box springs . . . .*" (emphasis added). The article later adds that "our patients used *zippered vinyl covers to encase completely the mattress and box spring* so that dust would not puff out from the bottom surfaces . . . ." (Murray-Ferguson article at 421, emphasis added.)

The Walshaw-Evans article states: "Previous studies have demonstrated adequately that it is not possible to eradicate dust mites from the mattress . . .; in this study the mattress (and pillow) were encased in impermeable plastic covers to avoid this source of allergen." (Walshaw-Evans article at 213.) The Rivo-Malveaux article states: "Dust mite control requires weekly hot-water washing of pillows and bedding. Mattresses should be encased in airtight covers . . . ." (Rivo-Malveaux article, DMC 000860.)

A person of ordinary skill in the art who wanted to use the '734 patent with an asthmatic child would be motivated to use a bed sheet that could completely enclose the bed mattress and keep dust mites away from the child. The Murray-Ferguson article, the Walshaw-Evans article, and the Rivo-Malveaux article each disclose such a bed sheet.

### 3.    Claim 3:  Zipper

The '734 patent makes claim 3 of the '502 patent obvious in light of the Murray-Ferguson article.  The abstract for the Murray-Ferguson article states, "Twenty asthmatic children with prick tests positive for house dust or house dust mites were allocated to two groups that were matched for severity. One group was provided with *zippered vinyl covers for pillows, mattresses, and box springs* . . . ." (emphasis added). The article later adds that "our patients used *zippered vinyl covers to encase completely the mattress and box spring* so that dust would not puff out from the bottom surfaces . . . ." (Murray-Ferguson article at 421, emphasis added.)

A person of ordinary skill in the art who wanted to use the '734 patent with an asthmatic child would be motivated to use a zippered bed sheet that could completely enclose the bed mattress and keep dust mites away from the child.  The Murray-Ferguson article discloses such a bed sheet.

### G.    U.S. Patent No. 5,010,843 (Henry)

U.S. Patent No. 5,010,843 ("the '843 patent") to Beth Henry describes a pet bed that is a "combination of cushions providing a number of resting options for the pet." ('843 patent, col. 1, lines 7-8.)  The abstract of the patent states:  "A pet bed comprises a pair of semi-circular cushions connected along their circumferential perimeters to a circular cushion having substantially the same radius as the semi-circular cushions." ('843 patent, Abstract.)

The application for the '843 patent was filed on November 16, 1989, and the patent was ultimately issued on April 30, 1991.  Both of these dates are before the

presumptive date of invention of the subject matter of claims 1-3 as represented by the

April 18, 1996 filing date of the application for the '502 patent.

### 1.    Claim 1

In my opinion, the '843 patent discloses each requirement of claim 1 of the

'502 patent.

#### a.    An outer covering.

The '843 patent claims, in part, a bed for which the "base and top cushions

each include a cover." ('843 patent, col. 4, lines 44-45.)  The patent adds that "[t]he

cushions, outer surfaces may be any suitable cloth fabric or plastic material and a

different covering material may be used for the external surfaces as compared to the inner

pocket surfaces." ('843 patent, col. 2, lines 53-56.)  Thus, although the pet bed disclosed

in the '843 patent does not have one overall outer covering, it does have individual outer

coverings for the top and base cushions.

As a result, one of ordinary skill in the art in 1996 would have understood

that the '843 patent discloses the requirements for the first element of claim 1 of the

'502 patent.

#### b.    A removable cushion disposed within the outer covering to form a cushioned bottom portion.

The '843 patent claims, among other things, "[a] bed as claimed in claim 5,

wherein said base and top cushions each include a cover having an opening therethrough

and filler therein, and reversible closure means in each cushion for controlling said

opening, said filler being removable and insertable into said cushion via said opening."

('843 patent, col. 4, lines 44-49.)  The patent adds, "The cushions 12, 14, and 16 are filled

with any suitable cushion material, for example, layers of plastic foam or resilient foam particles, semi-rigid or rigid beading, cloth filler, and the like." ('843 patent, col. 2, lines 44-47.)

