# EXHIBIT 18

sf 11-3-05 amc.txt

```
0001
  1              UNITED STATES DISTRICT COURT
  2            FOR THE DISTRICT OF MASSACHUSETTS
  3
  4     -------------------------------
  5   FLEXI-MAT CORPORATION, an      )  Civil Action No.
  6   Illinois corporation,          )  04 10162 DPW
  7                  PLAINTIFF,      )
  8        vs.                       )
  9   DALLAS MANUFACTURING COMPANY,  )
 10   INC., a Texas corporation;     )
 11   BJ's WHOLESALE CLUB, INC., a   )
 12   Delaware corporation, and      )
 13   DOSKOCIL MANUFACTURING COMPANY,)
 14   INC., a Texas corporation,     )
 15                  DEFENDANTS.     )  (Pages 285)
 16     ------------------------------ )
 17   AND RELATED COUNTERCLAIMS.     )
 18     -------------------------------
 19   VIDEOTAPED DEPOSITION OF:
 20                 SUZANNE D. FESSLER
 21                 THURSDAY, NOVEMBER 03, 2005
 22                 9:19 A.M.
 23   REPORTED BY:
 24                 DONNIE A. STICKLEY
 25                 C.S.R. 9510, R.P.R., R.M.R.
0002
  1           VIDEOTAPED DEPOSITION OF SUZANNE D.
  2   FESSLER, A WITNESS, TAKEN BY THE PLAINTIFF, ON
  3   THURSDAY, NOVEMBER 03, 2005, COMMENCING AT 9:19
  4   A.M., AT 333 SOUTH HOPE STREET, FORTY-SEVENTH FLOOR,
  5   LOS ANGELES, CALIFORNIA, BEFORE DONNIE A. STICKLEY,
  6   C.S.R. NO. 9510, R.P.R., R.M.R.
  7   APPEARANCES OF COUNSEL:
  8
  9        FOR THE PLAINTIFF:
 10
 11             MICHAEL BEST & FRIEDRICH, LLP
 12             BY:  MICHAEL E. HUSMANN, ESQ.
 13             100 EAST WISCONSIN AVENUE
 14             SUITE 3300
 15             MILWAUKEE, WISCONSIN 53202-4108
 16             414.225.4972
 17
 18        FOR THE DEFENDANT DALLAS MANUFACTURING:
 19
 20             SHEPPARD MILLIN RICHTER & HAMPTON, LLP
 21             BY:  DARREN M. FRANKLIN, ESQ.
 22             333 SOUTH HOPE STREET
 23             FORTY-EIGHTH FLOOR
 24             LOS ANGELES, CALIFORNIA 90071-1448
 25             213.617.5498
0003
  1   FURTHER APPEARANCES:
  2
  3        FOR THE DEFENDANT DOSKOCIL MANUFACTURING
  4   COMPANY:
  5
  6             LOCKE, LIDDELL & SAPP, LLP
  7             BY:  ROY W. HARDIN, ESQ.
  8             2200 ROSS AVENUE
  9             SUITE 2200
 10             DALLAS, TEXAS 75201-6776
```

Page 1

**FM Validity Ex. 18**

sf 11-3-05 amc.txt
2  disclosure?
3      A.  Well, he says it can be, it can be moved;
4  I'm just saying to what is most comfortable for the
5  user.  It says, it specifically says that the
6  position can be adjusted by simply rotating the
7  pillowcase.  So my understanding would be that, if I
8  don't want to sleep laying on my back with this
9  thing underneath my neck, if I want to sleep on my
10  side with it positioned in a different place, then
11  what I have to do is rotate that insert to be more
12  comfortable for me.
13      Q.  Okay.  Am I correct that all of the figures
14  shown in the Rinz patent show the insert on top of
15  the bottom --
16      A.  Yes.
17      Q.  -- cushion or pillow?
18      A.  All the pictures show it that way, yes.
19      Q.  Okay.  And the only thing, the only
20  disclosure in Rinz about changing from that position
21  is this paragraph on column two that you have just
22  read, correct?
23      A.  Correct.
24      Q.  And does that paragraph expressly disclose
25  taking that insert completely off the top of the
0094
1  pillow?
2      MR. FRANKLIN:  Objection; the document
3  speaks for itself.
4      THE WITNESS:  It talks about adjusting it
5  to a different position, which could mean it would
6  be disposed on the side of the pillow versus
7  disposed on top of the pillow.  It's adjusted within
8  the pillowcase itself, the pillowcase, which
9  surrounds the pillow.  That is I guess your own bed
10  pillow that you insert in there.  So, therefore, you
11  could, you know, substantially move it to be
12  disposed on the side of the pillow, on the top of
13  the pillow, on the bottom of the pillow perhaps.
14  BY MR. HUSMANN:
15      Q.  Does it expressly say that you can rotate
16  it so that it's completely off of the pillow?
17      MR. FRANKLIN:  Same objection; objection,
18  vague as to off the pillow.
19      THE WITNESS:  It says the position of the
20  insert can be adjusted by rotating the pillowcase,
21  okay, having the pocket 15 and 16 received therein.
22  So the insert 16 is in the pillowcase.
23      So, basically, you are not really rotating
24  the pillow; you are rotating the pillowcase to be,
25  to put the pillow, the insert where you want it to
0095
1  be in relationship to the pillow.  Okay.
2      And it just goes on to say in accordance
3  with the preference to the user.  So --
4  BY MR. HUSMANN:
5      Q.  So it doesn't expressly say how far you can
6  rotate it, correct?
7      MR. FRANKLIN:  Same objection.
8      THE WITNESS:  Logic would indicate that, if
9  something is attached to a case, that surrounds
10  something else, that you could rotate it 90 degrees,
11  180 degrees, 360 degrees, up, down, sideways, back
12  or forth.
Page 39

sf 11-3-05 amc.txt

```
13          If I had it in my hands, I could rotate in
14   it all of those positions.
15   BY MR. HUSMANN:
16      Q.  So this is an inherent disclosure the
17   way --
18      A.  Yes.
19      Q.  -- we talked about it --
20      A.  Yes.
21      Q.  -- earlier today?
22      A.  Thank you.  Yes.
23      Q.  Okay.  It's not an express disclosure?
24      A.  Not an express disclosure.
25      Q.  Okay.  And you can rotate the pillow or the
0096
1    pillowcase in relationship to the pillow in such a
2    position that it would move from the position shown
3    in the figures to a position in the center of the
4    pillowcase, right?
5       A.  That's correct.
6       Q.  Okay.  Do you understand that the pillow,
7    the case that's being used, is a conventional
8    pillowcase?
9       A.  In this particular --
10      Q.  Yes.
11      A.  -- patent?
12          It does not say it's a conventional
13   pillowcase.  It says it's a conventional pillow
14   inserted in the pillowcase.
15          A pillowcase, my definition of a pillowcase
16   would be anything that is covering the pillow.  You
17   could, you could have it shaped roundly like a
18   cushion on a chair.  You could have it shaped
19   rectangularly like a pillow, because a pillow can be
20   mooshed into different positions.
21          It doesn't seem to say, unless you can
22   point out to me the column, that it is a traditional
23   pillowcase.
24      Q.  Let's turn back to your report, then, at
25   page 19.
0097
1       A.  Okay.
2       Q.  Okay.  Subsection a. under Claim 1 on page
3    19, do you see that --
4       A.  Yes.
5       Q.  -- a portion of the patent there?
6           And in the second sentence of that
7    paragraph, you say, "'The pillowcase 10 has a pocket
8    15 formed in the inside'" of the panel.
9           what do you understand a pocket to be?
10      A.  Well, in this case a pocket would be
11   another piece of fabric sewn inside, so that the
12   insert can be placed inside of it and held, not
13   held, but would, would stay stabilized in a certain
14   position.
15      Q.  Do you use the term pocket in your, when
16   you design things, is that a general term that you
17   use?
18      A.  Yes, it is.
19      Q.  What is the general meaning, when you use
20   the term pocket, when you are designing a pet bed or
21   a piece of clothing?  What is it?
22      A.  A pocket would be like on your shirt,
23   something that you would put something into or
```

Page 40

sf 11-3-05 amc.txt
20   substantially all of which is disposed about the
21   perimeter exterior of the bottom cushion?
22       A.  I don't believe it is -- okay.  Let's see.
23           Okay.  It's disposed within the interior of
24   the outer covering.  And it's removably disposed
25   within the interior.  However, in most of the --
0103
1            In the two figures, it looks like it's not,
2    unless somebody maybe lays on it and pushes it to
3    the side.  I think that, I think that it would not
4    be substantially disposed to the perimeter.
5        Q.  You mentioned if somebody leans on it.
6    And.
7            Then are you talking about somebody leaning
8    on the structure that's labeled S 3 in the '350
9    patent?
10       A.  I believe three is just the inner structure
11   of the, of the fibers that make up the, I don't
12   think -- I think that we should be looking at
13   Figure 1 or 2.
14       Q.  Okay.  Well, let's do it this way.  If you
15   go to page 26 of your report --
16       A.  Sure.
17       Q.  -- in the first full paragraph, the third
18   sentence:
19           "Also, it is my opinion that if a
20           person using the pillow disclosed in
21           the '350 patent were to lean against
22           or push on the cylindrical roll, the
23           cylindrical roll could lean over the
24           side of the pillow or at least partly
25           flop over the side of the pillow."
0104
1            Do you see that?
2        A.  Yes.
3        Q.  Okay.  Now could you identify, when you say
4    in this sentence "push on the cylindrical roll,"
5    what are you talking about?
6        A.  That's number three, the bolster,
7    basically.
8        Q.  Okay.  So you are looking at Figure 1
9    there?
10       A.  Right, Figure 1.
11       Q.  Okay.  And that's the structure you
12   conclude corresponds to the bolster that is claimed
13   in claim one of the '502 patent?
14       A.  Right.
15           Now I'm not saying that it is, you know,
16   totally exteriorly, you know, surrounding, because
17   it probably won't.  But if, if a person leans, I
18   mean, since I haven't seen, you know, we are limited
19   here because we haven't, we don't physically have
20   one of their units to look at.  But I can see that's
21   the possibility, because it's within this interior,
22   interior to this covering that is totally covering
23   this bottom cushion and the bolster, that if
24   somebody leaned on it, it's possible that this could
25   then roll to, to the edge, to the end, maybe past
0105
1    that part of it.
2        Q.  Okay.
3        A.  It's possible in usage.
4        Q.  Is there anything in the '350 patent that
                                    Page 43

sf 11-3-05 amc.txt

```
 5    suggests that one would use the pillow in such a
 6    fashion by pushing it back, the cylinder that you
 7    are talking about, item three?
 8         A.  No, it doesn't say that.  I'm just saying
 9    it could happen.  That's all I'm saying.
10         Q.  Okay.
11         A.  No, the patent doesn't.
12         Q.  Okay.  Now, you talked about not having a
13    physical embodiment of this structure that's
14    disclosed in '350 patent.  Okay?
15         A.  Uh-huh.
16         Q.  If you had such a physical embodiment, what
17    would you have to look at to determine whether or
18    not the cylinder 3 could flop off the, I think
19    that's partly flop over the side of the pillow?
20         MR. FRANKLIN:  Objection; incomplete
21    hypothetical.
22         THE WITNESS:  I believe if the attachment,
23    maybe wasn't of high quality, that it could release,
24    and the pillow could, you know, flop off to the
25    side.
0106
 1    BY MR. HUSMANN:
 2         Q.  Okay.  By attachment, you are referring to
 3    what's identified as number four in Figure 1?
 4         A.  Yes, that black --
 5         Q.  Okay.
 6         A.  -- mark there.
 7         Q.  So you would have to look at how secure
 8    that attachment is?
 9         A.  Yes.
10         Q.  Okay.  And what else?  Anything else you
11    would have to see?
12         A.  No.  That would be, that would be it.
13         Q.  That would be it.
14         A.  This particular patent was 1996.  We have,
15    in the industry we have updated the quality of
16    things quite a bit.  So, you know, it's, things that
17    were made then, some of them -- what do you call it?
18    well, where they have defects, they would release,
19    they would not work.
20         I have zippers that will break and come
21    apart, just because the quality wasn't there,
22    whereas today, they are stronger and they are more
23    substantially made.
24         Q.  So there may be a better attachment means
25    at this point?
0107
 1         A.  Yes.
 2         Q.  Would it make any difference how large the
 3    cylinder is in relation to the pocket in which it is
 4    contained?
 5         A.  That's a possibility, as well as what it
 6    was stuffed with.  If it was softer-stuffed, it
 7    might tend to flop over more than if it was very
 8    firmly stuffed.
 9         I think the term malfunction, we were
10    talking to day about clothing malfunctions.  I
11    think, if you talk in reference to this particular
12    attachment, it would be attachment malfunction.
13         Q.  Okay.
14         A.  If it didn't --
15         Q.  If it didn't hold?
```

