# EXHIBIT F

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   DISTRICT OF MASSACHUSETTS

 3

 4   FLEXI-MAT CORPORATION, an     )

 5   Illinois Corporation,         )

 6                 Plaintiff,      ) Civil Action

 7              -vs-               ) No. 0410162 DPW

 8   DALLAS MANUFACTURING COMPANY, )

 9   INC., a Texas Corporation,    )

10   BJ's WHOLESALE CLUB, INC.,    )

11   a Delaware Corporation, and   )

12   DOSKOCIL MANUFACTURING        )

13   COMPANY, INC., a Texas        )

14   Corporation,                  )

15                 Defendants.     )

16

17        The videotaped deposition of SCOTT HAUGH,
     called for examination pursuant to the Rules of
18   Civil Procedure for the United States District
     Courts pertaining to the taking of depositions,
19   taken before Shelly S. Rubas, a notary public
     within and for the County of Cook and State of
20   Illinois, at 277 West Monroe, Chicago, Illinois, on
     the 14th day of September, 2005, at the hour of
21   2:12 o'clock P.M.

22

23   Reported by:  Shelly S. Rubas, CSR

24   License No.:  084-004298

25
```

SCOTT HAUGH

```
                                                              Page 3
 1        APPEARANCES:

 2

 3             MICHAEL, BEST & FRIEDRICH, LLP, by

 4             MR. MICHAEL E. HUSMANN

 5             100 East Wisconsin Avenue, Suite 3300

 6             Milwaukee, Wisconsin  53202-4108

 7             (414) 271-6560

 8                  Representing the Plaintiff;

 9

10

11             SHEPPARD, MULLIN, RICHTER & HAMPTON, by

12             MR. DARREN M. FRANKLIN and

13             MR. GARY CLARK

14             333 South Hope Street, 48th Floor

15             Los Angeles, California  90071-1448

16             (213) 620-1780

17                  Representing the Defendant,

18                  Dallas Manufacturing Company;

19

20

21   ALSO PRESENT:

22             Karolina Tesarski, Videographer;

23             James Elesh

24

25
```

Page 17

1  packet.
2      Q.   Have you heard this is U.S. patent number
3  5,765,502?
4      A.   I knew that it had been patented. I don't
5  know what the number was.
6      Q.   Had you ever heard your patent referred to
7  as the '502 patent?
8      A.   No, I haven't.
9      Q.   If throughout this deposition I refer to
10 your patent, will you understand that I am talking
11 about this exhibit?
12     A.   Yes.
13     Q.   So how did you come to design a bolster
14 bed?
15     A.   I worked for the company Now Products and
16 the president of that company had asked one of our
17 suppliers, a foam supplier, if there was anyone in
18 the Chicago area that needed patterns made or, you
19 know, would like to work with us, you know. And I
20 believe they are the ones who kind of introduced us
21 to Jim at Flexi-Mat.
22          We went over there one day and they had an
23 idea for a bed that they wanted to try to make and
24 asked if I would make it for them.
25     Q.   You had a meeting at Flexi-Mat?

1    Q.   When you say keeping this wall intact,
2  what would happen if you didn't have the Velcro
3  straps?
4    A.   I'll show you.
5    Q.   So what have you just done?
6    A.   I undid the Velcro straps and now you can
7  see that I am not conforming to the shape anymore.
8  I've got loose fabric billowing up because it's not
9  being held down into position like this is.
10   Q.   Without the straps, the outer covering
11 just becomes one big bag?
12   A.   Well, becomes sloppy.  It doesn't conform
13 to the shape that we want it to conform to.
14   Q.   And then what happens to the bolster?
15   A.   What would happen to the bolster if I
16 didn't have the Velcro strips?
17   Q.   Yes.
18   A.   It would be loose.  You know, it wouldn't
19 stay in position.  It would come out because it's
20 not being held, you know, by the walls of this
21 outer cover.
22   Q.   It could be pushed completely up on top in
23 the middle of the bottom cushion?
24   A.   Right.  It would go wherever it wants to
25 because there is no -- there is nothing to lock the

1   form into place.

2   Q.   So the bolster straps are -- would you say
3   they are pretty much essential to keeping the
4   bolster positioned in the pocket?

5   MR. HUSMANN:   Objection, vague and ambiguous as
6   to what you mean by essential.

7   THE WITNESS:   Actually, the straps were more of
8   a simplest way of doing what needed to get done
9   here.  There's other ways to accomplish that, but
10  with the Velcro strips, you know, only being
11  spaced, you know, that far apart, it's not a
12  perfect form like you would want it to be, but it
13  was acceptable for a dog bed.
14  BY MR. FRANKLIN:
15  Q.   And the goal was to keep the bolster from
16  moving around within the outer covering?
17  A.   The goal was to ensure that the objective,
18  which was to make this higher wall, would stay
19  doing what we wanted it to do, you know, to stay in
20  that position behind the pillow, you know, behind
21  the seating portion and look that way.  Not be --
22  you know, I mean, I could sloppily do that, too,
23  but that wouldn't have been attractive, you know.
24  It wouldn't be what we would want to show somebody,
25  you know, as a finished product that you were

Page 48

1   trying to sell.  It would be deemed too sloppy or
2   too -- not good enough.
3       Q.   Did you ever -- did you ever build a
4   prototype that didn't have the Velcro straps in it?
5       A.   This is the only dog bed that I think I
6   ever made other than just pillows.
7       Q.   Where did the idea -- excuse me.  Didn't
8   mean to cut you off.
9            Where did the idea for the Velcro straps
10  come from?
11      A.   Just --
12      Q.   Is that something you thought of?
13      A.   Yeah.  I might have done it on something
14  else at the time.  Even for this time when I made
15  this, I never really worked with it too much.  You
