# EXHIBIT 3

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FLEXI-MAT CORPORATION, an Illinois corporation, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil Action No. 04 10162 DPW |
| | ) |
| DALLAS MANUFACTURING COMPANY, a Texas corporation, BJ'S WHOLESALE CLUB, INC., a Delaware corporation, and DOSKOCIL MANUFACTURING COMPANY, INC., a Texas corporation, | )   SIMON HANDELSMAN'S <br> )   EXPERT REPORT ON <br> )   INFRINGEMENT <br> ) <br> ) <br> ) |
| | ) |
| Defendants. | ) |
| | ) |
| DALLAS MANUFACTURING COMPANY, INC., a corporation, | ) |
| | ) |
| Counter-claimant, | ) |
| | ) |
| v. | ) |
| | ) |
| FLEXI-MAT CORPORATION, a corporation, | ) |
| | ) |
| Counter-defendant. | ) |
| BJ'S WHOLESALE CLUB, INC., a corporation, | ) |
| | ) |
| Counter-claimant, | ) |
| | ) |
| v. | ) |
| | ) |
| FLEXI-MAT CORPORATION, a corporation, | ) |
| | ) |
| Counter-defendant. | ) |
| DOSKOCIL MANUFACTURING COMPANY, INC., a corporation, | ) |
| | ) |
| Counter-claimant, | ) |
| | ) |
| v. | ) |
| | ) |
| FLEXI-MAT CORPORATION, a corporation, | ) |
| | ) |
| Counter-defendant. | ) |

**FM Infr. Ex. 3**

If called to testify in this case, I will express the following opinions at the trial, the basis and reasons for which are set forth below and detailed in the documentation identified below. I reserve the right to supplement these opinions in the event of new information.

1.     **The Basis For My Opinion**

In preparation for this declaration and pursuant to my role as expert witness, I have reviewed the following documents and things which serve as the data and information upon which I base the opinions set forth herein:

1. U.S. Patent No. 5,765,502 ("the '502 patent");

2. The file history of the '502 patent;

3. Various pet beds, which I understand were manufactured by Doskocil and Dallas (as described in more detail below);

4. The patents and publications set forth on the face of the '502 patent as "References Cited"; and

5. Testimony from Neil Nivert, an employee of Dallas Manufacturing.

I also have extensive knowledge and personal experience in the research and development of products for the pet industry, and I used this knowledge and experience in preparing this report.

2.     **Statement Of My Opinion**

I understand that infringement is determined by comparing the terms (or "limitations") found in a patent's claims to an accused product. If each and every term in a particular claim is found in the accused product, then that product infringes the claim.

I understand that the claims at issue (claims 1-3) read as follows:

1. A pet bed comprising:

an outer covering;

a removable cushion disposed within the outer covering to form a cushioned bottom

2

portion; and

a bolster removably disposed within the interior of the outer covering and substantially all of said bolster disposed exteriorly about at least a portion of the perimeter of the bottom portion without being secured to the removable cushion.

2. The pet bed of claim 1, wherein the outer covering further includes a reclosable access opening.

3. The pet bed of claim 2, wherein the reclosable access opening further includes a zipper.

I have examined the pet beds shown in attached photographs and have found the following. The numbered portions of the beds in the attached photographs correspond to the numbers in the paragraphs below.

A.    Doskocil Bed Sold To BJ's

The pet bed which I understand was sold by Doskocil to BJ's is pictured behind the tab for Exhibit A. This pet bed has an outer covering (1), a cushion (2) and a bolster (3). The cushion is removable and is disposed within the outer covering. The cushion is in the bottom of the outer covering, and forms a cushioned bottom portion. The bolster is removable and is disposed within the interior of the outer covering. Substantially all of the bolster is disposed exteriorly about at least a portion of the perimeter (4) of the bottom portion. The bolster is not secured to the removable cushion. The outer covering includes a reclosable access opening, which includes a zipper (5).

B.    Dallas (I) Bed Sold To BJ's

The pet bed which I understand was initially sold by Dallas to BJ's is pictured behind the tab for Exhibit B. This pet bed has an outer covering (1), a cushion (2) and a bolster (3). The

3

cushion is removable and is disposed within the outer covering. The cushion is in the bottom of the outer covering, and forms a cushioned bottom portion. The bolster is removable and is disposed within the interior of the outer covering. Substantially all of the bolster is disposed exteriorly about at least a portion of the perimeter (4) of the bottom portion. The bolster is not secured to the removable cushion. The outer covering includes a reclosable access opening, which includes a zipper (5).

C.    **Dallas (II) Bed Sold To BJ's**

The pet bed which I understand was subsequently sold by Dallas to BJ's is pictured behind the tab for Exhibit C. This pet bed has an outer covering (1), a cushion (2) and a bolster (3). The cushion is removable and is disposed within the outer covering. The cushion is in the bottom of the outer covering, and forms a cushioned bottom portion. The bolster is removable and is disposed within the interior of the outer covering. Substantially all of the bolster is disposed exteriorly about at least a portion of the perimeter (4) of the bottom portion. The bolster is not secured to the removable cushion. The outer covering includes a reclosable access opening, which includes a zipper (5).

D.    **Dallas Bed Sold To Costco**

The pet bed which I understand was sold by Dallas to Costco is pictured behind the tab for Exhibit D. This pet bed has an outer covering (1), a cushion (2) and a bolster (3). The cushion is removable and is disposed within the outer covering. The cushion is in the bottom of the outer covering, and forms a cushioned bottom portion. The bolster is removable and is disposed within the interior of the outer covering. Substantially all of the bolster is disposed exteriorly about at least a portion of the perimeter (4) of the bottom portion. The bolster is not

secured to the removable cushion. The outer covering includes a reclosable access opening, which includes a zipper (5).

### E.    Dallas Bed Sold To Sam's Club

The pet bed which I understand was sold by Dallas to Sam's Club is pictured behind the tab for Exhibit E. This pet bed has an outer covering (1), a cushion (2) and a bolster (3). The cushion is removable and is disposed within the outer covering. The cushion is in the bottom of the outer covering, and forms a cushioned bottom portion. The bolster is removable and is disposed within the interior of the outer covering. Substantially all of the bolster is disposed exteriorly about at least a portion of the perimeter (4) of the bottom portion. The bolster is not secured to the removable cushion. The outer covering includes a reclosable access opening, which includes a zipper (5).

### F.    Dallas Bed Sold To Bass Pro And To Big Lots

In addition, although I have not physically examined the beds sold by Dallas to Bass Pro or to Big Lots, I have examined photographs of them. These photographs are behind the tab for Exhibits F and G, respectively. I have reviewed testimony from Neil Nivert, an employee of Dallas Manufacturing, stating that these beds were constructed by Dallas in the same way the beds sold to BJ's by Dallas were constructed. (Nivert Dep. at 120-125, attached as Exhibit H). Based on my review of these photographs, I agree.

In summary, and in my opinion, each of the Dallas and Doskocil beds I examined or reviewed in photographs include each of the limitations in claims 1,2 and 3 of the '502 patent.

3.    **Qualifications**

I am the president of Out Of Hand, Inc., a consulting firm for the pet industry. I have been a consultant since 1992. My clients include pet product manufacturers, importers, distributors, and retailers. I consult on pet product design, including pet beds, among other things, and have extensive experience in retailing, manufacturing, and distribution of pet supplies.

From 1989 to 1992, I co-founded and worked for PetCare Superstores, a retailer of pet products, which were eventually sold to PetCo. From 1978 to 1989, I was employed by Docktor Pet Centers, a franchise chain of over 200 pet stores. At Docktor Pet, I developed a private label product line of pet products and created promotions to increase sales per store.

Before Docktor Pet, I was with several retail stores, both department and specialty stores. I also worked for Faded Glory, a jeans apparel company, and learned the fashion and importing business.

I am an inventor on a number of pet product patents and patent applications, a list of which is attached.

