# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

FLEXI-MAT CORPORATION, an Illinois
corporation,

        Plaintiff,

        v.

DALLAS MANUFACTURING COMPANY,
INC., a Texas corporation, BJ'S WHOLESALE
CLUB, INC., a Delaware corporation, and
DOSKOCIL MANUFACTURING
COMPANY, INC., a Texas corporation,

        Defendants.

DALLAS MANUFACTURING COMPANY,
INC., a corporation,

        Counter-Claimant,

        v.

FLEXI-MAT CORPORATION, a corporation,

        Counter-Defendant.

BJ'S WHOLESALE CLUB, INC., a
corporation,

        Counter-Claimant,

        v.

FLEXI-MAT CORPORATION, a corporation,

        Counter-Defendant.

DOSKOCIL MANUFACTURING
COMPANY, INC., a corporation,

        Counter-Claimant,

        v.

FLEXI-MAT CORPORATION, a corporation,

        Counter-Defendant.

Civil Action No. 04 10162 DPW

**DEFENDANT DOSKOCIL
MANUFACTURING COMPANY, INC.'s**

**BRIEF IN SUPPORT
OF MOTION FOR
SUMMARY JUDGMENT
OF INVALIDITY AND
NON-INFRINGEMENT
OF THE '502 PATENT**

# APPENDIX

## APPENDIX TABLE OF CONTENTS

1.    Exhibit A:    Flexi-Mat's First Amended Complaint  ................................ A001 – A008

2.    Exhibit B:    United States Patent No. 5,765,502  ..................................... A009 – A013

3.    Exhibit C:    Prosecution File Wrapper for
United States Patent No. 5,765,502  ..................................... A014 – A072

4.    Exhibit D:    United States Patent No. 2,032,248  ..................................... A073 – A074

5.    Exhibit E:    United States Patent No. 5,010,843  ..................................... A075 – A079

6.    Exhibit F:    German Patent (Gebrauchsmuster) No. 93 09 699.2  ........... A080 – A092

7.    Exhibit G:    Certified English Language Translation of
German Patent (Gebrauchsmuster) No. 93 09 699.2  ........... A093 – A109

8.    Exhibit H:    United States Patent No. 5,109,559  ..................................... A110 – A117

9.    Exhibit I:    United States Patent No. 5,586,350  ..................................... A118 – A124

10.    Exhibit J:    United States Patent No. 5,421,044  ..................................... A125 – A141

11.    Exhibit K:    United States Patent No. 5,588,393  ..................................... A142 – A152

12.    Exhibit L:    United States Patent No. 5,136,981  ..................................... A153 – A177

13.    Exhibit M:    Plaintiff's Motion to File Second Amended Complaint  ...... A178 – A181

14.    Exhibit N:    Flexi-Mat Responses to First Requests for Admission  ........ A182 – A190

15.    Exhibit O:    Flexi-Mat Responses to Second Requests for Admission  ... A191 – A195

16.    Exhibit P:    Excerpts From Deposition of Jesus Benavides  .................... A196 – A197

17.    Exhibit Q:    Declaration of M. Scott Fuller  ............................................. A198 – A199

18.    Exhibit R:    Photographs of Doskocil Accused Bed  ................................ A200 – A203

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS

FLEXI-MAT CORPORATION,
an Illinois corporation,

      Plaintiff,

    v.

DALLAS MANUFACTURING COMPANY,
INC., a Texas corporation, BJ'S
WHOLESALE CLUB, INC., a Delaware
corporation, and DOSKOCIL
MANUFACTURING COMPANY, INC., a
Texas corporation,

      Defendants.

Civil Action No. 04-10162 DPW

**JURY TRIAL DEMANDED**

## FIRST AMENDED COMPLAINT

Plaintiff, Flexi-Mat Corporation ("Flexi-Mat"), by its undersigned attorneys, complains against defendants Dallas Manufacturing Company, Inc. ("Dallas Mfg."), BJ's Wholesale Club, Inc. ("BJWC"), and Doskocil Manufacturing Company, Inc. ("Doskocil") (collectively, the "defendants") as follows:

### NATURE AND STATUTORY BASIS OF ACTION

1.    This civil action arises under the Federal Patent Act, as provided for by 35 U.S.C. §§ 100, *et seq.*

### THE PARTIES

2.    Plaintiff Flexi-Mat is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business at 2244 South Western Ave., Chicago, Illinois 60608. Flexi-Mat makes and sells pet beds and other products.

3.    Upon information and belief, defendant Dallas Mfg. is a corporation duly

organized and existing under the laws of the State of Texas, having its principal place of business at 4215 McEwen Road, Dallas, Texas 75244. Upon information and belief, defendant Dallas Mfg. is an importer and distributor of pet beds and other pet products, and imports and distributes pet beds to defendant BJWC in this district and elsewhere in the United States.

4.    Upon information and belief, defendant BJWC is a corporation duly organized and existing under the laws of the State of Delaware, having its principal place of business at 1 Mercer Road, Natick, Massachusetts 01760-2400. Upon information and belief, defendant BJWC owns and operates warehouse club stores in this district and elsewhere in the United States which offer for sale and sell pet beds and other products. These stores are known as "BJ's Wholesale Club."

5.    Upon information and belief, defendant Doskocil is a corporation duly organized and existing under the laws of the State of Texas, having its principal place of business at 4209 Barnett Blvd., Arlington, Texas 76017. Upon information and belief, Doskocil manufactures, distributes, and sells pet beds and other products to retailers and consumers in this district and elsewhere in the United States and has sold pet beds to BJWC.

## JURISDICTION AND VENUE

6.    Jurisdiction is expressly conferred on this Court under 35 U.S.C. §§ 271 and 281 and 28 U.S.C. §§ 1331 and 1338(a).

7.    Personal jurisdiction over defendants is vested in this Court since, upon information and belief, defendants have committed one or more of the acts complained of herein within the United States and within this state and district pursuant to Mass. Gen. Laws c. 223A ¶3 (2000). In particular, Dallas Mfg. has imported into the United States and sold in this district pet beds to BJWC that infringe the asserted patent, and BJWC has offered to sell and has sold in

2

A002

this district Dallas Mfg.'s infringing pet beds. Doskocil has offered to sell and has sold its pet products and various other products in this state such that its connections with the state are substantial, continuous and systematic. Upon information and belief, Doskocil has also sold pet beds that infringe the asserted patent to BJWC, and BJWC has offered to sell and is selling those pet beds with labels identifying BJWC as the distributor in Natick, Massachusetts.

8.    Venue is proper in the United States District Court for the District of Massachusetts, pursuant to 28 U.S.C. §1391(b) and (c) and 1400(b), because a substantial part of the events or omissions giving rise to the claims herein occurred in this district.

<u>FACTUAL BACKGROUND</u>

9.    United States Letters Patent No. 5,765,502 ("the '502 patent"), entitled "Pet Bed With Removable Bolster," was duly and legally issued by the United States Patent and Trademark Office on June 16, 1998. A true and correct copy of the '502 patent is attached as Exhibit A.

10.    The inventor of the '502 patent, Scott Haugh, assigned to plaintiff Flexi-Mat his entire right, title and interest to this patent. Flexi-Mat owns the entire right, title and interest in and to the '502 patent, including the right to sue and recover damages for infringement.

11.    Upon information and belief, defendant Dallas Mfg. imports into the United States and distributes pet beds which are made substantially as claimed and described in the '502 patent. These pet beds are sold to defendant BJWC, which in turn offers for sale and sells the pet beds under the name "Berkley & Jensen Premium Quality Bolster Pet Bed" to purchasers in this district and elsewhere in the United States. A sample of this pet bed is shown in **Exhibit B** and bears a label identifying **Dallas Mfg.** as the source.

12.    Upon information and belief, defendant Doskocil manufactures, offers to sell and

3

sells pet beds which are made substantially as claimed and described in the '502 patent. These pet beds are sold to defendant BJWC, which in turn offers for sale and sells the pet beds under the name "Berkley & Jensen Premium Quality Bolster Pet Bed" to purchasers in the United States. A sample of this pet bed is shown in **Exhibit C** and bears a label with Doskocil's address.

**COUNT I**
**INFRINGEMENT OF U.S. PATENT NO. 5,765,502 BY DALLAS MFG. AND BJWC**

13.    Plaintiff Flexi-Mat hereby incorporates the allegations of paragraphs 1-12 as if fully set forth herein.

14.    Defendant Dallas Mfg. has infringed and/or has induced others to infringe and/or has committed acts of contributory infringement of one or more claims of the '502 patent. Dallas Mfg.'s infringing activities include, but are not limited to, importing into the United States and selling to BJWC stores in this district and elsewhere in the United States pet beds that are offered for sale and sold under the name "Berkley & Jensen Premium Quality Bolster Pet Bed," as shown in **Exhibit B**. The "Berkley & Jensen Premium Quality Bolster Pet Bed" is made substantially as claimed in the '502 patent.

15.    Defendant BJWC has infringed and/or has induced others to infringe and/or has committed acts of contributory infringement of one or more claims of the '502 patent. BJWC's infringing activities include, but are not limited to, offering for sale and selling pet beds under the name "Berkley & Jensen Premium Quality Bolster Pet Bed," as shown in **Exhibit B**.

16.    Upon information and belief, defendants' infringement of the '502 patent has been willful and deliberate.

17.    The availability of defendants' infringing products has damaged Flexi-Mat in several ways. For example, the patented products sold by Flexi-Mat are no longer exclusively

4

available from Flexi-Mat and instead appear to be commodity products also offered by BJWC and distributed by Dallas. Therefore, Flexi-Mat's patented product is less desirable to customers. The commodity image is emphasized by the fact that the defendants are offering the infringing products at a substantially lower price than Flexi-Mat, and consequently, on information and belief, diverting sales from Flexi-Mat.

18.    As a consequence of the defendants' infringing activities regarding the '502 patent, plaintiff Flexi-Mat has suffered monetary damages and is entitled to an award of monetary damages pursuant to 35 U.S.C. § 284 in an amount yet to be determined.

19.    As a consequence of the defendants' infringing activities regarding the '502 patent, plaintiff Flexi-Mat has suffered and will continue to suffer irreparable harm unless the defendants are enjoined by this Court.

**COUNT II**
**INFRINGEMENT OF U.S. PATENT NO. 5,765,502 BY DOSKOCIL AND BJWC**

20.    Plaintiff Flexi-Mat hereby incorporates the allegations of paragraphs 1-12 as if fully set forth herein.

21.    Defendant Doskocil has infringed and/or has induced others to infringe and/or has committed acts of contributory infringement of one or more claims of the '502 patent. Doskocil's infringing activities include, but are not limited to, making, offering for sale and selling to BJWC stores in the U.S. pet beds under the name "Berkley & Jensen Premium Quality Bolster Pet Bed", as shown in **Exhibit C**.

22.    Upon information and belief, defendants' infringement of the '502 patent has been willful and deliberate.

23.    The availability of defendants' infringing products has damaged Flexi-Mat in several ways. For example, the patented products sold by Flexi-Mat are no longer exclusively

5

available from Flexi-Mat and instead appear to be commodity products also offered by BJWC and distributed by Doskocil. Therefore, Flexi-Mat's patented product is less desirable to customers. The commodity image is emphasized by the fact that the defendants are offering the infringing products at a substantially lower price than Flexi-Mat, and consequently, on information and belief, diverting sales from Flexi-Mat.

24.    As a consequence of the defendants' infringing activities regarding the '502 patent, plaintiff Flexi-Mat has suffered monetary damages and is entitled to an award of monetary damages pursuant to 35 U.S.C. § 284 in an amount yet to be determined.

25.    As a consequence of the defendants' infringing activities regarding the '502 patent, plaintiff Flexi-Mat has suffered and will continue to suffer irreparable harm unless the defendants are enjoined by this Court.

## JURY DEMAND

Plaintiff Flexi-Mat demands a trial by jury on all matters and issues triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, Flexi-Mat Corporation, prays for the following relief:

A.    That defendants Dallas Mfg., BJWC and Doskocil, and their officers, agents, servants, employees, successors, assigns, parent, subsidiaries, affiliated or related companies, attorneys and all persons in active concert and/or participation with them who receive notice, be preliminarily and permanently enjoined and restrained from making, using, selling, offering to sell, or importing pet beds that infringe the '502 patent, including, but not limited to, the "Berkley & Jensen Premium Quality Bolster Pet Bed," or otherwise engaging in acts of infringement, inducing others to infringe, and/or contributing to the infringement of the '502 patent.

6

B.    That this Court order each defendant to:

    i)    communicate to all persons requesting the infringing pet beds that each defendant is prohibited from further advertisement or sale of the respective infringing pet bed; and

    ii)    notify in writing all recipients of each catalog in which any defendant has advertised or offered for sale the respective infringing pet bed, all prospective purchasers of that product, and all persons inquiring about that product, whether orally, in writing, or via the Internet, that defendants are prohibited from further advertisement or sale of the respective infringing pet bed.

C.    That this Court order defendants Dallas Mfg. and Doskocil to provide to Flexi-Mat all past and future customer purchase orders received by them relating to the sale of their respective infringing pet beds or any pet bed of similar design as shown in **Exhibit B** and **Exhibit C** that Dallas Mfg. and Doskocil have caused to be imported into, made or sold in the United States.

D.    That defendants be directed to file in Court, and to serve on plaintiff Flexi-Mat, within thirty (30) days after entry of the above injunction and order, a report in writing, under oath, setting forth in detail the manner and form in which they have complied with the above injunction and order.

E.    That this Court award to Flexi-Mat damages adequate to compensate Flexi-Mat for the infringement of the '502 patent by each of the defendants.

F.    That this Court award increased damages against each of the defendants up to three times the actual damages pursuant to 35 U.S.C. § 284.

7

G.    That this Court enter an order declaring this an exceptional case pursuant to 35 U.S.C. § 285 and award to Flexi-Mat its attorneys' fees, costs and expenses

H.    That this Court award to Flexi-Mat such other and further relief as may be just and appropriate.

FLEXI-MAT CORPORATION

Dated: ~~July __, 2004~~ 8/31/04

By: _John J. Cotter_

John J. Cotter (BBO #554524)
William Meunier
Testa, Hurwitz & Thibeault, LLP
125 High Street
Boston, MA 02110
Telephone: (617) 248-7000
Facsimile: (617) 248-7100

Of Counsel:
Larry L. Saret (*pro hac vice*)
Manotti L. Jenkins (*pro hac vice*)
MICHAEL BEST & FRIEDRICH LLP
401 N. Michigan Avenue, Suite 1900
Chicago, Illinois 60611-4274
Telephone: (312) 222-0800
Facsimile: (312) 222-0818

S:\CLIENT\2013000\9029\C0383030.1

8

A008

US005765502A

# United States Patent [19]

## Haugh

| | |
|---|---|
| [11] | **Patent Number:** 5,765,502 |
| [45] | **Date of Patent:** Jun. 16, 1998 |

[54] **PET BED WITH REMOVABLE BOLSTER**

[75] Inventor: **Scott Haugh**, Lockport, Ill.

[73] Assignee: **Flexi-Mat Corporation**, Chicago, Ill.

[21] Appl. No.: **634,374**

[22] Filed: **Apr. 18, 1996**

[51] Int. Cl.$^6$ ...................................... A01K 1/035
[52] U.S. Cl. .............................. 119/28.5; 5/722
[58] Field of Search ........................ 119/28.5, 526;
5/402, 691, 694, 722, 723, 737, 738, 740

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 984,324 | 2/1911 | Von Below | 5/722 |
| 1,469,523 | 10/1923 | McGarvey | 5/402 X |
| 1,569,710 | 1/1926 | Burt | 119/28.5 |
| 3,890,658 | 6/1975 | Petersilie | 5/722 X |
| 3,989,008 | 11/1976 | Neuman | 119/28.5 |
| 4,860,689 | 8/1989 | Stewart | 119/28.5 |
| 5,010,843 | 4/1991 | Henry | 119/28.5 |
| 5,109,559 | 5/1992 | West | 5/691 X |
| 5,197,411 | 3/1993 | Scharzenbart | 119/28.5 |

### OTHER PUBLICATIONS

'Braided "Jacobean" Bed' from p. 14 of Spring 1996 catalog entitled *In The Company Of Dogs.*
'Pucker Bed' from back page of Spring 1996 catalog entitled *In The Company Of Dogs.*

'Cuddler' Bed from 1994 Brochure of Flexi–Mat Corporation entitled *Flexi–Mat's Country Quilt Collection.*

'Flip Chair', 'Wing Chair', and 'Flip Couch' from 1995 Brochure Of Flexi–Mat Corporation entitled *Flexi–Mat's Cuddle–Up 'Cuddler'* from 1996 Brochure of Flexi–Mat Corporation entitled *Flexi–Mat's Poly/Cedar Cuddler.*

'Rainbow Cuddler' from 1991 Brochure of Flexi–Mat Corporation entitled *There's Gold At The End Of Our Rainbow.*

'Kozy Kup' from 1996 Brochure of Flexi–Mat Corporation entitled *Flexi–Mat's Kozy Kup.*

'Kitty Kup' from 1996 Brochure of Flexi–Mat Corporation entitled *Flexi–Mat's Kitty Kup.*

*Primary Examiner*—Robert P. Swiatek
*Assistant Examiner*—Elizabeth Shaw
*Attorney, Agent, or Firm*—Laff, Whitesel, Conte & Saret, Ltd.

[57] **ABSTRACT**

A pet bed comprising an outer covering, a removable cushion disposed within the outer covering to form a cushioned bottom portion, and a bolster removably affixed to the interior of the outer covering and disposed about at least a portion of the perimeter of the bottom portion. The outer covering further includes a reclosable access opening permitting both the bottom cushion and bolster to be removed as needed.

**11 Claims, 2 Drawing Sheets**





FIG. 1

FIG. 2

FIG. 3

Case 1:04-cv-10162-DPW    Document 90-2    Filed 12/01/2005    Page 13 of 207



FIG. 4

FIG. 5

A011

5,765,502

1

## PET BED WITH REMOVABLE BOLSTER

### FIELD OF THE INVENTION

This invention relates generally to a pet bed and in particular to a pet bed having a removable bolster.

### BACKGROUND OF THE INVENTION

Pet beds were originally devised both for the comfort of animal pets and to keep the animals from commandeering household furnishings. Although a simple cushion is often used as a pet bed, many animals would rather occupy a favorite couch or human bed than sleep on a mere cushion.

Much of the animal's reluctance to quit the family sofa is traceable to the animal's need to feel secure. Thus, pet beds having surrounding wall portions are more popular with pets. These wall portions extend upwardly from the periphery of the pet bed, leaving an opening through which the animal can enter and leave, and allowing the animal to see out even while in a supine position.

The wall portion can also be used as a headrest by animals who feel safer with a better view of their surroundings, but the wall does not provide support for the heavier breeds of animals. The wall tends to collapse under the weight of heavier animals unless it is made of material so rigid that it is uncomfortable for lighter animals.

In one popular method for pet bed fabrication, the base and wall portions are formed from two glued pieces of fairly firm material, such as foam. The pet bed is then provided with a single removable cover, which is generally a washable fabric. The foam material from which the pet bed is constructed is not easily washable, due to the bulk of the two glued foam pieces.

In another popular pet bed style, the wall portion is formed from a single piece of foam, often attached to a vinyl sheet bottom portion, and only the wall portion is then covered with fabric. The fabric is generally sewn around the wall and is therefore not removable for washing. In order to make this type of pet bed more comfortable, a separate bottom cushion with its own fabric cover is provided for insertion over the bottom portion. This requires two separate fabric covers, one for the wall and one for the bottom cushion, and this adds to the cost of manufacture. Pet beds are also known in which the bottom cushion is stuffed with replaceable foam pieces or other stuffing material, treated with an odor retarding agent, because odor and washability are of major concern to the pet's owner.

Yet another pet bed has a bottom cushion encased in fabric with an upstanding wall extending partially around the periphery of the bottom cushion. The wall is formed from multiple pockets sewn in the encasing fabric, and each pocket is stuffed with polyester fill. Because the pockets are permanently sewn into the encasing fabric, the fill is not accessible and cannot be replaced without replacing the entire fabric. This creates a major odor problem when, for example, the pet urinates on the wall.

Accordingly, a need arises for a structurally sound pet bed that is designed for the pet's comfort, regardless of whether the animal is light or heavy. The pet bed should be relatively inexpensive to manufacture, and should be equipped with a one-piece cover and separately removable bolster and bottom cushion for ease of cleaning.

### SUMMARY OF THE INVENTION

These needs and others are satisfied by the present invention, comprising a pet bed having an outer covering, a

2

removable cushion disposed within the outer covering to form a cushioned bottom portion, and a bolster removably affixed to the interior of the outer covering and disposed about at least a portion of the perimeter of the bottom portion. The outer covering includes a reclosable access opening that may be opened and closed with a zipper.

In one form of the invention, the bolster may be removably affixed to the interior of the outer covering by a plurality of hook-and-loop fastener straps. The outer covering may include a bolster pocket sized to accommodate the bolster, where the plurality of straps removably affixes the bolster within the bolster pocket. The bottom cushion rests within a bottom pocket which communicates with the bolster pocket. The removable cushion and the bolster are separately removable from the outer covering through the reclosable access opening.

Further objects, features, and advantages of the present invention will become apparent from the following description and drawings.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a top plan view of a pet bed in accordance with the present invention;

FIG. 2 is a perspective view of the pet bed of FIG. 1;

FIG. 3 is a bottom plan view of the pet bed of FIG. 1;

FIG. 4 is a bottom view of the pet bed of FIG. 1, with a portion of the outer covering cut away to illustrate the bolster removably affixed within the bolster pocket; and

FIG. 5 is an exploded view of the pet bed of FIG. 1.

### DETAILED DESCRIPTION OF THE INVENTION

In accordance with the present invention, a pet bed is described that provides distinct advantages when compared to those of the prior art. The invention can best be understood with reference to accompanying drawing FIGS. 1 through 5.

The pet bed 1 of the present invention includes an outer covering 2, preferably fabricated from a durable material, such as a fabric that is easily cleaned. The cover material can be furnished with colors and/or designs to suit the needs of the pet owner.

The pet bed 1 includes a removable cushion 4 disposed within a bottom pocket 12 formed in the outer covering 2 to form a cushioned bottom portion of the pet bed 1. The cushion may be fabricated from any soft, durable material, but is preferably designed to be replaced at intervals by the user as it becomes soiled or worn.

Within a bolster pocket 10 provided in the outer covering 2, a bolster 6 is removably affixed. The bolster is disposed about at least a portion of the perimeter of the cushioned bottom portion of the pet bed 1. The bolster 6 is also formed from a soft, durable material, and is designed to be replaced as needed. Since the bolster 6 is more cylindrical or banana-shaped than flat, and more like a pillow than a wall, the bolster 6 tends to retain its shape even when used as a pillow by the pet, and does not easily collapse from the weight of the pet as in some prior art products.

The bolster is held in place by a plurality of fasteners or straps 8. The straps 8 are preferably the well-known hook-and-loop fasteners, such as Velcro®, although other fasteners, such as ties or straps with snaps or buckles, would perform adequately in this application. The fasteners are sewn or otherwise secured to the interior of bolster pocket 10 in the outer covering 2.

A012

5,765,502

3

Removably affixing the bolster 6 within the bolster pocket 10 of the outer covering 2 has the advantage of lending structural integrity to the pet bed 1. Since the bolster 6 is much like a long, slender pillow, holding the bolster 6 in the bolster pocket 10 keeps the bolster relatively fixed in position with respect to the perimeter of the bottom portion of the pet bed 1.

Access to the interior of the outer covering 2 is preferably provided by a zipper 7. Thus, the bolster 6 is easily removable by the simple expedient of unzipping the zipper 7 on the bottom of the pet bed 1, disengaging the straps 8, and withdrawing the bolster through the reclosable access opening 11 that is sealed by the zipper 7. The bottom cushion 4 can also be withdrawn in the same way. The outer covering 2 can then be cleaned, and the bolster 6 and cushion 4 can be washed and replaced within the outer covering 2. Of course, a new bolster 6 or a new cushion 4 could also be replaced by the user as part of this removal operation.

Instead of a zipper, access to the interior of the bed could be provided through a slit in the covering 2. The slit could be concealed by merely overlapping flaps of the fabric. The flaps could be manually parted when necessary to remove the cushion or bolster.

It is also possible to combine other features with those just described. For example, the cushion 4 and bolster 6 could be cushions filled with foam pieces, polyester, styrofoam beads, a mixture of polyester and cotton, and other suitable materials, and be treated with an odor retarding agent such as cedar.

There has been described herein a pet bed that avoids the shortcomings of the prior art. It will be apparent to those skilled in the art that modifications may be made without departing from the spirit and scope of the invention. Accordingly, it is not intended that the invention be limited except as may be necessary in view of the appended claims.

What is claimed is:

1. A pet bed comprising:

an outer covering;

a removable cushion disposed within the outer covering to form a cushioned bottom portion; and

a bolster removably disposed within the interior of the outer covering and substantially all of said bolster disposed exteriorly about at least a portion of the perimeter of the bottom portion without being secured to the removable cushion.

2. The pet bed of claim 1, wherein the outer covering further includes a reclosable access opening.

3. The pet bed of claim 2, wherein the reclosable access opening further includes a zipper.

4. A pet bed comprising:

an outer covering;

a removable cushion disposed within the outer covering to form a cushioned bottom portion; and

a bolster removably affixed within the interior of the outer covering and disposed about at least a portion of the

4

perimeter of the bottom portion, wherein the bolster is removably affixed within the interior of the outer covering by a plurality of straps secured to the outer covering.

5. The pet bed of claim 4, wherein the straps are hook-and-loop fasteners.

6. The pet bed of claim 4, wherein the outer covering includes a bolster pocket sized to accommodate the bolster, and the plurality of straps removably affixes the bolster within the bolster pocket.

7. A pet bed comprising:

an outer covering including a reclosable access opening;

a removable cushion disposed within the outer covering to form a cushioned bottom portion;

a bolster removably secured to the interior of the outer covering and disposed about at least a portion of the perimeter of the bottom portion;

such that the removable cushion and bolster are separately removable from the outer covering interior through the reclosable access opening.

8. The pet bed of claim 7, and means for closing the reclosable access opening.

9. A pet bed comprising:

an outer covering including a bolster pocket and a reclosable access opening;

a removable cushion disposed within the outer covering to form a cushioned bottom portion;

a bolster removably affixed within the bolster pocket and disposed about at least a portion of the perimeter of the bottom portion;

such that the removable cushion and bolster are separately removably from the outer covering interior through the reclosable access opening;

wherein the bolster is removably affixed within the bolster pocket by a plurality of straps.

10. The pet bed of claim 9, wherein the straps are hook-and-loop fasteners.

11. A pet bed comprising:

an outer covering including a bolster pocket and a reclosable access opening through a bottom portion of the outer covering;

means for closing the reclosable access opening;

a removable cushion disposed within the outer covering to form a cushioned bottom portion;

a bolster removably affixed within the bolster pocket by a plurality of straps that are secured about the bolster, the bolster disposed about at least a portion of the perimeter of the bottom portion;

such that the removable cushion and the bolster are separately removable from the outer covering interior through the reclosable access opening.

* * * * *

5765502

|||||||||||||| 5765502

| UTILITY SERIAL NUMBER | PATENT DATE JUN 16 1998 | PATENT NUMBER |
|---|---|---|

08· 634374

| SERIAL NUMBER 08/634,374 | FILING DATE 04/18/96 | CLASS 119 | SUBCLASS 28.5 | GROUP ART UNIT 3303  2143 | EXAMINER Shaw |
|---|---|---|---|---|---|

APPLICANTS

HAUGH SCOTT, LOCKPORT, IL.

**CONTINUING DATA*********************
VERIFIED

none Ed

**FOREIGN/PCT APPLICATIONS***********
VERIFIED

none Ed

FOREIGN FILING LICENSE GRANTED 05/30/96          ***** SMALL ENTITY *****

| Foreign priority claimed ☐ yes ☒ no 35 USC 119 conditions met ☐ yes ☐ no Verified and Acknowledged    Examiner's initials | AS FILED → | STATE OR COUNTRY IL | SHEETS DRWGS. 2 | TOTAL CLAIMS 11 | INDEP. CLAIMS 3 | FILING FEE RECEIVED $375.00 | ATTORNEY'S DOCKET NO. 1300-112 |
|---|---|---|---|---|---|---|---|

ADDRESS

LAFF WHITESEL CONTE AND SARET LTD
401 NORTH MICHIGAN AVENUE
CHICAGO  IL 60611

TITLE

PET BED WITH REMOVABLE BOLSTER

U.S. DEPT. OF COMM./ PAT. & TM—PTO-436L (Rev.12

| PARTS OF APPLICATION FILED SEPARATELY | | | |
|---|---|---|---|

Applications Examiner

| NOTICE OF ALLOWANCE MAILED | | CLAIMS ALLOWED | |
|---|---|---|---|

11/25/97

Elizabeth Shaw
Assistant Examiner

| | Total Claims 11 | Print Claim 1 |

| ISSUE FEE | | DRAWING | | |
|---|---|---|---|---|

| Amount Due $660.00 | Date Paid N/A 2/30/98 | Sheets Drwg. 2 | Figs. Drwg. 5 | Print Fig. 5 |

Robert P. Swiatek
Primary Examiner

ISSUE BATCH NUMBER  U57

Label Area

PREPARED FOR ISSUE

WARNING:  The information disclosed herein may be restricted.  Unauthorized disclosure may be prohibited by the United States Code Title 35, Sections 122, 181 and 368.  Possession outside the U.S. Patent & Trademark Office is restricted to authorized employees and contractors only.

Form PTO-436A (Rev. 8/92)

(FACE)

IN THE

# UNITED STATES PATENT & TRADEMARK OFFICE

The Commissioner of Patents & Trademarks
Washington, D.C. 20231

DATE:    **April 18, 1996**

Sir:

OUR CASE NO:    1300-112

Transmitted herewith for filing is the patent application (including specification, claims and declaration) of:

Inventor:    **Scott Haugh**

For:    **PET BED WITH REMOVABLE BOLSTER**

A. Enclosed are:

Documents:       Specification       Claims       Abstract       Declaration
No. of Pages:        5                  2              1              2

[X]  2  sheets of drawing(s).     [ ] Formal     [X] Informal

[x] An assignment of the invention to  **Flexi-Mat Corporation**  _____

_____

[ ] A certified copy of a _____ application.

[ ] Claim for priority under 35USC119.

[ ] Associate Power of Attorney.

[X] Citation of Prior Art.

[ ] Preliminary Amendment.

[ ] Translation with Translator's Declaration.

[X] Check No.  27849  in the amount of $  415.00   dated  4/18/96   is
enclosed to cover the [X] filing fee **&** [X] assignment recording fee.

B.  FILING FEE CALCULATION:

[ ] Before calculating the filing fee, please cancel claims _____

[ ] After adding preliminary amendment claims _____

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| SMALL ENTITY STATUS - AFFIDAVIT ATTACHED | | | | | LARGE BUSINESS RATE | | |
| For | Number Filed | Number Extra | Rate | Basic Fee $375 | Rate | Basic Fee $750 | |
| Total Claims | 11  -20 | 0    X | $ 11  = | 0.00 | $ 22  = | | |
| Independent Claims | 3  -3 | 0    X | $ 39  = | 0.00 | $ 78  = | | |
| Multiple Dependency | | | $125  = | 0.00 | $250  = | | |
| Total Filing, Fee | | | | 375.00 | | | |
| Assignment Recordal Fee | | | | 40.00 | | | |
| | | | Total  $  415.00 | | Total  $ | | |

C.  SPECIAL INSTRUCTIONS:

[ ] Please charge our Deposit Account No. 12-0064 in the amount of $ _____.
A duplicate of this sheet is enclosed.

[X] The Commissioner is hereby authorized to charge any fees which may be required, including, but not limited to payment of issue fees, or credit any overpayment to Account No. 12-0064. A duplicate copy of this sheet is enclosed. If this payment also requires a Petition, please construe this authorization to pay as the necessary Petition which is required to accompany the payment.

**EXPRESS MAIL mailing label**
No.  TB 864 342 875 US
Date of Deposit  April 18, 1996
I hereby certify that this paper or fee is being deposited with the United States Postal Service "Express Mail Post Office to Addressee" service under 37 CFR 1.10 on the date indicated above and is addressed to the Assistant Commissioner for Patents, Washington, D.C. 20231. The person mailing this paper/fee is:
PRINT  Sandra Meza
SIGNATURE _____

Respectfully submitted,
Laff, Whitesel, Conte & Saret, Ltd.

By _____

Larry L. Saret

| | Registration No. |
|---|---|
| Charles A. Laff | 19787 |
| J. Warren Whitesel | 16830 |
| Robert F. I. Conte | 20354 |
| Larry L. Saret | 27674 |
| Martin L. Stern | 28911 |
| Louis Altman | 19373 |
| Barry W. Sufrin | 27398 |
| Marshall W. Sutker | 19962 |
| Jack R. Halvorsen | 18394 |
| Jennifer A. Dunner | 33685 |
| Neil R. Ormos | 35309 |
| Richar | |
| Kevin | |
| John | |

LAFF, WHITESEL, CONTE & SARET, LTD.
ATTORNEYS AT LAW
401 NORTH MICHIGAN AVENUE
CHICAGO, ILLINOIS 60611

TELEPHONE
(312) 661-2100
FAX
(312) 661-0029

**A015**





375-201

08/634374

## PET BED WITH REMOVABLE BOLSTER

### FIELD OF THE INVENTION

This invention relates generally to a pet bed and in particular to a pet bed having a removable bolster.

### BACKGROUND OF THE INVENTION

Pet beds were originally devised both for the comfort of animal pets and to keep the animals from commandeering household furnishings. Although a simple cushion is often used as a pet bed, many animals would rather occupy a favorite couch or human bed than sleep on a mere cushion.

Much of the animal's reluctance to quit the family sofa is traceable to the animal's need to feel secure. Thus, pet beds having surrounding wall portions are more popular with pets. These wall portions extend upwardly from the periphery of the pet bed, leaving an opening through which the animal can enter and leave, and allowing the animal to see out even while in a supine position.

The wall portion can also be used as a headrest by animals who feel safer with a better view of their surroundings, but the wall does not provide support for the heavier breeds of animals. The wall tends to collapse under the weight of heavier animals unless it is made of material so rigid that it is uncomfortable for lighter animals.

In one popular method for pet bed fabrication, the base and wall portions are formed from two glued pieces of fairly firm material, such as foam. The pet bed is then provided with a single removable cover, which is generally a washable fabric. The foam material from which the pet bed is constructed is not easily washable, due to the bulk of the two glued foam pieces.

In another popular pet bed style, the wall portion is formed from a single piece of foam, often attached to a vinyl sheet bottom portion, and only the wall portion is then covered with fabric. The fabric is generally sewn around the wall and is therefore not removable for washing. In order to make this type of pet bed more comfortable, a separate bottom cushion with its own fabric cover is provided for insertion over the bottom portion. This requires two separate fabric covers, one for the

wall and one for the bottom cushion, and this adds to the cost of manufacture. Pet beds are also known in which the bottom cushion is stuffed with replaceable foam pieces or other stuffing material, treated with an odor retarding agent, because odor and washability are of major concern to the pet's owner.

Yet another pet bed has a bottom cushion encased in fabric with an upstanding wall extending partially around the periphery of the bottom cushion. The wall is formed from multiple pockets sewn in the encasing fabric, and each pocket is stuffed with polyester fill. Because the pockets are permanently sewn into the encasing fabric, the fill is not accessible and cannot be replaced without replacing the entire fabric. This creates a major odor problem when, for example, the pet urinates on the wall.

Accordingly, a need arises for a structurally sound pet bed that is designed for the pet's comfort, regardless of whether the animal is light or heavy. The pet bed should be relatively inexpensive to manufacture, and should be equipped with a one-piece cover and separately removable bolster and bottom cushion for ease of cleaning.

## SUMMARY OF THE INVENTION

These needs and others are satisfied by the present invention, comprising a pet bed having an outer covering, a removable cushion disposed within the outer covering to form a cushioned bottom portion, and a bolster removably affixed to the interior of the outer covering and disposed about at least a portion of the perimeter of the bottom portion. The outer covering includes a reclosable access opening that may be opened and closed with a zipper.

In one form of the invention, the bolster may be removably affixed to the interior of the outer covering by a plurality of hook-and-loop fastener straps. The outer covering may include a bolster pocket sized to accommodate the bolster, where the plurality of straps removably affixes the bolster within the bolster pocket. The bottom cushion rests within a bottom pocket which communicates with the bolster pocket. The removable cushion and the bolster are separately removable from the outer covering through the reclosable access opening.

2

A017

Further objects, features, and advantages of the present invention will become apparent from the following description and drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a top plan view of a pet bed in accordance with the present invention;

FIG. 2 is a perspective view of the pet bed of FIG. 1;

FIG. 3 is a bottom plan view of the pet bed of FIG. 1;

FIG. 4 is a bottom view of the pet bed of FIG. 1, with a portion of the outer covering cut away to illustrate the bolster removably affixed within the bolster pocket; and

FIG. 5 is an exploded view of the pet bed of FIG. 1.

A018

## DETAILED DESCRIPTION OF THE INVENTION

In accordance with the present invention, a pet bed is described that provides distinct advantages when compared to those of the prior art. The invention can best be understood with reference to accompanying drawing figures 1 through 5.

The pet bed 1 of the present invention includes an outer covering 2, preferably fabricated from a durable material, such as a fabric that is easily cleaned. The cover material can be furnished with colors and/or designs to suit the needs of the pet owner.

The pet bed 1 includes a removable cushion 4 disposed within a bottom pocket 12 formed in the outer covering 2 to form a cushioned bottom portion of the pet bed 1. The cushion may be fabricated from any soft, durable material, but is preferably designed to be replaced at intervals by the user as it becomes soiled or worn.

Within a bolster pocket 10 provided in the outer covering 2, a bolster 6 is removably affixed. The bolster is disposed about at least a portion of the perimeter of the cushioned bottom portion of the pet bed 1. The bolster 6 is also formed from a soft, durable material, and is designed to be replaced as needed. Since the bolster 6 is more cylindrical or banana-shaped than flat, and more like a pillow than a wall, the bolster 6 tends to retain its shape even when used as a pillow by the pet, and does not easily collapse from the weight of the pet as in some prior art products.

The bolster is held in place by a plurality of fasteners or straps 8. The straps 8 are preferably the well-known hook-and-loop fasteners, such as Velcro®, although other fasteners, such as ties or straps with snaps or buckles, would perform adequately in this application. The fasteners are sewn or otherwise secured to the interior of bolster pocket 10 in the outer covering 2.

Removably affixing the bolster 6 within the bolster pocket 10 of the outer covering 2 has the advantage of lending structural integrity to the pet bed 1. Since the bolster 6 is much like a long, slender pillow, holding the bolster 6 in the bolster pocket 10 keeps the bolster relatively fixed in position with respect to the perimeter of the bottom portion of the pet bed 1.

Access to the interior of the outer covering 2 is preferably provided by a zipper 7. Thus, the bolster 6 is easily removable by the simple expedient of unzipping the zipper 7 on the bottom of the pet bed 1, disengaging the straps 8, and withdrawing the bolster through the reclosable access

4

opening 11 that is sealed by the zipper 7. The bottom cushion 4 can also be withdrawn in the same way. The outer covering 2 can then be cleaned, and the bolster 6 and cushion 4 can be washed and replaced within the outer covering 2. Of course, a new bolster 6 or a new cushion 4 could also be replaced by the user as part of this removal operation.

Instead of a zipper, access to the interior of the bed could be provided through a slit in the covering 2. The slit could be concealed by merely overlapping flaps of the fabric. The flaps could be manually parted when necessary to remove the cushion or bolster.

It is also possible to combine other features with those just described. For example, the cushion 4 and bolster 6 could be cushions filled with foam pieces, polyester, styrofoam beads, a mixture of polyester and cotton, and other suitable materials, and be treated with an odor retarding agent such as cedar.

There has been described herein a pet bed that avoids the shortcomings of the prior art. It will be apparent to those skilled in the art that modifications may be made without departing from the spirit and scope of the invention. Accordingly, it is not intended that the invention be limited except as may be necessary in view of the appended claims.

What is claimed is:

5

## CLAIMS

1.    A pet bed comprising:

an outer covering;

a removable cushion disposed within the outer covering to form a cushioned bottom portion; and

a bolster removably affixed within the interior of the outer covering and disposed about at least a portion of the perimeter of the bottom portion.

2.    The pet bed of claim 1, wherein the outer covering further includes a reclosable access opening.

3.    The pet bed of claim 2, wherein the reclosable access opening further includes a zipper.

4.    The pet bed of claim 1, wherein the bolster is removably affixed within the interior of the outer covering by a plurality of straps secured to the outer covering.

5.    The pet bed of claim 4, wherein the straps are hook-and-loop fasteners.

6.    The pet bed of claim 4, wherein the outer covering includes a bolster pocket sized to accommodate the bolster, and the plurality of straps removably affixes the bolster within the bolster pocket.

7.    A pet bed comprising:

an outer covering including a bolster pocket and a reclosable access opening;

a removable cushion disposed within the outer covering to form a cushioned bottom portion;

a bolster removably affixed within the bolster pocket and disposed about at least a portion of the perimeter of the bottom portion;

6

**A021**

such that the removable cushion and the bolster are separately removable from the outer covering interior through the reclosable access opening.

8.    The pet bed of claim 7, and means for closing the reclosable access opening.

~~Subal~~ 9.    The pet bed of claim 7, wherein the bolster is removably affixed within the bolster pocket by a plurality of straps.

10.    The pet bed of claim 9, wherein the straps are hook-and-loop fasteners.

11.    A pet bed comprising:

an outer covering including a bolster pocket and a reclosable access opening through a bottom portion of the outer covering;

means for closing the reclosable access opening;

a removable cushion disposed within the outer covering to form a cushioned bottom portion;

a bolster removably affixed within the bolster pocket by a plurality of straps that are secured about the bolster, the bolster disposed about at least a portion of the perimeter of the bottom portion;

such that the removable cushion and the bolster are separately removable from the outer covering interior through the reclosable access opening.

A022



S. N.
08/634374

**PET BED WITH REMOVABLE BOLSTER**

**ABSTRACT OF THE DISCLOSURE**

A pet bed comprising an outer covering, a removable cushion disposed within the outer covering to form a cushioned bottom portion, and a bolster removably affixed to the interior of the outer covering and disposed about at least a portion of the perimeter of the bottom portion. The outer covering further includes a reclosable access opening permitting both the bottom cushion and bolster to be removed as needed.

A023



1300-112                                                          Page 1 of

# Declaration and Power of Attorney For Patent Application
## English Language Declaration

As a below named inventor, I hereby declare that:

My residence, post office address and citizenship are as stated below next to my name,

I believe I am the original, first and sole inventor (if only one name is listed below) or an original, first and joint inventor (if plural names are listed below) of the subject matter which is claimed and for which a patent is sought on the invention entitled

PET BED WITH REMOVABLE BOLSTER
the specification of which

(check one)

☒ is attached hereto.

☐ was filed on _____ as

    Application Serial No. _____

    and was amended on _____
                            (if applicable)

I hereby state that I have reviewed and understand the contents of the above identified specification, including the claims, as amended by any amendment referred to above.

I acknowledge the duty to disclose information which is material to the examination of this application in accordance with Title 37, Code of Federal Regulations, §1.56(a).

I hereby claim foreign priority benefits under Title 35, United States Code, §119 of any foreign application(s) for patent or inventor's certificate listed below and have also identified below any foreign application for patent or inventor's certificate having a filing date before that of the application on which priority is claimed:

Prior Foreign Application(s)                                    Priority Claimed

**None** —————————

| (Number) | (Country) | (Day/Month/Year Filed) | ☐ Yes | ☐ No |
|----------|-----------|------------------------|-------|------|
| (Number) | (Country) | (Day/Month/Year Filed) | ☐ Yes | ☐ No |
| (Number) | (Country) | (Day/Month/Year Filed) | ☐ Yes | ☐ No |

I hereby claim the benefit under Title 35, United States Code, §120 of any United States application(s) listed below and, insofar as the subject matter of each of the claims of this application is not disclosed in the prior United States application in the manner provided by the first paragraph of Title 35, United States Code, §112, I acknowledge the duty to disclose material information as defined in Title 37, Code of Federal Regulations, §1.56(a) which occurred between the filing date of the prior application and the national or PCT international filing date of this application:

Form PTO-FB-110 (8-83)                    Patent and Trademark Office-U.S. DEPARTMENT OF COMMERCE

*(left margin, vertical text:)* LAFF, WHITESEL, CONTE & SARET, LTD.  ATTORNEYS AT LAW  401 N. MICHIGAN AVENUE  CHICAGO, ILLINOIS 60611

TELEPHONE
(312) 661-2100

TELEX NO.
20-6024

FAX (312) 661-0029

A024

None ————————
(Application Serial No.)        (Filing Date)        (Status)
                                                     (patented, pending, abandoned)

————————————        ————————        ————————
(Application Serial No.)        (Filing Date)        (Status)
                                                     (patented, pending, abandoned)

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

POWER OF ATTORNEY: As a named inventor, I hereby appoint the following attorney(s) and/or agent(s) to prosecute this application and transact all business in the Patent and Trademark Office connected therewith. Charles A. Laff (19787); J. Warren Whitesel (16830); Robert F.I. Conte (20354); Larry L. Saret (27674); Martin L. Stern (28911); Bernard L. Kleinke (22123); Louis Altman (19373); Barry W. Sufrin (27398); Marshall W. Sutker (19962); Jennifer A. Dunner (33685); Neil R. Ormos (35309); Richard P. Gilly (37630); Kevin C. Trock (37745); and Jack R. Halvorsen (18394).

Send Correspondence to LAFF, WHITESEL, CONTE & SARET, LTD., 401 North Michigan Avenue, Chicago, Illinois 60611.

Direct Telephone Calls to:  **Larry L. Saret**
at telephone No. (312) 661-2100.

| | |
|---|---|
| Full name of sole or first inventor<br>**Scott Haugh**  1-00 | |
| Inventor's signature<br>*Scott Haugh* | 4/15/96<br>Date |
| Residence<br>829 South St. LockPort IL 60441 | |
| Citizenship<br>**United States Of America** | |
| Post Office Address | |
| | |
| Full name of second joint inventor, if any  *None* | |
| Second Inventor's signature | Date |
| Residence | |
| Citizenship | |
| Post Office Address | |
| | |

(Supply similar information and signature for third and subsequent joint inventors.)

Form PTO-FB-110 (8-83)                              Patent and Trademark Office-U.S. DEPARTMENT OF COMMERCE

Applicant or Patentee: ___Scott Haugh_____ ____ Attorney's
Serial or Patent No: _____    _____ ____ Docket No: ___1300-112___
Filed or Issued: ___herewith_____    _____
For: ___PET BED WITH REMOVABLE BOLSTER_____

## VERIFIED STATEMENT (DECLARATION) CLAIMING SMALL
## ENTITY STATUS (37 CFR 1.9(f) and 1.27)

I. I hereby declare that I am making this verified statement to support a claim by ___Flexi-Mat Corporation___
_____ for small entity status for purposes of paying reduced fees under section 41(a) and (b)
of Title 35, United States Code, with regard to the invention entitled
___PET BED WITH REMOVABLE BOLSTER_____
by inventor(s) ___Scott Haugh_____
described in
(X) the specification filed herewith
( ) application serial No._____, filed_____
( ) patent no._____, issued _____

II. I hereby declare that I am:
( ) A.    The above-named inventor and qualify as an independent inventor as defined in 37 CFR 1.9(c).

I have not assigned, granted, conveyed or licensed and am under no obligation under law to assign
grant, convey or license, any rights in the invention to any person who could not be classified as a
independent inventor under 37 CFR 1.9(c) if that person had made the invention, or to any concern
which would not qualify as a small business concern under 37 CFR 1.9(d) or a nonprofit organizatio
under 37 CFR 1.9(e).

( ) B.    A non-inventor making this verified statement to support a claim by _____. I hereby
declare that I would qualify as an independent inventor as defined in Section II.A., above.

( ) C.    An official empowered to act on behalf of a nonprofit organization as defined in 37 CFR 1.9(e) an
identified below:
NAME OF ORGANIZATION_____
ADDRESS OF ORGANIZATION_____
_____

TYPE OF ORGANIZATION:

( ) UNIVERSITY OR OTHER INSTITUTION OF HIGHER EDUCATION
( ) TAX EXEMPT UNDER INTERNAL REVENUE SERVICE CODE (26 USC 501(a) an
501(c) (3))
( ) NONPROFIT SCIENTIFIC OR EDUCATIONAL UNDER STATUTE OF STATE OF TH
UNITED STATES OF AMERICA
(NAME OF STATE_____
( ) (CITATION OF STATUTE_____
( ) WOULD QUALIFY AS TAX EXEMPT UNDER INTERNAL REVENUE SERVICE CODE (2
USC 501(a) and 501(c) (3) IF LOCATED IN THE UNITED STATES OF AMERIC
( ) WOULD QUALIFY AS NONPROFIT SCIENTIFIC OR EDUCATIONAL UNDER STATUI
OF STATE OF THE UNITED STATES OF AMERICA IF LOCATED IN THE UNITE
STATES OF AMERICA
(NAME OF STATE_____
(CITATION OF STATUTE_____

LAFF, WHITESEL, CONTE & SARET, LT
ATTORNEYS AT LAW
401 N. MICHIGAN AVENUE
CHICAGO, ILLINOIS  60611

(x) D.    An owner or official of a small business concern empowered to act on behalf of the concern identified
below:

NAME OF CONCERN ___Flexi-Mat Corporation___
ADDRESS OF CONCERN ___2244 South Western Avenue___
___Chicago, IL 60608___

I hereby declare that the above identified small business concern qualifies as a small business
concern as defined in 13 CFR 121.3-18, and reproduced in 37 CFR 1.9(d), in that the number of
employees of the concern, including those of its affiliates, does not exceed 500 persons. For
purposes of this statement, (1) the number of employees of the business concern is the average over
the previous fiscal year of the concern of the persons employed on a full-time, part-time or
temporary basis during each of the pay periods of the fiscal year, and (2) concerns are affiliates of
each other when either, directly or indirectly, one concern controls or has the power to control the
other, or a third party or parties controls or has the power to control both.

III.    I hereby declare that rights in the above-identified invention under contract or law exist in or have been
conveyed to and remain with the small business concern identified above with regard to the invention.

—If the rights held by the above-identified small business concern are not exclusive, each individual, concern
or organization having rights in the invention is listed below* and no rights to the invention are held by any
person, other than the inventor, who would not qualify as an independent inventor under 37 CFR 1.9(c)
if that person made the invention, or by any concern which would not qualify as a small business concern
under 37 CFR 1.9(d), or a nonprofit organization under 37 CFR 1.9(e).
*NOTE: Separate verified statements are required from each named person, concern or organization
having rights to the invention averring to their status as small entities. (37 CFR 1.27).

NAME_____
ADDRESS_____
( ) INDIVIDUAL    ( ) SMALL BUSINESS CONCERN    ( ) NONPROFIT ORGANIZATION
NAME_____
ADDRESS_____
( ) INDIVIDUAL    ( ) SMALL BUSINESS CONCERN    ( ) NONPROFIT ORGANIZATION

IV.    I acknowledge the duty to file, in this application or patent, notification of any change in status resulting
in loss of entitlement to small entity status prior to paying, or at the time of paying, the earliest of the issue
fee or any maintenance fee due after the date on which status as a small entity is no longer appropriate.
(37 CFR 1.28(b))

I hereby declare that all statements made herein of my own knowledge are true and that all statements
made on information and belief are believed to be true; and further that these statements were made with
the knowledge that willful false statements and the like so made are punishable by fine or imprisonment,
or both, under section 1001 of Title 18 of the United States Code, and that such willful false statements
may jeopardize the validity of the application, any patent issuing thereon, or any patent to which this
verified statement is directed.

NAME OF PERSON SIGNING ___James N. Klesh___
TITLE IN ORGANIZATION ___President___
ADDRESS OF PERSON SIGNING ___2244 South Western Avenue___
___Chicago, IL 60608___
SIGNATURE_____    DATE ___11/18/91___

A027

08/634374



FIG. 1

FIG. 2

FIG. 3

LETTER

A028

HAYES/13a.
08/634374



FIG. 4

FIG 5

LETTER

08/**634374**

IN THE

# UNITED STATES PATENT & TRADEMARK OFFICE

The Commissioner of Patents & Trademarks
Washington, D.C. 20231

DATE:  **April 18, 1996**

OUR CASE NO:  **1300-112**

Sir:

Transmitted herewith for filing is the patent application (including specification, claims and declaration) of:

Inventor:  **Scott Haugh**

For:  **PET BED WITH REMOVABLE BOLSTER**

A. Enclosed are:

Documents:      Specification      Claims      Abstract      Declaration
No. of Pages:      __5__      __2__      __1__      __2__

[X] _2_ sheets of drawing(s).    [ ] Formal    [X] Informal

[x] An assignment of the invention to __Flexi-Mat Corporation__

[ ] A certified copy of a _____

[ ] Claim for priority under 35USC119. _____ application.

[ ] Associate Power of Attorney.

[X] Citation of Prior Art.

[ ] Preliminary Amendment.

[ ] Translation with Translator's Declaration.

[X] Check No. _27849_ in the amount of $ _415.00_ dated _4/18/96_ is enclosed to cover the [X] filing fee ⌗[X] assignment recording fee.
&

B. FILING FEE CALCULATION:

[ ] Before calculating the filing fee, please cancel claims _____.

[ ] After adding preliminary amendment claims _____.

| For | Number Filed | Number Extra | Rate | | Basic Fee $375 |
|---|---|---|---|---|---|
| Total Claims | 11  -20 | 0 | X  $ 11 | = | 0.00 |
| Independent Claims | 3  -3 | 0 | X  $ 39 | = | 0.00 |
| Multiple Dependency | | | $125 | = | 0.00 |
| Total Filing, Fee................................................ | | | | | 375.00 |
| Assignment Recordal Fee................................. | | | | | 40.00 |
| | | | | Total  $ | 415.00 |

SMALL ENTITY STATUS - AFFIDAVIT ATTACHED

| LARGE BUSINESS RATE | |
|---|---|
| Rate | Basic Fee $750 |
| $ 22 | = |
| $ 78 | = |
| $250 | = |
| Total  $ | |

C. SPECIAL INSTRUCTIONS:

[ ] Please charge our Deposit Account No. 12-0064 in the amount of $ _____. A duplicate of this sheet is enclosed.

[X] The Commissioner is hereby authorized to charge any fees which may be required, including, but not limited to payment of issue fees, or credit any overpayment to Account No. 12-0064. A duplicate copy of this sheet is enclosed. If this payment also requires a Petition, please construe this authorization to pay as the necessary Petition which is required to accompany the payment.

Respectfully submitted,
Laff, Whitesel, Conte & Saret, Ltd.

By _____
Larry L. Saret

**EXPRESS MAIL mailing label**
No. _TB 864 342 875 US_
Date of Deposit _April 18, 1996_
I hereby certify that this paper or fee is being deposited with the United States Postal Service "Express Mail Post Office to Addressee" service under 37 CFR 1.10 on the date indicated above and is addressed to the Assistant Commissioner for Patents, Washington, D.C. 20231. The person mailing this paper/fee is:
PRINT _Sandra Herza_
SIGNATURE _____

| | Registration No. |
|---|---|
| Charles A. Laff | 19787 |
| J. Warren Whitesel | 16830 |
| Robert F. I. Conte | 20354 |
| Larry L. Saret | 27674 |
| Martin L. Stern | 28911 |
| Louis Altman | 19373 |
| Barry W. Sufrin | 27398 |
| Marshall W. Sutker | 19962 |
| Jack R. Ha | |
| Jennifer A. | |
| Neil R. | |

LAFF, WHITESEL, CONTE & SARET, LTD.

A030



08/634374

#2
PRIOR ART
7-17-9
T. Sima

IN THE
UNITED STATES PATENT & TRADEMARK OFFICE

IN RE APPLICATION OF: Scott Haugh )
)
CASE: 1300-112 )
)                      CITATION OF PRIOR ART
SERIAL NO.: unknown )
)
FILED ON: herewith )
)
FOR: PET BED WITH REMOVABLE BOLSTER )
)

ASSISTANT COMMISSIONER OF PATENTS
WASHINGTON, DC 20231

Dear Sirs:

[X]     AUTHORIZATION TO PAY AND PETITION FOR THE ACCEPTANCE OF ANY
NECESSARY FEES: If any charges or fees must be paid in connection with the following
Communication (including but not limited to the payment of issue fees), they may be paid out of
our deposit account No. 12-0064. If this payment also requires a Petition, please construe this
authorization to pay as the necessary Petition which is required to accompany the payment.

[]     Applicant herewith petitions the Commissioner of Patents and Trademarks to extend the time
for response to the Office Action dated _____ for _____ month(s) from _____ to
_____. Submitted herewith is check No. _____ for $_____ to cover the cost of the
extension. If a check is lost, or otherwise does not accompany this Petition, please charge my
deposit account number 12-0064 in the appropriate amount to cover the cost of the extension.
Any deficiency or overpayment should be charged or credited to the above numbered deposit
account.

REGISTRATION

| | |
|---|---|
| Charles A. Laff | 19787 |
| J. Warren Whitesel | 16830 |
| Robert F.I. Conte | 20354 |
| Larry L. Saret | 27674 |
| Martin L. Stern | 28911 |
| Louis Altman | 19373 |
| Barry W. Sufrin | 27398 |
| Marshall W. Sutker | 19995 |
| Jennifer A. Dunner | 33685 |
| Neil R. Ormos | 35309 |
| Kevin C. Trock | 37745 |
| Richard P. Gilly | 37630 |
| John W. Hayes | 33900 |
| Tim C. Meece | 38553 |
| Jack R. Halvorsen | 18394 |

LAFF, WHITESEL, CONTE & SARET LTD.
401 North Michigan Avenue
Chicago, Illinois 60611-4212
(312) 661-2100
Fax: (312) 661-0029

A031

## CITATION OF PRIOR ART

Pursuant to Applicant's duty to disclose information which may be pertinent to the prosecution of the above-identified application, applicant submits herewith a list of prior art (three sheets of Form PTO-1449) which should be placed of record in the above identified application.

It is believed that the present invention clearly distinguishes over the enclosed prior art.

Respectfully submitted,

Larry L. Saret
LAFF, WHITESEL, CONTE & SARET, LTD.
401 North Michigan Avenue
Chicago, IL  60611
(312) 661-2100

Date: _April 18, 1996_

Sheet _1_ of 3

| FORM PTO-1449 (REV. 7-80) | U.S. DEPARTMENT OF COMMERCE PATENT AND TRADEMARK OFFICE | ATTY. DOCKET NO. 1300-112 | | SERIAL NO. |
|---|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT** (USE SEVERAL SHEETS IF NECESSARY) | | **APPLICANT** Scott Haugh | | |
| | | **FILING DATE** Herewith | | **GROUP** |

## U.S. PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | NAME | CLASS | SUBCLASS | FILING DATE IF APPROP. |
|---|---|---|---|---|---|---|---|
| ✓ | AA | 4 8 6 0 6 8 9 | 29Aug89 | Stewart | ~~A01K 1~~ 119 | ~~00~~ 28.5 | 14Mar88 |
| ✓ | AB | 3 9 8 9 0 0 8 | 02Nov76 | Neumann | 119 | ~~19~~ 28.5 | 13May75 |
| | AC | | | | | | |
| | AD | | | | | | |
| | AE | | | | | | |
| | AF | | | | | | |
| | AG | | | | | | |
| | AH | | | | | | |
| | AI | | | | | | |
| | AJ | | | | | | |
| | AK | | | | | | |

## FOREIGN PATENT DOCUMENTS

| | | DOCUMENT NUMBER | DATE | COUNTRY | CLASS | SUBCLASS | TRANSLATION YES | NO |
|---|---|---|---|---|---|---|---|---|
| | AL | | | | | | | |
| | AM | | | | | | | |
| | AN | | | | | | | |
| | AO | | | | | | | |
| | AP | | | | | | | |

## OTHER PRIOR ART (INCLUDING AUTHOR, TITLE, DATE, PERTINENT PAGES, ETC.)

| | | |
|---|---|---|
| ✓ | AR | 'Braided "Jacobean" Bed' from Page 14 of Spring 1996 catalog entitled In The Company Of Dogs |
| ✓ | AS | 'Pucker Bed' from back page of Spring 1996 catalog entitled In The Company Of Dogs |
| ✓ | AT | 'Cuddler' Bed from 1994 Brochure of Flexi-Mat Corporation entitled Flexi-Mat's Country Quilt Collection |

| EXAMINER C. Shaw | DATE CONSIDERED 6/19/97 |
|---|---|

\* EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

Sheet _2_ of 3

| FORM PTO-1449<br>(REV. 7-80) | U.S. DEPARTMENT OF COMMERCE<br>PATENT AND TRADEMARK OFFICE | ATTY. DOCKET NO.<br>1300-112 | | | | SERIAL NO. | |

**INFORMATION DISCLOSURE STATEMENT**

(USE SEVERAL SHEETS IF NECESSARY)

APPLICANT
Scott Haugh

FILING DATE
herewith

GROUP

### U.S. PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | NAME | CLASS | SUBCLASS | FILING DATE IF APPROP. |
|---|---|---|---|---|---|---|---|
| | AA | | | | | | |
| | AB | | | | | | |
| | AC | | | | | | |
| | AD | | | | | | |
| | AE | | | | | | |
| | AF | | | | | | |
| | AG | | | | | | |
| | AH | | | | | | |
| | AI | | | | | | |
| | AJ | | | | | | |
| | AK | | | | | | |

### FOREIGN PATENT DOCUMENTS

| | | DOCUMENT NUMBER | DATE | COUNTRY | CLASS | SUBCLASS | TRANSLATION | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | YES | NO |
| | AL | | | | | | | |
| | AM | | | | | | | |
| | AN | | | | | | | |
| | AO | | | | | | | |
| | AP | | | | | | | |

### OTHER PRIOR ART (INCLUDING AUTHOR, TITLE, DATE, PERTINENT PAGES, ETC.)

| | | |
|---|---|---|
| ES | AU | 'Flip Chair', 'Wing Chair', and 'Flip Couch' from 1995 Brochure Of Flexi-Mat Corporation entitled Flexi-Mat's  Cuddle-Up |
| ES | AV | 'Cuddler' from 1996 Brochure of Flexi-Mat Corporation entitled Flexi-Mat's Poly/Cedar Cuddler |
| ES | AW | 'Rainbow Cuddler' from 1991 Brochure of Flexi-Mat Corporation entitled There's Gold At The End Of Our Rainbow |

| EXAMINER<br>C. Shaw | DATE CONSIDERED<br>6/9/97 |
|---|---|

* EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

A034

Sheet _3_ of 3

| FORM PTO-1449 (REV. 7-80) | U.S. DEPARTMENT OF COMMERCE PATENT AND TRADEMARK OFFICE | ATTY. DOCKET NO. 1300-112 | | SERIAL NO. |
|---|---|---|---|---|

INFORMATION DISCLOSURE STATEMENT

(USE SEVERAL SHEETS IF NECESSARY)

APPLICANT Scott Haugh

FILING DATE Herewith    GROUP

## U.S. PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | NAME | CLASS | SUBCLASS | FILING DATE IF APPROP. |
|---|---|---|---|---|---|---|---|
| | AA | | | | | | |
| | AB | | | | | | |
| | AC | | | | | | |
| | AD | | | | | | |
| | AE | | | | | | |
| | AF | | | | | | |
| | AG | | | | | | |
| | AH | | | | | | |
| | AI | | | | | | |
| | AJ | | | | | | |
| | AK | | | | | | |

## FOREIGN PATENT DOCUMENTS

| | | DOCUMENT NUMBER | DATE | COUNTRY | CLASS | SUBCLASS | TRANSLATION | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | YES | NO |
| | AM | | | | | | | |
| | AN | | | | | | | |
| | AP | | | | | | | |
| | AR | | | | | | | |
| | AR | | | | | | | |

## OTHER PRIOR ART (INCLUDING AUTHOR, TITLE, DATE, PERTINENT PAGES, ETC.)

| | AX | 'Kozy Kup' from 1996 Brochure of Flexi-Mat Corporation entitled Flexi-Mat's Kozy Kup |
|---|---|---|
| | AY | 'Kitty Kup' from 1996 Brochure of Flexi-Mat Corporation entitled Flexi-Mat's Kitty Kup |
| | AZ | |

| EXAMINER E. Shaw | DATE CONSIDERED 6/19/97 |
|---|---|

* EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

A035



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address:    COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | | ATTORNEY DOCKET NO. |
|---|---|---|---|---|
| 08/634,374 | 04/18/96 | SCOTT | H | 1300-112 |

```
                              F3M1/0627
    LAFF WHITESEL CONTE AND SARET  LTD
    401 NORTH MICHIGAN AVENUE
    CHICAGO IL 60611
```

| EXAMINER | |
|---|---|
| SHAW, E | |
| **ART UNIT** | **PAPER NUMBER** |
| 3303 | 3 |

DATE MAILED:    06/27/97

**Please find below and/or attached an Office communication concerning this application or proceeding.**

Commissioner of Patents and Trademarks

PTO-90C (Rev. 2/95)
*U.S. GPO: 1996-404-496/40510

A036

| **Office Action Summary** | Application No. 08/634,374 | Applicant(s) Scott | |
|---|---|---|---|
| | Examiner Elizabeth Shaw | Group Art Unit 3303 | |

☒ Responsive to communication(s) filed on _Apr 18, 1996_

☐ This action is **FINAL**.

☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11; 453 O.G. 213.

A shortened statutory period for response to this action is set to expire ___3___ month(s), or thirty days, whichever is longer, from the mailing date of this communication. Failure to respond within the period for response will cause the application to become abandoned. (35 U.S.C. § 133). Extensions of time may be obtained under the provisions of 37 CFR 1.136(a).

**Disposition of Claims**

☒ Claim(s) _1-11_ is/are pending in the application.

Of the above, claim(s) _____ is/are withdrawn from consideration.

☒ Claim(s) _11_ is/are allowed.

☒ Claim(s) _1-3, 7, and 8_ is/are rejected.

☒ Claim(s) _4-6, 9, and 10_ is/are objected to.

☐ Claims _____ are subject to restriction or election requirement.

**Application Papers**

☒ See the attached Notice of Draftsperson's Patent Drawing Review, PTO-948.

☐ The drawing(s) filed on _____ is/are objected to by the Examiner.

☐ The proposed drawing correction, filed on _____ is ☐ approved ☐ disapproved.

☐ The specification is objected to by the Examiner.

☐ The oath or declaration is objected to by the Examiner.

**Priority under 35 U.S.C. § 119**

☐ Acknowledgement is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d).

☐ All ☐ Some* ☐ None of the CERTIFIED copies of the priority documents have been

☐ received.

☐ received in Application No. (Series Code/Serial Number) _____

☐ received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

*Certified copies not received: _____

☐ Acknowledgement is made of a claim for domestic priority under 35 U.S.C. § 119(e).

**Attachment(s)**

☒ Notice of References Cited, PTO-892

☒ Information Disclosure Statement(s), PTO-1449, Paper No(s). _2_

☐ Interview Summary, PTO-413

☒ Notice of Draftsperson's Patent Drawing Review, PTO-948

☐ Notice of Informal Patent Application, PTO-152

*--- SEE OFFICE ACTION ON THE FOLLOWING PAGES ---*

U. S. Patent and Trademark Office
PTO-326 (Rev. 9-95)                    Office Action Summary                    Part of Paper No. ___3___

**A037**

Serial Number: 08/634374

Art Unit: 3303

## DETAILED ACTION

### *Claim Rejections - 35 USC § 102*

The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the basis for the rejections under this section made in this Office action:

A person shall be entitled to a patent unless --

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United States.

Claims 1-3, 7 and 8 are rejected under 35 U.S.C. 102(b) as being anticipated by Henry (5,010,843). Henry shows a pet bed 10, see figure 5, having an outer covering (unnumbered) containing a zippered opening 34 for access to the interior, a base cushion 12 and semi-circular top cushions or bolsters 14" or 16". The top cushions or bolsters 14" or 16"are affixed to the edge 22 of the base cushion 12 in either a permanent (stitched) or removable (zippered or snapped) fashion, see column 2, lines 19-29.

### *Allowable Subject Matter*

Claims 4-6, 9 and 10 are objected to as being dependent upon a rejected base claim, but would be allowable if rewritten in independent form including all of the limitations of the base claim and any intervening claims.

Claim 11 is allowable.

Serial Number: 08/634374

Art Unit: 3303

## Conclusion

The prior art made of record and not relied upon is considered pertinent to applicant's disclosure. Included for further reference on pet beds are: Von Below (984,324), McGarvey (1,469,523), Burt (1,569,710), Petersilie (3,890,658), West (5,109,559) and Schwarzenbart (5,197,411).

Any inquiry concerning this communication or earlier communications from the examiner should be directed to Elizabeth Shaw whose telephone number is (703) 308-1853. Group Receptionist: (703) 308-0858. Art Unit Fax: (703) 308-2708.

Elizabeth Shaw d-YE

June 20, 1997

ROBERT P. SWIATEK
PRIMARY EXAMINER
ART UNIT 333

## Notice of References Cited

| Application No. | Applicant(s) |
| --- | --- |
| 08/634,374 | Scott |

| Examiner | Group Art Unit | |
| --- | --- | --- |
| Elizabeth Shaw | 3303 | Page 1 of 1 |

### U.S. PATENT DOCUMENTS

| | DOCUMENT NO. | DATE | NAME | CLASS | SUBCLASS |
| --- | --- | --- | --- | --- | --- |
| A | 984,324 | 2-1911 | Von Below | 5 | 722 |
| B | 1,469,523 | 10-1923 | McGarvey | 5 | 402x |
| C | 1,569,710 | 1-1926 | Burt | 119 | 28.5 |
| D | 3,890,658 | 6-1975 | Petersilie | 5 | 722x |
| E | 5,010,843 | 4-1991 | Henry | 119 | 28.5 |
| F | 5,109,559 | 5-1992 | West | 5 | 691x |
| G | 5,197,411 | 3-1993 | Scharzenbart | 119 | 28.5 |
| H | | | | | |
| I | | | | | |
| J | | | | | |
| K | | | | | |
| L | | | | | |
| M | | | | | |

### FOREIGN PATENT DOCUMENTS

| | DOCUMENT NO. | DATE | COUNTRY | NAME | CLASS | SUBCLASS |
| --- | --- | --- | --- | --- | --- | --- |
| N | | | | | | |
| O | | | | | | |
| P | | | | | | |
| Q | | | | | | |
| R | | | | | | |
| S | | | | | | |
| T | | | | | | |

### NON-PATENT DOCUMENTS

| | DOCUMENT (Including Author, Title, Source, and Pertinent Pages) | DATE |
| --- | --- | --- |
| U | | |
| V | | |
| W | | |
| X | | |

**A040**

Attachment  3

The drawings submitted with this application were declared informal by the applicant. Accordingly they have not been reviewed by a draftsperson at this time. When formal drawings are submitted, the draftsperson will perform a review.

Direct any inquires concerning drawing review to the Drawing Review Branch (703) 305-8404.

Substitute PTO-948



Gau 3303

T.H.
10-16-97
#9/Ci
pecd

IN THE
UNITED STATES PATENT & TRADEMARK OFFICE

IN RE APPLICATION OF:        Scott Haugh            )
                                                    )
ATTORNEY DOCKET NO:          1300-112              )
                                                    )
SERIAL NO.:                  08/634,374            )
                                                    ) ART UNIT: 3303
FILING DATE:                 April 18, 1996        )
                                                    )
ENTITLED:                    Pet Bed With          ) ATTENTION OF:
                             Removable Bolster     ) Examiner E. Shaw

ASSISTANT COMMISSIONER FOR PATENTS
WASHINGTON, D.C. 20231

Dear Sir:

[x]    AUTHORIZATION  TO PAY AND PETITION FOR THE ACCEPTANCE OF ANY NECESSARY FEES.  If
       any charges or fees must be paid in connection with the following Communication (including but not limited to
       the payment of issue fees), they may be paid out of our deposit account No. 12-0064.  If this payment also
       requires a Petition, please construe this authorization to pay as the necessary Petition which is required to
       accompany the payment.

[ ]    Applicant hereby petitions the Commissioner of Patents and Trademarks to extend the time for response to
       the  Office Action  dated _____ for _____ month(s)  from _____  to
       _____.  Submitted herewith is a check for the amount of $____ to cover the cost of the extension.  If
       a check is lost, or otherwise does not accompany this Petition, please charge my deposit account number
       12-0064 in the appropriate amount to cover the cost of the extension.  Any deficiency or overpayment should
       be charged or credited to the above numbered deposit account.


## AMENDMENT


### CERTIFICATE OF MAILING

I hereby certify that this correspondence is being deposited
with the United States Postal Service as first class mail
in an envelope addressed to: Assistant Commissioner of
Patents, Washington, D.C. 20231 on:


Date: Sept. 29, 1997     Irma Rivera
                         Irma Rivera


LAFF, WHITESEL, CONTE & SARET, LTD.
401 N. Michigan Avenue
Chicago, IL  60611
(312) 661-2100 - phone
(312) 661-2100 - fax

| | Registration |
|---|---|
| Charles A. Laff | 19787 |
| J. Warren Whitesel | 16830 |
| Robert F. I. Conte | 20354 |
| Larry L. Saret | 27674 |
| Martin L. Stern | 28911 |
| Louis Altman | 19373 |
| Barry W. Sufrin | 27398 |
| Marshall W. Sutker | 19962 |
| Jack R. Halvorsen | 18394 |
| Neil R. Ormos | 35309 |
| Kevin C. Trock | 37745 |
| Scott G. Feder | 33129 |
| G. Peter Albert, Jr. | 37268 |
| Michael B. Allen | 37582 |
| Lisa C. Childs | 39937 |



In response to the Office Action dated June 27, 1997, please amend the above application as follows and consider the following remarks.

IN THE CLAIMS:

Please amend claims 1, 4, 7 and 9 as follows:

1.    (Amended)  A pet bed comprising:

an outer covering;

a removable cushion disposed within the outer covering to form a cushioned bottom portion; and

a bolster removably [affixed] <u>disposed</u> within the interior of the outer covering substantially all of said bolster and disposed about at least a portion of the perimeter of the bottom portion <u>without being secured to the removable cushion.</u>
<u>exteriorly</u>

4.    (Amended)  [The pet bed of claim 1] <u>A pet bed comprising:</u>

<u>an outer covering;</u>

<u>a removable cushion disposed within the outer covering to form a cushioned bottom portion; and</u>

<u>a bolster removably affixed within the interior of the outer covering and disposed about at least a portion of the perimeter of the bottom portion</u>, wherein the bolster is removably affixed within the interior of the outer covering by a plurality of straps secured to the outer covering.

2

A043

7.    (Amended)  A pet bed comprising:

an outer covering including [a bolster pocket and] a reclosable access opening;

a removable cushion disposed within the outer covering to form a cushioned bottom portion;

a bolster removably [affixed within] secured to the interior of the outer covering and disposed about at least a portion of the perimeter of the bottom portion;

such that the removable cushion and bolster are separately removable from the outer covering interior through the reclosable access opening..

9.    (Amended)  [The bed of claim 7] A pet bed comprising:

an outer covering including a bolster pocket and a reclosable access opening;

a removable cushion disposed within the outer covering to form a cushioned bottom portion;

a bolster removably affixed within the bolster pocket and disposed about at least a portion of the perimeter of the bottom portion;

such that the removably cushion and bolster are separately removably from the outer covering interior through the reclosable access opening;

wherein the bolster is removably affixed within the bolster pocket by a plurality of straps.

3

A044

## REMARKS

This Amendment is submitted in response to the Office Action mailed on June 27, 1997. Prior to the Office Action, claims 1-11 were pending in the patent application. The Office Action indicated that claim 11 is allowed and that dependent claims 4-6, 9 and 10 would be allowable if rewritten to include the limitations of the base claim and any intervening claims. The Office Action rejected claims 1-3, 7 and 8 under 35 U.S.C. §102(b) as being anticipated by U.S. Patent No. 5,010,843, issued to Henry.

Applicant has amended claims 1, 4, 7 and 9. Claims 1-11 remaining pending in the application.

Applicant has amended claims 4 and 9 to include the limitations of the base claims as suggested by the Examiner. Thus, those claims dependent on claims 4 and 9, namely claims 5, 6 and 10 should now also be allowable.

Claims 1-3 are directed towards a pet bed comprising an outer covering, a cushion disposed within the outer covering, and a bolster removably disposed within the outer covering and disposed about at least a portion of the perimeter of the bottom portion without being secured to the cushion. Because the bolster is not secured to the cushion, this pet bed is easier than those in the prior art to assemble, i.e., to place the bolster and cushion within the outer covering, and also easier to disassemble for transport or cleaning purposes.

In the pet bed disclosed in <u>Henry</u>, the semi-circular cushions are attached to

4

the circular base cushion by stitching, hook and loop materials, or other fasteners. However, if the cushions are foam, a commonly used cushion material, it is not easy to sew or attach hook and loop fasteners to such foam material, and the joint between the semi-circular cushion and base cushion is susceptible to failure. As a result, Henry suggests individual liners for each cushion and requires covers for the semi-circular cushions 14, 16 which are separate from the cover for the base cushion. See Col. 2, lines 44-50. These separate liners and covers add manufacturing cost for material and assembly time. In addition, Henry has a concern for exposed connections between the semi-circular cushions and the base cushion, which is not a concern with the present invention because a single cover encompasses both cushions. Henry does not suggest a single cover for all of the cushions, and it would be difficult to design such a cover and assemble such a bed using the interconnected cushions of Henry.

Thus, the prior art of record does not teach or suggest the pet bed of claims 1-3. Accordingly, applicant respectfully submits that claims 1-3 are patentable over the prior art and requests allowance of such claims.

Claims 7 and 8 are directed to a pet bed in which the bolster is removably secured to the interior of the outer covering. This feature -- not disclosed by the Henry reference -- increases the stability of the pet bed by insuring that the bolster remains relatively fixed in position with respect to the perimeter of the bottom cushion 4 and bolster pocket 10. The prior art of record does not teach or suggest

5

A046

the pet bed of claims 7 and 8.   Accordingly, applicant respectfully submits that claims 7 and 8 are patentable over the prior art of record and requests allowance of such claims.

Respectfully submitted,
LAFF, WHITESEL, CONTE & SARET, LTD.

By: _____
Larry L. Saret
William A. Meunier

DATED: _Sept 25, 1997_

C:\MYDOCUMENTS\BILL\1300-112\AMENDMENT DATED SEPTEMBER 25, 1997

6

*# 5*

| *Interview Summary* | Application No. 08/634,374 | Applicant(s) Haugh |
|---|---|---|
| | Examiner Elizabeth Shaw | Group Art Unit 3303 |

All participants (applicant, applicant's representative, PTO personnel):

(1) _Elizabeth Shaw_                              (3) _____

(2) _Larry Saret_                                (4) _____

Date of Interview _____ _Nov 19, 1997_ _____

Type: ☒ Telephonic   ☐ Personal (copy is given to   ☐ applicant   ☐ applicant's representative).

Exhibit shown or demonstration conducted:   ☐ Yes   ☒ No.  If yes, brief description: _____
_____
_____

Agreement   ☒ was reached.   ☐ was not reached.

Claim(s) discussed: _1_

Identification of prior art discussed:
_Henry_
_____

Description of the general nature of what was agreed to if an agreement was reached, or any other comments:
_Additional language was discussed to insure that claim 1 read over the prior art patent to Henry._
_____

_    See Examiner's Amendment._
_____
_____
_____
_____
_____

(A fuller description, if necessary, and a copy of the amendments, if available, which the examiner agreed would render the claims allowable must be attached. Also, where no copy of the amendents which would render the claims allowable is available, a summary thereof must be attached.)

1. ☒   It is not necessary for applicant to provide a separate record of the substance of the interview.

Unless the paragraph above has been checked to indicate to the contrary, A FORMAL WRITTEN RESPONSE TO THE LAST OFFICE ACTION IS NOT WAIVED AND MUST INCLUDE THE SUBSTANCE OF THE INTERVIEW.  (See MPEP Section 713.04).  If a response to the last Office action has already been filed, APPLICANT IS GIVEN ONE MONTH FROM THIS INTERVIEW DATE TO FILE A STATEMENT OF THE SUBSTANCE OF THE INTERVIEW.

2. ☐   Since the Examiner's interview summary above (including any attachments) reflects a complete response to each of the objections, rejections and requirements that may be present in the last Office action, and since the claims are now allowable, this completed form is considered to fulfill the response requirements of the last Office action.  Applicant is not relieved from providing a separate record of the interview unless box 1 above is also checked.

Examiner Note:  You must sign and stamp this form unless it is an attachment to a signed Office action.

U. S. Patent and Trademark Office
PTO-413 (Rev. 10-95)                    Interview Summary                    er No. ___ 5

**A048**

#6/B

| *Notice of Allowability* | Application No. 08/634,374 | Applicant(s) Haugh |
|---|---|---|
| | Examiner Elizabeth Shaw | Group Art Unit 3303 |

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance and Issue Fee Due or other appropriate communication will be mailed in due course.

☒ This communication is responsive to *amendment filed on Oct. 3, 1997 and telephone interview on Nov. 19, 1997*

☒ The allowed claim(s) is/are *1-11*

☐ The drawings filed on _____ are acceptable.

☐ Acknowledgement is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d).

   ☐ All  ☐ Some*  ☐ None  of the CERTIFIED copies of the priority documents have been

      ☐ received.

      ☐ received in Application No. (Series Code/Serial Number) _____.

      ☐ received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

   *Certified copies not received: _____

☐ Acknowledgement is made of a claim for domestic priority under 35 U.S.C. § 119(e).

A SHORTENED STATUTORY PERIOD FOR RESPONSE to comply with the requirements noted below is set to EXPIRE **THREE MONTHS** FROM THE "DATE MAILED" of this Office action. Failure to timely comply will result in ABANDONMENT of this application. Extensions of time may be obtained under the provisions of 37 CFR 1.136(a).

☐ Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL APPLICATION, PTO-152, which discloses that the oath or declaration is deficient. A SUBSTITUTE OATH OR DECLARATION IS REQUIRED.

☒ Applicant MUST submit NEW FORMAL DRAWINGS

   ☒ because the originally filed drawings were declared by applicant to be informal.

   ☐ including changes required by the Notice of Draftsperson's Patent Drawing Review, PTO-948, attached hereto or to Paper No. _____.

   ☐ including changes required by the proposed drawing correction filed on _____, which has been approved by the examiner.

   ☐ including changes required by the attached Examiner's Amendment/Comment.

   **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the reverse side of the drawings. The drawings should be filed as a separate paper with a transmittal lettter addressed to the Official Draftsperson.**

☐ Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

Any response to this letter should include, in the upper right hand corner, the APPLICATION NUMBER (SERIES CODE/SERIAL NUMBER). If applicant has received a Notice of Allowance and Issue Fee Due, the ISSUE BATCH NUMBER and DATE of the NOTICE OF ALLOWANCE should also be included.

Attachment(s)

   ☐ Notice of References Cited, PTO-892

   ☐ Information Disclosure Statement(s), PTO-1449, Paper No(s). _____

   ☐ Notice of Draftsperson's Patent Drawing Review, PTO-948

   ☐ Notice of Informal Patent Application, PTO-152

   ☒ Interview Summary, PTO-413

   ☒ Examiner's Amendment/Comment

   ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material

   ☐ Examiner's Statement of Reasons for Allowance

*Robert P. Swiatek*

ROBERT P. SWIATEK
PRIMARY EXAMINER

**A049**

Serial Number: 08/634374

Art Unit: 3303

Page 2

## EXAMINER'S AMENDMENT

An examiner's amendment to the record appears below. Should the changes and/or additions be unacceptable to applicant, an amendment may be filed as provided by 37 CFR 1.312. To ensure consideration of such an amendment, it MUST be submitted no later than the payment of the issue fee.

Authorization for this examiner's amendment was given in a telephone interview with Larry Saret on November 19, 1997.

The application has been amended as follows:

In claim 1, line 6, after the word "and" the phrase --substantially all of said bolster-- has been inserted and after the word "disposed" the word --exteriorly-- has been inserted.

Summary: claims 1-11 are allowed.

Any inquiry concerning this communication or earlier communications from the examiner should be directed to Elizabeth Shaw whose telephone number is (703) 308-1853.

*Elizabeth Shaw*

Elizabeth Shaw d-YE

November 19, 1997

*Robert P. Swiatek*

ROBERT P. SWIATEK
PRIMARY EXAMINER
ART UNIT 353

A050



**UNITED STATES DEPARTMENT OF COMMERCE**
Patent and Trademark Office

## NOTICE OF ALLOWANCE AND ISSUE FEE DUE

F3017126

LAFF WHITESEL CONTE AND SARET LTD
401 NORTH MICHIGAN AVENUE
CHICAGO IL 60611

| APPLICATION NO. | FILING DATE | TOTAL CLAIMS | EXAMINER AND GROUP ART UNIT | DATE MAILED |
|---|---|---|---|---|
| 08/634,374 | 04/18/96 | 011 | SHAW, E    3603 | 11/25/97 |

| First Named Applicant | SCOTT, | HAUGH |
|---|---|---|

TITLE OF INVENTION PET BED WITH REMOVABLE BOLSTER

| ATTY'S DOCKET NO. | CLASS-SUBCLASS | BATCH NO. | APPLN. TYPE | SMALL ENTITY | FEE DUE | DATE DUE |
|---|---|---|---|---|---|---|
| 3  1300-112 | 119-028.500 | U57 | UTILITY | YES | $660.00 | 02/25/98 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT.
PROSECUTION ON THE MERITS IS CLOSED.**

**THE ISSUE FEE MUST BE PAID WITHIN <u>THREE MONTHS</u> FROM THE MAILING DATE OF THIS NOTICE OR THIS
APPLICATION SHALL BE REGARDED AS ABANDONED.  <u>THIS STATUTORY PERIOD CANNOT BE EXTENDED.</u>**

### HOW TO RESPOND TO THIS NOTICE:

I. Review the SMALL ENTITY status shown above.
   If the SMALL ENTITY is shown as YES, verify your current SMALL ENTITY status:

   If the SMALL ENTITY is shown as NO:

   A. If the status is changed, pay twice the amount of the FEE DUE shown above and notify the Patent and Trademark Office of the change in status, or

   A. Pay FEE DUE shown above, or

   B. If the status is the same, pay the FEE DUE shown above.

   B. File verified statement of Small Entity Status before, or with, payment of 1/2 the FEE DUE shown above.

II. Part B-Issue Fee Transmittal should be completed and returned to the Patent and Trademark Office (PTO) with your
    ISSUE FEE.  Even if the ISSUE FEE has already been paid by charge to deposit account, Part B Issue Fee Transmittal
    should be completed and returned.  If you are charging the ISSUE FEE to your deposit account, section "4b" of Part
    B-Issue Fee Transmittal should be completed and an extra copy of the form should be submitted.

III. All communications regarding this application must give application number and batch number.
    Please direct all communications prior to issuance to Box ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Utility patents issuing on applications filed on or after Dec. 12, 1980 may require payment of
maintenance fees.  It is patentee's responsibility to ensure timely payment of maintenance
fees when due.**

PTOL-85 (REV. 10-96) Approved for use through 06/30/99. (0651-0033)

PATENT AND TRADEMARK OFFICE COPY

☆U.S.GOVE

A051

#120

IN THE
**UNITED STATES PATENT & TRADEMARK OFFICE**
ART UNIT 3303

| | | |
|---|---|---|
| IN RE APPLICATION OF: | SCOTT, Haugh | ) |
| | | ) |
| CASE: | 1300-112 | ) |
| | | ) |
| SERIAL NO.: | 08/634,374 | ) |
| | | ) |
| FILED ON: | April 18, 1996 | ) |
| | | ) |
| FOR: | PET BED WITH | ) |
| | REMOVABLE BOLSTER | ) |

①Nm  33113/4100

**SUBMISSION OF FORMAL DRAWINGS AND ISSUE FEE DUE**

ASSISTANT COMMISSIONER OF PATENTS
WASHINGTON, DC 20231

FEB 20 1998

Dear Sirs:

[X]    AUTHORIZATION TO PAY AND PETITION FOR THE ACCEPTANCE OF ANY NECESSARY FEES: If any charges or fees must be paid in connection with the following Communication (including but not limited to the payment of issue fees), they may be paid out of our deposit account No. 12-0064. If this payment also requires a Petition, please construe this authorization to pay as the necessary Petition which is required to accompany the payment.

[]    Applicant herewith petitions the Commissioner of Patents and Trademarks to extend the time for response to the Office Action dated _____ for _____ month(s) from _____ to _____. Submitted herewith is check No. _____ for $_____ to cover the cost of the extension. If a check is lost, or otherwise does not accompany this Petition, please charge my deposit account number 12-0064 in the appropriate amount to cover the cost of the extension. Any deficiency or overpayment should be charged or credited to the above numbered deposit account.

CERTIFICATE OF MAILING

I hereby certify that this correspondence is being deposited with the United States Postal Service as first-class mail in an envelope addressed to: Commissioner of Patents and Trademarks, Washington, D.C. 20231 on:
Date: February 17, 1998

Signature: *Robbi Shew*
Print:        Robbi Shew

| REGISTRATION | |
|---|---|
| Charles A. Laff | 19787 |
| J. Warren Whitesel | 16830 |
| Robert F.I. Conte | 20354 |
| Larry L. Saret | 27674 |
| Martin L. Stern | 28911 |
| Louis Altman | 19373 |
| Barry W. Sufrin | 27398 |
| Marshall W. Sutker | 19995 |
| Neil R. Ormos | 35309 |
| Kevin C. Trock | 37745 |
| Scott B. Feder | 33129 |
| Jack H. Halvorsen | 18394 |
| G. Peter Albert, Jr. | 37268 |
| Michael B. Allen | 37582 |
| William A. Meunier | 41193 |

**LAFF, WHITESEL, CONTE & SARET LTD.**
**401 North Michigan Avenue**
**Chicago, Illinois 60611-4212**
**(312) 661-2100**
**Fax: (312) 661-0029**

A052

**PART B—ISSUE FEE TRANSMITTAL**

Complete and mail this form, together with ap~.~able fees, to:    **Box ISSUE FEE**
**Assistant Commissioner for Patents**
**Washington, D.C. 20231**

*Q.42-1666*
*S6l-37*

*MAILING INSTRUCTIONS:* This form should be used for transmitting the ISSUE FEE. Blocks 1 through 4 should be completed where appropriate. All further correspondence including the Issue Fee Receipt, the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

Note: The certificate of mailing below can only be used for domestic mailings of the Issue Fee Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing.

CURRENT CORRESPONDENCE ADDRESS (Note: Legibly mark-up with any corrections or use Block 1)

**Certificate of Mailing**
I hereby certify that this Issue Fee Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Box Issue Fee address above on the date indicated below.

```
                    F3M1/1125
LAFF WHITESEL CONTE AND SARET  LTD
401 NORTH MICHIGAN AVENUE
CHICAGO IL 60611
```

Robbi Shew                    (Depositor's name)

*Robbi Shew*                  (Signature)

February 17, 1998            (Date)

| APPLICATION NO. | FILING DATE | TOTAL CLAIMS | EXAMINER AND GROUP ART UNIT | | DATE MAILED |
|---|---|---|---|---|---|
| 08/634,374 | 04/18/96 | 011 | SHAW, E | 3303 | 11/25/97 |

First Named Applicant    SCOTT, HAUGH

TITLE OF INVENTION    PET BED WITH REMOVABLE BOLSTER

| ATTY'S DOCKET NO. | CLASS-SUBCLASS | BATCH NO. | APPLN. TYPE | SMALL ENTITY | FEE DUE | DATE DUE |
|---|---|---|---|---|---|---|
| 3  1300-112 | 119-028.500 | U57 | UTILITY | YES | $660.00 | 02/25/98 |

1: Change of correspondence address or indication of " Fee Address" (37 CFR 1.363). Use of PTO form(s) and Customer Number are recommended, but not required.

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" Indication (or "Fee Address" Indication form PTO/SB/47) attached.

2. For printing on the patent front page, list (1) the names of up to 3 registered patent attorneys or agents OR, alternatively, (2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1  LAFF, WHITESEL, CONTE
& SARET, LTD.

2 _____

3 _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)
PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. Inclusion of assignee data is only appropriate when an assignment has been previously submitted to the PTO or is being submitted under separate cover. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE    Flexi-Mat Corporation

(B) RESIDENCE: (CITY & STATE OR COUNTRY) Chicago, Illinois USA

Please check the appropriate assignee category indicated below (will not be printed on the patent)

☐ Individual    ☒ corporation or other private group entity    ☐ government

4a. The following fees are enclosed (make check payable to Commissioner of Patents and Trademarks):
☒ Issue Fee
☒ Advance Order - # of Copies    10

4b. The following fees or deficiency in these fees should be charged to:
DEPOSIT ACCOUNT NUMBER    12-0064
(ENCLOSE AN EXTRA COPY OF THIS FORM)
☒ Issue Fee
☒ Advance Order - # of Copies _____

The COMMISSIONER OF PATENTS AND TRADEMARKS IS requested to apply the Issue Fee to the application identified above.

(Authorized Signature)    (Date)    02/17/98

NOTE: The Issue Fee will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the Patent and Trademark Office.

*Burden Hour Statement:* This form is estimated to take 0.2 hours to complete. Time will vary depending on the needs of the individual case. Any comments on the amount of time required to complete this form should be sent to the Chief Information Officer, Patent and Trademark Office, Washington, D.C. 20231. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND FEES AND THIS FORM TO: Box Issue Fee, Assistant Commissioner for Patents, Washington, D.C. 20231

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

```
02/26/1998 LBERGER  00000139 08634374
01 FC:242            660.00 OP
02 FC:561             30.00 OP
```

**TRANSMIT THIS FORM WITH FEE**

A053

IN THE
**UNITED STATES PATENT & TRADEMARK OFFICE**
ART UNIT 3303

| | | |
|---|---|---|
| IN RE APPLICATION OF: | SCOTT, Haugh | ) |
| | | ) |
| CASE: | 1300-112 | ) |
| | | ) **SUBMISSION OF** |
| SERIAL NO.: | 08/634,374 | ) **FORMAL DRAWINGS** |
| | | ) **AND ISSUE FEE DUE** |
| FILED ON: | April 18, 1996 | ) |
| | | ) |
| FOR: | PET BED WITH | ) |
| | REMOVABLE BOLSTER | ) |

ASSISTANT COMMISSIONER OF PATENTS
WASHINGTON, DC 20231

Dear Sirs:

[X]     AUTHORIZATION TO PAY AND PETITION FOR THE ACCEPTANCE OF ANY NECESSARY FEES: If any charges or fees must be paid in connection with the following Communication (including but not limited to the payment of issue fees), they may be paid out of our deposit account No. 12-0064. If this payment also requires a Petition, please construe this authorization to pay as the necessary Petition which is required to accompany the payment.

[]     Applicant herewith petitions the Commissioner of Patents and Trademarks to extend the time for response to the Office Action dated _____ for _____ month(s) from _____ to _____. Submitted herewith is check No. _____ for $_____ to cover the cost of the extension. If a check is lost, or otherwise does not accompany this Petition, please charge my deposit account number 12-0064 in the appropriate amount to cover the cost of the extension. Any deficiency or overpayment should be charged or credited to the above numbered deposit account.

**CERTIFICATE OF MAILING**

I hereby certify that this correspondence is being deposited with the United States Postal Service as first-class mail in an envelope addressed to: Commissioner of Patents and Trademarks, Washington, D.C. 20231 on:
Date: February 17, 1998

Signature: *Robbi Shew*
Print:     Robbi Shew

| REGISTRATION | |
|---|---|
| Charles A. Laff | 19787 |
| J. Warren Whitesel | 16830 |
| Robert F.I. Conte | 20354 |
| Larry L. Saret | 27674 |
| Martin L. Stern | 28911 |
| Louis Altman | 19373 |
| Barry W. Sufrin | 27398 |
| Marshall W. Sutker | 19995 |
| Neil R. Ormos | 35309 |
| Kevin C. Trock | 37745 |
| Scott B. Feder | 33129 |
| Jack R. Halvorsen | 18394 |
| G. Peter Albert, Jr. | 37268 |
| Michael B. Allen | 37582 |
| William A. Meunier | 41193 |

**LAFF, WHITESEL, CONTE & SARET LTD.**
**401 North Michigan Avenue**
**Chicago, Illinois 60611-4212**
**(312) 661-2100**
**Fax: (312) 661-0029**

**A054**

## SUBMISSION OF FORMAL DRAWINGS AND ISSUE FEE DUE

Enclosed herewith are formal drawings to be filed in connection with the above-named application.

Also enclosed is a check in the amount of $ 690.00 as payment of the Notice of Allowance and Issue Fee Due, due February 25, 1998, as well as ten (10) advance copies, for the above-identified application.

Respectfully submitted,

Larry L. Saret
Registration No.  27674
LAFF, WHITESEL, CONTE & SARET, LTD.
401 North Michigan Avenue, Suite 1700
Chicago, IL  60611
(312) 661-2100
(312 661-0029 (fax)

2

A055



5765502

FIG. 1

FIG. 2

FIG. 3





FIG. 4

FIG. 5

A057

7530    100
4/22/98    119/028.500

5765502
6/16/98 1
9

Ltr +

IN THE
**UNITED STATES PATENT & TRADEMARK OFFICE**
ART UNIT 3303

| | | |
|---|---|---|
| IN RE APPLICATION OF: | SCOTT, Haugh [sic] | ) |
| CASE: | 1300-112 | ) |
| SERIAL NO.: | 08/634,374 | ) |
| FILED ON: | April 18, 1996 | ) |
| FOR: | PET BED WITH REMOVABLE BOLSTER | ) |

**AMENDMENT PURSUANT TO 37 C.F.R. 1.312**

Decl.
Cofer
10-2-98

ASSISTANT COMMISSIONER OF PATENTS
WASHINGTON, DC 20231

Corres/Allowed Files (07)
Publishing Division

RECEIVED
Publishing Division

FEB 0 2 1998

Dear Sirs:

RECEIVED
FEB 6 - 1998

13

[X]    AUTHORIZATION TO PAY AND PETITION FOR THE ACCEPTANCE OF ANY NECESSARY FEES: If any charges or fees must be paid in connection with the following Communication (including but not limited to the payment of issue fees), they may be paid out of our deposit account No. 12-0064. If this payment also requires a Petition, please construe this authorization to pay as the necessary Petition which is required to accompany the payment.

[ ]    Applicant herewith petitions the Commissioner of Patents and Trademarks to extend the time for response to the Office Action dated _____ for _____ month(s) from _____ to _____. Submitted herewith is check No. _____ for $_____ to cover the cost of the extension. If a check is lost, or otherwise does not accompany this Petition, please charge my deposit account number 12-0064 in the appropriate amount to cover the cost of the extension. Any deficiency or overpayment should be charged or credited to the above numbered deposit account.

CERTIFICATE OF MAILING

I hereby certify that this correspondence is being deposited with the United States Postal Service as first-class mail in an envelope addressed to: Commissioner of Patents and Trademarks, Washington, D.C. 20231 on:
Date: *January 28, 1998*

Signature: *Robbi Shew*
Print:    Robbi Shew

| REGISTRATION | |
|---|---|
| Charles A. Laff | 19787 |
| J. Warren Whitesel | 16830 |
| Robert F.I. Conte | 20354 |
| Larry L. Saret | 27674 |
| Martin L. Stern | 28911 |
| Louis Altman | 19373 |
| Barry W. Sufrin | 27398 |
| Marshall W. Sutker | 19995 |
| Neil R. Ormos | 35309 |
| Kevin C. Trock | 37745 |
| Scott B. Feder | 33129 |
| Jack R. Halvorsen | 18394 |
| G. Peter Albert, Jr. | 37268 |
| Michael B. Allen | 37582 |
| William A. Meunier | 41193 |

**LAFF, WHITESEL, CONTE & SARET LTD.**
401 North Michigan Avenue
Chicago, Illinois 60611-4212
(312) 661-2100
Fax: (312) 661-0029

A058

AMENDMENT PURSUANT TO 37 C.F.R. 1.312

This Amendment is submitted pursuant to 37 C.F.R. 1.312. The Notice of Allowance and Issue Fee Due dated November 25, 1997 indicates that the name of the inventor was recorded by the United States Patent and Trademark Office as "Haugh Scott", mistakenly reversing the inventor's surname and given name. The inventor's name should read: --Scott Haugh-- as originally set forth on the original application. Copies of the Transmittal document and the Declaration and Power of Attorney are attached.

Respectfully submitted,

Larry L. Saret
Registration No. 27674
LAFF, WHITESEL, CONTE & SARET, LTD.
401 North Michigan Avenue, Suite 1700
Chicago, IL 60611
(312) 661-2100
(312 661-0029 (fax)

Date: January 28, 1998

2

**A059**

1300-112

# Declaration and Power of Attorney For Patent Application

## English Language Declaration

As a below named inventor, I hereby declare that:

My residence, post office address and citizenship are as stated below next to my name.

I believe I am the original, first and sole inventor (if only one name is listed below) or an original, first and joint inventor (if plural names are listed below) of the subject matter which is claimed and for which a patent is sought on the invention entitled

PET BED WITH REMOVABLE BOLSTER

the specification of which

(check one)

☒ is attached hereto.

☐ was filed on _____ as

Application Serial No. _____

and was amended on _____
(if applicable)

I hereby state that I have reviewed and understand the contents of the above identified specification, including the claims, as amended by any amendment referred to above.

I acknowledge the duty to disclose information which is material to the examination of this application in accordance with Title 37, Code of Federal Regulations, §1.56(a).

I hereby claim foreign priority benefits under Title 35, United States Code, §119 of any foreign application(s) for patent or inventor's certificate listed below and have also identified below any foreign application for patent or inventor's certificate having a filing date before that of the application on which priority is claimed:

Prior Foreign Application(s)                                         Priority Claimed

| None | | | |
|------|------|------|------|
| (Number) | (Country) | (Day/Month/Year Filed) | ☐ Yes  ☐ No |
| (Number) | (Country) | (Day/Month/Year Filed) | ☐ Yes  ☐ No |
| (Number) | (Country) | (Day/Month/Year Filed) | ☐ Yes  ☐ No |

I hereby claim the benefit under Title 35, United States Code, §120 of any United States application(s) listed below and, insofar as the subject matter of each of the claims of this application is not disclosed in the prior United States application in the manner provided by the first paragraph of Title 35, United States Code, §112, I acknowledge the duty to disclose material information as defined in Title 37, Code of Federal Regulations, §1.56(a) which occurred between the filing date of the prior application and the national or PCT international filing date of this application:

401 N. MICHIGAN AVENUE
CHICAGO, ILLINOIS 60611

LAFF, WHITESEL, CONTE & SARET, LTD.
ATTORNEYS AT LAW

Form PTO-FB-110 (6-83)                     Patent and Trademark Office-U.S. DEPARTMENT OF COM

TELEPHONE                    TELEX NO.              FAX (312) 861-0029
(312) 861-2100              20-6024

A060

<u>None</u> ——————————————
(Application Serial No.)       (Filing Date)       (Status)
                                                     (patented, pending, abandoned)

——————————————
(Application Serial No.)       (Filing Date)       (Status)
                                                       (patented, pending, abandoned)

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

POWER OF ATTORNEY: As a named inventor, I hereby appoint the following attorney(s) and/or agent(s) to prosecute this application and transact all business in the Patent and Trademark Office connected therewith. Charles A. Laff (19787); J. Warren Whitesel (16830); Robert F.I. Conte (20354); Larry L. Saret (27674); Martin L. Stern (28911); Bernard L. Kleinke (22123); Louis Altman (19373); Barry W. Suffrin (27398); Marshall W. Sutker (19962); Jennifer A. Dunner (33685); Neil R. Ormos (35309); Richard P. Gilly (37630); Kevin C. Trock (37745); and Jack R. Halvorsen (18394).

Send Correspondence to: LAFF, WHITESEL, CONTE & SARET, LTD., 401 North Michigan Avenue, Chicago, Illinois 60611.

Direct Telephone Calls to: <u>Larry L. Saret</u>
at telephone No. (312) 661-2100.

| Full name of sole or first inventor | |
|---|---|
| Scott Haugh | 4/15/96 |
| Inventor's signature | Date |
| *[signature] Scott Haugh* | |
| Residence | |
| 829 South St. Lockport IL 60441 | |
| Citizenship | |
| United States Of America | |
| Post Office Address | |
| | |
| Full name of second joint inventor, if any    None | |
| Second inventor's signature | Date |
| Residence | |
| Citizenship | |
| Post Office Address | |
| | |

(Supply similar information and signature for third and subsequent joint inventors.)

Form PTO-FB-110 (8-83)                        Patent and Trademark

05/26/98  TUE 15:26 FAX 312 527 3001          L. W. C. & S.LTD.                      ☒002

# LAFF, WHITESEL, CONTE & SARET, LTD.

ATTORNEYS AT LAW

401 NORTH MICHIGAN AVENUE
CHICAGO, ILLINOIS 60611-4212

TELEPHONE (312) 661-2100
TELEX NO. 20-6024

FAX (312) 661-0029
FAX (312) 527-3001

Email: lwcs@lwcs.com

**VIA FACSIMILE**
May 26, 1998

CHARLES A. LAFF
J. WARREN WHITESEL
ROBERT F. I. CONTE
LARRY L. SARET
MARTIN L. STERN
LOUIS ALTMAN
JOSEPH F. SCHMIDT
BARRY W. SUFRIN
MARSHALL W. SUTKER
JUDITH L. GRUBNER
JOHN T. GABRIELIDES
KEVIN C. TROCK

JAMES B. CONTE
SCOTT B. FEDER
WILLIAM A. MEUNIER
G. PETER ALBERT
MICHAEL B. ALLEN
LISA C. CHILDS, Ph.D.
RITA ABBATI

CHRIS WOOD, Ph.D.
TECHNICAL ASSISTANT

J.R. HALVORSEN
OF COUNSEL

Mr. Lane
Correspondence Division
c/o Commissioner of Patents
United States Patent and Trademark Office
Washington, D.C. 20231

Re:     U.S. Patent Application Serial No. 08/634,374
        Inventor:      Scott Haugh
        For:      PET BED WITH REMOVABLE BOLSTER
        Our File No. 1300-112

RECEIVED

OCT 0 9 1998

GROUP 2100

Dear Mr. Lane:

Per your conversation this afternoon with my secretary, Robbi Shew, enclosed please find a copy of the Amendment Pursuant to 37 C.F.R. 1.312 to correct the inventor's name, which includes the Declaration and Power of Attorney and Application Transmittal sheet, showing the inventor's name as "Scott Haugh". The United States Patent and Trademark Office documents incorrectly show the inventor's name as "Haugh Scott".

Please have the inventor's name corrected to "Scott Haugh" before the patent issues on June 16, 1998. Feel free to call if you need additional document or information.

Sincerely,

LAFF, WHITESEL, CONTE & SARET, LTD.

*Larry L. Saret*

Larry L. Saret

LLS:rls
Enclosure
c:\mydoc\active\1300\112\poa to correct inventor name.lane

**A062**

05/26/98  TUE 15:26 FAX 312 527 3001          L. W. C. & S, LTD.                    ☐003

# IN THE
# UNITED STATES PATENT & TRADEMARK OFFICE
## ART UNIT 3303

IN RE APPLICATION OF:      SCOTT, Haugh [sic]        )
                                                      )      **AMENDMENT PURSUANT**
CASE:                      1300-112                   )      **TO 37 C.F.R. 1.312**
                                                      )
SERIAL NO.:                08/634,374                 )
                                                      )
FILED ON:                  April 18, 1996             )
                                                      )
FOR:                       PET BED WITH               )
                           REMOVABLE BOLSTER          )

ASSISTANT COMMISSIONER OF PATENTS
WASHINGTON, DC 20231

Dear Sirs:

[X]      AUTHORIZATION TO PAY AND PETITION FOR THE ACCEPTANCE OF ANY
         NECESSARY FEES: If any charges or fees must be paid in connection with the following
         Communication (including but not limited to the payment of issue fees), they may be paid out of
         our deposit account No. 12-0064. If this payment also requires a Petition, please construe this
         authorization to pay as the necessary Petition which is required to accompany the payment.

[]       Applicant herewith petitions the Commissioner of Patents and Trademarks to extend the time
         for response to the Office Action dated _____ for _____ month(s) from _____ to
         _____. Submitted herewith is check No. _____ for $_____ to cover the cost of the
         extension. If a check is lost, or otherwise does not accompany this Petition, please charge my
         deposit account number 12-0064 in the appropriate amount to cover the cost of the extension.
         Any deficiency or overpayment should be charged or credited to the above numbered deposit
         account.

| CERTIFICATE OF MAILING | | REGISTRATION | |
| --- | --- | --- | --- |
| | | Charles A. Laff | 19787 |
| I hereby certify that this correspondence is being | | J. Warren Whitesel | 16830 |
| deposited with the United States Postal Service as first- | | Robert F.I. Conte | 20354 |
| class mail in an envelope addressed to: Commissioner of | | Larry L. Saret | 27674 |
| Patents and Trademarks, Washington, D.C. 20231 on: | | Martin L. Stern | 28911 |
| Date: _January 28, 1998_ | | Louis Altman | 19373 |
| | | Barry W. Suffin | 27398 |
| Signature: _Robbi Shew_ | | Marshall W. Sutker | 19995 |
| Print:        Robbi Shew | | Neil R. Ormos | 35309 |
| | | Kevin C. Trock | 37745 |
| | | Scott B. Feder | 33129 |
| | | Jack R. Halvorsen | 18394 |
| | | G. Peter Albert, Jr. | 37268 |
| | | Michael B. Allen | 37582 |
| | | William A. Meunier | 41193 |

LAFF, WHITESEL, CONTE & SARET LTD.
401 North Michigan Avenue
Chicago, Illinois 60611-4212
(312) 661-2100
Fax: (312) 661-0029

AMENDMENT PURSUANT TO 37 C.F.R. 1.312

This Amendment is submitted pursuant to 37 C.F.R. 1.312. The Notice of Allowance and Issue Fee Due dated November 25, 1997 indicates that the name of the inventor was recorded by the United States Patent and Trademark Office as "Haugh Scott", mistakenly reversing the inventor's surname and given name. The inventor's name should read: --Scott Haugh-- as originally set forth on the original application. Copies of the Transmittal document and the Declaration and Power of Attorney are attached.

Respectfully submitted,

Larry L. Saret
Registration No. 27674
LAFF, WHITESEL, CONTE & SARET, LTD.
401 North Michigan Avenue, Suite 1700
Chicago, IL 60611
(312) 661-2100
(312 661-0029 (fax)

Date:   January 28, 1998

2

A064

# Declaration and Power of Attorney For Patent Application
## English Language Declaration

As a below named inventor, I hereby declare that:

My residence, post office address and citizenship are as stated below next to my name.

I believe I am the original, first and sole inventor (if only one name is listed below) or an original, first and joint inventor (if plural names are listed below) of the subject matter which is claimed and for which a patent is sought on the invention entitled

PET BED WITH REMOVABLE BOLSTER

the specification of which

(check one)

☒  is attached hereto.

☐  was filed on _____ as

Application Serial No. _____

and was amended on _____
(if applicable)

I hereby state that I have reviewed and understand the contents of the above identified specification, including the claims, as amended by any amendment referred to above.

I acknowledge the duty to disclose information which is material to the examination of this application in accordance with Title 37, Code of Federal Regulations, §1.56(a).

I hereby claim foreign priority benefits under Title 35, United States Code, §119 of any foreign application(s) for patent or inventor's certificate listed below and have also identified below any foreign application for patent or inventor's certificate having a filing date before that of the application on which priority is claimed:

Prior Foreign Application(s)                                                           Priority Claimed

| Name | | | |
|------|--|--|--|
| (Number) | (Country) | (Day/Month/Year Filed) | Yes ☐  No ☐ |
| (Number) | (Country) | (Day/Month/Year Filed) | Yes ☐  No ☐ |
| (Number) | (Country) | (Day/Month/Year Filed) | Yes ☐  No ☐ |

I hereby claim the benefit under Title 35, United States Code, §120 of any United States application(s) listed below and, insofar as the subject matter of each of the claims of this application is not disclosed in the prior United States application in the manner provided by the first paragraph of Title 35, United States Code, §112, I acknowledge the duty to disclose material information as defined in Title 37, Code of Federal Regulations, §1.56(a) which occurred between the filing date of the prior application and the national or PCT international filing date of this application:

Form PTO-FB-110 (8-83)                                     Patent and Trademark Office–U.S. DEPARTMENT OF CO

LAFF, WHITESEL, CONTE & SARET, LTD.
ATTORNEYS AT LAW
401 N. MICHIGAN AVENUE
CHICAGO, ILLINOIS 60611

TELEPHONE
(312) 661-2100

TELEX NO.
20-6624

FAX 312 861-0023

A065

05/26/98  TUE 15:27 FAX 312 527 3001          L. W. C. & S.LTD.                              ☑006

None
(Application Serial No.)                    (Filing Date)                    (Status)
                                                                  (patented, pending, abandoned)

(Application Serial No.)                    (Filing Date)                    (Status)
                                                                  (patented, pending, abandoned)

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

POWER OF ATTORNEY: As a named inventor, I hereby appoint the following attorney(s) and/or agent(s) to prosecute this application and transact all business in the Patent and Trademark Office connected therewith. Charles A. Laff (19787); J. Warren Whitesel (16830); Robert F.I. Conte (20354); Larry L. Saret (27674); Martin L. Stern (28911); Bernard L. Kleinke (22123); Louis Altman (19373); Barry W. Suffrin (27358); Marshall W. Sutker (19962); Jennifer A. Dunner (33685); Neil R. Ormos (35309); Richard P. Gilly (37630); Kevin C. Trock (37745); and Jack R. Halvorsen (18394).

Send Correspondence to: LAFF, WHITESEL, CONTE & SARET, LTD., 401 North Michigan Avenue, Chicago, Illinois 60611.

Direct Telephone Calls to: __Larry L. Saret__
at telephone No. (312) 661-2100.

Full name of sole or first inventor
Scott Haugh
Inventor's signature                                            4/15/96
                                                                  Date
Residence
829 South St. Lockport IL 60441
Citizenship
United States Of America
Post Office Address


Full name of second joint inventor, if any
                    None
Second Inventor's signature
                                                                  Date
Residence

Citizenship

Post Office Address


(Supply similar information and signature for third and subsequent joint inventors.)

Form PTO-FB-110 (8-83)

Patent and Trademark Office-U.S. DEPARTMENT OF COMM...

05/26/98  TUE 15:27 FAX 312 527 3001        L. W. C. & S.LTD.                      @007

IN THE

# UNITED STATES PATENT & TRADEMARK OFFICE

The Commissioner of Patents & Trademarks          DATE:   **April 18, 1996**
Washington, D.C. 20231

Sir:                                              OUR CASE NO:   **1300-112**

Transmitted herewith for filing is the patent application (including specification, claims and declaration) of:

Inventor:   **Scott Haugh**

For:   **PET BED WITH REMOVABLE BOLSTER**

A.  Enclosed are:

Documents:          Specification      Claims      Abstract      Declaration
No. of Pages:          5                 2            1              2

[X] _2_ sheets of drawing(s).   [ ] Formal   [X] Informal

[X] An assignment of the invention to   **Flexi-Mat Corporation**

[ ] A certified copy of a _____ application.

[ ] Claim for priority under 35USC119.

[ ] Associate Power of Attorney.

[X] Citation of Prior Art.

[ ] Preliminary Amendment.

[ ] Translation with Translator's Declaration.

[X] Check No. _27849_ in the amount of $ _415.00_ dated _4/18/96_ is
enclosed to cover the [X] filing fee ~~and~~[X] assignment recording fee.
                                          &

B.  FILING FEE CALCULATION:

[ ] Before calculating the filing fee, please cancel claims _____.

[ ] After adding preliminary amendment claims _____.

| SMALL ENTITY STATUS - AFFIDAVIT ATTACHED | | | | | | LARGE BUSINESS RATE | |
|---|---|---|---|---|---|---|---|
| | Number Filed | Number Extra | Rate | Basic Fee $375 | | Rate | Basic Fee $750 |
| Total Claims | 11 -20 | 0 X | $ 11 = | 0.00 | | $ 22 = | |
| Independent Claims | 3 -3 | 0 X | $ 39 = | 0.00 | | $ 78 = | |
| Multiple Dependency | | | $125 = | 0.00 | | $250 = | |
| Total Filing Fee.......................... | | | | 375.00 | | | |
| Assignment Recordal Fee................ | | | | 40.00 | | | |
| | | | Total | $ 415.00 | Total | $ | |

C.  SPECIAL INSTRUCTIONS:

[ ] Please charge our Deposit Account No. 12-0064 in the amount of $ _____.
A duplicate of this sheet is enclosed.

[X] The Commissioner is hereby authorized to charge any fees which may be required, including, but not limited to payment of issue fees, or credit any overpayment to Account No. 12-0064. A duplicate copy of this sheet is enclosed. If this payment also requires a Petition, please construe this authorization to pay as the necessary Petition which is required to accompany the payment.

RETAIN THIS NUMBER-CUSTOMER
RECEIPT WILL BE MAILED TO YOU.

TB864342875 US

**EXPRESS MAIL** mailing label
No. TB 864 342 875 US
Date of Deposit April 18, 1996
I hereby certify that this paper or fee is being deposited with the United States Postal Service "Express Mail Post Office to Addressee" service under 37 CFR 1.10 on the date indicated above and is addressed to the Assistant Commissioner for Patents, Washington, D.C. 20231. The person mailing this paper/fee is: Sandra Heza
PRINT
SIGNATURE

LAFF, WHITESEL, CONTE & SARET, LTD.
ATTORNEYS AT LAW
401 NORTH MICHIGAN AVENUE
CHICAGO, ILLINOIS 60611

TELEPHONE
(312) 661-2100
FAX
(312) 661-0029

Respectfully submitted,
Laff, Whitesel, Conte & Saret, Ltd.

By _____
Larry L. Saret

| | Registration No. |
|---|---|
| Charles A. Laff | 19787 |
| J. Warren Whitesel | 16830 |
| Robert F. I. Conte | 20354 |
| Larry L. Saret | 27674 |
| Marlin L. Stern | 28911 |
| Louis Altman | 19373 |
| Barry W. Sufrin | 27398 |
| Marshall W. Sutker | 19962 |
| Jack R. Halvorsen | 18394 |
| Jennifer A. Dunner | 33885 |
| Neil R. Ormos | 35308 |
| Richard P. Gilly | 37630 |
| Kevin C. Trock | 37745 |
| John W. Hayes | 33900 |

PTO UTILITY GRANT

Paper Number

## The Commissioner of Patents and Trademarks

*Has received an application for a patent for a new and useful invention. The title and description of the invention are enclosed. The requirements of law have been complied with, and it has been determined that a patent on the invention shall be granted under the law.*

*Therefore, this*

### United States Patent

*Grants to the person(s) having title to this patent the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States of America or importing the invention into the United States of America for the term set forth below, subject to the payment of maintenance fees as provided by law.*

*If this application was filed prior to June 8, 1995, the term of this patent is the longer of seventeen years from the date of grant of this patent or twenty years from the earliest effective U.S. filing date of the application, subject to any statutory extension.*

*If this application was filed on or after June 8, 1995, the term of this patent is twenty years from the U.S. filing date, subject to an statutory extension. If the application contains a specific reference to an earlier filed application or applications under 35 U.S.C. 120, 121 or 365(c), the term of the patent is twenty years from the date on which the earliest application was filed, subject to any statutory extension.*

*Bruce Lehman*

Commissioner of Patents and Trademarks

Attest

The
United
States
of
America

Form PTO-1584 (Rev. 2/97)

A069

Staple Issue Slip Here

| POSITION | ID NO. | DATE |
|---|---|---|
| CLASSIFIER | #714 | 5-3-96 |
| EXAMINER | 6805 | |
| TYPIST | 21 | 5/30/96 |
| VERIFIER | | 5/10/96 |
| CORPS CORR. | 2810 | |
| SPEC. HAND. | | |
| FILE MAINT. | | |
| DRAFTING | | |

## INDEX OF CLAIMS

| Claim Final | Original | | | | Date | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | ✓ | = | | | | | | |
| 2 | 2 | ✓ | = | | | | | | |
| 3 | 3 | ✓ | = | | | | | | |
| 4 | 4 | O | = | | | | | | |
| 5 | 5 | O | = | | | | | | |
| 6 | 6 | O | = | | | | | | |
| 7 | 7 | ✓ | = | | | | | | |
| 8 | 8 | ✓ | = | | | | | | |
| 9 | 9 | O | = | | | | | | |
| 10 | 10 | O | = | | | | | | |
| 11 | 11 | = | = | | | | | | |
| | 12 | | | | | | | | |
| | 13 | | | | | | | | |
| | 14 | | | | | | | | |
| | 15 | | | | | | | | |
| | 16 | | | | | | | | |
| | 17 | | | | | | | | |
| | 18 | | | | | | | | |
| | 19 | | | | | | | | |
| | 20 | | | | | | | | |
| | 21 | | | | | | | | |
| | 22 | | | | | | | | |
| | 23 | | | | | | | | |
| | 24 | | | | | | | | |
| | 25 | | | | | | | | |
| | 26 | | | | | | | | |
| | 27 | | | | | | | | |
| | 28 | | | | | | | | |
| | 29 | | | | | | | | |
| | 30 | | | | | | | | |
| | 31 | | | | | | | | |
| | 32 | | | | | | | | |
| | 33 | | | | | | | | |
| | 34 | | | | | | | | |
| | 35 | | | | | | | | |
| | 36 | | | | | | | | |
| | 37 | | | | | | | | |
| | 38 | | | | | | | | |
| | 39 | | | | | | | | |
| | 40 | | | | | | | | |
| | 41 | | | | | | | | |
| | 42 | | | | | | | | |
| | 43 | | | | | | | | |
| | 44 | | | | | | | | |
| | 45 | | | | | | | | |
| | 46 | | | | | | | | |
| | 47 | | | | | | | | |
| | 48 | | | | | | | | |
| | 49 | | | | | | | | |
| | 50 | | | | | | | | |

| Claim Final | Original | | | | Date | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 51 | | | | | | | | |
| | 52 | | | | | | | | |
| | 53 | | | | | | | | |
| | 54 | | | | | | | | |
| | 55 | | | | | | | | |
| | 56 | | | | | | | | |
| | 57 | | | | | | | | |
| | 58 | | | | | | | | |
| | 59 | | | | | | | | |
| | 60 | | | | | | | | |
| | 61 | | | | | | | | |
| | 62 | | | | | | | | |
| | 63 | | | | | | | | |
| | 64 | | | | | | | | |
| | 65 | | | | | | | | |
| | 66 | | | | | | | | |
| | 67 | | | | | | | | |
| | 68 | | | | | | | | |
| | 69 | | | | | | | | |
| | 70 | | | | | | | | |
| | 71 | | | | | | | | |
| | 72 | | | | | | | | |
| | 73 | | | | | | | | |
| | 74 | | | | | | | | |
| | 75 | | | | | | | | |
| | 76 | | | | | | | | |
| | 77 | | | | | | | | |
| | 78 | | | | | | | | |
| | 79 | | | | | | | | |
| | 80 | | | | | | | | |
| | 81 | | | | | | | | |
| | 82 | | | | | | | | |
| | 83 | | | | | | | | |
| | 84 | | | | | | | | |
| | 85 | | | | | | | | |
| | 86 | | | | | | | | |
| | 87 | | | | | | | | |
| | 88 | | | | | | | | |
| | 89 | | | | | | | | |
| | 90 | | | | | | | | |
| | 91 | | | | | | | | |
| | 92 | | | | | | | | |
| | 93 | | | | | | | | |
| | 94 | | | | | | | | |
| | 95 | | | | | | | | |
| | 96 | | | | | | | | |
| | 97 | | | | | | | | |
| | 98 | | | | | | | | |
| | 99 | | | | | | | | |

SYMBOLS

| | |
|---|---|
| ✓ | Rejected |
| = | Allowed |
| – (Through numeral) | Cancelled |
| N | Restricted |
| I | Non-elected |
| | Interference |
| A | Appeal |
| O | Objected |

(LEFT INSIDE)

A070

| SEARCHED | | | |
|---|---|---|---|
| Class | Sub. | Date | Exmr. |
| 119 | 28.5 | 6/19/97 | *Ed* |
| | 526 | | |
| | | | |
| 5 | 402 | | |
| | 691 | | |
| | 694 | | |
| | 722 | | |
| | 723 | | |
| | 737 | | |
| | 738 | | |
| | 740 | | |
| | | | |
| Search | | 11/19/97 | *Ed* |
| Updated | | | |

| SEARCH NOTES | | |
|---|---|---|
| | Date | Exmr. |
| | | |

| INTERFERENCE SEARCHED | | | |
|---|---|---|---|
| Class | Sub. | Date | Exmr. |
| 119 | 28.5 | 11/19/97 | *Ed* |
| | 526 | | |
| | | | |
| 5 | 462 | | |
| | 691 | | |
| | 694 | | |
| | 722 | | |
| | 723 | | |
| | 737 | | |
| | 738 | | |
| | 740 | | |

(RIGHT OUTSIDE)

A071

PATENT APPLICATION

08634374

APPROVED FOR LICENSE

MAY 09 1996

INITIALS

| Date Entered or Counted | | Date Received or Mailed |
|---|---|---|

## CONTENTS

| | | |
|---|---|---|
| ✓ | 1. Application **Prints** papers. | |
| | 2. **Prior Art** | 4-18-96 |
| | 3. Rejection (3 months) | 6-27-97 |
| 9-22-97 | 4. Amdt a | 10-3-97 |
| | 5. Interview Summary | 11-19-97 |
| | 6. Examiner Amdt/B | 11-25-97 P.W. |
| 4-8-98 | 7. Other Drawings ( 2 sets ) | 2-20-98 |
| | 8. PTO GRANT JUN 16 1998 | |
| | 9. Ltr + Decl | 2-2-98 |
| | 10. | |
| | 11. | |
| | 12. | |
| | 13. | |
| | 14. | |
| | 15. | |
| | 16. | |
| | 17. | |
| | 18. | |
| | 19. | |
| | 20. | |
| | 21. | |
| | 22. | |
| | 23. | |
| | 24. | |
| | 25. | |
| | 26. | |
| | 27. | |
| | 28. | |
| | 29. | |
| | 30. | |
| | 31. | |
| | 32. | |

(FRONT)

A072

Feb. 25, 1936.

J. G. BINS

DOG BED OR THE LIKE

Filed March 4, 1935

2,032,248



Fig. 1.
Fig. 2.
Fig. 3.
Fig. 4.
Fig. 5.
Fig. 6.

Inventor

John G. Bins

By

Attorney

Patented Feb. 25, 1936

2,032,248

# UNITED STATES PATENT OFFICE

2,032,248

## DOG BED OR THE LIKE

John G. Bins, St. Paul, Minn.

Application March 4, 1935, Serial No. 9,338

20 Claims.  (Cl. 119—1)

This invention is a novel improvement in beds for dogs, cats and other pets, and the principal objects of the invention are to provide an inexpensive portable bed for animal pets, which bed is adapted for use primarily in the home, although same being portable may be readily carried in a car, automobile, or other conveyance; also to provide a bed of circular, oval, oblong, or other shape which may conform with the natural contour of a dog or other pet when curled up in the act of sleeping, said bed comprising briefly an annular bolster, a reversible mattress within the bolster, a reversible mattress cover within the bolster above the mattress, means for securing the parts together, and a cowl-shaped cover adapted to be applied over the bed for use in cold weather, said cover having an arched curtained opening therein at one side through which the pet may pass in and out when the cover is in use, the cover being removable for warm weather; also to provide a low stand for preventing the bed from contacting directly with the surface of the floor or ground.

I will explain the invention with reference to the accompanying drawing which illustrates one practical embodiment thereof to enable others to adopt and use the same; and I will summarize in the claims the novel features of construction, and novel combinations of parts, for which protection is desired.

In said drawing:—

Fig. 1 is a perspective view of a bed of circular shape with the cover detached, and showing in dotted lines a dog therein in sleeping position.

Fig. 2 is a perspective view of the bed with the cover attached, but with the curtains of the cover opening removed.

Fig. 3 is a perspective view of the mattress member, detached.

Fig. 4 is a perspective view of the mattress cover, detached, showing the opening in the periphery for insertion of the split steel wire ring.

Fig. 5 is a perspective view of the cover for the bed detached, and showing the curtains applied to the opening in the cover.

Fig. 6 is a transverse section through the members of the bed showing the mattress and mattress cover in place in the pocket, and showing the bed mounted upon the stand.

As shown, the bed comprises an annular bolster 1 of general circular, oval, oblong, or other desired shape preferably formed by stitching the side edges of a strip of fabric of desired length together to form a tube, then filling the tube with cotton 2 or the like, preferably using a cotton

packer having a fan or blower. After the tube is filled one end is sewed up, and the sewed end of the tube inserted in the open end and the overlapping end portions of the tube sewed together, thereby forming a circular, oval, or oblong stuffed bolster. A base sheet of fabric 3, of approximately the same shape and size as the outer periphery of the annular bolster 1 has an annular band of fabric 4 stitched to its periphery and also stitched to the outer cover of the bolster 1 to connect the base sheet 3 to the bolster, the width of the band 4 being substantially the same as the thickness of the mattress 5 which is fitted into the pocket 6 (Fig. 6) formed between the lower end of bolster 1 and the base sheet.

The mattress 5 (Fig. 3) is of size and shape to suit the pocket 6 of the bolster member, and may be circular, oval, oblong or other desired shape. The mattress is preferably reversible and formed of upper and lower fabric members united at their peripheries by an annular band, the mattress being filled with cotton 2 or the like, preferably blown therein by a cotton packer, or may be filled with other suitable stuffing or filling material. Preferably the mattress is tufted, or upholstered with buttons 7 in the usual manner. The mattress is inserted through the upper side of the bolster 1 and forced into the pocket 6 formed between the annular bolster and the base sheet 3 as shown in Fig. 6, which operation is accomplished by slightly distorting the mattress and bolster; and the mattress when inserted in pocket 6 fills the pocket and forms a support for the annular bolster.

In the pocket 6 immediately above mattress 5 is a reversible mattress cover 8 (Fig. 4) consisting of two sheets of fabric substantially of same size and shape as the mattress 5, and having their peripheries stitched together except for a short length 9 which is left unstitched for the purpose of permitting insertion and removal of a split ring 10 of relatively stiff steel wire between the sheets. Ring 10 is of the same diameter as the mattress cover 8 and has on one end a socket member 11 consisting of a length of small tubing welded or otherwise secured thereto adapted to receive the other free end of the wire. The socket 11 of the split ring 10 is inserted into the mattress cover 8 through the opening 9, and the wire worked around until both ends thereof appear through the opening 9; and the free end of the wire is then inserted in socket 11. The mattress cover 8 with the wire stiffener 10 therein is then distorted and inserted down through the upper end of the bolster member 1 and dis-

A073A

posed between mattress 5 and the underside of the annular bolster as shown in Fig. 6, the flexibility of the wire 10 readily permitting the mattress cover to be sufficiently distorted for this purpose. When the stiffening wire 10 is secured in the mattress cover the sheets forming the cover will be held taut so that they cannot wrinkle, and when the mattress cover is inserted in the pocket 6 between mattress 5 and the annular bolster the sheets of the cover cannot readily become disengaged from the bed due to the wire 10 which maintains the mattress cover in proper shape. The reversible cover 8 will keep the mattress 5 clean, and may be readily removed when soiled and a new or clean cover inserted in its place.

If desired a stand shown in Fig. 6 may be provided to prevent the bed from directly contacting with the floor or ground, which stand preferably consists of a grille of a circular, oval, or oblong shape, having an annular frame member 12 of stiff wire provided with three or more offset bent portions 13 adapted to form short legs. Frame member 12 has a plurality of light cross wires 14 welded or otherwise secured to the frame member 12, the outer ends of the wires 14 being bent upwardly as shown at 14a. A wire guard rail 15 adapted to surround the lower end of the bed is mounted on the upturned ends 14a of wires 14 to prevent the bed from slipping off the stand. Preferably two hand-holds 16 are formed on the sides of the stand, diametrically opposed to each other, for the purpose of moving the stand with the bed thereon from place to place.

For use in cold weather I provide a removable cover (Figs. 2, 5, 6) consisting of a cowl-shaped member 17 having an arched opening 18 in its front maintained by a steel wire loop 19 of sufficient size for the dog, cat, or other pet to pass therethrough, said loop 19 being stitched to the edges of the opening 18. The cowl 17 is of size and shape to cover the exterior of annular bolster 1, and stitched to its periphery is a depending annular band 20 of somewhat larger diameter than bolster 1 provided with elastic inserts 21' so that when the band 20 is applied around the exterior of the bolster as shown in Fig. 6 the elastic inserts 21 will contract the band around the bolster to maintain the same in place, while the opening 18 through the cover is maintained by the wire loop 19 so that the dog or cat can readily pass into the bed through the opening. The lower portion of the loop 19 which lies adjacent the band 20 is secured thereto by an arcuate tape 20a (Fig. 2) stitched to the inner face of the band 20 over the wire loop 19; and as the lower portion of the loop 19 is disposed between the bolster 1 and the band 20, the loop 19 is thereby maintained in substantially vertical position when the cover 17 is applied to the bed.

The arched opening 17 for the cover 16 of the dog bed may be provided with curtains 22 (Fig. 5) consisting of two semi-circular sections adapted to overlap at the center of the opening 18. Suitable snap fasteners 23 are provided on the curtain sections 22 and on the material of the cover 17 adjacent the opening 18 for maintaining the curtain sections 22 closed when desired. When the sections 22 are not fastened the dog or other pet can readily pass in and out of the opening 18. In warm weather the cover 17 is not needed and may be removed.

As shown in Fig. 1 the upper end of the bolster

will generally be utilized by the dog or other pet as a pillow, although a separate pillow may be provided. The beds may be made in different sizes and shapes, and of various materials or fabrics.

I claim:—

1. A bed for pets comprising a mattress; and an annular bolster on said mattress having an annular pocket receiving the edge portions of the mattress for connecting said members together.

2. A bed for pets comprising a mattress; an annular bolster on said mattress; means for connecting said members together; and an extensible cover around the side edges of said bolster having an opening therein for the passage therethrough of the pet.

3. In a bed as set forth in claim 2, said cover having a band secured to its lower edge slightly larger in diameter than the exterior of the bolster; means for contracting the band around the bolster; and a stiffener secured to the edges of the opening.

4. In combination with a bed as set forth in claim 2, a portable stand comprising a grille having legs; a guard rail on the grille surrounding the mattress; and handles extending from the grille.

5. A bed for pets comprising a mattress; a mattress cover stretched over said mattress; an annular bolster on said mattress cover; means for connecting said members together; and a flexible extensible cover around the side edges of said annular bolster having an opening therein for the passage therethrough of the pet.

6. In a bed as set forth in claim 5, said mattress cover comprising superimposed sheets of substantially the same size and shape as the mattress stitched together at their edges, and a split stiffening ring removably inserted between the sheets maintaining the same taut.

7. In a bed as set forth in claim 5, said cover having a band secured to its lower edge slightly larger in diameter than the exterior of the bolster; means for contracting the band around the bolster; a stiffener secured to the edges of the opening; and means for closing said opening.

8. In combination with a bed as set forth in claim 5, a portable stand comprising a grille having legs; a guard rail on the grille surrounding the bed; and handles extending from the grille.

9. A bed for pets, comprising an annular bolster, a base sheet secured to the outer sides of the bolster and forming with the bottom of the bolster an annular pocket; and a mattress having its edge portions filling the annular pocket and its central portion forming the bottom of the space bounded by the said bolster.

10. A bed for pets, comprising an annular bolster, a base sheet secured to the outer sides of the bolster and forming with the bottom of the bolster an annular pocket; a mattress having its edge portions filling the annular pocket and its central portion forming the bottom of the space bounded by the said bolster; and a mattress cover in said pocket above the mattress.

11. In a bed as set forth in claim 10, said mattress cover comprising superimposed sheets of substantially the same size and shape as the mattress stitched together at their edges, and a split steel wire stiffening ring removably inserted between the sheets maintaining the same taut.

12. A bed for pets, comprising a flexible annular bolster, a base sheet s'

2,032,248

3

sides of the bolster and forming with the bottom of the bolster an annular pocket; a mattress having its edge portions filling the central portion forming the bottom of the space bounded by the said bolster; and a cover for the bed engaging the outer sides of the bolster and having an opening therein for the passage therethrough of the pet.

13. In a bed as set forth in claim 12, said cover having a band secured to its lower edge slightly larger in diameter than the exterior of the bolster; means for contracting the band around the bolster; and a stiffener secured to the edges of the opening.

14. A bed for pets, comprising an annular bolster, a base sheet secured to the outer sides of the bolster and forming with the bottom of the bolster an annular pocket; a mattress having its edge portions filling the annular pocket and its central portion forming the bottom of the space bounded by the said bolster; a mattress cover in said pocket above the mattress; and a flexible cover for the bed engaging the outer sides of the bolster and having an opening at one side for the passage therethrough of the pet.

15. In a bed as set forth in claim 14, said mattress cover comprising superimposed sheets of substantially the same size and shape as the mattress stitched together at their edges; and a split stiffening ring removably inserted between the sheets maintaining the same taut.

16. In a bed as set forth in claim 14, said flexible cover having a band secured to its lower edge of slightly larger size than the exterior of the bolster; means for contracting the band around the bolster; and a stiffening loop secured

to the edges of the opening in the cover and to the band.

17. A bed for pets, comprising a stuffed annular bolster, a base sheet secured to the outer sides of the bolster and forming with the bottom of the bolster an annular pocket; an upholstered reversible mattress having its edge portions filling the annular pocket and its central portion forming the bottom of the space bounded by the said bolster; a flexible reversible mattress cover in said pocket above the mattress; and a flexible cowl-shaped cover for the bed engaging the outer sides of the bolster and having an opening at one side for the passage therethrough of the pet.

18. In a bed as set forth in claim 17, said mattress cover comprising superimposed sheets of substantially the same size and shape as the mattress stitched together at their edges, said cover having an opening in its edge, and a removable split stiffening ring between the sheets insertible and removable through the opening, said ring maintaining the sheets of the cover taut.

19. In a bed as set forth in claim 17, said cowl-shaped cover having a band secured to its lower edge of slightly larger size than the exterior of the annular bolster; elastic inserts in said band for contracting the band around the bolster; a stiffening loop secured to the edges of the opening in the cover and to the band; and removable curtains adapted to close said opening.

20. In combination with a bed as set forth in claim 17, a portable stand comprising a grille having legs; a guard rail on the grille surrounding the bed; and handles extending from the grille.

JOHN G. BINS.

A074

# United States Patent [19]

## Henry

[11] **Patent Number:** **5,010,843**

[45] **Date of Patent:** **Apr. 30, 1991**

[54] **PET BED**

[76] Inventor: **Beth Henry**, La Tierra Nueva, 1063 Buckman Rd., Santa Fe, N. Mex. 87501

[21] Appl. No.: **438,163**

[22] Filed: **Nov. 16, 1989**

[51] Int. Cl.$^5$ .......................................... A01K 1/035
[52] U.S. Cl. ............................... 119/28.5; 5/462
[58] Field of Search .............. 119/1, 19, 29; 5/419, 5/420, 437, 442, 462, 463, 434, 435, 436

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,569,712 | 1/1926 | Burt ................................. | 119/1 |
| 2,032,248 | 2/1936 | Bins ................................. | 119/1 |
| 2,167,622 | 8/1939 | Bentivoglio ..................... | 5/338 |
| 2,775,222 | 12/1956 | Kruck ............................. | 119/1 |
| 2,952,856 | 9/1960 | Ruff ................................ | 5/437 |
| 3,842,454 | 10/1974 | Young ............................ | 5/343 |
| 3,902,456 | 9/1975 | David ............................. | 119/1 |
| 3,911,512 | 10/1975 | Plate ............................. | 5/465 |
| 3,989,008 | 11/1976 | Neumann ...................... | 119/1 |
| 4,008,687 | 2/1977 | Keys .............................. | 119/1 |
| 4,242,767 | 1/1981 | McMallen et al. ............ | 5/437 X |
| 4,259,757 | 4/1981 | Watson .......................... | 5/434 |
| 4,393,530 | 7/1983 | Stark .............................. | 5/437 |
| 4,742,799 | 5/1988 | Schlitz .......................... | 119/29 |

### FOREIGN PATENT DOCUMENTS

0117406   2/1901   Fed. Rep. of Germany .......... 5/437

*Primary Examiner*—Robert P. Swiatek
*Assistant Examiner*—Todd E. Manahan
*Attorney, Agent, or Firm*—Darby & Darby

[57] **ABSTRACT**

A pet bed comprises a pair of semi-circular cushions connected along their circumferential perimeters to a circular cushion having substantially the same radius as the semi-circular cushions. The opposed diametral edges of the semi-circular cushions are unattached leaving a trough between them. A pocket is formed between the adjacent surfaces of the semi-circular and circular cushions whereby a pet may crawl into the pocket for resting and sleeping or may lie in the trough surrounded on two sides by the diametral edges of the semi-circular cushions.

**12 Claims, 2 Drawing Sheets**



**U.S. Patent**        Apr. 30, 1991        Sheet 1 of 2        **5,010,843**



FIG.1

FIG. 2



FIG. 3

FIG. 4

FIG. 5

FIG. 6

A077

5,010,843

1

## PET BED

### FIELD OF THE INVENTION

This invention relates generally to a bed for a pet and more particularly to a combination of cushions providing a number of resting options for the pet.

### BACKGROUND OF THE INVENTION

In many instances a household pet is considered as a family member. As such, the pet is deserving of comfortable accommodations, especially for sleeping. A dog bed of the prior art may comprise a lying down surface which is surrounded, with the exception of an entrance opening, with low vertical wall sections. The dog may lie in the center of the bed and frequently the dog attempts to snuggle into the corners of the wall. Dogs seem to have an instinct to withdraw into recesses and trough-like depressions. Cats also seek out environments where they are enclosed or at least partially surrounded, with their head exposed, or sometimes concealed. However, the prior art beds offer the pet few, if any, options in the manner of using the pet bed.

### OBJECTS OF THE INVENTION

Accordingly, it is an object of this invention to provide an improved pet bed which gives the pet options for comfortable rest.

Another object of this invention is to provide an improved pet bed which allows for easy cleaning and maintenance.

Yet another object of this invention is to provide an improved pet bed which caters to the instinctive, protective traits of dogs and cats.

In accordance with a preferred embodiment of the invention, a pet bed is provided which is especially suited to accommodate several pet preferences in sleeping and resting. A pair of semi-circular cushions connect along their circumferential perimeters to a circular cushion having substantially the same radius as the semi-circular cushions. The opposed diametral edges of the semi-circular cushions are unattached leaving a trough or slot between them. A pocket is formed between the adjacent surfaces of the semi-circular and circular cushions whereby a pet, for example, a dog or cat, may crawl into the pocket for resting and sleeping or may lie in the trough surrounded on two sides by the diametral edges of the semi-circular cushions. Whether in one of the pockets or in the trough, the animal can keep its head exposed to the ambient air. The cushions are fabricated of a flexible material, for example, cloth covers which may be treated to resist staining. The cushions are filled by opening longitudinal zippers provided in each cushion. The semi-circular cushions are attached to the circular cushion by means of stitching, zippers, snaps, materials that releasably adhere when pressed together, and the like. The seams are turned under to prevent the pet from pulling them apart.

Further objects and advantages of the invention will be apparent from the specification and drawings. The invention accordingly comprises the features of construction, combinations of elements, and arrangement of parts which will be exemplified in the constructions hereinafter set forth and the scope of the invention will be indicated in the appended claims.

2

### BRIEF DESCRIPTION OF THE DRAWINGS

For a fuller understanding of the invention, reference is had to the following description taken in connection with the accompanying drawings, in which:

FIG. 1 is a top perspective view of a pet bed in accordance with the invention;

FIG. 2 is a sectional view taken along the line 2—2 of FIG. 1;

FIG. 3 is a top view of the bed of FIG. 1; and

FIGS. 4–6 are top views of alternative embodiments of pet beds in accordance with the invention.

### DESCRIPTION OF THE PREFERRED EMBODIMENTS

With reference to the figures, a pet bed in accordance with the invention includes a circular base cushion 12 and a pair of semi-circular top cushions 14, 16 which rest upon the base cushion 12. The semi-circular edges 18, 20 of the top cushions are coincident with the circular top edge 22 of the base cushion 12. The circumferential edges 18, 20, 22 are joined together by any suitable means in a permanent or releasable fashion, for example, by stitching, zippers, snaps, hook and loop materials that releasably adhere when pressed together, such as VELCRO (registered trademark of VELCRO Industries, Curacao), and the like, to attach the top cushions to the base cushion.

The diametral edges 24, 26 of the semi-circular cushions 14, 16 are opposed to each other and unattached to the base cushion 12, thereby leaving an opening between the top cushions 14, 16 which is readily and usually inelastically pliable depending upon the filler within the cushions. The edges 24, 26 can be kept close together or partially spread apart to form a generally V-shaped trough 28 or slot.

Because the top cushions 14, 16 are connected to the base cushion 12 only along the outer peripheral edges, pockets 30, 32 exist between the top cushions 14, 16 and the base cushion 12, these pockets extending from the central trough 28 toward the peripheral curved outer edges 18, 20, 22.

The cushions 12, 14, 16 are filled with any suitable cushion material, for example, layers of plastic foam or resilient foam particles, semi-rigid or rigid beading, cloth filler, and the like. To this end, the filler may be contained in its own liner (not shown) which is put into respective covers of the cushions 12, 14, 16 through zipper openings 34, 35, 36, provided in these covers. Thus, the inner filler material may be removed and cleaned as required, and the outer cushion covers may also be cleaned. The cushions, outer surfaces may be any suitable cloth fabric or plastic material and a different covering material may be used for the external surfaces as compared to the inner pocket surfaces. The connections between the top cushions 14, 16 and the base cushion 12 are turned under and the zippers 37, 38, 39 may be concealed to prevent the pets from pulling such joints apart. Also, the base cushion 12, on the surface 33 that contacts the floor or ground, may be of material different from the upper surface of the cushion. The filler material in the base cushion 12 may differ from the filler material in the top cushions 14, 16 to provide different resiliency characteristics, if desired.

In use, a pet can snuggle in the trough 28 as illustrated in FIG. 1; the pet may crawl into either pocket 30, 32, and the pet also may merely lie on top of the semi-circu-

5,010,843

3

lar cushions 14, 16. Thus, the pet has many options in using the pet bed 10 in accordance with this invention.

Cats also find such a device appealing. The cats will lie in the trough 28 or in the pockets 30, 32, or on the top surfaces, just as readily as dogs. Further, the basic size of the bed can be scaled for different dog sizes and for cats.

The outer periphery of the bed need not be limited to a circular shape as illustrated and described, but may be of any shape, for example, square, oval, elliptical, polygonal, etc. The trough 28 need not symmetrically divide the bed. The top cushions, for example, cushions 14, 16, can be complementary segments of the peripheral shape of the base cushion 12, regardless of the base cushion shape, such that the top cushions on opposite sides of the trough are of unequal size. Also, in other alternative embodiments in accordance with the invention, the top cushions need not entirely cover the base cushion, and conversely, the top cushions can extend beyond the edges of the base cushion 12. Also, the base cushion 12 may be replaced merely by a pad (not shown) which does not have removable fillers or a zippered cover. Further, in another alternative embodiment in accordance with the invention, one top cushion may be attached to the base cushion around the entire periphery of the top cushion such that the pet bed in accordance with the invention has only one pocket and a trough.

Nevertheless, in each of these embodiments in accordance with the invention a trough and at least one pocket is provided, with entrance to the pocket from the trough, such that the pet has the option of lying in the trough, crawling and resting at least partially within the pocket, or resting on the top surface of the top cushions.

Further, in alternative embodiments of a pet bed in accordance with the invention, the pockets as shown in FIGS. 1–3 may be omitted. That is, the diametral edges of the top cushions 14, 16 are attached to the base 12. Because the cushions are substantially pliable and inelastic, a trough 28 is still provided between the top cushions 14, 16. However, there are no pockets. In such an embodiment, the options for the pet are reduced to resting in the trough or resting on the top surfaces of the cushions 14, 16.

In the bed 10′ of FIG. 4 the top cushions 14′, 16′ are less than semi-circles and the trough 28 between the top cushions flares out at one end of the trough. In FIG. 5, the cushions 14″, 16″ are contoured so as to provide a basically circular enlargement in the trough 28″ at the center of the bed 10″.

FIG. 6 presents an embodiment of a pet bed 10‴ in accordance with the invention which is similar to the embodiment of FIG. 4. However, in FIG. 6 entrance to the pockets 30‴, 32‴ is only at the flared portion of the trough 28‴.

In FIGS. 4–6, the troughs are shown, for clarity in illustration, without deformations in the top cushion inner edges as would occur when a pet has been lying in the trough.

It will thus be seen that the objects set forth above, among those made apparent from the preceding description, are efficiently attained and, since certain changes may be made in the above constructions without departing from the spirit and scope of the invention, it is intended that all matter contained in the above description or shown in the accompanying drawings shall be interpreted as illustrative and not in a limited sense. It is also to be understood that the following claims are intended to cover all of the generic and spe-

4

cific features of the invention herein described and all statements of the scope of the invention which might be said to fall therebetween.

What is claimed:

1. A bed for pet comprising:
a base having a defined area;
a first top cushion having a first edge around the perimeter thereof, said first cushion being positioned on top of said base and covering a first portion of said base area, said first cushion being attached to said base along a major portion of said first edge, a minor portion of said first edge being unattached to said base, said unattached portion being an entrance to a first pocket formed between said first cushion and said base;
a second top cushion having a second edge around the perimeter thereof, said second cushion being positioned on top of said base and covering a second portion of said base area, an attachment being formed between said base and the second edge of said second top cushion, the unattached portion of said first top cushion edge being opposed to said second top cushion, a trough being formed between said cushions, said pocket entrance being within said trough.

2. A bed for a pet as claimed in claim 1, wherein said top cushions are attached to said base by at least one of stitching, zippers, snaps and materials that releasably adhere when pressed together.

3. A bed as claimed in claim 1, wherein a minor portion of the second edge of said second cushion is unattached to said base, said unattached portion of said second edge being an entrance to a second pocket formed between said second cushion and said base, and the unattached edge portions of said top cushions being opposed to each other, such that the entrance to said second pocket is within said trough.

4. A bed as claimed in claim 3, wherein said base is circular and said top cushions are each semi-circular, the diametral portions of said semi-circular cushions being opposed to each other and forming said trough therebetween.

5. A bed as claimed in claim 4, wherein said base is a cushion.

6. A bed as claimed in claim 5, wherein said base and top cushions each include a cover having an opening therethrough and filler therein, and reversible closure means in each cushion for controlling said opening, said filler being removable and insertable into said cushion via said opening.

7. A bed as claimed in claim 6, wherein said closure means is concealed from pet.

8. A bed as claimed in claim 1, wherein said base is circular and said top cushions are each semi-circular, the diametral portions of said semi-circular cushions being opposed to each other and forming said trough therebetween.

9. A bed as claimed in claim 1, wherein said base is a cushion.

10. A bed as claimed in claim 1, wherein said trough has two ends, said trough being narrow at one end and flared at the other end.

11. A bed as claimed in claim 10, wherein said pocket entrance is at said flared end of said trough.

12. A bed as claimed in claim 1, wherein said trough has two ends, said trough being narrow at both ends and wider for at lest a portion of the trough length between said two ends.

* * * * *

A079



(19) BUNDESREPUBLIK DEUTSCHLAND

DEUTSCHES PATENTAMT

(12) # Gebrauchsmuster

**U 1**

| | | |
|---|---|---|
| (11) | Rollennummer | G 93 09 699.2 |
| (51) | Hauptklasse | A47G 9/00 |
| (22) | Anmeldetag | 30.06.93 |
| (47) | Eintragungstag | 19.08.93 |
| (43) | Bekanntmachung im Patentblatt | 30.09.93 |

(54)  Bezeichnung des Gegenstandes
          Schwerentflammbares Kissen

(71)  Name und Wohnsitz des Inhabers
          Hoechst AG, 65929 Frankfurt, DE

G 6253
3.82

((O))

HOECHST AKTIENGESELLSCHAFT          HOE 93/F 177 G     Dr. VA/As

Beschreibung

5     Schwerentflammbares Kissen

Die vorliegende Erfindung betrifft ein schwerentflammbares Kissen aus einem
binderverfestigten Vliesstoffblock und einem vom Polsterkern trennbaren
Überzug, bestehend aus einer taschenförmigen verschließbaren Hülle aus einem
10    textilen Flächengebilde, wobei die Fasern und Filamente des Polsterkerns und
der Hülle aus flammfest modifiziertem Polyester bestehen.

Eine häufige Ursache von Bränden in Wohnungen und Unterkünften besteht
darin, daß Zündquellen, wie beispielsweise brennende Zigaretten, brennende
15    Kerzen, überhitzte elektrische Installationen oder offene Flammen,
beispielsweise bei Reparaturarbeiten, mit Polsterungen der
Einrichtungsgegenstände in Berührung kommen und in diesen Polsterungen
Schwelbrände auslösen oder die Polsterung entflammen. Für Einrichtungen, in
denen größere Menschenmengen versammelt sind, beispielsweise Hotels,
20    Tagungszentren aber auch in Transportmitteln wie Schiffen, Eisenbahnabteilen
oder Flugzeugen gibt es Vorschriften über die Flammwidrigkeit der dort
verwendeten Einrichtungsgegenstände. Besonders im Objektbereich, aber auch
im privaten Bereich haben Brände, auch Schwelbrände für die Bewohner oder
Insassen der Behausungen oder Verkehrsmittel schwerwiegende, oft tödliche
25    Folgen und es ist daher von größtem Interesse Polster bereitzustellen, die durch
Zündquellen schwer entzündet werden können.

Es hat nicht an Vorschlägen gefehlt, das Bedürfnis nach schwerentflammbaren
Polstermaterialien zu befriedigen. So ist aus der Japanischen Patentanmeldung
30    60 002 274 ein gebauschtes Faserprodukt zum Beispiel ein Kissen bekannt, das
mit einer Füllung aus thermoplastischen synthetischen Polyesterfasern,
flammhemmenden Fasern und/oder Polyamidfasern gefüllt ist. Dabei sollen
mindestens 30 Gew.-% der verwendeten Fasern flammhemmend modifizierte

A081

2

synthetische Polyesterfasern sein, die einen Querschnittsumfang von 1 bis 5 mm und eine Faserlänge von maximal 10 mm aufweisen. Der Querschnitt selbst ist dreizackig oder hakenkreuzförmig.

Dieses bekannte Material ist jedoch einerseits wegen der komplizierten

5   Querschnittsform der verwendeten Fasern in der Herstellung relativ aufwendig und teuer und es hat den gravierenden Nachteil, daß es aufgrund der unterschiedlichen Fasermaterialien die darin enthalten sind praktisch nicht zu recyclisieren ist.

10  Moderne Polstermaterialien sollen aber nicht nur schwer entflammbar sein, sondern sie sollen darüberhinaus auch hygienischen Belangen Rechnung tragen, daß heißt, sie sollen auch unter erschwerten Bedingungen einwandfrei zu reinigen und gegebenenfalls zu sterilisieren sein und für den Fall, daß sie ersetzt werden müssen, sollen sie einwandfrei zu entsorgen, vorzugsweise leicht zu

15  recyclisieren sein.

Insbesondere mit dem Problem, die Herstellung schwerentflammbarer Polstermaterialien zu verbilligen, befaßt sich das Deutsche Gebrauchsmuster 84 29 666, in dem ein flammhemmendes Vlies in Form einer Bahn, Platte oder

20  ähnlichem beschrieben wird, das aus einem an sich bekannten voluminösen Polstervlies besteht, das mindestens einseitig mit einem flammhemmenden Abdeckvlies kombiniert ist, wobei das Polstervlies und das Abdeckvlies großflächig miteinander verbunden sind. Das schwerentflammbare Abdeckvlies soll eine Nadelvlies aus schwerentflammbarer Faser sein, die einen Anteil

25  Schmelzklebefasern und/oder einen Anteil einer synthetischen Faser aufweist, wobei die schwerentflammbare Faser aus Polyvinylchlorid, modifiziertem Polyacrylnitril oder aus einem Mischpolymerisat besteht. Auch dieses Material kann die Anforderungen insbesondere an die einwandfreie Reinigung, die an moderne Polstermaterialien gestellt werden nicht in vollem Umfang erfüllen und

30  es ist wegen der Vielfalt der darin enthaltenen Fasermaterialien nicht recyclisierbar und schwierig zu entsorgen.

3

Die vorliegende Erfindung betrifft nun eine Polster, das nicht nur preisgünstig in der Herstellung ist, sondern auch im Gebrauch unter erschwerten Bedingungen leicht zu reinigen bzw. zu sterilisieren ist und das auf einfache Weise recyclisiert werden kann.

5

Das erfindungsgemäße schwerentflammbare Kissen besteht aus einem Polsterkern und einem vom Polsterkern trennbaren Überzug und ist dadurch gekennzeichnet, daß der Polsterkern aus einem binderverfestigten Vliesstoffblock von 5 bis 15 cm, vorzugsweise 8 bis 12 cm Dicke und einem

10 Flächengewicht von 500 bis 3000 g/m², vorzugsweise 1000 bis 2000 g/m² aus Fasern oder Filamenten mit einem Titer von 3 bis 50 dtex, vorzugsweise 6 bis 20 dtex besteht. Der Überzug hat die Form eines taschenförmigen, verschließbaren Hülle aus einem textilen Flächengebilde, das ein Gewebe oder eine Maschenware enthält oder daraus besteht. Die Fasern und Filamente des

15 Polsterkerns und der Hülle bestehen aus flammfest modifiziertem Polyester.

Eine weitere Ausgestaltung des erfindungsgemäßen schwerentflammbaren Kissens weißt einen Polsterkern auf, der zusätzlich zu dem Vliesstoffblock eine zylinderförmige Vliesstoffrolle aufweist deren Höhe der Breite des

20 Vliesstoffblocks entspricht und deren Durchmesser 5 bis 25 cm, vorzugsweise 10-20 cm, beträgt. Der Viesstoffblock und die Vliesstoffrolle des Polsterkerns können fest oder lösbar miteinander verbunden sein. Eine feste Verbindung der Vliesstoffrolle und des Vliesstoffblockes ist beispielsweise dadurch auf einfache Weise herbeizuführen, daß in der Verfestigungsphase der Vliese in der die dazu

25 benutzten Binder des Vliesstoffes aktiviert werden, - bei Benutzung eines Schmelzbinders z.B. durch Erhitzen über den Schmelzpunkt des Schmelzbinders - beide Teile so zusammengepreßt werden, daß an der Berührungsstelle zwischen Vliesstoffblock und Vliesstoffrolle eine einwandfreie Verbindung der beiden Teile eintritt.

30

Eine lösbare Verbindung von Vliesstoffblock und Vliesstoffrolle kann beispielsweise durch einen im Berührungsbereich aufgetragenen Streifen eines

4

Adhäsionsklebers oder eines Klettverschlusses geschaffen werden. Eine weitere Variante dieser Ausgestaltungsform besteht darin, daß der Vliesstoffblock und die Vliesstoffrolle des Polsterkerns jeweils eigene Überzüge haben und beide Teile lösbar miteinander verbunden sind. Auch in diesem Fall kann die lösbare

5  Verbindung durch einen streifenförmig aufgetragenen Adhäsionskleber oder vorzugsweise durch einen Klettverschluß geschaffen werden.

In dieser bevorzugten Ausführungsform ist das erfindungsgemäße schwerentflammbare Kissen besonders zur Abstützung des Nackens

10  (Nackenrolle) geeignet. Es kann in dieser Ausführungsform daher insbesondere im orthopädischen Bereich mit besonderem Vorteil eingesetzt werden. Vorzugsweise besteht die Vliesstoffrolle des Polsterkerns aus einem aufgerollten flächenförmigen Vliesstoff mit einem Flächengewicht von 200 bis 800 g/m² der im unverfestigten Zustand aufgerollt und anschließend durch Aktivierung des

15  Binders verfestigt und damit in der Rollenform fixiert wird.

Die Figur 1 zeigt schematisch einen Schnitt durch ein erfindungsgemäßes Kissen (1) mit dem Vliesstoffblock (2), der Vliesstoffrolle (3), dem Verbindungselement (4), das die lösbare Verbindung zwischen dem Vliesstoffblock (2) und der

20  Vliesstoffrolle (3) vermittelt, und dem gemeinsamen Überzug (5).
Die Figur 2 zeigt schematisch einen Schnitt durch ein andere Ausführungsform des erfindungsgemäßen Kissens (11) mit dem Vliesstoffblock (12), der Vliesstoffrolle (13), den Überzügen (15) und (15') für den Vliesstoffblock (12), und die Vliesstoffrolle (13) und dem Verbindungselement (14), das die lösbare

25  Verbindung zwischen den mit den Überzügen versehenen Kissenteilen vermittelt.

Der Vliesstoffblock und die Vliesstoffrolle des erfindungsgemäßen schwerentfalmmbaren Kissens können aus Endlosfilamenten oder aus Stapelfasern bestehen. Zweckmäßigerweise wird der Titer des Fasermaterials

30  der Vliesstoffrolle höher gewählt als der des Fasermaterials des Vliesstoffblockes. Dadurch ergibt sich eine höhere Druckfestigkeit der Rolle und damit eine besonders gute Abstützung des Nackens.

5

Selbstverständlich ist es auch möglich Vliesstoffblock und Vliesstoffrolle aus
unterschiedlichen Fasermaterialien herzustellen; insbesondere können sie
unterschiedliche Faserlängen aufweisen. Beispielsweise kann der Vliesstoffblock
aus Endlosfasern die Vliesstoffrolle aus Stapelfasern oder umgekehrt aufgebaut
5    sein. Die Stapellänge der Stapelfasern, die für Vliesstoffblock und/oder
Vliesstoffrolle eingesetzt werden, liegt zweckmäßigerweise bei 30 bis 150 mm,
vorzugsweise 40 bis 100 mm.

Obwohl als Binder für das erfindungsgemäße Kissen auch Binderdispersionen
10    eingesetzt werden können, die durch Verdunstung der flüssigen kontinuierlichen
Phase die Verfestigung des Vliesstoffs herbeiführen, ist der Einsatz von
Schmelzbindern bevorzugt.

Vorzugsweise besteht daher der Polsterkern, und zwar sowohl der
Vliesstoffblock als auch die Vliesstoffrolle, aus schmelzbinderverfestigtem
15    Vliesstoff. Der Schmelzbinder wird besonders vorteilhaft in Form von Fasern
(Bindefasern) in den Vliesstoff eingebracht. Je nach dem gewünschten Ausmaß
der Verfestigung des Vliese beträgt der Gewichtsanteil des Binders 5 bis 35
Gew.-%, vorzugsweise 10 bis 25 Gew.-% des gesamten Vliesstoffgewichts
(einschließlich Binder). Im Hinblick auf die gewünschte Recyclisierbarkeit ist es
20    besonders bevorzugt, daß der Schmelzbinder ein modifizierter Polyester ist,
dessen Schmelzpunkt mindestens 10°C, vorzugsweise 20°C unter dem
Schmelzpunkt der tragenden Vliesstoffasern liegt.

Wird der Schmelzbinder gemäß der bevorzugten Ausführungsform in Faserform
25    eingesetzt, so kann er in Form separater Bindefasern vorliegen oder er kann
Bestandteil einer Zweikomponentenfaser sein, vom Seite-an-Seite oder Kern-
Mantel-Typ, wobei der Mantel bzw. die eine Seite der Bikomponentenfaser aus
dem Schmelzbinder besteht. Im Interesse der erleichterten Entsorgung ist es
besonders bevorzugt, daß sowohl die tragenden Fasern als auch die Bindefasern
30    des Polsterkerns aus Polyestern mit unterschiedlichen Schmelzpunkten
bestehen. Im Rahmen der oben angegebenen Grenzen wird der Binderanteil
vorzugsweise so gewählt, daß der Polsterkern einen relativ harten Griff hat.

A085

6

Der Überzug des erfindungsgemäßen flammhemmenden Kissens kann aus einem Gewebe oder aus einer Maschenware aus Endlosfilamentgarn oder aus Stapelfasergarn bestehen. Gewebe oder Maschenware für den Überzug haben zweckmäßigerweise ein Flächengewicht von 100 bis 300 g/m². Gewebe für

5    diesen Zweck weisen vorteilhafterweise eine Leinwand- oder Atlasbindung auf, die einen besonders angenehmen Hautkontakt vermittelt. Maschenware ist aus demselben Grund vorzugsweise einseitig gestrickt.

Besonders bevorzugt ist ein erfindungsgemäßes schwerentflammbares Kissen,

10    das einen Überzug aus einer mindestens zweischichtigen Kombination eines Vliesstoffes mit einem Flächengewicht von 50 bis 300 g/m², mit einem Gewebe oder mit einer Maschenware mit einem Flächengewicht von 100 bis 300 g/m², die miteinander verbunden, vorzugsweise miteinander versteppt sind, besteht. Besonders vorteilhaft ist eine Überzug der aus einem derartigen Vliesstoff

15    besteht, der beidseitig  mit Gewebe- oder Maschenware abgedeckt und versteppt ist. Der Vorteil eines solchen dreischichtigen Aufbau des Überzugs besteht darin, daß ein solcher mehrschichtiger Überzug auch ohne den Polsterkern als dünne Kopfunterlage dienen kann.

20    Im Interesse eines besonders hautfreundlichen und textilen Griffs des erfindungsgemäßen schwerentflammbaren Kissens ist es bevorzugt, daß die Fasern, aus denen das Gewebe bzw. die Maschenware des Überzugs hergestellt ist, texturierte Multifilamentgarne oder aber Stapelfasergarne sind. Die Texturierung kann nach allen üblichen Verfahren erfolgt sein, insbesondere

25    durch Luftdüsentexturierung oder Falschdrahttexturierung. Die Titer, der in dem Überzug enthaltenen Garne, liegt zweckmäßigerweise im Bereich von 60 bis 200 dtex, wobei Multifilamentgarne in der Regel 30 bis 150 Einzelfilamente aufweisen.

30    Als Polyester aus denen die Fasermaterialien - Fasermaterialien im Sinne dieser Beschreibung sind sowohl Endlos- als auch Stapelfasern - des Polsterkerns und des Überzugs bestehen, eignen sich flammfest modifizierte oder ausgerüstete

7

spinnbaren Typen, die überwiegend aus Bausteinen, die sich von aromatischen Dicarbonsäuren und von aliphatischen Diolen ableiten, bestehen.

Gängige aromatische Dicarbonsäurebausteine sind die zweiwertigen Reste von Benzoldicarbonsäuren, insbesondere der Terephthalsäure und der Isophthalsäure;

5    gängige Diole haben 2-4 C-Atome, wobei das Ethylenglycol besonders geeignet ist. Vorzugsweise enthalten modifizierte Polyester mindestens 85 mol% Ethylenterephthalat-Einheiten. Die restlichen 15 mol% bauen sich dann aus Dicarbonsäureeinheiten und Glycoleinheiten auf, die als sogenannte Modifizierungsmittel wirken und die es dem Fachmann gestatten, die

10   physikalischen und chemischen Eigenschaften der hergestellten Filamente gezielt zu beeinflussen. Beispiele für solche Dicarbonsäureeinheiten sind Reste der Isophthalsäure oder von aliphatischen Dicarbonsäure wie z.B. Glutarsäure, Adipinsäure, Sebazinsäure; Beispiele für modifizierend wirkende Diolreste sind solche von längerkettigen Diolen, z.B. von Propandiol oder Butandiol, von Di-

15   oder Tri-ethylenglycol oder, sofern in geringer Menge vorhanden, von Polyglycol mit einem Molgewicht von ca. 500 - 2000. Besonders bevorzugt sind Polyester, die mindesten 95 mol% Ethylenterephthalat-Einheiten enthalten, insbesondere solche aus unmodifiziertem PET.

Die Flammfest-Modifizierung dieser Polyestermaterialien erfolgt durch Zusätze

20   von Halogenverbindungen, insbesondere Bromverbindungen, oder, was besonders vorteilhaft ist, durch einen Gehalt von 0,1 bis 20, vorzugsweise 2 bis 12 Gew.-% von Phosphorverbindungen, die in die Polyesterkette einkondensiert sind. Besonders bevorzugte flammfest modifizierte Polyester, aus denen die Fasermaterialien der schwer entflammbaren erfindungsgemäßen Kissen

25   bestehen, sind solche, die in der Kette Baugruppen der Formel

$$ \begin{array}{ccc} & O & O \\ & \uparrow & \parallel \\ -O-P-R-C- \\ & \mid \\ & R^1 \end{array} \qquad \text{(I)} $$

30   worin R Alkylen oder Polymethylen mit 2 bis 6 C-Atomen oder Phenyl und $R^1$ Alkyl mit 1 bis 6 C-Atomen, Aryl oder Aralkyl bedeutet, einkondensiert enthalten.

8

Vorzugsweise bedeuten in der Formel I R Ethylen und $R^1$ Methyl, Ethyl, Phenyl, oder o-, m- oder p-Methyl-phenyl, insbesondere Methyl.

5  Die in den erfindungsgemäßen Kissen enthaltenen Polyester haben zweckmäßigerweise ein Molekulargewicht entsprechend einer intrinsischen Viskosität (IV), gemessen in einer Lösung von 1g Polymer in 100 ml Dichloressigsäure bei 25°C, von 0,5 bis 1,4 dl/g.

10  In einer weiteren bevorzugten Ausgestaltung des erfindungsgemäßen schwerentflammbaren Kissens werden die für die Herstellung des Polsterkerns und des Überzugs eingesetzten Fasermaterialien bezüglich der Polyesterzusammensetzung und bezüglich der Spinnbedingungen so ausgewählt, daß der Polsterkern sterilisierbar und der Überzug kochwaschbeständig ist.

15  Es ist weiterhin besonders zweckmäßig den Überzug des schwerentflammbaren Kissens durch einen Reißverschluß oder einen Klettverschluß verschließbar zu gestalten. Im Interesse einer einwandfreien Recyclisierbarkeit des erfindungsgemäßen Kissens (Sortenreinheit) wird es bevorzugt, daß Reißverschluß bzw. Klettverschluß des Kissenüberzugs aus
20  Polyestermonofilamenten bestehen. Besonders bevorzugt ist es, daß die Monofilamente des Reiß- oder Klettverschlusses wie die übrigen Fasermaterialien des Kissens aus flammfest modifizierten Polyester bestehen.

25  Das folgende Ausführungsbeispiel veranschaulicht die Herstellung eines erfindungsgemäßen schwerentflammbaren Kissens. Alle in dem Beispiel eingesetzten flammfest modifizierten Polyesterfasern bestanden aus Polyethylenterephalat, das durch Einbau von Baugruppen der oben angegebenen Formel I flammfest modifiziert worden ist ((R)TREVIRA CS - Fasermaterialien der Hoechst AG).

30

A088

9

<u>Beispiel</u>

a) Viesstoffblock.

Auf einer Krempel wurde aus einer Mischung von 80 Gew.-% einer durch Einkondensieren von Bausteinen der Formel I, flammfest modifizierten

5    Polyethylenterephthalat-Stapelfaser mit 17 dtex und 80 mm Stapellänge und 20 Gew.-% einer Bikomponentenfaser vom Kern-Mantel-Typ mit einem Kern aus flammfest modifiziertem Polyethylenterephthalat und einem Mantel aus Polyethylenterephthalt-Isophthalat mit einem Kern-Mantel-Gewichtsverhältnis von 50 zu 50, einem Titer von 4,4 dtex und einer Stapellänge von 50 mm

10    wurde ein Vlies mit einem Flächengewicht von 1500 g/m² hergestellt. Das Vlies wurde auf eine Höhe von 8 bis 10 cm verdichtet und im Heißluftofen bei 160°C gebunden.

b) Nackenrolle

Aus der gleichen Fasermischung wurde auf der Krempel ein Vlies von 400 g/m²

15    hergestellt und durch ein leichtes Nadeln vorverfestigt. Das so erhaltene, noch nicht binderverfestigte Vlies wurde zu einer Rolle von 15 cm Durchmesser aufgerollt und in dieser Form im Heißluftofen bei 160°C fixiert. Die so erhaltenen Polsterkerne für Kissen und Nackenrolle waren schwer entflammbar, recyclingfähig, waschbar und sterilisierbar und wiesen einen relativ harten Griff

20    auf. Die Härte des Griffes dieser Kernmaterialien, ihre Druckfestigkeit und ihre Wiedererhohlungsfähigkeit lassen sich durch die Wahl des Fasertiters des Binderanteils der Fixiertemperatur und der Luftzufuhr variieren und wunschgemäß einstellen.

c) Überzug

25    Für den oben hergestellten Vliesstoffblock und die Vliesstoffrolle wurden getrennte Überzüge genäht, die an den offenen Seiten mit Reißverschlüssen aus Polyesterdraht versehen werden. Hierzu wurde ein dreischichtiges textiles Flächengebilde eingesetzt, bestehend aus einem Faservlies von 200 g/m² Flächengewicht aus flammfest modifizierten Polyethylenterephthalatfasern, das

30    beidseitig mit einem Gewebe (180 g/m²) aus Stapelfasergarn (Einzelfasertiter 1,7 dtex) aus flammfest modifiziertem Polyethylenterephthalat. Die beiden Überzüge werden an geeigneten Stellen mit Klettverschlußstreifen aus

A089

10

flammfestem Polyester-Draht versehen, so daß die Nackenrolle lösbar und in
geeigneter Position mit dem Kissen verbunden werden kann.

5    Die Überzüge werden über den Vliesstoffblock und die Vliesstoffrolle gestreift
und mit den Reißverschlüssen verschlossen. Danach werden die so erhaltenen
Elemente des Kissens an den Klettverschlußstreifen aneinandergedrückt und so
zu einem erfindungsgemäßen Kissen vereinigt.

11

Schutzansprüche                                            HOE 93/F 177 G

1.  Schwer entflammbares Kissen bestehend aus einem Polsterkern und
    einem vom Polsterkern trennbaren Überzug, dadurch gekennzeichnet, daß
5   der Polsterkern aus einem binderverfestigten Vliesstoff-Block von 5 bis 15
    cm, vorzugsweise 8 bis 12 cm Dicke und einem Flächengewicht von 500
    bis 3000 g/m² aus Fasern oder Filamenten mit einem Titer von 3 bis 50
    dtex besteht und der Überzug eine taschenförmige, verschließbare Hülle
    ist aus einem textilen Flächengebilde, das ein Gewebe oder eine
10  Maschenware enthält oder daraus besteht, wobei die Fasern und
    Filamente des Polsterkerns und der Hülle aus flammfest modifiziertem
    Polyester bestehen.

2.  Schwer entflammbares Kissen gemäß Anspruch 1, dadurch
15  gekennzeichnet, daß der Polsterkern zusätzlich zu dem Vließstoff-Block
    eine zylinderförmige Vließstoffrolle aufweist, deren Höhe der Breite des
    Vließstoffblocks entspricht und deren Durchmesser 5 bis 20 cm beträgt,
    die mit dem Vließstoffblock fest oder lösbar verbunden ist.

20  3.  Schwer entflammbares Kissen gemäß mindestens einem der Ansprüche 1
    und 2, dadurch gekennzeichnet, daß der Vließstoff-Block und die
    Vließstoffrolle des Polsterkerns jeweils eigene Überzüge haben und beide
    Teile lösbar miteinander verbunden sind.

25  4.  Schwer entflammbares Kissen gemäß mindestens einem der Ansprüche 1
    bis 3, dadurch gekennzeichnet, daß der Polsterkern sterilisierbar ist.

5.  Schwer entflammbares Kissen gemäß mindestens einem der Ansprüche 1
    bis 4, dadurch gekennzeichnet, daß der Polsterkern aus einem
30  schmelzbinderverfestigten Vliesstoff besteht.

6.  Schwer entflammbares Kissen gemäß mindestens einem der Ansprüche 1

HOE 93/F 177 G



Fig. 1



Fig. 2

[logo]   (19) Federal Republic of Germany
German Patent Office

(12)    **Utility Model**                                **U1**


(11) Registry Number: G 93 09 699.2
(51) Main Class: A47G   9/00
(22) Filing Date: 6/30/93
(47) Registration Date: 8/19/93
(43) Publication in Patent Gazette: 9/30/93
(54) Title of the object:
      Low Flammability Pillow
(71) Owner's Name and Residence
      Hoechst AG, 65929 Frankfurt, DE

A093

HOECHST AKTIENGESELLSCHAFT

[illegible]
HOE 93/F177  G   Dr. VA/As

Description

5

Low Flammability Pillow

The present invention relates to a low flammability pillow comprising a binder-consolidated nonwoven block and a cover separable from the cushioning core,
10  comprising a pocket-like closable casing comprising a textile sheet material, the fibers and filaments of the cushioning core and of the casing comprising flame resistant polyester.

A frequent cause of fires in homes and other occupancies is that sources of ignition, such
15  as burning cigarettes, burning candles, overheated electric installations or open flames, for example from repair work, come into contact with cushioning of the items of furniture or fitments and cause smoldering or flaming fires in this cushioning. Facilities where relatively large numbers of people congregate, such as hotels, conference centers, but also transport means such as ships, railroad compartments or airplanes, have regulations
20  governing the flame resistance of the items of furniture or fitments used therein. Especially in the real estate business, but also privately, fires, including smoldering fires, have serious, frequently fatal, consequences for the occupants, and it is therefore of very great interest to provide cushioning articles which are difficult to ignite by sources of ignition.

25

There has been no shortage of attempts to meet the need for low flammability cushioning materials. For instance, Japanese Patent Application 60 002 274 discloses a bulked fiber product, for example a pillow filled with a filling of thermoplastic synthetic polyester fibers, flame retardant fibers and/or polyamide fibers. At least 30% by weight of the
30

A094

2

[illegible]

fibers used are to be flame retardant synthetic polyester fibers with a cross-sectional circumference of 1 to 5 mm and a fiber length of not more than 10 mm. The cross-section itself is three-pointed or swastika-shaped.

5    However, this known material is not only relatively complicated and costly to manufacture, because of the complicated cross-sectional shape of the fibers used, but also has the serious disadvantage that, owing to the different fiber materials it contains, it is virtually impossible to recycle.

10    However, modern cushioning materials should not only have low flammability properties but also meet hygienic concerns; that is, they should be satisfactorily cleanable and, if necessary, sterilizable even under difficult circumstances and, in the event of their having to be replaced, should be satisfactorily disposable, preferably readily recyclable.

15    The particular problem of how to reduce the cost of manufacturing low flammability cushioning materials is the concern of German Utility Model 84 29 666, which describes a flame retardant web in the form of a sheet, tile or the like, which consists of a voluminous cushioning web known per se which is combined at least on one side with a flame retardant facing web, the cushioning web and the facing web being joined together over a large area. The low flammability facing web is a needlefelt of low flammability 20    fiber containing a portion of hot-melt adhesive fibers and/or a portion of synthetic fiber, the low flammability fiber consisting of polyvinyl chloride, modified polyacrylonitrile or of a copolymer. This material too is unable to meet in full the requirements of modern cushioning materials with respect to satisfactory cleaning in particular, and because of the variety of fiber materials it contains, it is not recyclable and is difficult to dispose of.

25

3

[illegible]

The present invention, then, relates to a cushioning material which is not only inexpensive to manufacture but also easy to clean and sterilize even in use under aggravated conditions and which is simple to recycle.

5      The low flammability pillow according to the invention comprises a cushioning core and a cover separable therefrom, and is characterized in that the cushioning core comprises a binder-consolidated nonwoven block from 5 to 15 cm, preferably from 8 to 12 cm, in thickness and from 500 to 3000 g/m$^2$, preferably from 1000 to 2000 g/m$^2$, in basis weight comprising fibers or filaments having a linear density from 3 to 50 dtex and preferably

10     from 6 to 20 dtex. The cover is a pocket-shaped, closable casing comprising a textile sheet material comprising or consisting of woven or knitted fabric. The fibers and filaments of the cushioning core and of the casing comprising flame resistant polyester.

15     A further embodiment of the low flammability pillow according the invention comprises a cushioning core which, in addition to the nonwoven block, comprises a cylindrical nonwoven roll whose height corresponds to the width of the nonwoven block and whose diameter is from 5 to 25 cm, preferably 10-20 cm. Said roll can be connected detachably or nondetachably to the block. A nondetachable connection between the nonwoven roll and the nonwoven block is achieved for example in a simple manner when, in the

20     consolidation phase of the webs, in which the consolidating binders of the nonwoven fabric are activated - in the case of the use of a meltable binder for example by heating to above the melting point of the meltable binder - the two parts are pressed together so that a satisfactory connection is formed between the nonwoven block and the nonwoven roll at the point of contact between the two parts.

25     A detachable connection between the nonwoven block and the nonwoven roll can be

A096

4

[illegible]

created for example by means of a strip of adhesive or a velcro fastener applied in the contact region. In a further variant of this embodiment, the nonwoven block and the nonwoven roll of the cushioning core each have separate covers and the two parts are connected together detachably. In this case too the detachable connection can be created
5   by means of an adhesive applied in strip form or preferably by means of a Velcro fastener.

In this preferred embodiment, the low flammability pillow according to the invention is particularly suitable for supporting the neck (neckroll). In this embodiment it can
10   therefore be used with particular advantage in particular in the orthopedic sector. Preferably the nonwoven roll of the cushioning core comprises a rolled-up sheet-like nonwoven having a basis weight from 200 to 800 $g/m^2$, which is rolled up in the unconsolidated state and then consolidated by activation of the binder and so stabilized in roll form.
15

FIG. 1 is a diagrammatic section through a pillow (1) according to the invention, comprising the nonwoven block (2), the nonwoven roll (3), the connecting element (4), which provides the detachable connection between the nonwoven block (2) and the nonwoven roll (3), and the common cover (5).
20   FIG. 2 is a diagrammatic section through another embodiment of the pillow (11) of the invention, comprising the nonwoven block (12), the nonwoven roll (13), the covers (15) and (15') for the nonwoven block (12) and the nonwoven roll (13), and the connecting element (14) which provides the detachable connection between the covered parts of the pillow.
25

The nonwoven block and the nonwoven roll of the low flammability pillow according to the invention may comprise continuous filaments or staple fibers. Advantageously the linear density of the fiber material of the nonwoven roll is chosen to be higher than that of the fiber material of the nonwoven block. This results in a higher compressive strength
30   for the roll and therefore particularly good support for the neck.

It is of course also possible to make the nonwoven block and the nonwoven roll from different fiber materials; in particular, they may have different fiber lengths. For example, the nonwoven block may be composed of continuous filament fibers and the nonwoven roll of staple fibers, or vice versa. The staple length of the staple fibers used for the nonwoven block and/or nonwoven roll is advantageously within the range of 30 to 150 mm, preferably from 40 to 100 mm.

Although the binders used for the pillow according to the invention can be binder dispersions which bring about the consolidation of the nonwoven through evaporation of the liquid continuous phase, the use of meltable binders is preferred. Preferably, therefore, the cushioning core, not only the nonwoven block but also the nonwoven roll, comprises meltable-binder-consolidated nonwoven. The meltable binder is particularly advantageously introduced into the nonwoven in the form of fibers (binding fibers). Depending on the desired degree of consolidation of the web, the weight proportion of the binder ranges from 5 to 35% by weight, preferably from 10 to 25% by weight, of the total nonwoven weight (including binder). From the aspect of the desired recyclability, it is particularly preferable for the meltable binder to be a modified polyester whose melting point is at least 10° C, preferably 20° C, below the melting point of the load-bearing nonwoven fibers.

If the meltable binder is, as is preferred, used in fiber form, it may be in the form of separate binding fibers or it may be part of a two-component fiber, of the side-by-side or core-sheath type, in which case the sheath or one of the sides of the bicomponent fiber consists of the meltable binder. In the interest of ease of disposal it is particularly preferable for the load-bearing fibers and the binding fibers of the cushioning core to comprise polyesters having different melting points. Within the above-specified limits, the binder content is preferably chosen so that the cushioning core is relatively firm to the touch.

A098

The cover of the flame retardant pillow according to the invention may comprise a fabric woven or knitted from continuous filament yarn or from staple fiber yarn. Woven or knitted fabrics for the cover advantageously have a basis weight from 100 to 300 g/m². Woven fabrics for this purpose advantageously have a linen or satin/sateen weave, which confers particularly pleasant skin contact. Knitted fabric is for the same reason preferably knitted to a single face.

Particular preference is given to a low flammability pillow according to the invention wherein the cover comprises an at least two-layered combination of a nonwoven having a basis weight from 50 to 300 g/m² with a woven or knitted fabric having a basis weight from 100 to 300 g/m², which are connected together, preferably by quilting. Of particular advantage is a cover comprising such a nonwoven faced and quilted on both sides with woven or knitted fabric. The advantage of such a three-layered construction of the cover is that such a multi-layered cover can serve as a thin headrest even without the cushioning core.

In the interest of making the low flammability pillow according to the invention particularly skin friendly and textile to the touch, it is preferable for the fibers comprising the woven or knitted fabric of the cover to be textured multifilament yarns or else staple fiber yarns. The texturing may be effected by any conventional process, in particular by air jet texturing or false twist texturing. The linear density of the yarns present in the cover is advantageously within the range from 60 to 200 dtex, and multifilament yarns generally contain from 30 to 150 individual filaments.

Suitable polyesters for the fiber materials--fiber materials for the purposes of this invention being not only staple fibers but also continuous filament fibers--of the cushioning core and of the cover are spinnable grades which have been modified or

finished to be flame resistant and which consist predominantly of building blocks derived from aromatic dicarboxylic acids and from aliphatic diols.

Widely used aromatic dicarboxylic acid building blocks are the bivalent radicals of benzenedicarboxylic acids, in particular of terephthalic acid and of isophthalic acid;

5   widely used diols have 2-4 carbon atoms, and ethylene glycol is particularly suitable. Modified polyesters preferably contain at least 85 mol % of ethylene terephthalate units. The remaining 15 mol % are then made up of dicarboxylic acid units and glycol units, which act as modifiers and which make it possible for the person skilled in the art to influence the physical and chemical properties of the filament products in a specific

10   manner. Examples of such dicarboxylic acid units are radicals of isophthalic acid or of aliphatic dicarboxylic acids such as glutaric acid, adipic acid and sebacic acid; examples of modifying diol radicals are those of longer diols, for example of propanediol or butanediol, of di- or triethylene glycol or, if present in a small amount, of polyglycol having a molecular weight of about 500-2000. Particular preference is given to polyesters

15   which contain at least 95 mol % of ethylene terephthalate units, in particular to polyesters made of unmodified PET.

The modifying of these polyester materials to render them flame resistant is effected by additions of halogen compounds, in particular bromine compounds, or, particularly

20   advantageously, by the presence of from 0.1 to 20, preferably from 2 to 12, % by weight of phosphorus compounds which have been co-condensed into the polyester chain. Particularly preferred flame resistant polyesters for the fiber materials of the low flammability pillows of the invention are those which contain, co-condensed into the chain, building groups of the formula

25

[see source for formula]                                                    (1)

where R is alkylene or polymethylene with 2 to 6 carbon atoms or phenyl and $R^1$ is alkyl with 1 to 6 carbon atoms, aryl or aralkyl.

30

8

The preferred meanings for the symbols in the formula I are ethylene for R and methyl, ethyl, phenyl or o-, m- or p-methylphenyl, in particular methyl, for $R^1$.

5    The polyesters present in the pillows of the invention advantageously have a molecular weight corresponding to an intrinsic viscosity (IV), measured in a solution of 1 g of polymer in 100 ml of dichloroacetic acid at 25°C, of from 0.5 to 1.4 dl/g.

In a further preferred embodiment of the low flammability pillow according to the invention, the fiber materials used for producing the cushioning core and the cover are
10    chosen in respect of the polyester composition and in respect of the spinning conditions so that the cushioning core is sterilizable and the cover can be boil-washed.

It is further particularly advantageous for the cover of the low flammability pillow to be constructed closable by means of a zip fastener (zipper) or a velcro fastener. In the
15    interest of satisfactory recyclability of the pillow according to the invention (single material constitution) it is preferable for the zip or velcro fastener of the pillow cover to comprise polyester monofilaments. It is particularly preferable for the monofilaments of the zip or velcro fastener to comprise flame resistant polyester like the rest of the fiber materials of the pillow.
20

The embodiment example which follows illustrates the production of a low flammability pillow of this invention. All the flame resistant polyester fibers used in the example were made of polyethylene terephthalate rendered flame resistant by incorporation of building groups of the above-indicated formula I ((R) TREVIRA CS - fiber materials from
25    Hoechst AG).

**A101**

## Example

a) Nonwoven block

5    A carding machine was used to process a mixture of 80% by weight of a 17 dtex polyethylene terephthalate staple fiber which had a staple length of 80 mm and had been rendered flame resistant by incorporation of building blocks according to formula I and 20% by weight of a bicomponent fiber of the core-sheath type with a core of flame resistant modified polyethylene terephthalate and a sheath of polyethylene terephthalate
10   isophthalate with a core-sheath weight ratio of 50:50, a linear density of 4.4 dtex and a staple length of 50 mm into a web having a basis weight of 1500 g/m$^2$. The web was compacted to a height of from 8 to 10 cm and bonded at 160° C in a hot air oven.

b) Neckroll

15

The same fiber mixture was carded on the same machine to produce a 400 g/m$^2$ web which was then preconsolidated by light needling. The resulting web, still to be binder-consolidated, was rolled up into a roll 15 cm in diameter and set in that form at 160° C in the hot air oven. The resulting cushioning cores for pillow and neckroll were of low
20   flammability, recyclable, washable and sterilizable and were relatively firm to the touch. The firmness of these core materials, their compressive strength and their ability to recover can be varied and adjusted as desired through the choice of fiber linear density, binder content, setting temperature and air supply.

25   c) Cover

Separate covers, equipped at the open sides with zippers made of polyester wire, were sewn for the resulting nonwoven block and the nonwoven roll. A three-layered textile sheet material was used comprising a fiber web 200 g/m$^2$ in basis weight comprising
30   flame resistant polyethylene terephthalate fibers and faced on both sides with a woven fabric (180 g/m$^2$) made of staple fiber yarn (fiber linear density 1.7 dtex) of flame resistant polyethylene terephthalate. The two covers are provided at suitable places with

A102

velcro strips of flame resistant polyester wire, so that the neckroll can be connected detachably to the pillow at a suitable position.

5    The covers are slipped over the nonwoven block and the nonwoven roll and closed with the zippers. The resulting elements of the pillow are then pressed together at the Velcro fastening strips and joined into an inventive pillow.

Patent Claims

HOE 93/F 177 G

1. A low flammability pillow comprising a cushioning core and a cover separable therefrom, characterized in that the cushioning core comprises a binder-consolidated nonwoven block with a thickness of 5 to 15 cm, preferably 8 to 12 cm, and a basis weight from 500 to 3000 g/m$^2$ comprising fibers or filaments having a linear density from 3 to 50 dtex, and that the cover is a pocket-shaped, closable casing comprising a textile sheet material containing or consisting of woven or knitted fabric, whereby the fibers and filaments of the cushioning core and of the casing consist of flame retardant polyester.

2. The low flammability pillow according to claim 1, characterized in that the cushioning core, in addition to the nonwoven block, comprises a cylindrical nonwoven roll whose height corresponds to the width of the nonwoven block and whose diameter is from 5 to 20 cm, said roll being connected detachably or nondetachably to the block.

3. The low flammability pillow according to at least one of the claims 1 and 2, characterized in that the nonwoven block and the cylindrical nonwoven roll of the cushioning core each have separate covers, and the two parts are connected together detachably.

4. The low flammability pillow according to at least one of the claims 1 to 3, characterized in that the cushioning core is sterilizable.

5. The low flammability pillow according to at least one of the claims 1 to 4, characterized in that the cushioning core comprises a meltable-binder-consolidated nonwoven batt.

6. The low flammability pillow according to at least one of the claims 1 to 5,

characterized in that the meltable binder is integrated in the nonwoven batt in fiber form, preferably in the form of bicomponent fibers composed of two polyesters having different melting points.

5    7. The low flammability pillow according to at least one of the claims 1 to 6, characterized in that the cover can be boil-washed.

8. A low flammability pillow according to at least one of the claims 1 to 7, characterized in that the textile sheet material of the cover comprises an at least two-layered
10   combination of a nonwoven batt having a basis weight from 50 to 300 $g/m^2$ with a woven or knitted fabric having a basis weight from 100 to 300 $g/m^2$, which are connected together, preferably by quilting.

9. The low flammability pillow according to at least one of the claims 1 to 8,
15   characterized in that the fibers of the cushioning core and of the cover comprise flame resistant polyethylene terephthalate.

10. The low flammability pillow according to at least one of the claims 1 to 9, characterized in that the flame retardant polyester comprises co-condensed structural
20   units according to Formula I,
[see source for formula]

                                                                    (1)

where R stands for alkyls or polymethyls with 2 to 6 C atoms or phenyl, and $R^1$ stands for alkyl with 1 to 6 C atoms, aryl or aralkyl.
25

11. The low flammability pillow according to at least one of the claims 1 to 10,

characterized in that the cover is closable by means of a zipper or velcro fastener, preferably one consisting of polyester wire, specifically flame retardant polyester wire.

A106

HOE 93/F 177 G

[see source for figures 1 and 2]

HOE 93/F 172 G



Fig. 1



Fig. 2

A108



**TRANSPERFECT**
**T R A N S L A T I O N S**

AFFIDAVIT OF ACCURACY

I, Charles Lorenz, hereby certify that the "German Patent Registry No. G 93 09 6992, filing date June 30, 1993" translation from German into English, is to my knowledge and belief, a true and accurate translation.

ATLANTA

BOSTON

BRUSSELS

CHICAGO

DALLAS

DENVER

FRANKFURT

GENEVA

HONG KONG

HOUSTON

LONDON

LOS ANGELES

MIAMI

MINNEAPOLIS

NEW YORK

PARIS

PHILADELPHIA

RESEARCH
TRIANGLE PARK

SAN DIEGO

SAN FRANCISCO

SEATTLE

WASHINGTON, DC

Charles Lorenz
Director, Business Development
TransPerfect Translations, Inc.
1717 Main Street
Suite 5650
Dallas, TX 75201

Sworn before me on this
2nd Day of March, 2005



Signature, Notary Public

Rosemaria Massangale
My Commission Expires
May 20, 2006

Stamp, Notary Public

# United States Patent [19]

**West**

[11] Patent Number: 5,109,559

[45] Date of Patent: May 5, 1992

[54] **FLOTATION MATTRESS PAD HAVING A COVER WITH PAD RETAINING STRAPS**

[76] Inventor: **Gordon W. West,** 35 Peel Village Parkway, Brampton, Ontario, L6W 1G1, Canada

[21] Appl. No.: **643,531**

[22] Filed: **Jan. 18, 1991**

[51] Int. Cl.⁵ ...................... A47C 27/10; A47C 31/00
[52] U.S. Cl. ........................................... 5/451; 5/470; 5/502; 5/903
[58] Field of Search ................... 5/451, 450, 449, 502, 5/500, 455, 470

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 2,201,424 | 5/1940 | Berger | 5/451 |
| 3,702,484 | 11/1972 | Tobinick et al. | 5/451 |
| 4,149,286 | 4/1979 | Fogel | 5/451 |
| 4,292,701 | 10/1981 | Woychick | 5/470 |
| 4,549,323 | 10/1985 | Brockhaus | 5/451 |
| 4,597,120 | 7/1986 | Fogel et al. | 5/451 |
| 4,847,931 | 7/1989 | Bard | 5/451 |
| 4,972,534 | 1/1990 | Hutton | 5/451 |
| 4,980,939 | 1/1991 | Smith | 5/451 |

5,001,792  3/1991  Strobel ..................................... 5/449

Primary Examiner—Alexander Grosz
Attorney, Agent, or Firm—Krass & Young

[57] **ABSTRACT**

A relatively shallow mattress for a bed which has three integral parts: an inner bladder, an outer bladder and a mattress cover. The inner bladder is formed from a rectangular top and bottom side welded together along the edges. The top side contains a valve. The outer bladder is effectively a safety cover for the inner bladder. It surrounds the inner bladder and but for a circular opening which allows access to the valve on the top side of the inner bladder, it is fluid tight. It is made in a similar fashion to the inner bladder which it permanently encloses. The mattress cover has an upper surface made of a quilted ticking. This ticking incorporates a thermal barrier layer. The mattress cover has a bottom and sides made from a relatively light woven cloth fabric. The mattress cover totally surrounds the bladder. An elongate zipper along the edge of the top surface allows insertion of the bladders and access to the valve used for filling.

13 Claims, 3 Drawing Sheets





FIG. 1

FIG. 2



FIG. 3

FIG. 4

FIG. 5

5,109,559

1

**FLOTATION MATTRESS PAD HAVING A COVER WITH PAD RETAINING STRAPS**

BACKGROUND OF THE INVENTION

This invention relates to waterbeds, and in particular to waterbed mattresses.

Waterbeds in the past have usually been made with a mattress consisting of a large, watertight bladder covered by mattress ticking, and a heavy supporting structure or frame to maintain the shape of the mattress and support the heavy weight of the water filling the bladder. A difficulty with this type of waterbed is that it cannot be moved without draining the mattress, and in view of the large quantity of water, this is time-consuming and wasteful since the water is usually not reused. A further difficulty with these waterbeds is that a leak in the bladder can cause extensive damage.

Attempts have been made to overcome the weight problem. One example of this is shown in U.S. Pat. No. 3,689,949 issued to J. D. Weinstein. Weinstein suggested the use of a base for the water bladder which was hollowed out on its top side in a shape to conform to the general shape of the human body. It was suggested that this structure would effectively reduce the weight of the water above those areas of the mattress which supported the least weight. However, this mattress was unusually bulky.

Another attempt to overcome the weight problem of conventional waterbeds is shown in U.S. Pat. No. 3,789,442 issued to S. Tobinick. This patent shows a hollowed out foamed flexible material which receives a liquid filled bladder. This bladder is also covered by a foamed flexible material. It would seem that the benefits achieved would be accompanied by a lost flotation effect.

A problem with both the Weinstein and Tobinick approaches is that these beds are very expensive to manufacture.

In order to solve the problem of leaking bladders, it has been proposed to make a separate watertight cover or envelope to enclose the main mattress bladder, so that if a leak occurs in the bladder, the water will be contained by the outer watertight cover. A problem with this solution, however, is that it must be possible to open the outer cover to insert the bladder, to fill it, and to empty it. This requires a large watertight closure which itself is prone to leakage.

It is an object of the present invention to provide a lightweight easily transportable flotation pad having a double wall to protect against leaks and which can be used to convert any ordinary bed into a waterbed.

SUMMARY OF THE INVENTION

According to one aspect of the invention there is provided a flotation mattress pad for a bed comprising a rectangular inner bladder constructed from an impervious plastic material having a top side and bottom side with coterminous peripheral edges which are heat sealed to each other in order to form a fluid-tight enclosure. The top side has a valve. A rectangular outer bladder is constructed from a fluid impervious plastic material having a top side and a bottom side with coterminous peripheral edges heat sealed to each other in order to form a fluid-tight enclosure which encloses the inner bladder. The top side of the outer bladder has a

2

circular opening which is positioned to surround the valve on the inner bladder and allow access thereto.

According to another aspect of the invention, there is provided a mattress cover for a flotation mattress pad. The cover comprises an upper side which is constructed of mattress ticking having a thermal barrier layer, and a bottom side and peripheral sides, both made of a woven cloth fiber. The cover is provided with an elongate zippered opening in order to allow the insertion of outer and inner bladders and the filling thereof.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is perspective view of a flotation mattress pad having two inner bladders;

FIG. 2 is an enlarged sectional view of the flotation mattress pad taken along lines 2—2 of FIG. 1;

FIG. 3 is a plan view of a portion of the mattress pad indicated in FIG. 1 by circle 3 showing the quilting design thereon;

FIG. 4 is a perspective view similar to FIG. 1 but showing a mattress pad with a single inner bladder with retaining straps; and

FIG. 5 is a perspective view of the underside of the mattress pad of FIG. 1.

DETAILED DESCRIPTION OF THE DRAWINGS

A flotation mattress pad 8 is shown in an open position in FIG. 1. A zipper 20 is used to removably affix a top of a mattress cover 14 to a side of the mattress cover 14. Disposed within the mattress cover 14 are two double bladder assemblies 15, each bladder assembly 15 including an outer bladder 12 which surrounds an inner bladder 10 which contains a valve 16 therein, which valve is used to fill the inner bladder 10 with a fluid such as water. The flotation mattress pad in FIG. 1 is for a wider bed, such as a standard size double mattress bed, a queen size mattress bed or a king size mattress bed, and appropriately contains two half-width, full length bladder assemblies 15. Alternatively, rather than using the two half-width outer bladders, a single full width outer bladder may be employed (not shown). In such employment, the bladder would have two circular openings in its top side positioned to permit access to the valve 16 in each inner bladder 10. Utilization of two half-width inner bladders 10 and outer bladders 12 reduces the transmission of waves caused by one user of the flotation mattress pad 8 to a second user laying beside the first. The mattress pad 8 is preferably about 5 centimeters (2 inches) thick; however, it may be as thin as 2.5 centimeters (1 inch) or as thick as 10 centimeters (4 inches).

FIG. 2 is a sectional view of the flotation mattress pad 8 taken along lines 2—2 of FIG. 1. The mattress cover 14 surrounds the outer bladder 12 which itself surrounds the inner bladder 10 which holds the fluid 44 therein. The outer bladder 12 may be made of a thinner material than the inner bladder 10. For example the outer bladder could be made of 10 mil vinyl and the inner bladder made of 20 mil vinyl. Further, it is also useful when filling, in order to ascertain that the inner bladder 10 is correctly aligned with respect to the outer bladder 10, to have the inner bladder 10 made of a coloured material, and the outer bladder 12 made of a transparent material.

The upper side 40 of the mattress cover 14 is composed of a mattress ticking 26 which is peripherally edged by a hem 18 which binds the outside edges of the

A114

5,109,559

3

layers of the mattress ticking 26 to each other as well as securing one side of the zipper 20 to the mattress ticking 26. The mattress ticking 26 itself is composed of a top polyester woven cloth 28, which is above a polyester filling 30, which is above a polyurethane foam layer 32, which is above a thermal barrier 34, which is above a bottom polyester cloth 37, all of which are quilted together. The thermal barrier layer 34 consists of a thin plastic film 35, reflective on both sides, which is attached to one side of a felted sheet 36. The other side of the zipper 20 is secured to an upper edge of a side surface 22 of the mattress cover 14. An additional hem 19 secures a lower edge of the side surface 22 of the mattress cover 14 to the bottom 24 of the mattress cover 14.

As an alternative to the construction of cover 14, the upper side 40 could be made out of lambswool or conventional mattress ticking. Also, cover 14 could be made reversible, with upper side 40 having lambswool on one side and normal mattress ticking on the other side. With a full zipper 20 around the periphery of cover 14, mattress cover 14 could be turned inside out to make the upper surface either lambswool or mattress ticking.

Optional attaching devices, such as flaps 21 may be provided at the corners and along the sides of cover 14. Flaps 21 are provided with grommets 23 for attaching light rope or straps 25 to mattress pad 8 for tying down the mattress pad where it is used in a mobile location such as in a truck, a recreation vehicle or a boat. Alternatively, straps 25 could be attached directly to cover 14 or to flaps 21 by being sewn in place, and such straps could be provided with hook and loop type releasable fasteners on the ends of the straps so that they could surround an anchoring device or even another conventional mattress located under mattress pad 8.

Individual users who are prone to arthritis or simply those who prefer a pre-warmed bed may choose to utilize a conventional water bed heater in conjunction with the flotation mattress pad 8. The heater would normally be located between bottom 24 and outer bladder 12.

In order to better facilitate the utilization of fitted bed sheets in standard sizes the flotation mattress pad may be marginally shortened and narrowed in order to provide a space between the peripheral edges of the bed mattress and the peripheral edges of the mattress pad 8 when viewed in plan.

FIG. 3 is an enlarged plan view of the mattress ticking 26 showing the top side 40 of the mattress cover 14, having a decorative quilting stitching 38 which holds all the layers together.

Referring next to FIGS. 4 and 5, a mattress pad 50 is shown which would be suitable for each one of a set of twin beds, or a single bed. A single bladder assembly 15 shown in chain dotted lines in FIG. 4 would be used inside an appropriately sized cover 14. A flotation mattress pad for a single bed is sufficiently light that a child might be able to pull it off the bed. For this reason the mattress cover may be provided with two outer safety straps 52 attached to the underside or bottom 24 of cover 14. One strap would encircle each end of a conventional bed mattress to secure mattress pad 50 in place. The two safety straps are about 7.5 centimeters (3 inches) wide, are formed of elasticized fabric, and are sewn between opposed bottom side hems 19 of mattress cover 14. In addition, mattress cover 14, as seen in FIG. 4, three non-stretch inner straps 54 span from opposite bottom side hems 19 of mattress cover 14, across the top of the bladder assembly 15 to hold blad-

4

der assembly 15 inside mattress cover 14. Straps 54 are about 7 to 10 centimeters in width and are made of the same material as side surfaces 22, which is a felted synthetic material flame treated to increase tear strength, but yet remain breathable. However, straps 54 could be made of any suitable webbing or elasticized material, if desired. Straps 52, 54 are optional, and usually are not required at all on the larger mattress pads containing two bladder assemblies 15. However, straps 52, 54 could be employed in the embodiments shown in FIGS. 1 to 3 if desired.

Where the mattress pads of the present invention are used in an unheated location, such as in an automobile, a recreation vehicle or a truck in the winter time, the inner bladders may be filled with an antifreeze solution such as ethylene glycol or propylene glycol to prevent freezing.

I claim:

1. A flotation mattress pad for a bed comprising: a rectangular inner bladder constructed from an impervious plastic material having a top side and a bottom side with coterminous peripheral edges, the top side having a valve, the inner bladder having a thickness between 2.5 and 10 centimeters; a rectangular outer bladder constructed from a fluid impervious plastic material having a top side and a bottom side with coterminous peripheral edges, the outer bladder enclosing the inner bladder, the top side of the outer bladder having a circular opening positioned to surround the valve on the inner bladder and allow access thereto.

2. A mattress pad as claimed in 1 wherein the inner bladder has a width approximately half the width of the bed and further comprising a second similar half-wide, full length inner bladder, and wherein each inner bladder is covered by a separate outer bladder.

3. A mattress pad as claimed in 1 wherein the inner bladder is made from a colored material and the outer bladder is made from a transparent material.

4. A mattress pad as claimed in 3 wherein the outer bladder is made from a thinner material than the inner bladder.

5. A mattress pad as claimed in 4 and further comprising a heater located adjacent to the outer bladder bottom side.

6. A mattress pad as claimed in 4 adapted to fit on a bed by providing a space between the peripheral edges of the bed and the peripheral edges of the mattress pad when viewed in plan.

7. A mattress pad as claimed in claim 1, the mattress cover including an upper side constructed of mattress ticking having a thermal barrier layer; a bottom side; and peripheral sides made of a woven cloth fiber, said cover being provided with an elongate zippered opening to allow the insertion of outer and inner bladders and the filling thereof.

8. A mattress pad as claimed in claim 7 and further comprising straps attached to the mattress cover for securing same in place.

9. A mattress pad as claimed in claim 8 wherein said straps are in the form of elasticized outer straps extending between opposed peripheral edges of the mattress cover adjacent to said bottom side.

10. A flotation mattress pad for a bed comprising: a rectangular inner bladder constructed form an impervious plastic material having a top side and a bottom side with coterminous peripheral edges, the top side having a valve;

5,109,559

5

a rectangular outer bladder constructed form a fluid impervious plastic material having a top side and a bottom side with coterminous peripheral edges, the outer bladder enclosing the inner bladder, the top side of the outer bladder having a circular opening positioned to surround the valve on the inner bladder and allow access thereto;

a mattress cover surrounding the outer and inner bladders, the mattress cover including an upper side constructed of mattress ticking having a thermal barrier layer, a bottom side, and peripheral sides made of a woven cloth fiber, said cover being provided with an elongate zippered opening to allow the insertion of outer and inner bladders and the filling thereof; and

6

inner straps extending between opposed peripheral sides of the mattress cover above the outer bladder to hold the inner and outer bladders in place.

11. A mattress cover for a flotation mattress pad comprising: an upper side constructed of mattress ticking having a thermal barrier layer; a bottom side; peripheral sides made of a woven cloth fiber, said cover being provided with an elongate zippered opening to allow the insertion of a bladder and the filling thereof; and inner straps extending between opposed peripheral sides of the cover to hold the bladder in place.

12. A mattress cover as claimed in claim 11 wherein the thermal barrier layer includes a thin reflective plastic film attached to a felted sheet.

13. A mattress cover as claimed in claim 11 and further comprising straps attached to the mattress cover for securing same in place.

* * * * *

## UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

**PATENT NO.** : 5,109,559

**DATED** : MAY 5, 1992

**INVENTOR(S)** : Gordon W. West

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 4,

Claim 1, line 15; delete "and said opening having a peripheral edge unattached to the inner bladder to allow the valve to move below the outer bladder top side." and insert --a cover for the outer bladder having sections extending about said peripheral edges of the outer bladder; and straps joining spaced peripheral portions of the cover to retain the bladder within the cover.--

Column 2, line 63, "10" should be --12--.

Column 3, line 34, "pad 8" should be --pad 8.--

Signed and Sealed this

Third Day of August, 1993

*Michael K. Kirk*

MICHAEL K. KIRK

*Attest:*

*Attesting Officer*          *Acting Commissioner of Patents and Trademarks*

US005586350A

# United States Patent [19]

## Thönnessen et al.

[11] **Patent Number:** 5,586,350

[45] **Date of Patent:** Dec. 24, 1996

[54] **LOW FLAMMABILITY PILLOW**

[75] Inventors: **Franz Thönnessen**, Bobingen; **Hans H. Mühlhaus**, Kriftel, both of Germany

[73] Assignee: **Hoechst Aktiengesellschaft**, Germany

[21] Appl. No.: **267,426**

[22] Filed: **Jun. 28, 1994**

[30]     **Foreign Application Priority Data**

Jun. 30, 1993  [DE]  Germany ............................. 9309699 U

[51] **Int. Cl.$^6$** ................................................. **A47G 9/02**

[52] **U.S. Cl.** ...................................... **5/636; 5/645**

[58] **Field of Search** ................................. 5/636, 645, 459

[56]               **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,336,610 | 8/1967 | Geddings . |
| 4,525,409 | 6/1985 | Elesh ...................................... 5/483 X |
| 4,618,531 | 10/1986 | Marcus . |
| 4,754,513 | 7/1988 | Rinz ........................................ 5/636 X |
| 4,879,168 | 11/1989 | McCullough, Jr. et al. . |
| 4,940,502 | 7/1990 | Marcus . |
| 4,956,886 | 9/1990 | Sarkozi . |
| 5,034,266 | 7/1991 | Kinlaw et al. . |
| 5,050,256 | 9/1991 | Woodcock ............................... 5/490 X |
| 5,141,805 | 8/1992 | Nohara et al. .......................... 5/459 X |
| 5,321,861 | 6/1994 | Dancey et al. .......................... 5/490 X |
| 5,458,971 | 10/1995 | Hernandez et al. ..................... 5/636 X |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 0265221 | 4/1988 | European Pat. Off. . |
| 0432620 | 6/1991 | European Pat. Off. . |
| 2161519 | 7/1973 | France . |

*Primary Examiner*—Michael F. Trettel
*Attorney, Agent, or Firm*—Connolly & Hutz

[57]                **ABSTRACT**

Described is a low flammability pillow comprising a cushioning core and a cover separable therefrom, wherein the cushioning core comprises a binder-consolidated nonwoven block from 5 to 15 cm in thickness and from 700 to 3000 g/m$^2$ in basis weight comprising fibers or filaments having a linear density from 3 to 30 dtex and the cover is a pocket-shaped, closable casing comprising a textile sheet material comprising or consisting of woven or knitted fabric, the fibers and filaments of the cushioning core and of the casing comprising flame resistant polyester.

Further, a process is described for the production of the low flammability pillow.

**18 Claims, 2 Drawing Sheets**







*Fig. 1*



*Fig. 2*

### Fig. 3



### Fig. 4



A120

5,586,350

## 1

## LOW FLAMMABILITY PILLOW

The present invention relates to a low flammability pillow comprising a binder-consolidated nonwoven block and a cover separable from the cushioning core, comprising a pocket-like closable casing comprising a textile sheet material, the fibers and filaments of the cushioning core and of the casing comprising flame resistant polyester.

A frequent cause of fires in homes and other occupancies is that sources of ignition, such as burning cigarettes, burning candles, overheated electric installations or open flames, for example from repair work, come into contact with cushioning of the items of furniture or fitments and cause smoldering or flaming fires in this cushioning. Facilities where relatively large numbers of people congregate, such as hotels, conference centers, but also transport means such as ships, railroad compartments or airplanes, have regulations governing the flame resistance of the items of furniture or fitments used therein. Especially in the contract sector, but also domestically, fires, including smoldering fires, have serious, frequently fatal, consequences for the occupants, and it is therefore of very great interest to provide cushioning articles which are different to ignite by sources of ignition.

There has been no shortage of attempts to meet the need for low flammability cushioning materials. For instance, Japanese Patent Application 60 002 274 discloses a bulked fiber product, for example a pillow filled with a filling of thermoplastic synthetic polyester fibers, flame retardant fibers and/or polyamide fibers. At least 30% by weight of the fibers used are to be flame retardant synthetic polyester fibers with a cross-sectional circumference from 1 to 5 mm and a fiber length of not more than 10 mm. The cross-section itself is three-pointed or swastika-shaped.

However, this known material is not only relatively complicated and costly to manufacture, because of the complicated cross-sectional shape of the fibers used, but also has the serious disadvantage that, owing to the different fiber materials it contains, it is virtually impossible to recycle.

However, modern cushioning materials should not only have low flammability properties but also meet hygienic concerns; that is, they should be satisfactorily cleanable and, if necessary, sterilizable even under aggravated conditions and, in the event of their having to be replaced, should be satisfactorily disposable, preferably readily recyclable.

Especially the problem of how to reduce the cost of manufacturing low flammability cushioning materials is the concern of German Utility Model 84 29 666, which describes a flame retardant web in the form of a sheet, tile or the like, which consists of a voluminous cushioning web known per se which is combined at least on one side with a flame retardant facing web, the cushioning web and the facing web being joined together over a large area. The low flammability facing web is a needlefelt of low flammability fiber containing a proportion of hot-melt adhesive fibers and/or a proportion of synthetic fiber, the low flammability fiber consisting of polyvinyl chloride, modified polyacrylonitrile or of a copolymer. This material too is unable to meet the requirements of modern cushioning materials, in particular satisfactory cleaning, in full and because of the variety of fiber materials it contains is not recyclable and is difficult to dispose of.

The present invention, then, relates to a cushioning material which is not only inexpensive to manufacture but also easy to clean and sterilize even in use under aggravated conditions and which is simple to recycle.

## 2

The low flammability pillow of the invention comprises a cushioning core and a cover separable therefrom, wherein the cushioning core comprises a binder-consolidated nonwoven block from 5 to 15 cm, preferably from 8 to 12 cm, in thickness and from 500 to 3000 g/m$^2$, preferably from 1000 to 2000 g/m$^2$, in basis weight comprising fibers or filaments having a linear density from 3 to 50 dtex and preferably from 6 to 20 dtex. The cover is a pocket-shaped, closable casing comprising a textile sheet material comprising or consisting of woven or knitted fabric, the fibers and filaments of the cushioning core and of the casing comprising flame resistant polyester.

A further embodiment of the low flammability pillow of the invention comprises a cushioning core which in addition to the nonwoven block comprises a cylindrical nonwoven roll whose height corresponds to the width of the nonwoven block and whose diameter is from 5 to 25 cm, preferably 10–20 cm, said roll being connected detachably or nondetachably to the block. A nondetachable connection between the nonwoven roll and the nonwoven block is achieved for example in a simple manner when, in the consolidation phase of the webs, in which the consolidating binders of the nonwoven are activated—in the case of the use of a meltable binder for example by heating to above the melting point of the meltable binder—the two parts are pressed together so that a satisfactory connection is formed between the nonwoven block and the nonwoven roll at the point of contact between the two parts.

A detachable connection between the nonwoven block and the nonwoven roll can be created for example by means of a strip of a restick adhesive or of a hook-and-loop fastener applied in the contact region. In a further variant of this embodiment, the nonwoven block and the nonwoven roll of the cushioning core each have separate covers and the two parts are connected together detachably. In this case too the detachable connection can be created by means of a restick adhesive applied in strip form or preferably by means of a hook-and-loop fastener.

In this preferred embodiment, the low flammability pillow of the invention is particularly suitable for supporting the neck (neckroll). In this embodiment it can therefore be used with particular advantage in particular in the orthopedic sector. Preferably the nonwoven roll of the cushioning core comprises a rolled-up sheetlike nonwoven having a basis weight from 200 to 800 g/m$^2$, which is rolled up in the unconsolidated state and then consolidated by activation of the binder and so stabilized in the roll form.

FIG. 1 is a diagrammatic section through a pillow (1) according to the invention, comprising the nonwoven block (2), the nonwoven roll (3), the connecting element (4), which provides the detachable connection between the nonwoven block (2) and the nonwoven roll (3), and the conjoint cover (5).

FIG. 2 is a diagrammatic section through another embodiment of the pillow (11) of the invention, comprising the nonwoven block (12), the nonwoven roll (13), the covers (15) and (15') for the nonwoven block (12) and the nonwoven roll (13), and the connecting element (14) which provides the detachable connection between the covered parts of the pillow.

FIG. 3 is a diagrammatic elevational view of a textile sheet material of the present invention including a nonwoven batt (20) and a woven or knitted fabric (22).

FIG. 4 is a diagrammatic elevational view illustrating a closure for cover (5) in the form of a zip or hook and loop fastener (24).

5,586,350

3

The nonwoven block and the nonwoven roll of the low flammability pillow of the invention may comprise continuous filaments or staple fibers. Advantageously the linear density of the fiber material of the nonwoven roll is chosen to be higher than that of the fiber material of the nonwoven block. This results in a higher compressive strength for the roll and so in particularly good support for the neck.

It is of course also possible to make the nonwoven block and the nonwoven roll from different fiber materials; in particular, they may have different fiber lengths. For example, the nonwoven block may be composed of continuous filament fibers and the nonwoven roll of staple fibers, or vice versa. The staple length of the staple fibers used for the nonwoven block and/or nonwoven roll is advantageously within the range from 30 to 150 mm, preferably from 40 to 100 mm.

Although the binders used for the pillow of the invention can be binder dispersions which bring about the consolidation of the nonwoven through evaporation of the liquid continuous phase, the use of meltable binders is preferred.

Preferably, therefore, the cushioning core, not only the nonwoven block but also the nonwoven roll, comprises meltable-binder-consolidated nonwoven. The meltable binder is particularly advantageously introduced into the nonwoven in the form of fibers (binding fibers). Depending on the desired degree of consolidation of the web, the weight proportion of the binder ranges from 5 to 35% by weight, preferably from 10 to 25% by weight, of the total nonwoven weight (including binder). From the aspect of the desired recyclability, it is particularly preferable for the meltable binder to be a modified polyester whose melting point is at least 10° C., preferably 20° C., below the melting point of the load-bearing nonwoven fibers.

If the meltable binder is, as is preferred, used in fiber form, it may be in the form of separate binding fibers or it may be part of a two-component fiber, of the side-by-side or core-sheath type, in which case the sheath or one of the sides of the bicomponent fiber comprises the meltable binder. In the interest of ease of disposal it is particularly preferable for not only the load-bearing fibers but also the binding fibers of the cushioning core to comprise polyesters having different melting points. Within the above-specified limits, the binder content is preferably chosen so that the cushioning core has a relatively firm hand.

The cover of the flame retardant pillow of the invention may comprise a fabric woven or knitted from continuous filament yarn or from staple fiber yarn. Woven or knitted fabrics for the cover advantageously have a basis weight from 100 to 300 g/m². Woven fabrics for this purpose advantageously have a plain or satin/sateen weave, which confers particularly pleasant skin contact. Knitted fabric is for the same reason preferably knitted to a single face.

Particular preference is given to a low flammability pillow of the invention wherein the cover comprises an at least two-layered combination of a nonwoven having a basis weight from 50 to 300 g/m² with a woven or knitted fabric having a basis weight from 100 to 300 g/m², which are connected together, preferably by quilting. Of particular advantage is a cover comprising such a nonwoven faced and quilted on both sides with woven or knitted fabric. The advantage of such a three-layered construction of the cover is that such a multi-layered cover can serve as a thin headrest even without the cushioning core.

In the interest of a particularly skin friendly and textile hand of the low flammability pillow of the invention it is preferable for the fibers comprising the woven or knitted fabric of the cover to be textured multifilament yarns or else staple fiber yarns. The texturing may have been effected by any conventional process, in particular by air jet texturing or

4

false twist texturing. The linear density of the yarns present in the cover is advantageously within the range from 60 to 200 dtex, and multifilament yarns generally contain from 30 to 150 individual filaments.

Suitable polyesters for the fiber materials—fiber materials for the purposes of this invention being not only staple fibers but also continuous filament fibers—of the cushioning core and of the cover are spinnable grades which have been modified or finished to be flame resistant and which consist predominantly of building blocks derived from aromatic dicarboxylic acids and from aliphatic diols. Widely used aromatic dicarboxylic acid building blocks are the bivalent radicals of benzenedicarboxylic acids, in particular of terephthalic acid and of isophthalic acid; widely used diols have 2–4 carbon atoms, and ethylene glycol is particularly suitable. Modified polyesters preferably contain at least 85 mol % of ethylene terephthalate units. The remaining 15 mol % are then made up of dicarboxylic acid units and glycol units, which act as modifiers and which make it possible for the person skilled in the art to influence the physical and chemical properties of the filament products in a specific manner. Examples of such dicarboxylic acid units are radicals of isophthalic acid or of aliphatic dicarboxylic acids such as glutaric acid, adipic acid and sebacic acid; examples of modifying diol radicals are those of longer diols, for example of propanediol or butanediol, of di- or triethylene glycol or, if present in a small amount, of polyglycol having a molecular weight of about 500–2000. Particular preference is given to polyesters which contain at least 95 mol % of ethylene terephthalate units, in particular to polyesters made of unmodified PET.

The modifying of these polyester materials to render them flame resistant is effected by additions of halogen compounds, in particular bromine compounds, or, particularly advantageously, by the presence of from 0.1 to 20, preferably from 2 to 12, % by weight of phosphorus compounds which have been cocondensed into the polyester chain. Particularly preferred flame resistant polyesters for the fiber materials of the low flammability pillows of the invention are those which contain, cocondensed into the chain, building groups of the formula

$$-O-\overset{\overset{\textstyle O}{\uparrow}}{\underset{\textstyle R^1}{P}}-R-\overset{\overset{\textstyle O}{\|}}{C}-$$
(1)

where R is alkylene or polymethylene of 2 to 6 carbon atoms or phenyl and $R^1$ is alkyl of 1 to 6 carbon atoms, aryl or aralkyl.

The preferred meanings for the symbols in the formula I are ethylene for R and methyl, ethyl, phenyl or o-, m- or p-methylphenyl, in particular methyl, for $R^1$.

The polyesters present in the pillows of the invention advantageously have a molecular weight corresponding to an intrinsic viscosity (IV), measured in a solution of 1 g of polymer in 100 ml of dichloroacetic acid at 25° C., of from 0.5 to 1.4 dl/g.

In a further preferred embodiment of the low flammability pillow of the invention, the fiber materials used for producing the cushioning core and the cover are chosen in respect of the polyester composition and in respect of the spinning conditions so that the cushioning core is sterilizable and the cover can be boil-washed.

It is further particularly advantageous for the cover of the low flammability pillow to be constructed closable by means of a zip fastener (zipper) or a hook-and-loop fastener. In the interest of satisfactory recyclability of the pillow of the

5,586,350

5

invention (single material constitution) it is preferable for the zip or hook-and-loop fastener of the pillow cover to comprise polyester monofilaments. It is particularly preferable for the monofilaments of the zip or hook-and-loop fastener to comprise flame resistant polyester like the rest of the fiber materials of the pillow.

The embodiment example which follows illustrates the production of a low flammability pillow of this invention. All the flame resistant polyester fibers used in the Example were made of polyethylene terephthalate rendered flame resistant by incorporation of building groups of the above-indicated formula I ((R) TREVIRA CS—fiber materials from Hoechst AG).

EXAMPLE

a) Nonwoven block

A worker-and-stripper type carding machine was used to process a mixture of 80% by weight of a 17 dtex polyethylene terephthalate staple fiber which had a staple length of 80 mm and had been rendered flame resistant by incorporation of building blocks of the formula I and 20% by weight of a bicomponent fiber of the core-sheath type with a core of flame resistant polyethylene terephthalate and a sheath of poly(ethylene terephthalate isophthalate) with a core-sheath weight ratio of 50:50, a linear density of 4.4 dtex and a staple length of 50 mm into a web having a basis weight of 1500 g/m². The web was compacted to a level from 8 to 10 cm and bonded at 160° C. in a hot air oven.

b) Neckroll

The same fiber mixture was carded on the same machine to produce a 400 g/m² web which was then preconsolidated by light needling. The resulting web, still to be binder-consolidated, was rolled up into a roll 15 cm in diameter and set in that form at 160° C. in the hot air oven. The resulting cushioning cores for pillow and neckroll were of low flammability, recyclable, washable and sterilizable and had a relatively firm hand. The firmness of the hand of these core materials, their compressive strength and their ability to recover can be varied and adjusted as desired through the choice of fiber linear density, binder content, setting temperature and air supply.

c) Cover

The above-produced nonwoven block and the nonwoven roll had sewn for them separate covers which are equipped at the open sides with zippers made of polyester wire. For this was used a three-layered textile sheet material comprising a fiber web 200 g/m² in basis weight comprising flame resistant polyethylene terephthalate fibers and faced on both sides with a woven fabric (180 g/m²) made of staple fiber yarn (fiber linear density 1.7 dtex) of flame resistant polyethylene terephthalate. The two covers are provided at suitable places with hook-and-loop fastener strips of flame resistant polyester wire, so that the neckroll can be connected detachably to the pillow at a suitable position.

The covers are slipped over the nonwoven block and the nonwoven roll and closed with the zippers. The resulting elements of the pillow are then pressed together at the hook-and-loop fastening strips to combine them into a pillow of this invention.

What is claimed is:

1. A low flammability pillow comprising a cushioning core and a cover separable therefrom, wherein the cushioning core comprises a binder-consolidated nonwoven block from 5 to 15 cm in thickness and from 500 to 3000 g/m² in basis weight comprising fibers or filaments having a linear density from 3 to 50 dtex and the cover is a pocket-shaped,

6

closable casing comprising a textile sheet material comprising woven or knitted fabric, the fibers and filaments of the cushioning core and of the casing comprising flame resistant polyester, and wherein the flame resistant polyester contains cocondensed structural units of the formula I

$$-O-P-R-C- \qquad (1)$$

where R is alkylene or polymethylene of 2 to 6 carbon atoms or phenyl and R¹ is alkyl of 1 to 6 carbon atoms, aryl or aralkyl.

2. The low flammability pillow of claim 1, wherein the cover is closable by means of a zip or hook-and-loop fastener.

3. The low flammability pillow of claim 2, wherein the zip or hook-and-loop fastener is made of polyester wire, in particular of flame resistant polyester wire.

4. The low flammability pillow of claim 1, wherein the cushioning core comprises a binder-consolidated nonwoven block from 8 to 12 cm in thickness.

5. The low flammability pillow of claim 1, wherein the cushioning core in addition to the nonwoven block comprises a cylindrical nonwoven roll whose height corresponds to the width of the nonwoven block and whose diameter is from 5 to 20 cm, said roll being connected detachably or nondetachably to the block.

6. The low flammability pillow of claim 1, wherein the nonwoven block and the cylindrical nonwoven roll of the cushioning core each have separate covers and the two parts are connected together detachably.

7. The low flammability pillow of claim 1, wherein the cushioning core is sterilizable.

8. The low flammability pillow of claim 1, wherein the cushioning core comprises a meltable-binder-consolidated nonwoven batt.

9. The low flammability pillow of claim 8, wherein the meltable-binder consolidated nonwoven batt includes a meltable binder introduced into the nonwoven batt in fiber form.

10. The low flammability pillow of claim 8, wherein the meltable-binder consolidated nonwoven batt includes a meltable binder introduced into the nonwoven batt in the form of bicomponent fibers composed of two polyesters having different melting points.

11. The low flammability pillow of claim 1, wherein the cover can be boil-washed.

12. The low flammability pillow of claim 1, wherein the fibers of the cushioning core and of the cover comprise flame resistant polyethylene terephthalate.

13. A low flammability pillow comprising a cushioning core and a cover separable therefrom, wherein the cushioning core comprises a binder-consolidated nonwoven block from 5 to 50 cm in thickness and from 500 to 3000 g/m² in basis weight comprising fibers or filaments having a linear density from 3 to 50 dtex and the cover is a pocket-shaped, closable casing comprising a textile sheet material comprising woven or knitted fabric, the fibers and filaments of the cushioning core and of the casing comprising flame resistant polyester, and wherein the textile sheet material of the cover comprises an at least two-layered combination of a nonwoven batt having a basis weight from 50 to 300 g/m² with a woven or knitted fabric having a basis weight from 100 to 300 g/m², which are connected together.

14. The low flammability pillow of claim 13, wherein the nonwoven batt and the woven or knitted fabric are connected together by quilting.

5,586,350

7

**15.** A low flammability pillow comprising a cushioning core and a cover separable therefrom, wherein the cushioning core comprises a binder-consolidated nonwoven block from 5 to 15 cm in thickness and from 500 to 3000 g/m$^2$ in basis weight comprising fibers or filaments having a linear density from 3 to 50 dtex and the cover is a pocket-shaped, closable casing comprising a textile sheet material comprising woven or knitted fabric, the fibers and filaments of the cushioning core and of the casing comprising flame resistant polyester, and wherein the flame resistant polyester contains halogen compounds condensed into the polyester.

**16.** The low flammability pillow of claim **15**, wherein the halogen compounds comprise bromine compounds.

**17.** A low flammability pillow comprising a cushioning core and a cover separable therefrom, wherein the cushioning core comprises a binder-consolidated nonwoven block

8

from 5 to 15 cm in thickness and from 500 to 3000 g/m$^2$ in basis weight comprising fibers or filaments having a linear density from 3 to 50 dtex and the cover is a pocket-shaped, closable casing comprising a textile sheet material comprising woven or knitted fabric, the fibers and filaments of the cushioning core and of the casing comprising flame resistant polyester, and wherein the flame resistant polyester contains 0.1 to 20% by weight of phosphorus compounds condensed into the polyester.

**18.** The low flammability pillow of claim **17**, wherein the phosphorous compounds are present in an amount from 2 to 12% by weight.

\* \* \* \* \*

US005421044A

# United States Patent [19]

## Steensen

[11] Patent Number: 5,421,044

[45] Date of Patent: Jun. 6, 1995

[54] **AIR BED**

[76] Inventor: **Steen W. Steensen,** 509 N. "T" St., Lompoc, Calif. 93436

[21] Appl. No.: **113,712**

[22] Filed: **Aug. 27, 1993**

[51] Int. Cl.6 ............................................. A47C 27/08
[52] U.S. Cl. .......................................... 5/453; 5/455; 5/456; 5/470
[58] Field of Search .................... 5/453, 455, 456, 449, 5/470

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 779,576 | 1/1905 | Berryman | 5/455 |
| 4,190,286 | 2/1980 | Bentley | 297/284 |
| 4,193,149 | 3/1980 | Welch | 5/455 |
| 4,221,013 | 9/1980 | Echevarria | 5/455 |
| 4,224,706 | 9/1980 | Young et al. | 5/499 |
| 4,306,322 | 12/1981 | Young et al. | 5/455 |
| 4,622,706 | 11/1986 | Takeuchi | 5/455 |
| 4,757,564 | 7/1988 | Goodale | 5/470 |
| 4,890,344 | 1/1990 | Walker | 5/449 |
| 4,947,500 | 8/1990 | Seiler | 5/455 |
| 5,070,560 | 12/1991 | Wilkinson | 5/455 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1113473 | 3/1956 | France | 5/456 |

*Primary Examiner*—Michael J. Milano
*Attorney, Agent, or Firm*—Ladas & Parry

[57]                 **ABSTRACT**

An air bed is disclosed comprising an enclosure formed from a flat rectangular bottom panel, a lower vertical panel standing perpendicularly up from the periphery of the bottom panel, an upper vertical panel disposed above the lower vertical panel, a gusset connecting the lower and upper vertical panels, a rectangular top panel removably connected to the upper vertical panel, and a plurality of restraining straps, with one end of each restraining strap connected to the gusset along the left side of the enclosure and the other end of each restraining strap attached to the gusset along the right side of the enclosure. The enclosure has upper level and lower levels separated by the restraining straps. In each level inflatable air tubes are inserted. Each level of tubes includes bolster tubes inserted parallel and adjacent to the sides and ends of the enclosure, and cushion tubes which are disposed laterally across the enclosure in the rectangular space surrounded by the bolster tubes. Each tube has sheathing surrounding it to reduce noise when adjacent tubes rub against each other, and attachment means are used to prevent rotation of the tubes. An air pump provides air pressure to the inflatable tubes through a manifold block having several separate, variably controlled output ports. An air hose assembly connects the manifold's output ports to the various tubes so that certain combinations of tubes receive various air pressures. In addition, the invention includes a single level embodiment.

**24 Claims, 8 Drawing Sheets**





**FIG. I**



**FIG. 2**



# FIG. 3

A127



FIG. 4

FIG. 5

FIG. 6



**F IG. 7**



**F IG. 8**



FIG. 9

Case 1:04-cv-10162-DPW    Document 90-2    Filed 12/01/2005    Page 135 of 207



**FIG. 10**



**FIG. 11**



# FIG. 12



# FIG. 13

A132



100

102

# FIG. 14

100

110  104        14        104 110  110    104

| CALF | THIGH | HIP | CHEST AND HEAD |

102

106        107        108        109

# FIG. 15

5,421,044

**1**

## AIR BED

### BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention relates to an improved air bed which may be used in vehicles, in the home, or in other locations.

2. Prior Art

Air beds have been in common usage for many decades. Such beds typically comprise (i) a single, large, air-tight bladder-shaped in the form of a mattress, or (ii) a plurality of air-tight bladders arranged together to form a mattress. One of the common forms of bladders used for air beds is a cylindrical tube formed of vinyl. Using a plurality of cylindrical tube bladders provides several advantages. Among them is the ability to make continued use of the air bed if only one or two of the tubes is damaged and forms a leak. Only the effected tube needs to be replaced (instead of the entire mattress in the event a leak occurs), and the tubes may be disposed relative to each other in a variety of ways, so that chairs and sofas comprised of air-filled compartments, as well as mattresses, could be formed.

It has also been known to have the tubes of an air bed connected to a pump assembly to vary the air pressure within each tube. U.S. Pat. No. 4,193,149, issued to Welch, discloses a mattress having two or three layers of inflatable tubes, each tube disposed laterally across the bed. The tubes are connected to an air pump in a manner such that the tubes are inflated and deflated in a sequential order so that a person lying on it has his weight supporting areas continually changed.

U.S. Pat. No. 3,363,941, issued to Wierwille, discloses an automobile seat having an air flotation assembly comprised of a plurality of rubber air tubes connected to a control panel of an air pump assembly so that the pressures in the air tubes may be manually adjusted relative to each other.

U.S. Pat. No. 3,303,518, issued to Ingram, U.S. Pat. No. 4,452,547, issued to Sato, and U.S. Pat. No. 4,190,286, issued to Bentley, disclose mattresses and cushions having compartments connected to air pump assemblies in which the air pressures may be individually controlled.

However, none of the prior art air beds or cushions comprise such structure so as to provide the comfort and versatility of the air bed of the present invention.

### BRIEF SUMMARY OF THE INVENTION

The present invention is an air bed which in its preferred embodiment comprises an enclosure formed from a substantially flat rectangular bottom panel, a lower vertical panel standing perpendicularly up from, surrounding and connected to the periphery of the bottom panel, an upper vertical panel disposed vertically above the lower vertical panel, a gusset disposed between and connecting the lower and upper vertical panels, a substantially flat, rectangular top panel removably connected to the top edge of the upper vertical panel, and a plurality of restraining straps disposed across the width of the enclosure, with one end of each restraining strap connected to the gusset along the left side of the enclosure and the other end of each restraining strap attached to the gusset along the right side of the enclosure.

The enclosure so formed has an upper level and a lower level separated by the restraining straps. In each

**2**

level inflatable air tubes are inserted. Each of the upper and lower sets of air tubes includes bolster tubes which are inserted parallel and adjacent to the sides and ends of the enclosure, and cushion tubes which are disposed laterally across the enclosure in the rectangular space surrounded by the bolster tubes.

Each tube has sheathing means surrounding it to reduce the creation of noise when adjacent tubes rub against each other, and attachment means are used to prevent the tubes from rotating relative to the enclosure.

An air pump provides air pressure to the inflatable tubes through a manifold block having several separate, variably controlled output ports.

An air hose assembly connects the manifold's output ports to the various tubes so that certain combinations of tubes receive various air pressures.

In addition, the invention includes a single level embodiment.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective view of a preferred embodiment of the air bed of the present invention, with the right foot portion of the bed closest to the viewer and with the top partially opened and the interior partially broken to illustrate interior detail.

FIG. 2 is a broken perspective view of the air bed of the present invention, with the right foot portion of the bed closest to the viewer.

FIG. 3 is an exploded perspective view of the air bed of the present invention, with the air tubes deleted.

FIG. 4 is a fragmentary, broken perspective view of an upper right side bolster air tube and surrounding structure.

FIG. 5 is a fragmentary cross sectional view of the bottom portion of the air bed of the present invention shown in exaggerated form to illustrate detail, taken along lines 5—5 of FIG. 1.

FIG. 6 is a fragmentary cross sectional view of the air bed of the present invention taken along lines 6—6 of FIG. 4.

FIG. 7 is a perspective view showing the magazine into which cushion air tubes are inserted prior to their being disposed into the air bed of the present invention.

FIG. 8 is an enlarged perspective view of one air tube showing its interconnection to the air delivery system of the present invention.

FIG. 9 is a schematic diagram illustrating the arrangement of the system for delivering air to the air tubes of the present invention.

FIG. 10 is a fragmentary perspective view of a pad being assembled for use in another embodiment of the present invention.

FIG. 11 is a cross sectional view taken from the right side of the pad of FIG. 10.

FIG. 12 is a perspective view of a bolster support member used in another embodiment of the present invention.

FIG. 13 is a cross sectional view of the right side of the embodiment of the air bed in which the bolster support member illustrated in FIG. 12 is used, shown in exaggerated form to illustrate detail.

FIG. 14 is a perspective view of another embodiment of the present invention.

FIG. 15 is a right side elevation cross sectional view of the embodiment of the invention shown in FIG. 14.

5,421,044

3

## DETAILED DESCRIPTION OF THE INVENTION

The preferred embodiments of the air bed of the present invention are illustrated in the attached drawings. Identical elements will be identified by the same reference numerals throughout this description.

In FIGS. 1–9 the embodiment of the present invention which is intended for use in vehicles (such as trucks, recreational vehicles, and boats) is illustrated.

Referring to FIGS. 1–3, this "transport" embodiment 10 comprises an outer covering 12. The outer covering is formed of flexible material and has a bottom panel 14 formed of rip stop nylon, upper and lower vertical panels 16 and 18, respectively, and a top panel 20.

Each of the top and bottom panels are substantially flat and rectangular, and have a length and width chosen to conform to the space the air bed is to fit into when the bed is being used for its intended purpose.

Each of the lower and upper vertical panels is formed of a rectangular strip of conventional mattress covering (i.e., ticking, foam and backing), the strip having a height approximately one half the intended height of the bed and a length equal to twice the sum of the intended length and width of the bed. The ends of each vertical panel strip are sewn together so that each forms an upstanding wall. The bottom edge of the lower vertical panel is sewn to the periphery of the bottom panel with nylon thread.

The top edge of the lower vertical panel is attached to the bottom edge of the upper vertical panel by means of a gusset 24.

Gusset 24 is formed of a pair of rectangular rings 24a and 24b, and reinforcing strip 24c, all made of rip stop nylon. As shown in FIG. 5, the outer edge of the lower rectangular ring 24b is sewn to the upper edge of the lower vertical panel 18, the outer edge of the upper rectangular ring 24a is sewn to the lower edge of upper vertical panel 16, and the inner edges of the rectangular rings are enfolded in and sewn together with reinforcing strip 24c using nylon thread. In an alternative preferred embodiment, the gusset may be formed from the reinforcing strip and a single rectangular ring which is folded in half along the imaginary line parallel to and midway between its outer edges. The crease of the folded rectangular ring is then sewn onto the folded reinforcing strip. One outer edge of the single rectangular ring is sewn to the upper edge of the lower vertical panel and the other outer edge of the single rectangular ring is sewn to the lower edge of the upper vertical panel.

Top panel 20, which in the transport embodiment is formed of conventional mattress covering, is removably joined to the upper vertical panel through the use of a zipper attachment means 22 which is disposed along the periphery of the top panel and the upper edge of the upper vertical panel.

The outer covering 12, comprised of the bottom, upper side, lower side and top panels, forms an enclosure into which air tubes 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 42 and 45 are disposed. The air tubes are formed from 20 mil thick vinyl. In the preferred embodiment, the air tubes are cylindrical with circular cross-sections. Tubes having other cross-sections (e.g., elliptical or rectangular) may also be used.

To help prevent the vertical panels of the outer covering from bowing outward when weight is placed on the top surface of the air bed, a series of restraining

4

straps 52, made from rip stop nylon, are disposed across the width of the air bed. The ends of the restraining straps are sewn with nylon thread to the reinforcing strip (and the portion of the rectangular ring enclosed within the folded strip) as shown in FIG. 5, on opposite sides of the bed. The restraining straps are spaced apart so that they substantially align with the depressions between the laterally disposed adjacent cushion tubes 45.

To help prevent the inwardly disposed ends of upper side bolster air tubes 32, 33, 34 and 35 from bulging upwardly, cinch belts 55 and 56 are sewn into the bottom panel and have sufficient length to fit around the upper and lower side bolster air tubes 32, 33, 34, 35, 37 and 38 as illustrated in FIG. 6. (The inwardly disposed ends of upper side bolsters 32, 33, 34 and 35 are shown in phantom lines under belts 55 and 56 in FIG. 2.) The cinch belts are several inches wide and are made of elastic material similar to that found in waist bands.

The air tubes are fitted into the outer covering and either or both of "egg crate" polyurethane foam pad 58 and rectangular polyurethane foam pad 59 are then placed on top of the upper laterally disposed cushion air tubes 42 in the space bounded by upper side bolster air tubes 32, 33, 34 and 35 and upper end bolster air tubes 31 and 36. The foam pads are used to provide a soft cushioned feel to the user, and to provide a level top surface. The top surface would otherwise have its outside edges extending substantially above the interior portions of the top surface due to the fact that the bolster air tubes 31, 32, 33, 34, 35, 36, 37, 38, 39 and 40 will typically be 8" diameter tubes while all the interior tubes (i.e., the upper laterally disposed cushion air tubes 42 and the lower laterally disposed cushion air tubes 45) will be 7" diameter tubes, and the height of the two levels of bolster tubes will therefore be 2" greater than the height of the two levels of interior tubes.

In the transport embodiment, only one foam pad will typically be used, usually the egg crate foam pad 58.

Referring to FIGS. 4 and 5, side and end bolster tubes are placed within a sheath 62. The purpose of the sheath is to prevent the squeaking noises typically created when vinyl air tubes rub against each other. The sheath may be made of a textile material such as a polyester cotton flannel, nylon or olefin (as for example, Polytex ™ material from Culp Ticking of Commerce, Calif.).

Each bolster tube and the sheath into which it is placed have hook and pile attachment means 63, such as Velcro ®, affixed at each end of the tube so that the bolster tube will not rotate relative to the sheath. It is preferred that the pile side of the attachment means be affixed to the bolster tube so that catching of the bolster tube as it is slid into the sheath is minimized. The pile side of the attachment means is adhesively affixed to the air tube and the hook side of the attachment means may be either sewn or adhesively affixed to the sheath.

Hook and pile attachment means are also adhesively affixed or sewn to each end of the sheath and an abutting portion of the enclosure, such as bottom panel 14, as shown in FIG. 5, and such as the gusset portion 24a. This prevents the sheath, and concomitantly the bolster tube, from rotating relative to the enclosure. Such rotation is to be prevented in order to preclude entanglement or other damage to air hoses described below.

Each of the laterally disposed cushion tubes may be similarly disposed within a sheath. However, referring to FIG. 7, in the preferred embodiment each set of

A135

5,421,044

| 5 | 6 |

laterally disposed cushion tubes comprising the upper or lower level of cushion tubes is disposed in a magazine 65. (Tubes 42 of the upper level are illustrated in FIG. 7 by way of example.) Each magazine is formed of two rectangular sheets 66 and 67 made from the same material as sheath 62.

The rectangular sheets are laid one on top of the other and the laterally extending ends of sheet 66 are sewn to the corresponding ends of sheet 67. Then the sheets are sewn together along a series of imaginary laterally extending lines 68 which are spaced sufficiently apart so that a series of sleeves 69 are created, each of which can receive a fully inflated laterally disposed cushion tube. When 7″ cushion tubes are used, the lines should be spaced just over 11″ apart. The lines may be double-stitched for extra strength.

Hook and pile attachment means are affixed to the interior of the open sides of each sleeve and on corresponding portions of the cushion tubes to prevent the tubes from rotating relative to the magazine. Since the magazine cannot rotate relative to the enclosure (i.e., the enclosure formed by the top, bottom and vertical panels), there is no need to attach the magazine to the enclosure, although the ends of the magazine could be attached by hook and pile attachment means to the portions of the gusset at the ends of the air bed.

FIG. 9 illustrates schematically how the various tubes relate to each other, and to the air pump 70 and manifold block 71 which also form parts of the preferred embodiment of the invention.

Air pump 70 provides the air pressure for filling all of the air tubes. The air pump is connected to the input of manifold block 71 through air hose 72. The manifold block has at least two output ports, and in the preferred embodiment has four output ports 73, 74, 75 and 76 which provide output air pressures A, B, C and D respectively, each of which is variable. Each of the output air pressures may be controlled a separate dial located on the manifold block or by a remotely held device, similar to remote controls used for televisions, VCRs and stereo tuners.

The output pressures of each of the output ports may be variable over the same range. The ultimate relative pressures will be determined by the particular comfort desires of the user. However, it is expected that output pressure A would usually be set higher than output pressure B, output pressure B would be set higher than output pressure C and output pressure C would be set higher than output pressure D.

The manifold block outputs are connected to the air tubes by air hose assembly 77.

The lower layer of air tubes, comprising lower left side bolster tube 37, lower right side bolster tube 38, lower head end bolster tube 39, lower foot end bolster tube 40, and lower laterally extending cushion tubes 45 is shown in the bottom half of FIG. 9. The head and foot end bolster tubes have a length approximately equal to the width of the bed. The lower side bolster tubes have a length approximately equal to the length of the bed less the diameters of the head and foot end bolster tubes. The length of the cushion tubes is approximately equal to the width of the bed less the diameters of the left and right side bolster tubes. The upper layer of air tubes, comprising upper head end bolster tube 31, upper left side torso bolster tube 32, upper right side torso bolster tube 33, upper left side leg bolster tube 34, upper right side leg bolster tube 35, upper foot end

bolster tube 36, and upper laterally extending cushion tubes 42 is shown in the top half of FIG. 9.

In the preferred embodiment for every tube in the lower layer there is an identical vertically aligned tube in the upper layer, with the exception that where there is a single, long lower left side bolster tube 37 and a single, long lower right side bolster tube 38 in the lower level of tubes, there are in the upper level of tubes two left side bolster tubes 32 and 34 and two right side bolster tubes 33 and 35, each one half the length of the bolster tube underneath it. This provides for more comfortable seating when the user is seated on the edge of the bed while allowing for the bed edges to remain firm, as described below. (In a less preferred embodiment, the two upper left side bolster tubes may be replaced by a single, long left side bolster and the upper right side bolster tube may be replaced by a single long right side bolster tube.)

Each tube is marked in FIG. 9 to indicate the air pressure being delivered to it (e.g., all side bolsters are marked with the letter A, the laterally extending cushion tubes nearer to the head end of the lower level of the bed are marked with the letter B, the laterally extending cushion tubes nearest the foot end of the bed are marked with the letter C, and the laterally extending cushion tubes nearer to the head end of the upper layer of the bed are marked with the letter D).

All the side bolster tubes are connected by the air hose assembly to one of the output ports, namely output port 73. In the preferred embodiment these tubes are maintained at the highest pressure A. This keeps the edges where a user sits firm to hold up the concentrated weight of the user, and helps maintain the user away from the side edges of the bed when the user is reclining on it. This is particularly useful in the transport embodiment of the air bed which may be used in recreational vehicles or in the rear portion of the cab of a truck traveling at high rates of speed over a curvy or bumpy roadway. This is also useful in other embodiments of the invented air bed on which it is desired to help prevent the user from falling off a side edge of the bed.

Lower head and foot end bolster tubes 39 and 40 are connected to the same output as the side bolster tubes so that the lower end bolster tubes are also maintained at pressure A. This contributes to the stability of the entire bed.

Upper foot end bolster tube 36 is connected by the air hose assembly 77 to output port 75 of the manifold block, which provides pressure C which is lower than pressure A. As a result, the firmness felt by the user at the foot end of the bed is a compromise between pressures A and B. This still provides for reasonable comfort when the user is sitting on the top surface of the bed at the bed's foot end, and it also provides for a soft enough surface for the user's feet to rest upon when the user is reclining on the bed.

The approximately one half of the lower laterally extending cushion tubes 45 closest to the foot end of the bed and the approximately one third of the upper laterally extending cushion tubes 42 closest to the foot end of the bed are all connected by the air hose assembly to manifold block output 75 and maintained at pressure C.

The approximately one half of the lower laterally extending cushion tubes 45 closest to the head end of the bed, and the approximately one half of the upper laterally extending cushion tubes 42 adjacent the upper laterally extending cushion tube maintained at pressure C which is furthest from the foot end of the bed, are all

5,421,044

7

connected to manifold block output 74 and maintained at pressure B, which is less than pressure A and greater than pressure C.

This results in the firmest support from the cushion tubes being applied where the user's chest will be when the user is reclining on the bed (i.e., a combination of pressures B and B from the lower and upper layers of cushion tubes), intermediate support under the users hips (i.e., a combination of pressures B and C from the lower and upper layers of cushion tubes), and the softest support under the user's legs (i.e., a combination of pressures C and C from the lower and upper layers of cushion tubes).

The upper head end bolster tube and the remaining laterally extending cushion tubes in the upper level of tubes are connected to manifold block output 76 and maintained at pressure D. Support for the user's head is determined from the combinations of pressures A and D, and support for the user's shoulders is determined by the combination of pressures B and D.

Thus arrangement comports with the comfort characteristics most people desire. Also, as mentioned above, the output pressures of the manifold block may be individually adjusted to the user's individual comfort.

In another embodiment of the invention, manifold block may be provided with three separately controlled output ports, that is, with output port 76 eliminated, and with the tubes described above as being connected to output port 76 being instead connected to output port 74 and maintained at pressure B.

Referring to FIGS. 7 and 8, detail of a portion of the air hose assembly is shown. The main lines 81, which are connected at one set of ends to an output port of the manifold block, are the biggest in diameter, each having an internal diameter of approximately ½″. The air pump and manifold block are, in the preferred embodiment, placed near to and outside of the outer covering 12. The main lines pass through a hole 80 in bottom panel 14, which hole has a reinforced border (see FIG. 3), and are connected at their other ends to T-adapters 82 which are inside the bed's enclosure. The middle leg of the T-adapter is connected to an adapter 83, which is connected to secondary line 84, which has an internal diameter of ¼″. The secondary line 84 is connected to one end of fitting 85, the other end of which is connected to the air tube fill valve stem 86, which has an inner diameter of ⅛″.

Air hose 73, valve stem 86, and all the lines, fittings, and adapters of air hose assembly 77 are formed of vinyl. The valve stem should be easily stretchable to accommodate movement of the air hose assembly.

The foregoing describes the transport embodiment of the air bed invention. As indicated above, it can be used in recreational vehicles or truck cabs. The transport embodiment may also be used on boats, in which case the outer cover should be treated with a mildew retarding substance.

A form of fitted bed sheet may be used with the air bed of the present invention. Whereas at least a portion of the border around a conventional fitted sheet's opening is formed of an elastic material, the border around the opening of the fitted sheet used with the present invention would not need to be elastic. That is because it would be fitted over the top half of the bed, with the fitted sheet's border fitting into the fold of the V formed by the gusset, before the air tubes are inflated. When the

8

air tubes are inflated, the fitted bed sheet will be firmly trapped onto the air bed.

The air bed as described above may also be used in the user's home. However, since in the home there is no jarring contact and vibrations passed along to the bed as there is when the bed is used in a moving truck or a recreational vehicle, the "home" embodiment of the bed may be made without the lower level of tubes (i.e., tubes 37, 38, 39, 40 and 45). Gusset 24, retaining straps 52, and lower vertical panel 18 may be omitted, with upper vertical panel 16 sewn directly to bottom panel 14.

In the single layer embodiment of the invention, when it is desired to make the air bed of the present invention look like a conventional mattress, each bolster tube is disposed in a bolster support member. The bolster member is formed from a block of polyurethane foam having a rectangular cross section and a length equal to that of the bolster tube to be inserted into it. A C-shaped section is then cut out of a corner of the foam block. A bolster support member 89 so formed is shown in perspective view in FIG. 12.

Referring to FIG. 13, a cross-sectional view looking along the longitudinal axis of bolster tube 33 is shown to illustrate how the bolster tube sits on the bolster support member. Bolster tube 33 is fitted within sheath 62 and is attached thereto by hook and pile attachment means 63. The sheath and bolster tube are disposed within the C-shaped cut-out of bolster support member 89, and the sheath is attached to the bolster support member with another attachment means 63.

As shown in FIG. 13, in this embodiment of the invention, both the foam pad 58 with the egg crate-shaped cross-section and foam pad 59 with the rectangular cross sections are used. The side edges of the foam pads are beveled to conform somewhat with the surface of the bolster tube.

The transport and home embodiments of the invented air bed may also be used in hospitals or other medical care facilities. In such cases the top panel may be treated to resist the effects of incontinence. If the invented air bed is used for burn victims, the top panel's conventional mattress covering material may be replaced with gauze material adapted for use against burnt tissue.

Also in connection with medical uses, a medicated pad may be disposed on top of or in place of egg crate foam pad 58. Referring to FIGS. 10 and 11, medicated pad has a pull cord 92 attached to it which is used to pull the medicated pad into gas permeable liner 93. In this embodiment, top panel 20 is formed of a gas permeable material. The medicated pad is treated with medication which vaporizes and permeates through the liner and top panel to reach the patient reclining thereon. When the medication is exhausted, the medicated pad is pulled out of the liner and replaced with a new medicated pad.

The home embodiment of the invented air bed (i.e., the embodiment with only a single layer of tubes) may also be used in combination with an adjustable electric reclining bed pedestal, such as available from Maxwell Products, Inc. FIG. 14 shows the home embodiment of the air bed 100 in the upright position on top of recliner pedestal 102. In FIG. 15 the recliner pedestal 102 is shown in functional representational form, in its fully reclined position. Air bed 100 is shown on top of the pedestal in right side elevational cross section, with only those details illustrated which are necessary to

A137

5,421,044

| 9 | 10 |

demonstrate how the air bed is connected to the pedestal.

Three wood planks 104, the length of which are almost equal to the width of the bed, are placed laterally across the bed directly on top of bottom panel 14. One plank is positioned above the calf platform 106 of the pedestal (which controls the height and angle of the calf portion of the bed) at the edge of that platform closest to the foot end of the bed. Another plank is positioned above the hip platform 108 of the pedestal at the edge of that platform closest to the foot end of the bed. The third plank is positioned above the hip platform closest to the head end of the bed. No planks need be positioned above the thigh platform 107 or the chest and head platform 109. Each plank is adhesively affixed to the top surface of bottom panel 14, and then screws 110 are driven into each plank, the bottom panel, and the platform above which the plank is positioned. As a result, the air bed is affixed to the pedestal at all the key points, and the position of the air bed will follow the adjustments made by each of the platforms. The screws should be driven sufficiently so that their tops are flush with the upper surface of the planks, and the edges of the planks should be rounded to prevent damage to any of the portions of the air bed which rub against the planks or screws.

A unique improved air bed has been described above. It will be understood that various changes of the details, materials, steps, arrangement of parts and uses which have been herein described and illustrated in order to explain the nature of the invention will occur to and may be made by those skilled in the art, and such changes are intended to be included within the scope of this invention.

I claim:

1. An air bed comprising:

an enclosure formed of flexible material including,
a substantially flat rectangular bottom panel having an opening therein,
a vertical panel having top and bottom edges, said vertical panel standing perpendicularly up from the periphery of the bottom panel with the bottom edge of the vertical panel connected to said periphery of the bottom panel, and
a substantially flat, rectangular top panel having substantially the same length and width as the bottom panel, the periphery of said top panel being removably connected to the top edge of said vertical panel,

said enclosure having a longitudinal axis running along its length and a lateral axis running along its width, said enclosure having a foot end at one end of the longitudinal axis of the enclosure, and having a head end at the other end of the longitudinal axis of the enclosure,

said enclosure having a right side at one end of the lateral axis of the enclosure when viewed from above, and having a left side at the other end of the lateral axis of the enclosure,

an inflatable foot end bolster tube disposed within and laterally across the enclosure at the foot end thereof,

an inflatable head end bolster tube disposed within and laterally across the enclosure at the head end thereof,

wherein each of said foot and head end bolster tubes has a length substantially equal to the width of the enclosure,

an inflatable left side bolster tube disposed longitudinally within said enclosure at the left side thereof,

an inflatable right side bolster tube disposed longitudinally within said enclosure at the right side thereof,

wherein each of said left and right side bolster tubes has a length substantially equal to the distance between said foot and head end bolster tubes when the foot and head end bolster tubes are disposed in the enclosure and inflated,

wherein said left side bolster tube, foot end bolster tube, right side bolster tube, and head end bolster tube when disposed in said enclosure define a rectangular space between them,

a plurality of inflatable cushion tubes disposed adjacent to each other and laterally within the rectangular space surrounded by said bolster tubes within said enclosure,

wherein each of said cushion tubes has a length substantially equal to the distance between said left and right side bolster tubes when the left and right side bolster tubes are disposed in the enclosure and inflated,

wherein the number of said cushion tubes is sufficient to substantially fill said rectangular space,

each of said inflatable tubes being enclosed in an open ended sheathing member for reducing the creation of noise when adjacent tubes rub against each other,

each of said inflatable tubes having a fill valve,

an air pump for providing air pressure to the inflatable tubes,

a manifold block connected to said air pump, said manifold block having at least first, second and third output ports, each of which provides a separate, variably controlled output air pressure, and

an air hose assembly having two ends, one end of said air hose assembly being connected to the output ports of the manifold block, said air hose assembly passing through the opening in the bottom panel of the enclosure, and the other end of the air hose assembly being connected to the fill valves of the inflatable tubes,

whereby air pressure created by the air pump passes through the manifold block and the air hose assembly to the inflatable tubes,

said left and right side bolster tubes being connected by said air hose assembly to said first output port of said manifold block, said foot end bolster tube and the cushion tubes closest to the foot end bolster tube being connected through said air hose assembly to said third output port of said manifold block, and said head end bolster tube and the remainder of said cushion tubes being connected through said air hose assembly to said second output port.

2. The air bed of claim 1, wherein the manifold block comprises a fourth output port and wherein said head end bolster tube and the cushion tube adjacent to said head end bolster tube are not connected to said second output port of said manifold block and are instead connected by said air hose assembly to said fourth output port.

3. The air bed of claim 1 wherein attachment means is affixed near the ends of each inflatable tube and near the ends of each adjacent, corresponding sheathing member for detachably attaching said bolster tubes to said sheathing member to prevent rotation of the inflatable tube relative to the sheathing member, and wherein said

5,421,044

| 11 | 12 |

attachment means is also affixed near the ends of each sheathing member and a portion of the enclosure adjacent thereto for detachably attaching said sheathing member to the enclosure to prevent rotation of the sheathing member relative to said enclosure, whereby 5 entanglement of the air hose assembly is prevented.

4. The air bed of claim 1 wherein each bolster tube and the sheathing member surrounding it are disposed in a foam bolster support member having approximately the same length as the tube which is disposed therein, 10 each bolster support member having a rectangular cross-section with a C-shaped cut out removed from an upper corner, when viewed from its end, into which cut out the bolster tube and its sheathing member fits, each of said bolster support members being disposed within 15 the enclosure adjacent the vertical panel, with the C-shaped cut out facing inwardly and upwardly.

5. The air bed of claim 3 wherein the cross sectional area of each bolster tube, when viewed from an end thereof, is equal to the cross sectional area of each of the 20 other bolster tubes, and wherein the cross sectional area of each cushion tube, when viewed from an end thereof, is equal to the cross sectional area of each of the other cushion tubes.

6. The air bed of claim 5 wherein the cross sectional 25 area of each bolster tube, when viewed from an end thereof, is greater than the cross sectional area of each cushion tube when viewed from an end thereof.

7. The air bed of claim 6 wherein said left side bolster tube is instead a first left side bolster tube and a second 30 left side bolster tube, said first and second left side bolster tubes being disposed end to end, longitudinally within the enclosure at the left side thereof, wherein said right side bolster tube is instead a first right side bolster tube and a second right side bolster tube, said 35 first and second right side bolster tubes being disposed end to end, longitudinally within the enclosure at the right side thereof, each of said first and second left side bolster tubes and said first and second right side bolster tubes having a length substantially equal to one half the 40 distance between said foot and head bolster tubes when the foot and head bolster tubes are disposed in the enclosure and inflated.

8. The air bed of claim 7 further comprising a foam pad having a length and width substantially equal to the 45 length and width of the rectangular space surrounded by the left side bolster tubes, the foot end bolster tube, the right side bolster tubes, and the head end bolster tube, said foam pad being disposed on top of said cushion tubes. 50

9. The air bed of claim 8 wherein each bolster tube and the sheathing member surrounding it are disposed in a foam bolster support member having approximately the same length as the tube which is disposed therein, each bolster support member having a rectangular 55 cross-section with a C-shaped cut out removed from an upper corner, when viewed from its end, into which cut out the bolster tube and its sheathing member fits, each of said bolster support members being disposed within the enclosure adjacent the vertical panel, with the C- 60 shaped cut out facing inwardly and upwardly.

10. The air bed of claim 8 wherein the sheathing member for said cushion tubes is a magazine having a plurality of open-ended sleeves, equal in number to the number of cushion tubes. 65

11. The air bed of claim 8 further comprising a plurality of wood planks disposed laterally within said enclosure and connected to the upper surface of said bottom panel, whereby when said air bed is disposed on top of an adjustable reclining bed pedestal, a connecting device may be driven into said planks and portions of said pedestal so that said air bed is fixedly attached to said pedestal.

12. The air bed of claim 7 wherein said top panel is formed of a gas permeable material and a medicated pad is disposed in said enclosure above said cushion tubes.

13. An air bed comprising:
a rectangular enclosure formed of flexible material, said enclosure having a longitudinal axis running along its length and a lateral axis running along its width, said enclosure having a foot and at one end of the longitudinal axis of the enclosure, and having a head end at the other end of the longitudinal axis of the enclosure, said enclosure having a right side at one end of the lateral axis of the enclosure when viewed from above, and having a left side at the other end of the lateral axis of the enclosure, said enclosure including,
a substantially flat rectangular bottom panel having an opening therein,
a lower vertical panel having top and bottom edges, said lower vertical panel standing perpendicularly up from and surrounding the periphery of the bottom panel with the bottom edge of the lower vertical panel connected to said periphery of the bottom panel,
an upper vertical panel having top and bottom edges, said upper vertical panel disposed vertically above said lower vertical panel,
a gusset member having top and bottom edges, said gusset member being disposed between said lower and upper vertical panels, the bottom edge of said gusset member being connected to the top edge of said lower vertical member and the top edge of said gusset member being connected to the bottom edge of said upper vertical member,
a substantially flat, rectangular top panel having substantially the same length and width as the bottom panel, the periphery of said top panel being removably connected to the top edge of said upper vertical panel, and
a plurality of restraining straps disposed across the width of the enclosure, with one end of each restraining strap connected to the gusset member along the left side of the enclosure and the other end of each restraining strap attached to the gusset member along the right side of the enclosure;
an inflatable lower foot end bolster tube disposed within and laterally across the enclosure, below said restraining straps, at the foot end of said enclosure, adjacent said lower vertical panel, said inflatable lower foot end bolster tube having a length substantially equal to the width of the enclosure;
an inflatable lower head end bolster tube disposed within and laterally across the enclosure, below said restraining straps, at the head end of said enclosure, adjacent said lower vertical panel, said inflatable lower head end bolster tube having a length substantially equal to the width of the enclosure;
an inflatable lower left side bolster tube disposed longitudinally within said enclosure at the left side thereof, below said restraining straps, adjacent said lower vertical panel, said inflatable lower left side bolster tube having a length substantially equal to

5,421,044

13

the distance between said lower foot and lower head end bolster tubes when the lower foot and lower head end bolster tubes are disposed in the enclosure and inflated;

an inflatable lower right side bolster tube disposed longitudinally within said enclosure at the right side thereof, below said restraining straps, adjacent said lower vertical panel, said inflatable lower right side bolster tube having a length substantially equal to the distance between said lower foot and lower head end bolster tubes when the lower foot and lower head end bolster tubes are disposed in the enclosure and inflated;

said lower left side bolster tube, lower foot end bolster tube, lower right side bolster tube, and lower head end bolster tube, when disposed in said enclosure, defining a lower rectangular space between them;

a plurality of inflatable lower cushion tubes disposed adjacent to each other and laterally within the lower rectangular space surrounded by said lower left side bolster tube, lower foot end bolster tube, lower right side bolster tube, and lower head end bolster tube, each of said lower cushion tubes having a length substantially equal to the distance between said lower left and lower right side bolster tubes when the lower left and lower right side bolster tubes are disposed in the enclosure and inflated, the number of said lower cushion tubes being sufficient to substantially fill said lower rectangular space;

an inflatable upper foot end bolster tube disposed within and laterally across the enclosure, above said restraining straps, at the foot end of said enclosure, adjacent said upper vertical panel, said inflatable upper foot end bolster tube having a length substantially equal to the width of the enclosure;

an inflatable upper head end bolster tube disposed within and laterally across the enclosure, above said restraining straps, at the head end of said enclosure, adjacent said upper vertical panel, said inflatable upper head end bolster tube having a length substantially equal to the width of the enclosure;

an inflatable upper left side bolster tube disposed longitudinally within said enclosure at the left side thereof, above said restraining straps, adjacent said upper vertical panel, said inflatable upper left side bolster tube having a length substantially equal to the distance between said upper foot and upper head end bolster tubes when the upper foot and upper head end bolster tubes are disposed in the enclosure and inflated;

an inflatable upper right side bolster tube disposed longitudinally within said enclosure at the right side thereof, above said restraining straps, adjacent said upper vertical panel, said inflatable upper right side bolster tube having a length substantially equal to the distance between said upper foot and upper head end bolster tubes when the upper foot and upper head end bolster tubes are disposed in the enclosure and inflated;

said upper left side bolster tube, upper foot end bolster tube, upper right side bolster tube, and upper head end bolster tube, when disposed in said enclosure, defining a upper rectangular space between them;

14

a plurality of inflatable upper cushion tubes disposed adjacent to each other and laterally within the upper rectangular space surrounded by said upper left side bolster tube, upper foot end bolster tube, upper right side bolster tube, and upper head end bolster tube, each of said upper cushion tubes having a length substantially equal to the distance between said upper left and upper right side bolster tubes when the upper left and upper right side bolster tubes are disposed in the enclosure and inflated, the number of said upper cushion tubes being sufficient to substantially fill said upper rectangular space;

sheathing means surrounding each inflatable tube for reducing the creation of noise when adjacent tubes rub against each other;

fill valve means attached to each inflatable tube for filling said tubes with air;

an air pump for providing air pressure to the inflatable tubes;

a manifold block connected to said air pump, said manifold block having at least first, second and third output ports, each of which provides a separate, variably controlled output air pressure; and

an air hose assembly having two ends, one end of said air hose assembly being connected to the output ports of the manifold block, said air hose assembly passing through the opening in the bottom panel of the enclosure, and the other end of the air hose assembly being connected to the fill valves means of the inflatable tubes,

said lower foot end, lower left side, upper left side, lower right side, upper right side and lower head end bolster tubes being connected by said air hose assembly to said first output port of said manifold block, said upper foot end bolster tube and the approximately one half of the lower cushion tubes closest to the lower foot end bolster tube and the approximately one third of the upper cushion tubes closest to the upper foot end bolster tube being connected by said air hose assembly to said third output port of said manifold block, and said head end bolster tube and the remainder of said lower and upper cushion tubes being connected by said air hose assembly to said second output port.

14. The air bed of claim 13, wherein the manifold block comprises a fourth output port and wherein said upper head end bolster tube and the upper cushion tube adjacent to said upper head end bolster tube are not connected to said second output port of said manifold block and are instead connected by said air hose assembly to said fourth output port.

15. The air bed of claim 13 wherein attachment means is affixed near the ends of each inflatable tube and near the ends of each adjacent, corresponding sheathing means for detachably attaching each of said inflatable tubes to said sheathing means to prevent rotation of the inflatable tube relative to the sheathing means, and wherein said attachment means is also affixed near the ends of each sheathing means and a portion of the enclosure adjacent thereto for detachably attaching said sheathing means to the enclosure to prevent rotation of the sheathing means relative to said enclosure, whereby entanglement of the air hose assembly is prevented.

16. The air bed of claim 15 wherein the cross sectional area of each bolster tube, when viewed from an end thereof, is equal to the cross sectional area of each of the other bolster tubes, and wherein the cross sectional area of each cushion tube, when viewed from an

5,421,044

15

end thereof, is equal to the cross sectional area of each of the other cushion tubes.

17. The air bed of claim 16 wherein the cross sectional area of each bolster tube, when viewed from an end thereof, is greater than the cross sectional area of each cushion tube when viewed from an end thereof.

18. The air bed of claim 16 wherein said upper left side bolster tube is instead a first upper left side bolster tube and a second upper left side bolster tube, said first and second upper left side bolster tubes being disposed end to end, longitudinally within the enclosure at the left side thereof, wherein said upper right side bolster tube is instead a first upper right side bolster tube and a second upper right side bolster tube, said first and second right side bolster tubes being disposed end to end, longitudinally within the enclosure at the right side thereof, each of said first and second upper left side bolster tubes and said first and second upper right side bolster tubes having a length substantially equal to one half the distance between said foot and head bolster tubes when the foot and head bolster tubes are disposed in the enclosure and inflated.

19. The air bed of claim 18 further comprising a foam pad having a length and width substantially equal to the length and width of the rectangular space surrounded by the upper left side bolster tubes, the upper foot end bolster tube, the upper right side bolster tubes, and the

16

upper head end bolster tube, said foam pad being disposed on top of said upper cushion tubes.

20. The air bed of claim 19 further comprising a left cinch belt member formed of elastic material attached to the bottom panel adjacent the left side of said enclosure and wrapped around the inwardly disposed ends of said first and second upper left side bolster tubes, and a right cinch belt member formed of elastic material attached to the bottom panel adjacent the right side of said enclosure and wrapped around the inwardly disposed ends of said first and second upper right side bolster tubes.

21. The air bed of claim 20 wherein the sheathing means for said upper cushion tubes is an upper magazine having a plurality of open-ended sleeves, equal in number to the number of upper cushion tubes and the sheathing means for said lower cushion tubes is an lower magazine having a plurality of open-ended sleeves, equal in number to the number of lower cushion tubes.

22. The air bed of claim 21 wherein said restraining belts are made from rip stop nylon.

23. The air bed of claim 21 wherein said bottom panel is made from rip stop nylon.

24. The air bed of claim 21 wherein said gusset member is made from rip stop nylon.

* * * * *

30

35

40

45

50

55

60

65

US005588393A

# United States Patent [19]

## Heilborn

| [11] | Patent Number: | 5,588,393 |
| [45] | Date of Patent: | Dec. 31, 1996 |

[54] **COLLAPSIBLE PET BED**

[76] Inventor: **Eric W. Heilborn**, 2216 I St., Bellingham, Wash. 98225

[21] Appl. No.: **491,786**

[22] Filed: **Jun. 19, 1995**

[51] Int. Cl.⁶ .................................................. **A01K 1/035**
[52] U.S. Cl. .................................... **119/285; 5/420**
[58] Field of Search ............................ 119/28.5; 5/470, 5/481, 655, 652

[56] **References Cited**

U.S. PATENT DOCUMENTS

| 3,879,775 | 4/1975 | Iwata ............................ | 5/420 X |
| 4,654,907 | 4/1987 | Haugaard ...................... | 5/420 |
| 4,999,863 | 3/1991 | Kane ............................ | 5/420 X |
| 5,000,116 | 3/1991 | Fife et al. ................... | 119/28.5 |
| 5,033,408 | 7/1991 | Langenbahn ................... | 119/28.5 |
| 5,136,981 | 8/1992 | Barreto, III et al. .......... | 119/28.5 |
| 5,161,484 | 11/1992 | Duane ......................... | 119/28.5 |

Primary Examiner—Robert P. Swiatek
Assistant Examiner—Yvonne R. Abbott
Attorney, Agent, or Firm—Todd N. Hathaway

[57]               **ABSTRACT**

A pet bed which is collapsible as a unit for more efficient packaging, storage, and display. The foam cores which form the bottom cushion and the surrounding wall are enclosed in first and second fabric enclosures. The enclosure for the bottom cushion is joined to the fabric layer which extends over the inside and top of the wall core, but is free from attachment to the fabric which extends under the lower edge of the wall. This permits the bottom cushion to be tilted up to a vertical alignment parallel to the forward and rearward portions of the wall as the latter are pressed together, producing a flattened structure in which the forward and rearward wall portions lie flat against the upper and lower surfaces of the bottom cushion. The lower edges of the two fabric enclosures are provided with elasticized openings which retain the foam cores, but permit their removal for washing of the fabric cover.

**11 Claims, 5 Drawing Sheets**





FIG. 1
PRIOR ART

FIG. 2
PRIOR ART

FIG. 3
PRIOR ART



FIG. 4

FIG. 5

FIG. 6

A144



FIG. 7



FIG. 8

# FIG. 9
### PRIOR ART



30

30

a

b

# FIG. 10



152

100

100

102b

104

154

102a

b-x

a



FIG. 11

FIG. 12



FIG. 13

A147

5,588,393

1

# COLLAPSIBLE PET BED

## FIELD OF THE INVENTION

The present invention relates generally to pet beds, and more particularly to a pet bed for cats, dogs, and other animals which collapses to provide a compact unit for storage, shipment, and sales display.

## BACKGROUND OF THE INVENTION

A common form of pet bed comprises an upstanding oval or circular wall which surrounds a padded floor cushion. Typically, the wall and floor cushion are formed of foam rubber or a similar material, over which a covering of fabric and/or artificial lamb's wool is installed. Such pet beds are attractive from the point of view that they provide the animal with a sheltered, semi-enclosed bed in which the pet feels secure, and also because the semi-enclosed structure helps to contain hair, etc. to provide a neat and tidy installation for in-home.

A typical pet bed 10 of this general type is shown in FIGS. 1–3 and is disclosed in U.S. Pat. No. 5,136,981. As noted above, the bed has an upstanding oval wall portion 12 which is formed by a foam slab or core 14, and in order to provide more convenient access for the animal, a cutaway portion 16 is formed in the forward side of the wall. The floor cushion 20, in turn, is formed by a flat, oval foam core 22 which abuts the inner surface of the perimeter wall 12 so as to maintain the oval shape of the latter.

As can be seen in FIGS. 1–3, the foam core portions are covered and held together by a fabric cover 24, with a synthetic sheep skin lining 26 on the interior portions of the bed. As can be seen in FIG. 3, the coverings consist of essentially two sheets of fabric. The first, namely the lining 26, extends over the top of the bed and is stitched to the exterior fabric 28 (e.g., cotton flannel or nylon fabric) at a perimeter seam 30 which runs along the entire upper edge of the oval sidewall 12. The fabric forming the exterior covering, in turn, extends down the outside of the wall portion and part way across the bottom of the bed. At the lower edge of the perimeter wall, there is another seam 32 at which the outer fabric layer is attached to the inner layer, the latter being tucked down between the outer edge of the floor panel 20 and the perimeter wall in this area. This forms a pocket or "bag" for holding the foam core 22 of the floor cushion. In the bed which is illustrated in U.S. Pat. No. 5,136,981, an opening 24 with an elastic enclosure band 26 is provided in the bottom fabric panel to permit removal of the bottom cushion core.

The prior art design which is shown in FIGS. 1–3 provides a comfortable and economical pet bed, but exhibits several significant deficiencies in practical use. A first problem is that because the foam core 14 is fully enclosed by the fabric covering which is stitched at seams 30 and 32, it is impossible for the customer to remove the wall core for washing of the fabric cover. Perhaps even more seriously, traditional pet beds of this general type are exceedingly inefficient in terms of the space which is required for storage, shipping, and point of sales display. For example, as can be seen in FIG. 9, when conventional pet beds having this shape are stacked for shipment, they take up an excessive volume of space, which greatly adds to packaging and transportation costs. Moreover, in a retail environment, such beds take up excessive shelf space, and are almost impossible to arrange in a neat, well-organized display.

2

The bed which is disclosed in U.S. Pat. No. 5,136,981 has provided a partial solution to this problem, being that the foam core for the bottom cushion is removable so that the perimeter wall can be flattened for packaging. This solution is not entirely satisfactory, however, because it requires packaging of two separate parts (i.e., the perimeter wall with its fabric covering and the separate bottom cushion), which is both inefficient and unsightly in practice, and which also requires assembly by the customer following purchase.

Accordingly, a need has existed for a pad bed of the semi-enclosed type which collapses so as to afford more efficient storage, shipping, and display of the product, and which does so as a single piece and does not require subsequent assembly by the purchaser. Moreover, there has existed a need for such a bed which permits convenient removal of all of the foam core structures from the fabric cover for laundering of the latter.

## SUMMARY OF THE INVENTION

The present invention has solved the problems cited above, and is a pet bed which is collapsible as a unit for packaging. Broadly, the bed comprises: (a) a generally planar cushion member, (b) a resiliently collapsible wall member which at least partially surrounds the cushion member when the bed is in its expanded configuration, and (c) a fabric cover member which comprises a first enclosure for the cushion member and a second enclosure for the wall member, the second enclosure being attached to the first enclosure at a junction along an edge thereof, at least a part of the junction being displaceable in a vertical direction relative to the wall member so as to permit the cushion member in the first enclosure to be tilted up as the first and second sides of the wall member are pushed together, to a collapsed position in which the cushion member is substantially parallel to and sandwiched between the first and second sides of the wall member.

The second enclosure for enclosing the wall member may comprise an inner fabric layer which extends upwardly and over an inner surface and upper edge of the wall member, and an outer fabric layer which extends downwardly over the outer surface and under the lower edge of the wall member, the junction attaching the first enclosure to the second enclosure being formed between an edge of the first enclosure and inner fabric layer of the second enclosure, and being free from attachment to the edge of the outer fabric layer which extends under the wall member, so that the inner fabric layer at the junction is free to fold upwardly as the cushion portion is tilted upwardly to the collapsed position.

Preferably, the inner fabric layer of the second enclosure has sufficient height from the junction to the upper edge of the wall member to permit the inner fabric layer to fold and extend upwardly as the cushion member is tilted up, until the rearward portion of the wall member comes into flat abutment against the lower surface of the cushion member. Also, the wall member may comprise a notch portion which is formed in an upper edge of the portion thereof which is generally opposite the junction between the enclosures, so as to permit the wall member to fold downwardly and rearwardly at the notch portion and into abutment with an upper surface of the cushion member as the cushion member is tilted to the collapsed position; also the notch is preferably of sufficient width to form an access opening in the wall member when the bed is in its expanded configuration. The junction between the first and second enclosures may be a seam connecting an upper edge of the first enclosure to the inner fabric layer of the second enclosure.

A148

5,588,393

3

The second enclosure may further comprise means for inwardly biasing the edge of the outer fabric layer which extends under the wall member, so that the inwardly biased edge retains the wall member in the second enclosure yet permits its selected removal therefrom for cleaning of the fabric cover. The means for inwardly biasing the edge of the fabric layer may comprise an elastic band attached to the edge of the fabric layer so as to draw the edge inwardly towards a central area of the bed. Similarly, the first enclosure may comprise a top fabric layer which extends over an upper surface of the cushion member and an outer fabric layer which extends downwardly over and under an outer edge of the cushion member, with means being provided for inwardly biasing the downwardly and inwardly extending edge of the latter so as to retain the cushion member in the first enclosure yet permit its selective removal for washing of the cover.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a top perspective view of a prior art bed of the semi-enclosed type which is unable to collapse as a unit for packaging and storage, and which does not allow removal of the wall core for washing of the fabric cover;

FIG. 2 is a bottom perspective view of the prior art pet bed of FIG. 1, showing its structure and the manner in which the removable foam bottom cushion is retained in its fabric pocket by an elasticized closure;

FIG. 3 is a cross-sectional view of the pet bed of FIGS. 1–2, showing the foam cores thereof and the relationship of the seams by which the upper and lower layers of the fabric cover are joined;

FIG. 4 is a top perspective view of a pet bed in accordance with the present invention, this being of the semi-enclosed type, somewhat similar in overall shape to the prior art pet bed shown in FIGS. 1–3 but being collapsible as a unit for packaging and shipment;

FIG. 5 is a bottom perspective view of the pet bed of FIG. 4, showing the first and second elasticized closures which permit removal of both of the foam core portions for laundering of the fabric cover;

FIG. 6 is a cross-sectional view, similar to FIG. 3, showing the foam core structures of the pet bed in accordance with the present invention, and also the relationship of the seams which join the fabric cover panels so as to permit the pet bed to be collapsed as a single unit for storage, shipment, point of sale display, without requiring removal of any part thereof or reassembly by the customer;

FIG. 7 is an upper perspective view of the pet bed of FIGS. 4–6, showing the pet bed in its collapsed, flattened configuration;

FIG. 8 is a cross-sectional view of the pet bed of FIG. 7 in the collapsed configuration;

FIG. 9 is a cross-sectional view of several prior art pet beds of the semi-enclosed type, illustrating how the non-collapsible structures thereof render it impossible to arrange these in an efficient manner for storage, shipment, or point of sales display;

FIG. 10 is a cross-sectional view somewhat similar to FIG. 9, showing the manner in which the configuration of the beds of the present invention in their collapsed, flattened condition facilitates an efficient, orderly arrangement for storage, shipment display, and so forth;

FIG. 11 is a top perspective view of a collapsible pet bed in accordance with a second embodiment of the present

4

invention, in which the bottom cushion folds in half as the bed is collapsed and the edges of the bottom cushion at the ends of the fold shift upwardly relative to the wall member as this is done, FIG. 11 showing the bed in its collapsed configuration;

FIG. 12 is a cross-sectional view of the collapsed pet bed of FIG. 11, taken along the short axis thereof, i.e., line 12—12 of FIG. 11; and

FIG. 13 is a cross-sectional view of the collapsed pet bed of FIG. 11, taken along the long axis thereof, i.e., line 13—13 in FIG. 11.

DETAILED DESCRIPTION

FIGS. 4–6 show an example of a pet bed 100 in accordance with the present invention, in its fully erected configuration, as when the bed is in its normal configuration for use by the pet. As was noted above, the bed 100 is of the semi-enclosed type, this example being a generally oval in overall shape. Accordingly, there is a generally vertically extending wall portion 102 which is encircles a horizontal bottom cushion portion 104.

As can be seen in FIG. 6, the main structural part of the wall portion 102 is an upstanding foam core 106, while that of the bottom cushion portion is a horizontal foam core 108. Similar to the prior art bed which was described above, the exterior of the foam core elements is covered by a fabric cover 110, in which the inner surfaces of the bed are covered with a synthetic lamb's wool 112 or similar material which is comforting to the animal, and the outer and lower surfaces of the bed are covered with a relatively hard-wearing, smooth-surfaced fabric 114; it will be understood, however, that any suitable fabrics may be used to form the covering.

As was noted above, it is a particular feature of the present invention that the pet bed can be compressed or folded flat for storage, shipping, and display without having to remove any part thereof. The construction which permits this to be done can be seen in FIG. 6, which is to be contrasted with the corresponding prior art construction which is shown in FIG. 3.

In particular, FIG. 6 shows that the inner/upper fabric panel 112 is joined to the outer fabric panel 114 at a perimeter seam 120 which runs along the top of the wall portion 102 of the bed, and that the outer fabric panel 114 extends downwardly over the outside of the wall. Unlike the prior art construction which is shown in FIG. 3, the outer fabric panel 114 is not joined again into the inner fabric layer at the base of the wall. Instead, the lower portion 122 of the outer fabric extends under the lower edge of the sidewall foam core and terminates at an edge 124 which is positioned proximate the lower inner edge thereof, the fabric edge 124 being biased radially inwardly by a continuous elastic band 126 (see also FIG. 5).

A second annular fabric panel extends inwardly around the edge of the bottom cushion core 108, and has an inner edge 132 which defines a generally oval opening 134, the fabric edge 132 being biased radially inwardly by a second elastic band 136. The outer edge of the annular fabric panel 130, in turn, extends upwardly between core 108 and the inner surface of the wall portion core 106, and is attached to the upper fabric layer 104 at a seam 138 which extends around the bottom cushion core at the upper edge thereof.

Thus, the first annular fabric panel 114, in combination with the interior panel 112, forms an elastic pocket for enclosing the foam core of the wall portion of the bed, and similarly, the second annular fabric panel 130 serves in

5,588,393

| 5 | 6 |

combination with the inner panel 112 to provide an elastic pocket for the bottom cushion core. This construction, i.e., the first and second elasticized openings at the bottom of the bed 100, enables the customer to easily remove both foam cores for cleaning of the fabric cover, as contrasted with the single opening structure of the prior art bed which is shown in FIG. 3.

Moreover, because the lower, inside edge of the fabric panel 114 that covers the wall core is not attached to the annular fabric panel 130 which encloses the bottom cushion core, the latter can be pivoted upwardly in the direction indicated by the arrow 140. As this is done, the back wall portion 142 of the upper fabric layer, which extends upwardly from seam 138 along the back edge of the bottom cushion, folds in an upward direction. As this is done, the forward and rearward wall portions 106a, 106b are pressed towards one another, in the directions indicated by arrows 144a, 144b. As this motion continues, the forward and rearward wall portions come together, and the height "h" of the rear wall portion 142 of the upper fabric layer is sufficient to permit the rearward edge of the bottom cushion to rotate upwardly past the upper edge of the rear wall portion 106b, until the bottom cushion is finally pressed flat between and lies more or less parallel to the front and rear wall portions 106a, 106b. In other words, as is shown in FIG. 8, the height "h" of the rear wall fabric portion 142, plus the distance from the inner edge of the wall to the seam 120, is selected to be sufficient to allow the rearward edge 146 of the bottom cushion to pivot upwardly past the upper edge of the rear wall portion 106b, by the distance "h" which is necessary for the inner surface of the rear wall portion to come into flat abutment with the lower surface of the bottom cushion.

Simultaneously, the sides of the entrance notch 105 at the front of the bed collapse together as shown in FIG. 7, permitting the front wall portion 106a to move downwardly and rearwardly into flat abutment against the upper surface of the bottom cushion 104, as is also shown in FIG. 8.

In short, the combination of the loose fabric rear panel 142 and the downwardly folding front wall 106a permit vertical adjustment of the foam core members until they come to the position shown in FIG. 8, in which the bottom cushion is sandwiched flat between the front and rear portions of the perimeter wall. It will be noted, however, that the movement of the front wall portion 106a relative to the forward edge of the bottom cushion may also be achieved in part or in whole by forming the forward wall portion 148 of the upper fabric panel with sufficient height to accommodate the shift in positions. Furthermore, the arrangement may be reversed in some embodiments, i.e., the floor which may pivot upwardly at the front wall portion and downwardly at the rear wall. It will also be understood that, in some embodiments, the wall covering and liner fabrics may be cut from a single sheet of fabric rather than from two different materials as in the illustrated example.

Once the bed has been folded or "flattened" to the compact configuration which is shown in FIG. 8, it can be secured in this position by shrink wrap and/or banding 150, or by other suitable means.

The much more efficient packaging which is thus made possible can be seen by comparison of FIGS. 9 and 10. As was noted above, FIG. 9 shows the stacking of a typical non-collapsible prior art pet bed 30. In the particular example which is shown in FIG. 9, it is only possible to package four of the non-collapsible beds 30 in a space defined by the dimensions "a"×"b" (the dimension along the

third axis is assumed to be identical in both FIGS. 9 and 10). However, using collapsible beds 100 in accordance with the present invention, having essentially identical dimensions, it is possible to pack approximately seven units in an actually slightly smaller space as defined by dimensions "a"×"b–x". As can be seen, the downwardly folded forward wall portion 102a of each of the collapsed beds 100 fits beneath the rearward wall portion 102b of the bed in front of it, and against the bottom side of the bottom cushion 104, so that each collapsed basically bed occupies the thickness of two of its foam core portions. Also, if two or more stacks of the collapsed beds are packed adjacent one another, the downwardly extending edges of the forward wall portions 102a may be received in the gaps 152 between the edges of the bottom cushions.

In the example given above, an approximately 75% improvement in volumetric efficiency of the packaging is achieved by the present invention, which represents a very significant savings in terms of both packaging and shipping costs. It will be understood that these are only rough approximations, however, and that various factors, such as thicknesses of the foam cores and the overall shapes and sizes of the erected beds will naturally affect how many of the beds can be packed in a particular volume.

As was also noted above, another advantage of the pet bed of the present invention is that it provides for a neat and efficient use of shelf space at the point of sale. In particular, as can be seen in FIG. 10, the forward faces of the upturned bottom cushions 104 provides display areas 154 (see also FIG. 7) on which a label and other information can be conveniently positioned for viewing by the customer.

To erect the bed for use by the pet, the customer simply removes the shrink wrap and/or cardboard banding and reverses the steps which were described above with reference to the FIGS. 6–8, simply letting the forward and rear wall portions 102a, 102b spread apart and simultaneously pivoting the bottom cushion portion 104 downwardly to its horizontal position; because the bed collapses as a single unit, it is unnecessary for the customer to perform any additional assembly steps when setting it up, such as inserting foam core panels, for example.

FIGS. 11–13 show a pet bed 200 in accordance with a second embodiment of the present invention, this being particularly suited to relatively larger sizes of beds. As can be seen, the overall construction of the bed 200 is similar to that which has been described above, in that there is an oval bottom cushion member 202 which is encircled by an upstanding wall member 204. Also, there is a first fabric enclosure 206 for the bottom cushion, this having an upper fabric layer 208 which extends across the top of the foam core 210 and a lower fabric layer 212 which extends under the outer edges thereof, the latter being provided with an elastic band 214 along its edge to form the resiliently deformable opening which allows selective removal of the foam core. Similarly, there is a second fabric enclosure 216 for the foam core 218 of the wall member; as with the embodiment which was described above, this comprises an inner fabric layer which extends upwardly over the inside surface and upper edge of the wall, and an outer fabric layer 222 which extends downwardly over the outer surface of the wall and under the lower edge thereof, the lower edge of the outer fabric panel being provided with an elastic band 224 which forms the pocket for holding the foam core 218.

As is also similar to the embodiment which was described above, the inner fabric layer 220 of the outer enclosure extends downwardly and has its lower edge joined to the

5,588,393

| 7 | 8 |

edge of the first enclosure 206 at a seam 226 which extends about the perimeter thereof, while the inner enclosure 206 remains free from attachment to the edge of the enclosure 216 which extends under the wall member. This allows the edges of the inner enclosure 206 and bottom cushion core 210 to be displaced upwardly relative to the wall member as the bed is folded, as is shown in FIG. 13.

Thus, as the bed 200 is folded to the collapsed configuration which is shown in FIGS. 11–13, the two edges 230, 232 at the ends of the long axis of the oval bottom cushion 202 bend upwardly as the forward and rearward portions 234, 236 of the wall member are pressed towards one another, and the inner fabric layer 220 in these areas folds and extends upwardly above the upper edge of the wall core to accommodate this movement. Simultaneously, the edges 240, 242 at the ends of the short axis of the bottom cushion remain positioned proximate the lower edges of the wall member 204, or in some embodiments move downwardly relative thereto. This results in the bottom cushion member 202 being folded essentially in half, in an inverted "U" configuration, with an upstanding ridge 244 formed along the long axis thereof. The wall member 204, in turn, is collapsed to a flattened, lozenge shape, with its forward and rearward portions 234, 236 being pressed flatly against the upper surface of the folded bottom cushion 202, adjacent the forward and rearward edges 240, 242 thereof.

The bed 200 can be secured in its collapsed configuration by a cardboard band 248 or other member which is wrapped around the short axis of the collapsed structure. An angled display area 250 may be formed on a forward portion of the band to display the label and other information. Thus, in their compact, collapsed form, the relatively larger beds 200 can be efficiently arranged in a row on a store shelf, with the display area 250 angled upwardly for convenient viewing by the purchaser.

To erect the bed, the purchaser simply removes the retainer band 248 and any associated packing, and spreads the forward and rearward wall portions 234, 236 apart. As this is done, the bottom cushion member 202 unfolds to its oval, planar configuration to form the floor of the bed, the fabric portions 220 at the ends thereof folding and extending downwardly to accommodate this motion relative to the wall member.

In the preferred embodiments which have been illustrated herein, the bottom cushion and wall cores are formed of a resiliently collapsible material, such as foam rubber. It will be understood, however, that in the embodiment which is illustrated in FIGS. 4–8, in which the floor cushion is not required to bend in order for the bed to collapse, the bottom cushion core may be formed in part or in whole of a rigid or semi-rigid material, and with cushioning being provided on the upper surface of this for the animal. Also, in many embodiments, the bottom cushion core may be retained in its enclosure by one, two, or more strips of plastic or webbing material which extend across the bottom opening, or by a continuous bottom panel which is releasably secured to the edges of the enclosure by a zipper, Vector™ (hook and loop) material, snaps, or other means. Furthermore, the foam core itself may be detachable mounted to the upper layer of the enclosure by hook and loop material, snaps, and so forth, so as to permit the lower portion of the fabric enclosure to be dispensed with. Also, the bed of the present invention can be made to collapse as a unit without any means being provided for removal/detachment of the foam cores (i.e., the cores could be permanently mounted within their enclosures), although the advantage of being able remove the cores for washing of the fabric cover would then be lost. Still further,

although the fabric covers have, for the purposes of this description, been discussed in terms of inner/outer and upper/lower layers of fabric, it will be understood that this includes a construction in which one or more of these layers may be formed of a single sheet of fabric, such as a single sheet running over the top of the bottom cushion and the upper edge and outer surface of the wall member, or over the outer and inner surfaces of the wall member and under the edge of the bottom cushion member, for example.

It is therefore to be recognized that these and many other modifications may be made to the illustrative embodiments described above without departing from the spirit and scope of the present invention. Accordingly, the invention is not to be limited, except as by the appended claims.

What is claimed is:

1. A pet bed which is collapsible as a unit for packaging, said bed comprising:

a generally planar cushion member;

a resiliently collapsible wall member which at least partially surrounds said cushion member when said bed is in an expanded configuration; and

a fabric cover member, said cover member comprising:
a first enclosure enclosing said cushion member; and
a second enclosure enclosing said wall member;
said second enclosure being attached to said first enclosure at a junction along an edge thereof, at least a part of said junction being displaceable in a vertical direction relative to said wall member so as to permit said cushion member in said first enclosure to be tilted up as first and second portions of said wall member are pushed together, to a collapsed position in which said cushion member is substantially parallel to and sandwiched between said first and second portions of said wall member.

2. The pet bed of claim 1, wherein said second enclosure for enclosing said wall member comprises:

an inner fabric layer which extends upwardly over an inner surface and upper edge of said wall member; and

an outer fabric layer which extends downwardly over an outer surface and under a lower edge of said wall member;

said junction attaching said first enclosure to said second enclosure being formed between an edge of said first enclosure and said inner fabric layer of said second enclosure, and being free from attachment to an edge of said outer fabric layer which extends under said lower edge of said wall member, so that said inner fabric layer at said junction is free to fold upwardly as said cushion portion is tilted upwardly to said collapsed position.

3. The pet bed of claim 2, wherein said inner fabric layer of said second enclosure has sufficient height from said junction to said upper edge of said wall member to permit said inner fabric layer to deform as said cushion member is tilted upwardly until a portion of said wall member which is adjacent said junction comes into flat abutment against a lower surface of said cushion member.

4. The pet bed of claim 3, wherein said wall member comprises:

a notch portion formed in an upper edge of a portion of said wall member generally opposite said junction, so as to permit said wall member to fold downwardly and rearwardly at said notch portion and into abutment with an upper surface of said cushion member as said cushion member is tilted to said collapsed position.

5. The collapsible pet bed of claim 4, wherein said notch is of sufficient width to form an access opening in said wall member when said bed is in said expanded configuration.

A151

5,588,393

**9**

6. The collapsible pet bed of claim 3, wherein said junction comprises:

a seam connecting an upper edge of said first enclosure to said inner fabric layer of said second enclosure.

7. The collapsible pet bed of claim 3, wherein said second enclosure further comprises:

means for inwardly biasing said edge of said outer fabric layer which extends under said lower edge of said wall member, so that said inwardly-biased edge retains said wall member in said second enclosure yet permits selective removal of said wall member therefrom for cleaning of said fabric cover member.

8. The collapsible pet bed of claim 7, wherein said means for inwardly biasing said edge of said outer fabric layer comprises:

an elastic band attached to said edge of said outer fabric layer so as to draw said edge inwardly toward a central area of said bed.

9. The collapsible pet bed of claim 7, wherein said first enclosure comprises:

a top fabric layer which extends over an upper surface of said cushion member; and

an outer fabric layer which extends downwardly over and under an outer edge of said cushion member;

said junction between said first and second enclosures being formed at an outer edge of said top fabric layer and said outer fabric layer extending downwardly therefrom intermediate said outer edge of said cushion member and said inner surface of said wall member.

10. The collapsible pet bed of claim 9, wherein said first enclosure further comprises:

means for inwardly biasing said edge of said outer fabric layer which extends downwardy and under said edge of said cushion member, so that said inwardly-biased edge retains said cushion member in said first enclosure yet permits selective removal of said cushion member therefrom for cleaning of said fabric cover member.

11. A pet bed which is collapsible as a unit for packaging, said bed comprising:

a generally planar cushion member having upper and lower surfaces and forward and rearward edges;

a resiliently collapsible wall member which encircles and extends upwardly around said cushion member when said bed is in an expanded configuration, said wall

**10**

member having forward and rearward portions and upper and lower edges;

a first fabric enclosure enclosing said cushion member, said first fabric enclosure having an upper fabric layer which extends over an upper surface of said cushion member and a lower fabric layer which extends over said edges of said cushion member and under said lower surface thereof, said lower fabric layer having an inner edge which forms an opening for selective removal of said cushion member from said first enclosure and having an elastic member attached thereto for biasing said inner fabric edge inwardly so as to retain said cushion member in said first enclosure;

a second fabric enclosure enclosing said wall member, said second fabric enclosure having an inner fabric layer which extends over an inner surface and upper edge of said wall member and an outer fabric layer which extends over an outer surface and lower edge of said wall member, said outer fabric layer having a lower edge which forms an opening for selective removal of said wall member from said second enclosure and having an elastic member attached thereto for biasing said lower fabric edge inwardly so as to retain said wall member in said second enclosure; and

a seam attaching said first enclosure to said inner fabric layer of said second enclosure along said forward and rearward edges of said cushion member; and

said first enclosure being free from attachment to said lower edge of said outer fabric layer of said second enclosure, and said inner fabric layer of said second enclosure extending upwardly from said seam along said rearward portion of said wall member by a sufficient height to permit said rearward edge of said cushion member to be tilted upwardly, as said inner fabric layer folds and extends upwardly and said forward and rearward portions of said wall member are pushed towards one another, to a collapsed position in which said cushion portion in said first enclosure is substantially parallel to and sandwiched between said forward and rearward portions of said wall member in said second enclosure, with said inner surfaces of said forward and rearward portions of said wall member flatly abutting said upper and lower surfaces of said cushion member.

\*  \*  \*  \*  \*

US005136981A

# United States Patent [19]

## Barreto, III et al.

[11] **Patent Number:** **5,136,981**

[45] **Date of Patent:** **Aug. 11, 1992**

[54] **PET BED**

[76] Inventors: **Aurelio F. Barreto, III**, 20455 Somma Dr., Lake Mathews, Calif. 92570; **Darrell R. Paxman**, 7186 Calico Cir., Corona, Calif. 91719

[21] Appl. No.: **738,587**

[22] Filed: **Jul. 31, 1991**

[51] Int. Cl.$^5$ ............................................ **A01K 29/00**
[52] U.S. Cl. .................... **119/28.5; D30/118**
[58] Field of Search ................. 119/174, 28.5; 5/424, 5/425, 99.1; D30/118

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 45,392 | 3/1914 | Matthai | D30/1 |
| D. 224,934 | 10/1972 | Gilstrap | D30/1 |
| D. 225,121 | 11/1972 | Mashburn | 119/28.5 |
| D. 246,540 | 11/1977 | Burleson | D30/1 |
| 1,029,144 | 6/1912 | Rich | 119/19 |
| 1,126,333 | 1/1915 | Adams | 454/358 |
| 3,147,736 | 9/1964 | Daniel | 119/19 |
| 3,565,040 | 2/1971 | Pohl | 119/1 |
| 3,814,058 | 6/1974 | Thompson | 119/19 |
| 3,902,456 | 9/1975 | David | 119/1 |
| 3,989,008 | 11/1976 | Neumann | 119/1 |
| 4,008,687 | 2/1977 | Keys | 119/1 |
| 4,010,880 | 3/1977 | Guillot - Munoz | 224/42.42 A |
| 4,057,031 | 11/1977 | Williams et al. | 119/1 |
| 4,729,343 | 3/1988 | Evans | 119/19 |
| 4,763,604 | 8/1988 | Meekins | 119/1 |
| 4,860,689 | 8/1989 | Stewart | 119/1 |
| 4,899,693 | 2/1990 | Arnold | 119/28.5 |
| 5,000,116 | 3/1991 | Fife et al. | 119/28.5 |
| 5,002,014 | 3/1991 | Albin | 119/28.5 |
| 5,010,843 | 4/1991 | Henry | 119/28.5 |
| 5,027,748 | 7/1991 | Wolak | 119/168 |
| 5,033,408 | 7/1991 | Langenbabu | 119/28.5 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2514990 | 4/1983 | France | 119/28.5 |
| 955581 | 4/1964 | United Kingdom | 119/28.5 |

*Primary Examiner*—John G. Weiss
*Attorney, Agent, or Firm*—Cassidy, Vance & Tarleton

[57] **ABSTRACT**

Apparatus and methods for providing soft padded bedding for pets, such as for cats and dogs. The invention comprises: a flexible foam-core sidewall; a flexible foam-core base; and a cover having a sidewall enclosure, a separate base enclosure, and a floor, the sidewall enclosure capable of at least partially enclosing the sidewall, and the base enclosure capable of at least partially enclosing the base. The invention may also be configured to have a general appearance of a boat or one of several different tepees.

**19 Claims, 14 Drawing Sheets**





FIG. 1

FIG. 2



FIG. 3

FIG. 4





FIG. 11

FIG. 12

FIG. 13

A157



FIG. 14

FIG. 15

FIG. 16

A158



FIG. 17

FIG. 18

A159

FIG. 19



FIG. 20



A160



FIG. 21

FIG. 22

FIG. 23

A161

Case 1:04-cv-10162-DPW    Document 90-2    Filed 12/01/2005    Page 166 of 207



FIG. 24



FIG. 25

FIG. 26

A162



A163



FIG. 30



FIG. 31



FIG. 32

A164



FIG. 33

FIG. 34

FIG. 35

A165



FIG. 36



FIG. 37

FIG. 38



FIG. 39



FIG. 40

A167

1

## PET BED

### COPYRIGHT NOTICE

©Copyright 1991, Cassidy, Vance & Tarleton, P.S. All Rights Reserved.

A portion of the disclosure of this patent document contains material which is subject to copyright protection. The copyright owner has no objection to the facsimile reproduction by anyone of the patent document or the patent disclosure, as it appears in the Patent and Trademark Office patent file or records, but otherwise reserves all copyrights whatsoever.

### TECHNICAL FIELD

This invention relates to apparatus and methods for providing soft, padded bedding and shelter for pets, and particularly for cats and dogs.

### BACKGROUND OF THE INVENTION

For decades manufacturers of pet products have recognized a need to provide a safe and comfortable environment for pets, and particularly for cats and dogs. A myriad of different forms of shelters, bedding, clothing, exercise equipment, toys, food, and health products for pets have been developed with safety and comfort in mind.

One of the most widely used padded bedding products is a simple fabric or vinyl bag which contain wood chips, foam chips, rags, or other material. When sat upon, the chips or rags are displaced to form an indented cradle within which a pet may rest.

Another type of pet bed comprises a unitary flexible foam core structure having a sidewall which is permanently adhered to a base. It is important to note that the base is not removable from the sidewall. Rather, the base and sidewall are permanently joined to give the pet bed structural integrity. A cradle is formed between the inner, upwardly extending surfaces of the sidewall and the upper surface of the base. The foam core structure is then covered and protected by a removable, washable cover.

The washable cover, which defines a single enclosure, is simply slid over the foam core structure defined by the sidewall and base. The cover does not supply any structural support for the bed. Instead, the cover is simply intended to cover and protect the exposed surfaces of the foam core structure. Consequently, the cover material is loosely laid upon the upper surfaces of the base and is limp and slack. This design is devoid of any means to place tension within the cover material which lays upon the upper surfaces of the base. The slack nature of the cover, causes such a pet bed to be rather unsightly and unappealing when placed upon a store shelf and when used by a pet within a home.

Another pet bed comprises a permanently joined, unitary cover and flexible core structure. The cover material is literally sewn onto the foam base and side walls and is not removable therefrom. The base and sidewall are thus permanently enveloped or enclosed within the cover. This type of pet bed is extremely difficult and expensive to manufacture and does not permit the cover to be removed for cleaning or replacement.

Another pet bed comprises a combination of the foregoing elements, wherein a sidewall cover permanently encases a flexible foam core sidewall. Attached to lower edges of the sidewall cover is a thin sheet of cloth material which defines a nonpadded floor. A separate base cover permanently encases a stuffed pillow or pad. The covered pad is then tossed onto the nonpadded floor within the cradle formed by the covered sidewall. This product requires the manufacture and use of two separate covers. The foam core sidewall and base are permanently encased within their respective covers. This type of pet bed is also extremely difficult and expensive to manufacture and does not permit only the cover to be removed for cleaning or replacement.

The above-mentioned bed products have other inherent difficulties. For example, it is not uncommon that a pet will urinate within the bedding or otherwise soil it. If a unitary core structure is used or if the cover is permanently attached to the core structure, the structure is almost impossible to wash within a conventional, household washing machine. The difficulty arises due to the bulk, size, and unitary structure of the product.

If the bedding is not washed, the soiled and contaminated cover and foam core structure become cold, damp, wet, and dirty. Insects, mildew, and bacteria can harbor within the bedding and thereby expose the pet to a severe health hazard.

Bedding having a unitary or permanently attached core structure and/or multiple covers is also more difficult and expensive to manufacture, package, and ship. For example, the bulky, three-dimensional nature of the bed slows down the manufacturing process and increases manufacturing expense. The large three-dimensional nature of the bed also consumes a large amount of storage and shelf space. This necessitates the use of larger shipping packages and crates for shipment, and increased shipping fees.

Other problems with the apparatus and methods of the prior art include: the need to adhere the sidewall to the base to give the apparatus structural support; or alternatively, the need to stitch the cover directly to the flexible, yet thick, foam core.

The following issued patents describe other types of cloth or padded pet enclosures and/or bedding: Pohl (U.S. Pat. No. 3,565,040, issued Feb. 23, 1971); David (U.S. Pat. No. 3,902,456, issued Sep. 2, 1975); Neumann (U.S. Pat. No. 3,989,008, issued Nov. 2, 1976); Keys (U.S. Pat. No. 4,008,687, issued Feb. 22, 1977); Guillot-Munoz (U.S. Pat. No. 4,010,880, issued Mar. 8, 1977); Meekins (U.S. Pat. No. 4,763,604, issued Aug. 16, 1988); and Stewart (U.S. Pat. No. 4,860,689, issued Aug. 9, 1989).

The inventor believes that the listed products and patents taken alone or in combination neither anticipate nor render obvious the present invention. These citations do not constitute an admission that such disclosures are relevant or material to the present claims. Rather, these citations relate only to the general field of the disclosure and are cited as constituting the closest art of which the inventor is aware.

### DISCLOSURE OF INVENTION

Most pet owners desire that their beloved pets are kept healthy and made as comfortable as possible. Heretofore, the soft, padded, pet bedding and shelters that were available to such owners were often bulky, untidy, unsightly, unattractive, and difficult to clean.

This invention is an improved soft, padded pet bed and shelter that is easily assembled, disassembled and washed, and is not unduly bulky. The various embodiments of this invention are specifically designed to re-

5,136,981

| 3 | 4 |

tain a tidy, attractive, clean, and aesthetically-appealing professional appearance. The various designs of this invention were generated from a consideration of not only the anatomical but also the psychological well being of the pet. For example, both dogs and cats must be provided with sufficient space to allow movement upon the bedding or within the enclosure. This space is needed because such animals will often change their sleeping positions for greater comfort. The space, however, must not be too large. Most pets appear to enjoy resting in a soft, clean, warm, protected, enclosed environment which have some form of a sidewall against which the pet may lean. Cats also like to tumble and climb, consequently, the below mentioned tepee design has been created to partially meet this need.

These benefits for the pet are coupled with an advantageous structure that enables the cover and base to be separated for cleaning and storage. The sidewall is not adhered to the periphery edges of the base. Consequently, the sidewall may be folded against itself for insertion into a washing machine or into a relatively flat carton for shipping or storage. If needed, the base may be similarly folded.

In short, this invention is simple, functional, efficient, reliable, durable, compact, and is easily used, constructed and assembled. The present invention is also inexpensive and economical to manufacture, and is extremely simple to use requiring minimal manipulation for assembly and disassembly.

To achieve these general and specific objectives the pet bed of the present invention generally comprises a sidewall, a base, and a cover.

It is intended that the sidewall and base are made of a soft, flexible, foam-core material, such as foam rubber or the like which are commonly used for the manufacture of mattresses and cushions.

Alternatively, the base and/or sidewall may comprise a hollow structure made of polyethylene, polypropylene, or similar material. Such a hollow structure could be formed by several different processes, including blow molding, rotational molding, vacuum molding, or injection molding. For example, the base could comprise a blow-molded, hollowcored structure wherein a generally horizontal base floor is raised above an underlying support surface and is suspended from generally upright base sidewalls located about the perimeter of the base floor. Since the base floor material is capable of flexing, this alternative structure provides not only insulating and weight-supporting characteristics but also provides a forgiving, shock absorbent base floor for the invention. This alternative structure is also more easily washed than a base made from a foam-core material.

The sidewall may be made of a single section or piece of foam which is generally continuous about at least a portion of a periphery of the pet bed. The sidewall serves as a wall against which the pet may lean.

The base serves as a mattress or cushion to insulate the pet from the underlying support surface. The base generally has an upper surface and a lower surface.

The cover generally covers and protects the sidewall and the base. The cover of the present invention is unique, however, in that it has a sidewall enclosure and a separate, independent base enclosure. The sidewall enclosure is capable of at partially enclosing the sidewall. The base enclosure is capable of at least partially enclosing the base.

The base is separable and removable from the base enclosure of the cover and, similarly, is insertable therein. The base is also separable from the sidewall of the invention. Removal of the base from the base enclosure enables the sidewall, when so urged, to collapse upon itself within the sidewall enclosure to assume a generally flat compact form.

The cover is preferably made of a washable material. For example, a portion or all of the cover could be made of a nylon, denim, and/or vinyl fabric. Portions of the cover could also be made of a synthetic material which simulates fur, such as an artificial sheepskin fabric.

The cover has a floor upon which the pet rests. The floor is generally stretched taut across the upper surface of the base when the base is properly inserted and positioned within the base enclosure. The lower surface of base may be placed upon the underlying support surface to be coplanar therewith.

The design of the cover also urges the sidewall of the invention to have a generally upright orientation with respect to the support surface and the base.

To maintain a taut condition, the cover may also be provided with a length of elastic material which is positioned about the perimeter of an opening to the base enclosure. The elastic material urges the opening toward at least a partial closure. Expansion of the elastic material enlarges the opening to enable the base to be removed from or inserted into the base enclosure. Thus, the cover is form fitted onto the sidewall and base.

Using the aforementioned concepts, a wide variety of differently configured pet beds can be manufactured. For example, the base, sidewall, and cover may be configured to create a pet bed having a generally circular or oval cradle or pet enclosure. A portion of the sidewall may be lower in height, as measured from the base or support surface, than a remaining portion of the sidewall. If used, this lower portion defines an entrance into the cradle or pet enclosure.

Alternatively, the pet bed may have a general appearance or configuration of a boat. The pet bed may also have a general appearance or configuration of a wide variety of differently designed tepees or wigwams having an inverted, cone shape. Use of piping, a foredeck, functional and/or ornamental stitching, bands of decorative material, door flaps and badges, ribbons, decals, or other indicia may be used to give the pet bed an attractive, aesthetically appealing appearance.

The present invention achieves each of the above-stated objectives and also overcomes the previously mentioned disadvantages of the prior art.

These and other objectives and advantages of the present invention will become more readily apparent upon reading the following disclosure and referring to the attached drawings.

BRIEF DESCRIPTION OF DRAWINGS

FIG. 1 is a perspective view of a first embodiment of the invention as taught herein.

FIG. 2 is a cross-sectional, side-elevational view of the first embodiment taken along line II—II in FIG. 1.

FIG. 3 is a bottom, plan view of the first embodiment shown in FIG. 1.

FIG. 4 is an exploded-perspective view of the first embodiment shown in FIG. 1 illustrating the removal and insertion of the base into the base enclosure of the cover.

5,136,981

5

FIG. 5 is a perspective view of a second embodiment of the invention as taught herein.

FIG. 6 is a front-elevational view of the second embodiment shown in FIG. 5.

FIG. 7 is a starboard side-elevational view of the second embodiment shown in FIG. 5.

FIG. 8 is a back-elevational view of the second embodiment shown in FIG. 5.

FIG. 9 is a port side-elevational view of the second embodiment shown in FIG. 5.

FIG. 10 is a top, plan view of the second embodiment shown in FIG. 5.

FIG. 11 is a bottom, plan view of the second embodiment shown in FIG. 5.

FIG. 12 is a perspective view of a third embodiment of the invention as taught herein with a first and second leading edge of a sidewall being joined to generally close an opening of an interior pet enclosure.

FIG. 13 is a front-elevational view of the third embodiment shown in FIG. 12.

FIG. 14 is a back-elevational view of the third embodiment shown in FIG. 12.

FIG. 15 is a side-elevational view of the third embodiment shown in FIG. 12.

FIG. 16 is a bottom, plan view of the third embodiment shown in FIG. 12.

FIG. 17 is a cross-sectional, side-elevational view of the third embodiment shown in FIG. 12 taken along line XVII—XVII in FIG. 13.

FIG. 18 is a top, plan view of the third embodiment shown in FIG. 12.

FIG. 19 is a front-elevational view of the third embodiment shown in FIG. 12 with the sides of the sidewall being separated generally to open the opening to the pet enclosure.

FIG. 20 is an exploded-perspective view of the third embodiment shown in FIG. 12 illustrating the removal and insertion of the base into the base enclosure of the pet bed.

FIG. 21 is a perspective view of a fourth embodiment of the invention as taught herein with less ornamental embellishment of the sidewall.

FIG. 22 is a front-elevational view of the fourth embodiment shown in FIG. 21.

FIG. 23 is a back-elevational view of the fourth embodiment shown in FIG. 21.

FIG. 24 is a side-elevational view of the fourth embodiment shown in FIG. 21.

FIG. 25 is a plan view of the fourth embodiment shown in FIG. 21.

FIG. 26 is a bottom, plan view of the fourth embodiment shown in FIG. 21.

FIG. 27 is a perspective view of a fifth embodiment of the invention as taught herein.

FIG. 28 is a front-elevational view of the fifth embodiment shown in FIG. 27.

FIG. 29 is a back-elevational view of the fifth embodiment shown in FIG. 27.

FIG. 30 is a side-elevational view of the fifth embodiment shown in FIG. 27.

FIG. 31 is a plan view of the fifth embodiment shown in FIG. 27.

FIG. 32 is a bottom, plan view of the fifth embodiment shown in FIG. 27.

FIG. 33 is a perspective view of a sixth embodiment of the invention as taught herein.

FIG. 34 is a front-elevational view of the sixth embodiment shown in FIG. 33.

6

FIG. 35 is a back-elevational view of the sixth embodiment shown in FIG. 33.

FIG. 36 is a side-elevational view of the sixth embodiment shown in FIG. 33.

FIG. 37 is a plan view of the sixth embodiment shown in FIG. 33.

FIG. 38 is a bottom, plan view of the sixth embodiment shown in FIG. 33.

FIG. 39 is a front-elevational view of the sixth embodiment shown in FIG. 3 with the first and second leading edges of the sidewall being partially separated to illustrate the separable attachment of the first and second leading edges.

FIG. 40 is an exploded-perspective view of the second embodiment shown in FIG. 5 illustrating the removal and insertion of the base into the base enclosure of the cover.

One should understand that the drawings are not necessarily to scale and the elements are sometimes illustrated by graphic symbols, phantom lines, diagrammatic representations, and fragmentary views. In certain instances, the inventor may have omitted details which are not necessary for an understanding of the present invention or which render other details difficult to perceive.

## BEST MODE FOR CARRYING OUT THE INVENTION

Referring to the drawings, wherein like numerals indicate like parts, FIGS. 1 through 4 illustrate a first embodiment of the present invention. FIGS. 5 through 11, and 40 illustrate a second embodiment of the invention. FIGS. 12 through 20 illustrate a third embodiment of the invention. FIGS. 21 through 26 illustrate a fourth embodiment of the invention. FIGS. 27 through 32 illustrate a fifth embodiment the invention. FIGS. 33 through 39 illustrate a sixth embodiment of the invention. For simplicity in comparing common features of each embodiment, similar reference numerals have been used.

Referring now to the first embodiment, a padded pet bed 40 is used to insulate a pet (not shown) from an underlying support surface (not shown). Pet bed 40 generally comprises a sidewall 42, a base 44, and a cover 46.

Base 44 serves as a cushion to support and insulate the pet from the support surface. Sidewall 42 is secured to base 44 and provides a perimeter wall to define a partial enclosure or cradle within which the pet may find comfort and solitude. Pets often use sidewalls of their shelters to lean against.

Sidewall 42 and base 44 may be made of a soft, flexible foam-core material, such as an open-cell or closed-cell foam rubber, or similar material, having a thickness of about one-quarter to six inches ($\frac{1}{4}''$ to 6''). The thickness of sidewall 42 and base 44 is dependent upon the size and weight of the pet, and the particular configuration of embodiment selected.

Alternatively, in some embodiments sidewall 42 and/or base 44 may be made with a hollow structure made of polyethylene, polypropylene, or similar material. Such a hollow structure could be formed by several different processes, including blow molding, rotational molding, vacuum molding, or injection molding. Since such a structure is hollow, the floor and sidewall of the structure are capable of flexing. This alternative structure provides insulating, weight-supporting, and shock absorbent characteristics, but in addition is more easily

5,136,981

7

washed than foam-core materials. This molded structure may even serve as a more durable replacement mattress if the foam-core base 44 as described herein becomes excessively soiled or worn.

As best seen in FIG. 2, sidewall 42 has a lower side 48, an interior side 50, a top side 52, and an outer side 54. Similarly, base 44 has a lower surface 56, a side surface 58, and an upper surface 60.

Sidewall 42 may comprise a plurality of joined sections or, as preferred, a single section of foam which is generally continuous about a periphery of pet bed 40. Although not preferred, base 44 may also be made of a plurality of joined sections.

Cover 46 generally covers and protects sidewall 42 and base 44 against becoming soiled. Cover 46 preferably is made of a flexible material than can be washed. The inventor prefers to make cover 46 out of a nylon, denim, or vinyl fabric, or a combination of these materials. Cover 46, or a portion thereof, may also be made from a natural or synthetic material which depicts or simulates fur. For example, many surfaces of cover 46 are illustrated as being made of an artificial sheepskin fabric.

It is important to note the structure and function of cover 46. As best seen in FIG. 2, cover 46 comprises a sidewall enclosure 62, a separate base enclosure 64, and a floor 66. Sidewall enclosure 62 is capable of at least partially enclosing sidewall 42. Base enclosure 64 is capable of at least partially enclosing base 44.

More particularly, sidewall enclosure 62 has an interior wall covering 68, a top wall covering 70, an outer wall covering 72, and means 74 for securing sidewall 42 within sidewall enclosure 62. Interior wall covering 68 covers and protects interior side 50. Top wall covering 70 covers and protects top side 52. Outer wall covering 72 covers and protects outer side 54. Securing means 74 may comprise a lower wall covering 76 that is permanently secured in place, may be opened, and/or is removable from cover 46 possibly to allow for the removal of sidewall 74 from within sidewall enclosure 62. It is not required that sidewall 74 be removable from within sidewall enclosure 62. In fact, for easy assembly by an end consumer, it is intended that sidewall 74 be already inserted into sidewall enclosure 62 prior to shipping, as will be described further below.

Base enclosure 64 has floor 66, a base wall 78, and means 80 for securing base 44 within base enclosure 64. Floor 66 covers and protects upper surface 60. Base wall 78 covers and protects side surface 54. Securing means 80 may comprise a lip 82 or flange of material extending inwardly from base wall 78, from lower wall covering 76, or from outer wall covering 72 which extends at least about the periphery of base 44 to catch and retain at least a portion of lower surface 56. Securing means 80 also defines an opening 84 into base enclosure 64.

Please note that base enclosure 64 is separate and apart from sidewall enclosure 62, and base 44 is separable and removable from cover 46 and from sidewall 42.

Cover 46 may further comprise a length of elastic material 86 affixed to securing means 80 about an edge 88 of opening 84. Elastic material 86 urges opening 84 toward at least a partial closure. Expansion of elastic material 86 enlarges opening 84 to allow base 44 to be removed from or inserted into base enclosure 64.

Cover 46 holds and retains sidewall 42 and base 44. When sidewall 42 is positioned within sidewall enclosure 62 and base 44 is positioned within base enclosure

8

64, cover 46 imparts structural integrity to pet bed 40 by not only joining and unifying cover 46, sidewall 42, and base 44, but also urging sidewall 42 to have a generally upright orientation with respect to base 44.

When pet bed 40 is properly placed upon the support surface, base 44 is generally coplanar with the support surface and sidewall 42 extends upwardly from either the support surface or from base 44.

Many different pet bed products were discussed above in the Background Of The Invention. Of such products having a sidewall and a removable cover, the cover simply slides over and covers the exposed surfaces of the foam core structure. Such a cover does not supply any structural support for the pet bed. Consequently, the cover is loosely laid upon the upper surfaces of the pet bed mattress and is limp and slack. Such pet bed products are devoid of any means to place tension within the cover that lays upon the upper surfaces of the base. The slack nature of the cover causes the pet bed to be rather unsightly and unappealing when placed upon a store shelf and when used by a pet within a home.

In stark contrast to the aforementioned pet bed products, when base 44 of the present invention is properly positioned within base enclosure 64 of cover 46, floor 66 is generally stretched taut across upper surface 60 giving pet bed 40 a clean, tidy, appealing, and professional appearance.

Removal of base 44 from within base enclosure 64 enables sidewall 42, when so urged, to collapse upon itself within sidewall enclosure 62 to assume a generally flat compact form. Thus, base 44 and the collapsed, combined sidewall 42 and cover 46 may be packaged, shipped, and stored as a relatively thin, flat product.

The foregoing description is applicable to each of the illustrated embodiments. Structure, features, and elements specific to individual embodiments will now be described in detail.

The first embodiment of pet bed 40 is illustrated in FIGS. 1 through 4. As shown, sidewall 42 imparts a general appearance of a circular or oval cradle to pet bed 40. A portion 90 of sidewall 42 may be lower in height as measured from base 44 or from the support surface than a remaining portion 92 of sidewall 42. Lower portion 90 defines an entrance into the cradle or pet enclosure.

The second embodiment of pet bed 40 is illustrated in FIGS. 5 through 11, and 40. The main concepts and structure as taught above are included within the second embodiment. One striking exception, however, is that cover 46, sidewall 42, and base 44 give pet bed 40 a general appearance or configuration of a boat. Sidewall 42 generally forms a stern freeboard 94, a port freeboard 96, a starboard freeboard 98, and a converging bow freeboard 100. Similarly, base 44 and floor 66 are shaped to give the general appearance or configuration of a boat deck. Lip 82 and opening 84, which lip 82 defines, are generally shaped similar to that of floor 66. This allows lip 82 and/or elastic material 86 to pull taut outer side 54 of sidewall 42 and secure it against becoming slack:

The boat shape may be of any desired configuration. In the preferred embodiment, however, the boat is shaped similar to that of a row boat. Such a design is particularly ornamental and attractive, especially since the interior floor 66 is stretched taut from port to starboard and from bow to stern. Similarly, the material

A171

5,136,981

9

which forms sidewall enclosure 62 is stretched taut and held securely by securing means 80.

Please note that cover 46 covers, protects, holds, and retains stern freeboard 94, port freeboard 96, starboard freeboard 98, and converging bow freeboard 98 in a generally upright orientation with respect to base 44 and contributes to the general appearance of the boat.

As best seen in FIG. 5, cover 46 may further comprise a length of piping 102 which is generally positioned around an upper, outer edge 104 of sidewall 42. Piping 102 adds a decorative flare to cover 46 and can be interpreted as indicating railing about upper, outer edge 104.

If additional ornamental decoration is desired, cover 46 of pet bed 40 may further comprise a foredeck 106 located near converging bow freeboard 100. Foredeck 106 of the preferred second embodiment comprises a sheet of material identical or similar to that used for cover 46 and a thin sheet of foam-core material. The sheet of material is folded beneath and over the foam-core material such that the foam-core material is sandwiched or juxtaposed between an upper and lower surface of foredeck 106. Foredeck 106 is then cut to a desired shape and sewn or otherwise secured to upper, outer edge 104 of sidewall 42 along a fore portion of converging bow freeboard 100.

Foredeck 106 may also be provided with one or more functional and/or ornamental stitch 108 or seam spanning the width of foredeck 106 from port to starboard. FIG. 10 illustrates foredeck 106 with three straight lines of stitches 108. Stitch 108 can provide increased structural integrity to foredeck 106 by passing through and thereby joining the upper surface, foam-core material, and lower surface of foredeck 106 together.

Cover 46 of the second embodiment may also be provided with an ornamental band 110 of material spanning across floor 66 from port to starboard. Band 110 could be made of the same sheet material as foredeck 106 and cover 46. In the preferred second embodiment of the invention, floor 66 is made of an artificial sheepskin material and the remaining portions of cover 46 are made of a nylon material. Piping 102 is made of a vinyl or rubber material.

Cover 46 may be provided with even further ornamentation in the form of one or more badges, ribbons, decals, or other indicia (not shown) which depict an anchor, a life buoy, a flag, or other boating memorabilia. Such indicia is either adhered or sewn onto outer wall covering 72 of cover 46, preferably near converging bow freeboard 100, and/or onto the upper surface of foredeck 106. Other locations may also be desirable depending upon the specific indicia selected.

Reference is now made to the third, fourth, fifth, and sixth embodiments of the present invention. Sidewall 42, base 44, cover 46, sidewall 42, and base 44 of each of these embodiments have a general appearance or configuration of an native American tepee or wigwam. Although the general structure is similar for each of these embodiments, each embodiment has different minor ornamental features. For example, the third embodiment is referred to as the deluxe cat version. The fourth embodiment is referred to as the standard cat version. The fifth embodiment is referred to as the deluxe dog version. The sixth embodiment is referred to as the standard dog version. These distinctions are not based upon anything other than appearance and possibly size. For example, in the pet industry dogs are often considered more masculine than cats. Consequently, pet

10

beds manufactured for dogs are provided with less ornamentation. Pet beds manufactured for cats have a greater amount of ornamentation. A brief comparison of these embodiments reveals that the deluxe and standard dog versions do not have flaps 112 that are otherwise found on the cat versions of the invention. The dog versions also have a more simplistic functional and/or ornamental stitching on cover 46, as compared to similar stitching on the cat versions of the invention. The primary distinction between the deluxe and standard versions of both the cat and dog pet beds is that the deluxe version uses an artificial sheep-skin material for interior wall covering 68 of cover 46, whereas the standard versions use a similar material for both the interior wall covering 68 and for outer wall covering 72.

Referring now to FIGS. 12 through 20, which illustrate the third embodiment of the invention, base 44 is generally circular in configuration. Cover 46 and sidewall 42 are configured to form a raised, inverted, generally cone-shaped wall 114. A wider portion 116 of cone-shaped wall 114 is joined to an upper perimeter 117 of base 44 by cover 46. A narrower portion 118 forms an apex of base 44 that extends upwardly from base 44 and gives pet bed 40 the general appearance or configuration of an American Indian tepee or wigwam.

A comparison of FIG. 17 with FIG. 2 reveals the particular cross-sectional structure of cover 46 in the third embodiment with respect to the first embodiment. A close inspection reveals that most if not all of the same concepts of using: sidewall 42, base 44, cover 46, lowerside 48, interior side 50, top side 52, outer side 54, lower surface 56, side surface 58, upper surface 60, sidewall enclosure 62, base enclosure 64, floor 66, interior wall covering 68, top wall covering 70, outerwall covering 72, and means 74 for securing sidewall 42 within sidewall enclosure 62 are all included within the third embodiment of the invention. Rather than using a separate lower wall covering 76, interior wall covering 68 and outer wall covering 72 are simple sewn together against floor 66. The third embodiment of the invention also has base wall 78, securing means 80, lip 82, opening 84, elastic material 86, and edge 88 as described above. The third embodiment, however, does not have lower portion 90 and remaining portion 92 because there is no wall immediately above floor 66 at the entrance into pet enclosure 120.

An important feature of the third embodiment is that a single cone-shaped wall 114 may be used to form both the sides and the ceiling of pet bed 40. Thus, interior wall covering 68 and floor 66 define the boundaries of a pet enclosure 120. Use of a single cone-shaped wall 114 greatly simplifies the complexity of manufacture and greatly reduces the cost of manufacture.

Since a single cone-shaped wall 114 is used, a portion of a front or leading edge 122 of wall 114 is capable of being either permanently or temporarily joined together. For example, pet bed 40 may be provided with means 123 for removably fastening at least a portion of a first leading edge 124 to a corresponding portion of a second leading edge 126. Fastening means 123 may comprise a zipper, one or more buttons, snaps, clasps, or any other device which will accomplish the task. The inventor prefers that fastening means 123 comprise respective lengths 128 and 130 of a hook-and-loop fastening system, such as mating lengths of a product sold under the trademark VELCRO. Length 128 is secured to interior wall covering 68 of first leading edge 124. Similarly, length 130 is secured to interior wall cover-

A172

5,136,981

**11**

ing 68 of second leading edge 126 such that when joined lengths 128 and 130 join and mesh with one another to form one or more openings into pet enclosure 120.

FIGS. 17, 19 and 39 illustrate the preferred placement of lengths 128 and/or 130. One of several reasons for, and benefits of, this placement is that a pet, such as a cat, can enter or leave pet enclosure 120 through either a first opening 132, located below fastening means 123, or through a second opening 134, located above fastening means 123. Use of a hook-and-loop fastening means 123 also enables the size of first opening 132 and second opening 134 to be adjusted. If both first opening 132 and second opening 134 are used, such structure not only allows stuffy spent air naturally to escape through such openings, but also permits fresh air to flow through pet enclosure 120 by being drawn therein as the pet enters and/or leaves the enclosure. Due to the generally porous nature of sidewall 42 and cover 46, pet bed 40 is capable of breathing or allowing air to pass therethrough. This feature is significantly different from pet shelters having hard, nonporous walls.

As briefly mentioned above, the front or leading edge 122 of the third and fourth embodiments of the invention may be provided with one or more functional and-/or ornamental door flaps 112 that are located near first opening 132 of pet enclosure 120. Flaps 112 are preferably extensions of first leading edge 124 and second leading edge 126 which are folded outwardly and back against outer wall covering 72 of cover 46. Flaps 112 may then be either permanently or temporarily fastened to outer wall covering 72. The inventor prefers that flaps 112 are permanently secured in place to serve simply as decorative adornment for pet bed 40. Alternatively, flaps 112 may be detachable from outer wall covering 72 and be joined together to at least partially close first opening 132. Another alternative is to use flaps 112 which are at least initially independent of cover 40 that are either permanently or temporarily affixed to cover 40.

Cover 46 and sidewall 42 of the third embodiment may also have one or more functional and/or ornamental side stitch 136 or seam that bind outer wall covering 72 to sidewall 42 and to interior wall covering 68. As seen in FIGS. 12 through 15 and 17 through 20, side stitch 136 may comprise a series of straight stitches that give the appearance from a distance of an enlarged zig-zag stitch hemmed with a straight stitch along each side of the zig-zag stitch. Other stitch designs or patterns can be used with similar aesthetic impact and effect.

The fourth embodiment of pet bed 40, as illustrated in FIGS. 21 through 26, is similar to the third embodiment except that an artificial sheepskin material is not used for the interior wall covering 68 and flaps 112, and a single straight stitch is used for side stitch 136.

In most respects the fifth embodiment of pet bed 40, as illustrated in FIGS. 27 through 32, is also similar to the third embodiment of the invention, except that: an artificial sheepskin material is not used for the interior wall covering 68; a single straight stitch is used for side stitch 136; and no flaps 112 are used.

The sixth embodiment of pet bed 40, as illustrated in FIGS. 33 through 39, is very similar to the fifth embodiment of the invention except that an artificial sheepskin material is not used for the interior wall covering 68.

In summary, the present invention is not restricted to a particular configuration. To the contrary, the invention may comprise a traditional oval pet bed design, a

**12**

novel and unique boat configuration, any one of a wide variety of tepee configurations, or other configuration which uses the same concepts and features as taught herein. The primarily claimed invention is use of a sidewall, a removable base, and a cover having separate and distinct compartments or enclosures for the sidewall and the base. From this broad concept and structure, many different more detailed and structured embodiments can be created. The illustrated embodiments are only illustrative. Many other designs may be used with the claimed invention.

The means and construction disclosed herein are by way of example and comprise primarily the preferred forms of putting the invention into effect. Although the drawings depict a preferred and alternative embodiments of the invention, other embodiments have been described within the preceding text. One skilled in the art will appreciate that the disclosed device may have a wide variety of shapes and configurations. Additionally, persons skilled in the art to which the invention pertains might consider the foregoing teachings in making various modifications, other embodiments, and alternative forms of the invention.

It is, therefore, to be understood that the invention is not limited to the particular embodiments or specific features shown herein. To the contrary, the inventor claims the invention in all of its forms, including all modifications, equivalents, and alternative embodiments which fall within the legitimate and valid scope of the appended claims, appropriately interpreted under the Doctrine of Equivalents.

### INDUSTRIAL APPLICABILITY

The present invention provides a simple, reliable, easily used apparatus and method to form a soft, flexible, padded pet bed. The apparatus of this invention is also compact, functional, unobtrusive, efficient, reusable, durable, rugged, is easily constructed, and is inexpensive and economical to manufacture. Traditional or nontraditional manufacturing processes may be used. The present invention not only increases the speed and simplifies the procedure to form a pet bed, it also provides an apparatus which requires less storage room and shipping packaging and expense without damaging the product. This invention also allows a wide variety of differently styled pet beds to be manufactured.

The industrial applicability of this invention can be more readily ascertained by reference to the following example of its use.

Once the cover is manufactured, the soft, flexible, foam-core sidewall is inserted into the sidewall enclosure of the cover. The sidewall is manipulated within the enclosure to place it in its proper position and orientation. The sidewall within the cover is urged to collapse upon itself to assume a generally flat compact form. Once collapsed, the base is combined with the flattened sidewall and cover. The base, flattened sidewall, and cover are then easily inserted into a protective plastic shipping bag and into a generally flat, cardboard shipping container. The product may then be shipped to distributors, wholesalers, retailers, or directly to end customers.

Upon receipt of the contained product, the pet bed is removed from its protective container and plastic shipping bag. The flattened sidewall and cover are allowed to resume their naturally expanded open position.

The base is then inserted into an opening in the base enclosure. The insertion of the base into the base enclo-

A173

5,136,981

13                                    14

sure stretches the floor of the cover taut for a smooth and attractive appealing and professional appearance.

If the product comprises the third or fourth embodiments as described above, the front or leading edges of the sidewall are joined generally to close the opening into the interior of the pet enclosure.

The product is now ready to be laid down where desired and used by a pet.

If the cover, sidewall, and/or base become soiled, the base may be simply removed from the base enclosure of the cover and one or more of these elements may be washed. Depending upon whether or not the sidewall is permanently or removably placed within the sidewall enclosure, the sidewall may also be removed for cleaning.

What is claimed is:

1. A soft, flexible pet bed, comprising:
a soft, flexible floor, and
at least one sidewall above and affixed to said floor made of a soft, flexible material yet sufficiently rigid to form a generally erect intended configuration above said floor; and
a base, said floor forming a cover for said base generally in the form of a bag having an opening, said base being easily inserted into or removed from said bag through said opening while said floor is affixed to said sidewall, said bed being collapsible to a generally compact form for ease of shipping and machine-washing when said base is removed, said base maintaining said intended configuration of the bed for use by the pet when the base is inserted into the floor.

2. The pet bed of claim 1, wherein said floor is sized so that when the base is inserted into the bag, the floor becomes generally taut over the top surface of said base, which in turn urges said sidewall to form and maintain the intended configuration of the bed for use by the pet.

3. The pet bed of claim 2, wherein said floor further comprises a means for urging said bag opening toward at least partial closure in order to hold the floor taut around said base.

4. The pet bed of claim 1, wherein said sidewall is made from a porous material which allows the passage of air through said sidewall.

5. The pet bed of claim 4, wherein said sidewall is formed from a foam-core material.

6. The pet bed of claim 4, wherein said sidewall is covered by a sidewall cover made from a washable material.

7. The pet bed of claim 6, wherein said sidewall cover is removable from said sidewall.

8. The pet bed of claim 1, wherein said base is formed from a foam-core material.

9. The pet bed of claim 1, wherein said sidewall extends only partially around the periphery of said floor thereby having two leading edges, further comprising fastening means for removably securing one leading edge of said sidewall to the other leading edge thereof in order to form at least a partial enclosure for sheltering the pet.

10. The pet bed of claim 6, wherein said fastening means comprises a hook and loop fastening system.

11. The pet bed of claim 6 wherein said sidewall is sized so that when the leading edges thereof are secured

to each other, a complete enclosure is formed except for an opening suitable for ingress and egress of the pet.

12. A soft, flexible pet bed comprising:
a base;
at least one sidewall which is flexible yet able to maintain a generally erect configuration above said base; and
a base enclosure, affixed to said sidewall, having an opening through which said base may be easily inserted and removed from said base enclosure, said base enclosure having means for urging said opening toward at least partial closure when the base is inserted therein in order to hole the base enclosure generally taut around said base and maintain the sidewall in said generally erect configuration, said base enclosure and said sidewall being collapsible to a compact form for ease of shipping and machine-washing when said base is removed from said base enclosure.

13. A pet bed comprising:
a shelter portion comprising:
(a) a soft, flexible floor, and
(b) at least one sidewall made of a soft, flexible material, said sidewall being affixed to said floor at least partially around the floor's periphery, said sidewall being sized and sufficiently rigid to form at least a generally erect partial enclosure above said floor within which said pet sleeps; and
a base, said floor forming a cover for said base generally in the form of a bag having an opening, said base being easily inserted into or removed from said bag through said opening such that when the base is removed from the bag, the shelter portion is collapsible to a generally compact form for ease of shipping and machine-washing, and the floor being sized so that when the base is inserted into the bag, the floor becomes generally taut over the top surface of said base, which in turn urges said sidewall to form and maintain the intended configuration of said shelter portion enclosure for use by the pet.

14. The pet bed of claim 13, wherein said floor further comprises a means for urging said opening toward at least partial closure in order to hold the floor taut around said base.

15. The pet bed of claim 14, wherein said means for urging said opening toward at least partial closure comprises an elastic material attached to said floor and positioned around the opening of said floor.

16. The pet bed of claim 13, wherein said shelter portion enclosure is a complete enclosure having ingress and egress means for the pet.

17. The pet bed of claim 13, wherein said sidewall extends only partially around the periphery of said floor thereby having two leading edges, further comprising fastening means for removably securing one leading edge of said sidewall to the other leading edge thereof in order to form at least a partial enclosure for sheltering the pet.

18. The pet bed of claim 17, wherein said fastening means comprises a hook and loop fastening system.

19. The pet bed of claim 17 wherein said sidewall is sized so that when the leading edges thereof are secured to each other, a complete enclosure is formed except for an opening suitable for ingress and egress of the pet.

* * * * *

A174

# UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO. : 5,136,981                    Page 1 of 3

DATED       : August 11, 1992

INVENTOR(S) : Aurelio F. Barreto, III, et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 1, line 29, delete "contain" and insert therefor --contains--.

Column 1, line 53, delete "," after "cover".

Column 1, lines 58-59, delete "side walls" and insert therefor --sidewalls--.

Column 2, line 48, delete "Aug. 9," and insert therefor --Aug. 29,--.

Column 3, lines 4-5, delete "well being" and insert therefor --well-being--.

Column 3, line 12, delete "have" and insert therefor --has--.

Column 3, line 14, delete"below mentioned" and insert therefor --below-mentioned--.

Column 3, line 28, insert --,-- between "use" and "requiring".

Column 3, line 35, delete "are" and insert therefor --is--.

Column 3, line 43, delete "hollowcored" and insert therefor --hollow-cored--.

Col. 3, line 66, insert --least-- between "at" and "partially".

Column 4, lines 17-18, insert --the-- between "of" and "base".

# UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO. : 5,136,981                    Page 2 of 3

DATED       : August 11, 1992

INVENTOR(S) : Aurelio F. Barreto, III, et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 4, line 41, delete "be" and insert therefor --bed--.

Column 4, line 48, delete "aesthetically appealing" and insert therefor --aesthetically-appealing--.

Column 7, line 16, delete "than" and insert therefor --that--.

Column 7, line 40, delete "74" and insert therefor --42--.

Column 7, line 41, delete "74" and insert therefor --42--.

Column 7, line 43, delete "74" and insert therefor --42--.

Column 9, line 5, second occurrence, delete "98" and insert therefor --100--.

Column 9, line 55, delete "sidewall 42, and base 44".

Column 9, line 55, insert --and-- between "44," and "cover".

Column 9, line 57, delete "native" and insert therefor --Native--.

Column 10, line 23, delete "of".

Column 10, line 39, delete "simple" and insert therefor --simply--.

Column 11, line 38, delete "40" and insert therefor --46--.

Column 11, line 39, delete "40" and insert therefor --46--.

## UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO. : 5,136,981                    Page 3 of 3

DATED      : August 11, 1992

INVENTOR(S) : Aurelio F. Barreto, III, et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 12, line 2, insert --any-- between "or" and "other".

Column 12, line 4, delete "primarily" and insert therefor --primary--.

Col. 13, claim 10, line 63, delete "6" and insert --9--

Col. 13, claim 11, line 65, delete "6" and insert --9--.

Col. 14, claim 12, line 13, delete "hole" and insert --hold--

Signed and Sealed this

Fourteenth Day of September, 1993

*Attest:*

*Bruce Lehman*

**BRUCE LEHMAN**

*Attesting Officer*          *Commissioner of Patents and Trademarks*

A177

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

**FLEXI-MAT CORPORATION,**
an Illinois corporation,

        Plaintiff,

    v.

**DALLAS MANUFACTURING COMPANY, INC.**, a Texas corporation, **BJ'S WHOLESALE CLUB, INC.**, a Delaware corporation, and **DOSKOCIL MANUFACTURING COMPANY, INC.**, a Texas corporation,

        Defendants.

Civil Action No. 04 10162 DPW

## PLAINTIFF'S MOTION TO FILE SECOND AMENDED COMPLAINT

Plaintiff Flexi-Mat Corporation ("Flexi-Mat"), by its attorneys, hereby moves the Court for an order pursuant to Fed. R. Civ. P. 15(a) permitting Flexi-Mat to amend its complaint. A copy of Flexi-Mat's proposed Second Amended Complaint is attached as Exhibit 1.

The bases for Flexi-Mat's motion are as follows:

1.    Flexi-Mat is the owner of United States Patent No. 5,765,502 (the "'502 Patent") which covers pet beds having a bolster. Flexi-Mat originally filed suit against defendants Dallas Manufacturing Co., Inc. ("Dallas Mfg.") and BJ's Wholesale Club ("BJWC") on January 23, 2004. On August 31, 2004, prior to the exchange of any discovery, Flexi-Mat filed its First Amended Complaint, adding Doskocil Manufacturing Co. ("Doskocil") as a defendant.

2.    Flexi-Mat alleges in its First Amended Complaint that Dallas Mfg. and Doskocil, among other things, offer to sell and sell to BJWC pet beds having a bolster that are made substantially as claimed in the '502 Patent. Flexi-Mat further alleges in the First Amended

Complaint that BJWC in turn offers for sale and sells these pet beds to purchasers in the United States under the name "Berkley & Jensen Premium Quality Bolster Pet Bed." Flexi-Mat also alleges in the First Amended Complaint that the infringing activities of Dallas Mfg. and Doskocil include, "but are not limited to," the sale and offer for sale of the beds sold and offered for sale by BJWC under the name "Berkley & Jensen Premium Quality Bolster Pet Bed."

3.     Based upon discovery received from the defendants, Flexi-Mat has reason to believe that Dallas Mfg. and Doskocil offer to sell and sell pet beds with bolsters made substantially as claimed and described in '502 Patent, to retailers other than BJWC. Dallas Mfg. and Doskocil have taken the position, in response to Flexi-Mat's discovery requests, that no bolster pet beds other than those offered for sale and sold to BJWC are accused of infringement in the First Amended Complaint, and thus information pertaining to such other pet beds are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

4.     While Flexi-Mat disagrees with that position taken by Dallas Mfg. and Doskocil, to avoid burdening this Court with a potentially protracted dispute on this issue, Flexi-Mat seeks leave to file a Second Amended Complaint stating that Flexi-Mat is accusing all such similarly constructed bolster pet beds of infringing the '502 Patent, and not just those sold to or by BJWC. The Second Amended Complaint also additionally alleges that Dallas and Doskocil make and use the infringing products, and that BJWC is possibly selling the infringing products under names other than "Berkley & Jensen Premium Quality Bolster Pet Bed."

5.     Fed. R. Civ. P. Rule 15 states that leave to amend "shall be freely given when justice so requires." Further, the U.S. Supreme Court has held that in the absence of undue delay, undue prejudice to the party opposing the motion, or futility of the amendment, leave to

A179

amend should be freely given. Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962).

6.    Flexi-Mat has not unduly delayed the amendment of its complaint, defendants will not face undue prejudice by allowance of the amendment, and the amendment is not futile. Flexi-Mat has only recently learned that those defendants are likely selling other pet beds having a bolster that are substantially similar to the pet beds sold to and by BJWC, and of their positions as to the scope of the First Amended Complaint. Moreover, the amendment supports judicial economy, since the same '502 Patent will be litigated against all accused products emanating from the defendants.

7.    The parties still have substantial discovery remaining, even absent discovery on these additional bolster pet beds, so there would be no prejudice due to the date of filing the Second Amended Complaint. Fact discovery is not scheduled to close until June 3, 2005, and no trial date has been set.

For the foregoing reasons, plaintiff Flexi-Mat Corporation respectfully requests that it be granted leave to file a Second Amended Complaint.


## LOCAL RULE 7.1 CERTIFICATION

Plaintiff attempted to confer with all of the defendants concerning the subject matter of this motion. Counsel for defendants Dallas and BJWC has indicated that Dallas and BJWC will not oppose this motion. Counsel for Dosckocil did not reply to Plaintiff's attempts confer on this motion and Plaintiff thus does not know whether Dosckocil will oppose this motion.  .


By: /s/ Manotti L. Jenkins
One of Plaintiff's Attorneys

Respectfully submitted,

Dated:  March 18, 2005

By: /s/ Richard B. Myrus
    Richard B. Myrus  (BBO # 638793)
    William Meunier
    Goodwin Procter LLP
    Exchange Place
    Boston, MA 02109
    Telephone:  (617) 570-1058
    Facsimile:  (617) 523-1231


    Larry L. Saret (*pro hac vice*)
    Manotti L. Jenkins (*pro hac vice*)
    MICHAEL BEST & FRIEDRICH LLP
    401 N. Michigan Avenue, Suite 1900
    Chicago, Illinois  60611-4274
    Telephone:  (312) 222-0800
    Facsimile:  (312) 222-0818

    **Attorneys for Plaintiff, Flexi-Mat Corporation**

**A181**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

FLEXI-MAT CORPORATION, an Illinois
corporation,

        Plaintiff,

    v.

DALLAS MANUFACTURING COMPANY,
INC., a Texas corporation, BJ'S
WHOLESALE CLUB, INC., a Delaware
corporation and DOSKOCIL
MANUFACTURING COMPANY, INC., a
Texas corporation.

        Defendants.

Civil Action No. 04 10162 DPW

## PLANTIFF'S RESPONSES TO DEFENDANT DOSKOCIL MANUFACTURING COMPANY, INC.'S FIRST REQUESTS FOR ADMISSION (1-14)

Pursuant to Rule 36 of the Federal Rules of Civil Procedure, plaintiff, Flexi-Mat Corporation ("Flexi-Mat") provides the following responses to defendant Doskocil Manufacturing Company, Inc.'s ("Doskocil") First Requests for Admission (1-14).

## GENERAL STATEMENT

Flexi-Mat will respond to the Requests for Admission on the basis of the best information available to it at the time of gathering relevant materials, within the limits, and subject to the objections described below. The fact that Flexi-Mat is willing to provide a response does not constitute an admission or acknowledgement that the related request is proper, that the request is within the proper bounds of discovery, or that similar requests will be treated in similar fashion. Further investigation may reveal additional information that is relevant to these requests. Flexi-Mat reserves the right to continue discovery and investigation into this matter and to supplement

A182

and/or correct prior Flexi-Mat responses during the trial period and otherwise, based upon Flexi-Mat's most current knowledge and information.

## GENERAL OBJECTIONS

The following General Objections apply to the Requests for Admission and shall have the same force and effect as if set forth in response to each individually numbered request.

A.    Flexi-Mat objects to the requests to the extent that they purport to impose duties on Flexi-Mat or to seek information that exceeds the scope of permissible discovery under the Federal Rules of Civil Procedure.

B.    Flexi-Mat objects to the requests to the extent that they seek information from any person or entity other than Flexi-Mat on the ground that such is not required by the Federal Rules of Civil Procedure.

C.    Flexi-Mat objects to the requests, and the definitions and instructions incorporated therein, to the extent that they are overbroad, unduly burdensome and/or seek information that is neither relevant nor reasonably calculated to lead the discovery of admissible evidence.

D.    Flexi-Mat objects to the requests to the extent that they call for information protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or protection from discovery. Any inadvertent disclosure of material protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or protection from discovery is not intended and should not be construed to constitute a waiver, either generally or specifically, of the privilege or immunity applicable to such material or the subject matter thereof.

E.    Flexi-Mat will search for information relevant to the requests by examining those documents and by interviewing those employees which Flexi-Mat knows or reasonably expects

A183

2

to have relevant information. Flexi-Mat objects to the requests to the extent they impose an unreasonable burden to examine each and every document in Flexi-Mat's possession, custody or control and/or to interview each and every person who might conceivably have knowledge relevant to the subject matter of the requests.

F.    Because all relevant information has not yet been ascertained, Flexi-Mat reserves the right to supplement its responses and assert additional objections as appropriate.

## REQUESTS FOR ADMISSION

### REQUEST NO. 1:

Admit that the Doskocil Accused Product sold under the name "Berkley & Jensen Premium Pet Bed" is constructed such that there are two separate zippered access openings and two separate cushions (i.e., the bolster and the base).

### RESPONSE:

Flexi-Mat objects to this request as vague and ambiguous, in that the terms "separate zippered access openings," "separate cushions" and "base" are unclear and indeterminate. To the extent that Flexi-Mat understands this request, Flexi-Mat admits that the Doskocil Accused Product it has seen has two zippered access openings, a bolster, and a bottom cushion. Flexi-Mat denies the remainder of this request.

### REQUEST NO. 2:

Admit that the Doskocil Accused Product sold under the name "Berkley & Jensen Premium Pet Bed" is constructed such that the bolster cushion and the base cushion are contained within two separate pockets.

### RESPONSE:

Flexi-Mat objects to this request as vague and ambiguous, in that the terms "bolster cushion," "base cushion" and "separate pockets" are unclear and indeterminate. To the extent that Flexi-Mat understands this request, Flexi-Mat admits that in the Doskocil Accused Product it

A184

3

has seen, the bolster is in a pocket and the bottom cushion is in a pocket, and both are within an outer covering. Flexi-Mat denies the remainder of this request.

## REQUEST NO. 3:

Admit that the Doskocil Accused Product sold under the name "Berkley & Jensen Premium Pet Bed" is constructed such that the bolster cushion and the base cushion are inserted and removed via two separate zippered access openings.

## RESPONSE:

Flexi-Mat objects to this request as vague and ambiguous, in that the terms "bolster cushion," "base cushion" and "separate zippered access openings" are unclear and indeterminate. To the extent that Flexi-Mat understands this request, Flexi-Mat admits that in the Doskocil Accused Product it has seen, the bolster and bottom cushion are inserted and removed via zippered access openings in the outer covering. Flexi-Mat denies the remainder of this request.

## REQUEST NO. 4:

Admit that the Doskocil Accused Product sold under the name "Berkley & Jensen Premium Pet Bed" has no "straps" securing or affixing the bolster cushion within or to the fabric cover or to any other part or portion of the pet bed.

## RESPONSE:

Flexi-Mat objects to this request as vague and ambiguous, in that the terms "bolster cushion" and "fabric cover" are unclear and indeterminate. To the extent that Flexi-Mat understands this request, Flexi-Mat admits that in the Doskocil Accused Product it has seen, there are no "straps" securing or affixing the bolster to the outer covering. Flexi-Mat denies the remainder of this request.

## REQUEST NO. 5:

Admit that the Doskocil Accused Product sold under the name "Berkley & Jensen Premium Pet Bed" is constructed such that, in its intended use, the bolster cushion is located primarily on top of (as opposed to adjacent to or outside) the bottom cushion.

A185

4

**RESPONSE:**

Flexi-Mat objects to this request as vague and ambiguous, in that the terms "bolster cushion," and "primarily on top of" are unclear and indeterminate. To the extent that Flexi-Mat understands this request, it is denied.

**REQUEST NO. 6:**

Admit that Figures 1-5 of the '502 Patent illustrate a pet bed having a single zippered access opening for insertion and removal of both the bottom cushion and the bolster cushion.

**RESPONSE:**

Flexi-Mat objects to this request as vague and ambiguous, in that the term "bolster cushion" is unclear and indeterminate. To the extent that Flexi-Mat understands this request, it is admitted.

**REQUEST NO. 7:**

Admit that Figures 1-5 of the '502 Patent illustrate a pet bed having a single compartment for receiving both the bolster and base cushions.

**RESPONSE:**

Flexi-Mat objects to this request as vague and ambiguous, in that the term "compartment" and "base cushion" are unclear and indeterminate. To the extent that Flexi-Mat understands this request, it is denied.

**REQUEST NO. 8:**

Admit that the specification of the '502 Patent (at 2:39-44 and 2:60-63) characterizes the presence of two fabric covers in pet bed construction as a disadvantage (*i.e.*, additional cost to manufacture) and distinguishes the patented invention by claiming a "one-piece cover."

A186

5

**RESPONSE:**

Flexi-Mat objects to this request as vague and ambiguous regarding the phrase "the presence of two fabric covers in pet bed construction as a disadvantage." To the extent that Flexi-Mat understands this request, it is denied.

**REQUEST NO. 9:**

Admit that, during prosecution of the '502 Patent, the Henry reference (U.S. Patent No. 5,010,843) was distinguished based upon its construction having separate covers for the cushion and the base, whereas the '502 invention has "a single cover encompass[ing] both cushions." [*See* Amendment dated September 29, 1997 at p. 5]

**RESPONSE:**

Flexi-Mat objects to this request as vague and ambiguous, because it states that the Henry reference was "distinguished" without making clear whether such distinction purportedly was made by Applicant or the Examiner. Flexi-Mat admits that in the prosecution history of the '502 patent the Amendment dated September 29, 1997 (at p. 5), contains the statement that the invention has "a single cover [that] encompasses both cushions." Flexi-Mat denies the remainder of this request.

**REQUEST NO. 10:**

Admit that Figures 1-5 of the '502 Patent do not illustrate any embodiment wherein the bolster cushion is located on top of the bottom cushion.

**RESPONSE:**

Denied.

**REQUEST NO. 11:**

Admit that the specification of the '502 Patent does not describe any embodiment of the invention wherein the bolster cushion is located on top of the bottom cushion.

**RESPONSE:**

Denied.

A187

**REQUEST NO. 12:**

Admit that claim 1 of the '502 Patent is not literally infringed by any pet bed having separate zippered covers for the base cushion and bolster, respectively.

**RESPONSE:**

Flexi-Mat objects to this request as vague and ambiguous, in that the terms "separate zippered covers" and "base cushion" are unclear and indeterminate. After reasonable inquiry, the information known or easily obtainable to Flexi-Mat is insufficient to enable it to admit or deny this request.

**REQUEST NO. 13:**

Admit that, prior to the filing of the present lawsuit against Doskocil, Flexi-Mat did not provide actual notice under 35 U.S.C. § 287(a) of the '502 Patent to Doskocil.

**RESPONSE:**

Denied.

**REQUEST NO. 14:**

Admit that the [sic] Flexi-Mat has no evidence that the alleged infringement of the '502 Patent by Doskocil was willful.

**RESPONSE:**

Denied.

FLEXI-MAT CORPORATION

Dated: May 10, 2005                    By: _____

Larry L. Saret (*pro hac vice*)
Manotti L. Jenkins (*pro hac vice*)
MICHAEL BEST & FRIEDRICH LLP
401 N. Michigan Avenue, Suite 1900
Chicago, Illinois 60611-4274
Telephone: (312) 222-0800
Facsimile: (312) 222-0818

A188

William A. Meunier
GOODWIN PROCTER LLP
Exchange Place
Boston, Massachusetts  02109
Telephone:  (617) 570-1058
Facsimile:  (617) 523-1231

A189

## CERTIFICATE OF SERVICE

I hereby certify that as true and correct copy of **PLANTIFF'S RESPONSES TO DEFENDANT DOSKOCIL MANUFACTURING COMPANY, INC.'S FIRST REQUESTS FOR ADMISSION (1-14)** was served, via facsimile and first class mail, postage pre-paid, on this 10th day of May 2005 upon:

Gary A. Clark
Darren M. Franklin
SHEPPARD MULLIN
333 South Hope Street, 48th Floor
Los Angeles, California 90071-1448
Facsimile: 213/620-1398

James J. Marcellino (BBO # 318840)
David M. Mello (BBO #634722)
MCDERMOTT, WILL & EMERY
28 State Street
Boston, Massachusetts 02109
Facsimile: 617/535-3800

Roy W. Hardin
M. Scott Fuller
LOCKE, LIDDELL & SAPP LLP
2200 Ross Avenue, Ste. 2200
Dallas, Texas 75201-6776
Facsimile: 214/740-8800

_____
One of the Attorneys for Plaintiff

A190

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

FLEXI-MAT CORPORATION, an Illinois
corporation,

          Plaintiff,

v.

DALLAS MANUFACTURING COMPANY, a
Texas corporation, BJ'S WHOLESALE CLUB,
INC., a Delaware corporation, and DOSKOCIL
MANUFACTURING COMPANY, INC., a Texas
corporation,

          Defendants.

DALLAS MANUFACTURING COMPANY, INC.,
a corporation,

          Counter-claimant,

v.

FLEXI-MAT CORPORATION, a corporation,

          Counter-defendant.

BJ'S WHOLESALE CLUB, INC., a corporation,

          Counter-claimant,

v.

FLEXI-MAT CORPORATION, a corporation,

          Counter-defendant.

DOSKOCIL MANUFACTURING COMPANY,
INC., a corporation,

          Counter-claimant,

v.

FLEXI-MAT CORPORATION, a corporation,

          Counter-defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 04 10162 DPW

PLAINTIFF FLEXI-MAT
CORPORATION'S RESPONSE TO
DEFENDANT DOSKOCIL
MANUFACTURING COMPANY,
INC.'S SECOND REQUESTS FOR
ADMISSION TO PLAINTIFF
FLEXI-MAT CORP.
[15-18]

**REQUEST NO. 15**
Admit that the Doskocil Accused Product sold under the name "Berkley & Jensen Premium Pet Bed" is constructed such that the "bottom cushion" is inserted and removed via a first "zippered access opening," and the "bolster" is inserted and removed via a second "zippered access opening." For purposes of this Request only, the terms "bottom cushion," "bolster," and "zippered access opening" shall be considered to be the same as those respective elements identified by Flexi-Mat in its response to Doskocil Request for Admission No. 1

**RESPONSE:**

As noted by Flexi-Mat in its response to Doskocil Request for Admission No. 1, Flexi-Mat

objects to this request as vague and ambiguous, in that the terms "separate zippered access

openings," "separate cushions" and "base" are unclear and indeterminate. To the extent that

Flexi-Mat understands this request, Flexi-Mat admits that the Doskocil Accused Product it has

seen is constructed such that the "bottom cushion" is inserted and removed via a first "zippered

access opening" in the outer cover and the "bolster" is inserted and removed via a second

"zippered access opening" in the same outer cover.

**REQUEST NO. 16**
Admit that the Doskocil Accused Product sold under the name "Berkley & Jensen Premium Pet Bed" is constructed such that the "bolster" is contained within a first "pocket" and the "bottom cushion" is contained within a second "pocket." For purposes of this Request only, the terms "bottom cushion," "bolster," and "pocket" shall be considered to be the same as those respective elements identified by Flexi-Mat in its response to Doskocil Request for Admission No. 2.

**RESPONSE:**

As noted by Flexi-Mat in its response to Doskocil Request for Admission No. 2, Flexi-Mat

objects to this request as vague and ambiguous, in that the terms "bolster cushion," "base

cushion" and "separate pockets" are unclear and indeterminate. To the extent that Flexi-Mat

understands this request, Flexi-Mat admits that the Doskocil Accused Product it has seen is

constructed such that the "bolster" is contained within a first "pocket" of the outer cover and the

"bottom cushion" is contained within a second "pocket" of the same outer cover.

**REQUEST NO. 17**

Admit that, in the Doskocil Accused Product sold under the name "Berkley & Jensen Premium Pet Bed," the "pocket" for the "bolster" includes a first "zippered access opening," and the "pocket" for the "bottom cushion" includes a second "zippered access opening." For purposes of this Request only, the terms "bottom cushion," "bolster," and "pocket" shall be considered to be the same as those respective elements identified by Flexi-Mat in its response to Doskocil Request for Admission No. 2. Further, for purposes of this Request only, the term "zippered access opening" shall be considered to be the same as those elements identified by Flexi-Mat in its response to Doskocil Request for Admission No. 1.

**RESPONSE:**

As noted by Flexi-Mat in its response to Doskocil Requests for Admission Nos. 1 and 2, Flexi-Mat objects to this request as vague and ambiguous, in that the terms "bolster," "bottom cushion," "pockets," "zippered access opening" are unclear and indeterminate. To the extent that Flexi-Mat understands this request, Flexi-Mat admits that in the Doskocil Accused Product it has seen, the outer cover includes a first "zippered access opening" that provides access to a "pocket" for the "bolster" and the same outer cover also includes a second "zippered access opening" that provides access to a "pocket" for the "bottom cushion."

**REQUEST NO. 18**

Admit that the Doskocil Accused Product sold under the name "Berkley & Jensen Premium Pet Bed" is constructed such that the "pocket" containing the "bolster" is interconnected by stitching to the "pocket" containing the "bottom cushion." For purposes of this Request only, the terms "bottom cushion," "bolster," and "pocket" shall be considered to be the same as those respective elements identified by Flexi-Mat in its response to Doskocil Request for Admission No. 2.

**RESPONSE:**

As noted by Flexi-Mat in its response to Doskocil Request for Admission No. 2, Flexi-Mat objects to this request as vague and ambiguous, in that the terms "bolster" and "pockets" are unclear and indeterminate. Flexi-Mat also objects to this request as vague in that the phrase "the

'pocket' containing the 'bolster' is interconnected by stitching to the 'pocket' containing the 'bottom cushion'" is unclear and indeterminate. To the extent that Flexi-Mat understands this request, Flexi-Mat admits that in the Doskocil Accused Product it has seen, the outer cover includes stitching between two pockets.

Dated _June 24 2005_

_Larry L. Saret_

Larry L. Saret
Michael Husmann
Lisa C. Childs
Michael Best & Friedrich LLP
401 North Michigan Avenue, Suite 1900
Chicago, IL 60611
(312) 222-0800
(312) 222-0818 (fax)

Attorneys for Plaintiff
Flexi-Mat Corporation

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of PLAINTIFF FLEXI-MAT CORPORATION'S RESPONSE TO DEFENDANT DOSKOCIL MANUFACTURING COMPANY, INC.'S SECOND REQUESTS FOR ADMISSION TO PLAINTIFF FLEXI-MAT CORP. [15-18] was served, via facsimile and first class mail, postage pre-paid, on this 27th day of June, 2005 upon:

Gary A. Clark
Darren M. Franklin
SHEPPARD MULLIN
333 South Hope Street, 48th Floor
Los Angeles, California 90071-1448
Facsimile: 213/620-1398

James J. Marcellino
David M. Mello
McDERMOTT, WILL & EMERY
28 State Street
Boston, Massachusetts 02109
Facsimile: 617/535-3800

Roy W. Hardin
M. Scott Fuller
LOCKE, LIDDELL & SAPP LLP
2200 Ross Avenue, Ste. 2200
Dallas, Texas 75201-6776
Facsimile: 214/740-8800

William Meunier
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
Facsimile: 617/523-1231

One of the Attorneys for Plaintiff

A195

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Jesus Benavides    June 30, 2005

46

1    Q.    Okay.  That's three parts?

2    A.    Three parts.  The band for the zipper that I

3    decide to put it back because it's easy --

4    Q.    Okay.

5    A.    -- to assemble.  So that's four.  The two parts

6    on the bottom.

7    Q.    Okay.

8    A.    And the top part.

9    Q.    Okay.

10   A.    Seven total.

11   Q.    Okay.

12   A.    And the construction that you asked, you know,

13   is the same thing, you know.  We create the bolster

14   first.

15   Q.    Right.

16   A.    And then we -- we prepare the zipper with the

17   bottom part.  And then, you know, we assemble the same

18   as the original one.  Top, bottom, and then, you know,

19   the bolster in the middle.  And then we sew all the way

20   around.

21   Q.    And there's -- there's one -- you sew the --

22   you close the bolster and the bottom cushion in one

23   sewing operation; is that right?

24   A.    Top, bottom.

25   Q.    Yes.                          A196

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Jesus Benavides   June 30, 2005

47

1    A.    Bolster previously sew, you know, together.

2    And it's in the middle.   Top, bottom, bolster in the

3    middle, the two parts sew all the way around.

4    Q.    Okay.  So there's two -- two -- two pieces of

5    material for the bottom part that are up.   And then

6    inside that, go the two pieces from the bolster.   And

7    those four are all sewn together in one operation?

8    A.    The four pieces construct bolster -- it's in

9    the middle from top and bottom.

10   Q.    Yes.

11   A.    Bottom have construct two parts.

12   Q.    Okay.

13   A.    So they are practically the same.   Parts got

14   together, you know --

15   Q.    Right, okay.

16   A.    -- at the end, and then sew all the way around.

17   Q.    Okay.

18   A.    And it's practically the same as the operation

19   of the original one.

20   Q.    Okay.

21         MR. HUSMANN:  Why don't we take a little

22   break.  I've got to get a little organized here.

23         MR. HARDIN:  Okay.

24         THE VIDEOGRAPHER:  We're going off the

25   record.  The time is 1:18 p.m.

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FLEXI-MAT CORPORATION, an Illinois corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 04 10162 DPW |
| DALLAS MANUFACTURING COMPANY, INC., a Texas corporation, BJ'S WHOLESALE CLUB, INC., a Delaware corporation, and DOSKOCIL MANUFACTURING COMPANY, INC., a Texas corporation, | ) ) ) ) ) ) ) | **DECLARATION OF M. SCOTT FULLER** |
| Defendants. | ) ) | |
| DALLAS MANUFACTURING COMPANY, INC., a corporation, | ) ) ) | |
| Counter-Claimant, | ) ) | |
| v. | ) ) | |
| FLEXI-MAT CORPORATION, a corporation, | ) ) | |
| Counter-Defendant. | ) ) | |
| BJ'S WHOLESALE CLUB, INC., a corporation, | ) ) ) | |
| Counter-Claimant, | ) ) | |
| v. | ) ) | |
| FLEXI-MAT CORPORATION, a corporation, | ) ) | |
| Counter-Defendant. | ) ) | |
| DOSKOCIL MANUFACTURING COMPANY, INC., a corporation, | ) ) ) | |
| Counter-Claimant, | ) ) | |
| v. | ) ) | |
| FLEXI-MAT CORPORATION, a corporation, | ) ) | |
| Counter-Defendant. | ) | |

### Declaration of M. Scott Fuller

I, M. Scott Fuller, declare as follows:

1.      I am an attorney in the Dallas office of the law firm Locke Liddell & Sapp, LLP. I have personal knowledge of the matters and facts as set forth herein.

2.      On November 29, 2005, I supervised the taking of several photographs of a pet bed manufactured by the Doskocil Manufacturing Company, Inc. under the name "Berkley & Jensen Premium Quality Bolster Pet Bed" (the "Photographs").  It is my understanding that the bed represented in these Photographs is the bed which has been placed at issue by the Plaintiff Flexi-Mat in the above-styled cause.

3.      The Photographs are attached to Defendant Doskocil Manufacturing Company's Motion for Summary Judgment as Appendix pages A200 to A203.  I saw the subject of these Photographs at the time the Photographs were taken.  I recognize these Photographs as representations of the subject that I saw at the time the Photographs were taken.  These Photographs are a true and accurate representation of the subject.


Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury under the laws of the United States of America that is foregoing is true and correct.

Executed on November 29, 2005, in Dallas, Texas.

M. Scott Fuller

A199



[3]                                    [4]

A200



[3]                    [4]

[2]     [1]



[3]     [4]

A202

[1]    [2]



[3]    [4]

A203