# EXHIBIT 24

Suzanne D. Fessler - 11/3/2005

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2           FOR THE DISTRICT OF MASSACHUSETTS

 3

 4    ------------------------------

 5    FLEXI-MAT CORPORATION, an      )  Civil Action No.

 6    Illinois corporation,          )  04 10162 DPW

 7                    PLAINTIFF,      )

 8        vs.                        )

 9    DALLAS MANUFACTURING COMPANY,  )

10    INC., a Texas corporation;     )

11    BJ's WHOLESALE CLUB, INC., a   )

12    Delaware corporation, and      )

13    DOSKOCIL MANUFACTURING COMPANY,)

14    INC., a Texas corporation,     )

15                    DEFENDANTS.    )  (Pages 285)

16    ------------------------------ )

17    AND RELATED COUNTERCLAIMS.     )

18    ------------------------------

19    VIDEOTAPED DEPOSITION OF:

20                    SUZANNE D. FESSLER

21                    THURSDAY, NOVEMBER 03, 2005

22                    9:19 A.M.

23    REPORTED BY:

24                    DONNIE A. STICKLEY

25                    C.S.R. 9510, R.P.R., R.M.R.
```

Suzanne D. Fessler - 11/3/2005

Page 14

1  which this prototype of a dog bed was a project that
2  Suzanne Patterns had in that regard?
3      A. Can you expand the question? I'm not sure
4  what --
5      Q. Sure.
6          What was the project that you were to do
7  with this dog bed?
8      A. Well, they wanted, both of them -- each of
9  them individually at different times wanted me to
10  design a dog bed for them.
11     Q. And approximately when was this?
12     A. Well, Linda would have been in the last
13  four years; Barbara Trister, probably six years ago.
14     Q. And did you design these prototype beds?
15     A. Yes.
16     Q. And can you describe them for me?
17     A. Well, Trister's was kind of a bolster bed
18  with a round cushion and just kind of a semicircular
19  bolster on the top of it.
20         And Linda's was a little more involved.
21  She had more of a -- she was doing a foam rubber,
22  kind of a wall around the outside with a cushion
23  inside; very similar to some of the products or
24  designs that are on the market today.
25     Q. The walled bed, is that what you are

Page 15

1  talking --
2      A. Yes.
3      Q. -- about?
4      A. Yes, yes.
5      Q. Did they provide to you the basic
6  configuration of the bed that they wanted?
7      A. Usually, that's what they did, yes.
8      Q. Okay. And you say that there was one bed
9  that was a, was it a round, like a round pillow on
10  the bottom?
11     A. Uh-huh.
12     Q. And then you say there was a bolster on
13  top?
14     A. Well, I would -- today, we are calling that
15  a bolster, yeah. It was just an attachment of a
16  stuffing, like a stuffed sausage or something around
17  the half of the top edge.
18     Q. What did you call it at the time?
19     A. I don't recall.
20     Q. Okay. What do you understand the bolster
21  to be?
22     A. In what reference?
23     Q. In the reference when call, you talk --
24         You described this bed as being round with
25  a bolster on top of it. I'm trying to find out how

Page 16

1  what you understand the word "bolster" to be.
2      MR. FRANKLIN: Objection to the extent the
3  question calls for a legal conclusion.
4      THE WITNESS: In --
5  BY MR. HUSMANN:
6      Q. You can go ahead.
7      A. Okay.
8      Q. They have the right to object to this, and
9  they will make various objections. Unless there is
10  an instruction not to answer, then --
11     A. Okay.
12     Q. -- the procedure is that you will answer
13  the question.
14     A. Okay. That's fine.
15         At that point, it was, she wanted it there
16  to protect the pet, as the bed was going to be
17  secured, at least in her pictures, against a wall.
18  And she wanted the pet protected from the wall of
19  the house or the room. That was her explanation of
20  what it was.
21         And so she called it a bolster, I believe,
22  at that time.
23     Q. Okay. And was this a, you said it looked
24  like a sausage that was stuffed?
25     A. Kind of, yeah.

Page 17

1      Q. And what was the filler that was used in
2  it?
3      A. We used fiberfill; actually not as nice as
4  what is used today in the beds.
5      Q. And then you also, said the other bed was a
6  walled bed?
