UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FLEXI-MAT CORPORATION, an Illinois corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil Action No. 04 10162 DPW |
| | ) | |
| DALLAS MANUFACTURING COMPANY, a Texas corporation, BJ'S WHOLESALE CLUB, INC., a Delaware corporation, and DOSKOCIL MANUFACTURING COMPANY, INC., a Texas corporation, | ) ) ) ) ) ) | Flexi-Mat's Statement of Contested Facts in Response to Defendants' Statements Submitted in Response To Flexi-Mat's Motion for Summary Judgment of Validity |
| | ) | |
| Defendants. | ) | |
| DALLAS MANUFACTURING COMPANY, INC., a corporation, | ) ) | |
| | ) | |
| Counter-claimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FLEXI-MAT CORPORATION, a corporation, | ) | |
| | ) | |
| Counter-defendant. | ) | |
| BJ'S WHOLESALE CLUB, INC., a corporation, | ) | |
| | ) | |
| Counter-claimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FLEXI-MAT CORPORATION, a corporation, | ) | |
| | ) | |
| Counter-defendant. | ) | |
| DOSKOCIL MANUFACTURING COMPANY, INC., a corporation, | ) ) | |
| | ) | |
| Counter-claimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FLEXI-MAT CORPORATION, a corporation, | ) | |
| | ) | |
| Counter-defendant. | ) | |

In accordance with Local Rule 56.1, Plaintiff Flexi-Mat Corporation hereby provides a concise statement of the material facts of record as to which Flexi-Mat controverts the statement served by defendants.  Defendants have not directly controverted any of Flexi-Mat's material facts.  In its response, Flexi-Mat has used both the exhibit references it submitted to the Court with its opening Statement of Material Facts and the parallel exhibit references used by defendants.

### STATEMENT OF MATERIAL FACTS CONTESTED BY FLEXI-MAT

1. All Defendants contend that the '502 Patent is invalid under 35 U.S.C. §§ 102 and/or 103 in view of numerous references, including but not limited to the following: 5,421,044 to Steensen ("the '044 Patent"); 5,136,981 to Barreto ("the '981 Patent"); 5,588,393 to Heilborn ("the '393 Patent"); 5,826,537 to Heilborn ("the '537 Patent"); 4,754,513 to Rinz ("the '513 Patent"); 5,586,350 to Thönnessen ("the '350 Patent"); German Patent No. 93 09699.2 to Hoechst AG ("the '699 Patent"); 4,872,228 to Bishop ("the '228 Patent"); Article by AB. Murray and AC. Ferguson, Dust Free Bedrooms in the Treatment of Asthmatic Children With House Dust or House Dust Mite Allergy (the "Murray Article"); Article by M. L. Walshaw and C.C. Evans, Allergen Avoidance in House Dust Mite Sensitive Adult Asthma (the "Walshaw Article"); Article by Marc L. Rivo and Floyd J.  Malveaux, Outpatient Management of Asthma in Adults (the "Rivo Article"); 4,873,734 to Pollard ("the '734 Patent"); 5,010,843 to Henry ("the '843 Patent"); 655,087 to Jones ("the '087 Patent"); 2,408,382 to Dubick ("the '382 Patent"); 3,566,423 to Reinfeldt ("the '423 Patent"); 3,902,456 to David ("the '456 Patent"); 5,455,973 to Brumfield ("the '973 Patent"); 2,032,248 to Bins ("the '248 Patent"); 5,109,559 to West ("the '559 Patent"); Japanese patent publication number 07-051154; European patent number 633,338; DE 3138463; and all prior art referenced, discussed and/or cited in the prosecution of the '502 Patent. Exhibit A at 9,14,17,18,19,23,27,30,31,32,37,42; Exhibit B at 11; Exhibit C at 6.

**Contested.**  Defendants have never applied any prior art to claims 1-3 (the only claims at issue) besides U.S. Patent Nos. 5,421,044 to Steensen ("the '044 Patent"); 5,136,981 to

Barreto ("the '981 Patent"); 5,588,393 to Heilborn ("the '393 Patent"); 5,826,537 to Heilborn ("the '537 Patent"); 4,754,513 to Rinz ("the '513 Patent"); 5,586,350 to Thönnessen ("the '350 Patent"); German Patent No. 93 09699.2 to Hoechst AG ("the '699 Patent"); 4,872,228 to Bishop ("the '228 Patent"); Article by AB. Murray and AC. Ferguson, Dust Free Bedrooms in the Treatment of Asthmatic Children With House Dust or House Dust Mite Allergy (the "Murray Article"); Article by M. L. Walshaw and C.C. Evans, Allergen Avoidance in House Dust Mite Sensitive Adult Asthma (the "Walshaw Article"); Article by Marc L. Rivo and Floyd J.  Malveaux, Outpatient Management of Asthma in Adults (the "Rivo Article"); 4,873,734 to Pollard ("the '734 Patent"); 5,010,843 to Henry ("the '843 Patent"); and 2,032,248 to Bins ("the '248 Patent"). Specifically, U.S. Patent Nos. 655,087 to Jones ("the '087 Patent"); 2,408,382 to Dubick ("the '382 Patent"); 3,566,423 to Reinfeldt ("the '423 Patent"); 3,902,456 to David ("the '456 Patent"); 5,455,973 to Brumfield ("the '973 Patent") and "all prior art referenced, discussed and/or cited in the prosecution of the '502 Patent" have not been applied to claims 1-3, despite Flexi-Mat's interrogatories requesting such application.

