# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FLEXI-MAT CORPORATION, an Illinois corporation,<br><br>       Plaintiff,<br><br>       v.<br><br>DALLAS MANUFACTURING COMPANY, a Texas corporation, BJ'S WHOLESALE CLUB, INC., a Delaware corporation, and DOSKOCIL MANUFACTURING COMPANY, INC., a Texas corporation,<br>       Defendants. | Civil Action No. 04 10162 DPW<br><br>SIMON HANDELSMAN'S<br>EXPERT REPORT ON VALIDITY |
| DALLAS MANUFACTURING COMPANY, INC., a corporation,<br><br>       Counter-claimant,<br><br>       v.<br><br>FLEXI-MAT CORPORATION, a corporation,<br><br>       Counter-defendant. | |
| BJ'S WHOLESALE CLUB, INC., a corporation,<br><br>       Counter-claimant,<br><br>       v.<br><br>FLEXI-MAT CORPORATION, a corporation,<br><br>       Counter-defendant. | |
| DOSKOCIL MANUFACTURING COMPANY, INC., a corporation,<br><br>       Counter-claimant,<br><br>       v.<br><br>FLEXI-MAT CORPORATION, a corporation,<br><br>       Counter-defendant. | |

FM Validity Ex. 16

If called to testify in this case, I will express the following opinions at the trial, the basis and reasons for which are set forth below and detailed in the documentation identified below. I reserve the right to supplement these opinions in the event of new information.

**The Basis For My Opinion**

In preparation for this declaration and pursuant to my role as expert witness, I have reviewed the following documents and things which serve as the data and information upon which I base the opinions set forth herein:

1. U.S. Patent No. 5,765,502 ("the '502 patent");

2. The file history of the '502 patent;

3. Various pet beds, which I understand were manufactured by Doskocil and Dallas (as described in more detail below);

4. The patents and publications set forth on the face of the '502 patent as "References Cited";

5. Testimony from Neil Nivert, an employee of Dallas Manufacturing;

6. "Expert Report of Suzanne Fessler re: Validity Issues for U.S. Patent No. 5,765,502" dated September 23, 2004 ("Fessler Validity Opinion" or simply "Op."); and

7. The patents and articles referenced in the Fessler Validity Opinion.

8. The dictionary definitions referenced in my Report.

I also have extensive knowledge and personal experience in the research and development of products for the pet industry, and I used this knowledge and experience in preparing this report.

**Statement of My Opinion**

The claims at issue (claims 1-3) read as follows:

1. A pet bed comprising:

    an outer covering;

    a removable cushion disposed within the outer covering to form a cushioned bottom portion; and

    a bolster removably disposed within the interior of the outer covering and substantially all of said bolster disposed exteriorly about at least a portion of the perimeter of the bottom portion without being secured to the removable cushion.

2. The pet bed of claim 1, wherein the outer covering further includes a reclosable access opening.

3. The pet bed of claim 2, wherein the reclosable access opening further includes a zipper.

    Figures 2 and 5 from the '502 patent are shown below.



FIG. 2

FIG. 5

3

### A.    Person of Ordinary Skill

In my opinion, a person of ordinary skill in the art relevant to the '502 patent has at least a high school diploma or trade technical/junior college courses in product design, fashion or the like; and some practical experience working with pet product development.   Also, a person of ordinary skill would have knowledge of pet behavior, especially sleeping behavior, and experience in designing pet beds.

**B.    The Prior Art Cited by Ms. Fessler Do Not Alone or In Combination Disclose or Make Obvious Claims 1-3 Of The '502 Patent**

**1.    U.S. Patent No. 5,421,044 (Steensen)**

I have reviewed U.S. Patent No. 5,421,044 (Steensen).  Steensen describes a human air bed, not a pet bed, and Figures 1, 2 and 3 are shown below.  It is not analogous art.



