# EXHIBIT 3

```
00001
 1           IN THE UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
 2

 3

 4  FLEXI-MAT CORPORATION, an    )
    Illinois corporation,        )
 5         Plaintiff,            )
                                 ) Civil Action
 6         -vs-                  ) No. 04 10162 DPW
                                 )
 7  DALLAS MANUFACTURING COMPANY,)
    INC., a Texas corporation,   )
 8  BJ'S WHOLSESALE CLUB, INC.,  )
    a Delaware corporation, and  )
 9  DOSKOCIL MANUFACTURING       )
    COMPANY, INC., a Texas       )
10  corporation,                 )
           Defendants.           )
11

12

13

14        Videotaped deposition of SIMON F. HANDELSMAN

15  taken before NADINE J. WATTS, CSR, RPR, and Notary

16  Public, pursuant to the Federal Rules of Civil Procedure

17  for the United States District Courts pertaining to the

18  taking of depositions, at Suite 4500, 227 West Monroe

19  Street, in the City of Chicago, Cook County, Illinois,

20  commencing at 10:00 o'clock a.m. on the 1st day of

21  November, A.D., 2005.

22

23

24
```

**EXCERPT**

00014
1    Q   Referring again to Exhibit 720, were there any
2  other documents and things that you considered in
3  connection with rendering this report?
4    A   Aside from what we've discussed previously, I
5  don't believe so.
6    Q   Okay. Referring you again to Section 1 on
7  page 2 of Exhibit 720, the section that's headed The
8  Basis for My Opinion, the last paragraph of that section
9  refers to extensive knowledge and personal experience in
10  the research and development of products for the pet
11  industry. Do you see that?
12    A   Yes, sir.
13    Q   And you say that you used this knowledge and
14  experience in preparing this report. Do you see that?
15    A   Yes.
16    Q   How did you use your knowledge and experience in
17  preparing this report?
18    A   In distinguishing the features of pet beds.
19    Q   In any other way?
20    A   A familiarity with how a retail buyer might
21  approach a pet bed, evaluation of features and benefits,
22  some constructional details.
23    Q   Anything else?
24    A   Perhaps, but nothing that comes to mind at this

00015
1  minute.

2  Q  On page 6 of Exhibit 720, in Section 3, you

3  describe your qualifications. Do you see that?

4  A  Yes, sir.

5  Q  Is that intended to set forth all of your

6  qualifications to serve as an expert witness in this

7  case?

8  A  I'm sure there are more qualifications I have

9  besides this, but this certainly sets forward some of

10 them.

11 Q  Can you tell me any other qualifications that

12 you believe you have to serve as an expert witness in

13 this case?

14 A  I have over 30 years in the pet industry, and

15 I'm not sure that it states it in that way. Whatever

16 things I've learned over 30 years would also be the

17 qualifications I would bring to the case.

18 Q  Anything else?

19 A  That seems to me the only other way -- I mean, I

20 don't know what's missing here from the things that I've

21 done since 1989 or actually before that when I went to

22 work for Docktor Pet Centers in 1978. But that's 20 --

23 In that 27-year period I'm sure that there are some

24 other things I might figure out to list that might have

**Handlesman, Simon; 11/1/05**                                **Page 15**

00017
1   Q   Did you found the company in 1992?
2   A   Yes.
3   Q   What consulting services has your company
4   provided to the pet industry since 1992?
5   A   Product design, merchandising, marketing, sales
6   promotion, speeches and seminars, articles, general
7   business information based primarily on and almost
8   exclusively on the pet business in the larger sense of
9   the word pet business.
10   Q   In the second sentence of Section 3, on page 6,
11   you say your clients include pet product manufacturers,
12   importers, distributors and retailers. Can you tell us
13   who have been your clients among pet product
14   manufacturers?
15   A   The Friskies division of Nestle, the cat litter
16   business of First Brands, which is now someone else, but
17   I've forgotten. Hartz Mountain Company, Ethical
18   Products, Flexi-Mat, Votoy.
19   Q   I'm sorry, what was that last one?
20   A   Votoy, V-O-T-O-Y. And then a number of small
21   ones.
22       There are probably more. If I went and looked
23   at my files, I could provide you with a complete list of
24   the people. There were obviously the Pet Dealer

00020
1  those companies as well.

