UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
FLEXI-MAT CORPORATION,        )
      Plaintiff,              )
                             )      CIVIL ACTION NO.
            v.               )      04-10162-DPW
                             )
DALLAS MANUFACTURING COMPANY, )
BJ'S WHOLESALE CLUB, INC.,   )
DOSKOCIL MANUFACTURING       )
COMPANY, INC.,               )
      Defendants.            )
```

MEMORANDUM AND ORDER
April 11, 2006

Flexi-Mat Corporation ("Flexi-Mat"), a manufacturer and wholesaler of pet beds and other products, is the assignee of U.S. Patent No. 5,765,502 ("'502 patent") entitled "Pet Bed With Removable Bolster."  The '502 pet bed is a simple design consisting of a base cushion with a detachable pillow, or bolster, resting along its side.  The cushion and bolster are enclosed by a fabric cover with an opening for removal.

Dallas Manufacturing Company ("Dallas") imports and distributes a pet bed with a removable base cushion and bolster that it sells to BJ's Wholesale Club, Inc. ("BJWC").  Doskocil Manufacturing Company ("Doskocil") also makes similar pet beds for sale to BJWC.  BJWC, in turn, sells these beds to consumers under the name "Berkley & Jensen Premium Quality Bolster Pet Bed."

Flexi-Mat brings this action alleging that Dallas, Doskocil,

-1-

and BJWC have infringed claims 1-3 of the '502 patent.
Defendants deny infringement and assert that the '502 patent is
invalid under 35 U.S.C. §§102 (anticipation), 103 (obviousness),
and 112 (enablement).  Each party has filed motions for summary
judgment as to infringement and the validity of the '502 patent.

## I.  BACKGROUND

The '502 patent was issued by the United States Patent and
Trademark Office on June 16, 1998, based on an application filed
in 1996.  The named inventor is Scott Haugh, who was then in the
promotional furniture business as an employee of Now Products,
Inc.  Haugh Depo. at 17, 60 (Clark Decl., Ex. F).  Now Products,
Inc. assigned the entire right, title, and interest to this
patent to Flexi-Mat for unstated consideration.  Second Amended
Complaint, ¶ 10.

James Elesh, the Chief Executive Officer of Flexi-Mat,
claims that in 1996, there was a need for a bed with a washable
covering and a pillow or cushion that would elevate and support a
large dog's head and also provide the back support and sense of
security that dogs seem to like.  Elesh Decl. at ¶¶ 3, 4.
Believing that the '502 patent met these needs, Flexi-Mat
acquired it and began selling the beds described in it.  Id. at ¶
6.

Elesh claims that the Flexi-Mat bolster bed has been very
successful and created a new niche of luxury pet bed that
retailed in the range of $100-$200.  Id.  Between July 2000 and
June 2005, sales of the Flexi-Mat bed totaled over 150,000 units

-2-

and $7.5 million.  Id.  Elesh contends that several companies
have copied Flexi-Mat's patented bolster pet bed, and that those
companies have, by agreement, stopped making and selling the
beds.[1]  Id. at ¶ 7.

In 2002, Dallas first began talking to Costco, the
membership warehouse chain, about supplying a bolster pet bed.
Matthews Decl. at ¶ 5.  Richard Matthews, Vice President of Sales
and Marketing for Dallas, sent an email to the Costco buyer
attaching an image from a magazine that, although he claims not
to have known it at the time, showed a Flexi-Mat bolster bed.
Id.  Dallas sent several sizes of Flexi-Mat's bed with specified
materials and dimensions to its supplier in China and requested
quotes on making the beds.  Docket No. 105, Ex. 13, 14.  In an
email to the supplier, a Flexi-Mat employee referred to this bed
as a "knock off flexi bed."  Id., Ex. 14.  Costco decided not to
proceed with the pet bed at that time.

In mid-2003, Costco again expressed interest in a bolster
pet bed.  Matthews Decl. at ¶ 5.  Dallas Vice President of Sales
Susan White emailed to Costco another image of a proposed bolster
bed that Costco rejected.  Id. and Ex. A.  The Costco buyer
wrote:

> The pictures of this particular bolster illustrates
> [sic] the issue that we have been trying to get away
> from.  What happens is that the dog ends up nesting on
> the bolster instead of being able to snuggle their

_____

[1] Those companies are Trade Lines, Wynken, Blynken & Fido,
American Recreation Products, and New England Serum.  Elesh Decl.
at ¶ 7.

> [sic] back up to it.  In the end, the bolster gets
> squished and just becomes an extension of the bed, and
> a floppy extension at that.  I am trying to achieve a
> modified couch back style, one that stand [sic] up to a
> big dog leaning on it.

Id.  Dallas did not proceed to manufacture the pet bed shown in
that email.  Id.

Also in 2003, James M. Periera, the buyer for BJWC, asked
Dallas to submit a proposal for a bolster pet bed.  Id. at ¶ 6.
BJWC was interested in selling a "$29.99 Bolstered/Comfort Couch
type design Bed," modeled after the Orvis "Comfort Couch," a
version of Flexi-Mat's bed sold to Orvis by Flexi-Mat.  Docket
No. 105 at 2, Ex. 15, 16; Elesh Decl. at ¶ 6.  Dallas again sent
its supplier images and dimensions of a Flexi-Mat bed in order to
receive a quote.  Docket No. 105, Ex. 18.

On June 6, 2003, a Dallas sales representative met with Mr.
Pereira and showed him a prototype bolster bed made by Dallas in
its facility in Texas.  Docket No. 105 at 3.  Periera rejected
this design because the bolster, which was positioned alongside
the outer edge of the bottom cushion, "does not sit up very well
against the visuals from Orvis or against the import piece."  Id.
at Ex. 19; Matthews Decl. at ¶ 6.  Periera asked Dallas to make
modifications so that the bed would "sit up better and look
better once it is put on the floor."  Docket No. 105, Ex. 19; see
Periera Depo. at 132 (Clark Decl., Ex. G).

In response to Periera, Dallas made additional modifications
to the proposed pet bed.  Matthews Decl. at ¶ 8.  Periera
approved of the modified design, and in July 2003, BJWC agreed to

-4-

buy the Dallas bed.  Docket No. 105, Ex. 20.  Until that time, Doskocil had been BJWC's primary bolster pet bed supplier.  Id.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

Once the moving party shows that there is no genuine issue of material fact, the nonmovant must produce evidence to show that such a dispute exists.  Rathburn v. Autozone, Inc., 361 F.3d 62, 66 (1st Cir. 2004).  A fact is "material" if it has the "potential to affect the outcome of the suit under the applicable law."  Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000).  A "genuine" issue is one supported by such evidence that "a 'reasonable jury, drawing favorable inferences,' could resolve it in favor of the nonmoving party."  Triangle Trading Co., Inc. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (quoting Smith v. F.W. Morse & Co., 76 F.3d 413, 428 (1st Cir. 1996)).  "[C]onclusory allegations, improbable inferences, and unsupported speculation" are insufficient to establish a genuine dispute of fact.  Velez-Rivera v. Agosto-Alicea, 437 F.3d 145, 154 (1st Cir. 2006).

In ruling on the motion for summary judgment, a court must view "the facts in the light most favorable to the non-moving

party, drawing all reasonable inferences in that party's favor." Pacific Ins. Co., Ltd. v. Eaton Vance Management, 369 F.3d 584, 588 (1st Cir. 2004). The standard is the same where, as here, each party has moved for summary judgment. Id.

### III.  INFRINGEMENT

Flexi-Mat alleges that Defendants have infringed claims 1-3 of the '502 patent. Claims 1-3 provide:

> 1.  A pet bed comprising:
> an outer covering;
> a removable cushion disposed within the outer covering
> to form a cushioned bottom portion; and
> a bolster removably disposed within the interior of the
> outer covering and substantially all of said bolster
> disposed exteriorly about at least a portion of the
> perimeter of the bottom portion without being secured
> to the removable cushion.
>
> 2.  The pet bed of claim 1, wherein the outer covering
> further includes a reclosable access opening.
>
> 3.  The pet bed of claim 2, wherein the reclosable
> access opening further includes a zipper.

'502 patent at col. 3, ll. 37-50.

Determination of patent infringement requires a two-step analysis: first, the claims must be construed, and second, the accused device must be compared to the construed claims. Mars, Inc. v. H.J. Heinz Co., L.P., 377 F.3d 1369, 1373 (Fed. Cir. 2004). "The first step is a question of law; the second step is a question of fact." Freedman Seating Co. v. American Seating Co., 420 F.3d 1350, 1357 (Fed. Cir. 2005).

### A.  Claim construction

In Phillips v. AWH Corporation, 415 F.3d 1303 (Fed. Cir. 2005), the Federal Circuit set forth comprehensive guidelines for

claim construction.  Phillips reaffirmed the "'bedrock principle' of patent law that the 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  Id. at 1312 (quoting Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  Claim terms are "of primary importance, in the effort to ascertain precisely what it is that is patented."  Id. (quoting Merrill v. Yeomans, 94 U.S. 568, 570(1876)).

The starting point for claim construction is the claim term itself.  Id. at 1312.  In general, claim terms are given the "ordinary and customary meaning" that they would have to a person of ordinary skill in the art in question at the time of the invention.  Id. at 1313.  In cases involving simple technology, such as this one, "the ordinary and customary meaning of claim language as understood by a person of ordinary skill in the art may be readily apparent to a lay judge."  Id.  Consequently, claim construction "involves little more than the application of the widely accepted meaning of commonly understood words."  Id. General purpose dictionaries may be helpful in these circumstances.  Id. at 1314.

When the meaning of a claim term is not readily apparent, Phillips directs district courts to a hierarchy of sources to aid in claim construction.  The claims and the specification provide the best guidance.  Id. at 1313-14.  Other claims of the patent in question, both asserted and unasserted, can be "valuable sources of enlightenment as to the meaning of a claim term."  Id.