The '843 patent thus discloses removable filler for cushion 12. The removable filler is disposed within the outer covering for cushion 12, which forms a cushioned bottom portion.

As a result, one of ordinary skill in the art in 1996 would have understood that the '843 patent discloses the requirements for the second element of claim 1 of the '502 patent.

        **c.    A bolster removably disposed within the interior of the outer covering and substantially all of said bolster disposed exteriorly about at least a portion of the perimeter of the bottom portion without being secured to the removable cushion.**

The '843 patent states that the patented pet bed includes "a pair of semi-circular top cushions 14, 16 which rest upon the base cushion 12." ('843 patent, col. 2, lines 18-19.) The patent adds, "The semi-circular edges 18, 20 of the top cushions are coincident with the circular top edge 22 of the base cushion 12." ('843 patent, col. 2, lines 19-21.)

At least figures 4-6 of the '843 patent show the top cushions 14 and 16 as bolsters. For Figure 4, the patent states that "the top cushions 14', 16' are less than semi-circles . . . ." ('843 patent, col. 3, lines 45-46.) The patent adds, "In FIG. 5, the cushions 14", 16" are contoured so as to provide a basically circular enlargement in the trough 28" at the center of the bed 10"." ('843 patent, col. 3, lines 47-50.) The top

cushions of Figure 6 are similar to the top cushions of Figure 4. The '843 patent thus discloses cushions 14 and 16 that can each be contoured to comprise a bolster.

The top cushions 14 and 16 of the '843 patent are disposed atop the bottom cushion. But if claim 1 of the '502 patent were read to cover a bed with the bolster atop the bottom cushion, then this distinction would be moot. Also, it is my opinion that if a pet were to use the '843 pet bed as shown in Figure 4 of the '843 patent, and were to roll against or lean on one of the top cushions, the top cushion could lean over the side of the bottom cushion or at least partly flop over the side of the bottom cushion.

Also, the filler for the top cushions 14 and 16 of the '843 patent is placed in different outer coverings than the filler for the bottom cushion. I am informed that, during the application process for the '502 patent, Flexi-Mat gave up any coverage for pet bed designs that require covers for the bolster cushions which are separate from the cover for the base cushion. I am also informed that, during the application process for the '502 patent, Flexi-Mat limited its patent to pet bed designs that have a single cover that encompasses both cushions. But if claim 1 of the '502 patent were read to cover a bed having covers for the bolster cushions which are separate from the cover for the base cushion, then it is a moot point that the filler for the top cushions 14 and 16 of the '843 patent is placed in different outer coverings than the filler for the bottom cushion.

2.    Claim 2: Reclosable access opening

The '843 patent states, "The cushions 12, 14, 16 are filled with any suitable cushion material, for example, layers of plastic foam or resilient foam particles, semi-rigid or rigid beading, cloth filler, and the like. To this end, the filler may be contained in its own liner (not shown) which is put into respective covers of the

cushions 12, 14, 16 through zipper openings 34, 35, 36, provided in these covers."
('843 patent, col. 2, lines 44-50.)

The '843 patent thus discloses reclosable access openings—zipper openings 34, 35, and 36.  As a result, one of ordinary skill in the art in 1996 would have understood that the '843 patent discloses the requirements for claim 2 of the '502 patent, if claim 1 of the '502 patent were read to cover a bed with the bolster atop the bottom cushion and if claim 1 of the '502 patent were read to cover a bed having covers for the bolster cushions which are separate from the cover for the base cushion.

### 3.    Claim 3:  Zipper

The '843 patent states, "The cushions 12, 14, 16 are filled with any suitable cushion material, for example, layers of plastic foam or resilient foam particles, semi-rigid or rigid beading, cloth filler, and the like.  To this end, the filler may be contained in its own liner (not shown) which is put into respective covers of the cushions 12, 14, 16 through zipper openings 34, 35, 36, provided in these covers."
('843 patent, col. 2, lines 44-50.)