Page 44

sf 11-3-05 amc.txt

```
23   because I feel that they are not totally secure on
24   the top.  There is no -- They are put in a covering
25   that then has to be tucked under the bed.  So I
0115
 1   think that there is some movability there, where
 2   they could literally be moved to the side of the bed
 3   and not stay on the top.  One side might be moved to
 4   the side.  The other one would probably come more
 5   towards the top of the bed.
 6       Q.  Is there any disclosure in the Bishop
 7   patent that suggests that these bolsters could move
 8   to a position where substantially all of them would
 9   be disposed about the perimeter of the bottom
10   cushion?
11       A.  Yeah, they could.  If somebody leaned and
12   rolled against it, it could literally be, one side
13   of it could be pushed off the bed, if you are, you
14   know, really moving around a lot.  And then the
15   other side would just kind of be moved a little more
16   towards the center of the bed.
17           But you could, basically, if somebody was,
18   if they didn't secure -- I'm not sure at this point
19   how secure this covering is to the bed.  But if
20   somebody was very restless at night, I believe that
21   this, these two bolsters on one side could be pushed
22   to be disposed exteriorly to the top of the, or on
23   the side of the mattress.  And then these two would
24   be, then, rolled more towards the center of the bed.
25   So they would kind of be shifted a little bit.
0116
 1           That's not what the inventor intended, but
 2   practically.
 3       Q.  My question is:
 4           Is there any disclosure in the Bishop
 5   patent that expressly discloses that these bolsters
 6   can move in the fashion in which you just described?
 7       A.  I think it's inherent.  But let me, let me
 8   see if I can find something that --
 9           That's not his intention.  His intention is
10   that they are protected bolsters to set on top of
11   the bed.
12           He claims in column one, 61:
13           "It is within the spirit of the
14           invention...to anchor the bolster(s)
15           with a conventional rectangular sheet
16           that covers the mattress and is tucked
17           under" in its usual way.
18           I don't know about your bed, but my bed
19   sheets get all messed up at night.  Sorry.
20           And they don't retain, you know, the same
21   positions as they were in the morning, I mean.  But
22   at night, when we get up in the morning, they are
23   all like disheveled.
24           And I firmly believe that they will protect
25   the person, his invention will protect somewhat, but
0117
 1   it won't totally protect from rolling out of the
 2   bed, if they shift over, excuse me, to the side of
 3   the mattress.
 4       Q.  Would this be in the area of I think what
 5   you called a malfunction?
 6       A.  Yeah, definitely malfunction.
 7       Q.  Okay.  It's different than what the
                           Page 48
```

sf 11-3-05 amc.txt

```
 8  inventor intended by this patent --
 9         MR. FRANKLIN:  Objection; lack of
10  foundation.
11  BY MR. HUSMANN:
12      Q.  -- correct?
13          You can go ahead and answer.
14          MR. FRANKLIN:  Please.
15          THE WITNESS:  Oh, I'm sorry; I'm sorry.
16          Would you restate your question?
17  BY MR. HUSMANN:
18      Q.  Yes.
19          This malfunction that we have been
20  discussing is not what was intended by this patent,
21  correct?
22      A.  No, it's not, not intended.  But I think
23  it's, you can -- a normal person, a practical person
24  can see that this shift can easily occur.
25          MR. FRANKLIN:  Same objection.
0118
 1  BY MR. HUSMANN:
 2      Q.  What do you consider to be the structure in
 3  the Bishop patent that corresponds to the bottom
 4  cushion?
 5      A.  The bottom cushion is the mattress pad that
 6  is built into the bed.
 7      Q.  When you say the mattress pad, what are you
 8  talking about?
 9      A.  The bed, the bed's own mattress.
10      Q.  Okay.  The mattress itself?
11      A.  Yes.
12          I think Figure 3 shows that quite
13  adequately.
14      Q.  And which item in Figure 3 would you
15  consider to be the bottom portion?
16      A.  That's 12.
17      Q.  Okay.  And what item would you consider to
18  be the outer covering, corresponding to the outer
19  covering of claim one of the '502 patent?
20      A.  That's number 13; he has numbered that 13.
21      Q.  Okay.
22          MR. HUSMANN:  I would suggest we break for
23  lunch.  I believe it's 12:30.
24          MR. FRANKLIN:  Sounds good to me.
25          THE VIDEOGRAPHER:  Okay.  Let's go off the
0119
 1  record.
 2          The time is 12:32.
 3          (The luncheon recess was taken
 4      at 12:22 p.m.)
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
```

sf 11-3-05 amc.txt

11      Q.  Okay.
12      A.  One is a mattress pad that is the bed, and
13  the other one is the covering that covers the
14  bolsters themselves.
15      Q.  Okay.  If we look at Figure 1, let me see
16  if I can understand what you are saying.
17          Figure 1, you see where it says 16 and --
18      A.  Yes.
19      Q.  -- 19?
20      A.  Yes.
21      Q.  The patent at column three, lines 19
22  through 21, refer to those structures as pockets.
23      A.  Okay.  The other one is a little confusing.
24  Okay.
25          That's a better, that's a better one, yes.
0130
1       Q.  Okay.  And you understand those are
2   attached to sheet 12 --
3       A.  Right.
4       Q.  -- again referring to themselves.  Okay.
5           So are you referring to the outer covering,
6   then, being these pockets that are sewn to cover 12?
7       A.  Right.
8       Q.  Okay.  what is the purpose of the pockets
9   in the Pollard?
10      A.  Just to hold apparently the bolsters in
11  place.
12      Q.  Okay.
13      A.  Keep them from rolling off the rectangular.
14      Q.  Now the Pollard patent shows the bolsters
15  on top of the bottom cushion, correct?
16      A.  Right.
17      Q.  The bottom cushion being the mattress
18  itself, is that correct?
19      A.  Yeah.  That's what it appears to be.
20      Q.  Okay.  Now does the Pollard patent disclose
21  having the bolsters substantially all of which would
22  be in an exterior perimeter around the bottom
23  cushion?
24      A.  Well, it's supposed to be disposed atop the
25  mattress, but I think it's also used to cover --
0131
1   It's used two ways:  It's used inside a crib area,
2   like Figure 6, which they would be definitely
3   bolsters, or it's also used on top of a bed.  And
4   they could, they could twist a little bit and turn
5   towards the side or partially towards the side.
6       Q.  Do you believe they could move to a
7   position or substantially all of the bolster is off
8   of the top and disposed around the perimeter of the
9   bottom cushion?
10      A.  Probably not totally.  Because if the
11  pockets were secure enough, if they are stable, they
12  should be holding it in a fairly good position.  If
13  the mattress cover, the sheet that covers the
14  mattress, then, is tucked under, if it's stable,
15  then it probably won't move substantially.
16      Q.  You are talking about whether or not the
17  entire cover would move?
18      A.  Correct.
19      Q.  Okay.  Does Pollard make my explicit
20  disclosure about moving the bolsters off of the top
21  of the bottom portion?

Page 54

sf 11-3-05 amc.txt
```
22          A.  I don't believe so, because I believe he is
23  thinking that it's going to be used within a crib
24  environment enclosure rather than on top of a bed
25  like Bishop was.
0132
 1              Bishop was the one previous.  Yes.
 2              That's a little bit different than Bishop.
 3          Q.  Because of the rails?
 4          A.  Because of the rails, yeah.  They hold it
 5  more stable.
 6          Q.  Now at page 35 and 36 of your report, you
 7  discuss claims two and three of the '502 patent,
 8  correct?
 9          A.  Right.
10          Q.  And here you propose a combination of the
11  Pollard patent with any one of three articles,
12  correct?
13          A.  Yes.
14          Q.  And, again, we are talking about the
15  zippered vinyl covers, correct?
16          A.  Correct.
17          Q.  A separate cover for the mattress and a
18  separate cover for the bolster, correct?
19          A.  No.  It would be, it would be a separate, a
20  plastic vinyl for the mattress and box springs.  And
21  for, the bolsters are still set in within the --
22          Q.  Pockets?
23          A.  -- pockets that they have.  And it's still,
24  it would be somehow then attached to this plastic
25  covering that covers the mattress.
0133
 1              See, in this particular one, let me get
 2  the -- this is for a baby's crib, so it's even less,
 3  less thick than the Bishop one, which was for a
 4  regular bed.  So this idea --
 5              It has less of a distance to have to go
 6  from the top of the mattress to the bottom.  They
 7  are very thin compared to our box spring/mattress
 8  sort of thing.
 9              So, again, I'm talking about combining a
10  zippered plastic vinyl cover that this bolster
11  assembly would be attached to.  And, therefore, it
12  would be secured to the child's crib bed, the
13  mattress part of the crib bed.
14          Q.  Okay.  Would you --
15          A.  That's one unit.
16          Q.  -- use the vinyl coverings at all for the
17  bolsters?
18          A.  No.
19          Q.  Okay.  And would you replace the sheet,
20  that is shown in the Pollard patent, with the vinyl
21  cover for the mattress?
22          A.  No.  It would be secured on top of the
23  vinyl cover --
24          Q.  So you -- Okay.
25          A.  -- one unit.
0134
 1          Q.  All right.  So you have the vinyl cover
 2  over the mattress.  Okay.
 3              Then you said you would attach these
 4  pockets to the vinyl somehow, correct?
 5          A.  I would attach the whole sheet/pocket
 6  assembly to the vinyl.
```
                              Page 55

sf 11-3-05 amc.txt

3    A.  -- Figures 4, 5 and 6.
4    Q.  Now the figures we have been referring to
5  show the bolster, you refer to it entirely on top of
6  the bottom cushion, correct?
7    A.  That's what it appears to be, yes.
8    Q.  And do any of the --
9        And rest of the figures also show that
10 arrangement in the Henry bed, correct?
11   A.  Yes.
12   Q.  Now, does the Henry reference disclose a
13 configuration in which those ones a configuration in
14 which those, a configuration in which substantially
15 all of one of those bolsters is disposed exteriorly
16 around the perimeter of the bottom cushion?
17   A.  The cushions are within the perimeter of
18 the circle, not exterior to the perimeter.  However,
19 if a pet is inside of it, it appears to be pushed
20 towards the side, over the side somewhat.  So it's
21 not totally exposed, but it would be somewhat pushed
22 towards the edge.
23   Q.  How do you understand that the bolster, as
24 shown in Figure 3, is connected to the bottom
25 portion or bottom cushion?
0140
1    A.  Apparently, it's seamed across, around the
2  circular circumference of the bottom cushion.
3    Q.  So it -- well, let me give you a pen.
4        And could you draw the seam that you are
5  referring to.
6    A.  Well, I believe the dotted line on the
7  figure here is the seam.  So it would be --
8    Q.  Okay.
9    A.  -- around the total circumference.
10   Q.  So one bolster is sewn to half of the
11 bottom, the circumference of the bottom pillow and
12 the other one is sewn to the other half of the
13 circumference of the bottom cushion, is that
14 correct?
15   A.  That's what it appears to be like, yes.
16   Q.  Okay.  If that is the way in which it is
17 sewn, how could that bolster move off of the bottom
18 cushion?
19   A.  Well, if you look at the first page of this
20 patent with a dog, or actually the Figure 1 that he
21 has --
22   Q.  Okay.
23   A.  -- over here with the dog snuggled in
24 between these two bolsters, there is not much space
25 in Figure 2, at least in the first figuration that
0141
1  he has.  Figure 4, 5 and 6 are structured a little
2  differently.  But in the first figure, putting that
3  pet in between these two stuffed pieces would push
4  the bolsters apart.
5    Q.  Okay.
6    A.  And depending on how fat your dog is, it
7  would maybe not totally substantially, but it would
8  push some of the stuffing and some of the bolsters
9  over the side of the bottom cushion.
10   Q.  Okay.  Do you think that, given the
11 stitching between the top bolster cushion and the
12 bottom cushion, it could push substantially all of
13 that bolster off of the perimeter of the bottom
                                        Page 58

sf 11-3-05 amc.txt

14    portion?
15         A.  No, I don't think it could do all.
16         If you look at Figure 1, he shows a drawing
17    of an animal in there.  And it looks like already
18    the cushion is starting to, the bolster is starting
19    to push out a little bit, but it wouldn't be a
20    totality.
21         Q.  Okay.  Could you identify for me in the
22    Henry patent the outer covering that you believe
23    corresponds to the outer cover that is claimed in
24    claim one of the '502 patent?
25         A.  Okay.  There is, there is two outer covers.
0142
 1    There is an outer cover number 12 that covers the
 2    bottom cushion, and then there is one that
 3    independently covers the top cushions.  The bottom
 4    cushion, it looks like it's numbered 12, if I'm
 5    reading the picture right.
 6         Wait a minute.  That's the cushion itself.
 7    Okay.  Wait a minute.
 8         Looks like it's, looks like it's, 33 is the
 9    bottom cover 137.  And 138, let me see if I can find
10    it in the patent.
11         Q.  I think the 33 is a reference at column
12    two, line 61, if that --
13         A.  I will get the numbers for you.  Let's see.
14         The numbers are the zippers.  The numbers
15    of the cushion are 16, 14 and 12.  So those are the
16    cushions.
17         The cover -- let me see what the covers
18    are.
19         He doesn't give, he doesn't give numbers
20    within the embodiment.  He just talks about on 44,
21    45, column 4, a base and top cushion each include a
22    cover having an opening there through and the filler
23    therein.
24         But I think, looking at the numbers in his
25    picture, I want to track the zipper numbers he has.
0143
 1         Okay.  There is a zipper opening.  Oh,
 2    well, maybe that's what the covers are, 34, 35 and
 3    36.  Let's see.  34, 35, 36, I guess that must be
 4    the coverings.  I guess that's what I interpreted as
 5    the coverings, 34, 35 and 36.
 6         Q.  And how are those coverings attached to one
 7    another?
 8         A.  Well, apparently the covering surrounds
 9    like the top cushion, each one, 35 and 34, surrounds
10    the top cushion independently.  And then the lower
11    cushion, 36, surrounds the bottom cushion.  And then
12    they appear to be sewn together at the outer edge.
13         So they are secured all the way around the
14    top cushion.
15         Q.  Okay.  When you say independently, what do
16    you mean?
17         A.  Well, first, the top cushion would be
18    covered.
19         Q.  Okay.
20         A.  And then the bottom cushion would be
21    covered.  And then they would be sewn -- attached
22    together.
23         Q.  Okay.  If you could turn to page 42 of your
24    report.