16  know, in the furniture business, things are a
17  little more refined.
18           You know, I expected them to tell me that
19  it wasn't good enough actually I think when I
20  showed it to them.  I thought that it was the
21  expedient good enough solution for a dog bed, but,
22  you know, it actually works pretty well, you know,
23  because the bed is sloppy here.  There's wrinkles
24  and that sort of thing and I wasn't sure that would
25  be acceptable to them.

1    If they had wanted it different, you know,
2    I would have had to have designed the bolster to be
3    a completely contained pocket, you know, that had
4    its own opening.  This way allowed me to have just
5    one opening.
6        Q.   Was that important to you?
7        MR. HUSMANN:  Was what important to you?
8             My objection is to vagueness.
9    BY MR. FRANKLIN:
10       Q.   Was it designed that -- was a design that
11   had only one opening important to you?
12       A.   Not to me, no.  It was strictly the most
13   expedient way to make the cover.  Like I say, I
14   wasn't sure whether it would be good enough for
15   them when I made it.
16       Q.   And why didn't you make a design with a
17   separate opening for the bolster?
18       A.   That's quite a bit more complicated
19   pattern work and sewing labor.  You know, in the
20   pet bed business, you are always down at the
21   bottom.  It's kind of like the beanbag business.
22   You know, there's not a lot of room for extra labor
23   if you can get away with it.
24       Q.   So the reason -- so the reason pretty much
25   had to do with what was the easiest to do for

Page 60

1    A.   Right, a soft form like that rather than
2 the hard form foam of a dog bed.
3    Q.   Had you designed any pet beds before you
4 got this assignment?
5    A.   If I did, it was strictly an oval shaped
6 knife edge pillow with a -- sometimes with a furry
7 top.  I believe we did try and show some people
8 that one time when we had a license for
9 101 Dalmatians.  We decided we should make some dog
10 beds, too, but nobody wanted to buy them.
11         I think Jim has that business sewed up.
12 We were in the promotional furniture business, so
13 it's very hard to sell a pet bed.  You know, your
14 people have no connections to that stream of buyers
15 and that sort of thing.
16    Q.   So you signed the patent documents.
17         Did you sign any sort of assignment of
18 your design to Flexi-Mat?
19    A.   There was -- it could have been a couple
20 different documents that I signed at that time,
21 yeah.
22    Q.   Did Flexi-Mat give anything to Now
23 Products in exchange for the design?
24    A.   I'm not sure of that.  I don't know
25 whether -- we must have, you know, because we had

Page 61

1   gone there like looking for work, so I believe they
2   billed them for my time probably and the samples,
3   you know, the labor and the samples.
4       Q.   Was that something that the president of
5   Now Products was dealing with?
6       A.   Yeah.  It would have just been handled
7   like any other invoice, you know, or account in
8   that company.
9       Q.   And were you involved at all with that
10  invoicing or accounting at all?
11      A.   I believe they did ask me, you know, like
12  how much time I spent and what we had done.  So my
13  guess is they probably billed them, but I never saw
14  the bill or how much the bill was or anything.
15      Q.   Okay.  Do you know whose idea it was to
16  patent your design?
17      A.   Not mine.  I assume Jim's.  He decided it
18  was worthwhile.
19      Q.   And just so I can confirm, do you have any
20  financial stake in Flexi-Mat?
21      A.   No.
22      Q.   Do you have any financial stake in this
23  patent, your patent?
24      A.   No.
25      Q.   Do you have any financial stake in the

Page 68

1  in it there was -- it was kind of allowed that that
2  wouldn't -- that was not the only -- it does say on
3  number 60, that ties, straps, snaps, and buckles
4  could also be used.
5          It's also providing for another common
6  type of pet bed system where there is not a zipper
7  on the bottom, it's just overlapping flaps.  I
8  don't see a number next to that.  It's on -- there
9  is a number three at the top of the column about
10 halfway down.
11 BY MR. FRANKLIN:
12     Q.  Isn't the slit that's disclosed in column
13 three at approximately line 20 -- the line numbers
14 are to the right of that column.
15     A.  Okay.
16     Q.  Isn't that just talking about instead of
17 having a zipper at the bottom of the bed, just
18 having some overlapping --
19     A.  Overlapping slits that you could pull open
20 and put the covers in.
21     Q.  That is not referring to how a bolster
22 might be affixed to the outer covering?
23     A.  No.
24     Q.  The only structures that are disclosed in
25 the patent for affixing the bolster to the outer

Page 69

1  covering are the ties, straps, snaps, or buckles
2  that are talked about in column two at around line
3  64; is that right?
4      A.   That is the only thing I see.
5      Q.   And without having those ties, straps,
6  snaps, or buckles, the bolster cushion design can
7  move around with respect to the bottom cushion?
8      A.   Correct.
9      Q.   It could be moved beneath the bottom
10 cushion?
11     A.   It would be sloppy, you know, and not stay
12 where it should stay.  It could in theory go
13 anywhere inside that loose bag is all you'd have
14 without those ties.
15     Q.   Without those ties, there is nothing
16 keeping the bolster to the side of the bolster
17 cushion?
18     A.   Correct.
19     Q.   If you could flip back to figure one for
20 me.
21          I am going to ask you to draw something on
22 figure one, but since this exhibit that you are
23 touching right now has been used in another
24 deposition, I am going to give you another copy of
25 the patent assuming I've got one here.  Let me give