A listing of all articles I have authored and have been able to locate copies of is provided along with this report. I was unable to locate copies of some articles published in *Pet Dealer*.

4.    **Compensation And Expert Testimony In Other Cases**

I am being compensated at $400/hour for my study and testimony. I was retained as an expert by Four Paws Products Ltd. in the past, however, I have not testified as an expert at trial or by deposition in that or any other case.

6

Having been informed that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code, I declare under penalty of perjury that the foregoing is true and correct:

September 20, 2005

Simon Handelsman

**List of Publications**

Copies of my booklet, Successful Retailing, and my columns published in The Pet Dealer, Pet Age, and Groom & Board are provided in lieu of a list.

United States Patent No. 6,474,268
Suchowski and Handelsman, entitled Composite Chew Toy, issued November 5, 2002, assignee The Hartz Mountain Corporation (Secaucus, NJ)

United States Patent No. 6,415,741
Suchowski, Handelsman and Lai, entitled Scented Chew Toy, issued July 9, 2002, assignee The Hartz Mountain Corporation (Secaucus, NJ)

United States Patent No. 6,360,695
Suchowski and Handelsman, entitled Composite Chew Toy, issued March 26, 2002, assignee The Hartz Mountain Corporation (Secaucus, NJ)

United States Patent No. D450,894
Suchowski and Handelsman, entitled Composite Chew Toy, issued November 20, 2001, assignee: The Hartz Mountain Corporation

United States Patent No. 6,305,326
Suchowski and Handelsman, entitled Composite Chew Toy, issued October 23, 2001, assignee The Hartz Mountain Corporation (Secaucus, NJ)

United States Patent No. 6,116,191
Suchowski and Handelsman, entitled Composite Chew Toy, issued September 12, 2000, assignee The Hartz Mountain Corporation (Secaucus, NJ)

United States Patent No. 6,112,703
Handelsman, entitled Shrouded Chewable Pet Toys and Method of Making, issued September 5, 2000, assignee: JW Pet Company, Inc. (Hasbrouck Heights, NJ)

United States Patent No. 5,806,464
Willinger and Handelsman, entitled Modular Pet Furniture, issued September 15, 1998, assignee: J.W. Pet Company, Inc. (Englewood, NJ)

United States Patent Application Pub. No. 20050166865
Handelsman and Lai, entitled Multipart Chew Toy, published August 4, 2005.

United States Patent Application Pub. No. 20040216693
Handelsman, entitled Pet Chews And Methods Of Providing Dental Care To Pets, published November 4, 2004.

United States Patent Application Pub. No. 20010042521
Suchowski and Handelsman, entitled Composite Chew Toy, published November 22, 2001.

United States Patent Application Pub. No. 20010029903
Suchowski, Handelsman, and Lai, entitled Scented Chew Toy, published October 18, 2001.

DOSKOCIL BED SOLD TO BJ'S (PAR. 2.A)



1

3 (inside)

2 (inside)



1

3

5

2



**EXHIBIT**

A

DOSKOCIL BED SOLD TO BJ'S (PAR. 2.A)





DOSKOCIL BED SOLD TO BJ'S (PAR. 2.A)



DALLAS (I) BED SOLD TO BJ'S (PAR. 2.B)



1
3 (inside)
2 (inside)
4



1
3
2
5



EXHIBIT
B

DALLAS (I) BED SOLD TO BJ'S (PAR. 2.B)





DALLAS (I) BED SOLD TO BJ'S (PAR. 2.B)



4

3 (inside)

DALLAS (II) BED SOLD TO BJ'S (PAR. 2.C)





1

3

2

5

EXHIBIT

C

DALLAS (II) BED SOLD TO BJ'S (PAR. 2.C)





DALLAS (II) BED SOLD TO BJ'S (PAR. 2.C)



DALLAS BED SOLD TO COSTCO (PAR. 2.D)



1
3 (inside)
2 (inside)



1
3
2
5



EXHIBIT
D

DALLAS BED SOLD TO COSTCO (PAR. 2.D)





DALLAS BED SOLD TO COSTCO (PAR. 2.D)



— 3 (inside)

— 4

DALLAS BED SOLD TO SAM'S CLUB (PAR. 2.E)



1
3 (inside)
4
2 (inside)



1
3
2
5



EXHIBIT

E

DALLAS BED SOLD TO SAM'S CLUB (PAR. 2.E)





DALLAS BED SOLD TO SAM'S CLUB (PAR. 2.E)



— 4

— 3 (inside)

DALLAS BED SOLD TO BASS PRO (PARA. 2.F)





— 3 (inside)

— 1

— 4

— 2 (inside)



DALLAS BED SOLD TO BASS PRO (PAR. 2.F)





DALLAS BED SOLD TO BIG LOTS (PAR. 2.G)





3 (inside)

1

4

2 (inside)

EXHIBIT

G

DALLAS BED SOLD TO BIG LOTS (PAR. 2.G)



2 (inside)

1

3 (inside)

5



4

3 (inside)

DALLAS BED SOLD TO BIG LOTS (PAR. 2.G)



— 2 (inside)

— 4

— 3 (inside)

1

1          IN THE UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS

2

   FLEXI-MAT CORPORATION, an  )   CASE NO. 04 10162 DPW
3  Illinois corporation,      )
                       )
4    Plaintiff,         )
                       )
5  VS.                 )
                       )
6  DALLAS MANUFACTURING      )
   COMPANY, INC., a Texas    )
7  corporation, and BJ'S     )
   WHOLESALE CLUB, INC., a   )
8  Delaware corporation,     )
   DOSKOCIL MANUFACTURING    )
9  COMPANY, INC., a Texas    )
   corporation,           )
10                   )
    Defendants.       )
11

12      --------------------------------------
         ORAL AND VIDEOTAPED DEPOSITION OF
13              NEIL NIVERT
              JUNE 29, 2004
14      --------------------------------------

15    ORAL AND VIDEOTAPED DEPOSITION OF NEIL NIVERT,

16  produced as a witness at the instance of the Plaintiff,

17  and duly sworn, was taken in the above-styled and

18  numbered cause on the 29th day of June, 2005, from

19  10:06 a.m. to 2:36 p.m., before Kimberly Byrns Buchanan,

20  CSR in and for the State of Texas, reported by machine

21  shorthand, at the offices of Hughes & Luce, LLP,

22  1717 Main Street, Suite 2900, Dallas, Texas 75201,

23  pursuant to the Federal Rules of Civil Procedure and the

24  provisions stated on the record or attached hereto.

25

EXHIBIT

H

120

1    A.    There's enough bulk of the fiber in there that

2    it won't compress all the way.

3    Q.    Bulk of the filling?  When you said fiber --

4    A.    Of the filling.

5    Q.    -- you're talking about --

6    A.    Yes, of the filling.

7    Q.    Okay.  All right.  Dallas made bed -- has

8    manufactured and sold beds, bolster beds to customers

9    other than BJ's, correct?

10    A.    Correct.

11    Q.    And do you know to whom they've sold?

12    A.    Costco.

13    Q.    Okay.  Costco.

14    A.    Big Lots.

15    Q.    Sam's?

16    A.    Sam's, yes.

17    Q.    Who else we got?  Bass Pro?

18    A.    Yes.

19    Q.    Do you recall anyone else?

20    A.    I think that's it.

21    Q.    Okay.  Now I believe next to you is a bed

22    that's labeled Bass Pro?

23    A.    Big Lots.

24    Q.    That bed, yes.  And what is the exhibit there?

25    A.    2C.

121

1    Q.   Okay.  And I understand that is a example of

2   the bolster bed that has been sold to Big Lots?