7      A. Uh-huh.
8      Q. What do you mean by a walled bed?
9      A. Well, it was a cushion. And then she had
10  foam rubber that we covered to create a surround
11  with the cushion.
12     Q. So that there was a bottom cushion that the
13  pet would lay on?
14     A. Right.
15     Q. And then there was a foam --
16     A. Right.
17     Q. -- piece around it completely enclosing it?
18     A. Yes.
19     Q. I think you said this was Tristen?
20     A. Trister. The name is actually written
21  better in the next line. It says under dog clothes:
22  T-R-I-S-T-E-R. I always put an E in there, but it's
23  really --
24     Q. Okay. Is that a person's name or a
25  company?

5 (Pages 14 to 17)

Suzanne D. Fessler - 11/3/2005

Page 18

1      A.  Barbara Trister?  She was a promoter.
2  She -- what did she do?
3          She actually, if you wanted, let's say, an
4  events planned, okay, you were going to, well, I'm
5  the Emmys, or something, she would be the person to
6  call to plan the event.
7      Q.  Okay.
8      A.  And she would get all the people there, all
9  the caterers; she would do everything.  She was an
10 events planner.
11         And she was a dog lover.  And she decided
12 that she wanted to create this line of dog clothes
13 and accessories.  And so we started on that.
14         She was kind of at retirement age, and she
15 did retire from the event planning.  I have lost
16 track of her since then.
17     Q.  Do you know if these beds were ever
18 commercialized?
19     A.  No, I don't.
20     Q.  You do not know?
21     A.  No.
22     Q.  Do you have any documents that reflect the
23 style of bed that you designed?
24     A.  Possibly.  I would really have to hunt in
25 my office.

Page 19

1          Normally, I give my client all the
2  information, because it is work-for-hire.  So I
3  normally give them all the pictures and stuff that I
4  have created.
5      Q.  But you have not, in connection with this
6  case, gone back and looked for the --
7      A.  No, I haven't.
8      Q.  -- designs you made for these beds?
9      A.  I don't think I have it, but I haven't
10 looked.
11     Q.  You said this wall on this bed that was
12 made for, is it Linda --
13     A.  Uh-huh.
14         THE REPORTER:  May I have verbal answers,
15 please.
16         THE WITNESS:  Yes.  I'm sorry.
17 BY MR. HUSMANN:
18     Q.  You have described it was a round bottom
19 cushion.
20         And what was the purpose of the wall, as
21 you understood it?
22         MR. FRANKLIN:  Objection to the extent the
23 question mischaracterizes prior testimony.
24         THE WITNESS:  I didn't ask her --
25         MR. HUSMANN:  Okay.

Page 20

1          THE WITNESS:  -- the purpose.
2  BY MR. HUSMANN:
3      Q.  I think you have called it a surround?
4      A.  Yes.
5      Q.  Okay.  And what do you mean by a surround?
6      A.  A surround, something that surrounded the
7  bottom cushion.
8      Q.  Okay.  And yet, you have no idea what the
9  purpose of this surround was?
10     A.  I didn't ask her.  I just created it for
11 her.
12     Q.  Okay.  And it was -- what was it?
13         It was made out of foam, is that correct?
14     A.  Yes, it was, foam rubber.
15     Q.  And how big was this bed?
16     A.  Oh, maybe 24 by 18.  It was on the smaller
17 side; it wasn't on the big side.
18     Q.  Okay.  And how thick was the foam wall that
19 was put around the bottom cushion?
20     A.  It was just a couple of inches.  I know we
21 had to cut it with a knife to create the shape that
22 she wanted.
23     Q.  You had to cut the foam?
24     A.  Uh-huh.
25     Q.  And how did you have to cut the foam?

Page 21

1      A.  Well, it wasn't just straight around and
2  tall.  It was about, oh, I think it was about eight
3  inches tall.  And she wanted it shaped so it started
4  tall at what I would call the back, and then it
5  sloped down and around to the front.
6      Q.  Okay.  Other than these two prototypes
7  beds, have you been involved in any other designs of
8  pet beds?
9      A.  I don't believe so.
10     Q.  On Exhibit 332, you then, the next line I
11 think after the dog beds, you say dog clothes; is
12 that correct?
13     A.  Yes.
14     Q.  And what type of dog clothes was involved
15 in this?