2. The references cited by Defendants either anticipate one or more of claims 1-3 of the '502 Patent, or render such claim(s) obvious in view of other cited art, if the claims are construed to cover Defendants' accused pet beds. Exhibit A at 9.

**Contested**.  Flexi-Mat's position with respect to Defendants' references being insufficient to invalidate any of claims 1-3 are set forth at Flexi-Mat's Validity Statement of Facts Nos. 8-66.  Specifically, the missing limitations of the allegedly anticipatory patents are identified in the table below taken from Statement No. 66.

| Claims 1 of the '502 Patent | Defendants' Alleged Anticipatory Prior Art | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 5,136,981 (Barreto) | 5,588,393 5,826,537 (Heilborn) | 4,754,513 (Rinz) | 5,586,350 (Thönnessen) | 4,872,228 (Bishop) | 4,873,734 (Pollard) | 5,010,843 (Henry) | 5,421,044 (Steensen) | 2,032,248 (Bins) |
| A pet bed comprising: | | | X | X | X | X | | X | |
| an outer covering; | | | | | | | | | |
| a removable cushion disposed within the outer covering to form a cushioned bottom portion; and | | | | | | | | | |
| a bolster removably disposed within the interior of the outer covering and | X | X | | | | | | X | X |
| substantially all of said bolster disposed exteriorly about at least a portion of the perimeter of the bottom portion | | | X | X | X | X | X | | X |
| [a bolster being disposed] without being secured to the removable cushion. | | | | | | | | X | |

3. Each of the references cited by Defendants are within the field of the inventor's endeavor, or at a minimum are reasonably pertinent to pet beds and the problems addressed by the inventor. Exhibit D at 5:23 to 10:2, 18:13 to 19:13; Exhibit H at 44:7 to 45:7,89:21 to 90:2,122:820.

**Contested**. Whether a reference is "within the field of the inventor's endeavor" is irrelevant for allegedly anticipatory art. Moreover, none of the non-pet bed art is within the field of the inventor's endeavor. Only four patents asserted by defendants as anticipatory, U.S. Patent Nos. 5,136,981 (Barreto), 5,588,393 and 5,826,537 (collectively Heilborn), and 5,010,843 (Henry), pertain to pet beds. U.S. Patent No. 2,032,248 (Bins) also features a pet bed. See Flexi-Mat's Validity Statement of Facts Nos. 9, 46.

4. Each of the '981, '393, and '537 Patents disclose structures which are "bolsters." Exhibit A at 15-16, 44-45; Exhibit E; Exhibit F; Exhibit G.

**Contested**.  The term *bolster*, as used in the patent-in-suit, means a long, narrow pillow, and does not include the walls of Barreto and Heilborn (the '981, '393, and '537 patents).  Flexi-Mat's Validity Statement of Facts No. 21.

The plain meaning of the claim language, the specification, and the use of the terms "bolster" and "wall" in the art establish that they are two different structures.  A *bolster* is commonly understood to be a long pillow or cushion.  http://www.m-w.com/dictionary.  FM Validity Ex. 22.  The '502 patent confirms that this ordinary usage of the term "bolster" is intended:  the patent describes the bolster as a "long, slender pillow," (FM Validity Ex. 1, Defs. Ex. J, at Col. 3, line 4) and "more cylindrical or banana-shaped than flat, and more like a pillow than a wall." *Id.* at Col. 2, lines 56-57 so that it "tends to retain its shape even when used as a pillow by the pet, and does not easily collapse from the weight of the pet as in some prior art products." *Id.* at Col. 2, lines 58-60.  Flexi-Mat's Validity Statement of Facts No. 17.

The '502 patent describes previously-known walled pet beds as being unsatisfactory because the wall "does not provide support for heavier … animals" to use as a headrest and "tends to collapse … unless it is made of material so rigid that it is uncomfortable." *Id.* at Col. 1, lines 21-26.  The '502 patent then distinguishes a bolster from a wall in that the bolster, unlike the wall, "tends to retain its shape even when used as a pillow by the pet, and does not easily collapse from the weight of the pet." *Id.* at Col. 2, lines 57-60.  Flexi-Mat's Validity Statement of Facts No. 18.

The '981, '393, and '537 patents (Barreto and Heilborn) disclose structures which are walls.  Flexi-Mat's Validity Statement of Facts Nos. 10-16.

5. A "bolster" can be any structure that surrounds the base and provides support; the term broadly includes embodiments such as an upraised back rest on an article of furniture and can take on a variety of other embodiments. Exhibit D at 18:6 to 19:13; Exhibit A at 16; Exhibit H at 46:2-14, 73: 18 to 74:5; 81: 16 to 82: 18; Exhibit I at 64:3-17.