FIG. 1

FIG. 2

FIG. 3

<u>Not a Pet Bed</u>

The '502 patent describes only pet beds.  Pets, primarily dogs and cats, use pet beds differently than humans use human beds.  Human beds are usually raised above the floor and not placed on the floor, like pet beds.  Pets have both denning and guarding instincts, and prefer to have their heads facing out to keep an eye out for approaching danger.  When a pet sleeps, in general, it prefers to keep its back in a position where attack is limited or against a protective structure such as a wall.  Also, pets tend to be dirtier than humans.  Because pet beds become

dirty, the pet beds should be easy to clean. Pet beds do not have sheets that can be cleaned. In contrast, human beds typically have sheets that can be cleaned. Human beds are usually used with the human's head, not the human's back, next to a headboard or wall. Human beds are substantially different from pet beds. Steensen does not discuss pet beds, the needs of a pet or requirements for pet beds.

No Bolster

Contrary to Ms. Fessler's argument, Steensen does not disclose a bolster as described in the '502 patent. Ms. Fessler argues that each of the air tubes 31, 32, 33, 34, 35, and 36 is a bolster as recited in claim 1. Op. at 11. The '502 patent explains that the claimed bolster is a separate structure from the bottom cushion and is not part of the bottom cushion. The bolster of the '502 patent can be used as a pillow by the pet and it is described in the claims as separately removable from the bottom cushion.

The Steensen patent discloses a human bed without a bolster. The tubes 31, 32, 33, 34, 35, and 36 together with air tubes 42 and pads 58 and 59 make up a single bottom portion or resting surface (shown above). As described in the Steensen patent, the foam pads 58 and/or 59 and tubes 31, 32, 33, 34, 35, and 36 and 42 "provide a soft cushioned feel to the user, and are used to provide a level top surface." Col. 4, lines 26-27 (emphasis added). These air tubes do not provide a structure separate from the "level top surface" for the user of the air bed and are not the bolster described and claimed in the '502 patent.

Foam Pads

Ms. Fessler incorrectly describes the Steensen patent at page 12 of her report to suggest that the foam pads need not be used. Actually, the language of the Steensen patent from which

6

she quotes teaches that the assembled bed should include the foam pads so that the top surface is level.

### Non-removable interconnected air tubes

Ms. Fessler asserts that the air tubes of the Steensen air mattress (both those that she claims are the bottom cushion and those that she claims are the bolsters) are removable because the outer covering can be unzipped and each of the air tubes 31-36, 42 and 45 can be removed from the air mattress. She further claims that these air tubes are not connected. Op. at 11. She is wrong.

The term "removable cushion" is used in the '502 patent to describe a cushion that is designed to be removed from the outer cover and then replaced. "The pet bed should be . . . equipped with a one-piece cover and separately removable bolster and bottom cushion for ease of cleaning." Col. 1 lines 60-64. The '502 patent also discusses the construction of the pet bed in a manner that provides for the ease of removing and replacing the bolster and bottom cushion at Col. 3, lines 8-17:

> Access to the interior of the outer covering 2 is preferably provided by a zipper 7. Thus, the bolster 6 is easily removable by the simple expedient of unzipping the zipper 7 on the bottom of the pet bed 1, disengaging the straps 8, and withdrawing the bolster through the reclosable access opening 11 that is sealed by the zipper 7. The bottom cushion 4 can also be withdrawn in the same way. The outer covering 2 can then be cleaned, and the bolster 6 and cushion 4 can be washed and replaced within the outer covering 2.

A pet bed with a removable cushion as described in the '502 patent is one that is specifically designed in a manner such that the bolster and bottom cushion can be readily removed and replaced and excludes the removal by a means that would require such excessive effort as to discourage a pet bed owner from removing the bolster and bottom cushion or destroy the bed. Removability is a benefit to the pet bed owner, allowing convenient removal of both the bolster

and bottom cushion. "Removable" does not include disassembling a connection that is intended to be permanent, cutting seams, or tearing the fabric to access the bolster and bottom cushion.