2   Q  When you say you sold them for those companies,
3  you mean as a floor salesman?

4   A  No, as a retail -- And I actually had sold pet
5  beds, yes.

6   Q  As a salesman on the floor of a pet store?

7   A  No, more as the owner of the company who always
8  takes the sale.

9   Q  There was one other company I should have asked
10 you about earlier in your consulting activities.  Have
11 you ever consulted for a company known as Dogloo,
12 D-O-G-L-O-O?

13  A  No, I don't believe so.

14  Q  How many different pet beds have you designed?

15  A  Approximately 30.

16  Q  Were those in connection with any particular job
17 or employment?

18  A  Yes.

19  Q  What was that?

20  A  They were in the form of consulting for probably
21 several companies over a period of time.

22  Q  All since 1992?

23  A  Yes, all since 1992.  Occasionally if I have an
24 idea, I will get the idea sketched up.  I don't have any

00035

1 the last three months or so?

2   A  Whatever the period of when I became an expert

3 and first started to work on this case.

4   Q  Tell me about the first visit where you looked

5 at any Dallas or Doskocil beds. What did you do with

6 the beds on that occasion?

7   A  My first -- My first examination was to make

8 sure I understood which bed was which bed and then to

9 look at the bed. I physically handled the beds. I took

10 them apart. I unzipped the zippers and removed the

11 cushion and the bolster. I examined the cover. I

12 looked at the fabrics. I tried to familiarize myself

13 with the beds.

14   Q  Anything else?

15   A  I'm sure, but that's what comes to mind.

16   Q  This was on the first visit?

17   A  Yes.

18   Q  How many different Dallas Manufacturing beds did

19 you see on that first visit?

20   A  At least two.

21   Q  Can you identify them for me say by retailer

22 that they were sold to?

23   A  No.

24   Q  Did you understand that one of them was a BJ's

00095
1  cushion?  Just hold your hands up.

2  A  (Indicating.)

3  Q  That appears to be the whole width of the --

4  A  No, it's not.  If I go back to that, it's about

5  that much I would guess.  And I suspect it's a little

6  different here and it's a little different there.  But

7  it was the best methodology I could use to determine

8  what I was trying to determine -- what I was asked.

9  Q  If what you're saying is true, why isn't the

10  bolster just flopped over -- You're saying that there's

11  nothing holding that bolster up, there's nothing

12  underneath it except an empty cover on the bottom?

13  MR. SARET:  Objection --

14  THE WITNESS:  No.

15  MR. SARET:  -- mischaracterizing the witness'

16  testimony.

17  THE WITNESS:  I'm not saying that.

18  MR. CLARK:  Q  Well, if you're saying there's that

19  much of the bolster that's beyond the base cushion,

20  you're saying that much of the bolster is not supported

21  by anything underneath?

22  MR. SARET:  Objection.

23  MR. CLARK:  Correct?

24  MR. SARET:  Again, mischaracterizing the witness'

00096
1 testimony.

2   THE WITNESS: I'm saying that when you take this bed

3 and you are trying to determine where the position of

4 the bolster is in relationship to the bottom cushion,

5 one, it changes. If you keep fluffing the bed, it

6 changes wherever it is. But my estimation is it's about

7 like that. And that's on this bed. If you present me

8 with a hundred beds, I suspect there's a variation.

9   MR. CLARK: Q Okay. Now, in the up and down

10 direction where is the bolster relative to the base

11 cushion?

12   A In the up and down direction?

13   Q In other words, is the bolster down around the

14 side of the base cushion or is it up above the side of

15 the base cushion and simply extended outwardly, you

16 know, above the base cushion?

17   MR. SARET: Object to the form of the question.

18   THE WITNESS: It flops over, if that's any help.

19   MR. CLARK: Q Is it flopped over right now?

20   A Yes.

21   Q That's -- Okay. Just so we have our terminology

22 straight, this is your idea of flopping over?

23   A This is a degree of flopping over. I'm not

24 trying to be -- I've examined other beds which are more

00097

1 flopped over than this. This one is not as flopped over

2 as some of the others I saw.

3     Q   Okay. But could you explain what you mean by

4 flopped over?

5     A   The majority of the bolster is outside the

6 perimeter of the bottom cushion.

7     Q   Maybe I should have you draw for me in a

8 cross-section what you think --

9     A   Yes, I'm sorry about that.

10      THE VIDEOGRAPHER: Mr. Clark, can we turn the bed so

11 it's perpendicular, counterclockwise -- clockwise as you

12 look down it, the other way, so it's to the right angle?