-7-

at 1314.  Consistent use of claim terms and differences among claims can be useful guides in claim construction.  Id.  Claims, however, must be read in view of the specification.  Id. at 1315. Phillips particularly emphasized the importance of the specification, stating that it is "entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description."  Id. at 1317.

Although Phillips approved of the use of prosecution history and extrinsic evidence in claim construction, it urged caution in their use.  Prosecution history may be valuable in that it demonstrates how the inventor understood the invention, but it represents an ongoing negotiation between the PTO and the applicant and "often lacks the clarity of the specification." Id. at 1317.  Technical dictionaries and expert testimony may help a judge better understand the underlying technology, but they are unreliable sources.  Dictionaries are neither part of the patent nor created at the same time; expert testimony is generated for litigation and may contain bias that is absent in the intrinsic record.  Id.

In sum, the touchstone of claim construction is the ordinary meaning of claim language as understood by a person of skill in the art.  In non-technical cases, determining this meaning may only require consultation of a general purpose dictionary.  If the meaning is not readily apparent, a court should give the most weight to the claims and the specification, followed by the prosecution history, and finally, the extrinsic evidence.

With these principles in mind, I construe the three disputed terms: "outer covering," "substantially all," and "disposed exteriorly about at least a portion of the perimeter of the bottom portion."

1.   <u>"outer covering"</u>

The dispute over the term "outer covering" focuses on whether the cover described in claim 1 must be a single, open compartment containing both the bottom cushion and the bolster or whether it includes coverings that have sealed partitions in between the cushion and bolster.  Flexi-Mat argues for a broad interpretation that includes coverings with pockets, interiors and/or compartments completely separating the cushion and bolster.  Docket No. 86 at 6.  Defendants urge a narrower construction: "a single article for receiving and enclosing both the removable bottom cushion and the removable bolster within a single interior space."  Docket No. 90 at 17.

Claim 1 provides:

    1. A pet bed comprising:
    an <u>outer covering</u>;
    a removable cushion disposed within the <u>outer covering</u>
    to form a cushioned bottom portion; and
    a bolster removably disposed within the interior of the
    outer covering and substantially all of said bolster
    disposed exteriorly about at least a portion of the
    perimeter of the bottom portion without being secured
    to the removable cushion.

'502 patent at col. 3, ll. 37-46 (emphasis added).

Beginning with the claim language itself, the term "outer covering" is singular and the articles "the" and "an," which are used in connection with "outer covering" in the claim and

throughout the specification, are also singular.  This suggests that the patentee intended there to be only one cover enclosing both the cushion and the bolster.  This language alone does not preclude the possibility that the single cover contains interior pockets or compartments providing some separation between the two pillows.

The other claims and the specification, however, indicate that the term "outer covering" does not include coverings that completely seal off the bolster from the pillow.  Claim 2 claims "a reclosable access opening."  '502 patent at col. 3, ll. 49-50.  Claim 7 states: "the removable cushion and bolster are separately removable from the outer covering interior through the reclosable access opening."  Id. at col. 4, ll. 20-22.  The use of the singular here again indicates that the covering has only one opening.  Figures 3, 4, and 5, although arguably representing only preferred embodiments, clearly depict a single opening.

The specification explains that the invention was designed to allow removal of both the cushion and the bolster through a single opening:

> the bolster is easily removable by the simple expedient of unzipping the zipper 7 on the bottom of the pet bed 1, disengaging the straps 8, and withdrawing the bolster through the reclosable access opening....  The bottom cushion 4 can also be withdrawn in the same way.

Id. at col. 3, ll. 9-14.  If the covering contained an internal partition completely sealing off the cushion from the bolster, removal of the two pillows through a single opening in the bottom of the covering would be impossible.

The same issue arises from claims 4, 7, 9, and 11.  They describe a bolster that is "removably affixed" or "removably secured" to the interior of the outer covering.  The specification contemplates no other mode of access to the affixed bolster other than through the single opening in the covering.  If the bolster were completely walled off from the compartment containing the opening, the user would be unable to detach it from the interior of the covering and remove it for cleaning.

In anticipation of this problem, the specification teaches that the pocket of the covering containing the bottom cushion must "communicate" with the bolster pocket.  Id. at col. 2, ll. 12-14.  In other words, the spaces containing the bolster and the bottom cushion must open into each other.  Figure 5, which clearly illustrates the insertion of both the bolster and the cushion through a single opening, further supports the conclusion that the two pillows must communicate.

Although the claims and specification present a strong case for a narrow construction of "outer covering," the parties debate extensively whether the patentee disavowed such a construction during prosecution.  Arguments made by the applicant during patent prosecution may serve to refine the scope of claim coverage.  Omega Engineering, Inc. v. Raytek Corp., 334 F.3d 1314, 1323-24 (Fed. Cir. 2003).  In order for the doctrine of prosecution disclaimer to apply, the patentee must make "clear and unmistakable" actions or statements disavowing claim scope.  Id. at 1325-26.  In determining the scope of disavowal, the test

is "whether a competitor would reasonably believe that the applicant had surrendered the relevant subject matter."  Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1457 (Fed Cir. 1998).

The patent examiner initially rejected claims 1-3 of the '502 patent as anticipated by U.S. Patent No. 5,010,843 ("Henry patent" or "'843 patent").  Docket No. 86, Ex. 2 at DMC000034-36. The Henry patent discloses a pet bed having a pair of top cushions that rest on a base cushion.  '843 patent at Abstract. The top cushions are joined to the base cushion by stitching or other means.  Id. at col. 2, ll. 19-28.  One embodiment of Henry's invention consists of a circular base cushion with two semi-circular top cushions, or bolsters, that leave a circular space in the middle for a pet.  Id. at Fig. 5.  The patent examiner found that this embodiment of the Henry patent anticipated the '502 patent.  Docket No. 86, Ex. 2 at DMC000034.

In response, claim 1 was amended to read that the bolster is located within the outer covering "without being secured to the removable cushion."  Docket No. 86, Ex. 2 at DMC000039.  In accompanying remarks, the inventor attempted to distinguish his invention from Henry by arguing that Henry teaches "separate covers" for each cushion with the potential for exposed connections that a pet could tear apart.  In contrast, the present invention avoids the problem of exposed connections because "a single cover encompasses both cushions."  Id. at DMC000042; '843 patent at col. 2, ll.56-60. at DMC000042.  He further argued that "Henry does not suggest a single cover for

all of the cushions, and it would be difficult to design such a cover and assemble such a bed using the interconnected cushions of Henry." Id.

The patent examiner did not comment further on the issue of separate covers. He merely proposed two additional amendments to claim 1: adding the phrase "substantially all of said bolster" and the word "exteriorly" to describe the position of the bolster relative to the bottom cushion. Id. at DMC000046. After a telephone interview with the examiner confirming that the '502 patent as amended read over the prior art, the patentee accepted the amendments and the patent issued. Id. at DMC000044.

Defendants contend that in distinguishing Henry on the basis of separate covers, the patentee limited the scope of his claims to a single cover with one interior compartment for both the bottom cushion and the bolster. Flexi-Mat argues that the examiner's response and suggested amendment indicate that the examiner rejected the patentee's attempt to distinguish Henry, and because the patentee accepted the examiner's proposals without further comment, any disavowal of claim scope is ambiguous.

I find that the patentee's comments during prosecution "clearly and unmistakably" disavow separate covers. Flexi-Mat effectively concedes this point. What is not clear from the record is the patent examiner's interpretation of the scope of the disavowal and his reasons for ultimately allowing the claims. Although the applicant and examiner discussed the issue of

separate covers, Docket No. 86, Ex. 2 at DMC000034, 42, the examiner's final communication offers only two amendments unrelated to the nature of the covering and no further explanation of his reasoning.  Id. at DMC000046.

Flexi-Mat argues that this silence on the part of the examiner suggests that examiner rejected the patentee's expressed claim limitation.  Flexi-Mat, however, misconstrues the law: the examiner's silence does not discount the value of the patentee's comments.  The fact that "the prosecution shifted to a different focus does not blunt the impact of those remarks made to overcome the prior rejection." Springs Window Fashions LP v. Novo Industries, LP, 323 F.3d 989, 995 (Fed. Cir. 2003). See also Laitram Corp. v. Morehouse Indus., Inc., 143 F.3d 1456, 1462 (Fed. Cir. 1998) ("Regardless of the examiner's motives, arguments made during prosecution shed light on what the applicant meant by its various terms.  The fact that an examiner placed no reliance on an applicant's statement distinguishing prior art does not mean that the statement is inconsequential for claim construction.")(internal citation omitted).  Thus, although I can draw no conclusion directly from the examiner's silence, the clarity of the patentee's disavowal is sufficient to cause a competitor, after reviewing the specification and the prosecution history, reasonably to conclude that the claimed invention consisted of a single covering, not multiple separate coverings.[2]

---

[2] Flexi-Mat distinguishes Springs Window Fashions LP v. Novo Industries, LP, 323 F.3d 989, 995 (Fed. Cir. 2003) from this case

The prosecution history clarifies that the "outer covering" must be a single covering, but it is of little use in resolving the main point of contention between the parties: whether that single covering includes compartments in which the bolster and cushion are entirely sealed off from each other.  That point of contention reduces the dispute to the definition of "separate."

"Separate" in this context is not a technical term, and its meaning is readily apparent: to set or keep apart.  Webster's Third New International Dictionary (1986).  The '502 patent refines this definition in that it teaches that the pillows may

---

on the grounds that the examiner here rejected the patentee's attempt to distinguish Henry on the basis of separate coverings. As discussed above, the examiner's proposal for two further amendments sheds no light on his acceptance or rejection of the separate covers argument.  Thus, Spring Windows, which addresses the situation in which an examiner's motivations are unclear, is on point.

Flexi-Mat analogizes this case to Hoganas AB v. Dresser Industries, Inc., 9 F.3d 948, 953 (Fed. Cir. 1993), in which an applicant attempted to distinguish his invention for making light-weight bricks over the prior art by arguing during prosecution that the fibers had to be thicker than capillaries. The district court found that the patentee disavowed coverage of capillary-sized fibers.  Id.  The Federal Circuit affirmed this conclusion, explaining that a "reasonable competitor could have concluded, from a reading of the prosecution history, that the examiner relied on this distinction in allowing the claim, and thus, that Hoganas had given up coverage" of that subject matter. Id.