The '843 patent thus discloses zippers.  As a result, one of ordinary skill in the art in 1996 would have understood that the '843 patent discloses the requirements for claim 3 of the '502 patent, if claim 1 of the '502 patent were read to cover a bed with the bolster atop the bottom cushion and if claim 1 of the '502 patent were read to cover a bed having covers for the bolster cushions which are separate from the cover for the base cushion.

### H.    U.S. Patent Nos. 5,588,393 and 5,826,537 (Heilborn)

U.S. Patent No. 5,588,393 ("the '393 patent") and U.S. Patent

No. 5,826,537 ("the '537 patent") to Eric W. Heilborn describe:

> [a] pet bed which is collapsible as a unit for more efficient
> packaging, storage, and display.  The foam cores which
> form the bottom cushion and the surrounding wall are
> enclosed in first and second fabric enclosures.  The
> enclosure for the bottom cushion is joined to the fabric
> layer which extends over the inside and top of the wall
> core, but is free from attachment to the fabric which
> extends under the lower edge of the wall. . . . The lower
> edges of the two fabric enclosures are provided with
> elasticized openings which retain the foam cores, but
> permit their removal for washing of the fabric cover.

('393 patent, and '537 patent, Abstract.)

The application for the '393 patent was filed on June 19, 1995, and the

patent was ultimately issued on December 31, 1996.  I am informed that the '537 patent

can claim priority to the filing date of the '393 patent.  The filing dates of these patents

are before the presumptive date of invention of the subject matter of claims 1-3 as

represented by the April 18, 1996 filing date of the application for the '502 patent.

#### 1.    Claim 1

In my opinion, the '393 patent and '537 patent each disclose each

requirement of claim 1 of the '502 patent.

#### a.    An outer covering.

In the '393 patent and '537 patent, each individual cushion is covered

independently.  As can be seen in Figures 4-6 of the patents, the foam core portions are

covered and held together by fabric coverings.

As a result, one of ordinary skill in the art in 1996 would have understood that the '393 patent and '537 patent each disclose the requirements for the first element of claim 1 of the '502 patent.

###### b. A removable cushion disposed within the outer covering to form a cushioned bottom portion.

The '393 patent states that "the first annular fabric panel 114, in combination with the interior panel 112, forms an elastic pocket for enclosing the foam core of the wall portion of the bed, and similarly, the second annular fabric panel 130 serves in combination with the inner panel 112 to provide an elastic pocket for the bottom cushion core. This construction, i.e., the first and second elasticized openings at the bottom of the bed 100, enables the customer to easily remove both foam cores for cleaning of the fabric cover . . . ." ('393 patent, col. 4, line 64 to col. 5, line 5.) *See also* '537 patent, col. 4, line 62 to col. 5, line 3. The patents identify the bottom cushion core with the number 108.

The removable horizontal foam core 108 is a removable bottom cushion. Foam core 108 is disposed within the outer covering. When so disposed, foam core 108 forms a cushioned bottom portion.

As a result, one of ordinary skill in the art in 1996 would have understood that the '393 patent and the '537 patent each discloses the requirements for the second element of claim 1 of the '502 patent.

        c.      **A bolster removably disposed within the interior of the outer covering and substantially all of said bolster disposed exteriorly about at least a portion of the perimeter of the bottom portion without being secured to the removable cushion.**

The '393 patent explains, "As can be seen in FIG. 6, the main structural part of the wall portion 102 is an upstanding foam core 106, while that of the bottom cushion portion is a horizontal foam core 108." ('393 patent, col. 4, lines 23-25.) *See also* '537 patent, col. 4, lines 22-24. "FIG. 5 is a bottom perspective view of the pet bed of FIG. 4, showing the first and second elasticized closures which permit removal of both of the foam core portions for laundering of the fabric cover." ('393 patent, col. 3, lines 39-42.) *See also* '537 patent, col. 3, lines 38-41.

As disclosed by the '393 patent and '537 patent, the upstanding foam core 106 is disposed exteriorly about (*i.e.*, outside) the perimeter (*i.e.*, outermost limits) of the horizontal foam core 108. This is shown in Figure 6. The upstanding foam core 106 is not secured to the horizontal foam core 108, and can be removed from the bed separately from the horizontal foam core 108.