Page 59

sf 11-3-05 amc.txt
21          A.  It doesn't give any measurements.  It
22    doesn't give any suggestion, like a previous patent
23    did, as to the thick or thinness of the wall.
24          Q.  Well, does it teach to use a thick
25    structure around the bottom of the perimeter?
0149
1          A.  what it says is, column four, line 23 and
2    24, it says the structural part that is an
3    upstanding foam core.  That's what, that's what it
4    teaches.
5          Q.  Okay.  And do you consider an upstanding
6    foam core to be a bolster?
7          A.  It could be referred to as that.  It could
8    be, another inventor could call it a bolster.
9          Q.  Do you consider it to be a bolster?
10          A.  I think it's semantics.  I think a bolster,
11    if it's a stuffed unit within a covering, it could
12    be stuffed with peanuts; it could be stuffed with
13    foam; it could be stuffed with fiberfill, it could
14    be stuffed with batting, blown in, or whatever, it
15    still creates an outer area for the pet.
16          So whether do you call it a bolster or a
17    wall I think is semantics.  It's still, it's not
18    solid.  Yet, as we would go over to the wall of this
19    room and say, this is a wall, and I hit it and I
20    hurt my hand, this is not the same sort of
21    structure.
22          So I would consider any of these terms
23    cushion/bolster/wall to be interchangeable.
24          Q.  No matter how thick the upright portion is
25    or how soft it is, you would consider that, those
0150
1    words to be interchangeable when used in a pet bed,
2    is that correct?
3          A.  Yes, I would.
4          Q.  So if one made the wall portion a quarter
5    of an inch thick and six inches high, and made it
6    out of stiff foam, you would, nonetheless, consider
7    that to be a bolster?
8          A.  It would still work within his, his
9    description of his patent.
10          Q.  Would you consider it to be a bolster?
11          A.  Yes, it would be a bolster.
12          Q.  Okay.  And if you took a piece of hard
13    plastic and stood it up, and it was a quarter of an
14    inch thick and 10 inches high, would you consider
15    that to be a bolster?
16          A.  No, I would not.
17          Q.  Why not?
18          A.  Because of the element that you are putting
19    into it.  A hard plastic is hard.  It would not be
20    put in a pet bed, number one.  And number two, it
21    could then be traditionally called a wall, because
22    it would be inflexible.
23          When -- You said only a quarter of an inch
24    thick?
25          Q.  Yes.
0151
1          A.  I personally don't see the purpose of it.
2    Right here, it is stuffed; it is soft.  It is
3    something that the dog will be comfortable with.
4          A six-inch tall piece of Plexiglas, even if
5    it was covered with fabric, would not be something
                              Page 62

# EXHIBIT 19

*C 05*

# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FLEXI-MAT CORPORATION, an Illinois corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 04 10162 DPW |
| DALLAS MANUFACTURING COMPANY, INC., a Texas corporation, BJ'S WHOLESALE CLUB, INC., a Delaware corporation, and DOSKOCIL MANUFACTURING COMPANY, INC., a Texas corporation, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| AND RELATED COUNTERCLAIMS. | ) | |

## DEFENDANT DALLAS MANUFACTURING'S SUPPLEMENTAL RESPONSE TO PLAINTIFF FLEXI-MAT'S INTERROGATORY NO. 4 AND SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5

Pursuant to FED. R. CIV. P. 26(e) and 33, Defendant and Counter-Claimant Dallas Manufacturing Company, Inc. ("Dallas Manufacturing") hereby objects and provides a supplemental response to Interrogatory No. 4 and a second supplemental response to Interrogatory No. 5 of *Plaintiff Flexi-Mat's First Set of Interrogatories to Defendant Dallas Manufacturing (Nos. 1-16)*, served by Plaintiff Flexi-Mat Corporation ("Flexi-Mat") on or about May 25, 2004.

## GENERAL OBJECTIONS

1.      Dallas Manufacturing objects to each interrogatory insofar as it is vague, overly broad, oppressive, harassing or vexatious; imposes burden or expense that outweighs its likely benefit; seeks a legal conclusion; and/or seeks information not relevant to a claim or defense of any party.

**FM Validity Ex. 19**

-1-

None of Dallas Manufacturing's pet beds use ties, straps, or equivalent structure to hold the bolsters in place relative to the base cushions. In the Dallas Manufacturing pet beds, the bolsters are enclosed within separate compartments formed by separate covers that are attached to the covers for the base cushions.

**INTERROGATORY NO. 5:**

Identify in detail the factual basis for Dallas Manufacturing's affirmative defense that "[e]ach and every claim of the '502 patent is invalid and/or unenforceable under one or more provisions of the Patent Laws of the United States, including, without limitation, 35 U.S.C. §§ 101, 102, 103 and 112."

**RESPONSE TO INTERROGATORY NO. 5:**

In addition to the grounds set forth in the General Objections, Dallas Manufacturing objects to this interrogatory on the following grounds:

Dallas Manufacturing objects to this interrogatory as premature in that (1) discovery has just commenced; (2) Flexi-Mat has not identified the claims of U.S. Patent No. 5,765,502 ("the '502 patent") that it is asserting against Dallas Manufacturing; (3) Flexi-Mat has not provided any information concerning the dates of conception and reduction to practice of the claimed invention; (4) Flexi-Mat has not provided its contentions regarding the proper interpretation of the claims of the '502 patent; and (5) the claims of the '502 patent have not yet been interpreted by the Court.

Dallas Manufacturing objects to this interrogatory as overly broad, unduly burdensome, and not relevant to a claim or defense of any party to the extent it is not limited to the claims of the '502 patent that Flexi-Mat is asserting to have been infringed by the accused pet bed supplied to BJ's Wholesale Club, Inc. by Dallas Manufacturing that is identified in the *Complaint*.

-10-

Dallas Manufacturing objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege and/or the work product doctrine and/or the common interest doctrine.

Subject to and without waiving the foregoing objections, Dallas Manufacturing contends that if the claims of the '502 patent are construed broadly enough to cover the accused Dallas Manufacturing pet bed, then the claims are invalid as anticipated or obvious in view of several references, including U.S. Patent Nos. 4,872,228; 5,010,843; 5,421,044; 5,588,393; and 5,826,537.

Dallas Manufacturing reserves the right to amend and/or supplement its response (1) as its investigations and discovery progress; (2) when Flexi-Mat identifies the claims of the '502 patent that it is asserting against Dallas Manufacturing; (3) when Flexi-Mat provides its contentions regarding the proper interpretation of the claims of the '502 patent; and (4) when the Court interprets the claims of the '502 patent.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5:**

Dallas Manufacturing understands that the only claims of the '502 patent that it is charged with infringing are claims 1-3. Subject to and without waiving the foregoing objections, Dallas Manufacturing contends that claims 1-3 of the '502 patent are invalid as anticipated or obvious in view of several references, including U.S. Patent Nos. 4,754,513; 4,872,228; 4,873,734; 5,010,843; 5,136,981; 5,421,044; 5,586,350; 5,588,393; and 5,826,537; German Patent No. 93 09 699.2; and AB Murray and AC Ferguson, *Dust-free bedrooms in the treatment of asthmatic children with house dust or house dust mite allergy: a controlled trial*, 71 PEDRIATRICS 418-22 (March 1, 1983).

Claims 1-3 of the '502 patent read as follows:

1.  A pet bed comprising:

an outer covering;

-11-

a removable cushion disposed within the outer covering to

form a cushioned bottom portion; and

a bolster removably disposed within the interior of the outer

covering and substantially all of said bolster disposed

exteriorly about at least a portion of the perimeter of the

bottom portion without being secured to the removable

cushion.

2.    The pet bed of claim 1, wherein the outer covering

further includes a reclosable access opening.

3.    The pet bed of claim 2, wherein the reclosable access

opening further includes a zipper.

('502 patent, col. 3, lines 37-46.)

Preliminarily, as a matter of claim construction, the preamble of claim 1 ("A pet
bed . . . ") is not a limitation because it neither recites essential structure nor gives life, meaning,
and vitality to the claim. Also, due to statements during prosecution concerning and
distinguishing U.S. Patent No. 5,010,843 to Henry ("the '843 patent") (*i.e.*, argument that the
'843 patent required separate covers for the cushions and base), the term "outer covering" is
limited to something that is placed over or about the cushion and the bolster with a single interior
compartment for receiving both the cushion and the bolster.

### The '044 Patent Anticipates Claim 1 of the '502 Patent.

U.S. Patent No. 5,421,044 to Steensen ("the '044 patent") anticipates claim 1 of
the '502 patent. The '044 patent issued on June 6, 1995, based on an application filed on
August 27, 1993. Both of these dates are before the presumptive date of invention of the subject
matter of the claim 1 as represented by the April 18, 1996 filing date of the application for the
'502 patent. Therefore the '044 patent is prior art to the '502 patent under 35 U.S.C. §§ 102(a)
and (e).

-12-

The '044 patent discloses a human air bed. Figure 1 of the '044 patent shows that the air bed has an outer covering 12, which "is formed of flexible material and has a bottom panel 14 formed of rip stop nylon, upper and lower vertical panels 16 and 18, respectively, and a top panel 20." ('044 patent, col. 3, lines 13-15.)

The '044 patent states that "either or both of 'egg crate' polyurethane foam pad 58 and rectangular polyurethane foam pad 59 are . . . placed on top of . . . upper laterally disposed cushion air tubes 42 in the space bounded by upper side bolster air tubes 32, 33, 34 and 35 and upper end bolster air tubes 31 and 36." (Id., col. 4, lines 21-26.) "Top panel 20 . . . is removably joined to the upper vertical panel through the use of a zipper attachment means 22 which is disposed along the periphery of the top panel and the upper edge of the upper vertical panel." (Id., col. 3, lines 52-57.) The foam pads 58 and 59 and the air tubes 42 are removable from the outer covering 12 when the zipper attachment means 22 is unzipped. The foam pads 58 and 59, singly or in combination, with or without the air tubes 42, thus comprise a removable cushion disposed within the outer covering to form a cushioned bottom portion.

Each air tube 31-36 is a "bolster." (Id., col. 4, line 11.) Each air tube 31-36 is disposed within the interior of the outer covering 12 and exteriorly about at least a portion of the foam pads 58 and 59 and the air tubes 42, without being secured to the foam pads 58 and 59 or the air tubes 42. Each air tube 31-36 is removable from the outer covering 12 when the zipper 22 is unzipped. The air tubes 3-36, singly or in combination, thus comprise a bolster removably disposed within the interior of the outer covering and substantially all of said bolster disposed exteriorly about at least a portion of the perimeter of the bottom portion without being secured to the removable cushion.

This covers all the elements of claim 1 of the '502 patent. Although the bed disclosed in the '044 patent is flat when foam pads 58 and 59 are placed within the outer covering, the foam pads need not be used. The '044 patent states in that case that the top surface would "have its outside edges extending substantially above the interior portions of the top

-13-

surface due to the fact that the bolster air tubes . . . will typically be 8" diameter tubes, and the height of the two levels of bolster tubes will therefore be 2" greater than the height of the two levels of interior tubes." ('044 patent, col. 4, lines 28-37.)  This statement further confirms that the '044 patent anticipates claim 1 of the '502 patent under 35 U.S.C. § 102(a).

Thus, the '044 patent satisfies each and every limitation of claim 1 of the '502 patent as set forth in the following chart:

| Claim | Element | '044 Patent Anticipation Analysis |
|-------|---------|-----------------------------------|
| 1 | A pet bed comprising: | Not a limitation. |
| | an outer covering; | The '044 patent discloses an outer covering 12. |
| | a removable cushion | The foam pads 58 and 59, singly or in combination, and/or the air tubes 42 comprise a removable cushion. |
| | disposed within the outer covering | The foam pads 58 and 59 and the air tubes 42 are disposed within the outer covering 12. |
| | to form a cushioned bottom portion; and | The foam pads 58 and 59, singly or in combination, and/or the air tubes 42 form a cushioned bottom portion. |
| | a bolster | The air tubes 3-36, singly or in combination, comprise a bolster. |
| | removably disposed within the interior of the outer covering | The air tubes 3-36, singly or in combination, are removably disposed within the interior of the outer covering 12. |
| | and substantially all of said bolster disposed exteriorly about at least a portion of the perimeter of the bottom portion | The air tubes 3-36, singly or in combination, are disposed exteriorly about at least a portion of the perimeter of the bottom portion formed by foam pads 58 and 59 and/or the air tubes 42. |
| | without being secured to the removable cushion. | The air tubes 31-36 are not secured to the removable cushion formed by foam pads 58 and 59 and/or the air tubes 42. |

W02-LA:LGA\70874231.2

DALLAS MANUFACTURING'S FURTHER SUPPL.
RESPONSES TO INTERROGATORY NOS. 2, 4 AND 5

**The '981 Patent Anticipates Claim 1 of the '502 Patent.**

U.S. Patent No. 5,136,981 to Barreto, III et al. ("the '981 patent") also anticipates claim 1 of the '502 patent. The '981 patent issued on August 11, 1992, more than one year before the April 18, 1996 filing date of the application for the '502 patent. Therefore the '981 patent is prior art to the '502 patent under 35 U.S.C. § 102(b).

The '981 patent discloses a pet bed 40 comprising an outer covering 46 configured to receive a removable bottom cushion 44. ('981 patent, col. 6, lines 40-45, and col. 7, lines 14-45.) The removable bottom cushion 44 is disposed within the outer covering 46, as reflected in Figures 2, 3, and 4. The '981 patent further discloses a foam wall 42 disposed within the outer covering 46, as shown in Figure 2 and as described at column 7, lines 9-45. As disclosed by the '981 patent, the foam wall 42 is disposed exteriorly about (*i.e.,* outside) the perimeter (*i.e.,* outermost limits) of the bottom cushion 44. This is reflected in Figures 1-4. The foam wall disclosed by the '981 patent is not secured to the bottom cushion, and is separately removable therefrom. ('981 patent, col. 7, lines 9-59.) As such, claim 1 of the '502 patent is invalid under 35 U.S.C. § 102(b) as anticipated by the disclosures of the '981 patent.

It is true that the '981 patent describes the foam wall 42 as a sidewall, rather than as a bolster. However, the patent specification states that the wall can vary widely in shape, ranging from a slim wall a quarter-inch thin to a wide cushion a half-foot thick. ('981 patent, col. 6, line 55.) The specification further notes that the thickness of the wall "is dependent upon the size and weight of the pet, and the particular configuration of embodiment selected." ('981 patent, col. 6, lines 56-58.) In short, the patent places no particular constraints on the shape of the wall, allowing for a thick wall that may be more pillow-like than flat and upright.

The foam wall described in the '981 patent thus comes within the scope of the "bolster" recited in claim 1 of the '502 patent. Claim 1 says nothing about the size, shape, or proportions of the bolster, leaving open the possibility of a square or rectangular bolster

DALLAS MANUFACTURING'S FURTHER SUPPL.
RESPONSES TO INTERROGATORY NOS. 2, 4 AND 5

encompassed by the disclosure of the '981 patent. Although the specification of the '502 patent describes an embodiment in which the bolster is cylindrical or banana-shaped, ('502 patent, col. 2, lines 56-57), this limitation does not appear in claim 1. The '502 patent emphasizes that the invention is not limited "except as may be necessary in view of the appended claims," which lack any limitation on the shape of the bolster. ('502 patent, col. 3, line 36.) Because the disclosure of the '981 patent comes within the scope of claim 1 of the '502 patent, claim 1 is invalid by anticipation under 35 U.S.C. § 102(b).