```
 1   STATE OF ILLINOIS   )
 2                       )  SS:
 3   COUNTY OF C O O K   )
 4            I, SHELLY S. RUBAS, a notary public within
 5   and for the County of Cook County and State of
 6   Illinois, do hereby certify that heretofore,
 7   to-wit, on the 14th day of September 2005,
 8   personally appeared before me, at 227 West Monroe,
 9   Chicago, Illinois, SCOTT HAUGH, in a cause now
10   pending and undetermined in the Circuit Court of
11   Cook County, Illinois, wherein FLEXI-MAT, is the
12   Plaintiff, and Dallas Manufacturing Company,
13   et al., are the Defendants.
14            I further certify that the said witness
15   was first duly sworn to testify the truth, the
16   whole truth and nothing but the truth in the cause
17   aforesaid; that the testimony then given by said
18   witness was reported stenographically by me in the
19   presence of the said witness, and afterwards
20   reduced to typewriting by Computer-Aided
21   Transcription, and the foregoing is a true and
22   correct transcript of the testimony so given by
23   said witness as aforesaid.
24            I further certify that the signature to
25   the foregoing deposition was not waived by counsel
```

```
 1  for the respective parties.
 2          I further certify that the taking of this
 3  deposition was pursuant to Notice, and that there
 4  were present at the deposition the attorneys
 5  hereinbefore mentioned.
 6          I further certify that I am not counsel
 7  for nor in any way related to the parties to this
 8  suit, nor am I in any way interested in the outcome
 9  thereof.
10          IN TESTIMONY WHEREOF:  I have hereunto set
11  my hand and affixed my notarial seal this  15th
12  day of  September , 2005.
13
14
15
16
17          _____Shelly S. Rubas_____
18          NOTARY PUBLIC, COOK COUNTY, ILLINOIS
19
20
21
22
23
24
25
```