3    A.   Correct.

4    Q.   And is there any difference, other than size,

5   on the construction of this bed from the bed sold to

6   BJ's by Dallas, the bolster bed sold to BJ's?

7    A.   No, there isn't.

8    Q.   Okay.  It's the --

9    A.   It's the same bed.

10    Q.   -- same construction, just different size?

11    A.   Different size, different materials, maybe.

12    Q.   Okay.  Is that a 3-inch gusset bed?

13    A.   Yes.

14    Q.   Okay.  Now would there be a cost sheet on that

15   particular bed for the manufacture -- after it's

16   designed to be manufactured --

17    A.   Yes.

18    Q.   -- still at Athens?

19    A.   There should be, yes.

20    Q.   Okay.  Now does BJ's sell any -- well, back

21   that up.

22           Big Lots is a 34-inch bolster bed,

23   correct?

24    A.   Correct.

25    Q.   And does Dallas sell any other 34-inch bolster

122

1   beds?

2        A.   Not that I can recall.

3        Q.   Okay.  All the other bolster beds are

4   42 inches?

5        A.   Correct.

6        Q.   Okay.  And then up to your right, there is a

7   bolster bed that is labeled Sam's?

8        A.   Correct.

9        Q.   It has exhibit sticker on it 2D?

10       A.   Okay.

11       Q.   Okay?

12       A.   Yes.

13       Q.   And is -- is the bolster bed sold to Sam's of

14   the same construction as the bolster bed sold to BJ's?

15       A.   Yes, it is.

16       Q.   And is that the construction with the 3-inch

17   gusset?

18       A.   I think that one has a 4-inch gusset, it looks

19   like.

20       Q.   The Sam's --

21       A.   It looks like it --

22       Q.   -- bed has a 4-inch --

23       A.   Yes.

24       Q.   Okay.  Is --

25       A.   It looks like it from here.  I'd have to

123

1   measure it to be certain.

2        Q.   Okay.  Is the only difference between the bed,

3   the type of fabric -- is the type of fabric that

4   you'd --

5        A.   Yes.

6        Q.   Okay.  And the difference between the 42-inch

7   BJ bolster bed and the Sam's bed is the fabric?

8        A.   Correct.

9        Q.   Okay.  Dallas also makes a bolster bed for

10  Bass Pro, correct?

11       A.   Correct.

12       Q.   And is that bed -- does -- is it of the same

13  construction as the bed -- the bolster bed sold to BJ's?

14       A.   Yes, it is.

15       Q.   The only real difference is fabric?

16       A.   Correct.

17       Q.   And does the Bass Pro bed have a 3- or 4-inch

18  gusset?

19       A.   I would have to look.

20       Q.   Okay.  I believe the sample is down here.

21       A.   It looks, just from here, like a 4-inch gusset.

22       Q.   And would there be a cost sheet at Athens on

23  the Bass Pro bed?

24       A.   Yes, there would.

25       Q.   And there would -- would there be one on the --

124

1    I guess I asked you on the Sam's bed?

2        A.   Yes, there would.

3        Q.   Would be, okay.  And then Dallas also sells a

4    42-inch bolster bed to Costco?

5        A.   Correct.

6        Q.   And is there any difference between the

7    construction of the Costco bed and the bolster bed sold

8    to BJ's other than fabric?

9        A.   No.

10       Q.   Okay.  And does the Costco have a 3- or a

11   4-inch gusset?

12       A.   It's probably a 4-inch.

13       Q.   Okay.  And there would also be a cost sheet at

14   Athens on this bed?

15       A.   Yes.

16       Q.   Is there any difference in the fill between the

17   Costco bed and the BJ bed?

18       A.   Yes, there is.  There would be.

19       Q.   And what is the difference?

20       A.   The Costco bed is virgin fiber.  And the BJ's

21   is regenerated fiber, reprocessed fiber.

22       Q.   And why does the Costco use virgin fiber?

23       A.   Costco insists upon it.

24       Q.   Okay.  Is there any difference in the weight --

25   the amount of fill by weight used in the Costco 42-inch

# EXHIBIT 4

## EXPERT REPORT OF SUZANNE FESSLER
### RE: INFRINGEMENT ISSUES FOR U.S. PATENT NO. 5,765,502

### I.

### INTRODUCTION

I have been retained by the law firms of Sheppard, Mullin, Richter & Hampton LLP and Locke, Liddell & Sapp LLP to serve as an expert witness on behalf of Dallas Manufacturing Company, Inc., Doskocil Manufacturing Company, Inc., and BJ's Wholesale Club, Inc. I have been asked as an expert witness to analyze the disclosure and prosecution history of U.S. Patent No. 5,765,502 ("the '502 patent") and address issues relating to infringement or non-infringement of the '502 patent by certain pet beds sold by Dallas Manufacturing, Doskocil, and BJ's Wholesale Club. I am informed that the '502 patent is assigned to Flexi-Mat Corporation, as shown on the face of the patent. I have no past or present affiliation with any of these entities or with anyone associated with them to the best of my knowledge.

This report discusses the '502 patent and whether the inventions set forth in claims 1-3 of the '502 patent are infringed by seven specific beds sold by Dallas Manufacturing, Doskocil, and BJ's Wholesale Club. I understand that claims 1-3 are the only claims of the '502 patent that Flexi-Mat asserts are infringed by pet beds sold by Dallas Manufacturing, Doskocil, and BJ's Wholesale Club. In this report, I will refer to these claims and pet beds as the "asserted claims" and the "accused pet beds," respectively. All issues relating to whether the accused pet beds infringe the asserted claims will be addressed in this report. I conclude that none of the accused pet beds infringe any of claims 1-3 of the '502 patent.

-1-

FM Infr. Ex. 4

# II.

## LEGAL STANDARDS

I am informed that the legal analysis of patent infringement involves two steps; first, the claims at issue must be construed; and second, the claims as construed are compared to the accused products. Claims are construed as a matter of law by assigning the ordinary and customary meaning of each term as would be understood by one of ordinary skill in the art. The claims are construed in view of the written specification, the drawings, and the prosecution history.

### Level of Ordinary Skill

The law regarding level of ordinary skill is discussed in my expert report concerning validity issues for the '502 patent, which is incorporated by reference.

### Claim Interpretation

The law regarding claim interpretation is discussed in my expert report concerning validity issues for the '502 patent, which is incorporated by reference.

### Infringement

I am informed that the second step of the infringement analysis is as follows: Once the claim language is interpreted, the accused product is compared to the claims to determine infringement. There are two types of infringement: literal infringement and infringement under the doctrine of equivalents.

I am informed that literal infringement of a claim requires that the accused device or process include each element of the claim exactly as claimed. For claim

elements in the "means-plus-function" format, the structures in the accused product must perform the identical function specified in the claim and the structures must be the same as or equivalent to the corresponding structures in the patent specification.

I am informed that if a claim element is not found directly in the accused product, infringement may still be established under the doctrine of equivalents if the accused product has a structure that is equivalent to the claim element. The structure of the accused product is equivalent to the claim element if the differences are insubstantial. Equivalence may be established under the doctrine of equivalents by showing that the structure of the accused product performs substantially the same function, in substantially the same way, to produce the same result as the claim element of the patented invention.

I am informed that the doctrine of equivalents is tempered by the doctrine of prosecution history estoppel. This estoppel potentially arises from amendment or cancellation of claims and arguments or representations made to the United States Patent and Trademark Office before the application issued as a patent. Where the applicant surrendered an equivalent product or process during prosecution history, the patentee is estopped from asserting infringement based on that equivalence.

I am informed that each claim is a definition of the invention. When the claim is stated as a full self-contained sentence without reference to elements stated elsewhere, the claim is "independent." When a claim expressly refers to another claim, the claim is "dependent." The dependent claim includes and requires all the elements recited in the claim itself as well as all the elements of the independent claim and any

intervening claims from which it depends.  As such, a dependent claim cannot be

infringed unless the claim from which it depends is infringed.

### III.

### PERSON OF ORDINARY SKILL IN THE ART FOR THE '502 PATENT

My opinions regarding a person of ordinary skill in the art for the '502

patent are discussed in my expert report concerning validity issues for the '502 patent,

which is incorporated by reference.