16     A.  For Trister, we made coats.
17     Q.  Okay.  What other type of dog clothes have
18 you designed?
19     A.  T-shirts and sweaters, socks, or boots if
20 you will.  I don't know if you could call a collar
21 clothes, but that would be an accessory.
22         I guess that's basically, they don't --
23 there aren't a lot of wide categories for, I don't
24 personally do a lot of costumes, but I have.
25         When I worked, taught at Otis, we did

Suzanne D. Fessler - 11/3/2005

Page 74

1    A. Some inventors call it a bolster and some
2  inventors call it a wall, a sidewall, a surround.
3    Q. And how do people in the pet industry use
4  them? Do they use them interchangeably?
5    A. Yes.
6    Q. And who have you talked to in the industry
7  that use the terms wall and bolster interchangeably?
8    A. The customers that I have dealt with, they
9  kind of don't find a distinction between the two.
10   If you go in the, outside in the retail,
11  they will talk about different pet beds. And some
12  of them, they call them bolsters; some of them they
13  call them walls.
14   It's not, it doesn't seem to have a
15  difference at all in the function of it. It's just
16  in the terminology.
17   Q. The two customers that you dealt with in
18  terms of designing a bed, one of them wanted a
19  bolster?
20   A. Right.
21   Q. And you made a pillow that looked like a
22  sausage, correct?
23   A. That's correct.
24   Q. The other one wanted a wall, and you used a
25  foam piece that stood up around the outside column,

Page 75

1  correct?
2    A. We used the foam piece. I don't recall
3  that she called it a wall. She just, that's how she
4  wanted it structured.
5    Q. Okay. I think we can go back to your
6  testimony on that.
7    And as I understand it, those are the only
8  two pet-bed designs that you have been involved
9  with?
10   A. As I recall, yes.
11   Q. Okay. And then you said, if you go to the
12  retail, if you look at these beds in the market, I
13  believe you said, you believe the terms are used
14  interchangeably?
15   A. Correct.
16   Q. What are you basing that on? What have you
17  done to determine that?
18   A. Well, I went to PETCO to take a look at
19  some of your products, your, Flexi-Mat's products.
20  And I also went on the Internet. And I have gone to
21  also the retailers that have Dallas Manufacturing
22  beds. And then there are, of course, a lot of other
23  beds in the marketplace, too.
24   And looking at them, some of them are
25  calling a bolster, which is actually a very rigid

Page 76

1  sidewall, if you will, they are calling that a
2  bolster. Some of them are not even defining it.
3  They are just saying a snuggle bed that has these
4  walls around it that the pet snuggles into. And
5  they don't define what that side part is.
6    So it's it kind of all over the map, the
7  terminology.
8    Q. Do you in your business use the word wall
9  and bolster interchangeably?
10   A. As regards to pet beds?
11   Q. Anything in your business.
12   A. Other than pet beds, I don't use those
13  terminologies.
14   Q. I believe you used them in regard to a bed
15  for a child, didn't you?
16   A. I stand corrected. Yes, for the baby bed,
17  the baby basket, bump -- she called it like a bumper
18  bolster, that's what she called it, that surrounded
19  the mattress or the --
20   Did she call it a mattress? She called it
21  a mattress. It was a foam-rubber pad that we
22  covered. She called it a mattress pad and cover.
23  And then she called it a bumper bolster that went
24  around it. And that was her terminology.
25   Q. All right. And you made a soft pillow to

Page 77

1  be this bumper bolster, correct?
2    A. It was -- I wouldn't call it a pillow. It
3  was really -- I mean some of the sides were four
4  inches and some were like six to seven inches tall,
5  because it goes from wide to narrow at the base.
6  And it was, it was only about an inch and a half
7  thick with fiberfill. It's kind of a cushy. It's
8  not foam rubber.
9    And I call it more of a bumper pad, but she
10  called it a bolster bumper. That was how she sold
11  it.
12   Q. When you reviewed the '502 patent, did you
13  see a distinction that the patent makes between a
14  wall and a bolster?
15   A. I believe you just called it a bolster.