**Contested**.  See Flexi-Mat's response to Statement No. 4 above.  Moreover, the inventor's testimony (Ex. D at 18:6 to 19:13) does not describe a bolster as "an upraised back rest."  He described the bolster in the following ways:

- A bolster is "like a back rest for furniture." FM Validity Ex. 25 at 18:16-17.

- "What we call a bolster is more of a rounded pillow.  There's a foam chair that we make that has a bolster, it's what you lean back against, but it's just like a sausage shaped pillow."  FM Validity Ex. 25 at 18:22-19:2.

- "Wall is usually a solid filling and a bolster has loose filling."  FM Validity Ex. 25 at 45:22-23.

- "a soft form like this, you would call it a bolster because it basically forms around in kind of a sausage.  A wall would be more like a sheet of foam, you know, that would stand up.  And what they wanted was a soft rounded structure, not just a straight wall."  FM Validity Ex. 26 at 20:22-21:2.

- "in furniture terms, a bolster is like a pillow that you would lean against.  In a dog bed, it's … like a sausage shaped pad that sits higher than the seating portion of the bed."  FM Validity Ex. 26 at 21:5-9.

- "A wall would be made from a layer of foam and bent like a wall like that and a bolster is a soft form round pillow."  FM Validity Ex. 26 at 83:17-19.

- A bolster is "designed to be more of a soft almost like a back rest or a pillow versus just an enclosing wall."  FM Validity Ex. 26 at 83:23-25.

- "A bolster is more of a cushion and a wall is more of a delineating line than a cushion." FM Validity Ex. 26 at 86:2-4.

- "A bolster is something the dog rests against like a pillow versus a wall."  FM Validity Ex. 26 at 86:9-10.

In other words, the inventor's testimony is consistent with the patent specification, the patent claims, and the ordinary meaning of the terms *bolster* and *wall*.

6. The '981 Patent discloses a sidewall 42 which can vary widely in shape, ranging from a slim wall to a wide cushion, i.e., a "bolster." Exhibit A at 16; Exhibit E at 6:52-58.

**Contested**. While the '981 patent (Barreto) discloses a sidewall which can vary in **thickness**, it does not disclose one which varies in **shape** nor does it disclose a bolster. See responses to Statement Nos. 4-5.

7. The specification of the '981 Patent does not limit sidewall 42 to that of a thin, vertical member; sidewall 42 may be of virtually any size and shape, including a pillow-like configuration. The dimensional size of sidewall 42 is "dependent upon the size and weight of the pet, and the particular configuration of the embodiment selected." Exhibit A at 16; Exhibit E at 6:55-58.

**Contested**. The '981 patent (Barreto) does not disclose that a wall can be pillow-like, and defendants' expert conceded this. FM Validity Ex. 24 at 84:18-24. Barreto describes its invention as featuring "some form of sidewall against which the pet may lean" (FM Validity Ex. 3, Defs. Ex. E, at col. 3, lines 12-13, see also col. 3, lines 57-58); the sidewall has "a generally upright orientation" (*Id.* at col. 4, line 21) and "a generally erect intended configuration above said floor" (*Id.* at claim 1, col. 13, lines 21-22). Such upright, erect walls for leaning against are not pillows for reclining on. Because the sidewall 42 is a wall, the teaching that "the thickness of sidewall 42 and base 44 is dependent upon the size and weight of the pet, and the particular configuration of [the] embodiment selected" is a teaching that the wall should be thick enough to support the size of pet expected to lean against it and still maintain its generally upright configuration.

Defendants' expert explained that the correlation between the thickness of the wall and size of the pet in Barreto was so that "if the pet were bigger, you would want a thicker sidewall so that, if he leaned on it or put his head up on it, reclined, then it would support him better." FM Validity Ex. 24 at 80:6-10.

8. Each of the '393 and '537 Patents disclose a foam core 106 which is not limited to any specific shape or size, i. e., a "bolster." Exhibit A at 44.

**Contested**. The '393 and '537 patents (Heilborn) disclose walls, not bolsters. Heilborn explicitly describes its side parts as walls and its invention is described as one in which the walls of the semi-enclosed type of pet bed can be collapsed for shipping. FM Validity Ex. 5, Defs. Ex. G, at col. 2, lines 10-14. The walled bed "provide[s] the animal with a sheltered, semi-enclosed bed in which the pet feels secure." *Id.* at Col. 1, lines 17-19.

Defendants' own expert, when asked about Heilborn's wall made from an "upstanding foam core," could only respond that the difference between a pillow and wall was one of "semantics."

> Q. Okay. And do you consider an upstanding foam core to be a bolster?
> A. It could be referred to as that. It could be, another inventor could call it a bolster.
> Q. Do you consider it to be a bolster?
> A. I think it's semantics. I think a bolster, if it's a stuffed unit within a covering, it could be stuffed with peanuts; it could be stuffed with foam; it could be stuffed with fiberfill, it could be stuffed with batting, blown in, or whatever, it still creates an outer area for the pet. So whether do you call it a bolster or a wall I think is semantics. It's still, it's not solid. Yet, as we would go over to the wall of this room and say, this is a wall, and I hit it and I hurt my hand, this is not the same sort of structure. So I would consider any of these terms cushion/bolster/wall to be interchangeable.