None of Steensen's air tubes are removable. The lower air tubes 45 are in a magazine formed of two rectangular sheets, and held in place by restraining straps 52. The air tubes 31, 32, 33, 34, 35, and 36 and the air tubes 42 that make up the cushioned bottom portion of the Steensen bed are, like the air tubes 45, connected by hose assembly 77 through a hole 80 in the bottom panel 14 of the outer cover to an air pump via a manifold block, both of which are located outside the outer cover. Col. 7, lines 37-43. Figures 7 and 8 (below) show the

permanently installed air tubes interconnected with the air hoses, which supply air pressure. Contrary to Ms. Fessler's report, each of the air tubes are connected to the remaining air tubes through this system of air hoses. These interconnected air tubes mean that 1) the bolster asserted by Ms. Fessler is not "removable"; 2) the bolster asserted by Ms. Fessler is secured to the bottom cushion; and 3) the bottom cushion is not "removable."



FIG. 7



FIG. 8

While I agree that the pads 58 and 59 are removable, I do not agree that they alone or individually make up the bottom cushion claimed in the '502 patent. They are simply parts of

8

the bottom cushion.  Air tubes 31, 32, 33, 34, 35, and 36 together with air tubes 42 and pads 58 and 59 make up the "level top structure" of Steensen's air bed.

2.    **U.S. Patent No. 5,136,981 (Barreto)**

No Bolster

Ms. Fessler is wrong in asserting that the side wall of Barreto "comes within the scope of the 'bolster' in claim 1." A *bolster* is commonly understood to be a long, narrow pillow or cushion. Am. Herit. Dict. (2000). It is a pillow for use by the pet while it rests. The '502 patent confirms that this ordinary usage of the term *bolster* is intended. The '502 patent describes the bolster as a "long, slender pillow," col. 3, line 4, and "more cylindrical or banana-shaped than flat, and more like a pillow than a wall," col. 2, lines 56-57, so that it "tends to retain its shape even when used as a pillow by the pet, and does not easily collapse from the weight of the pet as in some prior art products." Col. 2, lines 58-60.

Representative illustrations of Barreto's walled pet bed in perspective and cross-section are shown below.



A bolster is not a wall. The '502 patent specifically distinguishes between pet beds that use a wall and those that use a bolster. In the section of the '502 patent entitled Background of the Invention, the patent describes previously-known walled pet beds and explains why they are unsatisfactory, *i.e.*, because the wall "does not provide support for heavier … animals" to use as

a headrest and "tends to collapse ... unless it is made of material so rigid that it is uncomfortable." Col. 1, lines 21-26. Examples of these pet beds that used walls were provided to the Patent and Trademark Office during the application process leading to the issuance of the '502 patent. See DMC000068, 70-73, 75.

In contrast to the walled beds, the Summary of the Invention section of the '502 patent explains that the invention, rather than using a wall and a bottom cushion, uses a bolster and a bottom cushion. Subsequently, in the Detailed Description of the Invention, the '502 patent explains that:

> Since the bolster 6 is more cylindrical or banana-shaped than flat, and **more like a pillow than a wall**, the bolster 6 tends to retain its shape even when used as a pillow by the pet, and does not easily collapse from the weight of the pet as in some prior art products.

Col. 2, lines 57-60 (emphasis added).

Barreto discloses the same wall as that disclosed in the prior art cited to the Patent and Trademark Office by the applicant of the '502 patent. Barreto explains that "[t]he <u>sidewall</u> serves as a wall against which the pet may lean," Col. 3, lines 57-58, and the sidewall has "a generally upright orientation with respect to [the] base", Col. 8, lines 3-4, and it "extends upwardly" from the base, Col. 8, lines 7-8. In contrast to a bolster, Barreto's wall creates an "enclosure" for the pet to provide security and does not act like a pillow. Barreto also teaches that the "foam–core material" used to construct the wall can vary in thickness of between 1/4" to 6" and is "dependent upon the size and weight of the pet." This teaching is clearly that a larger pet requires a more substantial wall to lean against, not that a thicker wall becomes a bolster. Barreto does not teach the use of a bolster.