13 There, we can see the angle of the bolster.

14      MR. CLARK:  Q   Why don't you draw a cross-section

15 and show me as the bed sits there right now without you

16 pushing it around at all --

17     A   Well, you want to arrange it?

18     Q   Why don't you draw for me in cross-section where

19 you say the bolster is relative to the base cushion?

20      MR. SARET: Gary, while we're waiting, I don't know

21 that you ever identified this exhibit by number. Did

22 you do that omission purposefully?

23      MR. CLARK: I'm sorry?

24      MR. SARET: Did you omit the exhibit number

**Handlesman, Simon; 11/1/05**                               **Page 97**


00113

1  around.

2  Q  All right. Does the word about indicate to you
3  that the bolster essentially has to be side by side with
4  the base cushion?

5  A  No.

6  Q  Can the bolster be disposed about the base
7  cushion if it's basically up above the base cushion?

8  MR. SARET: Object to the form of the question.

9  THE WITNESS: Yes.

10  MR. CLARK: Q  How is that?

11  A  Because about has to do with the relationship of
12  one object to another and how those objects are
13  positioned.

14  Q  Well, so you're saying that you think that the
15  bolster can be about the perimeter of the base cushion
16  if the bolster is essentially up above the perimeter as
17  you've drawn it in your drawings?

18  A  I believe that's -- Yes, I think that's exactly
19  right.

20  MR. CLARK: All right. Let's ask the court reporter
21  to mark this drawing as the next exhibit in order.

22      (Document marked as Deposition
23      Exhibit 728 for identification.)

24  MR. CLARK: Q  Just for the record, would you agree

00114
1  that what we've now marked as Exhibit 728 are two
2  sketches you made of what you believe to be the
3  relationship between the bolster and the base cushion
4  for the Dallas Manufacturing bed, which is Exhibit 2B?
5    A  Is 2B the first bed?
6    Q  Yes.
7    A  Yes, the one with the arrow is.
8    Q  And you're now disclaiming the drawing above?
9    A  I like the one on the bottom. As I told you,
10 I'm not an artist, so I have a hard time drawing. But
11 that's as good -- that's as close as I can do it.
12   Q  Is it your testimony that that drawing is
13 representative of the position of the bolster relative
14 to the base cushion at every place around the bolster?
15   A  No.
16   Q  That's just at one location?
17   A  Yes.
18   Q  Is that your testimony?
19   A  Yes.
20   Q  Okay. Is your opinion of -- in this case on
21 infringement in any way dependent on whether or not a
22 pet is on the bed?
23   A  Is it -- Are you asking me if it -- Would you
24 ask me again? I'm sorry. I understand -- I think I

Handlesman, Simon; 11/1/05                    Page 114

00115
1  understand what you're asking me.

2  Q  Are the opinions expressed in your infringement
3  report relative to the Dallas Manufacturing beds in any
4  way dependent on whether or not a pet is on the bed?

5  A  My report does not reflect the -- whatever
6  effect a pet being on the bed would have because I
7  didn't have a pet with me.

8  Q  Did you believe it was necessary one way or the
9  other to use a pet?

10  A  No.

11  MR. SARET: Object.

12  THE WITNESS: Sorry.

13  MR. SARET: That's okay.

14  MR. CLARK: Q  You testified earlier that it's
15  common to push pet beds back against a wall or into a
16  corner.

17  A  Yes.

18  Q  If the Dallas beds were pushed against a wall or
19  into a corner, would that change your view at all as to
20  the position of the bolster relative to the base
21  cushion?

22  MR. SARET: Object to the form of the question.

23  THE WITNESS: If you push the bed up against the
24  wall, the wall will push the bolster into the center of

00163

1   Q   Well, you examined it closely, correct?

2   A   At the time I wrote my report, I had it at hand.

3   Q   But you didn't examine the construction closely

4 enough to answer those simple questions?

5   MR. SARET: Objection.

6   THE WITNESS: I don't remember is what I'm saying to

7 you.

8   MR. HARDIN: Q   All right. Did you make any

9 investigation on how my client's dog bed was put

10 together, in other words, where the seams were and how

11 the seams were sewn?

12   A   I did look at that.

13   Q   What did you find?

14   A   It's not identical to the Dallas bed.

15   Q   Were the seams double stitched, single stitched?

16 What did you find?

17   A   Some -- There's overcast stitching and there's

18 straight stitching as well.