Flexi-Mat ignores this central holding.  Instead, it mistakenly focuses on the Court's rejection of Hoganas' argument that the scope of the disavowal encompassed all of the distinctions that the patentee made between his invention and the prior art.  Id.  The Court refused to apply prosecution history estoppel to arguments that the examiner could not reasonably have relied on in allowing the claims.  Id.  In this case, the separateness of the coverings was clearly a meaningful way to distinguish over Henry, and there is no question that the examiner would have relied upon it.  Thus, Flexi-Mat's reliance on Hoganas is misplaced.

be "separate" in the sense that they are located in different parts of the interior, but they cannot be entirely sealed off from each other; the spaces containing each pillow must "communicate."  '502 patent, col. 2, ll. 12-13.

Flexi-Mat contends that the definition of "separate" turns on the way the covering was manufactured.  Specifically, it argues that the distinction between the "separate" covers in Henry and those at issue here is that each Henry cover is manufactured individually and completely and then connected together; the '502 cover, in contrast, is a unitary structure. Thus, Flexi-Mat argues, the '502 patent covers a bolster and pillow enclosed in a single covering sewn to create entirely sealed off pockets for each, but does not cover a bed made from pillows enclosed in individually made coverings, then connected together.  Id.  This argument makes little sense in light of the claims and the specification.  The patentee distinguished his invention over Henry because the Henry pillows were physically isolated in individual coverings and his were not; the method of manufacture was not at issue.[3]

_____

[3] Flexi-Mat points to testimony from Defendants' expert, Suzanne Fessler, in support of the proposition that the way the separate covers were created is material to the interpretation of "outer covering."  Docket No. 107 at 8; Docket No. 86 at 8. Fessler explains that the patentee used the term "separate" to mean that the Henry pillows were enclosed in individual pockets of material and then sewn together.  Id.  This testimony underscores the importance of the closed partition between the pillows in distinguishing between Henry and the current invention.  I do not understand Fessler's testimony to suggest that Henry does not anticipate a covering made from a unitary piece of cloth in which the bolster and cushion are sewn into

In sum, relying primarily on the claim terms, the claims, and the specification in accordance with <u>Phillips</u>, I construe the term "outer covering" as an article for receiving and enclosing both the removable bottom cushion and the removable bolster within an interior space such that the two pillows communicate with each other.[4]

2.   <u>"substantially all"</u>

Claim 1 requires that "<u>substantially all</u> of said bolster [be] disposed exteriorly about at least a portion of the perimeter of the bottom portion."  '502 patent at col. 3, ll. 43-44 (emphasis added).  The parties appear to agree that this means that some of the bolster is located along the perimeter, as opposed to the top, of the bottom cushion.  The dispute centers around exactly how much of the bolster must be alongside the bottom cushion in order to satisfy the "substantially all" limitation.  Defendants argue that "substantially all" should be construed as "largely, but not wholly, the totality of the bolster."  Flexi-Mat argues that the amount should not be expressly quantified, but that the entire bolster is not required

_____

individual, closed pockets.

[4] Flexi-Mat suggests that a construction of "outer covering" that excludes coverings with walled off compartments would exclude the preferred embodiment.  Docket No. 107 at 2, n.1. This is not the case.  The preferred embodiment describes a covering with two "pockets" -- one for each pillow -- and no suggestion of a barrier between them.  '502 patent at col. 2, ll. 45-46, 51-52, 65-67, and col. 3, ll. 1-2.  This design fits comfortably within the construction that I have given to the term "outer covering."

to be located alongside the perimeter.

The term "substantially all" in this context is neither technical nor complex.  If the term "all" were unmodified, the entirety of the bolster would rest alongside the perimeter of the bottom cushion, and no part of it could lie on top of the cushion.  See Webster's Third New International Dictionary (1986) (defining "all" as "the whole amount or quantity of").  The adjective "substantially" suggests that not just a small portion, but some significant amount, of the bolster must be located along the perimeter of the bottom cushion.  See id. (defining "substantial" as "of or relating to the main part of something").

This language is simple and clear, and according to Phillips, 415 F.3d at 1313, I need go no further than applying the widely accepted meaning of these commonly used words. Nevertheless, I note that the drawings in the specification and the prosecution history support the construction of "substantially all" as requiring the main portion of the bolster to be positioned along the outside edge of the bottom cushion.

Figures 1 -5 each depict a circular base cushion with a semi-circular bolster positioned around its perimeter.  The edge of the bolster appears to rest slightly on top of the bottom cushion, and in Figure 2, a small portion of the bolster seems to touch the ground.  But the main portion of the bolster is clearly located along the outside edge of the bottom cushion.  The remainder of the written description is not clear as to what portion of the bolster must be located along the edge of the

-18-

bottom cushion.  The specification states that the bolster is
"disposed about at least a portion of the perimeter of the
cushioned bottom portion of the pet bed," but offers no further
detail.  '502 patent at col. 2, ll. 52-54.

The prosecution history sheds some light on the question.
At the recommendation of the examiner, the patentee added the
words "substantially all of said bolster" and "exteriorly" to
distinguish the position of the bolster over the Henry patent.
The Henry patent primarily described top cushions that rested
entirely on top of the bottom cushion, but it explicitly
identified an alternative embodiment in which the top cushions
extend beyond the edges of the base cushion.  '843 patent at col.
3, ll. 18-19.  To avoid anticipation by Henry, the patentee made
clear that the bolster in the '502 pet bed was not situated
primarily on top of the bottom cushion, but along its outside
edge.

I agree with Flexi-Mat that expressly quantifying a
percentage of the bolster that must be located along the outside
edge of the bottom cushion is unnecessary.  However, merely
stating that the entire bolster need not be exterior ignores the
modifier "substantially."  In contrast, Defendant's proposed
definition -- "largely, but not wholly, the totality of the
bolster" -- accurately reflects the requirement that a main part
of the bolster be disposed exteriorly while allowing for a small
portion of the bolster to make contact with the floor or the top
of the cushion.  Thus, I construe "substantially all" to mean

"largely, but not wholly, the totality of the bolster."

3.   "disposed exteriorly about at least a portion of the
     perimeter of the bottom portion"

Claim 1 teaches that the bolster must be "disposed exteriorly about at least a portion of the perimeter of the bottom portion."  '502 patent at col. 3, l. 44.  The issue here is whether this language represents a means-plus-function claim that invokes 35 U.S.C. §112, ¶ 6.  Defendants contend that §112, ¶ 6 applies, and the function of "disposing" the bolster should be construed to cover fasteners, straps, or equivalents secured to the interior of the outer covering.  Flexi-Mat argues that this claim falls outside §112, ¶ 6.

Section 112, ¶ 6 allows for an element in a claim to be expressed "as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof."  35 U.S.C. §112, ¶ 6.  Such limitations are generally known as "means-plus-function" claims.  Apex, Inc. v. Raritan Computer, Inc., 325 F.3d 1364, 1371 (Fed. Cir. 2003).  Means-plus-function claims allow a patent applicant to claim a functional element without reciting specific structures for performing those functions.  Id.  When §112 applies, claim construction consists of two steps: (1) identifying the function and (2) identifying the structure described in the specification that performs that function.  ACTV, Inc. v. Walt Disney Co., 346 F.3d 1082, 1087 (Fed. Cir. 2003).

The Federal Circuit has established a framework for

-20-

determining whether a claim invokes §112, ¶ 6.  <u>Micro Chemical,</u>
<u>Inc., v. Great Plains Chemical Co., Inc.</u>, 194 F.3d 1250, 1257
(Fed. Cir. 1999).  If the word "means" appears in association
with a function, §112, ¶ 6 is presumed to apply.  <u>Id.</u>  This
presumption may be rebutted if the "claim itself recites
sufficient structure, material, or acts to perform the claimed
function."  <u>Id.</u>  If the word "means" does not appear in the claim
language, "a claim element is presumed to fall outside means-
plus-function strictures."  <u>Id.</u>  This presumption collapses "when
an element lacking the term 'means' nonetheless relies on
functional terms rather than structure or material to describe
performance of the claimed function."  <u>Id.</u>

Because claim 1 does not use the word "means," it is
presumed that §112, ¶ 6 does not apply.  The analysis then turns
on whether claim 1, "as understood by one of ordinary skill in
the art, ... fails to recite sufficiently definite structure or
else recites a function without reciting sufficient structure for
performing that function."  <u>Apex</u>, 325 F.3d at 1373.

The relevant portion of claim 1 provides:

a bolster removably disposed within the interior of the
outer covering and substantially all of said bolster
disposed exteriorly about at least a portion of the
perimeter of the bottom portion without being secured
to the removable cushion

'502 patent at col. 3, ll. 42-46.  This language describes the
bolster as "disposed exteriorly."  These are non-technical words
whose meanings to one skilled in the art are readily apparent:
"disposed" means "to put in place," and "exteriorly" means

external or situated at the outer surface.  See Webster's Third New International Dictionary (1986).  Thus, the term "disposed exteriorly" explains that the bolster is positioned alongside the surface of the outer edge of the bottom cushion.  "Disposed exteriorly" is not a specific function; rather, it is a description of the location of a structure -- the bolster -- relative to other structures.

The construction of "disposed exteriorly" as structural rather than functional makes sense in light of the specification. The specification repeatedly describes, and the figures each depict, the bolster as "disposed about at least a portion of the perimeter of the bottom portion."  '502 patent at col. 2, ll. 2-5, 52-53.  In describing the advantages of securing the bolster to the interior of the cover, the patentee explains that "holding the bolster in the bolster pocket keeps the bolster relatively fixed in position with respect to the perimeter of the bottom portion of the pet bed."  Id. at col. 3, ll. 4-7.  This language suggests that the invention consisted of a bolster that was located in a certain position relative to the bottom cushion. The term "exteriorly" makes clear that the position is along the outer edge of the base.