The '393 patent and '537 patent do not use the word "bolster." But the patents do not limit the shape of the foam core 106.

For the reasons discussed above in connection with the '981 patent, the foam core described in the '393 patent and '537 patent comes within the scope of the "bolster" in claim 1 of the '502 patent. Claim 1 of the '502 patent says nothing about the size, shape, or proportions of the bolster, allowing for a square or rectangular bolster encompassed by the disclosures of the '393 patent and '537 patent. Although the '502 patent says the bolster may be cylindrical or banana-shaped, ('502 patent, col. 2,

lines 56-57), this limitation does not appear in claim 1. The '502 patent emphasizes that the invention is not limited "except as may be necessary in view of the appended claims," which lack any limitation on the shape of the bolster. ('502 patent, col. 3, line 36.)

It is thus my opinion that the foam core 106 of the '393 patent and '537 patent is a bolster within the scope of the "bolster" in claim 1 of the '502 patent. A bolster may have a square or rectangular cross-section.

The foam cores 106 and 108 of the '393 patent and the '537 patent are placed in different outer coverings. I am informed that, during the application process for the '502 patent, Flexi-Mat gave up any coverage for pet bed designs that require covers for the bolster cushions which are separate from the cover for the base cushion. I am also informed that, during the application process for the '502 patent, Flexi-Mat limited its patent to pet bed designs that have a single cover that encompasses both cushions. But if claim 1 of the '502 patent were read to cover a bed having covers for the bolster cushions which are separate from the cover for the base cushion, then it is a moot point that the foam cores 106 and 108 of the '393 patent and the '537 patent are placed in different outer coverings.

2.    **Claim 2: Reclosable access opening**

The '393 patent states that "the bottom cushion core may be retained in its enclosure . . . by a continuous bottom panel which is releasably secured to the edges of the enclosure by a zipper, Vector™ (hook and loop) material, snaps, or other means." ('393 patent, col. 7, lines 53-58.) In other words, the '393 patent discloses a bottom panel that can be used to close the access opening 134 into the bottom cushion enclosure. The

'537 patent similarly discloses a zippered bottom panel that can be used to close the access opening 134 into the bottom cushion enclosure.

As a result, one of ordinary skill in the art in 1996 would have understood that the '393 patent and '537 patent each discloses the requirements for claim 2 of the '502 patent.

### 3.     Claim 3:  Zipper

The '393 patent and '537 patent each invalidates claim 3 of the '502 patent, for the same reasons as discussed above.

## VI.

## THE '502 PATENT DOES NOT DESCRIBE THE INVENTION OF CLAIMS 1-3

I am informed that, although the claims define the invention, the invention set forth in the claims must be described in the patent specification.  In the patent specification, the broadest statement of the invention is the following:  "[A] pet bed having an outer covering, a removable cushion disposed within the outer covering to form a cushioned bottom portion, and a bolster *removably affixed* to the interior of the outer covering and disposed about at least a portion of the perimeter of the bottom portion." ('502 patent, col. 1, line 67 – col. 2, line 5, emphasis added.)  The patent specification goes on to disclose a plurality of fasteners or straps 8 to affix the bolster to the interior of the outer covering.  Nowhere does the patent specification disclose or suggest a pet bed with a bolster that is not affixed or otherwise secured to the outer covering.

In contrast, claim 1 does not expressly state that the bolster is affixed or otherwise secured to the outer covering. This is in contrast to all of the other claims of the '502 patent, claims 4-11, which do specify that the bolster is "removably affixed" within or to the interior of the outer covering.

In my opinion, a person of ordinary skill would not understand from the patent specification that the inventor had possession of an invention in which the bolster is somehow disposed in the outer covering in a particular relationship with the bottom portion without the bolster being affixed or otherwise secured to the outer covering.