Thus, the '981 patent satisfies each and every limitation of claim 1 of the '502 patent as set forth in the following chart:

| Claim | Element | '981 Patent Anticipation Analysis |
|---|---|---|
| 1 | A pet bed comprising: | Not a limitation. |
| | an outer covering; | The '981 patent discloses an outer covering 46. |
| | a removable cushion | The '981 patent discloses a removable bottom cushion 44. |
| | disposed within the outer covering | The removable bottom cushion 44 is disposed within the outer covering 46. |
| | to form a cushioned bottom portion; and | The removable bottom cushion 44 forms a cushioned bottom portion. |
| | a bolster | The '981 patent discloses a foam wall 42 that comprises a bolster. |
| | removably disposed within the interior of the outer covering | The foam wall 42 is removably disposed within the interior of the outer covering 46. |
| | and substantially all of said bolster disposed exteriorly about at least a portion of the perimeter of the bottom portion | The foam wall 42 is disposed exteriorly about at least a portion of the perimeter of the bottom cushion 44. |
| | without being secured to the removable cushion. | The foam wall 42 is not secured to the bottom cushion 44. |

-16-

**The '513 Patent Anticipates Claim 1 of the '502 Patent.**

U.S. Patent No. 4,754,513 to Rinz ("the '513 patent) also anticipates claim 1 of the '502 patent. The '513 patent issued on July 5, 1988, more than one year before the April 18, 1996 filing date of the application for the '502 patent. Therefore the '513 patent is prior art to the '502 patent under 35 U.S.C. § 102(b).

The '513 patent discloses a pillowcase 10 that comprises an outer covering. The '513 patent also discloses a pillow 17 disposed within the pillowcase 10 that comprises the outer covering: "A conventional pillow [17] is inserted in the inventive pillowcase . . ." (Col. 1, lines 54-55.)

The pillow 17 is removable from the pillowcase 10 because the pillowcase 10 may be open at one side: "The pillowcase 10 is thus substantially rectangular in shape, closed on three sides, specifically its opposite longer sides 13a, 13b and one of its short sides 14a. The pillowcase 10 is open at the other of its short sides 14b." (Col. 2, lines 29-32.) "The open side of the pillowcase 10 can be left open . . . ." (Col. 2, line 39.)

The '513 patent discloses a bolster (insert 16) that is removably disposed within the interior of the pillowcase 10: "Among the objectives of the present invention are to provide a conventional and inexpensive, pillowcase and removable insert . . . ." (Col. 1, lines 47-49.) "The pillowcase 10 has a pocket 15 formed on the inside of one panel 9, as presently described, for receiving and carrying an insert 16 to be used in combination with a conventional pillow 17. The insert 16 is preferably semi-cylindrical in cross section defining a curved surface 18 facing the panel 9 on which the pocket 15 is formed and a flat side 19. The insert may have a diameter in the range of about 4 inches to 5 inches, and preferably 5 inches, and may have a length in the range of about 17 inches to 19 inches, and preferably 17 inches. Alternatively the insert may be oval in cross section. . . ." (Col. 2, lines 15-26.)

-17-

The insert 16 is removable from the pillowcase 10 because the pillowcase has a pocket 15 that may be open at one side: "The pocket 15 is formed by a flat rectangular panel 22 and has opposed long sides 23 and short sides 24. The panel 22 is secured, as by sewing, to the inside of the pillowcase 10 on its opposite longer sides 23 and on one short side 24a furthest from the open side 14b of the pillowcase, near and parallel to one of the longer sides 13a, 13b of the panel 9." (Col. 2, lines 42-48.) The insert 16 is not secured to the removable pillow 17.

Although the drawings of the '513 patent show the insert 16 atop the pillow 17, the patent states that "[t]he position of the insert 16 can be adjusted by simply rotating the pillowcase 10 having the pocket 15 and insert 16 received therein, about the conventional pillow 17 in accordance with the preference [sic] of the user . . . ." (Col. 2, lines 53-56.)

Thus, the '513 patent satisfies each and every limitation of claim 1 of the '502 patent as set forth in the following chart:

| Claim | Element | U.S. Patent No. 4,754,513 Anticipation Analysis |
|---|---|---|
| 1 | A pet bed comprising: | Not a limitation. |
| | an outer covering; | The '513 patent discloses a pillowcase 10 that comprises an outer covering. |
| | a removable cushion | The '513 patent discloses a removable pillow 17. |
| | disposed within the outer covering | The removable pillow 17 is disposed within the pillowcase 10 that comprises the outer covering. |
| | to form a cushioned bottom portion; and | The removable pillow 17 forms a cushioned bottom portion. |
| | a bolster | The '513 patent discloses an insert 16 that comprises a bolster. |
| | removably disposed within the interior of the outer covering | The insert 16 is removably disposed within the interior of the pillowcase 10 that comprises the outer covering. |

| Claim | Element | U.S. Patent No. 4,754,513 Anticipation Analysis |
|---|---|---|
| | and substantially all of said bolster disposed exteriorly about at least a portion of the perimeter of the bottom portion | Although the drawings of the '513 patent show the insert 16 atop the pillow 17, the patent states that "[t]he position of the insert 16 can be adjusted by simply rotating the pillowcase 10 having the pocket 15 and insert 16 received therein, about the conventional pillow 17 in accordance with the prefarance [sic] of the user . . . ." (Col. 2, lines 53-56.) |
| | without being secured to the removable cushion. | The insert 16 is not secured to the removable pillow 17. |

**The '513 Patent, the '350 Patent, and the DE '699 Patent Each Anticipates Claim 1 of the '502 Patent if it is Construed to Cover a Bed with the Bolster Atop the Bottom Cushion.**

Claim 1 of the '502 patent requires that "substantially all of said bolster [be] disposed exteriorly about at least a portion of the perimeter of the bottom portion." ('502 patent, col. 3, lines 43-45.) This limitation indicates that substantially all of the bolster must be disposed on the sides of or surrounding the perimeter of the bottom portion. *See* THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2000), available at http://www.yourdictionary.com/ahd/a/a0021300.html (defining the preposition "about" as "[o]n all sides of; surrounding"). A significant amount of the bolster cannot be on top of the bottom cushion because then it would be within the perimeter of the cushion. This construction is supported by the definition of "exterior" as meaning "outer" or "external." *See* THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th Ed. 2000), available at http://www.yourdictionary.com/ahd/e/e0296200.html (defining the adjective "exterior" as "[o]uter; external"). Thus, substantially all of the bolster must be disposed externally about or outside the perimeter of the bottom portion, which is inconsistent with the bolster being on top of the bottom portion.

If claim 1 of the '502 patent were construed to cover a bed with the bolster atop the bottom cushion, then it would be anticipated by the '513 patent for the reasons discussed in the preceding section.

In addition, if claim 1 of the '502 patent were construed to cover a bed with the bolster atop the bottom cushion, then it also would be anticipated by U.S. Patent No. 5,586,350 to Thönnsessen et al. ("the '350 patent") and German Patent No. 93 09 699.2 to Hoechst AG ("the DE '699 patent"). The application for the '350 patent was filed on June 28, 1994, which is before the presumptive date of invention of the subject matter of the claim 1 as represented by the April 18, 1996 filing date of the application for the '502 patent. Therefore the '350 patent is prior art to the '502 patent under 35 U.S.C. § 102(e). The DE '699 patent was published on September 30, 1993, more than one year before the April 18, 1996 filing date of the application for the '502 patent. Therefore the DE '699 patent is prior art to the '502 patent under 35 U.S.C. § 102(b).

The '350 patent and the DE '699 patent each disclose a bolstered pillow 1 having an outer covering 5, a removable cushion disposed within the outer covering to form a cushioned bottom portion 2, and a bolster cushion removably disposed within the interior of the outer covering 3. (See Fig. 1 of both patents). The bolster pillow (i.e., the "cylindrical roll") of the '350 patent and the DE '699 patent is disposed atop the bottom portion. The bolster pillow is also connected "detachably" to the bottom cushion.

Thus, both the '350 patent and the DE '699 patent satisfy each and every limitation of claim 1 of the '502 patent as set forth in the following chart:

| Claim | Element | '350 Patent and DE '699 Patent Anticipation Analysis |
|-------|---------|------------------------------------------------------|
| 1 | A pet bed comprising: | Not a limitation. |
|   | an outer covering; | The '350 patent and the DE '699 patent disclose an outer covering 5. |

| Claim | Element | '350 Patent and DE '699 Patent Anticipation Analysis |
|---|---|---|
| | a removable cushion | The '350 patent and the DE '699 patent disclose a removable cushion 2. |
| | disposed within the outer covering | The removable cushion 2 is disposed within the outer covering 5. |
| | to form a cushioned bottom portion; and | The removable cushion 2 forms a cushioned bottom portion. |
| | a bolster | The '350 patent and the DE '699 patent disclose a cylindrical roll 3 that comprises a bolster. |
| | removably disposed within the interior of the outer covering | The cylindrical roll 3 is removably disposed within the interior of the outer covering 5. |
| | and substantially all of said bolster disposed exteriorly about at least a portion of the perimeter of the bottom portion | Like the bolster of the accused Dallas Manufacturing pet bed, the cylindrical roll 3 of the '350 patent and the DE '699 patent is disposed atop the bottom portion. But if the '502 patent were construed to cover the accused Dallas Manufacturing pet bed, then the '350 patent and the DE '699 patent would include this claim limitation. |
| | without being secured to the removable cushion. | The cylindrical roll 3 is not secured to the removable cushion 2. The cylindrical roll 3 is "detachably" connected to the removable cushion 2. |
| 2 | The pet bed of claim 1, wherein the outer covering further includes a reclosable access opening. | The '350 patent and the DE '699 patent disclose a zipper for a reclosable access opening. |
| 3 | The pet bed of claim 2, wherein the reclosable access opening further includes a zipper. | The '350 patent and the DE '699 patent disclose a zipper for a reclosable access opening. |

**The '228 Patent, the '734 Patent, the '843 Patent, the '393 Patent, and the '537 Patent Each Anticipates Claim 1 of the '502 Patent if it is Construed to Cover a Bed with the Bolster Atop the Bottom Cushion.**

      If claim 1 of the '502 patent is construed broadly enough to cover the accused Dallas Manufacturing pet beds, then it is invalid as anticipated by several additional references,

DALLAS MANUFACTURING'S FURTHER SUPPL.
RESPONSES TO INTERROGATORY NOS. 2, 4 AND 5

namely, U.S. Patent Nos. 4,872,228 to Bishop ("the '228 patent"); 4,873,734 to Pollard ("the '734 patent"); 5,010,843 to Henry ("the '843 patent"); 5,588,393 to Heilborn ("the '393 patent"); and 5,826,537 to Heilborn ("the '537 patent").

The '228 patent issued on October 10, 1989, the '734 patent issued on October 17, 1989, and the '843 patent issued on April 30, 1991, all more than one year before the April 18, 1996 filing date of the application for the '502 patent. Therefore each of these patents is prior art to the '502 patent under 35 U.S.C. § 102(b).

The application for the '393 patent was filed on June 19, 1995, and the application for the '537 patent was a continuation of the application for the '393 patent, which means that it also has an effective filing date of June 19, 1995. These filing dates are before the presumptive date of invention of the subject matter of claim 1 as represented by the April 18, 1996 filing date of the application for the '502 patent. Therefore the '393 patent and the '537 patent are each prior art to the '502 patent under 35 U.S.C. § 102(e).

The manner in which each of the foregoing patents satisfies the limitations of claim 1 of the '502 patent is set forth in the following charts:

| Claim | Element | U.S. Patent No. 4,872,228 Anticipation Analysis |
|-------|---------|--------------------------------------------------|
| 1 | A pet bed comprising: | Not a limitation. |
| | an outer covering; | The '228 patent discloses a fitted bottom sheet 13 that comprises an outer covering. |
| | a removable cushion | The '228 patent discloses a mattress 12. The mattress 12 is removable from the fitted bottom sheet 13. |
| | disposed within the outer covering | The mattress 12 is disposed within the fitted bottom sheet 13 that comprises the outer covering. |
| | to form a cushioned bottom portion; and | The mattress 12 forms a cushioned bottom portion. |
| | a bolster | The '228 patent discloses a bolster 10. |

| Claim | Element | U.S. Patent No. 4,872,228 Anticipation Analysis |
|---|---|---|
| | removably disposed within the interior of the outer covering | The bolster 10 is removably disposed beneath the fitted bottom sheet 13 that comprises the outer covering. |
| | and substantially all of said bolster disposed exteriorly about at least a portion of the perimeter of the bottom portion | Like the bolster of the accused Dallas Manufacturing pet bed, the bolster 10 of the '228 patent is disposed atop the bottom portion. But if the '502 patent were construed to cover the accused Dallas Manufacturing pet bed, then the '228 patent would include this claim limitation. |
| | without being secured to the removable cushion. | The bolster 10 is not secured to the mattress 12. |

| Claim | Element | U.S. Patent No. 4,873,734 Anticipation Analysis |
|---|---|---|
| 1 | A pet bed comprising: | Not a limitation. |
| | an outer covering; | The '734 patent discloses a fitted sheet 12 that comprises an outer covering. |
| | a removable cushion | The '734 patent discloses a mattress 11. The mattress 11 is removable from the fitted sheet 12. |
| | disposed within the outer covering | The mattress 11 is disposed within the fitted sheet 12 that comprises the outer covering. |
| | to form a cushioned bottom portion; and | The mattress 11 forms a cushioned bottom portion. |
| | a bolster | The '734 patent discloses inserts 17 and 20 that comprise bolsters. |
| | removably disposed within the interior of the outer covering | Like the bolster of the accused Dallas Manufacturing pet bed, the inserts 17 and 20 of the '734 patent are disposed within a different outer covering than the bottom portion. But if the '502 patent were construed to cover the accused Dallas Manufacturing pet bed, then the '734 patent would include this claim limitation. |
| | and substantially all of said bolster disposed exteriorly about at least a portion of the perimeter of the bottom portion | Like the bolster of the accused Dallas Manufacturing pet bed, the inserts 17 and 20 of the '734 patent are disposed atop the bottom portion. But if the '502 patent were construed to cover the accused Dallas Manufacturing pet bed, then the '734 patent would include this claim limitation. |
| | without being secured to the removable cushion. | The inserts 17 and 20 that comprise the bolsters are not secured to the mattress 11. |