### IV.

### CLAIMS 1-3 OF U.S. PATENT NO. 5,765,502

Claims 1-3 of the '502 patent read as follows:

1.  A pet bed comprising:

an outer covering;

a removable cushion disposed within the outer
covering to form a cushioned bottom portion;
and

a bolster removably disposed within the interior of
the outer covering and substantially all of said
bolster disposed exteriorly about at least a
portion of the perimeter of the bottom portion
without being secured to the removable cushion.

2.  The pet bed of claim 1, wherein the outer
covering further includes a reclosable access
opening.

3.  The pet bed of claim 2, wherein the reclosable
access opening further includes a zipper.

('502 patent, col. 3, lines 37-46.)

## V.

## CLAIM CONSTRUCTION ISSUES

I understand that it is the Court that construes the claims of the patent. I understand that the Court first looks at the claims, specification, and prosecution history of the patent to construe the claims, and then considers extrinsic evidence if the claims remain ambiguous. Based on my reading of the patent claims, specification, prosecution history, and relevant extrinsic evidence, my understanding of the '502 patent is as follows:

A.    "[D]isposed within the interior of the outer covering."

I believe that this limitation, and in particular the reference to "the interior" in the singular, would indicate to one of ordinary skill that the claimed pet bed has just one interior space. In other words, the limitation does not read on an outer covering with multiple interior spaces or compartments that are walled off from one another. The claim would be indefinite if it allowed for multiple interior spaces, because then it would be unclear in which "interior" the bolster is disposed.

Moreover, each of the embodiments disclosed in the '502 specification shows just one interior space. The text of the specification also discloses just one access opening. (See '502 patent, col. 3, lines 9-14 ("[T]he bolster 6 is easily removable by the simple expedient of unzipping the zipper 7 on the bottom of the pet bed 1, disengaging the straps 8, and withdrawing the bolster through the reclosable access opening 11 that is sealed by the zipper 7. The bottom cushion 4 can also be withdrawn in the same way.").)

Furthermore, the prosecution history for the '502 patent indicates that there is only one interior space. The prosecution history shows that the '502 patent was allowed following an amendment after the first office action. In the office action, the examiner rejected claims 1-3 as anticipated by U.S. Patent No. 5,010,843 to Beth Henry (the "Henry patent").

The Henry patent discloses a pet bed comprising "a pair of semi-circular cushions connected along their circumferential perimeters to a circular cushion having substantially the same radius as the semi-circular cushions." (Henry patent, Abstract.) Figure 5 of the Henry patent resembles the accused beds, except that it has two cushions or bolsters atop the bottom circular cushion instead of one. In the figure, **12** is a circular base cushion and **14** and **16** are top cushions. In rejecting claims 1-3 of the '502 patent, the examiner cited the embodiment in Figure 5 of the Henry patent with the two bolster cushions.

In response to the examiner's rejection, Flexi-Mat amended the bolster element of claim 1 as follows:

> . . . a bolster removably [affixed] disposed within the interior of the outer covering and disposed about at least a portion of the perimeter of the bottom portion without being secured to the removable cushion.

Underlined words were added, while words in brackets were deleted. In its remarks accompanying the amendment, Flexi-Mat distinguished the Henry patent on the grounds that:

> Henry suggests individual liners for each cushion and requires covers for the semi-circular cushions 14, 16 which

-6-

are separate from the cover for the base cushion. See Col. 2, lines 44-50. These separate liners and covers add manufacturing cost for material and assembly time. In addition, Henry has a concern for exposed connections between the semi-circular cushions and the base cushion, which is not a concern with the present invention because a single cover encompasses both cushions. Henry does not suggest a single cover for all of the cushions, and it would be difficult to design such a cover and assemble such a bed using the interconnected cushions of Henry.

In short, the '502 patent can't include beds with separate covers (or separate interior spaces) for the bolster and bottom cushion.

I am informed that explicit statements made by a patent applicant during prosecution to distinguish a claimed invention over prior art may serve to narrow the scope of a claim. Because Flexi-Mat distinguished its invention over the Henry patent on the ground that "a single cover encompasses both cushions," the word "interior" should be construed to mean the one compartment or space formed by a single covering.

I am also informed that arguments made during prosecution may give rise to what is known as "prosecution history estoppel" if they show a surrender of subject matter. Because Flexi-Mat distinguished the Henry patent's two-cover design, I understand that Flexi-Mat may not argue that two coverings are equivalent to one covering under the doctrine of equivalents.

Furthermore, if a person were to construe the limitation "disposed within the interior of the outer covering" as allowing for two interior spaces, claim 1 would be invalid for the reasons discussed in my expert report regarding validity issues for the '502 patent.

-7-

B.    "[S]ubstantially all of said bolster disposed exteriorly about at least a portion of the perimeter of the bottom portion."

I believe that this limitation would indicate to one of ordinary skill that substantially all of the bolster is disposed on the sides of or surrounding the perimeter of the bottom portion. *See* THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th Ed. 2000).[1]  A significant amount of the bolster cannot be on top of the bottom cushion because then it would be within the perimeter of the cushion.

This construction is supported by the definition of "exterior" as meaning "outer" or "external." *See* THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th Ed. 2000).[2]  Thus, substantially all of the bolster must be disposed externally about or outside at least a portion of the perimeter of the bottom portion, which is inconsistent with the bolster being on top of the bottom portion.  A significant amount

---

[1] The American Heritage Dictionary of the English Language defines the preposition "about" as follows:

1. On all sides of; surrounding: *I found an English garden all about me.*
2. In the vicinity of; around: *explored the rivers and streams about the estate.*
3. Almost the same as; close to; near.
4.
   a. In reference to; relating to; concerned with: *a book about snakes.*
   b. In the act or process of: *While you're about it, please clean your room.*
5. In the possession or innate character of: *Keep your wits about you.*

THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th Ed. 2000), available at http://www.yourdictionary.com/ahd/a/a0021300.html.

[2] The American Heritage Dictionary of the English Language defines the adjective "exterior" as follows:

1. Outer; external: *the exterior door.*
2. Originating or acting from the outside: *exterior influences on the negotiations.*
3. Suitable for use outside: *an exterior paint.*

THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th Ed. 2000), available at http://www.yourdictionary.com/ahd/e/e0296200.html.

of the bolster cannot be on top of the bottom cushion because then it would be disposed

internally within or inside the perimeter of the cushion.

Moreover, each of the embodiments disclosed in the '502 patent

specification shows the bolster on the sides of or surrounding the perimeter of the bottom

cushion, not on top of the cushion.

Furthermore, the prosecution history for the '502 patent indicates that the

bolster must be on the sides of or surrounding the perimeter of the bottom cushion, not on

top of the cushion.  After Flexi-Mat amended the bolster element of claim 1, as discussed

above, the examiner held a telephone interview with Flexi-Mat's patent attorney.

According to the Interview Summary, "[a]dditional language was discussed to insure that

claim 1 read over the prior art patent to Henry."  As a result, claim 1 was amended as

follows:

> . . . a bolster removably disposed within the interior of the
> outer covering and <u>substantially all of said bolster</u> disposed
> <u>exteriorly</u> about at least a portion of the perimeter of the
> bottom portion without being secured to the removable
> cushion.

The examiner released Flexi-Mat from having to provide a record of the interview.  After

the amendment, claims 1 through 11 were allowed.

The Henry patent shows the top cushions or bolsters atop the bottom

circular cushion, not on the sides of or surrounding the bottom cushion.  Thus, the words

"substantially all of said bolster" and "exteriorly" must have been added to ensure that

claim 1 did not read on a bed in which a significant amount of the bolster was on top of

the bottom cushion.  Because Flexi-Mat added these words to distinguish its invention

over the Henry patent, these words should be construed to read on only a bed in which substantially all of the bolster is disposed on the sides of or surrounding the perimeter of the bottom portion.