16   Q. You don't remember the '502 patent talking
17  about a wall at all?
18   A. At the moment, I don't recall. If you want
19  me to look in the patent.
20   Q. No. I'm --
21   A. I don't recall that the words were --
22   Q. Were ever used?
23   A. -- used as a wall.
24   Q. Okay. On page 16 of your report, in the
25  second paragraph, the second sentence of that

20 (Pages 74 to 77)

Suzanne D. Fessler - 11/3/2005

Page 78

1  paragraph states:
2      "But the '981 patent states that
3      the sidewall can vary widely in shape,
4      ranging from a slim wall a
5      quarter-inch thin to a wide cushion a
6      half-foot thick."
7      Now the '981 patent does not talk about a
8  wide cushion at all, does it?
9      MR. FRANKLIN:  Objection; the document
10 speaks for itself.
11     THE WITNESS:  Well, I have, I have quoted
12 it from column six, line 55.  So let's check back.
13     (Deposition Exhibit 321 marked for
14     identification and is retained in the
15     custody of Mr. Husmann.)
16 BY MR. HUSMANN:
17     Q.  I believe if you look at Exhibit 321.
18     A.  Uh-huh.
19     Q.  All right.
20     A.  Line 21.
21     Did I put the wrong number down there?
22     50.  I'm sorry.  I misread it.  55.
23     It actually starts at 52:
24     "Sidewall...made of a soft,
25 flexible foam-core material, such as

Page 79

1  an open-cell or closed-cell foam
2  rubber, or similar material, having a
3  thickness of about one-quarter to six
4  inches."
5      Q.  Does it say --
6      A.  In other words, it varies.
7      Huh?
8      Q.  Does it say anything in there about a wide
9  cushion?
10     A.  Oh.  I guess that's my terminology that I
11 implanted in there.
12     No, it doesn't specifically say it's a
13 cushion.
14     Q.  So you just interchanged the word "cushion"
15 with "sidewall"?
16     A.  Apparently, yeah, apparently that's what I
17 did, yes.
18     Q.  Okay.  The '981 uses the term sidewall?
19     A.  Sidewall.
20     Q.  Not cushion, correct?
21     A.  Correct.
22     Q.  And in that same section, it talks about
23 the thickness of the wall being dependent upon the
24 size and weight of the pet; do you see that?
25     A.  Yes.  It says it is dependent on the size

Page 80

1  and weight of the pet.
2      Q.  And how did you understand that to be?
3  What was the correlation between the thickness of
4  the wall and size of the pet -- the thickness of the
5  wall and the size of the pet?
6      A.  I would assume that the, that, if the pet
7  were bigger, you would want a thicker sidewall so
8  that, if he leaned on it or put his head up on it,
9  reclined, then it would support him better.  A
10 thicker wall would probably be a little more secure.
11     That's what happens with foam rubber.  The
12 thicker it is, the more it will support something.
13     Q.  And if it's too thin for a big dog, the
14 wall can collapse correct?
15     A.  It would, it would put -- compress
16 downwards, yes.
17     Q.  Right.
18     And if it's stiff foam, it could fall in
19 with the head, correct, and deform the wall?
20     A.  Well, it would definitely deform the wall.
21 Whether it would go in or out --
22     Q.  Okay.  Sure.
23     A.  -- I can't say.
24     Q.  Okay.  The Barreto patent at
25 321Exhibit 321, talks about if the wall -- if I can

Page 81

1  find it here.  On column six --
2      A.  Uh-huh.
3      Q.  -- about line 49, 48, 49.
4      A.  Okay.
5      Q.  It says a perimeter wall to define a
6  partial enclosure; do you see that?
7      A.  Yes.
8      Q.  Isn't the ordinary meaning of the term wall
9  something that is going to define an enclosure?
10     A.  In the, in the broad sense of the world,
11 outside world, a wall could be a separating factor.
12 It would not always enclose something.
13     There are other means of enclosing things.
14     Q.  In the general use of the term -- well,
15 strike that.
16     Do you know of any, excluding pet beds that
17 you have talked about that that you believe the
18 terms are used interchangeably, the terms being wall
19 and bolsters, do you know whether or not those terms
20 are used interchangeably in any other area,
21 industry, anyplace else?
22     MR. FRANKLIN:  Objection; lack of
23 foundation.
24     THE WITNESS:  I believe the terms are