FM Validity Ex. 18, Defs. Ex. H, at p. 149.

There is no disclosure of varying the *shape* of the sidewall so that it could become a bolster.

9. There is no difference for purposes of anticipation between the bolster structures of the '981, '393, and '537 Patents and the "bolster" of claims 1,2 and 3 of the '502 Patent. Exhibit I at 138:4 to 139:7; Exhibit H at 149:5 to 150: 11; Exhibit A at 16,44.

**Contested**. The '981 (Barreto) and '393 and '537 (Heilborn) patents disclose walls, not bolsters. See responses to Statements 5-9.

10. According to Defendants' expert, Suzanne Fessler, the term "bolster" broadly encompasses structures providing either protection or comfort. Exhibit H at 46:2-14.

**Contested**. Ms. Fessler testified that "the bolster is … a comfort factor. A bolster is something that a pet can lay its head on; a bolster is something it can lean against. A bolster could be a pillow … semantics could be used a lot interchangeably with those two things. But a bolster sometimes is protection; sometimes it's comfort." Defs. Ex. H at 46:2-10. The patent-in-suit describes the bolster pet bed as meeting the need for a pet's comfort, regardless of whether the animal is light or heavy (FM Validity Ex. 1, Defs. Ex. J, at col. 1, lines 58-60; col. 2, lines 57-60). It does not state that the bolster pet bed is a structure providing protection.

11. According to Defendants' expert, Suzanne Fessler, the terms "wall" and "bolster" are used interchangeably in the pet industry. Exhibit H at 73:18 to 74:5,81:16 to 82:18.

**Contested**. Defendants' expert claims that the terms are used interchangeably. Defendants' expert, however, acknowledged that she has designed a bolster pet bed, featuring a "pillow that looked like a sausage", and a second pet bed with a "wall" or "a foam piece that stood up around the outside column." FM Validity Ex. 24 at 74:17-75:4; see also 14:16-18; 20:18-22.

12. Each of the '981, '393, and '537 Patents disclose a pet bed having a "bolster" within the meaning of the '502 Patent. Exhibit E; Exhibit F; Exhibit G; Exhibit A at 15-16,44-45; Exhibit H at 73:18 to 74:5, 145:17 to 150:3.

**Contested**. See Flexi-Mat's responses to Statement Nos. 4-12.

13. The '502 Patent makes clear that pets customarily occupy furniture and human beds, that pet beds are sometimes designed with such furniture in mind, and that such furniture is related to pet bedding. Exhibit J at 1:9-20.

**Contested**. Although the '502 patent-in-suit explains that pets may occupy furniture and human beds, the patent does not state that pets *customarily* occupy furniture and human beds or that pet beds are designed with such furniture in mind or that such furniture is related to pet bedding, except to the extent that "many animals would rather occupy a favorite couch or human bed than sleep on a mere cushion." Defs. Ex. J at col. 1, lines 12-13.


14. The '734 Patent makes clear that pets commonly occupy furniture and human beds. Exhibit L at 1:13-20.

**Contested**. The '734 (Pollard) patent states: "The present invention relates to bed-type restraints and, in particular, to a removable bumper restraint which is incorporated into a covering or sheet used in a crib or other bed-type restraint having surrounding rails or slats or the like, for preventing children or the infirm (or even animals or inanimate objects) from getting stuck or injured by the restraining slats or rails." FM Validity Ex. 9, Defs. Ex. L, at 1:13-20. This statement does not locate the animal within the crib, and certainly does not establish that pets *commonly* occupy cribs or other bed-type restraints.


15. Both the '537 and '393 Patents disclose a pet bed having an upstanding foam core 106; such structure is not limited to any particular shape. Exhibit F; Exhibit G; Exhibit A at 44; Exhibit H at 147:8 to 150:3.

**Contested**. See Flexi-Mat's responses to Statement Nos. 6-8.


16. The upstanding foam core 106 of the '537 and '393 Patents is a "bolster" within the meaning of the '502 Patent. Exhibit A at 44-45; Exhibit H at 145:17 to 148:2.

**Contested**.  See Flexi-Mat's responses to Statement Nos. 8-9, 12, 15.

17. The apparent preference of animals, such as dogs, to sleep with their backs against a supporting structure (such as in a "cradle" or "trough") was well known in the art prior to the '502 Patent. Exhibit E at 1:21-42; Exhibit M at 1:16-20.

**Contested**.  While it was asserted in Barreto (the '981 patent, FM Validity Ex. 2, Defs. Ex. E) that there is a known pet bed that features a base and sidewall permanently joined to form a cradle and Henry (the '843 patent, FM Validity Ex. 10, Defs. Ex. M) describes dogs as "hav[ing] an instinct to withdraw into recesses or trough-like depressions", these descriptions do not establish that it is well known in the art that dogs prefer to sleep with their backs against a supporting structure.