11

Those persons experienced in the pet industry also distinguish between the terms *bolster*

and *side wall* and recognize the difference between the two structures.  The term *bolster*, as used

in the '502 patent, does not include a wall.

### 3.    U.S. Patent No. 4,754,513 (Rinz)

I have reviewed U.S. Patent No. 4,754,513 (Rinz).  As shown in Figures 1 and 5 below

from Rinz, it describes a pillowcase and insert, for use by humans in relieving neck pain.  It is

not analogous art.



Not A Pet Bed

Human pillows are not for pets and are not pet beds.  Pillows are for supporting the head

of the user, while a pet bed is supposed to support the entire animal.

Substantially All Of The Bolster Is Not Disposed Exteriorly

Rinz does not teach a bolster substantially all of which is disposed exteriorly about at

least a portion of the perimeter of the bottom portion.  Rinz describes a semi-cylindrical insert in

combination with a conventional pillow, both within a pillowcase that has a pocket formed inside

one panel for the insert.  The semi-cylindrical insert is shown on top of the pillow.

Ms. Fessler's reliance on Col. 1, lines 53-56 is misplaced.  These lines state:

> The position of the insert 16 can be adjusted by simply rotating the pillowcase 10
> having the pocket 15 and insert 16 received therein, about the conventional pillow
> 17 in accordance with the preferance [sic] of the user . . . .

From this statement, Ms. Fessler speculates that if a person rotated the pillowcase far enough, the

insert could be positioned beside the pillow.  But, the only disclosed location of the insert 16 is

13

atop the pillow 17.  There certainly is no teaching or suggestion in the Rinz patent to make substantially all of the bolster disposed exteriorly about at least a portion of the perimeter of the bottom portion, as described in claim 1 of the '502 patent.  Also, there is no teaching or suggestion in Rinz to rotate the pillow case to the extent or in the manner suggested by Ms. Fessler. The rotation actually suggested by the Rinz patent is to "prevent and provide relief from morning headache, stiff neck, pain in the back, shoulders, and arms, tension and generally provide for a comfortable, relaxed sleep." Col. 2, lines 57-60.  To accomplish those purposes, the insert should remain atop the pillow..  If one were to rotate the pillow case as Ms. Fessler suggests, the insert would simply lie along side the pillow and, due to the constraints of the pillowcase, compress the pillow.  In other words, the insert would cease functioning as a neck support and in effect become part of that pillow.

4.    U.S. Patent No. 5,586,350 and German Patent No. 93 09 699.2 (Thönnessen)

<u>Not a Pet Bed</u>

I have reviewed U.S. Patent No. 5,586,350 (Thönnessen).  Thönnessen describes a low flammability pillow, not a pet bed.  It is not analogous art.  As explained above, a human pillow is not a pet bed.



<u>Substantially All Of The Bolster Is Not Disposed Exteriorly</u>

It is unclear whether Ms. Fessler is claiming that all of the limitations of Claim 1 of the '502 patent are present in the pillow disclosed by Thönnessen.  She concedes that the "bolster pillow ... is disposed atop the bottom portion," Op. at 26, but then states:

> "[I]f Claim 1 of the '502 patent were read to cover a bed with the bolster atop the bottom cushion, then it would be anticipated by the '350 patent."

Op. at 26.  Apparently, however, she concludes that Claim 1 of the '502 patent should not be so interpreted.  I agree that it should not.

Thönnessen does not teach or disclose a bolster substantially all of which is disposed exteriorly about at least a portion of the perimeter of the bottom portion.