19   Q   And do you know why one stitching was chosen

20 over another stitching?

21   A   I don't know the reason that you're -- Doskocil

22 chose to make the bed in that way, no.

23   Q   Do you know how the bed is constructed, which

24 piece is put together with which piece and the order of

00164

1 construction?

2   A   I understand it.

3   Q   Do you understand from your study of the bed
4 which pieces were sewn together first, second, third,
5 et cetera?

6   A   I don't at this moment, but I believe it's
7 possible to determine that.

8   Q   Did you ever read a deposition of a man named
9 Mr. Jesus Benevadies?

10   A   I think there are pages of his deposition. I
11 never read the entire deposition.

12   Q   You believe you reviewed a deposition where the
13 construction of my client's dog bed was explained?

14   A   I don't -- I believe the focus of what I read to
15 the best of my recollection was -- had to do with him
16 saying that they constructed the bed similarly to
17 another bed they already had and that they had continued
18 to construct it in the same manner. That's my
19 recollection.

20   Q   That's what you recall?

21   A   That's what I recall.

22   Q   Now, would you agree with me that Flexi-Mat was
23 not the first to use what you would call a bolster in
24 connection with a pet bed?

00171
1   it.

2   Q   Okay.

3   A   724.

4   Q   Right. Now, this bed has not just one covering,
5   but several covers, several covers, right?

6   A   I believe this does, yes.

7   Q   Okay. Let's take a look at the description of
8   that for a moment. It's in column 2.

9       Look down at about 44 in column 2, the
10  paragraph beginning with "the cushions". Do you see
11  that?

12  A   Yes, sir.

13  Q   It says the cushions 12, 14 and 16 are filled
14  with any suitable cushion material, for example, layers
15  of plastic foam or resilient foam particles, semi-rigid
16  or rigid beading, cloth filler and the like. To this
17  end, the filler may be contained in its own liner not
18  shown, which is put into the respective covers, that's
19  plural covers, of the cushions, 12, 14, 16 through
20  zipper openings 34, 35, 36 provided in these covers.

21      Do you see what that's referring to by looking
22  at the pictures?

23  A   Yes, sir, I do.

24  Q   So, first, it's talking about having an inner

00174

1   Q   You think my client's bolster has an open side?

2   A   Yes.

3   Q   Are you sure about that?

4   A   If I were to pick -- If I were to separate the
5   bolster from the bed, I believe that you would be able
6   to see the liner.

7   Q   That's the way you think my client's product is
8   constructed?

9   A   Yes, sir.

10  Q   You don't understand that my client has one --
11  has a complete cover that goes all the way around the
12  bolster and then a seam and then connects that -- those
13  two pieces of material to the bottom of the bottom
14  cushion?

15      MR. SARET:  Object to the form of the question.

16      THE WITNESS:  I believe it's all sewn together to
17  allow the bolster -- so that there isn't an opening, but
18  the bolster itself is like a separate open cut -- The
19  cover of the liner of the bolster is separate.  Until
20  you sew them together and close it, it's not a closed,
21  encapsulated container.

22      MR. HARDIN:  Q   I see.  And when that happens, when
23  it's sewed, isn't it a separate cover?

24  A   No, sir, it's the same cover.

Handlesman, Simon; 11/1/05                    Page 174

00176
1  together, that that makes it not a separate cover?

2  A  Yes, sir.

3  Q  I wanted to understand what your position is.

4     So my client could have, instead of paying $2 a

5  pop, which is what they say this patent is worth, my

6  client could simply have sewn one more seam along the

7  cover of its bolster and then practice the Henry patent

8  and not paid anything?

9  MR. SARET: Object to the form of the question.

10  THE WITNESS: One, I don't know anything about the

11  $2. This is the first time I've ever heard any money

12  mentioned. But I believe if your client or anybody were

13  to sew the bolster closed completely so it was a

14  separate item, that -- and then they could then attach

15  that, it would not be identical to the Flexi-Mat.

16  MR. HARDIN: Q  Okay. Fair enough.

17     Is there, by the way, a description in the

18  Henry patent about how those separate cushions are made?

19  A  There's some discussion, but I don't believe

20  there's a specific. Henry does talk about how they

21  might be attached, although, he doesn't -- I don't

22  believe it specifically defined as exactly how they were

23  made. But the way he talks about attaching them appears

24  to make it obvious that they are separate.

Handlesman, Simon; 11/1/05                    Page 176