Defendants contend that claim 1 includes the function of "dispos[ing] the bolster exteriorly about at least a portion of the perimeter of the bottom portion."  Docket No. 79 at 16.  They argue that the structures for performing this function are the fasteners or straps mentioned not in claim 1, but in claims 4, 5,

6, 9, 10, 11 and in the specification at col. 2, ll. 11-12, 61-68 and col. 3, ll. 1-7.

This interpretation distorts, and consequently misconstrues, the claim terms. "Disposing the bolster" could be construed as functional language claiming the function of positioning the bolster in place. But this is not the language that the patentee used. Claim 1 clearly states that the bolster is "disposed exteriorly," not that some later-claimed structure is "disposing the bolster." The fact that the patentee also claimed structures -- fasteners or straps -- for holding the bolster in place does not convert his description of the bolster in claim 1 into a means-plus-function claim.

Thus, the claim language and specification indicate that the presumption against applying §112, ¶ 6 stands, and the strictures of that provision do not limit the construction of "disposed exteriorly about at least a portion of the perimeter of the bottom portion."

**B.   Comparison of claims to the accused products**

The second step in the infringement inquiry consists of comparing the claims to the accused product. <u>Microstrategy Inc. v. Business Objects, S.A.</u>, 429 F.3d 1344, 1352 (Fed. Cir. 2005). To prove infringement, a patentee must show that an accused product "incorporates every limitation of a claim, either literally or under the doctrine of equivalents." <u>Id.</u> If even one claim limitation is missing or not met, there is no literal infringement. <u>Id.</u> In the absence of literal infringement, the

doctrine of equivalents allows patentees "to claim those insubstantial alterations that were not captured in drafting the original patent claim but which could be created through trivial changes." <u>Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.</u>, 535 U.S. 722, 733 (2002).

Flexi-Mat asserts that Defendants literally infringed claims 1-3 of the '502 patent; it makes no argument based on the doctrine of equivalents. Thus, in order to survive summary judgment, Flexi-Mat must show that the accused beds literally read on each element of claims 1-3.

Dallas makes two styles of beds that are at issue here. Each style consists of a cylindrical bolster and a circular bottom cushion. Docket No. 79 at 7; Matthews Decl., Exhs. B-E. The bolster and cushion are enclosed individually in coverings that are stitched together to form a single covering. <u>Id.</u>; Fessler Rept., Ex. A. The bolster rests primarily on top of the bottom cushion, extending the length of approximately half the circumference of the base. Docket No. 79 at 7; Matthews Decl., Exhs. B-E.

The two styles differ in terms of the placement of the openings in the outer covering. The bed that is sold to BJWC, Big Lots, Sam's Club, and Bass Pro, has two zippered openings in the back: one that provides access to the bolster and one for the bottom cushion. The one that opens to the bolster is located along a portion of the seam that connects the bolster cover to the cushion cover. The opening for the cushion stretches along

-24-

part of the bottom perimeter of the cushion cover.  In contrast, the bed sold at Costco ("Costo bed") has only a single opening in the covering through which both the bolster and cushion can be removed.   Matthews Decl., Ex. F.  Upon unzipping this opening, the bottom cushion is immediately visible and accessible.  The bolster is accessed by reaching into the space where the bottom cushion is located and opening the pocket containing the bolster.

The bed made by Doskocil ("Doskocil bed") contains the same basic components as the Dallas bed sold to the four major retailers: a circular bottom cushion and a cylindrical bolster, each enclosed in a fabric covering with a zippered opening.  The pillow covers are stitched together to create a single covering. The Doskocil bed differs from the Dallas bed in terms of the position of the openings and the bolster.  The opening in the bolster cover is near, but not on, the seam with the bottom cushion and runs the length of the cover, instead of just a portion of it.  The opening for the bottom cushion is a straight line stretching across a portion of the circular base near the seam where the bolster connects.  Both of these openings are located on the underside of the bed.  The Doskocil bed bolster rests primarily along the perimeter of the bottom cushion rather than on top of it, as in the Dallas bed.

Neither the Dallas nor Doskocil beds have fasteners or straps securing or affixing the bolster to the outer cover.

The accused products clearly meet several of the limitations set forth in claims 1-3.  Defendants effectively admit to making

-25-

and selling pet beds that include a removable bottom cushion disposed within a covering, an unsecured removable bolster disposed within a covering, and a reclosable zippered access opening.  Because I have held that the language "disposed exteriorly about at least a portion of the perimeter of the bottom portion" falls outside §112, ¶6, fasteners, straps, or the equivalent are not required for a finding of infringement.  Thus, the determination of infringement turns on whether the accused products contain an "outer covering" and a bolster such that "substantially all of said bolster [is] disposed exteriorly about at least a portion of the perimeter of the bottom portion."  '502 patent at col. 3, ll. 43-46.

An "outer covering," as I have construed the term, is a an article for receiving and enclosing both the removable bottom cushion and the removable bolster within an interior space such that the two pillows communicate with each other.  The Doskocil bed and the Dallas bed sold to the four major retailers do not meet this limitation because the two pillows are sealed off from each other by a sewn seam.  The Costco bed, however, is configured so that the bolster pocket opens into the cushion pocket, allowing both the bolster and cushion to be removed through a single opening in the outer covering.  This design arguably fits within claim 1.

"Substantially all" of the bolster of the Costco bed, however, is not disposed about the perimeter of the bottom cushion.  I defined "substantially all" in this context to mean

-26-

"largely, but not wholly, the totality of the bolster."  The
Costco bed bolster, like the bolsters on all of the accused
Dallas beds, is situated on top of the bottom cushion.  Only the
Doskocil bed, in which the bolster appears to rest almost
entirely along the outer perimeter of the bottom cushion,
satisfies this limitation.

Flexi-Mat contends that the Dallas bed bolsters meet the
"substantially all" limitation because when a pet leans against
it, the bolster moves so that it rests against the side of the
bottom cushion.  Flexi-Mat claims that Dallas' expert conceded as
much when she opined that a pet could "push the bolster so that
part of it leans over the side of the bottom cushion."  Fessler
Report at 15.  Because the Dallas bed meets this limitation at
least some of the time, Flexi-Mat argues, it infringes.  See Bell
Communications Research, Inc. v. Vitalink Communications Corp.,
55 F.3d 615, 622-23 (Fed. Cir. 1995) ("an accused product that
sometimes, but not always, embodies a claimed method nonetheless
infringes").

Dallas responds that although some of the bolster may extend
over the cushion when leaned upon, most of it remains on top.
Dallas' expert supports this view.  She explains that the bolster
covering is stitched to the top of the cushion covering and a
fabric gusset prevents the bolster from sliding down over the
perimeter of the bottom cushion.  Fessler Report at 14-15.  In
other words, the bottom cushion prevents the bolster from
"flopping over."

"An accused device may be found to infringe if it is reasonably capable of satisfying the claim limitations, even though it may also be capable of non-infringing modes of operation." Hilgraeve Corp. v. Symantec Corp., 265 F.3d 1336, 1343 (Fed. Cir. 2001). The evidence before me indicates that substantially all of the Dallas bed bolster is not "reasonably capable" of being located alongside the outer edge of the bottom cushion.

The Dallas bolster cover is sewn to the top of the bottom cushion cover so that the edges of the two covers are aligned at the back of the bed. See Fessler Report, Ex. A. As a result, the area of the bottom cushion where the pet sits is not completely circular; the portion where the bolster lies is shaped like a bell. Id. When the pillows are inside the covers and the bed is unoccupied, the bolster clearly sits on top of the bottom cushion, with the backs of the bolster and cushion aligned vertically up from the floor. See id. at Ex. B.

If a large pet were to sit in the bed and lean against the bolster, the bolster cover -- because it is sewn to the top of the cushion cover and extends about half way around the bottom cushion -- would restrict the bolster's range of motion. Although some of the bolster may extend beyond the perimeter of the bottom cushion, as is the case with the Henry patent, "substantially all" of it cannot. If a pet or a person were to

-28-

lean against the bolster with great force, either the bottom cushion would lift up  off of the ground or the seams of the bolster cushion would stretch or tear.  Under these circumstances, perhaps a greater portion of the bolster would rest alongside the edge of the bottom cushion than under normal conditions.  However, there would be no infringement.  See Hilgraeve, 265 F.3d at 1343 ("an accused device does not infringe in its normal configuration, even if it may be altered into an infringing configuration under unusual circumstances") (citing High Tech Medical Instrumentation v. New Image Industries, Inc., 49 F.3d 1551, 1556 (Fed. Cir. 1995)).

In sum, after viewing the facts in favor of each party in turn, none of the accused beds presents a genuine issue of material fact as to infringement.  The Dallas beds do not meet the "substantially all" limitation, even though he Costco bed may be siad to have an "outer covering."  The Doskocil bed may read on the "substantially all" element, but not the "outer covering."[5]

---

[5] Defendants have moved to strike the Declaration of Simon Handelsman, Docket No. 100, an expert retained by Flexi-Mat in this matter.  They object to ¶¶ 2-9 in his Declaration, arguing that they constitute a new, belated, and improper expert report, submitted three-and-a-half months after the deadline for submitting opening expert reports and well after the close of discovery.  Docket No. 113 at 1; see Fed. R. Civ. Proc. 16(f).  Flexi-Mat responds that the Handelsman Declaration merely restates what he said in his initial expert reports and deposition, and even if it is considered a belated supplemental expert report, it should be admitted because it addresses points raised in Defendants' motion for summary judgment and Defendants were not surprised or otherwise prejudiced by it.  Docket No. 114

## IV.  Validity

Defendants contend that claims 1-3 of the '502 patent are invalid under 35 U.S.C. §§102, 103, and 112.[6]  Patents are

_____

at 2.