## VII.

### CLAIMS 1-3 FAIL TO INCLUDE STRAPS, FASTENERS OR OTHER STRUCTURE TO DISPOSE THE BOLSTER IN PLACE

Claim 1 of the '502 patent does not disclose any structure for holding the bolster in place so that it is "disposed exteriorly about at least a portion of the perimeter of the bottom portion without being secured to the removable cushion." Claim 1 fails to disclose how the patented pet bed ensures that the bolster remains disposed beside the bottom cushion, as required by the claim.

On looking at the pictures in the patent and reviewing the patent embodiments, it is clear that the inventor intended to secure the bolster to the outer covering with a series of straps and/or fasteners. The '502 patent states:

> The bolster is held in place by a plurality of fasteners or straps 8. The straps 8 are preferably the well-known hook-and-loop fasteners, such as Velcro®, although other fasteners, such as ties or straps with snaps or buckles, would perform adequately in this application. The fasteners are sewn or otherwise secured to the interior of the bolster pocket 10 and the outer covering 2.

('502 patent, col. 2, lines 61-67.)

Without the fasteners or straps 8, it is my opinion that the bolster would be loosely floating within the outer covering.  The bolster could move around within the outer covering so that it would be no longer "disposed exteriorly about at least a portion of the perimeter of the bottom portion."  The fasteners or straps 8 are the only means disclosed in the patent to keep the bolster in the required position with respect to the bottom cushion.

In my opinion, claim 1 requires the pet bed to perform the function of keeping the bolster "disposed exteriorly about at least a portion of the perimeter of the bottom portion," but fails disclose or explain how this is done or accomplished.  This is because claim 1 does not disclose any straps, fasteners, or other means for keeping the bolster in place.

## VIII.

## QUALIFICATIONS AND PUBLICATIONS

I own my own patternmaking, consulting and design business in Los Angeles.  My qualifications, as well as a list of my publications, are set forth in my curriculum vitae, which is attached as Exhibit A.

## IX.

## COMPENSATION

I am being compensated at my normal rate of $250-$275 per hour, depending on services rendered.  My compensation does not depend in any way upon the outcome of this litigation.

## X.

## PREVIOUS TESTIMONY

My expert witness testimony experience/history is set forth in my curriculum vitae, which is attached as Exhibit A.

## XI.

## RESERVATION OF RIGHTS

I reserve the right to amend and/or supplement this report as appropriate after reviewing further documents or information available after the date of execution of this report and/or after reviewing the report(s) of Flexi-Mat's expert witnesses and any supporting materials. Furthermore, I may study additional materials, documentation and testimony as it becomes available during the discovery process. I may also provide graphic materials.

## XII.

## DEMONSTRATIVE EXHIBITS

If called to testify at trial, I may prepare demonstrative exhibits, such as charts, graphs, patterns, and models, to further explain my opinions.

## XIII.

## INFORMATION CONSIDERED

I have considered the following materials in reaching the opinions set

forth is this report:  All patents and publication cited in this report.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September _23_, 2005, at Los Angeles, California.

SUZANNE D. FESSLER

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon Plaintiff's counsel, William Meunier, Esq. Goodwin Procter LLP, Exchange Place, Boston, Massachusetts 02109, and Larry L. Saret, Esq., Michael, Best & Friedrich LLP, 401 N. Michigan Avenue, Suite 1900, Chicago, Illinois 60611, via first class mail, postage pre-paid, on September 23, 2005.

I hereby certify that a true copy of the above document was also served upon counsel for Defendant Doskocil Manufacturing Company, Inc., Roy W. Hardin, Esq., Locke Liddell & Sapp LLP, 2200 Ross Avenue, Suite 2200, Dallas, Texas 75201-6776, via first class mail, postage pre-paid, on September 23, 2005.