-23-

| Claim | Element | U.S. Patent No. 5,010,843 Anticipation Analysis |
|---|---|---|
| 1 | A pet bed comprising: | Not a limitation. |
| | an outer covering; | The '843 patent discloses an outer covering for cushion 12. |
| | a removable cushion | The '843 patent discloses removable filler for cushion 12. |
| | disposed within the outer covering | The removable filler is disposed within the outer covering for cushion 12. |
| | to form a cushioned bottom portion; and | Cushion 12 forms a cushioned bottom portion. |
| | a bolster | The '843 patent discloses cushions 14 and 16 that can each be contoured to comprise a bolster. |
| | removably disposed within the interior of the outer covering | Like the bolster of the accused Dallas Manufacturing pet bed, the filler of cushions 14 and 16 is disposed within a different outer covering than the bottom portion. But if the '502 patent were construed to cover the accused Dallas Manufacturing pet bed, then the '843 patent would include this claim limitation. |
| | and substantially all of said bolster disposed exteriorly about at least a portion of the perimeter of the bottom portion | Like the bolster of the accused Dallas Manufacturing pet bed, the cushions 14 and 16 of the '843 patent are disposed atop the bottom portion. But if the '502 patent were construed to cover the accused Dallas Manufacturing pet bed, then the '843 patent would include this claim limitation. |
| | without being secured to the removable cushion. | The filler of cushions 14 and 16 is not secured to the filler for cushion 12. |

| Claim | Element | U.S. Patent Nos. 5,588,393 and 5,826,537 Anticipation Analysis |
|---|---|---|
| 1 | A pet bed comprising: | Not a limitation. |
| | an outer covering; | The '393 patent and the '537 patent disclose an outer covering. |
| | a removable cushion | The '393 patent and '537 patent disclose a removable horizontal foam core 108 that comprises a removable cushion. |

-24-

DALLAS MANUFACTURING'S FURTHER SUPPL.
RESPONSES TO INTERROGATORY NOS. 2, 4 AND 5

| Claim | Element | U.S. Patent Nos. 5,588,393 and 5,826,537 Anticipation Analysis |
|---|---|---|
| | disposed within the outer covering | The horizontal foam core 108 that comprises the removable cushion is disposed within the outer covering. |
| | to form a cushioned bottom portion; and | The horizontal foam core 108 that comprises the removable cushion forms a cushioned bottom portion. |
| | a bolster | The '393 patent and '537 patent disclose an upstanding foam core 106 that comprises a bolster. |
| | removably disposed within the interior of the outer covering | Like the bolster of the accused Dallas Manufacturing pet bed, the upstanding foam core 106 that comprises the bolster is disposed within a different outer covering than the bottom portion. But if the '502 patent were construed to cover the accused Dallas Manufacturing pet bed, then the '393 patent and the '537 patent would include this claim limitation. |
| | and substantially all of said bolster disposed exteriorly about at least a portion of the perimeter of the bottom portion | The upstanding foam core 106 is disposed exteriorly about at least a portion of the perimeter of the horizontal foam core 108. |
| | without being secured to the removable cushion. | The upstanding foam core 106 is not secured to the horizontal foam core 108. |

**Claim 2 of the '502 Patent Is Invalid**

Claim 2 of the '502 patent recites: "The pet bed of claim 1, wherein the outer covering further includes a reclosable access opening."

As discussed above, the '044 patent anticipates claim 1 of the '502 patent. The '044 patent in addition discloses a reclosable access opening—the zipper 22 ('044 patent, col. 3, line 55). Therefore, the '044 patent also invalidates claim 2 of the '502 patent by anticipation.

Similarly, as discussed above, the '350 patent and the DE '699 patent both anticipate claim 1 of the '502 patent. These patents additionally disclose a reclosable single cover 5 having an access opening allowing for the insertion and removal of both the base cushion

-25-

2 and the bolster cushion 3. Therefore, both the '350 patent and the DE '699 patent also invalidate claim 2 of the '502 patent by anticipation.

The '513 patent also was shown to anticipate claim 1 of the '502 patent. The '513 patent further states that "[t]he open side of the pillowcase 10 can be left open but is preferably closed by fasteners that can be opened such as a zipper 21." ('513 patent, col. 2, lines 39-41.)

Likewise, it was shown above that the '981 patent anticipates claim 1 of the '502 patent. The '981 patent has an access opening 84. The patent specification states that "[e]lastic material 86 urges opening 84 toward *at least* a partial closure." ('981 patent, col. 7, lines 62-63 (emphasis added); *see also id.*, col. 7, lines 27-29 ("Sidewall enclosure 62 is capable of *at least* partially enclosing sidewall 42. Base enclosure 64 is capable of *at least* partially enclosing base 44.") (emphasis added).) The inventors of the '981 patent thus contemplated that the elastic material 86 might cause the opening 84 to close completely, although a partial closure would suffice. The '981 patent thus invalidates claim 2 of the '502 patent by anticipation.

The '981 patent also renders claim 2 of the '502 patent obvious in light of the '393 patent. The '393 patent discloses a pet bed with foam cores that form a bottom cushion and surrounding wall. ('393 patent, Abstract.) The bottom cushion and foam wall are enclosed in separate fabric enclosures. (*Id.*) The patent specification states that "the bottom cushion core may be retained in its enclosure . . . by a continuous bottom panel which is releasably secured to the edges of the enclosure by a zipper, Vector™ (hook and loop) material, snaps, or other means." ('393 patent, col. 7, lines 53-58.) In other words, the '393 patent discloses a bottom panel that can be used to close the access opening 134 into the bottom cushion enclosure.

The bottom panel disclosed in the '393 patent also could be used to close the access opening 84 in the '981 pet bed. Both the opening 134 in the '393 pet bed and the opening 84 in the '981 bed are oval- or circle-shaped holes through which a person can remove a

-26-

bottom cushion. As discussed above, the '981 patent contemplated that the opening 84 might be closed completely. A person who wanted to accomplish this (to keep the bottom cushion from getting dirty, for example) would be motivated to use the bottom panel disclosed in the '393 patent. The '537 patent similarly discloses a bottom panel that can be used to close the access opening 134 into the bottom cushion enclosure.

For similar reasons, Dallas Manufacturing contends that if the claims of the '502 patent are construed broadly enough to cover the accused Dallas Manufacturing pet bed, then claim 2 is invalid as anticipated by, or obvious in view of, the '513 patent; the '228 patent; the '734 patent; the '843 patent; and AB Murray and AC Ferguson, *Dust-free bedrooms in the treatment of asthmatic children with house dust or house dust mite allergy: a controlled trial*, 71 PEDRIATRICS 418-22 (March 1, 1983) ("Murray-Ferguson article"). As noted above, the '513 patent states that "[t]he open side of the pillowcase 10 can be left open but is preferably closed by fasteners that can be opened such as a zipper 21." ('513 patent, col. 2, lines 39-41.) The '843 patent discloses that cushions 12, 14, and 16 include zipper openings 34, 35, and 36, with zippers 37, 38, and 39. ('843 patent, col. 2, lines 47-60.)

The '228 patent and '734 patent each render claim 2 of the '502 patent obvious in light of the Murray-Ferguson article. The article abstract states, "Twenty asthmatic children with prick tests positive for house dust or house dust mites were allocated to two groups that were matched for severity. One group was provided with *zippered vinyl covers for pillows, mattresses, and box springs . . .*" (emphasis added). A person of ordinary skill in the art who wanted to use either the '228 patent or '734 patent with an asthmatic child would be motivated to use a bed sheet that could completely enclose the bed mattress and keep dust mites away from the child. The Murray-Ferguson article discloses such a bed sheet.

-27-

**Claim 3 of the '502 Patent Is Invalid**

Claim 3 of the '502 patent recites "[t]he pet bed of claim 2, wherein the reclosable access opening further includes a zipper." As discussed above, the '044 patent, the '350 patent, the DE '699 patent, the '393 patent, and the '537 patent all disclose zippers for the reclosable access opening. By extension of the arguments made for claim 2, the '044 patent, the '350 patent, the DE '699 patent, the '393 patent, and the '537 patent invalidate claim 3 of the '502 patent by anticipation. Likewise, the '981 patent renders claim 3 of the '502 patent obvious in light of either the '393 patent or the '537 patent for the reasons discussed in the preceding section.

For similar reasons, if the claims of the '502 patent are construed broadly enough to cover the accused Dallas Manufacturing pet bed, then claim 3 is invalid as anticipated by, or obvious in view of, the '513 patent; the '228 patent; the '734 patent; the '843 patent, and the Murray-Ferguson article for the reasons discussed in the preceding section.

Dallas Manufacturing reserves the right to amend and/or supplement its response (1) as its investigations and discovery progress; (2) when Flexi-Mat identifies the claims of the '502 patent that it is asserting against Dallas Manufacturing; (3) when Flexi-Mat provides its contentions regarding the proper interpretation of the claims of the '502 patent; and (4) when the Court interprets the claims of the '502 patent.

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5:**

In addition to the facts set forth in the Supplemental Response to Interrogatory No. 5 above, Dallas Manufacturing makes the following contentions:

**Invalidity of Claims 1-3 over the Prior Art**

Claims 2 and 3 are anticipated by U.S. Patent Nos. 5,588,393 to Heilborn ("the '393 patent"); and 5,826,537 to Heilborn ("the '537 patent") based on the facts discussed above in the Supplemental Response to Interrogatory No. 5.

-28-

If claim 1 is interpreted as set forth in the Supplemental Response to Interrogatory No. 4 above, then claims 1-3 are anticipated by U.S. Patent No. 5,421,044 to Steensen ("the '044 patent") as discussed above in the Supplemental Response to Interrogatory No. 5, and for the additional reason that the '044 patent discloses the use of belts 55 and 56 that "are sewn into the bottom panel and have sufficient length to fit around the upper and lower side bolster air tubes 32, 33, 34, 35, 37 and 38 as illustrated in FIG. 6." (Col. 4, lines 12-15.)

### Invalidity of Claims 7-8 over the Prior Art

Although Flexi-Mat has not asserted infringement of claims 7 and 8 of the '502 patent, Dallas Manufacturing notes that these claims also are anticipated or obvious in view of the facts set forth above and the Supplemental Response to Interrogatory No. 5 above. Dallas Manufacturing reserves the right to supplement this response in the event claims 7 and 8 are asserted.

### Invalidity of Claims 1-3 under 35 U.S.C. § 112

Claims 1-3 are invalid for failure to satisfy the written description requirement of 35 U.S.C. § 112, first paragraph. In the application as filed, the invention was described in the "Summary of the Invention" as comprising:

> . . . a pet bed having an outer covering, a removable cushion disposed within the outer covering to form a cushioned bottom portion, and a bolster *removably affixed* to the interior of the outer covering and disposed about at least a portion of the perimeter of the bottom portion. The outer covering includes a reclosable access opening that may be opened and closed with a zipper.

(*See* col. 1, line 67 – col. 2, line 5, emphasis added.) The specification repeatedly referred to the fact that the bolster is "affixed" within the outer covering. See Abstract; col. 2, lines 7-8; col. 2,

-29-

line 29; and col. 2, line 52. Nowhere did the specification disclose or suggest that the bolster can be anything other than "affixed" within the outer covering.

Consistent with the Summary of the Invention, all of the claims as filed in the application for the '502 patent required the bolster to be "affixed" within the outer covering. This includes application claim 1, which ultimately issued as claim 1 in the '502 patent. Application claim 1 as filed was limited to "a bolster removably affixed within the interior of the outer covering . . ." However, during prosecution Flexi-Mat amended claim 1 to delete the word "affixed" and substitute the word "disposed," so that the limitation reads, "a bolster removably disposed within the interior of the outer covering . . ."

The ordinary definition of the word "affix" is "to attach physically." http://www.m-w.com/cgi-bin/dictionary?book=Dictionary&va=affix&x=14&y=14. In contrast, the ordinary definition of the word "dispose" is "to put in place." http://www.m-w.com/cgi-bin/dictionary?book=Dictionary&va=dispose&x=15&y=11.

It is clear that, by its amendment Flexi-Mat broadened the scope of claim 1, and that the broadened scope of claim 1 was beyond any invention described in the application for the '502 patent as filed. The "affixed" limitation was important to claim 1 in light of the further claim requirement that the bolster be disposed in a prescribed position relative to the bottom portion without being attached to the removable cushion. Nothing in the application of the '502 patent as filed indicated that the named inventor had possession of the invention of somehow disposing the bolster in the prescribed position relative to the bottom portion without affixing the bolster within the interior of the outer covering. Therefore, for these reasons, claims 1-3 are invalid for failing to meet the written description requirement of 35 U.S.C. § 112, first paragraph.

Further, the description of the invention quoted above from the "Summary of the Invention" included the statement that the bolster is "disposed about at least a portion of the perimeter of the bottom portion." The bolster bed disclosed in the application for the '502 patent

-30-

was shown and described as having the bolster disposed about at least a portion of the perimeter of the bottom portion. *See* Figures 1-5; Abstract; col. 2, lines 52-54. Nowhere did the specification disclose or suggest that any substantial part of the bolster could be disposed on top of the bottom portion.

Similarly, all of the claims as filed in the application for the '502 patent, including application claim 1, required the bolster to be "disposed about at least a portion of the perimeter of the bottom portion." During prosecution, however, Flexi-Mat amended claim 1 to recite that "substantially all" of the bolster is disposed exteriorly about at least a portion of the perimeter of the bottom portion.

The word "substantially" in claim 1 is vague and ambiguous and renders claims 1-3 indefinite, and therefore invalid under 35 U.S.C. § 112, second paragraph. Also, to the extent that claim 1 as amended is construed to cover a bolster bed in which any significant or substantial part of the bolster is disposed on top of the base cushion, claims 1-3 are invalid for failing to meet the written description requirement of 35 U.S.C. § 112, first paragraph.

Claims 1-3 and 7-10 are also invalid for claim indefiniteness under 35 U.S.C. § 112, second paragraph, if the following recitations in the independent claims of the '502 patent are *not* construed as means-plus-function elements subject to the interpretation requirements of 35 U.S.C. § 112, sixth paragraph:

1. Claim 1: "a bolster removably disposed within the interior of the outer covering and substantially all of said bolster disposed exteriorly about at least a portion of the perimeter of the bottom portion without being secured to the removable cushion."

2. Claim 7: "a bolster removably secured to the interior of the outer covering and disposed about at least a portion of the perimeter of the bottom portion."

-31-

3.    Claim 9: "a bolster removably affixed within the bolster pocket and disposed about at least a portion of the perimeter of the bottom portion."

Since each of these elements is written in purely functional terms, they are indefinite in the absence of specific structure or material sufficient to perform the function of disposing the bolster in the prescribed position relative to the bottom portion. *See* Supplemental Response to Interrogatory No. 4 above.

Attorneys for Defendant and Counter-Claimant
DALLAS MANUFACTURING COMPANY, INC.