Moreover, I believe that Flexi-Mat may not argue that claim 1 encompasses a pet bed in which the bolster is attached to the top of the bottom cushion, but a significant amount of the bolster flops over the perimeter of the bottom portion. First, the specification of the Henry patent states that "the top cushions can extend beyond the edges of the base cushion 12." (Henry patent, col. 3, lines 18-19.) Thus, in order to distinguish over Henry, the words "substantially all of said bolster" and "exteriorly" should be construed not to read on a bed in which the bolster flops over the perimeter of the bottom cushion.

Second, the Henry specification states that the cushions may be "filled with any suitable cushion material, for example, layers of plastic foam or resilient foam particles, semi-rigid or rigid beading, cloth filler, and the like." (Henry patent, col. 2, lines 44-47.) A bed filled with foam, beads, or cloth can be deformed, fluffed, or plumped up so that its shape changes. Hence, it was foreseeable that someone might design a pet bed in which the bolster is attached to the top of the bottom cushion, but a significant amount of the bolster flops over the perimeter of the bottom portion. Flexi-Mat has given away the right to claim this subject matter.

Third, I believe it would render claim 1 indefinite if infringement depended on how the bed was deformed or distorted during use. A bed filled with foam, beads, or cloth is inherently malleable and pliable. If infringement depends on how the

-10-

bed happens to be used, then a bed could be infringing at one moment and non-infringing the next.

Fourth, the '502 bolster must be disposed on the ground about the perimeter of the bottom cushion, and not on top, because the '502 specification won't allow it any other way. The specification states, "Since the bolster **6** is more cylindrical or banana-shaped than flat, and more like a pillow than a wall, the bolster **6** tends to retain its shape even when used as a pillow by the pet, and does not easily collapse from the weight of the pet as in some prior art products." ('502 patent, col. 2, lines 56-60; *see also* '502 patent, col. 1, lines 24-26 (discussing prior art beds: "The wall tends to collapse under the weight of heavier animals unless it is made of material so rigid that it is uncomfortable for lighter animals.").) In my opinion, a pet bed in which the bolster flops or collapses over the perimeter of the bottom portion can't infringe claim 1 of the '502 patent because the specification admits that such a bed is part of the prior art.

Finally, construing claim 1 to encompass a floppy, top-attached bolster would render the '502 patent invalid for the reasons discussed in my expert report regarding validity issues for the '502 patent.

**C.     Means-plus-function issues.**

Claim 1 of the '502 patent does not set forth any structure for holding the bolster in place so that it is "disposed exteriorly about at least a portion of the perimeter of the bottom portion without being secured to the removable cushion." Claim 1 fails to state how the patented pet bed ensures that the bolster remains disposed beside the bottom cushion, as required by the claim.

-11-

On looking at the pictures in the patent and reviewing the patent embodiments, it is clear that the inventor intended to secure the bolster to the outer covering with a series of straps and/or fasteners. The '502 patent states:

> The bolster is held in place by a plurality of fasteners or straps 8. The straps 8 are preferably the well-known hook-and-loop fasteners, such as Velcro®, although other fasteners, such as ties or straps with snaps or buckles, would perform adequately in this application. The fasteners are sewn or otherwise secured to the interior of the bolster pocket 10 and the outer covering 2.

('502 patent, col. 2, lines 61-67.)

Without the fasteners or straps 8, it is my opinion that the bolster would be loosely floating within the outer covering. The bolster could move around within the outer covering so that it would be no longer "disposed exteriorly about at least a portion of the perimeter of the bottom portion." The fasteners or straps 8 are the only means disclosed in the patent to keep the bolster in the required position with respect to the bottom cushion.

In my opinion, claim 1 requires the pet bed to perform the function of keeping the bolster "disposed exteriorly about at least a portion of the perimeter of the bottom portion," but fails disclose or explain how this is done or accomplished. This is because claim 1 does not disclose any straps, fasteners, or other means for keeping the bolster in place.

I am informed that, when a claim element is expressed in terms of a function performed without reciting structure or acts to do so, the claim element is called a "means-plus-function" element and covers the structure disclosed in the specification

-12-

that performs the function, which is defined in the claim, and structures equivalent to those disclosed structures. As written, claim 1 of the '502 patent does not disclose the structure for keeping the bolster "disposed exteriorly about at least a portion of the perimeter of the bottom portion without being secured to the removable cushion." On looking at the pictures and reviewing the patent embodiments, it becomes clear that the inventor intended to secure the bolster in place with a series of straps and fasteners.

Straps and fasteners are the only structures disclosed in the '502 patent for holding the bolster in place so that it is "disposed exteriorly about at least a portion of the perimeter of the bottom portion without being secured to the removable cushion." Specifically, the '502 patent states, "The bolster is held in place by a plurality of fasteners or straps 8. The straps 8 are preferably the well-known hook-and-loop fasteners, such as Velcro®, although other fasteners, such as ties or straps with snaps or buckles, would perform adequately in this application." ('502 patent, col. 2, lines 62-65.) The '502 patent requires the straps 8 to hold the bolster in place within the outer covering; otherwise, the bolster would move, meander, wander, and/or float out of position.

## VI.

## NON-INFRINGEMENT ISSUES

**A.    Dallas Manufacturing Bolster Pet Bed Sold at BJ's Wholesale Club, Deposition Exhibit No. 2B ("BJ's Bed by Dallas Manufacturing")**

## Claim 1

The bolster of the BJ's bed by Dallas Manufacturing is not "disposed within the interior of the outer covering," as that phrase must be construed under the '502 patent specification and prosecution history. Also, "substantially all of said bolster" is

-13-

not "disposed exteriorly about at least a portion of the perimeter of the bottom portion," as those phrases must be construed under the intrinsic evidence.

*"[D]isposed within the interior of the outer covering"*: The bolster of the BJ's bed by Dallas Manufacturing has a covering that is separate from the bottom cushion. In other words, the bed has two coverings, and the bolster is situated in its own separate compartment. The bolster is completely partitioned off from the bottom cushion. The two coverings are sewn together, but sewing does not turn two coverings into one, as Flexi-Mat's remarks concerning the Henry patent show. The construction of the BJ's bed by Dallas Manufacturing is completely different than the one piece outer covering disclosed in the '502 patent.

As discussed above, claim 1 refers to one interior of one outer covering in which both the bottom cushion and bolster are disposed. The BJ's bed by Dallas Manufacturing cannot literally infringe this claim because it has two interiors and two outer coverings, one for the bottom cushion and one for the bolster. The bed cannot infringe under the doctrine of equivalents because Flexi-Mat surrendered the subject matter of a two-covering, two-interior bed during prosecution.

*"[S]ubstantially all of said bolster disposed exteriorly about at least a portion of the perimeter of the bottom portion"*: The bolster of the BJ's bed by Dallas Manufacturing is set on top of the bottom cushion and is not "disposed exteriorly about the perimeter." The bed is designed and constructed to have the bolster on top of the bottom cushion by use of a side fabric gusset. By virtue of the fabric gusset, the bolster cannot slide down to the side or over the perimeter of the bottom cushion. Although a

-14-

person or pet could push the bolster so that part of it leans over the side of the bottom cushion, at no time does substantially all of the bolster lean over the side of the bottom cushion. One benefit of the top-situated bolster on the BJ's bed by Dallas Manufacturing is that it gives more protection for the pet, by insuring that the pet's body is not making contact with the floor or other hard surface under the pet bed. For all these reasons, the BJ's bed by Dallas Manufacturing does not infringe claim 1 of the '502 patent either literally or under the doctrine of equivalents.

In preparing this expert report, I examined a BJ's bed by Dallas Manufacturing that did not have the covering for the bolster cushion sewn onto the covering for the bottom cushion. Photographs of this bed are attached to this expert report as Exhibit A. A black line was drawn on top of the covering for the bottom cushion where the bolster covering would normally be sewn on. This bed further confirms that the bolster of the BJ's bed by Dallas Manufacturing is set on top of the bottom cushion and is <u>not</u> "disposed exteriorly about the perimeter."