25 interchangeable in several senses of like

21 (Pages 78 to 81)

Suzanne D. Fessler - 11/3/2005

Page 82

1  upholsteries, chairs, that sort of thing, where we
2  have pillows, cushions and bolsters to lean against.
3  In Victorian times, they made that distinction of
4  bolsters that were attached to the fainting beds,
5  where they would lay on.
6       As far as a wall is concerned, I think it
7  happens to be the inventor's terminology that he
8  wants to describe it as a wall instead of a bolster,
9  without having the inventor here to ask him
10 specifically.
11      It's not, it's not something made of
12 concrete. It's a stuffed element of his design.
13 And whether he chooses to call it a wall or a
14 bolster, I think that's his license --
15 BY MR. HUSMANN:
16     Q. He could call it a pillow, if he wanted to?
17     A. -- to call.
18      I believe so.
19     Q. On page 16 of your report, in the last
20 sentence you say:
21      "In short, the patent does not
22 limit the shape of the wall..."
23      Do you see that?
24     A. No. You lost me. Oh.
25     Q. It's the last sentence of that paragraph.

Page 83

1      A. The second paragraph. Yes.
2      Q. The second paragraph, yes.
3       Do you see that?
4      A. Yes.
5      Q. What do you, what do you mean when you say
6  the patent doesn't limit the shape of the wall?
7      A. He has already described that his wall
8  could be a quarter-inch thick or six inches thick,
9  half-foot thick. He also doesn't talk about the
10 shape, the height, you know, as specifically a
11 certain height in one area or it shapes down to a
12 smaller area. He doesn't, he didn't specify that.
13 It's not something that --
14      It's not like building a car that this has
15 to be 64ths of an inch and this has to be an inch.
16 He doesn't, you know -- in fact, he takes the total
17 patent idea and puts it in three or four different
18 designs.
19      So he is just creating and describing the
20 way in which he wants to make his, his item not
21 specifically a yardstick with measures and inches
22 and that sort of thing.
23      That's how I, that's why I wrote that,
24 because he does not, he does not specifically has
25 that it has to have a certain shape.

Page 84

1      Q. But there is no --
2       So there is no explicit disclosures of any
3  other shapes?
4      A. No, no.
5      Q. Okay. But he doesn't say it can only be
6  this shape I have got here?
7      A. No, no, because he, it can be, you know,
8  flatter; it can be standing more upright.
9       In a couple of the other figures, he shows
10 teepee shape. So he shows a lot of different,
11 different shapes. He is just talking about what
12 it's going to do for the pet. It's going to have
13 the base cushion; that's going to have its sidewall
14 to protect the pet.
15      That's all he is -- he is not specific --
16     Q. Okay.
17     A. -- in that limit.
18     Q. I'm sorry.
19      Continuing on in that sentence at page 16
20 of your report, and I will just read the whole
21 sentence so it's in context:
22      "In short, the patent does not
23 limit the shape of" sidewalls
24 "allowing for a thick wall that may be
25 more pillow-like than flat and

Page 85

1  upright."
2      A. Correct.
3      MR. FRANKLIN: Objection; the question
4  misstates the report.
5      MR. HUSMANN: All right. Let me ask the
6  question.
7      MR. FRANKLIN: Do you see where you misread
8  it?
9  BY MR. HUSMANN:
10     Q. Do it this way:
11      The sentence says:
12      "In short, the patent does not
13 limit the shape of the wall, allowing
14 for a thick wall that may be more
15 pillow-like than flat and upright."
16      Correct?
17     A. Correct.
18     Q. But it doesn't disclose any wall that's
19 more pillow-like, correct; there is no express
20 disclosure of that?
21     A. There is no --
22     MR. FRANKLIN: Objection; the patent speaks
23 for itself.
24      THE WITNESS: There is no express. He is
25 just saying that it could be tall or short, fat or

Suzanne D. Fessler - 11/3/2005

Page 90

1    Q. It's possible they would?
2    A. Yes.
3    Q. Okay. You concluded --
4        You identify in the Rinz patent,
5    Exhibit 322, the structure that you believe
6    corresponds to the bolster in claim one of the '502