18. The '513 Patent discloses a structure in which, in certain configurations, "substantially all of the bolster is disposed exteriorly about the perimeter of the bottom portion." Exhibit A at 22.

**Contested**.  The '513 patent (Rinz, FM Validity Ex. 6, Defs. Ex. N) discloses an orthopedic pillowcase that encases an insert (the alleged bolster) located entirely on top of a pillow (the alleged bottom cushion).  As explained by Flexi-Mat's expert, Rinz does not disclose a bolster substantially all of which is disposed exteriorly about at least a portion of the perimeter of the bottom portion.

> Rinz does not teach a bolster substantially all of which is disposed exteriorly about at least a portion of the perimeter of the bottom portion.  Rinz teaches to place the insert, the alleged bolster, **on top** of a conventional pillow, the bottom cushion.

FM Validity Ex. 16 at p. 13 (emphasis added).

19. The '513 Patent states that the purpose of the invention disclosed therein is broader than simply relieving neck pain; rather, the invention may be useful in preventing and providing

relief from morning headaches, stiff neck, pain in the back, shoulders and arms, tension, and generally proving for a comfortable, relaxing slumber. Accordingly, it is well within the scope and teaching of the '513 Patent to rotate the bolstered insert as suggested in the expert report of Suzanne Fessler at page 22. Exhibit A at 22; Exhibit N at 2:53-60.

**Contested**.  Col. 2, lines 53-60 of the Rinz patent (FM Validity Ex. 6, Defs. Ex. N) states:

> The position of the insert 16 can be adjusted by simply rotating the pillowcase 10 have the pocket 15 and insert 16 received therein, about the conventional pillow 17 in accordance with the preferance [sic] of the user and thereby prevent relief from morning headache, stiff neck, pain in the back, shoulders, and arms, tension and generally provide for a comfortable, relaxed sleep.

This does not teach that one should change the only disclosed location of the insert 16, atop the pillow 17, while rotating the pillowcase.  There certainly is no teaching or suggestion in the Rinz patent to rotate the pillow case in the manner suggested by Ms. Fessler. The rotation actually suggested by the Rinz patent in keeping with the purpose of the pillow, *i.e.*, relieving neck pain and the like, is an amount of rotation to adjust the insert's location atop the pillow.  If one were to rotate the pillow case as Ms. Fessler suggests, the insert would simply compress the pillow inside the pillow case and in effect become part of that pillow.  FM Validity Ex. 16 at pp. 13-14.

20. The '350 Patent discloses a structure in which, in certain configurations, "substantially all of the bolster is disposed exteriorly about the perimeter of the bottom portion." Exhibit A at 26.

**Contested**.  Defendants' expert has conceded that the '350 patent (Thŏnnessen) features a bolster atop the bottom portion.  See FM Validity Ex. 19, Defs. Ex. B, at 21.

21. The '350 Patent places no functional or structural limitation as to the location of the bolster structure relative to the base cushion (pillow), and there is no function served by positioning the bolster structure at any given point around the base cushion. Exhibit K.

**Contested**.  The '350 patent (Thõnnessen) teaches that the bolster "is particularly suitable for supporting the neck (neckroll)."  FM Validity Ex. 7, Defs. Ex. K, at col. 2, lines 40-42. Because the bolster of the '350 patent is to support the neck, it should be positioned where the user's neck is, namely, atop the pillow in the position shown in Figures 1 and 2.

22. The bolster structure of the '350 Patent is not limited to any particular point of attachment or position relative to the base cushion (pillow), and may be "connected detachably to the pillow at a suitable position." Exhibit K at 5:52-55.

**Contested**.  The '350 patent (Thõnnessen) teaches that the bolster "is particularly suitable for supporting the neck (neckroll)."  FM Validity Ex. 7, Defs. Ex. K, at col. 2, lines 40-42. A suitable position for the bolster or neckroll is thus where the user's neck is, namely, atop the pillow in the position shown in Figures 1 and 2 of the '350 patent.  Thõnnessen does not teach any other location for the neckroll.

23. The bolster of the '228 Patent is disposed atop the mattress. But if claim 1 of the '502 Patent were read to cover a bed, like the accused Dallas Manufacturing beds, with the bolster atop the bottom cushion, then claim 1 would be anticipated by the '228 Patent, because then the '228 Patent would disclose a structure in which "substantially all of the bolster is disposed exteriorly about the perimeter of the bottom portion." Exhibit A at 30.

**Contested**.  The bolster of the '228 patent (Bishop) is disposed atop the mattress. However, Dallas Manufacturing's bed is not like Bishop's bed, where all of the top cushion lies over the bottom cushion.  Compare Ex. B of FM Infr. Ex. 3 with Figs. 1, 2 and 3 of FM Validity Ex. 8; Handelsman January 9, 2006 Decl. at ¶8 (submitted in opposition to defendants' motions for summary judgment).