Ms. Fessler speculates "that if a person using the pillow disclosed in the [Thönnessen] patent were to lean against or push on the cylindrical roll, the cylindrical roll could lean over the side of the pillow or at least partly flop over the side of the pillow," Op. at 26, but this is not what is shown or taught by Thönnessen. Thönnessen shows only a roll atop the pillow and there is no suggestion that the roll would flop over the side. If the roll were pushed over the side of the pillow, it would no longer work as a neck roll. Further, before concluding that the roll could flop over as Ms. Fessler claims, one would need to see the actual construction of the product and know for example: What is the connection made of? How strong is the connection? How tight are the covers to the roll and pillow? What kinds of material are the covers made of?

Ms. Fessler also argues that the phrase "substantially all of the bolster" being disposed exteriorly about the perimeter of the bottom portion means that a "significant amount of the bolster cannot be atop the bottom cushion." Op. at 25. I disagree.

The modifying term *substantially* is used in its common and ordinary manner. The term "substantially" as used in claim 1 does not exclude a "significant" part of the bolster being atop the bottom cushion. *Substantially* means considerable in importance, value, degree, amount, or extent. Am. Herit. Dict. (2000). Merriam Webster's Online Dictionary defines "substantially" as "being largely but not wholly that which is specified." In specifying that only "substantially all of the bolster" rather than all or the entirety of the bolster be disposed outside the bottom portion, Claim 1 specifically allows that a portion of the bolster be located or disposed on top of the bottom portion. The claim does not require that the amount of the bolster on top of the bottom cushion be significant, as Ms. Fessler argues, or insignificant.

### No Bolster That Is Not Secured To The Removable Cushion

I disagree with Ms. Fessler's interpretation of Figure 1 of Thönnessen. Ms. Fessler states in regard to Figure 1 that "[t]he bolster cushion is connected 'detachably' to the bottom cushion," and that "[w]hen the bolster cushion 3 is detached from the bottom cushion 2, the bolster cushion is not secured to the bottom cushion." Op. at 25-26. She then concludes that Thönnessen discloses that the bolster need not be secured to the removable bottom cushion (the nonwoven block 2). Op. at 26. Thönnessen does not teach a bottom cushion with an unsecured bolster.

Figure 1 of Thönnessen discloses only a neck roll that is secured to the pillow. See connection 4 in Figure 1, connection 14 in Figure 2, col. 2, lines 14-39 and lines 49-61 (describing nature of connection). And, when the neck roll is detachably secured to the pillow, as in Figure 2, detaching the neck roll and pillow results in two, separate parts that do not function together. These separate components are not the assembly taught by the patent, and Ms. Fessler's modification in effect destroys the Thönnessen invention. Thönnessen does not disclose a bolster that is not secured to the removable cushion and, in fact, teaches away from this limitation of claim 1 of the '502 patent.

Further, *secured* as used in the claims of the '502 patent means firmly fastened, as in *a secure lock*. Am. Herit. Dict. (2000). A secure lock can still be opened, and thus, *secured* does not require permanence, as Ms. Fessler suggests by alleging that a "detachable" connection between the bolster and bottom cushion falls within the scope of claim 1. Thus, *without being secured to the removable cushion* means that the bolster is not fastened to the cushion, whether permanently or detachably.

**5.     U.S. Patent No. 4,872,228 (Bishop) and (a) Murray & Ferguson or (b) Walshaw and Evans or (c) Rivo and Malveaux**

<u>Not A Pet Bed</u>

I have reviewed U.S. Patent No. 4,872,228 (Bishop). Bishop describes a bed guard for human beds (shown at right) and in particular, for those who need to be restrained in their bed, such as children, the infirm, and those who otherwise fall out of bed. It is not analogous art. As explained above, human beds are not pet beds. A guard for a human bed is certainly not a pet bed.



Again, it is unclear whether Ms. Fessler is claiming that all of the limitations of Claim 1 of the '502 patent are present in the bed guard disclosed by Bishop. She concedes that the bolster is disposed atop the mattress, Op. at 30, and then states:

> "[I]f claim 1 of the '502 patent were read to cover a bed with the bolster atop the bottom cushion, then it would be anticipated by the '228 patent."