Flexi-Mat filed and served the Handelsman Declaration on January 9, 2006, well after the September 23, 2005, deadline for opening expert reports.  In ¶¶ 2-9, Handelsman comments on the method of manufacture of the Doskocil and Dallas beds and describes the location of the bolster on those beds.  The discussion of the manufacturing process was new information not directly raised in the Expert Reports on Infringement and Validity submitted by Handelsman prior to the deadline.  Docket No. 86, Ex. 3; Docket No. 81, Ex. 16.

Although the subject matter of the Declaration was closely related to the previously submitted expert reports, Flexi-Mat never moved for leave to supplement its expert report and offers no reason for its tardiness.  In the absence of an excuse from Flexi-Mat, I will exclude the belated Declaration.  <u>See Astrazeneca AM v. Mutual Pharmaceutical Co., Inc.,</u> 278 F. Supp. 2d 491, 502-503 (E.D. Pa. 2003).

[6] Doskocil's motion for summary judgment on validity includes claims 7 and 8, in addition to claims 1-3.  It notes that Flexi-Mat's complaint does not specify which claims are at issue; rather, it broadly alleges infringement "of one or more claims of the '502 patent."  Amended Complaint at ¶ 21.  In its briefs, Flexi-Mat only argues the infringement and validity of claims 1-3.  It insists that there is no case or controversy regarding claims 7 and 8.  Docket No. 96 at 2.

Without a case or controversy, a district court has no jurisdiction to make a declaratory judgment on the validity of claims.  <u>Grain Processing Corp. v. American Maize-Products Co.</u>, 840 F.2d 902, 905 (Fed. Cir. 1988).  An actual controversy exists where "the defendant objectively has a 'reasonable apprehension' that it will face an infringement suit' on those claims."  <u>Id.</u> at 906 (quoting <u>Jervis B. Webb Co. v. Southern Sys., Inc.</u>, 742 F.2d 1388, 1398 (Fed. Cir. 1984)).

Here, Doskocil has no "reasonable apprehension" that it will face an infringement suit from Flexi-Mat on claims 7 and 8.  Although Flexi-Mat's Amended Complaint is unclear as to which claims it includes, Flexi-Mat has litigated only claims 1-3 and has expressly and unambiguously denied that claims 7 and 8 are at issue.  Docket No. 96 at 2.  Moreover, claims 7 and 8, which require that the bolster be "removably secured to the interior of the outer covering," do not plainly read on the Doskocil bed.  Thus, despite Doskocil's professed distrust of Flexi-Mat, <u>see</u> Docket No. 110 at 2, the lack of an actual controversy precludes

presumed to be valid.  35 U.S.C. §282.  In order to overcome this

presumption, Defendants must prove invalidity by "clear and

convincing" evidence.  Perricone v. Medicis Pharmaceutical Corp.,

432 F.3d 1368, 1372 (Fed. Cir. 2005).

1.  §102

        Section 102 invalidates claims that have been anticipated by

prior art.  A claim is anticipated "if each and every limitation

is found either expressly or inherently in a single prior art

reference."  IPXL Holdings, L.L.C. v. Amazon.com, Inc., 430 F.3d

1377, 1381 (Fed. Cir. 2005).  "A claim limitation is inherent in

the prior art if it is necessarily present in the prior art, not

merely probably or possibly present."  Akamai Technologies, Inc.

v. Cable & Wireless Internet Services, Inc., 344 F.3d 1186, 1192

(Fed. Cir. 2003).  The touchstone of anticipation analysis is

"whether one skilled in the art would reasonably understand or

infer from the prior art reference's teaching that every claim

[limitation] was disclosed in that single reference."  Id.  The

inquiry consists of two steps: (1) claim construction and (2)

comparison of the properly construed claims to the prior art.

Id.  I begin here with step two, referring to the terms that I

construed in Part III.A., supra, and construing additional claim

terms as necessary.

        Defendants contend that the '502 patent is anticipated by

numerous references, including: 5,421,044 to Steensen ('044

_____

a declaration about the validity of claims 7 and 8.

-31-

patent"); 5,136,981 to Baretto ('981 patent); 5,588,393 to
Heilborn ('393 patent); 5,826,537 to Heilborn ('537 patent);
4,754,513 to Rinz ('513 patent); 5,586,350 to Thönnessen ('350
patent); German Patent No. 93 09 699.2 to Hoechst AG ('699
patent); 4,872,228 to Bishop ('228 patent); Article by A.B.
Murray and A.C. Furguson, <u>Dust Free Bedrooms in the Treatment of
Asthmatic Children With House Dust or House Dust Mite Allergy</u>
("Murray article"); Article by Walshaw and C.C. Evans, <u>Allergen
Avoidance in House Dust Mite Sensitive Adult Asthma</u> ("Walshaw
article"); Article by Marc L. Rivo and Floyd J. Malveaux,
<u>Outpatient Management of Asthma in Adults</u> ("Rivo article");
4,873,734 to Pollard ('734 patent); the Henry patent; 655,087 to
Jones ('087 patent); 2,408,382 to Dubick ('382 patent); 3,566,423
to Reinfelds ('423 patent); 3,902,456 to David ('456 patent);
5,455,973 to Brumfield ('973 patent); 2,032,248 to Bins ('248
patent); 5,109,559 to West ('559 patent); Japanese patent
publication number 07-051154; European patent number 633,338; DE
3138463; and all prior referenced art in the '502 patent.

In their briefs, Flexi-Mat and Dallas group the majority of
these references into three categories: walled pet beds, non-pet
beds, and top bolster references.  They then separately address
the '044 and '248 patents.  For clarity and ease of analysis, I
do the same here.

a.   *Walled pet beds*

The '981, '393, and '573 patents each feature pet beds in
which the bottom cushion is surrounded in whole or in part by a

wall.  The '981 bed consists of a sidewall, a base, and a cover.
'981 patent at col. 3, ll. 31-33.  The sidewall and base are made
of a soft, flexible foam-core material or a hollow polyethylene
structure so that a pet can lean comfortably against it.  Id. at
col. 3, ll. 34-40, 57-58.  The sidewall and base are separable
and removable from each other and from the cover to allow for
cleaning and for folding the bed compactly.  Id. at col. 4, ll.
1-7.

The '393 and '537 patents (Heilborn patents) disclose a
bottom cushion at least partially surrounded by a collapsible
wall and a fabric cover with openings for removal of the cushion
and wall.  '393 patent at col. 2, ll. 22-36.  The primary
difference between the '981 patent and the Heilborn patents
appears to be the method of collapse and storage of the beds.

Defendants contend that these walled pet beds anticipate the
'502 patent because they disclose a pet bed comprising an outer
covering, configured to receive a removable bottom cushion; a
bottom cushion disposed within the outer covering; and a bolster,
substantially all of which is disposed about at least the
perimeter of the bottom cushion.  Flexi-Mat responds that the
'502 patent discloses a "bolster," which is different from a
"wall."  The question of whether the walled pet beds are
anticipatory, therefore, turns on the definitions of "bolster"
and "wall."

The specification suggests that a "bolster" and a "wall" are
distinct structures.  The '502 patent describes a "bolster" as a

-33-

"long, slender pillow" and "more cylindrical or banana-shaped than flat, and more like a pillow than a wall."  '502 patent at col. 3, l. 4; col. 2, ll. 56-57.  The drawings and figures show just such an elongated, cylindrical pillow.  This usage of "bolster" conforms with the commonly understood definition of the term as "a long pillow or cushion."  Webster's Third New International Dictionary (1986).  In contrast, the specification describes a "wall" as a structure that "extends upwardly from the periphery of the bed."  '502 patent, col. 1 at 17-18.  The vertical nature of a wall is distinct from the flatter, rounder, nature of the bolster and lends different qualities to the pet bed.  The patentee explained that wall beds tend to collapse when leaned upon by a large pet.  Id. at col. 1, ll. 21-26.  In contrast, the "bolster tends to retain its shape even when used as a pillow by the pet, and does not easily collapse."  Id. at col. 2, ll. 57-60.

Defendants contend that in the industry, "bolster" and "wall" are interchangeable terms, Fessler Decl. at 46, 73-74, 81-82, and that the "walls" disclosed in the walled pet bed patents can vary in size and shape, including a pillow-like configuration.  '981 patent at col. 6, ll. 56-58.  The use of this term in the relevant industry, however, is unhelpful to claim construction here for two reasons.

First, the industry usage is disputed: Flexi-Mat's expert, Simon Handelsman, disagrees that the two terms are interchangable.  Handelsman Report at 12 (Docket No. 81, Ex. 16).

-34-

In arriving at opposite conclusions, Defendants focus on the
ability of both a bolster and a wall to provide support for a
pet, while Flexi-Mat focuses on the physical characteristics of
the bolster.  <u>See</u> Docket No. 104 at 9; Docket No. 5.

Second, the specification clearly distinguishes the two
terms, and according to <u>Phillips</u>, it is more reliable, and hence
more persuasive, than expert testimony.  <u>Phillips</u>, 415 F.3d at
1318.  The specification narrows the definition of "bolster"
beyond just a structure that provides support.  The specification
suggests that a "bolster" is a long, cylindrical pillow, as
opposed to a vertically oriented structure.

Adopting this definition, there is no genuine dispute of
fact as to whether the walled pet beds anticipate the '502
patent; they do not.  The sidewall of the '981 patent has "a
generally upright orientation with respect to base" and "extends
upwardly from either the support surface or from the base."  '981
patent at col. 8, ll. 3-4, 7-8.  Similarly, the Heilborn patents
describe the sidewall as "an upstanding wall member."  <u>See</u> '393
patent at col. 6, ll. 48-49.  Thus, none of the walled pet beds
disclose a "bolster," and they are not anticipatory.