Darren M. Franklin

# Resume
### Suzanne D. Fessler

Home:
1740 Golf Club Drive
Glendale, California 91206
(818) 246-9499

Business:
***Suzanne's Pattern Specialist***
819 Santee #402
Los Angeles, California 90014
(213) 627-5255

## EXPERIENCE

| | | |
|---|---|---|
| A. | Present: | Suzanne's Pattern Specialist - Owner / Manager:  Professional  Consultations, Designing ( including Contemporary & Updated, Junior and Missy Dresses, Sportswear, Swimwear, Men's, Children, Maternity, Uniforms, Evening wear, Bridal, Specialty items ),  First  and Production patterns,  Samplemaking, Cutting,  and  Grading.  Designing dolls and toys,  Prototypes, and Inflatables. Costumes for Movies.  Supervise 7. |
| B. | Present: | Instructor – Woodbury University:  Senior Collection – Couture; Senior Studio – Contemporary; Costume Design Studio. |
| C. | 1999-2003 | Instructor - Otis School of Art and Design:  Sophmore Studio and Pattern Drafting. Instructor - California Design College:  Draping, and Advanced Pattern Drafting. |
| D. | 2003 | Write and published a book entitled – "Creating an Original Soccer Bag" |
| D. | 2000-2003 | Instructor - Pasadena City College:  Advanced Pattern Drafting. |
| E. | 2000: | Wrote and published a book entitled  -  "Creating Garments Using Novelty Fabric Textures". |
| F. | 1999: | Wrote and published a booklet entitled  -  "Creating Dog and Cat Toys from Denim Fabrics". |
| G. | 1988: | Wrote and published a book entitled  -  "Draping and Design". |
| H. | 1982-1988: | Instructor  -  Los Angeles Trade-Technical College:  Pattern Draping. |
| I. | 1982-1984: | Instructor  -  Los Angeles Fashion Institute:  Patternmaking. |
| J. | 1982-1984: | Nina Piccalino  -  Production Supervisor:  First Patternmaker,  Production Patternmaker,  Production Manager,  Quality Control.  Supervised  8. |
| K. | 1982: | Barbara's Express  -  Production Patternmaker, 9 months.  Supervised 4. |
| L. | 1981-1982: | New Leaf  -  Production Patternmaker, 7 months.  Supervised 5. |
| M. | 1980-1981: | Poor Charlie  -  Head Production Patternmaker, 10 months.  Supervised 9. |
| N. | 1979-1980: | Funky  -  Head Production Patternmaker,  1 year.  Supervised 8. |
| O. | 1979: | Junior Concepts  -  Designer / Patternmaker,  Production Manager,  Sample Cutter, 8 months.  Supervised 5. |
| P. | 1978-1979: | Julie Miller  -  Head Production Patternmaker,  9 months.  Supervised 8. |
| Q. | 1978: | Saba  -  Head Production Patternmaker, 9 months.  Supervised 8. |
| R. | 1974-1978: | Adult Education Teacher,  Garden Grove District -  Tailoring, Fit and Pattern Design, Pants,  Alterations,  Beginning and Advanced Clothing, Sewing. |
| S. | 1997: | Barbara Barbara – Head Production Patternmaker, 8 months.  Supervised 6. |
| T. | 1976-1977: | That's It  -  Production Patternmaker, 10 months.  Supervised 3. |
| U. | 1976: | Knapps Originals  -  First and Production Patternmaker, 6 months.  Supervised 4. |
| V.a | 1975-1976: | YWCA in Hollywood  -  Lecture / Demonstration classes on Design, Patternmaking Personal Fit.  Lectured at Orange Coast College on Personal Fit. |
| W. | 1975: | Saba-Arjon  -  Samplemaker, 6 months. |
| X. | 1975: | Alpaq  -  Graded patterns, made markers, 7 months.  Supervised  2. |

Y.   1962-1975:   Designing, Dressmaking, Tailoring and Alteration Business: including dress designing, drill team outfits, men and women's suits, school clothes, bridesmaid and wedding dresses, nurses uniforms, airline pilot's suits, formals and graduation dresses for private customers.

Z.   1972-1974:   Donna O'Hara Originals - Manufacturing Restaurant Uniforms: Production Manager of designing, patternmaking, and construction. Supervised 2.

AA.   1974:   Wrote a revised edition and new material for "Sewing Men'swear", to be published by Prentice Hall, New York.

BB.   1974:   Student-Teacher, Fullerton College pilot program for the 4-H Club.