*Darren M. Franklin (BC)*

Gary A. Clark (*pro hac vice*)
Darren M. Franklin (*pro hac vice*)
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   A Limited Liability Partnership
   Including Professional Corporations
333 South Hope Street, 48th Floor
Los Angeles, California 90071-1448
(213) 620-1780

Dated: September 14, 2005

James J. Marcellino, Esq. (BBO # 318840)
David M. Mello, Esq. (BBO # 634722)
MCDERMOTT, WILL & EMERY
28 State Street
Boston, MA 02109-1775
(617) 535-4000

-32-

DALLAS MANUFACTURING'S FURTHER SUPPL.
RESPONSES TO INTERROGATORY NOS. 2, 4 AND 5

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon Plaintiff's counsel, William Meunier, Esq. Goodwin Procter LLP, Exchange Place, Boston, Massachusetts 02109, and Larry L. Saret, Esq., Michael, Best & Friedrich LLP, 401 N. Michigan Avenue, Suite 1900, Chicago, Illinois 60611, via first class mail, postage pre-paid, on September 14 2005.

I hereby certify that a true copy of the above document was also served upon counsel for Defendant Doskocil Manufacturing Company, Inc., Roy W. Hardin, Esq., Locke Liddell & Sapp LLP, 2200 Ross Avenue, Suite 2200, Dallas, Texas 75201-6776, via first class mail, postage pre-paid, on September 14, 2005.

Darren M. Franklin

-33-

DALLAS MANUFACTURING'S FURTHER SUPPL.
RESPONSES TO INTERROGATORY NOS. 2, 4 AND 5

William Meunier, Esq.
Goodwin Procter LLP
Exchange Place
Boston, MA 02109

Larry L. Saret, Esq.
Michael, Best & Friedrich LLP
401 N. Michigan Avenue, Suite 1900
Chicago, Illinois 60611

Roy W. Hardin, Esq.
Locke Liddell & Sapp LLP
2200 Ross Avenue, Suite 2200
Dallas, TX 75201-6776

-34-

DALLAS MANUFACTURING'S FURTHER SUPPL.
RESPONSES TO INTERROGATORY NOS. 2, 4 AND 5

# EXHIBIT 20

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FLEXI-MAT CORPORATION, an Illinois corporation, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 04 10162 DPW |
| v. ) | |
| ) | |
| DALLAS MANUFACTURING COMPANY, ) | |
| INC., a Texas corporation, BJ'S WHOLESALE ) | |
| CLUB, INC., a Delaware corporation, and ) | |
| DOSKOCIL MANUFACTURING ) | **DEFENDANT DOSKOCIL** |
| COMPANY, INC., a Texas corporation, ) | **MANUFACTURING COMPANY, INC.'s** |
| ) | |
| Defendants. ) | **SECOND SUPPLEMENTAL** |
| _____ ) | **OBJECTIONS AND RESPONSES** |
| DALLAS MANUFACTURING COMPANY, ) | **TO PLAINTIFF FLEXI-MAT'S** |
| INC., a corporation, ) | **FIRST SET OF INTERROGATORIES** |
| ) | |
| Counter-Claimant, ) | |
| ) | |
| v. ) | |
| ) | |
| FLEXI-MAT CORPORATION, a corporation, ) | |
| ) | |
| Counter-Defendant. ) | |
| _____ ) | |
| BJ'S WHOLESALE CLUB, INC., a ) | |
| corporation, ) | |
| ) | |
| Counter-Claimant, ) | |
| v. ) | |
| FLEXI-MAT CORPORATION, a corporation, ) | |
| ) | |
| Counter-Defendant. ) | |
| _____ ) | |
| DOSKOCIL MANUFACTURING ) | |
| COMPANY, INC., a corporation, ) | |
| ) | |
| Counter-Claimant, ) | |
| v. ) | |
| ) | |
| FLEXI-MAT CORPORATION, a corporation, ) | |
| ) | |
| Counter-Defendant. ) | |

**FM Validity Ex. 20**

**Interrogatory No. 1:** State the date on which Doskocil Manufacturing, or any officer, employee or agent of Doskocil Manufacturing, first knew of the existence of the '502 patent, describe in detail the circumstances of how Doskocil Manufacturing first knew of the existence of the '502 patent, and identify those persons most knowledgeable about such circumstances.

**Doskocil's Objection and Response to Interrogatory No. 1:** Doskocil objects to this Interrogatory to the extent the potential range of persons knowing "of the existence of the '502 patent" is overly broad and cannot impute knowledge on the part of Doskocil as a company. Doskocil further objects to this Interrogatory to the extent knowledge "of the existence of the '502 patent" is vague and ambiguous.

Subject to and without waiving these objections, Doskocil answers that it first became aware of the existence of the '502 patent on or about February 3, 2004, when Michael Cosgrove received a telephone call from Jim Pereira of BJ's Wholesale Club. The persons most knowledgeable about the circumstances of Doskocil's knowledge are Messrs. Brad Kane and Tim Vokes. In answering this Interrogatory, Doskocil expressly states that its response does not admit to any degree of "notice" of the '502 patent, as that term is used in 35 U.S.C. § 287.

**Interrogatory No. 2:** Identify each patent, publication, reference, device, public use, sale, offer for sale or other information or material, known to or considered by Doskocil Manufacturing as prior art or potential prior art with respect to the '502 patent.

**Doskocil's Objection and Response to Interrogatory No. 2:** Doskocil objects to this Interrogatory as being premature and seeking to improperly require Doskocil to set forth its prior art disclosures. Doskocil further objects to this Interrogatory to the extent it is not limited to "relevant" prior art and is overly broad. Doskocil further objects to this Interrogatory to the extent it seeks information covered by the attorney-client or attorney work product privileges.

Notwithstanding any disclosures herein, Doskocil expressly reserves the right to amend by addition or deletion the identification of prior art at any time.

Subject to and without waiving these objections, Doskocil answers by identifying the following: all patents, publications, and prior art identified or cited in the prosecution of the '502 patent, including U.S. Patent No. 5,010,843 to Henry entitled "Pet Bed." Doskocil further identifies the following United States Patents: (a) 655,087; (b) 2,408,382; (c) 3,566,423; (d) 3,902,456; (e) 4,872,228; (f) 4,873,734; (g) 5,455,973; (h) 4,754,513; (i) 2,032,248; (j) 5,586,350; (k) 5,109,559; (l) 5,421,044; (m) 5,588,393; and (n) 5,136,981. Doskocil further identifies the following foreign patent documents: (a) German patent (gebrauchsmuster) number 9,309,699; (b) Japanese patent publication number 07-051154; (c) European patent number 633,338; and (d) DE 3138463 (abstract).

**Interrogatory No. 3:** Identify each person involved in any investigation, consideration, report, opinion, analysis or review of the validity, enforceability and/or infringement of the '502 patent.

**Doskocil's Objection and Response to Interrogatory No. 3:** Doskocil objects to this Interrogatory to the extent it seeks information covered by the attorney-client or attorney work product privileges. Doskocil further objects to this Interrogatory as being vague and ambiguous with respect to the terms "investigation, consideration, report, opinion, analysis or review."

Subject to and without waiving these objections, Doskocil answers that Roy W. Hardin, Martin Korn, and M. Scott Fuller, attorneys in the firm Locke Liddell & Sapp, are the persons most involved in the analysis of the '502 patent.

**Interrogatory No. 4:** Identify in detail the factual basis for Doskocil Manufacturing's affirmative defense that "[d]efendant Doskocil has not infringed and does not infringe any valid

claim of the '502 patent, either literally or under the doctrine of equivalents," including but not limited to, the claimed elements or features allegedly missing from the "Berkeley & Jansen Premium Quality Bolster Pet Bed."

**Doskocil's Objection and Response to Interrogatory No. 4:**    Doskocil objects to this Interrogatory to the extent the claims at issue in this litigation have not been construed by the Court as a matter of law, and Doskocil expressly reserves the right to amend its non-infringement and invalidity arguments in accordance with the Court's construction.    Doskocil further objects to this Interrogatory to the extent it seeks information covered by the attorney-client or attorney work product privileges.

Subject to and without waiving these objections, Doskocil answers that the "Berkeley & Jansen Premium Quality Bolster Pet Bed" does not infringe any claim of the '502 patent because, at minimum: (a) it does not include "an outer covering" or any equivalent thereof; (b) it does not have straps for affixing the bolster within the bolster pocket; and (c) the claims of the '502 patent are invalid.


**Interrogatory No. 5:**    Identify in detail the factual basis for Doskocil Manufacturing's affirmative defense that "[e]ach and every claim of the '502 patent is invalid and/or unenforceable under one or more provisions of the Patent Laws of the United States, including, without limitation, 35 U.S.C. §§ 101, 102, 103 and 112."

**Doskocil's Objection and Response to Interrogatory No. 5:**    Doskocil objects to this Interrogatory as premature because discovery is incomplete.    Doskocil further objects to this Interrogatory to the extent it calls for information covered by the attorney-client and/or attorney work product privileges.

Subject to and without waiving these objections, Doskocil answers that the claims of the '502 patent are invalid under 35 U.S.C. §§ 102 and 103 in view of at least the patents identified in response to Interrogatory No. 2. Doskocil further answers that its position with respect to at least claims 1, 2, 3, 7, and 8 of the '502 patent are set forth in the Request for Reexamination filed with the Patent and Trademark Office, a copy of which has been provided to Plaintiffs and to the Court.

**Interrogatory No. 6:** Identify in detail the factual basis for Doskocil Manufacturing's affirmative defense that "[b]y virtue of the arguments made during the prosecution of the application for the '502 patent in order to obtain allowance of the claims, and statements made in the '502 patent, Plaintiff Flexi-Mat is estopped from asserting a claim construction that would encompass any pet beds supplied, manufactured or sold by Defendant Doskocil Manufacturing," including but not limited to, an identification of each of the arguments referenced in this affirmative defense.

**Doskocil's Objection and Response to Interrogatory No. 6:** Doskocil objects to this Interrogatory to the extent it seeks information covered by the attorney-client or attorney work product privileges.

Subject to and without waiving these objections, Doskocil answers that the multiple statements made during prosecution of the '502 patent with respect to the teachings of U.S. Patent No. 5,010,843, as well as the prosecution amendments to the claims, prevent any coverage of a pet bed comprising two separate pockets for the cushion and bolster, respectively. Doskocil further answers that its position with respect to this Interrogatory is at least partially set forth in the Request for Reexamination filed with the Patent and Trademark Office, a copy of which has been provided to Plaintiffs and to the Court.

As to Objections,

Dated: ~~April~~ MAY 4 , 2005

_____

Roy W. Hardin
Martin Korn
M. Scott Fuller
LOCKE LIDDELL & SAPP LLP
2200 Ross Avenue
Suite 2200
Dallas, Texas 75201-6776
(214) 740-8000
Fax: (214) 756-8800

James J. Marcellino, Esq. (BBO # 318840)
David M. Mello, Esq. (BBO # 634722)
MCDERMOTT, WILL & EMERY
28 State Street
Boston, MA  02109-1775
(617) 535-4000


As to Responses,

_____

For Doskocil Manufacturing Company, Inc.
VICE PRESIDENT & CFO

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that true and correct copies of the foregoing were caused to be served on the following by the manner indicated on ~~April~~ MAY 4 , 2005:

### By Facsimile and First Class Mail

William A. Meunier, Esq.,
Goodwin Procter LLP
Exchange Place
53 State Street
Boston, MA 02109
Facsimile: (617) 523-1231

Larry L. Saret, Esq.
Manotti L. Jenkins, Esq.
Michael Best & Friedrich LLP
401 N. Michigan Avenue, Suite 1900
Chicago, IL 66011
Facsimile: (312) 222-0818

Darren M. Franklin
Gary A. Clark
Sheppard, Mullin, Richter & Hampton LLP
48th Floor
333 South Hope Street
Los Angeles, CA 90071-1448
Telephone: (213) 617-5498
Facsimile: (213) 620-1398

Attorneys for Defendant
Doskocil Manufacturing Company, Inc.

# EXHIBIT 21

26937/00036

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re:       United States Patent Number 5,765,502
Inventor:    Haugh, Scott
Title:       Pet Bed With Removable Cover
Serial No.:  08/634,374
Filed:       April 18, 1996
Issued:      June 16, 1998

Mail Stop: *Ex Parte* Reexam
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Dear Sir:

### REQUEST FOR *EX PARTE* REEXAMINATION
### PURSUANT TO 37 C.F.R. 1.510 and 35 U.S.C. 302

Requestor herein respectfully seeks *ex parte* reexamination pursuant to 37 C.F.R. 1.510 of United States Patent Number 5,765,502, issued June 16, 1998 to Haugh, entitled "Pet Bed With Removable Cover." Reexamination is requested with respect to claims 1, 2, 3, 7, and 8 of the referenced patent. This request is made by the undersigned attorneys on behalf of third party requestor, Doskocil Manufacturing Company, Inc., 4209 Barnett, Arlington, Texas 76004-1246. The Director is hereby authorized to charge the fee of $2,520.00, as set forth in 37 C.F.R. 1.20(c)(1), to Deposit Account No. 12-1781 (Customer No. 20873).

The referenced patent is currently the subject of the following concurrent proceeding in the United States District Court for the District of Massachusetts: *Flexi-Mat Corp. v. Dallas Mfg. Co., Inc., BJ's Wholesale Club, Inc., and Doskocil Mfg. Co., Inc.*, Civil Action No. 04-10162 DPW. Plaintiff Flexi-Mat has asserted that defendants infringe the referenced patent. Pursuant to MPEP 2219, a copy of the First Amended Complaint in the referenced litigation is submitted herewith.

Pursuant to 37 C.F.R. 1.510(b)(4), a full copy of the patent to be examined having a double column format on one side of a separate paper is enclosed herewith. Pursuant to 37 C.F.R. 1.510(b)(3), copies of every patent or printed publication relied upon or referred to herein,

1

FM Validity Ex. 21

including English language translations when appropriate, are enclosed herewith, including a listing thereof on Form PTO/SB/08, PTO-1449, or equivalent.

The detailed request herein below contains at least the following: (a) a statement identifying each substantial new question of patentability based on prior patents and printed publications (37 C.F.R. 1.510(b)(1)); and (b) an identification of every claim for which reexamination is requested, and a detailed explanation of the pertinency and manner of applying the cited art to every claim for which reexamination is requested (37 C.F.R. 1.510(b)(2)).

### DETAILED REQUEST

Reexamination under 35 U.S.C. 302 – 307 and C.F.R. 1.510 is respectfully requested of United States Patent Number 5,765,502 ("the '502 Patent") which issued on June 16, 1998 to Scott Haugh. This patent is understood to be still enforceable.