***Lack of straps, fasteners or equivalent structure***: The BJ's bed by Dallas Manufacturing has no straps, fasteners, or equivalent structure for holding the bolster in place so that it is "disposed exteriorly about at least a portion of the perimeter of the bottom portion without being secured to the removable cushion." For this additional reason, the bed does not infringe claim 1 of the '502 patent either literally or under the doctrine of equivalents.

-15-

**Claim 2**

I am informed that there can be no infringement of a dependent claim unless the corresponding independent claim is infringed. Because the BJ's bed by Dallas Manufacturing does not infringe claim 1 of the '502 patent, it also does not infringe claim 2 of the '502 patent.

**Claim 3**

Because the BJ's bed by Dallas Manufacturing does not infringe claims 1 and 2 of the '502 patent, it also does not infringe claim 3 of the '502 patent.

**B.    Dallas Manufacturing Bolster Pet Bed Sold by Bass Pro, Deposition Exhibit No. 2E ("Bass Pro Bed")**

The Bass Pro bed appears to have the same construction as the BJ's bed by Dallas Manufacturing. The only difference appears to be that the Bass Pro bed is missing the "Berkeley & Jensen" embroidery. This difference is not relevant to the '502 patent. For the same reasons that the BJ's bed by Dallas Manufacturing does not infringe claims 1-3 of the '502 patent, the Bass Pro bed does not infringe claims 1-3 of the '502 patent either literally or under the doctrine of equivalents.

**C.    Dallas Manufacturing Bolster Pet Bed Sold at Sam's Club, Deposition Exhibit No. 2D ("Sam's Club Bed")**

The Sam's Club bed appears to have the same construction as the BJ's bed by Dallas Manufacturing. The only differences appear to be that the Sam's Club bed is missing the "Berkeley & Jensen" embroidery. Also, the Sam's Club bed has a different fabric than the BJ's bed by Dallas Manufacturing. These differences are not relevant to the '502 patent. For the same reasons that the BJ's bed by Dallas Manufacturing does not

-16-

infringe claims 1-3 of the '502 patent, the Sam's Club bed does not infringe claims 1-3 of the '502 patent either literally or under the doctrine of equivalents.

**D.    Dallas Manufacturing Bolster Pet Bed Sold at Big Lots, Deposition Exhibit No. 2C ("Big Lots Bed")**

The Big Lots bed appears to have the same construction as the BJ's bed by Dallas Manufacturing, except that the Big Lots bed is proportionately smaller. The only other difference appears to be that the Big Lots bed is missing the "Berkeley & Jensen" embroidery. These differences are not relevant to the '502 patent. In particular, although a person or pet could push the bolster of the Big Lots bed so that part of it leans over the side of the bottom cushion, at no time does substantially all of the bolster lean over the side of the bottom cushion. For the same reasons that the BJ's bed by Dallas Manufacturing does not infringe claims 1-3 of the '502 patent, the Big Lots bed does not infringe claims 1-3 of the '502 patent either literally or under the doctrine of equivalents.

Drawings that accurately depict the BJ's bed by Dallas Manufacturing, Bass Pro bed, Sam's Club bed, and Big Lots bed are attached to this expert report as Exhibit B. Figure 1 is a top plan view of any of these beds. Figure 2 is a perspective view of any of these beds. Figure 3 is a bottom plan view of any of these beds. Figure 4 is a bottom view of any of these beds, with a portion of the covering for the bottom cushion cut away. Figure 5 is an exploded view of any of these beds. Figure 6 is a front view of any of these beds. Figure 7 is a right side view of any of these beds. Figure 8 is a left side view of any of these beds.

-17-

E.     **Dallas Manufacturing Bolster Pet Bed Sold at Costco, Deposition Exhibit No. 2F ("Costco Bed")**

The Costco bed appears to have mostly the same construction as the BJ's bed by Dallas Manufacturing. One difference appears to be that the Costco bed is missing the "Berkeley & Jensen" embroidery. Also, the Costco bed has a different fabric than the BJ's bed by Dallas Manufacturing.

The Costco bed also has an inside zipper opening that allows for removal of the top bolster from its separate enclosure. This zipper can be reached only after opening the zipper to the compartment for the bottom cushion. Because the inside zipper opening sections off the bolster compartment, the bolster of the Costco bed is enclosed in a covering that is separate from the bottom cushion. The bolster is completely partitioned off from the bottom cushion. The coverings for the bottom cushion compartment and bolster compartment are sewn together, but again sewing does not turn two coverings into one, as Flexi-Mat's remarks concerning the Henry patent show.

Claim 1 refers to one interior of one outer covering in which both the bottom cushion and bolster are disposed. The Costco bed cannot literally infringe this claim because it has two interiors and two outer coverings, one for the bottom cushion and one for the bolster. The bed cannot infringe under the doctrine of equivalents because Flexi-Mat surrendered the subject matter of a two-covering, two-interior bed during prosecution.

The bolster for the Costco bed is set on top of the bottom cushion and is not "disposed exteriorly about the perimeter." The bed also has no straps, fasteners, or equivalent structure for holding the bolster in place so that it is "disposed exteriorly about

-18-

at least a portion of the perimeter of the bottom portion without being secured to the removable cushion." Thus, for the same reasons that the BJ's bed by Dallas Manufacturing does not infringe claims 1-3 of the '502 patent, the Costco bed does not infringe claims 1-3 of the '502 patent either literally or under the doctrine of equivalents.

The drawings in Exhibit B accurately depict the Costco bed, except for the zipper attached to the bolster covering in Figures 2-5, 7, and 8.

**F.    Doskocil Bolster Pet Bed Sold at BJ's Wholesale Club ("Doskocil Bed")**

The Doskocil bed appears to have a somewhat different construction than the BJ's bed by Dallas Manufacturing. This construction also does not infringe claims 1-3 of the '502 patent either literally or under the doctrine of equivalents.

*"[D]isposed within the interior of the outer covering"*: The bolster of the Doskocil bed has a covering that is separate from the bottom cushion. In other words, the bed has two coverings, and the bolster is situated in its own separate compartment. This separate fabric covering is attached to the bottom cushion covering along the knife seam edge of the bottom cushion covering. The bolster is completely partitioned off from the bottom cushion. The two coverings are sewn together, but sewing does not turn two coverings into one, as Flexi-Mat's remarks concerning the Henry patent show. The construction of the Doskocil bed is completely different than the one piece outer covering disclosed in the '502 patent.

As discussed above, claim 1 refers to one interior of one outer covering in which both the bottom cushion and bolster are disposed. The Doskocil bed cannot literally infringe this claim because it has two interiors and two outer coverings, one for

-19-

the bottom cushion and one for the bolster. The bed cannot infringe under the doctrine of equivalents because Flexi-Mat surrendered the subject matter of a two-covering, two-interior bed during prosecution.

*Lack of straps, fasteners or equivalent structure*: The Doskocil bed has no straps, fasteners, or equivalent structure for holding the bolster in place so that it is "disposed exteriorly about at least a portion of the perimeter of the bottom portion without being secured to the removable cushion." For this additional reason, the bed does not infringe claim 1 of the '502 patent either literally or under the doctrine of equivalents.

### Claim 2

I am informed that there can be no infringement of a dependent claim unless the corresponding independent claim is infringed. Because the Doskocil bed does not infringe claim 1 of the '502 patent, it also does not infringe claim 2 of the '502 patent.

### Claim 3

Because the Doskocil bed does not infringe claims 1 and 2 of the '502 patent, it also does not infringe claim 3 of the '502 patent.