7    patent.
8        (Discussion off the record.)
9        THE WITNESS: The bolster, that would be c.
10   on page 21?
11   BY MR. HUSMANN:
12       Q. Yes.
13       And what I would like you to do is identify
14   in the Rinz patent, Exhibit 322, the structure that
15   you believe corresponds to the bolster that's
16   claimed in claim one of the '502 patent.
17       A. Okay. I'm referring to the insert, which
18   is number 16.
19       Q. Okay. And then the bottom, the structure,
20   what is the structure in the Rinz patent that you
21   believe corresponds to the bottom cushion as claimed
22   in claim one of the '502 patent?
23       A. Well, the bottom cushion, it basically has
24   a combination of two. It's 17, and then in
25   Figure 4, it's identified as 17 in the first

Page 91

1    Figure 2. And then Figure 4 -- no. I'm sorry I was
2    reading it wrong.
3        It's the same thing. It's number 17 in
4    Figure 2 and 4. That's the bottom cushion.
5        Q. Is it your opinion that the Rinz patent
6    teaches one to dispose insert 16 on the outer
7    perimeter of the pillow 17?
8        A. It talks about, teaches that it can be
9    movable; that it doesn't have to be maintained in
10   any one position. So it can be turned around or
11   moved from the, disposed to the outer edge to the
12   top of the pillow.
13       It's, apparently within its covering, it
14   can be moved to whatever is comfortable for the
15   person. It's orthopedic, so what might be
16   comfortable for one person with a back or neck
17   problems might not be comfortable for the next
18   person. So it's teaching that it is flexible.
19       Like I have a back problem, and I would not
20   be able to sleep the way that they have it in this
21   picture here in the patent. That is only one
22   configuration that they have described.
23       Q. They only show one configuration?
24       A. In their, in their pictures in Figure 5, it
25   only shows one way that a person is laying on it.

Page 92

1    But in the embodiment, it talks about there is other
2    positions that they can move this bolster, this top
3    part of their pillow.
4        Q. Okay. What position is the insert 16 shown
5    on the figures of the patent?
6        A. In Figure 2, it's shown a top. And in
7    Figure 3, is shown pushed more towards the outer
8    edge. And Figure 4, it is flattened. That's what
9    they, that's what these pictures are showing.
10       However, when you go into the interior of
11   the patent, it shows in column two, line 53, it
12   says:
13       "The position of the insert 16 can
14       be adjusted by simply rotating the
15       pillowcase 10 having the pocket 15 and
16       insert...received therein, about the
17       conventional pillowcase...in
18       accordance with the preference of the
19       user and thereby prevent and provide
20       relief from morning headaches, stiff
21       neck," et cetera, et cetera.
22       So inherently, I believe that they are
23   showing how you can rotate and move the insert
24   within the various places to be more comfortable for
25   the user.

Page 93

1    Q. You are saying that's an inherent
2    disclosure?
3    A. Well, he says it can be, it can be moved;
4    I'm just saying to what is most comfortable for the
5    user. It says, it specifically says that the
6    position can be adjusted by simply rotating the
7    pillowcase. So my understanding would be that, if I
8    don't want to sleep laying on my back with this
9    thing underneath my neck, if I want to sleep on my
10   side with it positioned in a different place, then
11   what I have to do is rotate that insert to be more
12   comfortable for me.
13       Q. Okay. Am I correct that all of the figures
14   shown in the Rinz patent show the insert on top of
15   the bottom --
16       A. Yes.
17       Q. -- cushion or pillow?
18       A. All the pictures show it that way, yes.
19       Q. Okay. And the only thing, the only
20   disclosure in Rinz about changing from that position
21   is this paragraph on column two that you have just
22   read, correct?
23       A. Correct.
24       Q. And does that paragraph expressly disclose
25   taking that insert completely off the top of the

24 (Pages 90 to 93)