24. The bolster of the '734 Patent is disposed atop the mattress. But if claim 1 of the '502 Patent were read to cover a bed, like the accused Dallas Manufacturing beds, with the bolster atop the bottom cushion, then claim 1 would be anticipated by the '734 Patent, because then the '734 Patent would disclose a structure in which "substantially all of the bolster is disposed exteriorly about the perimeter of the bottom portion." Exhibit A at 35.

**Contested**.  The bolster of the '734 patent (Pollard) is disposed atop the mattress. However, Dallas Manufacturing's bed is not like Pollard's bumper sheet, where all of the top cushions are atop the mattress.  Compare Ex. B of FM Infr. Ex. 3 with Figs. 1-6 of FM Validity Ex. 9; Handelsman January 9, 2006 Decl. at ¶8 (submitted in opposition to defendants' motions for summary judgment).

25. The bolster of the '843 Patent is disposed atop the mattress. But if claim 1 of the '502 Patent were read to cover a bed, like the accused Dallas Manufacturing beds, with the bolster atop the bottom cushion, then claim 1 would be anticipated by the '843 Patent, because then the '843 Patent would disclose a structure in which "substantially all of the bolster is disposed exteriorly about the perimeter of the bottom portion." Exhibit A at 40.

**Contested**.  The bolster of the '843 patent (Henry) is disposed atop the mattress. However, Dallas Manufacturing's bed is not like Henry's dog bed, where the top cushions are atop the mattress.  Compare Ex. B of FM Infr. Ex. 3 with Figs. 1-6 of FM Validity Ex. 10, Defs. Ex. M; Handelsman January 9, 2006 Decl. at ¶8 (submitted in opposition to defendants' motions for summary judgment).

26. The '843 Patent discloses an embodiment where the top cushions "extend beyond the edges of the base cushion." Exhibit M at 3:18-19.

**Contested.**  When read in context, the '843 patent (Henry) states, "Also, in other alternative embodiments in accordance with the invention, the top cushions need not entirely

cover the base cushion, and conversely, the top cushions can extend beyond the edges of the base cushion." FM Validity Ex. 10, Defs. Ex. M, at col. 3, lines 16-20.

27. The '843 Patent discloses an embodiment where the base cushion of the pet bed is a square shape, and the top cushions are complimentary portions of such square. In such an embodiment, the top cushions may be stitched to the base cushion along only one side each, making the top cushions pivotable about the stitching such that the top cushions could rest either atop the base cushion or alongside it. Exhibit M at 3:8-15.

**Contested**. The '843 patent (Henry) does disclose a square embodiment with the top cushions being complimentary portions of the square. However, Henry repeatedly emphasizes that nearly the entirety of the perimeter of the top cushions should be stitched down. FM Validity Ex. 10, Defs. Ex. M, at col. 1, lines 40-42; col. 2, lines 21-22, lines 40-42; col. 3, lines 24-25; col. 4, lines 10-13, lines 16-21. The only portion of the top cushions that Henry mentions could be unattached are the "diametral portions", i.e., the portions extending across the diameter of the circular cushion or the interior of other cushion shapes. E.g., col. 2, lines 30-35 (referring to diametral edges 24, 26). Absent a teaching that "the top cushions may be stitched to the base cushion along only one side each," the top cushions of Henry are not "pivotable about the stitching such that the top cushions could rest either atop the base cushion or alongside."

28. The '044 Patent discloses a removable bolster which is not secured to the bottom cushion. The removable bolster is represented in the '044 Patent as tubes 31-36. Each such air tube is removable from the interior of the outer covering 12 when zipper 12 is unzipped. Exhibit A at 12; Exhibit H at 45:8-21.

**Contested**. The '044 patent (Steensen) does not disclose a removable bolster which is not secured to the bottom cushion.

Because Steensen pertains to an air bed, each of the air tubes is connected to each other.  Fig. 9 of the patent is a diagram of the Steensen air system and shows that the "cushion tubes" and the "bolster tubes" are all connected together by air hoses that are then connected to a manifold and air pump outside of the bed. Fig. 7 shows the air hoses connecting some of the air tubes that have been enclosed in magazine 65.  FM Validity Ex. 11, Defs. Ex. O.

Steensen's interconnection of "bolster air tubes" with the rest of the air tubes and the manifold and air pump makes this alleged "bolster" non-removable.

> The term "removable cushion" is used in the '502 patent to describe a cushion that is designed to be removed from the outer cover and then replaced. "the pet bed should be . . . equipped with a one-piece cover and separately removable bolster and bottom cushion for ease of cleaning."  Col. 1 lines 60-64. Again at Col. 3, lines 8-17 the patent discusses the construction of the pet bed in a manner that provides for the ease of removing and replacing the bolster and bottom cushion. . . .
> A pet bed with a removable cushion as described in the '502 patent is one that is specifically designed in a manner such that the bolster and bottom cushion can readily be removed and replaced and excludes the removal by a means that would require excessive effort as to discourage a pet bed owner from removing the bolster and bottom cushion or destroy the bed.

FM Validity Ex. 16 at p. 7.

As shown in the Steensen patent, each of the air tubes, including "bolster air tubes" 31-36, are secured to air tubes 42 which are part of the bottom cushion.