Op. at 30. Apparently, however, she concludes that Claim 1 of the '502 patent should not be so interpreted. I agree that it should not.

Ms. Fessler speculates "that if a person using the bed disclosed in the '228 patent were to roll against or lean on one of the bolsters, the bolster could lean over the side of the bed or at least partly flop over the side of the bed," Op. at 30, but this is not what is shown or taught by

Bishop. Bishop shows only a bolster atop the bed and there is no suggestion that the roll would flop over the side. In fact, the suggestion is clearly to the contrary. The Bishop bed was designed to "reduce the risk of people accidentally falling out of conventional beds.' If the bolsters "could lean over the side of the bed or at least partly flop over the side of the bed," they would not serve their intended purpose of keeping people in bed.

Further, before concluding that bolsters could act as Ms. Fessler claims, one would need to see the actual construction of the product and know, for example: How strongly and tightly are the bolsters anchored to the mattress? What kinds of material are the sheets used to anchor the bolsters made of?

Ms. Fessler concedes that Bishop does not teach or suggest the reclosable access opening of claim 2 or the zipper of claim 3. Thus, Bishop does not teach each and every element of claims 1-3.

The Asthma Articles

I have also reviewed the three articles, (a) Murray & Ferguson and (b) Walshaw and Evans and (c) Rivo and Malveaux. These articles all relate to treatment of human asthma. Treating asthma and pet beds are at cross purposes because I believe asthmatics are not supposed to be exposed to pet dander. A person designing a pet bed would not look to the art pertaining to the treatment of human asthma to assist in that design effort. These articles are not analogous art.

I have found no suggestion in these articles or in Bishop that their teachings should be combined in any manner. Moreover, these articles do not disclose the limitations missing from Bishop. Even if combined, the asthma articles, alone or in combination with Bishop, do not teach or suggest every limitation of claims 1-3.

**6.    U.S. Patent No. 4,873,734 (Pollard) and (a) Murray & Ferguson or (b) Walshaw and Evans or (c) Rivo and Malveaux**

I have reviewed U.S. Patent No. 4,873,734 (Pollard).  Figure 1 from Pollard is shown.

<u>Substantially All Of The Bolster Is Not Disposed Exteriorly</u>

It is unclear whether Ms. Fessler is claiming that all of the limitations of claim 1 of the '502 patent are present in the bumper sheet disclosed by Pollard and shown at right.  After describing the inserts as disposed atop the mattress and conceding that they are not disposed exteriorly as described in claim 1 of the '502 patent, she states:



> "[I]f claim 1 of the '502 patent were read to cover a bed with the bolster atop the bottom cushion, then this distinction [of the inserts being disposed atop the mattress] would be moot."

Op. at 35.  Apparently, however, she concludes that Claim 1 of the '502 patent should not be so interpreted.  I agree that it should not.

Ms. Fessler speculates "that if a person were to use the [Pollard] bumper sheet on a mattress outside a crib and were to roll against or lean on one of the inserts, the insert could lean over the side of the mattress or at least partly flop over the side of the mattress," Op. at 35, but this is not what is shown or taught by Pollard.  As Ms. Fessler concedes, Pollard shows only bumper guards atop the mattress and there is no suggestion that the bumper guards would flop over the side.  In fact, if a bumper guard did flop over, then it would not be a bumper guard because the user would then roll out of bed and the guard would not serve its intended purpose.  See Col. 2, line 65-Col. 3, line 2 (noting that the bed guards can be used in a regular bed).

Further, before concluding that the bumpers could act as Ms. Fessler claims, one would need to see the actual construction of the product and know, for example: How strongly and tightly are the bed covers or sheets joined to the cylindrical inserts? What kinds of material are the covers made of?

Ms. Fessler concedes that Pollard does not teach or suggest the reclosable access opening of claim 2 or the zipper of claim 3.