    b.    *Non-pet beds*

Defendants contend that five patents disclosing various
sleep-related inventions intended primarily for human use
anticipate the '502 patent.  The '044 patent discloses an air bed
comprised of two levels of inflatable air tubes packed within a
rectangular frame, surrounded by bolster and cushion air-filled

tubes. '044 patent at Abstract. The '513 patent claims a pillowcase with a pocket secured to the inside containing a semi-cylindrical, elastomeric insert that converts a regular pillow into an orthopedic pillow. '513 patent at col. 2, ll. 9-28. Similarly, the '350 patent describes a low flammability pillow consisting of a pillowcase enclosing a removable, flat pillow and a cylindrical orthopedic neckroll made with a particular fiber density.[7] '350 patent at col. 2, ll. 8-9, 40-48. The '734 patent discloses a "bumper sheet," which it describes as a sheet with an array of pockets containing soft, removable, cylindrical inserts entirely or partially enclosing a sleeping area to prevent the occupant of the bed or crib from falling out or getting caught in the side rails. '734 patent at col. 1, ll. 49-64. The '228 patent, also concerned with preventing occupants from falling out of bed, discloses a bed guard comprised of at least one cylindrical bolster held in place on top of a mattress by friction and a conventional fitted bed sheet. '228 patent at col. 1, ll. 51-61.

In determining whether these non-pet beds are anticipatory, the parties focus on the relevance of the preamble to claim 1. A preamble "limits the invention if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and

---

[7] Defendants have cited to foreign patents which disclose inventions similar to the '350 patent. See '699 patent; Japanese patent publication number 07-051154; European patent number 633,338. Analysis of the '350 patent in this Memorandum applies equally to these foreign patents.

vitality' to the claim." Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc., 289 F.3d 801, 808 (Fed Cir. 2002) (quoting Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1305 (Fed. Cir. 1999)). However, "a preamble is not limiting 'where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use of the invention.'" Id. (quoting Rowe v. Dror, 112 F.3d 473, 478 (Fed. Cir. 1997)). Ultimately, a judge determines whether a preamble is a limitation only after reviewing the entire patent "to gain an understanding of what the inventors actually invented and intended to encompass by the claim." Id. (quoting Corning Glass Works v. Sumitomo Electric U.S.A., Inc., 868 F.2d 1251, 1257 (Fed. Cir. 1989)).

The preamble to claim 1, in its entirety, states: "A pet bed comprising..." '502 patent at col. 3, l. 38. Flexi-Mat argues that this language indicates that the inventor was focused on fixing certain problems specific to existing pet beds, and consequently, only inventions related to pet beds can be anticipatory. Defendants respond that the preamble is not so limiting here because it was not relied upon during prosecution, claim 1 describes a structurally complete invention, the preamble merely states an intended use or description of the article itself, and the patent examiner cited non-pet bed references against the claims.

Looking at the patent as a whole, the inventor clearly intended the invention to be used for the purpose stated in the

preamble: as a pet bed.  The specification repeatedly refers to
the invention as a "pet bed," and each claim begins with the term
"pet bed."  <u>See</u> '502 patent at Abstract; col. 1, l. 67; col. 2,
ll. 34, 40, 45, ; col. 3 at l. 31; claims 1-11.  The Background
to the Invention makes clear that the inventor designed the
bolster feature to accommodate larger pets and the single cover
for easy cleaning of pet dirt and odors.  <u>Id.</u> at col. 1, ll. 23-
24, 46-47.

Nevertheless, I find that the preamble is not necessary to
give "life, meaning, and vitality" to the claim.  <u>Catalina
Marketing,</u> 289 F.3d at 808.  The brief preamble states the
intended use of the invention but contains no structurally
significant information or information essential to understand
the claim body.  <u>See id.</u>  In <u>Catalina Marketing</u>, the Federal
Circuit rejected the argument that the words "located at
predesignated sites such as consumer stores" in the preamble
limited the scope of claims that described a coupon dispensing
terminal.  The location of the terminal was not essential to the
structure of the coupon dispenser terminal.  <u>Id.</u> at 810.
Similarly, the use of the invention as a pet bed here is not
essential to its structure.  Indeed, limiting the scope of the
claims only to pet bed uses would deprive Flexi-Mat of the full
benefit of the patent.[8]  <u>See id.</u> at 809 ("[t]he inventor of a
machine is entitled to the benefit of all the uses to which it

_____

[8] For example, the "pet bed" could be used as a chair for
children.

can be put, no matter whether he had conceived of the idea of the use or not") (quoting Roberts v. Ryer, 91 U.S. 150, 157 (1875)).

Flexi-Mat analogizes this case to Corning Glass, 868 F.2d 1251, in which the Federal Circuit found that the term "optical waveguide" in the preamble limited the scope of the claim because the inventors were working on a particular problem with optical communication systems, not on general conventional optical fibers. Id. at 1257. The Corning Glass Court held that the inventor used the words "optical waveguide" to refer to a very specific type of optical fiber covered by the claims, and to broaden the claims beyond that type of fiber would be "divorced from reality." Id. But that is a distinctly different circumstance than that presented here where the patentee made an invention intended for a particular use, but clearly usable for other purposes.

Having held that the preamble does not limit the claims, it follows that non-pet bed prior art may be anticipatory. Upon examination of the patents offered by the defendants, there is no genuine issue of material fact that the '044, '734, '228, and '350, patents do not meet each and every limitation set forth claim 1. The '044 patent, as discussed in greater detail in Part d., infra, consists of an interconnected system of air tubes, which do not include a bolster disposed exteriorly about at least a portion of the perimeter of the bottom portion. The bumper restraints disclosed by the '734 and '228 patents fail because the bolsters appear to be located on top of the bottom mattress.

The '350 patent also fails to anticipate because of the location of the bolster on top of the pillow.  I consider in the next section whether there is a genuine issue of material fact as to whether the '513 patent is anticipatory.

   *c.   top bolster references*

   Five of the allegedly anticipatory patents appear to have bolsters that rest on top of, as opposed to alongside, the bottom cushion.  The '513 and '350 patents, described above, disclose orthopedic pillows with semi-cylindrical bolsters.  <u>See</u> '513 patent at col. 2, ll. 9-28; '350 patent at col. 2, ll. 8-9, 40-48.  The '734 and '228 patents, also described above, are bumper sheets with bolsters that prevent occupants from falling out of bed.  '734 patent at col. 1, ll. 49-64; '228 patent at col. 1, ll. 51-61.  The Henry patent, discussed in detail in Part A.1., discloses a pet bed with two semi-circular pillows on top of a bottom cushion.  '843 patent at Abstract.

   I have defined the phrase "substantially all of said bolster disposed exteriorly about at least a portion of the perimeter of the bottom portion" to mean that largely, but not wholly, the totality of the bolster must be positioned alongside the surface of the outer edge of the bottom cushion.  On their face, each of the top bolster references appear to include bolsters that rest entirely, or almost entirely, on top of the bottom cushion and, consequently, are not anticipatory.

   Defendants contend that certain configurations of the top bolster references disclose a bolster that meets the limitations

-40-

in the '502 patent.  The '513 patent, they argue, teaches that the bolster may be rotated "about the conventional pillow 17 in accordance with the preferance [sic] of the user" for prevention of and relief from headaches, stiff neck, back pain and upper body tension.  '513 patent at col. 2, ll. 53-56.  Defendants' expert claims that "[i]f a person rotated the pillowcase 10 far enough, the person could adjust the position of the insert 16 so that substantially all of the insert would be disposed beside the pillow 17, as opposed to atop the pillow 17."  Fessler Rept. at 22 (Docket No. 104, Ex. A).  Flexi-Mat responds that while it may be possible to position the bolster exteriorly, it is not "necessarily present" in the invention and thus is not inherent in the prior art.  See Akamai, 344 F.3d at 1192.  Flexi-Mat's expert claims that the rotation of the pillow suggested by the patent is limited only to adjustment on top of the bottom pillow. Handelsman Rept. at 14 (Docket No. 81, Ex. 16).

A claim limitation must be "necessarily present," not "merely probably or possibly present" in the prior art in order to be anticipatory.  Akamai, 344 F.3d at 1192.  The '513 patent teaches that the bolster may be rotated "about" the bottom pillow.  The term "about" is used in its non-technical, common manner, and thus suggests that the bolster can, within reason and not by some extreme act of contortion, be placed variously around bottom pillow.  Although the figures depict the bolster resting on the top, the language of the specification arguably appears to leave room for a bolster that adjusts to the side of the pillow.

-41-

But it requires an act of contortion to do so.  It is simply unreasonable to say that the '513 patent inherently discloses a bolster substantially all of which is disposed exteriorly about at least a portion of the perimeter of the bottom portion.

The '350 patent presents an even weaker case for anticipation because the written description makes no suggestion that the bolster can be positioned alongside the bottom pillow. To be sure, the  specification states that the bolster can be "connected detachably to the pillow at a suitable position," '350 patent at col. 5, ll. 54-55, and there is no language limiting the range of "suitable" positions.  However, without some suggestion that the invention contemplates a bolster positioned alongside the bottom cushion, a reasonable juror cannot, on these facts, find that the '350 patent is anticipatory.

There is no genuine issue of material fact that the remaining top bolster references do not anticipate the '502 patent.  The '228 and '734 patents do not appear to disclose any bolster position other than on top of the bed, and although the Henry bolster may partially extend over the edge of the bottom cushion, <u>see</u> '843 patent at col. 3, ll. 18-19, the main part of it rests atop the base.

d.    '044 patent

The '044 patent describes a bed made from a series of air-filled tubes.  In its preferred embodiment, the bed frame consists of a rectangular, zippered outer covering sewn to create an upper and a lower panel, resembling two empty mattresses

-42-

stacked on top of each other. '044 patent at col. 3, ll. 11-32, 52-57. The enclosure has an upper and a lower level separated by a plurality of restraining straps. Id. at col. 1, ll. 60-66. A number of inflatable air tubes lie horizontally within each level. Id. at col. 1, l. 68- col. 2, l. 6. The sides of the upper and lower levels of the enclosure are lined with bolster and cushion air tubes, and a foam pad covers the upper level of tubes. Id. at col. 2, l. 4-6; col. 4, ll. 20-27. The bolster tubes are secured by cinch belts and surrounded by an attached, noise-reducing sheathing material to prevent the tubes from moving excessively. Id. at col. 4, ll. 10-19, 48-51. The bolster tubes are connected by an air hose assembly to an output port for inflation. Id. at col. 6, ll. 28-30.