CC.   1973:   Wrote an article that was published in BEAU Men's Magazine.

DD.   1973:   Wrote and published a book entitled - "Sewing Men's Knit Pants".

EE.   1973:   Made two personal TV appearances in connection with published books on - "Dialing for Dollars", and "Ralph Story's AM Program".

FF.   1971-1973:   Leah's Fabric Gallery, Orange and Cerritos Mall - Lectured, demonstrated, gave lessons, put on fashion shows, designed and constructed store samples of men, women, and children's clothing. Clothing Construction Consultant for store customers.

GG.   1971-1973:   Sunny Fabrics, Fullerton - Organized sewing classes on men'swear, gave lectures and lessons, and made up sample garments for men, women and children's clothing.

HH.   1972:   Wrote and published a revised edition of - "Sewing Men's Knit Jackets".

I I.   1970-1972:   Leslie's Fabrics, Placentia: Organized stretch-sewing classes on basic knits and men'swear, gave lectures and sewing lessons, made up store samples. Store Manager and Fabric Buyer. Responsible during owners' absence.

JJ.   1970-1972:   Leiter's Designer Fabrics, Kansas City, Mo. - Fabric and Design Consultant for individual customers, displayed fabric, and made display models.

KK.   1969-1973:   Teacher - Private homes. Sewing lessons for small groups of 3-10, including personal sewing, fit, lingerie, men'swear and tailoring.

LL.   1969-1972:   Teacher - Brea Recreation Department, Brea - Organized and taught sewing for teens and adults, groups of 10-20. Beginning and Advanced classes.

MM.   1967-1969:   Turnabout Shop, Brea; and Irene's House of Fashion, Fullerton - Alterations for these two dress shops including sportswear and formals.

NN.   1965-1967:   Oregon Tailor Shop, Klamath Falls - Extensive experience in all phases of men and women's alterations.


## EDUCATION

A.   1986:   California State University at Los Angeles. Major: Home Economics/Textiles and Clothing Department. Graduated: Masters Degree.

B.   1973-1981:   California State Polytechnic College, Pomona. Major: Home Economics. Graduated: B.S. Degree.

C.   1972-1979:   Fullerton College, Fullerton. Major: Home Economics and Fashion..

D.   1977-1978:   University of California at Long Beach. Major: Education.

E.   1976-1978:   University of California at Los Angeles. Major: Teacher Education.

F.   1976-1977:   University of California at Irvine. Major: Education.

G.   1974-1977:   University of California at Fullerton. Major: Education.

H.   1974-1976:   Los Angeles Trade-Technical College. Major: Fashion Design. Graduated: A.A. Degree.

I.   1974-1975:   Chapman College, Orange. Major: Education.

J.   1971-1972:   National School of Dress Design, Chicago. Graduate.

K.   1968-1973:   North Orange County Adult Eduction. Tailoring; Knit and Stretch Fabrics, Dress Design, Sportswear for Men.

L.   1963-1967:   University of California Extension, Berkeley. Major: English.

M.   1960-1962:   University of California at Sacramento. Major: Home Economics.

N.   1957-1960:   Palo Alto High School. Graduate.

## COMMUNITY SERVICE

A.  1980-1990:  Advisory Committee Member, Apparel Arts, Fullerton College.
B.  1974-1978:  Fashion Show Coordinator for Garden Grove Adult Education.
C.  1967:       Lecture series presentation at Orange Coast College: Personal Fit.
D.  1967-1974:  Brea Junior Women's Club, Brea: Member and Fine Arts Chairman, 1967;
                Historian, 1968; Publicity Chairman, 1969; Second Vice-President, 1970;
                Publicity Chairman, 1971; Ways and Means Chairman, 1973.
E.  1972-1973:  Brea United Methodist Church: Member. Adult Choir member.
F.  1968-1971:  Brea Congregational Church: Member. Organized and directed Youth Choirs.
                Adult Choir member.
G.  1970:       Brea Congregational Sewing Fair: Organized, instsigated and participated in
                fashion show, showed films, sew up displays, and demonstrated.
H.  1967:       Miss Brea Beauty Contest: Organized and developed procedures for the lst Miss
                Brea Beauty Contest, during the lst Brea Bonanza Days Celebration;
                encouraged participants and sponsors. Personally sponsored a contestant.