### I.    Claims for Which Reexamination is Requested

Reexamination is requested of claims 1, 2, 3, 7, and 8 of the '502 Patent in view of the following references, which are also listed on accompanying Form PTO-1449: (a) U.S. Patent No. 2,032,248 ("the '248 Patent") (newly discovered reference; not previously considered); (b) U.S. Patent No. 5,010,843 ("the '843 Patent") (previously considered); (c) German Patent No. 93 09 699.2 ("the DE '699 Patent") (newly discovered reference; not previously considered) (English translation filed herewith); (d) U.S. Patent No. 5,109,559 ("the '559 Patent") (previously considered); (e) U.S. Patent No. 5,421,044 ("the '044 Patent") (newly discovered reference; not previously considered); (f) U.S. Patent No. 5,588,393 ("the '393 Patent") (newly discovered reference; not previously considered); and (g) U.S. Patent No. 5,136,981 ("the '981 Patent") (newly discovered reference; not previously considered). As noted, a number of newly discovered references are cited herein which raise substantial new questions of patentability under 35 U.S.C. 303(a). Moreover, the references which were considered in the original examination of the '502 Patent application have renewed significance in view of the newly-discovered references; thus, the previously considered references now also raise substantial new questions of patentability under 35 U.S.C. 303(a). It is expected that the Director may further discover and identify additional references not cited herein which raise substantial new questions of patentability, as provided in 35 U.S.C. 303(a).

### II.    Statement of Substantial New Questions of Patentability

The primary references cited herein were not considered during the original examination of the '502 Patent application, and a number of previously considered references gain renewed significance in view of these newly discovered references. More specifically, claim 1 of the '502 Patent is unpatentable under 35 U.S.C. 102 as anticipated by any of the '248, '393, '044, and/or '981 Patents. Alternatively, claim 1 of the '502 Patent is unpatentable under 35 U.S.C. 103(a) as obvious over any of the '248, '393, '044, and/or '981 Patents in view of the '843 Patent, the '248 Patent, and/or the DE '699 Patent. Claim 2 of the '502 Patent depends from claim 1 and is unpatentable under 35 U.S.C. 103(a) as obvious in view of the DE '699 Patent, the '843 Patent,

2

the '393 Patent, and/or the '981 Patent. Claim 3 of the '502 Patent depends from claim 1 and is unpatentable under 35 U.S.C. 103(a) as obvious in view of the DE '699 Patent, the '044 Patent, and/or the '843 Patent. Claim 7 of the '502 Patent is unpatentable under 35 U.S.C. 103(a) as obvious in view of any of the '248 Patent, the DE '699 Patent, the '559 Patent, the '044 Patent, the '393 Patent, and/or the '981 Patent. Claim 8 of the '502 Patent depends from claim 7 and is unpatentable under 35 U.S.C. 103(b) as obvious in view of the DE '699 Patent, the '044 Patent, and/or the '843 Patent.

## III.    Detailed Explanation and Application of Prior Art to Reexamination Claims

The '502 Patent discloses and claims a pet bed having an outer covering. A removable cushion is disposed within the outer covering to form a bottom portion. A bolster is removably disposed within the outer covering. The '502 Patent contains five independent claims and six dependent claims. Each claim requires that the cushion and bolster be disposed within the outer covering of the pet bed.

During the original prosecution of the '502 Patent application, the Applicant defined the invention and distinguished over a cited reference, the '843 Patent. In construing the '843 Patent, the Applicant argued that the pet bed covered by the '843 Patent required separate covers for the cushions and base, and as a result of utilizing separate covers, added manufacturing costs for material and added assembly time was required to manufacture the bed of the '843 Patent. Since the '843 Patent did not disclose a single cover for the cushion and base, the Applicant argued that the invention of the '502 Patent was not anticipated by the disclosure of the '843 Patent. Based on these arguments, allowance of the application was secured, and the '502 Patent subsequently issued.

### A.    Discussion: Claim 1

Claim 1 of the '502 Patent is directed to a pet bed generally comprising three distinct elements: (1) an outer covering, (2) a removable bottom cushion, and (3) a removable bolster. Due to the statements in the original prosecution concerning and distinguishing the '843 Patent (i.e., argument that the '843 Patent required separate covers for the cushions and base), the term "outer covering" is limited to a single article for receiving and enclosing the removable bottom cushion and the removable bolster.

The '248 Patent discloses a pet bed comprising a fabric article (i.e., base sheet 3, band 4, and outer periphery of annular bolster 1 (see col. 2, ll. 5-11)) configured to receive and enclose a removable bottom mattress (5). The removable bottom mattress (5) is disposed within (surrounded by) the exterior fabric article, as reflected in '248 Patent Figure 6. The '248 Patent further discloses a bolster disposed within the fabric article, as reflected in Figure 6 and as described at column 1, line 50 through column 2, line 15. The '248 Patent bolster filler material is preferably cotton which is packed within the outer periphery of the bolster and is, inherently, removable by simply reversing the process and extracting the filler material. As disclosed by the '248 Patent, substantially all of the bolster material is disposed exteriorly about at least a portion of the perimeter of the bottom mattress. This structure is reflected in '248 Patent Figures 1 and 6. The bolster disclosed by the '248 Patent is not secured to the bottom mattress. Accordingly, each and every limitation in claim 1 of the '502 Patent is expressly or inherently disclosed by the

3

'248 Patent. As such, claim 1 of the '502 Patent is invalid under 35 U.S.C. 102(b) as anticipated by the disclosures of the '248 Patent.

Likewise, the '393 Patent discloses a pet bed (100) comprising an outer covering (110) configured to receive a removable bottom cushion (108). *See* Figs. 5 and 6; col. 2, lines 22-30, and col. 4, line 15 to col. 5, line 7. The removable bottom cushion (108) is disposed within the outer covering (110), as reflected in '393 Figures 5 and 6. The '393 Patent further discloses a bolster (106) disposed within the outer covering (110), as reflected in Figures 5 and 6 and as described at column 2, lines 23-35 and column 4, line 65 to column 5, line 7. As disclosed by the '393 Patent, substantially all of the bolster material (106) is disposed exteriorly about at least a portion of the perimeter of the bottom cushion (108). This is reflected in '393 Figures 4-6. The bolster disclosed by the '393 Patent is not secured to the bottom cushion, and is separately removable therefrom. As such, claim 1 of the '502 Patent is invalid under 35 U.S.C. 102(b) as anticipated by the disclosures of the '393 Patent.

Likewise, the '981 Patent discloses a pet bed (40) comprising an outer covering (46) configured to receive a removable bottom cushion (44). *See* Fig. 2; col. 6, lines 40-45, and A146 at col. 7, lines 14-45. The removable bottom cushion (44) is disposed within the outer covering (46), as reflected in '981 Figures 2, 3, and 4. The '981 Patent further discloses a bolster (42) disposed within the outer covering (46), as reflected in Figure 2 and as described at column 7, lines 9-45. As disclosed by the '981 Patent, substantially all of the bolster material (42) is disposed exteriorly about at least a portion of the perimeter of the bottom cushion (44). This is reflected in '981 Figures 1-4. The bolster disclosed by the '981 Patent is not secured to the bottom cushion, and is separately removable therefrom. Figs. 2-4; col. 7, lines 9-59 (also identifying alternative embodiment for removal of bolster (sidewall) (42)). As such, claim 1 of the '502 Patent is invalid under 35 U.S.C. 102(b) as anticipated by the disclosures of the '981 Patent.

Likewise, the '044 Patent discloses a bed (10) comprising an outer covering (12) configured to receive a removable bottom cushion ((42), (58), (59)). *See* Figs 1 and 2; col. 3, line 58 to col. 4, line 39. The removable bottom cushion is disposed within the outer covering, as reflected in '044 Figures 1 and 2. The '044 Patent further discloses a bolster (*e.g.*, (31), (32), (33), (34)) disposed within the outer covering, as reflected in Figures 1 and 2 and as described at column 3, lines 11-15, and column 4, lines 20-37. As disclosed by the '044 Patent, substantially all of the bolster material is disposed exteriorly about the perimeter of the bottom cushion. This is reflected in '044 Figures 1 and 2. The bolster disclosed by the '044 Patent is not secured to the bottom cushion, and is separately removable therefrom. As such, claim 1 of the '502 Patent is invalid under 35 U.S.C. 102(b) as anticipated by the disclosures of the '044 Patent.

Even assuming claim 1 of the '502 Patent is not anticipated by the disclosures of any of the '248, '393, '981, or '044 Patents, claim 1 is nevertheless invalid under 35 U.S.C. 103(a) as obvious in view of additional relevant prior art. The '843 Patent teaches the simple containment of bolster filler material within its own, separate liner. *See* '843 Patent at col. 2, ll.44-53. As taught by the '843 Patent specification, this separate liner allows the inner fill material to be removed and cleaned as necessary or desired. Thus, the removability of the bolster from within the outer covering is an obvious limitation.

4

Furthermore, the '248 Patent discloses an optional mattress cover (8) (*see* Figure 4). The mattress cover serves the purpose of keeping the mattress (5) clean. *See* '248 Patent at col. 3, ll.5-16. As taught by the '248 Patent, the optional cover is not physically attached to the remainder of the exterior fabric article (*i.e.*, the outer cover). The absence of any physical attachment allows for the removable insertion of the base mattress (5) within the exterior fabric article. In the event the "outer cover" claim 1 element of the '502 Patent is construed in terms of substantial or complete enclosure of the removable bottom cushion, then the exterior fabric article disclosed by the '248 Patent may not be anticipatory. In view of the knowledge in the art and the teachings of references such as the '843 Patent, for example, the substantial or complete enclosure of the removable bottom cushion by the exterior fabric article is an obvious derivation and limitation. The DE '699 Patent also discloses the complete enclosure of the removable bottom cushion by the exterior fabric article. The use of zipper openings to allow for the physical attachment of the optional mattress cover would have been obvious to one of skill in the art, as the '843 Patent utilizes zipper openings for the insertion and removal of both the bolster cushion (14, 16) and the base cushion (12).

Still further, the DE '699 Patent discloses a bolstered pillow (1) having an outer covering (5), a removable cushion disposed within the outer covering to form a cushioned bottom portion (2), and a bolster cushion removably disposed within the interior of the outer covering (3). *See* DE '699 Patent at p.4, ll.16-19; p.11, ll.11-14 (claim 2); *see also* Fig. 1. The DE '699 Patent bolster pillow (*i.e.*, the "cylindrical roll") is disposed exteriorly about at least a portion of the perimeter of the bottom portion. *See* Figs. 1 and 2. Finally, the DE '699 Patent bolster pillow is connected "detachably" to the bottom cushion. *See* DE '699 at p.3, l.17 to p.4, l.6; p.11, l.14 (claim 2); *see also* Fig. 1 (indicating connecting element (4)). Thus, claim 1 of the '502 Patent is invalid under 35 U.S.C. 103(a) as obvious in view of the DE '699 Patent, if not anticipated thereby under 35 U.S.C. 102(b).

**B.    Discussion: Claims 2 and 3**

Claim 2 of the '502 Patent recites: "[t]he pet bed of claim 1, wherein the outer covering further includes a reclosable access opening." The "reclosable access opening" language is used only twice in the '502 specification, once at column 3, line 12, and again as part of the Abstract. "It is well-settled that claims must be read in view of the specification, of which they are a part. This includes consulting the preferred embodiment and the abstract." *Pandrol USA, LP v. Airboss Railway Products, Inc.,* 320 F.3d 1354, 1363 n.1 (Fed. Cir. 2003) (internal citations omitted). The Abstract states that "[t]he outer covering further includes a reclosable access opening permitting both the bottom cushion and bolster to be removed as needed." At column 3, the reclosable access opening (11) is defined and discussed in terms of receiving both the bottom cushion and the bolster. *See* '502 Patent at col. 3, ll.8-18. Thus, one of ordinary skill in the art would understand the "reclosable access opening" limitation to mean "a reclosable opening in the outer covering allowing for the insertion and removal of both the bottom cushion and the bolster." Under this construction, claim 2 of the '502 Patent is rendered obvious in view of the teachings of the DE '699 Patent. The DE '699 Patent discloses a reclosable single cover (5) having an access opening allowing for the insertion and removal of both the base cushion (2) and the bolster cushion (3). *See* DE '699 Patent at p.3, l.14 to p.4, l.6; p.8, ll.13-14 (cover is closable by means of a zipper); p.11, ll.7-8 (cover is closable); p.12, l.26 to p.13, l.2 (use of zipper closure); *see also* Figure 1. Alternatively, if the "reclosable access opening" limitation is

5

construed in terms of allowing for the removal and insertion of any number of cushions through the opening (*i.e.*, allowing for separate openings for the bolster and base cushion, respectively), such condition is obvious in view of any of the '843, '393, or '981 Patents, as discussed *supra*. Furthermore, such condition is clearly taught by the DE '699 Patent. *See* DE '699 Patent at p.4, ll.2-6; p.4, ll.20-24; p.9, l.25 to p.10, l.6; *see also* Fig. 2.

Claim 3 of the '502 Patent recites "[t]he pet bed of claim 2, wherein the reclosable access opening further includes a zipper." As discussed *supra*, the use of a zipper to facilitate the closure of the access opening was known in the art and would have been obvious in view of any of either the DE '699 Patent or the '843 Patent. The '044 Patent also discloses the use of a zipper for closing the access opening.

### C.    Discussion: Claim 7

Claim 7 of the '502 Patent recites the following:

A pet bed comprising:

> an outer covering including a reclosable access opening;

> a removable cushion disposed within the outer covering to form a cushioned bottom portion;

> a bolster removably secured to the interior of the outer covering and disposed about at least a portion of the perimeter of the bottom portion;

> such that the removable cushion and bolster are separately removable from the outer covering interior through the reclosable access opening.

Each of the following claim elements have been shown herein to be in the prior art: "outer covering," "reclosable access opening," "removable cushion," and "bolster." Claim 7 of the '502 Patent further limits the pet bed therein to one in which the bolster is "removably secured to the interior of the outer covering" and in which the bolster and cushion "are separately removable from the outer covering interior through the reclosable access opening." There is no explicit teaching in the '502 Patent specification with respect to "removably securing" the bolster to the interior of the outer covering, and the issue was addressed without clarifying elaboration during the original prosecution. Thus, this claim is invalid as indefinite or not enabled, according to 35 U.S.C. 112. Alternatively, if there is determined to be an absence of distinction between the use of the terms "securing" and "affixing," claim 7 is nevertheless unpatentable as will be shown below.