**G.    Doskocil Bolster Pet Bed, SKU no. 27251 ("Smaller Doskocil Bed")**

The Smaller Doskocil Bed appears to have the same basic construction as the Doskocil Bed. The only differences appear to be the respective amounts of fabric and the respective locations of the zipper for the bolster cover. These differences are not relevant to the '502 patent. For the same reason that the Doskocil Bed does not infringe

-20-

claims 1-3 of the '502 patent, the Smaller Doskocil Bed does not infringe claims 1-3 of the '502 patent either literally or under the doctrine of equivalents.

## VIII.

## QUALIFICATIONS AND PUBLICATIONS

I own my own patternmaking, consulting and design business in Los Angeles. My qualifications, as well as a list of my publications, are set forth in my curriculum vitae, which is attached as Exhibit A to my expert report regarding validity issues for the '502 patent.

## VIII.

## COMPENSATION

I am being compensated at my normal rate of $250-$275 per hour, depending on services rendered. My compensation does not depend in any way upon the outcome of this litigation.

## IX.

## PREVIOUS TESTIMONY

My expert witness testimony experience/history is set forth in my curriculum vitae, which is attached as Exhibit A to my expert report regarding validity issues for the '502 patent.

## X.

## RESERVATION OF RIGHTS

I reserve the right to amend and/or supplement this report as appropriate after reviewing further documents or information available after the date of execution of this report. Furthermore, I may study additional materials, documentation and testimony as it becomes available during the discovery process. I may also provide graphic materials.

## XI.

## DEMONSTRATIVE EXHIBITS

If called to testify at trial, I may prepare demonstrative exhibits, such as charts, graphs, patterns, and models, to further explain my opinions.

## XII.

## INFORMATION CONSIDERED

I have considered the following materials in reaching the opinions set forth is this report: All patents, publications, and pet beds cited in this report, as well as the prosecution history for the '502 patent, parts of the transcript of the deposition of Jesus Benavides, and Simon Handelsman's Expert Report on Infringement.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 2/, 2005, at Los Angeles, California.

SUZANNE D. FESSLER

-22-

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon Plaintiff's counsel, William Meunier, Esq. Goodwin Procter LLP, Exchange Place, Boston, Massachusetts 02109, and Larry L. Saret, Esq., Michael, Best & Friedrich LLP, 401 N. Michigan Avenue, Suite 1900, Chicago, Illinois 60611, via first class mail, postage pre-paid, on October 21, 2005.

I hereby certify that a true copy of the above document was also served upon counsel for Defendant Doskocil Manufacturing Company, Inc., Roy W. Hardin, Esq., Locke Liddell & Sapp LLP, 2200 Ross Avenue, Suite 2200, Dallas, Texas 75201-6776, via first class mail, postage pre-paid, on October 21, 2005.

Darren M. Franklin











1/3



FIG. 1

FIG. 2

FIG. 3

2/3



FIG. 4

FIG. 5

3/3



**FIG. 6**



**FIG. 7**



**FIG. 8**

# EXHIBIT 5

# United States Patent [19]

## Henry

[11] **Patent Number:** 5,010,843

[45] **Date of Patent:** Apr. 30, 1991

[54] **PET BED**

[76] Inventor: Beth Henry, La Tierra Nueva, 1063 Buckman Rd., Santa Fe, N. Mex. 87501

[21] Appl. No.: 438,163

[22] Filed: Nov. 16, 1989

[51] Int. Cl.⁵ .................................................. A01K 1/035
[52] U.S. Cl. ...................................... 119/28.5; 5/462
[58] Field of Search ................... 119/1, 19, 29; 5/419, 5/420, 437, 442, 462, 463, 434, 435, 436

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,569,712 | 1/1926 | Burt | 119/1 |
| 2,032,248 | 2/1936 | Bins | 119/1 |
| 2,167,622 | 8/1939 | Bentivoglio | 5/338 |
| 2,775,222 | 12/1956 | Kruck | 119/1 |
| 2,952,856 | 9/1960 | Ruff | 5/437 |
| 3,842,454 | 10/1974 | Young | 5/343 |
| 3,902,456 | 9/1975 | David | 119/1 |
| 3,911,512 | 10/1975 | Plate | 5/465 |
| 3,989,008 | 11/1976 | Neumann | 119/1 |
| 4,008,687 | 2/1977 | Keys | 119/1 |
| 4,242,767 | 1/1981 | McMallen et al. | 5/437 X |
| 4,259,757 | 4/1981 | Watson | 5/434 |
| 4,393,530 | 7/1983 | Stark | 5/437 |
| 4,742,799 | 5/1988 | Schlitz | 119/29 |

### FOREIGN PATENT DOCUMENTS

0117406  2/1901  Fed. Rep. of Germany .......... 5/437

*Primary Examiner*—Robert P. Swiatek
*Assistant Examiner*—Todd E. Manahan
*Attorney, Agent, or Firm*—Darby & Darby

[57] **ABSTRACT**

A pet bed comprises a pair of semi-circular cushions connected along their circumferential perimeters to a circular cushion having substantially the same radius as the semi-circular cushions. The opposed diametral edges of the semi-circular cushions are unattached leaving a trough between them. A pocket is formed between the adjacent surfaces of the semi-circular and circular cushions whereby a pet may crawl into the pocket for resting and sleeping or may lie in the trough surrounded on two sides by the diametral edges of the semi-circular cushions.

12 Claims, 2 Drawing Sheets





FIG.1

FIG. 2



5,010,843

1

## PET BED

### FIELD OF THE INVENTION

This invention relates generally to a bed for a pet and more particularly to a combination of cushions providing a number of resting options for the pet.

### BACKGROUND OF THE INVENTION

In many instances a household pet is considered as a family member. As such, the pet is deserving of comfortable accommodations, especially for sleeping. A dog bed of the prior art may comprise a lying down surface which is surrounded, with the exception of an entrance opening, with low vertical wall sections. The dog may lie in the center of the bed and frequently the dog attempts to snuggle into the corners of the wall. Dogs seem to have an instinct to withdraw into recesses and trough-like depressions. Cats also seek out environments where they are enclosed or at least partially surrounded, with their head exposed, or sometimes concealed. However, the prior art beds offer the pet few, if any, options in the manner of using the pet bed.

### OBJECTS OF THE INVENTION

Accordingly, it is an object of this invention to provide an improved pet bed which gives the pet options for comfortable rest.

Another object of this invention is to provide an improved pet bed which allows for easy cleaning and maintenance.

Yet another object of this invention is to provide an improved pet bed which caters to the instinctive, protective traits of dogs and cats.

In accordance with a preferred embodiment of the invention, a pet bed is provided which is especially suited to accommodate several pet preferences in sleeping and resting. A pair of semi-circular cushions connect along their circumferential perimeters to a circular cushion having substantially the same radius as the semi-circular cushions. The opposed diametral edges of the semi-circular cushions are unattached leaving a trough or slot between them. A pocket is formed between the adjacent surfaces of the semi-circular and circular cushions whereby a pet, for example, a dog or cat, may crawl into the pocket for resting and sleeping or may lie in the trough surrounded on two sides by the diametral edges of the semi-circular cushions. Whether in one of the pockets or in the trough, the animal may keep its head exposed to the ambient air. The cushions are fabricated of a flexible material, for example, cloth covers which may be treated to resist staining. The cushions are filled by opening longitudinal zippers provided in each cushion. The semi-circular cushions are attached to the circular cushion by means of stitching, zippers, snaps, materials that releasably adhere when pressed together, and the like. The seams are turned under to prevent the pet from pulling them apart.

Further objects and advantages of the invention will be apparent from the specification and drawings. The invention accordingly comprises the features of construction, combinations of elements, and arrangement of parts which will be exemplified in the constructions hereinafter set forth and the scope of the invention will be indicated in the appended claims.

2

### BRIEF DESCRIPTION OF THE DRAWINGS

For a fuller understanding of the invention, reference is had to the following description taken in connection with the accompanying drawings, in which:

FIG. 1 is a top perspective view of a pet bed in accordance with the invention;

FIG. 2 is a sectional view taken along the line 2—2 of FIG. 1;

FIG. 3 is a top view of the bed of FIG. 1; and

FIGS. 4–6 are top views of alternative embodiments of pet beds in accordance with the invention.