29. The '044 Patent suggests an embodiment wherein the perimeter bolster tubes 31-36 are utilized to prevent the user from falling out of the bed. Exhibit O at 6:28-41.

**Uncontested**.

30. Bolster tubes 31-36 of the '044 Patent may be maintained at a selected air pressure by a set of hoses 77. The base air tubes 42 of the '044 Patent may be maintained at a selected air pressure by a separate set of hoses 77. The bolster tubes 31-36 of the '044 Patent are not secured to base air tubes 42. Exhibit O at Fig. 9, 6:19-28.

**Contested**.  Figure 9 of the '044 patent (Steensen) shows the tube 31 sharing the same hose with two upper base air tubes 42, collectively shown as D in Figure 9.  FM Validity Ex. 11, Defs. Ex. O, col. 7, lines 14-17.  Similarly, tube 36 shares the same hose with three upper base air tubes and five base air tubes, collectively shown as C in Figure 9.  *Id.* at col. 6, lines 47-50.  Thus, the base air tubes do not have "a separate set of hoses."  Moreover, all of the hoses originate from the same manifold block 71 and pass through the same hole 80 in the bottom panel 14, and they secure the bolster and base air tubes.  *Id.* at col. 7, lines 37-43.

31. The foam pads 58 and 59 of the '044 Patent may be excluded. Exhibit A at 12.

**Contested**.  Steensen's bed or mattress is made from the combination of all of the air tubes and the foam pads 58, 59 to "provide a level top surface."

> The air tubes are fitted into the outer covering and either or both of "egg crate" polyurethane foam pad 58 and rectangular polyurethane foam pad 59 are then placed on top of the upper laterally disposed cushion air tubes 42 in the space bounded by upper side bolster air tubes 32, 33, 34 and 35 and upper end bolster air tubes 31 and 36. The foam pads are used to provide a soft cushioned feel to the user, and to provide a level top surface. The top surface would otherwise have its outside edges extending substantially above the interior portions of the top surface due to the fact that the bolster air tubes 31, 32, 33, 34, 35, 36, 37, 38, 39 and 40 will typically be 8" diameter tubes while all the interior tubes (i.e., the upper laterally disposed cushion air tubes 42 and the lower laterally disposed cushion air tubes 45) will be 7" diameter tubes, and the height of the two levels of bolster tubes will therefore be 2" greater than the height of the two levels of interior tubes.

FM Validity Ex. 11, Defs. Ex. O, at col. 4, lines 20-37.

32. The assorted structures of the bed disclosed in the '044 Patent are all "removable" because the bed is specifically disclosed in terms of a preferred "transport" embodiment. Exhibit O at 3: 11-15.

**Contested**.  The fact that the '044 patent (Steensen) describes its air mattress as a "transport embodiment", which is "for use in vehicles (such as trucks, recreational vehicles, and boats")" does not make the subparts of its air mattress removable.  FM Validity Ex. 11, Defs. Ex.

O, at col. 3, lines 8-15; see also *Id.* at col. 6, lines 35-39 (explaining that differential air pressure in the various elements are "particularly useful in the transport embodiment of the air bed which may be used in recreational vehicles or in the rear portion of the cab of a truck traveling at high rates of speed over a curry [sic] or bumpy roadway").

33. The '248 Patent discloses a pet bed comprising a fabric article (i.e., base sheet (3), band (4), and outer periphery of annular bolster (1)) configured to receive and enclose a removable bottom mattress (5). Exhibit S at 2:5-11.

**Uncontested**.

34. The '248 Patent discloses and describes a bolster disposed within the fabric article; the bolster filler material is preferably cotton which is packed within the outer periphery of the bolster and is, inherently, removable by simply reversing the process and extracting the filler material. See Exhibit S at 1:50 to 2:15.

**Contested**.  The 248 patent (Bins) does not have a "removable" bolster as required by claim 1.  Bins' bolster is sewn shut and then sewn to the pocket that holds the bottom mattress.  The claim term *removable* "excludes the removal by a means that would require excessive effort as to discourage a pet bed owner from removing the bolster and bottom cushion or destroy the bed."  FM Validity Ex. 16 at p. 7.

35. The bolster of the '248 Patent is disposed atop the mattress. But if claim 1 of the '502 Patent were read to cover a bed, like the accused Dallas Manufacturing beds, with the bolster atop the bottom cushion, then claim 1 would be anticipated by the '248 Patent, because then the '248 Patent would disclose a structure in which "substantially all of the bolster is disposed exteriorly about the perimeter of the bottom portion." Exhibit S at Fig. 6.

**Contested**.  The bolster of the '248 patent (Bins) is disposed atop the mattress. However, Dallas Manufacturing's bed is not like Bin's dog bed, where the top cushions are atop the mattress.  Compare Ex. B of FM Infr. Ex. 3 with Figs. 1, 6 of FM Validity Ex. 12, Defs. Ex. S; Handelsman January 9, 2006 Decl. at ¶8 (submitted in opposition to defendants' motions for summary judgment).