Thus, Pollard does not teach each and every element of claims 1-3.

The Asthma Articles

I have also reviewed the three articles, (a) Murray & Ferguson and (b) Walshaw and Evans and (c) Rivo and Malveaux. As explained above, these articles all relate to treatment of asthma. Neither these articles nor Pollard provide a suggestion to combine these references. For the same reasons that they do not address the deficiencies of Bishop, as explained above, they also do not address the deficiencies of Pollard. Thus, even if combined, they, alone or in combination with Pollard, do not teach every element of claims 1-3.

### 7.    U.S. Patent No. 5,010,843 (Henry)

I have reviewed U.S. Patent No. 5,010,843 (Henry). Representative figures are shown.





<u>Substantially All Of The Bolster Is Not Disposed Exteriorly</u>

It is unclear whether Ms. Fessler is claiming that all of the limitations of claim 1 of the '502 patent are present in the pet bed disclosed by Henry. She concedes that:

> "The top cushions 14 and 16 of the '843 patent are disposed atop the bottom cushion. But if claim 1 of the '502 patent were read to cover a bed with the bolster atop the bottom cushion, then this distinction would be moot."

Op. at 40. Apparently, however, she concludes that Claim 1 of the '502 patent should not be so interpreted. I agree that it should not.

Ms. Fessler speculates "that if a pet were to use the '843

pet bed as shown in Figure 4 of the '843 patent, and were to roll

against or lean on one of the top cushions, the top cushion could

lean over the side of the bottom cushion or at least partly flop over

the side of the bottom cushion," Op. at 40, but this is not what is

shown or taught by Henry.  Henry shows only cushions atop the

bottom cushion and there is no suggestion that the top cushions



would flop over the side.  Henry teaches that "[t]he semi-circular edges 18, 20 of the top

cushions are coincident with the circular top edge 22 of the base cushion 12.  The circumferential

edges 18, 20, 22 are joined together by any suitable means ...."  Col 2, lines 19-23.  In order for

the semi- circular cushions to lean over the side of the bottom cushion, the joined edges would

have to be at least partially separated or removed.  Henry teaches joining the cushions in such a

manner that the top cushions do not move from their position atop the bottom cushion.  Ms.

Fessler is suggesting something contrary to Henry.

Further, the Henry bed was designed to form pockets between the top and bottom

cushions and a trough between the two top cushions.  Col. 1, lines 44-50.  As Henry states,

"[d]ogs seem to have an instinct to withdraw into recesses and trough-like depressions.  Col. 1,

lines 19-20.  If the top cushions "could lean over the side of the bottom cushion or at least partly

flop over the side," Op. at 40, then the top cushions would not serve their intended purpose of

providing a recess or trough-like depression.  Further, even if the joined edges of the cushions of

Henry were partially separated, before concluding that top cushions could act as Ms. Fessler

claims, one would need to see the actual construction of the product and know, for example:

How strongly and tightly are the edges joined between the top and bottom cushions? What kinds of material are the cushion covers made of?

8.    **U.S. Patent Nos. 5,588,393 and 5,826,537 (Heilborn)**

I have reviewed U.S. Patent Nos. 5,588,393 and 5,826,537 (Heilborn).

<u>No Bolster</u>

As explained above with respect to the Barreto patent, walls are not bolsters.  Heilborn

discloses pet beds with walls, not bolsters.  Heilborn does not disclose the bolsters claimed in the

'502 patent.



25

C.    **The '502 Patent Describes The Claimed Invention And How To Keep The Bolster In Place**

I disagree with Ms. Fessler's opinion that:

[A] person of ordinary skill would not understand from the patent specification that the inventor had possession of an invention in which the bolster is somehow disposed in the outer covering in a particular relationship with the bottom portion without the bolster being affixed or otherwise secured to the outer covering.

Op. at 47.