Reading the '044 patent in the light most favorable to Defendants, the bolster tubes arguably fit within the broad definition of bolster that I have adopted -- a long, cylindrical pillow -- and the bottom layer of tubes could be said to form a "cushioned bottom portion." See '044 patent, Fig. 2. However, the bolster tubes themselves, in addition to the internal tubes, comprise that cushioned bottom portion. Once the outer covering is closed, the bolsters and the other tubes form a single bed with a "level top surface." Id. at col. 4, ll. 27-37. In other words, the complete invention discloses no bolster disposed exteriorly; rather, the bolsters are disposed interiorly.[9]

---

[9] It is not clear from the written description whether the bolster tubes are removable or not, and thus there is a genuine

-43-

e.    '248 patent

The '248 patent, entitled "Dog Bed or the Like," discloses a pet bed comprised of an annular bolster lying atop a circular bottom mattress.  '248 patent at col. 1, ll. 50-52.  The bolster is covered with a sheet of fabric that extends down from the periphery of the bolster to form a pocket for the mattress.  <u>Id.</u> at col. 2, ll. 6-15.  This sheet is stitched to the bolster, but has an opening through which the mattress may be inserted or removed.  <u>Id.</u> at col. 2, ll. 9, 28-34.  A reversible mattress cover stretched on a wire ring may be inserted on top of the mattress to keep the mattress clean.  <u>Id.</u> at col. 2, l. 35 - col. 3. l. 16.

This patent does not anticipate the '502 patent because the bolster is positioned on top of the bottom cushion and the bolster does not appear to be removable.  The drawings clearly show the annular bolster resting entirely on top of the mattress.  '248 patent, Figs. 1-6.  The specification also describes the size of the sheet forming the mattress pocket as "approximately the same shape and size as the outer periphery of the annular bolster."  <u>Id.</u> at col. 2, ll. 6-8.  There is no suggestion in the patent that the bolster extends beyond the periphery of the mattress.

The bolster is made by using a cotton packer with a fan or

_____

issue of material fact on this point.  Because I have found that the '044 patent does not meet the limitation that the bolster be disposed exteriorly, however, the '044 patent cannot be anticipatory.

blower to stuff a fabric tube with cotton or other filler
material and sewing the ends shut to form an annular bolster.
Id. at col. 1, l. 54 - col. 2, l. 6.  The cover sheet containing
the mattress pocket is then sewn to the bolster.  Id. at col. 2,
ll. 6-15.  Although the mattress can be inserted into and removed
from the outer covering, the specification says nothing about
removing the bolster.  Indeed, it appears to be sewn shut and
sewn into the outer covering.

Defendants argue that the bolster can be "removed" by simply
extracting the filler material, and by logical extension, it can
be inserted by repacking the bolster.  In order to accomplish
this, the user would have to tear the seams of the bolster cover
and would, at least in the preferred embodiment, need access to a
cotton packer with a fan or blower.  The claims and the
specification of the '502 patent, suggest that "removably
disposed" means, at a minimum, that the bolster can be taken out
of the outer cover and reinserted without destroying it or
requiring industrial tools.[10]  Thus, the '248 patent, does not
contain a bolster "removably disposed within the interior of the
outer covering" and does not anticipate the '502 patent.

In sum, none of the cited references presents a genuine

_____

[10] The '502 patent specification describes removal as
"withdrawing the bolster through the reclosable access opening"
and replacing it through the same opening either with the
original bolster or a new one.  '502 patent at col. 3, ll. 12-18.
This makes for easier washing of the cover and bolster, as
compared to the situation presented by the '248 patent in which
"the fill is not accessible and cannot be replaced without
replacing the entire fabric."  Id. at col. 1, ll. 54-56.

issue of material fact as to anticipation of the '502 patent.

2.  §103

Under §103, a patent is considered "obvious" if "the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  35 U.S.C. §103.

The ultimate conclusion of obviousness is a question of law for the court to decide, but several factual findings will underlie this determination.  Akamai, 344 F.3d at 1195 (citing Graham v. John Deere Co., 383 U.S. 1, 17-18 (1966)).  These factual findings include the "scope and content of the prior art, the level of ordinary skill in the field of the invention, the differences between the claimed invention and the prior art, and any objective evidence of nonobviousness."  Id.  Objective evidence, or "secondary considerations" include long-felt, but unresolved need, commercial success, and failure of others.  Graham, 383 U.S. at 17-18.

"The genius of invention is often a combination of known elements which in hindsight seems preordained."  McGinley v. Franklin Sports, Inc., 262 F.3d 1339, 1351 (Fed. Cir. 2001).  In order to prevent hindsight invalidation of patent claims that involve a combination of prior art references, "there must be some teaching, suggestion, or motivation to combine the references."  Akamai, 344 F.3d at 1196.  When the invention involves relatively simple technology, as is the case here, "the opportunity to judge by hindsight is particularly tempting."

-46-

McGinley, 262 F.3d at 1351.  Consequently, the test for a
suggestion or motivation to combine must be rigorously applied
against the clear and convincing standard.  Id.

     The test for obviousness when an invention combines two or
more known elements, is simply stated: "whether there is
something in the prior art to suggest the desirability, and thus
the obviousness, of making the combination."  Id. (quoting
Lindemann Maschinenfabrik GMBH v. American Hoist and Derrick Co.,
730 F.2d 1452, 1462 (Fed. Cir. 1984)).  The suggestion to combine
may derive from the nature of the problem, but "more often it
comes from the teachings of the pertinent references, or from the
ordinary knowledge of those skilled in the art that certain
references are of special importance in a particular field."
Akamai, 344 F.3d at 1196 (internal citations omitted).  The
inquiry is informed by the Graham factors mentioned above: the
scope and content of the prior art, the level of skill in the
art, and the differences between the claims in suit and the prior
art.  McGinley, 262 F.3d at 1351-52.

     Doskocil contends that claim 1 of the '502 patent is obvious
in light of the prior art.  First, it points to the Henry patent
for a bolster made from filler material contained within its own,
separate liner, '843 patent at col. 2, ll. 44-53.  From this, it
argues that the removability of the bolster from within the outer
covering is an obvious limitation.  Second, it notes that the
'248 patent discloses an optional, removable mattress cover for
keeping the mattress clean.  '248 patent at col. 1, ll. 5-16.

Finally, it contends that the '350 patent discloses each of the limitations of claim 1 of the '502 patent: a bolstered pillow with an outer covering, a removable cushion disposed within the outer covering to form a cushioned bottom portion, and a removable bolster disposed exteriorly about at least a portion of the perimeter of the bottom portion.

Dallas builds on Doskocil's argument, claiming that any differences between the '502 patent and the allegedly anticipatory prior art cited by Defendants is slight. Dallas argues that motivation to combine here comes from the nature of the problem to be solved. The '502 patentee addressed the problem of assembling a comfortable and washable pet bed which would satisfy "the animal's reluctance to quit the family sofa." '502 patent at col. 1, ll. 9-63. From this, Dallas contends that pet beds and human furniture are related and form the basis of the problem to be solved. Dallas claims that it was also well-known in the art at the time of the invention that animals, such as dogs, prefer to recline against supporting structures. Accordingly, it argues, the inquiry into motivation to combine should look to furniture, bedding, and animal bed references. Id.

Flexi-Mat responds that Defendants' arguments declare individual claim limitations to be obvious without considering the patent claim as a whole. See, e.g., Environmental Designs, Ltd. v. Union Oil Co., 713 F.2d 693, 698 (Fed. Cir. 1983)). Flexi-Mat also points to secondary considerations as evidence of

nonobviousness.  James Elesh, the President of Flexi-Mat,
explained in his Declaration that there was a need in the
industry for a pet bed of the type described and claimed in the
'502 patent.  Elesh Declaration at ¶¶ 3-5.  Elesh also described
the commercial success of the '502 patent bed: from "July 2000 to
June 2005, Flexi-Mat's sales of bolster beds totaled in excess of
150,000 units and $7.5 million."  Id. at ¶ 6.  Additionally,
Flexi-Mat offers as evidence of copying, Elesh's claims that
Flexi-Mat had settled disputes with four companies who copied the
'502 patent bed.  Id. at ¶ 7.

    Beginning with the first Graham factor, the scope and
content of prior art, it is clear that each element of claims 1-3
of the '502 patent, was previously disclosed, and several of the
elements were disclosed by more than one reference.  The Henry
patent alone teaches a pet bed with a bottom cushion; a bolster
pillow, albiet two of them located on top; and removable,
washable, covers with zippered openings.  '843 patent at Fig. 5;
col. 2 at ll. 47-56.  The '513 patent discloses a single bolster
on top of a bottom pillow with an arguable suggestion that the
bolster could be positioned alongside the bottom cushion.  '513
patent at Abstract; col. 2, ll. 54-60.  The walled pet beds
clearly disclose walls positioned exteriorly along the perimeter
of the bottom cushions.  See '981, '393, '537 patents.

    The second Graham factor is the level of ordinary skill in
the field of the invention.  At the time the patent was filed,
the inventor of the '502 pet bed, who had a bachelor's degree in

-49-

accounting, had been in the furniture business for about six years.  <u>See</u> Haugh Depo at 6-9 (Docket No. 105, Ex. D).  He had experience designing novelty-type furniture, such as bean bag chairs, futons, and ottomans, but he had never before designed a pet bed.  <u>Id</u>.  Given the simple technology involved in the '502 patent, there does not appear to be a high level of ordinary skill in the art.