## HONORS

A.  1975:       Los Angeles Trade-Technical College. Save-A-Life Scholarship.
B.  1974-1976:  Los Angeles Trade-Technical College. Chancellor's Distinguished Honor List.
C.  1974:       Los Angeles Trade-Technical College. Patternmaking Contest Winner.
D.  1960-1962:  Delta Sigma Nu Sorority, Sacramento College. Member.

## CREDENTIALS

A.  1979:       State of California, Community College Instructors Credential, Life-Time, Full-
                Time. Subjects: Textiles, Textile Services, and Related Technologies.
B.  1979:       State of California, Standard Designated Teaching Credential, Vocational Trade
                and Technical, Life-Time, Full-Time. Subjects: Sewing, Tailoring, and
                Fashion Design.
C.  1974:       State of California, Adult Education Credential. Subjects: Sewing, Tailoring and
                Patternmaking.

## CONSULTATION INFORMATION

I am listed as an expert witness in the Southern California Experts and Consultants Directory, published by the Los Angeles County Bar Association. A Lawyer-to-Lawyer Consultants Network.

I am also listed as an expert witness with TASA, Technical Advisory Service for Attorneys in Penn. A nation-wide referral service for attorneys. 1-800-523-2319.

The following are the people I have consulted with and served as an expert for:

Gordon Boyco                          Date: 1990 and onwards
Wes-Tex Adjusting Service, Inc.       Re: Expert Witness testimony in an arbitration hearing;
8I9 Santee #400                            testimony on the witness stand before the judge;
Los Angeles, California 90014.            casework consultation.
(213) 627-5255

Ms. Judianne Jaffee, Esq.
Pritchard and Fields
10100 Santa Monica Blvd., Suite #950
Los Angeles, California  90067
(310)284-8410

Date: May 13, 1993
Re: Texollini, Inc. v. Lola, Inc.
    Expert Witness testimony in arbitration hearing,
    meetings with attorneys (Depo preparation).

Date:  June 5,  1998
Re:  Southern Calif. Embroidery v. Thin Red Line
    Expert Witness Consultation: review doc, assess
    damaged goods, document and report findings.

John T. Brooks, Esq.
Luce, Forward, Hamilton and Scripps, LLP
600 West Broadway, Suite #2600
San Diego, California  92101
(619) 699-2401

Date: September 30, 1996
Re: Rated R Clothing, Inc. v. Northbrook, et al.
    Expert Witness Consultation: review doc, prepare
    questions  for opposition Depo. (fire loss,
    pattern damage)

Steve Galvez
Mirrors-Granite, Inc.
4309 Exchange Avenue
Vernon, California  90058
(213) 585-7282

Date: June 20,  1997
Re: Documented Report: Inspection of Garments
    Dispute between  Mirrors  Inc. and Lerners Store

Joe Pittera, Esq.
2214 Torrance Blvd.  #101
Torrance, California  90501
(310) 328-3588

Date:  Nov. 20, 2002
Re:  Tooba Jaghoori v. Teresa Kucer
    Client Dispute/ Arbitration

Kristin Wedell
Gallagher, Sharp, Fulton, and Norman
1501 Euclid Avenue, 6th Floor
Cleveland, Ohio  44115-2108
(216) 241-5310

Date: October 12, 2000
Re: Jane Barrett v. Bradcourt Corp, et al.
    Expert Witness Opinion Report: review docs,
    research, document and report findings.

Sheridan Ross
Paul Cha
1560 Broadway, Suite 1200
Denver, Colorado  80202
(303) 863-9700

Date: October 18, 2004
Re: Lippincott v. Bounce Inc.
    Witness Consultation.  Research/Documents
    Patent infringement

David Brien, Esq.
23801 Calabasas Road, Suite 1006
Calabasas, California  91302
(818) 222-6667

Date: January 2, 2005
Re:  Adwani v. Jan
    Expert  research on clothing fire damage