The '502 Patent specification discusses "removably affixing" the bolster to the interior of the outer covering, with the purpose of providing structural integrity to the pet bed. Preferably, this is accomplished by means such as straps (8). *See* '502 Patent at col. 2, ll.7-9; col.2, l. 51 to col. 3, l. 13; Figure 4; *see also* Prosecution Amendment, September 29, 1997 (removably

6

securing bolster to the interior of outer covering increases stability of the bed by fixing the position of the bolster). The need for structural integrity was known in the art, as the '248 Patent taught the use of a stiffening wire (10) for this purpose. Further, the DE '699 Patent teaches the need to maintain the relative position of the bolster member (3) to the base member (2), utilizing hook and loop fasteners (Velcro) (4) to accomplish this objective. *See* DE '699 Patent at p.3, l.14 to p.4, l.6; *see also* Figure 1. Still further, the '559 Patent teaches the use of straps (54) to hold the inner member (15) in place. *See* '559 Patent at col.3, l. 51 to col. 4, l. 11; Figure 4. Still further, the '044 Patent teaches the use of straps ((55), (56)) to hold the bolster in place. *See* '044 Patent at Figs. 3, 4 and 6. Thus, the removable securing (or "affixing") of the bolster using, for example, straps and/or hook and loop material would have been obvious to one of ordinary skill in the art at the time of the '502 Patent application. With respect to the final limitation of claim 7 of the '502 Patent, the separate removability of the bolster and cushion from the outer covering, reference is again made to the teachings of the DE '699 Patent, as discussed *supra* with respect to obviousness of claim 2 of the '502 Patent. More specifically, the DE '699 Patent discloses a reclosable single cover (5) having an access opening allowing for the separate insertion and removal of both the base cushion (2) and the bolster cushion (3). *See* DE '699 Patent at p.3, l.14 to p.4, l.6; p.8, ll.13-14; *see also* Figure 1. Thus, the separate removability of the bolster and cushion from the outer covering is a limitation rendered obvious in view of the DE '699 Patent. As further discussed *supra*, the separate removability of the bolster and bottom cushion from the outer covering is anticipated by either of the '393 or '981 Patents, as both disclose such separate removability.

### D.    Discussion: Claim 8

Claim 8 of the '502 Patent depends from claim 7 and further recites a "means for closing the reclosable access opening." Notwithstanding the questionable distinction between claim 7 comprising a "reclosable" opening and claim 8 comprising "means for closing" that which is already said to be "reclosable," it is noted that claim 8 is governed by 35 U.S.C. 112(6) as incorporating a "means plus function" limitation. Accordingly, the limitation is limited to the particular embodiments linked to the "closing" operation in the specification and any equivalents therefor. The '502 Patent specification limits its disclosure in this regard to the use of a zipper. *See* '502 Patent at col. 3, ll.6-13. As discussed *supra*, the use of a zipper to facilitate the closure of the access opening was known in the art and would have been obvious in view of any of the DE '699 Patent, the '044 Patent, or the '843 Patent.

## IV.    Conclusion

There are substantial new questions of patentability raised herein with respect to at least claims 1, 2, 3, 7, and 8 of the '502 Patent. Accordingly, reexamination of those claims is requested in view of the prior art cited herein, as well as any art identified by the Director, pursuant to 37 C.F.R. 1.510 and 35 U.S.C. 302 – 304.

DALLAS: 26935.00036; 1380275v1

Pursuant to 37 C.F.R. §§ 1.510(f) and 1.34(a), the undersigned attorneys are acting in a representative capacity of third party requestor Doskocil Manufacturing Company, Inc.

Please direct all correspondence concerning this Request for Reexamination to the undersigned counsel:

Respectfully submitted,

DOSKOCIL MANUFACTURING COMPANY, INC.

By its attorneys,

Date: April 4, 2005

Roy W. Hardin, Reg. No. 28,304
Martin Korn, Reg. No. 28,317
M. Scott Fuller, Reg. No. 54,716
LOCKE LIDDELL & SAPP LLP
2200 Ross Avenue, Suite 2200
Dallas, TX 75201
Telephone: (214) 740-8000 (Main)
Facsimile: (214) 740-8800 (Main)

Attorneys for Third Party Requestor,
Doskocil Manufacturing Company, Inc.

Pursuant to 37 C.F.R. 1.33(c), it is certified that a copy of this Request has been served in its entirety, via Certified Mail, Return Receipt Requested, on the party believed to be the registered agent of the patent owner. The name and address of the party served and the date of service are:

Flexi-Mat Corporation
c/o Michael Best & Friedrich LLP
Larry L. Saret, Esq.
401 N. Michigan Avenue, Suite 1900
Chicago, IL 60611
Telephone: (312) 222-0800
Facsimile: (312) 222-0818

Date of Service: April 4, 2005

By:

M. Scott Fuller, Reg. No. 54,716

8

# EXHIBIT 22



# Merriam-Webster OnLine

Merriam-Webster **FOR KIDS**    Encyclopædia **BRITANNICA**

Merriam-Webster **ONLINE**    Merriam-Webster **COLLEGIATE®**    Merriam-Webster **UN**






**HOME**
**PREMIUM SERVICES** ▼
M-WCollegiate.com
M-WUnabridged.com
Britannica.com
Multi-User Licenses
**DOWNLOADS**
**WORD OF THE DAY** ◄
**WORD GAMES** ◄
**WORD FOR THE WISE** ◄
**ONLINE STORE** ◄
**HELP** ◄

**Merriam-Webster Inc.**
**Company information**

## Merriam-Webster Online Dictionary

**Thesaurus**

### bolster

2 entries found for **bolster**.
To select an entry, click on it.

bolster[1,noun]
bolster[2,transitive verb]    **Go**

Main Entry: **¹bol·ster** 🔊
Pronunciation: 'bOl-st&r
Function: *noun*
Etymology: Middle English, from Old English; akin to Old
English *belg* bag -- more at BELLY
**1** : a long pillow or cushion
**2** : a structural part designed to eliminate friction or provide
support or bearing

For **More Information on "bolster" go to Britannica.com**

Get the **Top 10 Search Results for "bolster"**

**Ads by Google**

**Custom Down Pillow Forms**
Hand-Filled, Any Size, Down/FeatherToll-Free Advice (877) 441-5509
www.down-and-feather.com

**Yoga Meditation**
Learn Yoga & more. 5 books for $2with membership. Great selection!
www.OneSpirit.com

**Yoga Bolster**
Yoga Bolster for sale. affCheck out the deals now!
www.eBay.com

Merriam-Webste
 ⦿ Dictionary
 ○ Thesaurus

**Browse by letter**
A B C D E F G H I
N O P Q R S T U V

**Browse words n**
bolster

**Brita**
bolster

**Babylon-Pro**
Get instant results
Merriam-Webster
desktop applicatio
single click
Merriam-Web:
Babylon-Pro

**Handheld**
**Collegiate**
Now you can take
Eleventh Edition w
anywhere as Franl
new Speaking Ele
Handheld!
Franklin.com/

Merriam-Wel
**Collegiat**
**14-day Free**

**FM Validity Ex. 22**

http://www.m-w.com/cgi-bin/dictionary



# Merriam-Webster OnLine

Merriam-Webster FOR KIDS    Encyclopædia BRITANNICA

Merriam-Webster ONLINE    Merriam-Webster COLLEGIATE⁺    Merriam-Webster UNA






Earn Degree

**HOME**
**PREMIUM SERVICES** ▼
M-WCollegiate.com
M-WUnabridged.com
Britannica.com
Multi-User Licenses
**DOWNLOADS** ◄
**WORD OF THE DAY** ◄
**WORD GAMES** ◄
**WORD FOR THE WISE** ◄
**ONLINE STORE** ◄
**HELP** ◄

**Merriam-Webster Inc.**
**Company information**

## Merriam-Webster Online Dictionary

Thesaurus

## bolster

2 entries found for **bolster**.
To select an entry, click on it.

bolster[1,noun]
bolster[2,transitive verb]    Go

Main Entry: **²bolster**
Function: *transitive verb*
Inflected Form(s): **bol·stered; bol·ster·ing** ◀)) /-st(&-)ri
[ng]/
**1** : to support with or as if with a bolster : **REINFORCE**
**2** : to give a boost to <news that *bolstered* his spirits>
- **bol·ster·er** ◀)) /-st&r-&r/ *noun*

For **More Information on "bolster" go to Britannica.com**

Get the **Top 10 Search Results for "bolster"**

**Ads by Google**

**Custom Down Pillow Forms**
Hand-Filled, Any Size, Down/FeatherToll-Free Advice (877) 441-5509
www.down-and-feather.com

**Yoga Meditation**
Learn Yoga & more. 5 books for $2with membership. Great selection!
www.OneSpirit.com

**Yoga Bolster**
Yoga Bolster for sale. affCheck out the deals now!
www.eBay.com

Merriam-Webste
◉ Dictionary
○ Thesaurus

**Browse by letter**
A B C D E F G H I
N O P Q R S T U V

**Browse words n**
bolster


Britan

bolster

**Babylon-Pro**
Get instant results
Merriam-Webster i
desktop applicatio
single click
Merriam-Webs
Babylon-Pro

**Handheld Collegiate**
Now you can take
Eleventh Edition w
anywhere as Fran
new Speaking Ele
Handheld!
Franklin.com/

Merriam-Wel
**Collegiat**
14-day Free



# Merriam-Webster OnLine

Merriam-Webster **FOR KIDS**     Encyclopædia **BRITANNICA**

Merriam-Webster **ONLINE**     Merriam-Webster **COLLEGIATE®**     Merriam-Webster **UNA**

**Open a Capital One High Yield Savings Account today!**

- 3.75% APY
- No minimum balance
- No fees
- Links to your existing checking account

*CapitalOne®* **savings**

MEMBER FDIC

**HOME**
**PREMIUM SERVICES**
M-WCollegiate.com
M-WUnabridged.com
Britannica.com
Multi-User Licenses

**DOWNLOADS**
**WORD OF THE DAY**
**WORD GAMES**
**WORD FOR THE WISE**
**ONLINE STORE**
**HELP**

**Merriam-Webster Inc.
Company information**

## Merriam-Webster Online Dictionary

**Thesaurus**

One entry found for **substantial**.

**Main Entry: sub·stan·tial** 🔊
**Pronunciation:** s&b-'stan(t)-sh&l
**Function:** *adjective*
**1 a :** consisting of or relating to <u>substance</u> **b :** not imaginary or illusory : <u>REAL</u>, <u>TRUE</u> **c :** <u>IMPORTANT</u>, <u>ESSENTIAL</u>
**2 :** ample to satisfy and nourish : <u>FULL</u> <a *substantial* meal>
**3 a :** possessed of means : <u>WELL-TO-DO</u> **b :** considerable in quantity : significantly great <earned a *substantial* wage>
**4 :** firmly constructed : <u>STURDY</u>
**5 :** being largely but not wholly that which is specified <a *substantial* lie>
- **substantial** *noun*
- **sub·stan·ti·al·i·ty** 🔊 /-"stan(t)-shE-'a-l&-tE/ *noun*
- **sub·stan·tial·ly** 🔊 /-'stan(t)-sh(&-)1E/ *adverb*
- **sub·stan·tial·ness** 🔊 /-'stan(t)-sh&l-n&s/ *noun*

For **More information on "substantial" go to Britannica.com**

Get the **Top 10 Search Results for "substantial"**

Merriam-Webste

⊙ Dictionary
○ Thesauru



Britan

substantial

**Palm & Pock**
Browse and downl
Merriam-Webster
e-books and game
Palm and Pocket P
and Mobile Phones
**Merriam-Webs
Online Store**

**Handheld
Collegiate**
Now you can take
Eleventh Edition w
anywhere as Frank
new Speaking Elec
Handheld!
**Franklin.com/**

**Merriam-Wel
Collegiat
14-day Free**

# EXHIBIT 23

# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FLEXI-MAT CORPORATION, an Illinois corporation, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 04 10162 DPW |
| DALLAS MANUFACTURING COMPANY, INC., a Texas corporation, BJ'S WHOLESALE CLUB, INC., a Delaware corporation, and DOSKOCIL MANUFACTURING COMPANY, INC., a Texas corporation, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| AND RELATED COUNTERCLAIMS. | ) | |

### BJ'S WHOLESALE CLUB'S JOINDER IN
### DALLAS MANUFACTURING'S RESPONSES AND OBJECTIONS TO
### FLEXI-MAT'S INTERROGATORY NOS. 2, 4, AND 5

Defendant and Counter-Claimant BJ's Wholesale Club, Inc. ("BJ's Wholesale Club") hereby joins in DEFENDANT DALLAS MANUFACTURING'S SUPPLEMENTAL RESPONSES TO PLAINTIFF FLEXI-MAT'S INTERROGATORY NOS. 2 AND 5 and in DEFENDANT DALLAS MANUFACTURING'S SUPPLEMENTAL RESPONSE TO PLAINTIFF FLEXI-MAT'S INTERROGATORY NO. 4 AND SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5.

Attorneys for Defendant and Counter-Claimant
BJ'S WHOLESALE CLUB, INC.

Gary A. Clark (*pro hac vice*)
Darren M. Franklin (*pro hac vice*)
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
333 South Hope Street, 48th Floor
Los Angeles, California  90071-1448
(213) 620-1780

Dated:  October 25, 2005.

FM Validity Ex. 23

James J. Marcellino, Esq. (BBO # 318840)
David M. Mello, Esq. (BBO # 634722)
MCDERMOTT, WILL & EMERY
28 State Street
Boston, MA 02109-1775
(617) 535-4000

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon Plaintiff's counsel, William Meunier, Esq. Goodwin Procter LLP, Exchange Place, Boston, Massachusetts 02109, and Larry L. Saret, Esq., Michael, Best & Friedrich LLP, 401 N. Michigan Avenue, Suite 1900, Chicago, Illinois 60611, via first class mail, postage pre-paid, on October 25, 2005.

I hereby certify that a true copy of the above document was also served upon counsel for Defendant Doskocil Manufacturing Company, Inc., Roy W. Hardin, Esq., Locke Liddell & Sapp LLP, 2200 Ross Avenue, Suite 2200, Dallas, Texas 75201-6776, via first class mail, postage pre-paid, on October 25, 2005.

Darren M. Franklin