### DESCRIPTION OF THE PREFERRED EMBODIMENTS

With reference to the figures, a pet bed in accordance with the invention includes a circular base cushion 12 and a pair of semi-circular top cushions 14, 16 which rest upon the base cushion 12. The semi-circular edges 18, 20 of the top cushions are coincident with the circular top edge 22 of the base cushion 12. The circumferential edges 18, 20, 22 are joined together by any suitable means in a permanent or releasable fashion, for example, by stitching, zippers, snaps, hook and loop materials that releasably adhere when pressed together, such as VELCRO (registered trademark of VELCRO Industries, Curacao), and the like, to attach the top cushions to the base cushion.

The diametral edges 24, 26 of the semi-circular cushions 14, 16 are opposed to each other and unattached to the base cushion 12, thereby leaving an opening between the top cushions 14, 16 which is readily and usually inelastically pliable depending upon the filler within the cushions. The edges 24, 26 can be kept close together or partially spread apart to form a generally V-shaped trough 28 or slot.

Because the top cushions 14, 16 are connected to the base cushion 12 only along the outer peripheral edges, pockets 30, 32 exist between the top cushions 14, 16 and the base cushion 12, these pockets extending from the central trough 28 toward the peripheral curved outer edges 18, 20, 22.

The cushions 12, 14, 16 are filled with any suitable cushion material, for example, layers of plastic foam or resilient foam particles, semi-rigid or rigid beading, cloth filler, and the like. To this end, the filler may be contained in its own liner (not shown) which is put into respective covers of the cushions 12, 14, 16 through zipper openings 34, 35, 36, provided in these covers. Thus, the inner filler material may be removed and cleaned as required, and the outer cushion covers may also be cleaned. The cushions, outer surfaces may be any suitable cloth fabric or plastic material and a different covering material may be used for the external surfaces as compared to the inner pocket surfaces. The connections between the top cushions 14, 16 and the base cushion 12 are turned under and the zippers 37, 38, 39 may be concealed to prevent the pets from pulling such joints apart. Also, the base cushion 12, on the surface 33 that contacts the floor or ground, may be of material different from the upper surface of the cushion. The filler material in the base cushion 12 may differ from the filler material in the top cushions 14, 16 to provide different resiliency characteristics, if desired.

In use, a pet can snuggle in the trough 28 as illustrated in FIG. 1; the pet may crawl into either pocket 30, 32, and the pet also may merely lie on top of the semi-circu-

5,010,843

3

lar cushions 14, 16. Thus, the pet has many options in using the pet bed 10 in accordance with this invention.

Cats also find such a device appealing. The cats will lie in the trough 28 or in the pockets 30, 32, or on the top surfaces, just as readily as dogs. Further, the basic size of the bed can be scaled for different dog sizes and for cats.

The outer periphery of the bed need not be limited to a circular shape as illustrated and described, but may be of any shape, for example, square, oval, elliptical, polygonal, etc. The trough 28 need not symmetrically divide the bed. The top cushions, for example, cushions 14, 16, can be complementary segments of the peripheral shape of the base cushion 12, regardless of the base cushion shape, such that the top cushions on opposite sides of the trough are of unequal size. Also, in other alternative embodiments in accordance with the invention, the top cushions need not entirely cover the base cushion, and conversely, the top cushions can extend beyond the edges of the base cushion 12. Also, the base cushion 12 may be replaced merely by a pad (not shown) which does not have removable fillers or a zippered cover. Further, in another alternative embodiment in accordance with the invention, one top cushion may be attached to the base cushion around the entire periphery of the top cushion such that the pet bed in accordance with the invention has only one pocket and a trough.

Nevertheless, in each of these embodiments in accordance with the invention a trough and at least one pocket is provided, with entrance to the pocket from the trough, such that the pet has the option of lying in the trough, crawling and resting at least partially within the pocket, or resting on the top surface of the top cushions.

Further, in alternative embodiments of a pet bed in accordance with the invention, the pockets as shown in FIGS. 1-3 may be omitted. That is, the diametral edges of the top cushions 14, 16 are attached to the base 12. Because the cushions are substantially pliable and inelastic, a trough 28 is still provided between the top cushions 14, 16. However, there are no pockets. In such an embodiment, the options for the pet are reduced to resting in the trough or resting on the top surfaces of the cushions 14, 16.

In the bed 10' of FIG. 4 the top cushions 14', 16' are less than semi-circles and the trough 28 between the top cushions flares out at one end of the trough. In FIG. 5, the cushions 14'', 16'' are contoured so as to provide a basically circular enlargement in the trough 28'' at the center of the bed 10''.

FIG. 6 presents an embodiment of a pet bed 10''' in accordance with the invention which is similar to the embodiment of FIG. 4. However, in FIG. 6 entrance to the pockets 30''', 32''' is only at the flared portion of the trough 28'''.

In FIGS. 4-6, the troughs are shown, for clarity in illustration, without deformations in the top cushion inner edges as would occur when a pet has been lying in the trough.

It will thus be seen that the objects set forth above, among those made apparent from the preceding description, are efficiently attained and, since certain changes may be made in the above constructions without departing from the spirit and scope of the invention, it is intended that all matter contained in the above description or shown in the accompanying drawings shall be interpreted as illustrative and not in a limited sense. It is also to be understood that the following claims are intended to cover all of the generic and spe-

4

cific features of the invention herein described and all statements of the scope of the invention which might be said to fall therebetween.

What is claimed:

1. A bed for pet comprising:
a base having a defined area;
a first top cushion having a first edge around the perimeter thereof, said first cushion being positioned on top of said base and covering a first portion of said base area, said first cushion being attached to said base along a major portion of said first edge, a minor portion of said first edge being unattached to said base, said unattached portion being an entrance to a first pocket formed between said first cushion and said base;
a second top cushion having a second edge around the perimeter thereof, said second cushion being positioned on top of said base and covering a second portion of said base area, an attachment being formed between said base and the second edge of said second top cushion, the unattached portion of said first top cushion edge being opposed to said second top cushion, a trough being formed between said cushions, said pocket entrance being within said trough.

2. A bed for a pet as claimed in claim 1, wherein said top cushions are attached to said base by at least one of stitching, zippers, snaps and materials that releasably adhere when pressed together.

3. A bed as claimed in claim 1, wherein a minor portion of the second edge of said second cushion is unattached to said base, said unattached portion of said second edge being an entrance to a second pocket formed between said second cushion and said base, and the unattached edge portions of said top cushions being opposed to each other, such that the entrance to said second pocket is within said trough.

4. A bed as claimed in claim 3, wherein said base is circular and said top cushions are each semi-circular, the diametral portions of said semi-circular cushions being opposed to each other and forming said trough therebetween.

5. A bed as claimed in claim 4, wherein said base is a cushion.

6. A bed as claimed in claim 5, wherein said base and top cushions each include a cover having an opening therethrough and filler therein, and reversible closure means in each cushion for controlling said opening, said filler being removable and insertable into said cushion via said opening.

7. A bed as claimed in claim 6, wherein said closure means is concealed from said pet.

8. A bed as claimed in claim 1, wherein said base is circular and said top cushions are each semi-circular, the diametral portions of said semi-circular cushions being opposed to each other and forming said trough therebetween.

9. A bed as claimed in claim 1, wherein said base is a cushion.

10. A bed as claimed in claim 1, wherein said trough has two ends, said trough being narrow at one end and flared at the other end.

11. A bed as claimed in claim 10, wherein said pocket entrance is at said flared end of said trough.

12. A bed as claimed in claim 1, wherein said trough has two ends, said trough being narrow at both ends and wider for at lest a portion of the trough length between said two ends.

* * * * *