36. The '502 Patent describes the "bolster" as being "disposed about" the perimeter of the bottom cushion. The claims of the '502 Patent also include this limitation. Exhibit J at 2: 52-54; 3: 1-7; 3:37 to 4:55.

**Contested**.  The '502 patent (Haugh) describes the bolster as being disposed about at least a portion of the perimeter of the bottom cushion.  FM Validity Ex. 1, Defs. Ex. J, at col. 2, lines 52-54.  Claim 1, and its dependent claims, call for "substantially all of said bolster disposed exteriorly about at least a portion of the perimeter of the bottom portion."  *Id.* at col. 3, lines 42-44.  The other claims call for the bolster to be "disposed about at least a portion of the perimeter of the bottom portion."

37. The '502 Patent discloses several specific means for maintaining the bolster in its described and claimed "disposed" location exteriorly about at least a portion of the perimeter of the bottom portion; namely, hook and loop fasteners, and ties or straps with snaps or buckles. Exhibit J at 2:61-67.

**Contested**.  The '502 patent (Haugh) discloses several specific structures for maintaining substantially all of the bolster disposed exteriorly about at least a portion of the perimeter of the bottom portion; namely, hook and loop fasteners, and ties or straps with snaps or buckles, and pockets.  FM Validity Ex. 1, Defs. Ex. J, at 2:51-52; 61-67.

38. The '502 Patent does not teach or suggest that the bolster cushion can remain "disposed exteriorly about" at least a portion of the perimeter of the bottom portion without the use of means such as hook and loop fasteners, or ties or straps with snaps or buckles. Exhibit A at 46-48.

**Contested**. The '502 invention is not so limited:

Claim 1 of the '502 patent does not include a limitation requiring that the bolster be affixed or otherwise secured to the outer covering. It does contain a limitation that the bolster be disposed in the outer covering in a particular relationship with the bottom portion. One of ordinary skill would clearly understand that the inventor had possession of the invention actually described in claim 1.

The patent specification makes clear that the inventor did have possession of an invention in which the bolster is disposed in the outer covering in a particular relationship with the bottom portion, *i.e.*, such that substantially all of the bolster is disposed exteriorly about at least a portion of the perimeter of the bottom portion. The patent discloses the use of a "bolster pocket" and a "bottom pocket" to create such a relationship.

FM Validity Ex. 16 at p. 26.

39. The named inventor of the '502 Patent, Scott Haugh, testified that the purpose of including the straps in the invention was to "hold the bolstered pillow in position." Mr. Haugh did not create any other embodiment. Exhibit D at 29:5-11; 32:5 to 33:13.

**Uncontested**.

40. Claim 1 of the '502 Patent requires a removable bolster, substantially all of which must be "disposed exteriorly about at least a portion of the perimeter of the bottom portion without being secured to the removable cushion." Claim 1 of the '502 Patent does not include any structure for maintaining the bolster cushion in its required "disposed" location with respect to the bottom cushion. Exhibit J at 3:42-46; Exhibit A at 47-48.

**Contested**. Claim 1 recites the structure of the outer covering as having the removable cushion and bolster disposed therein, and further defines the relationship of the cushion and bolster as one in which the bolster is "disposed exteriorly about at least a portion of the

perimeter of the bottom portion without being secured to the removable cushion." Thus, claim 1 describes the spatial relationship of the bolster cushion and the bottom cushion, but does not limit how to accomplish it so long as both are within the outer covering.

41. Claims 1-3 of the '502 Patent fail to disclose any structure for maintaining the bolster in its position "disposed exteriorly about at least a portion of the perimeter of the bottom portion," and are thus indefinite. Exhibit A at 46-48.

**Contested**. Claim 1 recites the structure of the outer covering as having the removable cushion and bolster disposed therein, and further defines the relationship of the cushion and bolster as one in which the bolster is "disposed exteriorly about at least a portion of the perimeter of the bottom portion without being secured to the removable cushion." Thus, claim 1 describes the spatial relationship of the bolster cushion and the bottom cushion, but does not limit how to accomplish it so long as both are within the outer covering. Claims do not disclose how to accomplish the claimed invention as that is the job of the written description of the invention.

| | Respectfully submitted, |
|---|---|
| | |
| Dated:  January 30, 2006 | /s/ Richard B. Myrus |
| | Richard B. Myrus (BBO # 638793) GOODWIN PROCTER LLP Exchange Place Boston, MA 02109 Telephone:  (617) 570-1058 Facsimile:  (617) 523-1231<br><br>Michael Husmann MICHAEL BEST & FRIEDRICH LLP 100 East Wisconsin Avenue Suite 3300 Milwaukee, WI 53202-4108<br><br>Larry L. Saret Lisa C. Childs Gretchen M. Hosty MICHAEL BEST & FRIEDRICH LLP Two Prudential Plaza |

|  | 180 North Stetson Avenue<br>Suite 2000<br>Chicago, IL 60601<br>Phone: (312) 222-0800<br>Fax: (312) 222-0818<br><br>Attorneys for Plaintiff<br>Flexi-Mat Corporation |
|---|---|

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 30, 2006.

/s/ Richard B. Myrus