Claim 1 of the '502 patent does not include a limitation requiring that the bolster be affixed or otherwise secured to the outer covering. It does contain a limitation that the bolster be disposed in the outer covering in a particular relationship with the bottom portion. One of ordinary skill would understand that the inventor had possession of the invention actually described in claim 1.

The patent specification makes clear that the inventor did have possession of an invention in which the bolster is disposed in the outer covering in a particular relationship with the bottom portion, *i.e.*, such that substantially all of the bolster is disposed exteriorly about at least a portion of the perimeter of the bottom portion. The patent discloses the use of a "bolster pocket" and a "bottom pocket" to create such a relationship. Col. 2, lines 9-14.

Further, the specification teaches that one way of keeping the bolster in the bolster pocket so that it is disposed in a particular relationship with the bottom portion is to affix the bolster in the bolster pocket. Various ways of affixing the bolster through the use of straps, fasteners etc. are disclosed.

Another way to dispose the bolster, that would have been recognized by one of skill in the art upon reading the '502 patent, would be to simply separate the bolster pocket from the bottom pocket by stitching the bolster pocket closed and providing for an access to the bolster pocket separate from the access to the bottom pocket. While the patent makes clear that

substantially all of the bolster is to be disposed exteriorly about the perimeter of the bottom portion, nowhere does it make any particular method of so locating the bolster critical to the invention.

Based on the patent's disclosure of "pockets" for both the bolster and bottom cushion, one of ordinary skill would know to simply size the pockets closely to the shapes of the bolster and bottom cushion and thereby retain them in the claimed spatial relationship.

I also disagree with Ms. Fessler's opinion that:

[C]laim 1 requires the pet bed to perform the function of keeping the bolster "disposed exteriorly about at least a portion of the perimeter of the bottom portion," but fails disclose [sic] or explain how this is done or accomplished."

Op. at 48.

First, claim 1 does not state or require any "function" that the pet bed must perform. Claim 1 requires that the pet bed have a bolster (defined above), and then further requires that this bolster be located in a particular relationship to the bottom portion, *i.e.*, substantially all of the bolster disposed exteriorly. Secondly, even if claim 1 were rewritten to require the "function" asserted by Ms. Fessler, the patent does disclose "fasteners or straps" as a "means to keep the bolster in the required position," as conceded in Ms. Fessler's report at page 48.

My qualifications, compensation and expert testimony in other cases have not changed since the time of my Expert Report on Infringement and are set forth in that report.

Having been informed that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code, I declare under penalty of perjury that the foregoing is true and correct:

October 20, 2005

Simon Handelsman

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of SIMON HANDELSMAN'S EXPERT REPORT

ON VALIDITY was served, via e-mail and first class mail, postage pre-paid, on this 21st day of

October, 2005 upon:

> Gary A. Clark / gclark@sheppardmullin.com
> Darren M. Franklin / dfranklin@sheppardmullin.com
> SHEPPARD MULLIN
> 333 South Hope Street, 48th Floor
> Los Angeles, California 90071-1448
> Facsimile: 213/620-1398

> James J. Marcellino (BBO # 318840) / U.S. Mail Only
> David M. Mello (BBO #634722) / U.S. Mail Only
> MCDERMOTT, WILL & EMERY
> 28 State Street
> Boston, Massachusetts 02109
> Facsimile: 617/535-3800

> Roy W. Hardin / rhardin@lockeliddell.com
> M. Scott Fuller / sfuller@lockeliddell.com
> Locke, Liddell & Sapp LLP
> 2200 Ross Avenue, Ste. 2200
> Dallas, Texas 75201-6776
> Facsimile: 214/740-8800

> William Meunier / wmeunier@goodwinprocter.com
> Richard Myrus / rmyrus@goodwinprocter.com
> Goodwin Procter LLP
> Exchange Place
> Boston, MA 02109
> Facsimile: 617/523-1231

_Lisa C. Childs_

One of the Attorneys for Plaintiff