Turning to the third <u>Graham</u> factor, differences of varying degrees exist between the claimed invention and the prior art. The difference between the Henry bed and the '502 bed are: (1) the number of bolsters -- two instead of one; (2) the placement of the bolsters -- on top as opposed to alongside the bottom cushion; and (3) the nature of the outer covering -- individual covers as opposed to a single covering.  The '248 patent discloses a pet bed, but it has an annular bolster resting on top of the bottom cushion that is securely affixed to the bottom cushion.  The walled pet beds differ from the '502 patent primarily in only one feature: the presence of a bolster instead of a wall.  The '513 patent differs from the '502 patent in that it is intended for human use, its bolster is straight rather than curved into a banana shape, and the bolster appears to rest on top of the bottom cushion.  The '350 patent is similarly distinguishable.  The bumper sheets of the '734 and '228 patents contain bolsters, but they lie on top of the bed in order to keep people from falling.  The air bed disclosed by the '044 patent has bolsters, but is otherwise unrelated to the '502 patent.

The fourth <u>Graham</u> factor concerns secondary evidence of non-obviousness.  The fact that Flexi-Mat sold over 150,000 bolster pet beds in five years for $7.5 million is evidence of some commercial success, and therefore, indicative of nonobviousness.[11]  Elesh claims that the '502 pet bed launched a new luxury pet bed niche, which also weighs in favor of nonobviousness.  Elesh Decl. at ¶ 6.  The fact that other companies have copied the '502 patent is also probative of nonobviousness, but because neither the agreements nor any descriptions of the accused products were submitted for consideration in this motion for summary judgment, the extent of the copying is not clear.

Finally, I turn to the question of motivation or suggestion to combine.  There is no explicit suggestion in the prior art to combine the limitations of an outer covering with a zippered opening, a removable bottom cushion, and a removable bolster disposed exteriorly about a portion of the bottom cushion.

---

[11]Defendants argue that these sales figures are irrelevant to the determination of nonobviousness because Flexi-Mat presents no evidence of a causal nexus between the revenue and the '502 patent.  <u>See</u> <u>Merck & Co., Inc., v. Teva Pharmaceuticals USA, Inc.</u>, 395 F.3d 1364, 1376-77 (Fed. Cir. 2005) (stating that commercial success alone is not probative of nonobviousness; a causal relationship between an invention and commercial success is required).  However, the nexus is clear where, as here, the revenue was reportedly generated directly from sales of the patented invention and there are no alleged market distortions.  <u>Cf.</u> <u>id.</u> (finding that commercial success was an inappropriate measure of obviousness when others were legally barred from commercially testing similar ideas disclosed in prior art); <u>Iron Grip Barbell Co., Inc. v. USA Sports, Inc.</u>, 392 F.3d 1317, 1324 (Fed. Cir. 2004) (requiring "affirmative evidence of a nexus where the evidence of commercial success is a license").

However, as discussed above, each of these elements is disclosed in the prior art.  The desirability of an easy-to-clean circular-shaped pet bed consisting of a bottom mattress, a bolster, and a form of outer covering has been known in the art since at least 1936.  <u>See</u> '248 patent at col. 1, ll. 1-11; col. 2, ll. 13-14. In light of this well-known need, one of ordinary skill in the art could have been motivated to combine the washable covering disclosed by several patents, <u>see</u>, <u>e.g.</u>, the '248 patent, Henry, and walled bed patents, with a single bolster variation of the Henry patent, <u>see</u> '843 patent at Fig. 5, in the exterior position disclosed by the walled pet beds.  Whether Defendants can clearly and convincingly demonstrate the existence of such a motivation is a question of fact that a reasonable jury could, on these facts, resolve in favor of either party.  See <u>McGinley</u>, 262 F.3d 1339 at 1351.

In sum, after considering the <u>Graham</u> factors and the motivation to combine, I find the issue of obviousness cannot be resolved on summary judgment.[12]

---

[12] The foregoing discussion focused on claim 1 of the '502 patent, but it also applies to dependent claims 2 and 3.  Claims 2 and 3 add to claim 1 the limitations of an outer covering with a reclosable access opening and a zippered opening, respectively. A reclosable outer opening and a zippered opening are repeatedly disclosed in the prior art, <u>see, e.g.</u>, '843 patent at col. 2, l. 50, and a tenable case for obviousness can be made.  However, the case is not so strong that a reasonable jury would be unable to find in favor of Flexi-Mat.  Therefore, I deny both parties' motions for summary judgment on claims 2 and 3.

3.    §112

     Defendants contend that claims 1-3 are invalid for failure

to comply with the requirement of §112 that the patent contain a

written description sufficient to enable it to be made and used.

Whether a claim complies with the written description

requirements is a question of fact.   Invitrogen Corp. v. Clontech

Laboratories, Inc., 429 F.3d 1052, 1072 (Fed. Cir. 2005).

     Section 112 mandates that the specification

          contain a written description of the invention, and of
          the manner and process of making and using it, in such
          full, clear, concise, and exact terms as to enable any
          person skilled in the art to which it pertains, or with
          which it is most nearly connected, to make and use the
          same, and shall set forth the best mode contemplated by
          the inventor of carrying out his invention.

35 U.S.C. §112.  With respect to the claims, §112 requires that

they "particularly point[] out and distinctly claim[] the subject

matter which the applicant regards as his invention."   Id.

     A broad claim is invalid under §112 "when the entirety of

the specification clearly indicates that the invention is of a

much narrower scope."   Cooper Cameron Corp. v. Kvaerner Oilfield

Products, Inc., 291 F.3d 1317, 1323 (clarifying the holding in

Gentry Gallery, Inc. v. Berkline Corp., 134 F.3d 1473 (Fed. Cir.

1998)).   In other words, "claims may be no broader than the

supporting disclosure."   Id. (quoting Gentry, 134 F.3d at 1479).

     Defendants contend that claim 1 is overly broad because it

does not specify that the bolster must be affixed or secured to

the outer covering.   Their argument is as follows.  Claim 1

contains the express limitation that "substantially all of said

-53-

bolster [be] disposed exteriorly about at least a portion of the perimeter of the bottom portion without being secured to the removable cushion," but it specifies no means for maintaining the bolster in this position.  '502 patent at col. 3, ll. 43-46.  The specification, however, repeatedly describes the bolster as "removably affixed" and discloses several means for affixing: hook and loop fasteners, ties or straps with snaps or buckles. Id. at col. 2, ll. 61-65.  The specification does not teach or suggest that the bolster can remain in position without being secured.  Because claim 1 omits the requirement that the bolster be affixed, it is broader than the specification, and is invalid.

Flexi-Mat counters that a removably affixed bolster is merely the preferred embodiment.  It points to the following language in the specification as evidence that the patentee contemplated other forms of the invention: "In one form of the invention, the bolster may be removably affixed."  '502 patent at col. 2, ll. 7-8.  Flexi-Mat claims that the pocket itself holds the bolster in position, and that affixing it, while preferred, is not required.  Id. at col. 3, ll. 1-7.  Flexi-Mat's expert opined that the bolster pockets could perform this function. Handelsman Validity Rep. at 26 (Docket No. 81, Ex. 16).

Ultimately, I find the specification supports the broad language of claim 1.  To be sure, the Summary of the Invention -- which is not, of course, a preferred embodiment but a concise description of the entire claimed invention as conceived at the time of the filing -- specifically describes the bolster as

-54-

"removably affixed to the interior of the outer covering."[13]  Id.
at col. 2, ll. 2-3.  The Detailed Description of the Invention
also describes the bolster as "removably affixed," and Figure 5
depicts it as such.  Id. at col. 2, ll. 51-52.  The specification
explains that removably affixing the bolster lends structural
integrity to the pet bed, thereby giving it a "distinct
advantage" over the prior art.  Id. at col. 2, l. 35; col. 3, ll.
1-3.  Mr. Haugh, the inventor of the '502 pet bed, explained in
his deposition that the purpose of including the straps was to
"hold the bolstered pillow in position."  Haugh Depo. at 29
(Docket No. 104, Ex. D).

    Nevertheless, although removably affixing the bolster
clearly plays an important role in at least one embodiment of the
invention, the figures and the wording of the specification do
not necessarily foreclose the possibility that the bed could be
made without the fasteners.  The bolster pocket appears to be
constructed so as to hold the bolster against the side of the
bottom cushion, suspended at an angle.  See '502 patent, Fig. 4.
This may not be the preferred embodiment or the best mode of the
invention, but it appears to fit within the claims and the
specification.

_____

    [13] The Summary of the Invention "should, when set forth, be
commensurate with the invention as claimed and any object recited
should be that of the invention as claimed... The brief summary,
if properly written to set out the exact nature, operation, and
purpose of the invention, will be of material assistance in
aiding ready understanding of the patent in future searches."
Manual of Patent Examining Procedure, §608.01(d)(2004).

The test for sufficiency of the written description under §112 turns on the "entirety of the specification." <u>Cooper Cameron</u>, 291 F.3d at 1323.  The specification here fairly encompasses a pet bed with an unaffixed bolster.  I will, therefore, grant summary judgment for Flexi-Mat on the issue of enablement.

## V. CONCLUSION

For the reasons set forth more fully above,

I DENY Flexi-Mat's motion for summary judgment as to infringement, and conversely, I GRANT Defendants' motion for summary judgement of non-infringement;

I GRANT Flexi-Mat's motion for summary judgment as to validity based upon anticipation and enablement challenges and DENY Defendants' cross-motion on these issues; and

I DENY the parties' motions for summary judgment with respect to obviousness.

<u>/s/ Douglas P. Woodlock</u>
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

APPENDIX: Claim construction summary

| Term | Court Construction |
|------|--------------------|
| outer covering | an article for receiving and enclosing both the removable bottom cushion and the removable bolster within an interior space such that the two pillows communicate with each other |
| substantially all | largely, but not wholly, the totality of the bolster |
| disposed exteriorly about at least a portion of the perimeter of the bottom portion | positioned alongside the surface of the outer edge of the bottom cushion<br><br>§112, ¶ 6 does not apply |
| bolster | long, cylindrical pillow |
| wall | vertically oriented structure |
| bolster removably disposed | bolster may be taken out and reinserted without being destroyed or requiring industrial tools |